2024-1219

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ILSENBURGER GROBBLECH GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, AND SALZGITTER MANNESMANN INTERNATIONAL GMBH,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

Appeal from the United States Court of International Trade
in Case No. 1:17-CV-00158
Judge Leo Gordon

### BRIEF OF PLAINTIFFS-APPELLANTS
ILSENBURGER GROBBLECH GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, AND SALZGITTER MANNESMANN INTERNATIONAL GMBH

**NON-CONFIDENTIAL VERSION**

David E. Bond
Ron Kendler
Allison Kepkay
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

February 2, 2024

Counsel to Plaintiff-Appellants Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH

FORM 9. Certificate of Interest Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2024-1219 |
| **Short Case Caption** | AG der Dillinger Huttenwerke v. US |
| **Filing Party/Entity** | Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH,  Salzgitter Mannesmann International GmbH |

**Instructions:**

1.  Complete each section of the form and select none or N/A if appropriate.

2.  Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3.  In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4.  Please do not duplicate entries within Section 5.

5.  Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Signature:   /s/ David E. Bond

Date: February 2, 2024          Name:   David E. Bond

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Ilsenburger Grobblech GmbH | | Wholly-owned (directly or indirectly) by Salzgitter AG, a publicly traded entity. |
| Salzgitter Flachstahl GmbH | | Wholly-owned (directly or indirectly) by Salzgitter AG, a publicly traded entity. |
| Salzgitter Mannesmann Grobblech GmbH | | Wholly-owned (directly or indirectly) by Salzgitter AG, a publicly traded entity. |
| Salzgitter Mannesmann International GmbH | | Wholly-owned (directly or indirectly) by Salzgitter AG, a publicly traded entity. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑   None/Not Applicable            ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☑   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable            ☐   Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

Pursuant to Federal Circuit Rules 25.1(d) and 25.1(e)(1)(B), this brief contains confidential material that has been omitted. The material omitted on pages 8, 14, 21 and 25 identifies Salzgitter's sales information. The material omitted on page 16 identifies production processes and one of Salzgitter's CONNUM numbers. The material omitted on page 43 identifies dumping margin information.

## TABLE OF CONTENTS

STATEMENT OF RELATED CASES ................................................................1

JURISDICTIONAL STATEMENT ...............................................................2

STATEMENT OF THE ISSUES.....................................................................3

STATEMENT OF THE CASE ........................................................................5

SUMMARY OF THE ARGUMENT ...........................................................20

ARGUMENT .................................................................................................23

I.    STANDARD OF REVIEW .....................................................................23

II.    ARGUMENT.............................................................................................23

    A.    The Department's Decision to Apply Facts Available Was Not Supported by Substantial Evidence........................................23

        1.    Legal Standard ....................................................................23

        2.    Salzgitter's responses to the Department's requests for data and information were fully responsive .......................24

        3.    Salzgitter satisfied all elements of § 1677m(e) ..................27

            a.    SMSD's sales information was "submitted by the deadline established for its submission"........................28

            b.    SMSD's sales information "could be" verified..............29

            c.    SMSD's sales information was "not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination".........................................29

i

d.      SMSD demonstrated that it "acted to the best of its ability" ............................................................... 31

e.      SMSD's information could have been used without "undue difficulties" ................................................ 32

B.    The Department's Decision to Apply an Adverse Inference Was Not Supported by Substantial Evidence ............................... 32

1.    Legal Standard ..................................................... 32

2.    The Department's determination that Salzgitter did not cooperate to the best of its ability was not supported by substantial evidence .......................................... 33

3.    The CIT incorrectly upheld the Department's application of an adverse inference ..................................... 37

C.    The Department's Selection of Partial AFA Was Unsupported by Substantial Evidence and Contrary to Law ............................... 40

1.    Legal Standard ..................................................... 40

2.    The Department unjustifiably disregarded verified pricing data for the sales in the Separate Database, which did not address the gap regarding the manufacturer for those sales ................................ 40

3.    The data used by the Department as partial AFA was aberrational ...................................................... 42

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ............................... 45

ADDENDUM .................................................................... 46

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AG der Dillinger Hüttenwerke v. United States*,
399 F. Supp. 3d 1247 (July 16, 2019) ............................................................ passim

*AG der Dillinger Hüttenwerke v. United States*,
534 F. Supp. 3d 1403 (Ct. Int'l Trade 2021) .................................................. 5, 17

*AG der Dillinger Hüttenwerke v. United States*,
648 F. Supp. 3d 1321 (Ct. Int'l Trade 2023) ............................................ 5, 6, 18

*Am. Silicon Techs. v. United States*,
334 F.3d 1033 (Fed Cir. 2003) .......................................................................... 23

*China Steel Corp. v. United States*,
264 F. Supp. 2d 1339 (Ct. Int'l Trade 2003) ............................................... 31, 33

*Dillinger France S.A. v. United States*,
350 F. Supp. 3d 1349 (Ct. Int'l Trade 2018) ............................................... passim

*Dillinger France S.A. v. United States*,
393 F. Supp. 3d 1225 (Ct. Int'l Trade 2019) .................................................... 17

*F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*,
216 F.3d 1027 (Fed. Cir. 2000) ........................................................................ 40

*Gallant Ocean (Thail.) Co. v. United States*,
602 F.3d 1319 (Fed. Cir. 2010) ........................................................................ 44

*Hyundai Steel Co. v. United States*,
319 F. Supp. 3d 1327 (Ct. Int'l Trade 2018) .................................................... 42

*Jiangsu Changbao Steel Tube Co. v. United States*,
884 F. Supp. 2d 1295 (Ct. Int'l Trade 2012) .................................................... 32

*JTEKT Corp. v. United States*,
642 F.3d 1378 (Fed. Cir. 2011) ........................................................................ 23

*Maverick Tube Corp. v. United States*,
857 F.3d 1353 (Fed. Cir. 2018) ........................................................................ 39

*NEC Home Elecs. v. United States*,
   54 F.3d 736 (Fed. Cir. 1995) ....................................................38

*Nippon Steel Corp. v. United States*,
   337 F.3d 1373 (Fed. Cir. 2003) ............................................32, 35

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006) ................................................26

*Shandong Huarong Mach. Co. v. United States*,
   435 F. Supp. 2d 1261 (Ct. Int'l Trade 2006) ..........................40

*SKF USA Inc. v. United States*,
   630 F.3d 1365 (Fed. Cir. 2011) ................................................37

*Tung Fong Indus. Co. v. United States*,
   318 F. Supp. 2d 1321 (Ct. Int'l Trade 2004) ......................31, 33

*Viraj Group v. United States*,
   476 F.3d 1349 (Fed. Cir. 2007) ................................................23

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
   716 F.3d 1370 (Fed. Cir. 2013) ................................................33

*Zhejiang Dunan Hetian Metal Co. v. United States*,
   652 F.3d 1333 (Fed. Cir. 2011) ................................................41

## STATUTES AND REGULATIONS

19 U.S.C. § 1677e(a)................................................................23

19 U.S.C. § 1677e(b) ..................................................................3

19 U.S.C. § 1677e(b)(1)(A) ......................................................32

19 U.S.C. § 1677m(d)..............................................3, 20, 23, 25

19 U.S.C. § 1677m(e) ........................................................passim

19 U.S.C. § 1677m(e)(1)..........................................................28

19 U.S.C. § 1677m(e)(5)..........................................................32

28 U.S.C. § 1295(a)(5)................................................................2

28 U.S.C. § 1581(c) ................................................................................2

## LEGISLATIVE MATERIALS

Uruguay Round Agreements Act,
   H.R. Rep. No. 103-826(I),
   reprinted in 1994 U.S.C.C.A.N. 4040.................................................28

Uruguay Round Agreements Act,
   H.R. Rep. No. 103-826(I),
   reprinted in 1994 U.S.C.C.A.N. 4040.................................................40

## ADMINISTRATIVE DETERMINATIONS

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany*,
   82 Fed. Reg. 16,360 (Dep't Commerce Apr. 4, 2017)................................passim

*Certain Cut-To-Length Carbon-Quality Steel Plate Products from Japan*,
   64 Fed. Reg. 73,215 (Dep't Commerce Dec. 29, 1999)...............................26, 36

## <u>STATEMENT OF RELATED CASES</u>

In accordance with Rule 47.5 of the Rules of this Court, counsel for Plaintiffs-Appellants, Ilsenburger Grobblech GmbH ("ILG"), Salzgitter Mannesmann Grobblech GmbH ("MGB"), Salzgitter Flachstahl GmbH ("SZFG"), and Salzgitter Mannesmann International GmbH ("SMID") (collectively, "Salzgitter"), make the following statement:

1.　　No other appeal in or from the same civil action or proceeding in the lower court or body was previously before this Court or any other appellate court.

2.　　No other action pending before the Court of International Trade ("CIT") may be directly affected by the Court's disposition of this appeal.

## JURISDICTIONAL STATEMENT

The consolidated actions filed, in part, by Plaintiffs-Appellants Ilsenburger Grobblech GmbH ("ILG"), Salzgitter Mannesmann Grobblech GmbH ("MGB"), Salzgitter Flachstahl GmbH ("SZFG"), and Salzgitter Mannesmann International GmbH ("SMID") (collectively, "Salzgitter") before the CIT, *AG der Dillinger Hüttenwerke v. United States*, Consol. Ct. No. 17-00158, which resulted in this appeal, contested certain aspects of the Department of Commerce's ("Department") final antidumping duty ("ADD") determination in *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany*, 82 Fed. Reg. 16,360 (Dep't Commerce Apr. 4, 2017) (final AD determ.) ("*Final Determination*"). The CIT had exclusive jurisdiction over Salzgitter's complaint under 28 U.S.C. § 1581(c).

On November 15, 2023, the CIT granted Salzgitter's motion for partial judgment and issued the judgment from which this appeal was taken pursuant to CIT Rule 54(b).

Salzgitter timely filed its notice of appeal on November 28, 2023.

This Court has exclusive jurisdiction over appeals from final decisions of the CIT under 28 U.S.C. § 1295(a)(5).

## STATEMENT OF THE ISSUES

**Issue 1:**  Was the Department's use of facts available ("FA"), pursuant to 19 U.S.C. §§ 1677e(a), 1677m(d), and 1677m(e), in relation to allegedly incomplete information regarding the manufacturer for sales by Salzgitter's affiliated reseller supported by substantial evidence and otherwise in accordance with law?  More specifically, was the Department's determination that Salzgitter's responses and explanations were not satisfactory under § 1677m(d), and therefore, that there was a need to use FA, supported by substantial evidence and in accordance with law?  If so, was the Department's determination that it may decline to consider Salzgitter's information under § 1677m(e) supported by substantial evidence and otherwise in accordance with law?

**Issue 2:**  If the Department was justified in using FA with respect to the manufacturer information for the sales by Salzgitter's affiliated reseller, was the Department's use of an adverse inference in selecting from the facts available, pursuant to 19 U.S.C. § 1677e(b), supported by substantial evidence and otherwise in accordance with law?

**Issue 3:**  Was the Department's choice of partial adverse facts available ("AFA") with respect to the manufacturer information sales by Salzgitter's affiliated reseller supported by substantial evidence and otherwise in accordance with law?  More specifically, was the Department permitted to disregard verified data regarding

sales prices as AFA for missing manufacturer information?  If so, was the price data used by the Department aberrational and therefore not supported by substantial evidence and otherwise not in accordance with law?

## <u>STATEMENT OF THE CASE</u>

The Department issued the *Final Determination* of the ADD investigation on Certain Carbon and Alloy Steel Cut-to-Length Plate ("CTL plate") from Germany on March 29, 2017. Appx9-12 (*Final Determination*); Appx1-8 (*ADD Order*); Appx14-112 (*Final Issues & Decision Memo*). Salzgitter, as well as the other mandatory respondent in the case, AG der Dillinger Hüttenwerke ("Dillinger"), separately appealed the *Final Determination* to the CIT. The appeals were consolidated into *AG der Dillinger Hüttenwerke v. United States*, and the CIT's decisions resulted in a series of remands to the Department.

The CIT's decision in *AG der Dillinger Hüttenwerke v. United States*, 399 F. Supp. 3d 1247 (Ct. Int'l Trade 2019) ("*Dillinger I*") sustained the Department's decision to apply partial AFA to Salzgitter in the *Final Determination*. Appx113-123. The CIT issued *AG der Dillinger Hüttenwerke v. United States*, 534 F. Supp. 3d 1403 (Ct. Int'l Trade 2021) ("*Dillinger II*") following the Department's Final Results of Redetermination Pursuant to Court Remand ("*First Remand Results*"). Appx129-140 (*Dillinger II*); Appx124-128 (*First Remand Results*). The CIT issued *AG der Dillinger Hüttenwerke v. United States*, 648 F. Supp. 3d 1321 (Ct. Int'l Trade 2023) ("*Dillinger III*") following the Department's Final Results of Redetermination Pursuant to Court Remand ("*Second Remand Results*"). Appx199-214 (*Dillinger III*); Appx141-198 (*Second Remand Results*).

5

The CIT granted Salzgitter's motion for partial judgment under CIT Rule 54(b), determining that *Dillinger III* was conclusive as to Salzgitter's appeal of the *Final Determination*.  Appx215-219.  Accordingly, in a separate judgment, the CIT sustained the Department's determination with respect to Salzgitter in the *Final Determination* and *Second Remand Results*.  Appx220-221.[1]

**The Department's ADD Investigation of CTL Plate from Germany**

On April 8, 2016, ArcelorMittal USA LLC, Nucor Corporation, and SSAB Enterprises, LLC ("Petitioners") submitted an ADD petition concerning CTL plate from twelve countries, including Germany.  Appx252-253.  The Department subsequently initiated the investigation, selecting Salzgitter as a mandatory respondent; Salzgitter was therefore required to respond to the antidumping questionnaire ("*Initial Questionnaire*").  Appx278 (*Respondent Selection Memo*); Appx281 (*Initial Questionnaire*).

*Salzgitter's Initial Questionnaire Response and Sales Reporting Methodology*

The *Initial Questionnaire* asked Salzgitter to report sales of CTL plate during the period of investigation ("POI") to the United States and in Germany (its home

---

[1]  Pursuant to Federal Circuit Rule 28(a)(11), the CIT's and the Department's decisions are attached hereto in the Addendum.  Additionally, pursuant to Federal Rule of Appellate Procedure 28(f), because this Court's "determination of the issues presented requires the study of statutes, rules, regulations, etc.," the Addendum also includes relevant statutes and regulations.

market).   Appx315-319, Appx341-342.   Among other information, the *Initial Questionnaire* requested Salzgitter to report the gross unit price and identify the manufacturer for each sale.  Appx326, Appx338, Appx352, Appx371.

Ten Salzgitter companies responded to the *Initial Questionnaire* (eight in Germany and two in the United States).  Appx5742, Appx6432.  Among the German companies, three were CTL plate manufacturers and five were resellers.  Salzgitter Mannesmann Stahlhandel GmbH ("SMSD") was one of the German resellers.  Appx5742.  SMSD and the other resellers were required to report their resales of CTL plate manufactured by, and purchased from, Salzgitter.

In the ordinary course of business and in accordance with customers' requirements, Salzgitter's manufacturing companies issued mill test reports ("MTRs") that identified the manufacturer and provided information regarding the physical properties of the product.  *See* Appx7107-7111.  In contrast, resellers such as SMSD typically did not provide MTRs because their customers did not require them.  As a result, the electronic systems used by SMSD in the ordinary course of business were not capable of identifying the manufacturer of the CTL plate that it resold.  Appx6789-6790.

Consequently, to respond to the Department's request for a sales database containing the manufacturer of each sale (among other information), SMSD devised a method to identify the manufacturer by linking information kept in two separate

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

electronic systems that were used for other purposes in the ordinary course of business. Appx6789-6790, Appx7107-7111. During the POI, SMSD made 105,000 sales in Germany, covering [Number ] metric tons ("MT") of CTL plate. By maximizing its ability to use the information recorded in the ordinary course of business, it identified the manufacturer for 77,000 sales accounting for [ Number] MT, which was [ No] percent of its home-market sales volume.[2] Appx11351-11378. SMSD was unable to identify the manufacturer for 28,000 sales accounting for [Number] MT, which was [No] percent of its home-market sales volume. Appx8237, Appx8331-8346. Thus, through the efforts SMSD took to respond to the *Initial Questionnaire*, it identified the manufacturer for a large number of its resales, but not all of them. Salzgitter therefore explained in its response that it did not report home-market sales by SMSD if it was not possible to determine the manufacturer using the electronic linkage described above. Appx5742-5743.

SMSD's resales accounted for only a portion of the data that Salzgitter and its affiliated companies reported with respect to home-market sales. Altogether, Salzgitter reported 184,000 home-market sales accounting for [         ] MT of CTL plate. Appx11351-11378.

---

[2] Numbers relating to the number and volume of SMSD's home-market sales have been rounded to the nearest thousand.

### *First Supplemental Sections B/C Questionnaire*

In the *First Supplemental Sections B/C Questionnaire*, the Department acknowledged that Salzgitter "did not report the downstream sales made by SMSD because it could not identify the manufacturer of the CTL plates sold unless it performed a burdensome manual check." Appx6756-6757. The Department asked Salzgitter to report the "downstream sales" of Salzgitter CTL plate, but also stated that "{i}f Salzgitter is unable to link all of its sales of subject merchandise to SMSD to SMSD's resales, {it should} explain in detail how each entity tracks the merchandise through all of its sale and record-keeping process, and why certain sales cannot be traced to the manufacturer." Appx6757.

As requested, in preparing the *First Supplemental B/C Response*, Salzgitter verified that it had reported all sales by SMSD of CTL plate that could be identified using its electronic systems as having been manufactured by Salzgitter mills. Salzgitter also explained that "steel trading businesses {such as SMSD} traditionally do not systemically track the producer/supplier of the product they are selling," because customers normally do not "require the knowledge of the original supplier." Appx6789, Appx7107. Salzgitter further explained how SMSD tracked CTL plate through its sales and inventory systems, and why certain sales could not be traced electronically to the MTR and, ultimately, the manufacturer. Appx6789-6790. Finally, Salzgitter offered to report complete information regarding the SMSD

resales for which the manufacturer could not be identified electronically, except for the manufacturer.  Appx6789.

### *Third Supplemental Sections B/C Questionnaire*

In the *Third Supplemental Sections B/C Questionnaire*, the Department repeated itself, requesting that Salzgitter submit a revised home-market database including "all SMSD resales of Salzgitter CTL plate made during the POI." Appx8032.  The Department appeared to disregard the explanation that Salzgitter had provided twice before that it was not possible, with the resources and time available, to determine manually the manufacturer for the SMSD resales that were not included in the previously-submitted home-market sales database.  Therefore, in the *Third Supplemental B/C Response*, Salzgitter again explained that it had already provided the requested information to the extent possible.  Appx8044-8046.

### *Preliminary Determination and Fifth Supplemental B/C Response*

In the *Preliminary Determination*, the Department concluded:

Salzgitter did not comply with our requests for information . . . . Specifically, although Salzgitter contends that identifying all SMSD sales of Salzgitter-produced merchandise would be unreasonably burdensome, Salzgitter stated it could report SMSD's sales where the manufacturer could not be identified.  However, it failed to do so. Accordingly, we are applying facts available, in part, with an adverse inference, to account for SMSD's unreported downstream sales . . . .

Appx8213.  Thus, while the Department acknowledged Salzgitter's statements regarding the practical impossibility of manually reviewing information for the 28,000 sales, it did not address them.  As partial AFA, the Department applied the

"highest net price among the reported sales made by SMSD to all of the sales made by SMSD." Appx8213. The Department calculated a preliminary dumping margin of zero percent for Salzgitter, which was amended to five percent for reasons unrelated to SMSD's ability to report manufacturer information. Appx8225; Appx8348.

After issuing the *Preliminary Determination*, the Department asked Salzgitter to "{r}eport in a separate database all of the resales by SMSD during the period of investigation . . . for which Salzgitter is unable to identify the original manufacturer of the CTL plate." Appx8230. The Department also requested that Salzgitter provide data regarding the total value and volume of CTL plate that SMSD had purchased from each manufacturer during the POI, and the total value and volume of CTL plate that SMSD had sold during the POI by manufacturer. Appx8230.

In the *Fifth Supplemental B/C Response*, Salzgitter submitted a database with the sales for which the manufacturer could not be identified ("Separate Database"). Appx8237. The Separate Database included all information required in the *Initial Questionnaire* with respect to each of the 28,000 transactions, including the sales price. The only information not reported was the manufacturer. Salzgitter also submitted the total volume and value of CTL plate purchased and resold by SMSD by manufacturer. Appx8274-8279. This aggregate information regarding purchases by manufacturer could be extracted from accounting records kept in the ordinary

course of business (unlike the transaction-specific manufacturer information needed for purposes of the home-market sales database). Finally, to further substantiate the practical impossibility of performing a manual check to determine the manufacturer for the 28,000 sales, Salzgitter calculated, based on its experience in preparing the responses to the *Initial Questionnaire*, that for half of those sales it "would take an average of 10 minutes per record to review the certificate, identify the manufacturer, manually enter the information into the home-market sales database, and recheck the correctness of the information," and for the other half, it would take longer. Appx8239-8240. That is, a manual search, while theoretically possible, would take *at least* 4,667 hours, or more than two years for two people working full-time at the task. Appx8238-8240. This work would have been in addition to the work already being performed by teams of personnel at each of the Salzgitter companies to respond to the *Initial Questionnaire* and various supplemental questionnaires and in addition to their work to support the day-to-day operations of the companies.

### *Verification of SMSD's Information*

At verification, the Department verified that SMSD had accurately stated in its various responses that it was impossible to identify the manufacturer for the sales in the Separate Database with the electronic systems used in the ordinary course of business. Appx11313 (The Department "conducted an online review of SMSD's SAP {sales accounting} and CMS {mill test archive} systems and reviewed the

extent to which SMSD tracks the producer of the CTL plate it resells.  Company officials demonstrated that SAP does not maintain producer information."). Moreover, for the sales in the Separate Database, the Department found no instance in which it was possible for SMSD to electronically identify the manufacturer and SMSD failed to do so.  *See* Appx11322-11323.

In addition, the Department verified SMSD's calculation that, on average, it would take 10 minutes to identify manually the manufacturer for each of the 28,000 sales in the Separate Database.  Appx11313 (the Department noted that its "review was consistent with Salzgitter's descriptions at . . . pages 1 – 3 of SQRBC5."); Appx11322-11323; Appx8237-8239 (pages 1-3 of the *Fifth Supplemental B/C Response* describing linking of electronic systems and significant time required to manually collect manufacturer information).

The Department also verified the information reported in the Separate Database, in particular the sales prices for the 28,000 sales.  *See* Appx11322-11323; Appx9463-9513 (Verification Exhibit SMSD-11); Appx9574-9603 (Verification Exhibit SMSD-15).

### *Case Brief*

When calculating a dumping margin, the Department's programs normally compare U.S. and home-market sales of the product under investigation produced by the same manufacturer or "collapsed" group of manufacturers.  Appx11659;

Appx11866; Appx11869. Therefore, using the Department's normal programs, the sales for which SMSD could not identify the manufacturer would not be used in the calculation of Salzgitter's dumping margin. Based on the verified data the Department had for the sales in the Separate Database, Salzgitter proposed three options for integrating the sales in the Separate Database into the overall calculation of Salzgitter's dumping margin:

> **Option 1**: Salzgitter proposed that the Department could use only the home-market sales database, and disregard the Separate Database; that is, the Department could treat all sales in the Separate Database as if they were not Salzgitter-manufactured plate. To implement this option, the Department would have used the home-market sales database with no change.

> **Option 2**: Alternatively, Salzgitter proposed that the Department could combine the Separate Database with the home-market sales database; that is, the Department could treat all sales in the Separate Database as if they were Salzgitter-manufactured plate. Salzgitter provided specific programming language for the Department to use to implement this option.

> **Option 3**: Alternatively, Salzgitter proposed that the Department could combine a portion of the 28,000 sales in the Separate Database with the home-market sales database based on the actual and verified ratio of plate purchased from Salzgitter affiliates versus other mills during the POI ([     ] percent). Under this option, the Department would have treated this percentage of the volume reported for each sale reported in the Separate Database as Salzgitter-sourced plate and include it in the calculation of the dumping margin. Salzgitter provided specific programming language for the Department to use to implement this option as well.

*See* Appx11405-11406, Appx14428-11430; Appx11570-11571.

Salzgitter advocated for the use of Option 3 in particular, because it was based on verified data regarding the actual percentage of SMSD's purchases sourced from Salzgitter's mills, and SMSD's actual sales prices for the sales in the Separate Database. *See* Appx11316; Appx11430. Because this alternative reflected SMSD's actual verified purchases during the POI, and the actual verified prices for the sales at issue, Salzgitter believed it was an accurate approach.

Importantly, ***under any of the three options – using none, all, or some of the sales in the Separate Database, Salzgitter's dumping margin would have been zero***. Appx11570.

**The Department's Final Determination**

In the *Final Determination*, the Department again applied partial AFA, finding that Salzgitter had not "cooperated to the best of its ability." Appx44. The Department contended, without citing to evidence on the record, that the identity of the manufacturer "is the type of information that a respondent should have reasonably anticipated being required to provide to its customers for quality assurance and warranty claims." Appx45. It further dismissed Salzgitter's legal support for its argument that generating manufacturer information would be "unreasonably burdensome" claiming that "technological advancements in records

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

management" since the time of relevant precedent "significantly reduce{} the burden in obtaining the missing information." Appx45.

As partial AFA, the Department "determined the highest non-aberrational net price among all of the downstream sales in the additional SMSD sales database" and assigned that price to all 28,000 of SMSD's sales for which the manufacturer was not identified, ***causing the final dumping margin for Salzgitter to be 22.90 percent, rather than zero***. Appx46. The price selected by the Department related to a sale of a particular product (CONNUM [    CONNUM Number    ] (sequence number NN_03569 in Salzgitter's Separate Database)). Appx8329-8330. The product was further processed by [ Process Description]. *See* Appx6796-6797; Appx8329-8330. Salzgitter explained: "{f}abrication has a profound effect on the cost and price of the product," and "products that have undergone fabrication processes often have very high prices . . . ." Appx5756. The product also had a high scrap ratio, resulting in a high unit price, because of the way in which it was cut. Appx8329-8330; Appx8240.

### *Dillinger I*

In *Dillinger I*, the CIT sustained the Department's decision to apply partial AFA to Salzgitter. Appx122. Nevertheless, the CIT stated it "was confronted with a near identical issue" in *Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349 (Ct. Int'l Trade 2018) ("*Dillinger France I*"), in which the Department had also

used the "highest non-aberrational net price" as partial AFA for sales where the only information missing was the manufacturer and the CIT had remanded the case because "Commerce did not explain what authority permitted it to replace known information {*i.e.*, sales prices} with adverse facts available . . . ." 350 F. Supp. 3d at 1364. On remand in *Dillinger France I*, the Department changed its selection of partial AFA and treated all sales with an unknown manufacturer as produced by the respondent and used the reported sales prices. *See Dillinger France S.A. v. United States*, 393 F. Supp. 3d 1225, 1228 (Ct. Int'l Trade 2019) ("*Dillinger France II*"). Because the facts and issues raised by Salzgitter and in *Dillinger France* were "near identical," the CIT ordered the Department to review whether the approach taken in *Dillinger France* would have a material effect on Salzgitter's dumping margin, and if so, to recalculate Salzgitter's margin using the same approach. Appx123.

In the *First Remand Results*, the Department recalculated Salzgitter's margin using the approach in *Dillinger France* (which was the same approach that Salzgitter had proposed to the Department as Option 2 described above) and assigned it a dumping margin of zero. Appx128.

### ***Dillinger II***

In *Dillinger II*, the CIT again remanded the use of partial AFA with respect to SMSD's sales for the Department to explain why it should be permitted to apply a different AFA methodology to Salzgitter than it applied in *Dillinger France*. *See*

Appx139-140.  In the *Second Remand Results*, the Department concluded that the following differences between Salzgitter and *Dillinger France* justified using a different AFA methodology: "(1) the number of sales lacking the requested manufacturer information; (2) the net prices among the sales with the missing data; and (3) the impact on the margin caused by the respondents' failure to provide the requested information."  Appx197-198.

### *Dillinger III*

In *Dillinger III*, Salzgitter argued that the Department's claimed differences between the facts for Salzgitter and *Dillinger France* were not supported by substantial evidence and that the Department had relied on the application of a different standard to Salzgitter.  In particular, Salzgitter emphasized that the Department's reliance on the number of sales with an unknown manufacturer was not the equivalent analysis performed by the Department in *Dillinger France*, and thus, the Department's conclusion that the number of sales was significant enough to justify a different AFA methodology was inaccurate.  Salzgitter Opp'n Remand Comments, March 15, 2022, ECF No. 135 (CIT Ct. No. 17-00158) at 3-6.  Moreover, Salzgitter demonstrated that there was no evidence on the record to suggest that Salzgitter was attempting to "distort" the margin, as the Department suggested, and that Salzgitter would not improperly benefit from using the same approach as in *Dillinger France.  Id.* at 6-7.  In fact, evidence on the record – namely, the dumping

18

margins that would result from using any of the three options proposed by Salzgitter (use none, all, or some of the sales in the Separate Database) – showed that Salzgitter's dumping margin would be the same (zero).  *Id.* at 8-9.

The CIT sustained the *Second Remand Results*.  Appx211.  As a result, Salzgitter's dumping margin was unchanged from the *Final Determination* (22.90 percent).  This appeal followed.

# SUMMARY OF THE ARGUMENT

## Issue 1: Use of Facts Available for SMSD's Sales with an Unknown Manufacturer

The Department did not have grounds to apply FA with respect to SMSD's sales in the Separate Database. Salzgitter timely responded to all of the Department's requests for information and explanations. Where the Department identified a deficiency, Salzgitter remedied or explained the deficiency. Under these circumstances, the Department was not permitted to disregard Salzgitter's information under 19 U.S.C. § 1677m(d). Moreover, the data Salzgitter provided with respect to SMSD's sales in the Separate Database, in particular the sales prices, met the requirements under 19 U.S.C. § 1677m(e). Therefore, even if the information Salzgitter submitted in the Separate Database did not "meet all the applicable requirements," the Department was not permitted to disregard it and use FA. Instead, the Department was required to calculate the dumping margin as proposed under Options 1, 2, or 3, or use another reasonable approach that integrated the data in the Separate Database.

## Issue 2: Use of partial AFA for SMSD's Sales with an Unknown Manufacturer

The Department did not have grounds to use an adverse inference to select from among the facts available for the SMSD sales in the Separate Database. The evidence demonstrating that Salzgitter acted to the best of its ability is overwhelming, and Salzgitter was not required to submit perfect responses.

20

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Salzgitter reported all information that could be extracted electronically from the accounting and other records kept in the ordinary course of business. Indeed, Salzgitter developed special programs to maximize the manufacturer information that could be extracted from electronic databases maintained for other purposes that did not "talk" to one another. In this way, Salzgitter reported the manufacturer for approximately [No.] percent of SMSD's sales by number and [No] percent by volume. The remaining manufacturer information was practically impossible to obtain within the timelines set by the Department. Moreover, the Department's justifications for using an adverse inference in the *Final Determination* were based on speculation and conjecture regarding SMSD's recordkeeping, rendering the Department's decision unsupported by substantial evidence. In particular, the Department's assumptions regarding recordkeeping for steel distributors was squarely contradicted by the record. The Department also failed to appreciate the difference between manual review of documents for occasional requests in the ordinary course of business and manual review of thousands of sales within the Department's dictated schedule.

**Issue 3:   Choice of partial AFA for SMSD's Sales with an Unknown Manufacturer**

The Department did not have grounds to use the "highest non-aberrational net price" as partial AFA for SMSD's sales in the Separate Database. The Department's actions were unsupported by substantial evidence and contrary to law because it

disregarded verified data that was not related to filling the informational "gap" identified in the record, namely the manufacturer.  Moreover, the sales price the Department selected as partial AFA was aberrational because it related to a product with unusual physical characteristics, which result in an unusually high price.  The conclusion that the price was aberrational was corroborated by the fact that the Department's use of partial AFA generated a dumping margin 12 times higher than the dumping margin that would have resulted from using the verified data and any of the three options proposed by Salzgitter.

# ARGUMENT

## I. STANDARD OF REVIEW

This Court reviews the CIT's rulings *de novo*, "stepping into its shoes and applying the same standard of review." *JTEKT Corp. v. United States*, 642 F.3d 1378, 1381 (Fed. Cir. 2011) (citation omitted). It does so "without affording any deference to the Court of International Trade{.}" *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1037 (Fed Cir. 2003) (citation and internal quotation marks omitted). This Court "must reverse a determination that is unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Viraj Group v. United States*, 476 F.3d 1349, 1354 (Fed. Cir. 2007) (citation and internal quotation marks omitted).

## II. ARGUMENT

### A. The Department's Decision to Apply Facts Available Was Not Supported by Substantial Evidence

#### 1. Legal Standard

The Department may only apply FA if a respondent fails to submit requested information. *See* 19 U.S.C. § 1677e(a). Before reaching that conclusion, the Department must inform the respondent of a "deficiency" and provide "an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigation . . . ." 19 U.S.C. § 1677m(d). If, after the respondent has had an opportunity to remedy the deficiency, the Department

concludes that the information submitted is "not satisfactory" the Department may decline to consider information that is "necessary to the determination but does not meet all the applicable requirements," ***but only*** if the submitted information does not meet the conditions set forth under 19 U.S.C. § 1677m(e).

> **2.    Salzgitter's responses to the Department's requests for data and information were fully responsive**

The Department concluded in the *Final Determination* that Salzgitter "withheld" information and "failed to fully respond" to requests for "complete home market sales data, inclusive of manufacturer information." Appx44. Yet, the record shows that Salzgitter fully responded to the Department's requests for data and information, even if the data were not perfect. And, where Salzgitter provided information that the Department considered "incomplete," it provided comprehensive explanations as to why the information was not available "in light of the time limits established for the completion of investigations" and the resources available.

Under these circumstances, substantial evidence does not support the Department's conclusions. Perfection is not the relevant standard. And the Department may not simply put its "head in the sand" and ignore verified data showing that what it has requested cannot reasonably be provided. Under such circumstances, which were the circumstances here, characterizing the reported data as incomplete or unsatisfactory is not supported by substantial evidence.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

The record demonstrates that:

- Salzgitter timely submitted 100% of the home-market sales for which the manufacturer could be identified as a Salzgitter mill using the electronic systems maintained in the ordinary course of business, including 77,000 of SMSD's home-market resales accounting for [No] percent of SMSD's home-market sales (by volume). Appx11351-11378.

- To maximize the data that could be submitted, SMSD created new programs to link data kept in its systems in the ordinary course of business – it did not simply give up and report whatever was easily available. Appx7107-7111.

- Salzgitter described in detail the steps it took to identify the manufacturer for SMSD's resales of CTL plate. Appx7107-7111.

- Where those newly created systems were unable to identify the manufacturer, Salzgitter explained the extreme efforts that would be required to attempt to manually identify the manufacturer for the remaining sales. Appx8237-8240. Salzgitter provided evidence, which was later verified, that attempting to identify manually the manufacturer for the 28,000 sales in the Separate Database would have taken two people, working full time, two years and, thus, would have been unreasonably burdensome and not possible in the time available for the investigation. *Id*.

- Salzgitter timely submitted the Separate Database containing complete sales and expense information for the sales contained therein, except the identity of the manufacturer. Appx8329-8346.

Thus, Salzgitter provided all requested information, and where information was not available "in light of the time limits established for the completion of {the} investigation{,}" it provided the Department with a comprehensive explanation. 19 U.S.C. § 1677m(d).

To the extent that the Department attempted to articulate why Salzgitter's responses were not sufficient, its explanations were based on conjecture. In particular, in concluding that SMSD could have reported the manufacturer for the sales in the Separate Database, the Department cited to the fact that SMSD was able to manually identify the manufacturer for one sale at verification. Appx44. However, that isolated exercise demonstrated nothing regarding the burden of repeating the exercise 28,000 times. Thus, the exercise cited by the Department in no way supported its conclusion.

SMSD emphasized that the manual review required was not possible in the time and with the resources available, particularly given all of the other work being performed simultaneously to meet the Department's requests. SMSD quantified that burden. The Department never responded to SMSD's explanations. It simply ignored them. The Department has acknowledged these difficulties in other cases and has not faulted the respondent for being unable to complete an unreasonably burdensome manual review in the timeline of an investigation. *See Certain Cut-To-Length Carbon-Quality Steel Plate Products from Japan*, 64 Fed. Reg. 73,215, 73,225 (Dep't Commerce Dec. 29, 1999) (final AD determ.).

Under these circumstances, it was unreasonable for the Department to conclude that the data in the Separate Database were not satisfactory and that the Department was entitled to replace them with other data. *See*, *e.g.*, *Nippon Steel*

*Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (stating that the "substantial evidence" standard of review "can be translated roughly to mean 'is the determination reasonable?'") (internal brackets omitted).

### 3.    Salzgitter satisfied all elements of § 1677m(e)

The Department shall not decline to consider information that is "necessary to the determination but does not meet all the applicable requirements" if the following criteria are met:

> (1)    the information is submitted by the deadline established for its submission,
>
> (2)    the information can be verified,
>
> (3)    the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
>
> (4)    the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and
>
> (5)    the information can be used without undue difficulties.

19 U.S.C. § 1677m(e).  While the Department made no reference to these criteria in the *Final Determination*, Salzgitter met all five conditions with respect to SMSD's reported home-market sales.[3]

---

[3] When considering whether a respondent meets the five conditions laid out in 19 U.S.C. § 1677m(e), the Statement of Administrative Action ("SAA") emphasizes that the individual respondent's circumstances – including its "accounting systems" and "computer capabilities" are a relevant consideration.  *See* Statement of

### a. SMSD's sales information was "submitted by the deadline established for its submission"

Salzgitter timely submitted all requested information that was contained in the electronic systems used in the ordinary course of business, including 77,000 of SMSD's home-market sales for which the manufacturer could be identified. Appx5742-5743; Appx13351-13378. Likewise, Salzgitter timely submitted the Separate Database pursuant to the Department's request. Appx8230; Appx8237. The Department did not find that this information was untimely pursuant to 19 U.S.C. § 1677m(e)(1).

As noted above, while the Department maintains that Salzgitter "withheld" or "failed to fully respond" to the Department's requests, the Department verified the accuracy of SMSD's statement that it was impossible to identify the manufacturer for the sales in the Separate Database with the electronic systems used in the ordinary course of business. *See* Appx11313. Consequently, the Department's assertion that Salzgitter "withheld" information or "failed to provide it in a timely manner" was contrary to its findings at verification and, therefore, was unsupported by substantial evidence.

---

Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-826(I), at 865, reprinted in 1994 U.S.C.C.A.N. 4040, 4194. Notably, the SAA underscores that the term "{c}omputer capabilities relates to *the ability to provide requested information in an automated format without incurring an unreasonable extra burden or expense*." *Id.* (emphasis added, internal quotation marks omitted).

#### b.    SMSD's sales information "could be" verified

The Department could, and actually did, verify the information that SMSD provided in the Separate Database.  *See* Appx11322-11323, Appx9463-9513 (Verification Exhibit SMSD-11); Appx9574-9603 (Verification Exhibit SMSD-15). Nowhere in the *Final Determination* or in the *Final Issues & Decision Memo* did the Department indicate that SMSD's sales were not verifiable, including those in the Separate Database.  Moreover, the Department affirmatively verified the entirety of Salzgitter's other home-market sales data (aside from SMSD's data) without significant discrepancies.  *See generally* Appx12293-11308; Appx11328-11342.

#### c.    SMSD's sales information was "not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination"

The Department stated that "manufacturer information is critical for the Department's margin analysis because the Department matches sales by . . . manufacturer."  Appx44.  While the Department's statement is generally true, it does not support its actions, because the Department had accurate and verified data available to ensure that the calculation of Salzgitter's dumping margin considered the manufacturer of SMSD's resales.  Therefore, the Separate Database was not "so

incomplete" that it could not "serve as a reliable basis" for calculating the dumping margin.

As discussed in detail in the Statement of the Case, the Separate Database contained all information for the 28,000 sales, including sales prices, except for the manufacturer. And, Salzgitter proposed three options for calculating the dumping margin in a way that would integrate the verified data in the Separate Database. Under Option 1, the Department would have disregarded the Separate Database entirely such that none of the sales would have been included. Under Option 2, the Department would have included the Separate Database in the margin calculation and treated all sales as if they were manufactured by Salzgitter (as it had in the *Dillinger France* case). Under Option 3, the Department would have used SMSD's actual verified purchasing data to determine the portion of each sale that would be treated as manufactured by Salzgitter. *See* Appx11406.

Under any of these options, Salzgitter's dumping margin would have been the same – zero. That Salzgitter's dumping margin would be the same under any of these options, including simply excluding the sales entirely, is substantial evidence that the data were "not so incomplete" that they could not "serve as a reliable basis" for calculating Salzgitter's dumping margin. There is no evidence to support the opposite conclusion.

### d.    SMSD demonstrated that it "acted to the best of its ability"

The Department claimed that "Salzgitter had relevant information available to it {regarding the manufacturer of the sales in the Separate Database}, but determined not to invest the time in comprehensively examining its documentation in order to provide the requested information."  Appx44.  The Department's claim that Salzgitter simply decided not to "invest the time" to report the manufacturer is incorrect.   As Salzgitter demonstrated at verification, manually reviewing documentation to identify the manufacturer for 28,000 sales was not possible with the resources available and under the time limitations of the investigation.  It was unreasonable for the Department to ignore this evidence and to portray the fact that SMSD did not conduct a manual search as a failure to cooperate.

The courts have ruled against the Department when it has disregarded a company's actual ability to respond when assessing whether it acted to the best of its ability.  *See Tung Fong Indus. Co. v. United States*, 318 F. Supp. 2d 1321, 1335-36 (Ct. Int'l Trade 2004) ("the record is simply devoid of evidence" to support the Department's conclusion that "had it chosen to do so, the company would have easily been able to calculate" requested data); *China Steel Corp. v. United States*, 264 F. Supp. 2d 1339, 1357-61 (Ct. Int'l Trade 2003) (emphasizing that the Department "fail{ed} to address" the plaintiff's described "difficulties it experienced in gathering and submitting the requested information").

e.    **SMSD's information could have been used without "undue difficulties"**

The Department could have implemented any of the three proposed options to incorporate the Separate Database into the calculation of Salzgitter's final dumping margin "without undue difficulties." *See* 19 U.S.C. § 1677m(e)(5). To implement Option 1, the Department would have simply used the home-market sales database with no change. To implement Options 2 or 3, Salzgitter provided specific programming language for the Department to use. *See* Appx11427-11430.

**B.    The Department's Decision to Apply an Adverse Inference Was Not Supported by Substantial Evidence**

**1.    Legal Standard**

The Department may use an adverse inference in selecting from facts otherwise available only if it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1)(A); *see also Jiangsu Changbao Steel Tube Co. v. United States*, 884 F. Supp. 2d 1295, 1302 (Ct. Int'l Trade 2012) (AFA is permitted "{o}nce Commerce determines that the conditions established by subsections 1677e(a), 1677m(d) and 1677m(e) are met and that resort to FA is appropriate").

"An adverse inference may not be drawn merely from a failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made{.}" *Nippon Steel Corp. v. United*

*States*, 337 F.3d 1373, 1383 (Fed. Cir. 2003). Courts have ruled against the Department when it has applied an adverse inference without taking into account the company's ability to respond. *See Tung Fong Indus. Co.*, 318 F. Supp. 2d at 1335-36; *China Steel Corp.*, 264 F. Supp. at 1357-61.

> ### 2. The Department's determination that Salzgitter did not cooperate to the best of its ability was not supported by substantial evidence

In the *Final Determination*, the Department concluded that Salzgitter "did not act to the best of its ability" based on three findings, none of which were supported by substantial evidence. *See* Appx45.

***First***, the Department asserted that the identity of manufacturers "is the type of information that a respondent should have reasonably anticipated being required to provide to its customers for quality assurance and warranty claims." Appx45. Because SMSD's systems did not gather such data on a scale that would have permitted it to report the manufacturer for all sales, the Department claimed SMSD had not cooperated to the best of its ability.

The Department did not cite to any evidence to support its assertion – meaning that the Department's statement amounted to mere speculation. *See Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (An agency's decision may not be based on "mere conjecture or supposition."). Nor did the Department address contradictory evidence on the record. That evidence

demonstrated that SMSD was a large, experienced, global steel distributor, and understood its customers' needs and expectations. Indeed, Salzgitter specifically explained that "steel trading businesses {such as SMSD} traditionally do not systemically track the producer/supplier of the product they are selling," because customers typically do not "require the knowledge of the original supplier." Appx6789, Appx7107. Thus, the evidence refutes the Department's conclusion.

Moreover, Salzgitter, unlike the Department's hypothetical respondent, did not have notice that the Department would conduct an ADD investigation of CTL plate from Germany, and thus had no reason to preemptively adapt its electronic systems to meet the Department's requirements. Appx8046. Instead, SMSD reasonably designed and operated its systems for commercial purposes. In that context, SMSD could identify the manufacturer for particular transactions to address "quality assurance and warranty claims" that arose in the ordinary course of business. *See* Appx45. However, it had no need for a system that could identify the manufacturer of all sales in the Separate Database within the timeframe of an ADD investigation.

Further, the affiliated reseller of the other respondent in this case (Dillinger) and the affiliated reseller of the respondent the *Dillinger France* case faced the same issue. Appx76; App122. Inexplicably, the Department ignored this evidence of how large resellers actually conduct their business in the absence of an ADD proceeding.

**Second**, the Department erroneously concluded that Salzgitter could identify the manufacturer information for all sales in the Separate Database based on its ability to identify the manufacturer for one sale at verification. That is, it concluded that SMSD did not cooperate to the best of its ability because SMSD "was able {at verification} to identify the manufacturer *of a sale* in the additional SMSD sales database when it attempted to find that information." Appx45 (emphasis added). This finding ignored the critical difference discussed above between doing something once and doing it 28,000 times, making it unreasonable for the Department to conclude that Salzgitter failed to cooperate.

As discussed in the Statement of the Case, given the inability to obtain the manufacturer information electronically, finding the manufacturer for *all* sales in the Separate Database would have required two people to work full-time for more than two years. Appx8239-8240. That Salzgitter did not pursue such a manifestly unreasonable course of action does not constitute a failure to cooperate. *See Nippon Steel Corp.*, 337 F.3d at 1383 (permitting an adverse inference only where the Department could have "reasonably expected" a "more forthcoming" response).

**Third**, the Department incorrectly sought to distinguish applicable precedent. In an earlier investigation concerning CTL plate from Japan, the Department excused the respondent from manually reviewing records "given the volume of sales . . . and the time constraints of an investigation." *Certain Cut-To-Length Carbon-*

*Quality Steel Plate Products from Japan*, 64 Fed. Reg. 73,215, 73,225 (Dep't Commerce Dec. 29, 1999) (final AD determ.).  The Department found that requiring the respondent to "manually search its production instruction slips" would be unreasonable.  *Id*.

The exact same reasoning applied to Salzgitter and the Separate Database.  Yet, the Department dismissed this precedent, citing "technological advancements in electronic records management . . . , which significantly reduces the burden in obtaining the missing information."  Appx45.  The Department's conclusion ignored record evidence and missed the point:  SMSD used "technological advancements" to maximize the capabilities of its electronic systems and to extract manufacturer data for 77,000 sales.  *See* Appx7107-7111.  Thus, it succeeded in using technology to extract the needed data for some, but not all of SMSD's sales.  For the remaining 28,000 sales, the manufacturer could only be identified manually.  *See* Appx8237-8240.  A manual review of documents for 28,000 sales was just as unreasonably burdensome in 2016 when Salzgitter was preparing its responses as it was in 1999 when the respondent in *Cut-To-Length Carbon-Quality Steel Plate Products from Japan* was preparing its responses.

### 3.    The CIT incorrectly upheld the Department's application of an adverse inference

In affirming the Department's use of an adverse inference, the CIT made various incorrect conclusions.

***First***, the Court stated that the Department "interpreted" Salzgitter's three proposals for integrating the Separate Databases into the calculation of the dumping margin "as arguing for 'neutral' facts available to substitute for the missing CTL plate manufacturer information" but that the Department "found that Salzgitter's three proposals lacked the type of 'connectivity' or indication that any of these proposals would reasonably reflect the missing CTL plate manufacturer information for the relevant transactions." *Dillinger I*, 399 F. Supp. 3d at 1255 (citing Appx43-44). The Court therefore concluded that an adverse inference was justified.

The source of the CIT's conclusion is unclear. Although the Department cited Salzgitter's argument that its three proposals amounted to the use of neutral FA, it neither discussed a lack of "connectivity" nor, more generally, discussed the three proposals themselves in the *Final Determination*. *See* Appx43-46. This Court will find a Department determination unreasonable when the Department fails "to consider an important aspect of the problem" and has further held that the Department "has an obligation to address important factors raised by comments from petitioners and respondents." *SKF USA Inc. v. United States*, 630 F.3d 1365, 1374 (Fed. Cir. 2011) (internal quotation marks and citations omitted). Here, the

Department failed to address Salzgitter's three proposals, thereby failing to meet this obligation. *See* Appx43-46. The CIT's affirmance of this unreasonable decision, citing a purported discussion of "connectivity" that is nowhere to be found in the *Final Determination*, therefore constitutes reversible error. *See, e.g.*, *NEC Home Elecs. v. United States*, 54 F.3d 736 (Fed. Cir. 1995) ("We are powerless to affirm an administrative action on a ground not relied upon by the agency.") (citations omitted).

Second, the CIT stated that it "cannot understand why Salzgitter did not just simply conduct a statistical analysis of the 28,000 CTL plate sales with missing manufacturer information, using a sufficient and randomized sample size that was then manually matched to the missing manufacturer information from its legacy mill certificate management system." *Dillinger I*, 399 F. Supp. 3d at 1255. The CIT posited that this "approach ***might have*** established a statistically valid extrapolation, rather than Salzgitter's mere speculation, of the missing manufacturer information based on the sample's actual ratio of Salzgitter-manufactured to non-Salzgitter-manufactured CTL plate sales." *Id.* (emphasis added).

The CIT incorrectly characterized Salzgitter's proposed alternatives as "mere speculation" and incorrectly suggested that they were not accurate and statistically valid. Under Option 3, Salzgitter proposed to use SMSD's actual purchase data during the POI, which was verified by Commerce, to calculate the percentage of the

quantity of each sale that was treated as Salzgitter-manufactured plate. *See* Appx11316, Appx11406. Salzgitter also provided programming language for this alternative approach. *See* Appx11430. Because Option 3 was based on the full universe of SMSD's actual purchases during the period, it was at least as accurate as, and likely more accurate than, a random sample.

Finally, in sustaining the Department's application of an adverse inference, the CIT cited *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1360-61 (Fed. Cir. 2018), noting that in that case the Court affirmed the Department's "application of AFA where {the} respondent failed to indicate that it was <u>unable</u> to provide relevant information nor suggest {an} alternative for provision of that information . . . ." *Dillinger I*, 399 F. Supp. 3d at 1255 (emphasis original). Here, Salzgitter explained and verified why it was unable to provide the requested manufacturer information within the timeframe of the investigation. And while the respondent in *Maverick Tube* never offered an alternative to the Department to correct its deficiency, *Maverick Tube Corp.*, 857 F.3d at 1361, that is not the case here. Not only did Salzgitter provide an alternative for the missing information, it provided three different alternatives.

**C.      The Department's Selection of Partial AFA Was Unsupported by Substantial Evidence and Contrary to Law**

**1.      Legal Standard**

The use of FA, with or without an adverse inference, is limited to filling the gap with respect to the specific information that was not provided or was withheld. *See* Statement of Administrative Action, accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-826(I), at 869, reprinted in 1994 U.S.C.C.A.N. 4040, 4198. Accordingly, where the Department applies partial AFA it "generally may use an adverse inference only with respect to the specific information that a respondent failed to provide." *Shandong Huarong Mach. Co. v. United States*, 435 F. Supp. 2d 1261, 1273 (Ct. Int'l Trade 2006). The Department's authority is further limited because it may not impose "punitive, aberrational, or uncorroborated margins." *F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000).

**2.      The Department unjustifiably disregarded verified pricing data for the sales in the Separate Database, which did not address the gap regarding the manufacturer for those sales**

In the *Final Determination*, the Department stated that the informational gap it sought to address through the use of AFA was the manufacturer information for SMSD's sales reported in the Separate Database. Appx43-46. However, the Department's choice of AFA in both the *Final Determination* and the *Second Remand Results* – replacing the sales prices for all sales in that database with the

"highest non-aberrational net price" among them – did not address the missing manufacturer information. At no point during the investigation did the Department question SMSD's reported prices for these sales. In fact, the Department verified them. *See generally* Appx11322-11323.

Thus, as in the CIT's finding in *Dillinger France*, "the reliability of the reported sales prices" was not called into question and there was "no informational gap in the sale prices for Commerce to fill." 350 F. Supp. 3d at 1364; *see also Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011) (finding that "the gap in the record is the quantity" and the Department could apply partial AFA "only in selecting the quantity" of select sales for purposes of calculating the dumping margin).

As discussed in Section II.A.3 above, the Department is not permitted to reject information on the record if it meets the criteria set forth in 19 U.S.C. § 1677m(e). SMSD's reported sales prices met these criteria: (1) they were submitted by the deadline established for submission (Appx8237); (2) they were verified (Appx13322-13323); (3) they were complete and could have served as a reliable basis for calculating Salzgitter's dumping margin (Appx8237-8241); (4) Salzgitter acted to the best of its ability in providing SMSD's sales prices (Appx8237-8240); and (5) SMSD's sales prices could be used without undue difficulties (in fact, the Department did so in the *First Remand Results* (Appx12565)). Furthermore,

Salzgitter provided three alternative approaches the Department could have used to integrate the sales prices into the calculation of its dumping margin. Thus, the Department's use of the "highest non-aberrational net price" as partial AFA was unsupported by substantial evidence because it filled a gap that did not exist.

### 3.    The data used by the Department as partial AFA was aberrational

Even if the Department were permitted to address the missing manufacturer information for the sales in the Separate Database by altering the prices for such sales, the Department was not permitted to use aberrational sales prices as AFA.

The Department stated in the *Final Determination* and the *Second Remand Results* that it determined the "highest non-aberrational net price" by "sort{ing} all of SMSD's net prices for these sales in descending order and select{ing} the transaction at the beginning of a smooth continuum of net prices." Appx170; Appx12565. It is not clear where the so-called "smooth continuum" began and ended or whether any statistical tool was used to define it, but the evidence shows that the sale selected was aberrational. *See Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1356 (Ct. Int'l Trade 2018) (recognizing that using aberrational transactions "based on the nature of the transaction or product involved" is an impermissible application of AFA).

The price selected by the Department related to a product that was so dissimilar in physical characteristics to the products sold to the United States that it

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

was not compared to a single U.S. sale in the calculation of the dumping margin. *See* Appx8329-8330; Appx12127-12130; Appx12171-12174.   The product was further processed and identified in the Separate Database as having a high scrap ratio, factors that significantly increased the cost and price of the product. *See* Appx8329-8330; Appx5756 ("{P}roducts that have undergone fabrication processes often have very high prices . . . ."); Appx8240 (noting the high gross unit prices for products with high scrap ratios).  It was unreasonable for the Department to use the price of a single home-market sale of a dissimilar product as the price for the 28,000 sales in the Separate Database.  The Department's selection of partial AFA was aberrational and, therefore, unreasonable.

The aberrational nature of the chosen price is clear from the dumping margin it generated.  The dumping margin generated in the *Final Determination* and *Second Remand Results* was hugely inflated.  The minimum and maximum dumping margins calculated in the *First Remand Results* were negative [margin] percent and positive [ margin] percent, respectively.  Appx13028.  In contrast, the minimum and maximum dumping margins calculated for all U.S. CONNUMs in the *Final Determination* were negative [margin] percent and positive [ margin ], respectively. Appx12121.  Thus, the dumping margin in the *Final Determination* and *Second Remand Results* was over *12 times higher* than in the *First Remand Results* where the Department used the actual sales data in the Separate Database.  Such an extreme

difference is punitive, especially where it results from what is supposed to be partial AFA relating to a minor element of the sales database.  *See Gallant Ocean (Thail.) Co. v. United States*, 602 F.3d 1319, 1324 (Fed. Cir. 2010) ("This court also perceives that a rate over five times the highest rate imposed on similar products is far beyond an amount sufficient to deter . . . future non-compliance.").

## **CONCLUSION AND STATEMENT OF RELIEF SOUGHT**

For the foregoing reasons, the Department's conclusions in the *Final Determination* regarding the application of partial AFA to Salzgitter, as well as the choice of partial AFA, are unsupported by substantial evidence on the record and otherwise not in accordance with law. Salzgitter respectfully requests that the Court reverse the CIT's decision on these issues, and remand to the Department with instructions to issue a revised determination, consistent with the opinion of the Court.

Respectfully submitted,

/s/ David E. Bond
David E. Bond
Ron Kendler
Allison Kepkay

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiff-Appellants Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH

February 2, 2024

ADDENDUM

*Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan: Amended Final Affirmative Antidumping Determinations for France, the Federal Republic of Germany, the Republic of Korea and Taiwan, and Antidumping Duty Orders*,
82 Fed. Reg. 24096 (May 25, 2017)

Appx1-Appx8



will facilitate the marketing of cauliflower by providing the industry with more flexibility.

The official grade of a lot of cauliflower covered by these standards will be determined by the procedures set forth in the Regulations Governing Inspection, Certification, and Standards of Fresh Fruits, Vegetables and Other Products (7 CFR 51.1, 7 CFR 51.61).

The United States Standards for Grades of Cauliflower will be effective 30 days after publication of this notice in the **Federal Register**.

**Authority:** 7 U.S.C. 1621–1627.

Dated: May 19, 2017.

**Bruce Summers,**

*Acting Administrator, Agricultural Marketing Service.*

[FR Doc. 2017–10674 Filed 5–24–17; 8:45 am]

**BILLING CODE 3410–02–P**

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–433–812, A–423–812, A–427–828, A–428–844, A–475–834, A–588–875, A–580–887, A–583–858]**

### Certain Carbon and Alloy Steel Cut-To-Length Plate From Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan: Amended Final Affirmative Antidumping Determinations for France, the Federal Republic of Germany, the Republic of Korea and Taiwan, and Antidumping Duty Orders

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** Based on affirmative final determinations by the Department of Commerce (the Department) and the International Trade Commission (the ITC), the Department is issuing antidumping duty orders on certain carbon and alloy steel cut-to-length plate (CTL plate) from Austria, Belgium, France, the Federal Republic of Germany (Germany), Italy, Japan, the Republic of Korea (Korea), and Taiwan. In addition, the Department is amending its final affirmative determinations with respect to France, Germany, Korea, and Taiwan.

**DATES:** May 25, 2017.

**FOR FURTHER INFORMATION CONTACT:** Edythe Artman at (202) 482–3931 (Austria), Andrew Medley (202) 482–6345 (Belgium), Terre Keaton Stefanova at (202) 482–1280 (France), David Goldberger at (202) 482–4136 (Germany), Alice Maldonado at (202)

482–4682 (Italy), Kabir Archuletta at (202) 482–2593 (Japan), Michael J. Heaney at (202) 482–4475 (Korea), or Tyler Weinhold (Taiwan) at (202) 482–1121, AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW., Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

### Background

In accordance with sections 735(d) and 777(i)(1) of the Tariff Act of 1930, as amended (the Act), and 19 CFR 351.210(c), on April 4, 2017, the Department published its affirmative final determinations in the less-than-fair-value (LTFV) investigations of CTL plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan.[1] On May 18, 2017, the ITC notified the Department of its affirmative determination, pursuant to section 735(d) of the Act, that an industry in the United States is materially injured within the meaning of section 735(b)(1)(A)(i) of the Act, by reason of the LTFV imports of CTL plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan, and its determination that critical circumstances do not exist with respect to imports of subject merchandise from Austria, Belgium, and Italy that are subject to the Department's affirmative critical circumstances findings.[2]

---

[1] *See Certain Carbon and Alloy Steel Cut-To-Length Plate from Austria: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 82 FR 16366 (April 4, 2017); *Certain Carbon and Alloy Steel Cut-To-Length Plate from Belgium: Final Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances, in Part*, 82 FR 16378 (April 4, 2017); *Certain Carbon and Alloy Steel Cut-to-Length Plate from France: Final Determination of Sales at Less Than Fair Value*, 82 FR 16363 (April 4, 2017) (*France Final*); *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany: Final Determination of Sales at Less Than Fair Value*, 82 FR 16360 (April 4, 2017) (*Germany Final*); *Certain Carbon and Alloy Steel Cut-to-Length Plate from Italy: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 82 FR 16345 (April 4, 2017); *Certain Carbon and Alloy Steel Cut-to-Length Plate from Japan: Final Determination of Sales at Less Than Fair Value*, 82 FR 16349 (April 4, 2017); *Certain Carbon and Alloy Steel Cut-To-Length Plate from the Republic of Korea: Final Determination of Sales at Less Than Fair Value and Final Negative Critical Circumstances Determination*, 82 FR 16376 (April 4, 2017) (*Korea Final*); and *Certain Carbon and Alloy Steel Cut-to-Length Plate from Taiwan: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances Final*, 82 FR 16372 (April 4, 2017) (*Taiwan Final*).

[2] *See Letter regarding CTL plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan Australia, Brazil, China, Indonesia, and Portugal (May 18, 2017) (ITC Letter). See also*

### Scope of the Orders

The merchandise covered by these orders is certain CTL plate. *See* Appendix A for Austria, Belgium, France, Germany, and Italy, Appendix B for Korea, Appendix C for Japan, and Appendix D for Taiwan.

### Amendment to Final Determinations

A ministerial error is defined as an error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and any other similar type of unintentional error which the Secretary considers ministerial.[3]

### France Amended Final Determination

Pursuant to section 735(e) of the Act and 19 CFR 351.224(e) and (f), the Department is amending the *France Final* to reflect the correction of ministerial errors in the final estimated weighted-average dumping margin calculated for Dillinger France S.A. (Dillinger France). In addition, because Dillinger France's estimated weighted-average dumping margin is the basis for the estimated weighted-average dumping margin determined for all other French producers and exporters of subject merchandise, we also are revising the "all-others" rate in *France Final*.[4][5]

### Germany Amended Final Determination

Pursuant to section 735(e) of the Act and 19 CFR 351.224(e) and (f), the Department is amending the *Germany Final* to reflect the correction of a ministerial error in the final estimated weighted-average dumping margin calculated for AG der Dillinger Hüttenwerke (Dillinger Germany). In addition, because the Department determined the estimated weighted-average dumping margin for all other German producers and exporters of subject merchandise based on a weighted-average of the respondents' estimated weighted-average dumping margins using publicly-ranged quantities for their sales of subject

---

*Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan Investigation Nos. 701–TA–561 and 731–TA–1317–1318, 1321–1325, and 1327 (Final) USITC Publication 4691 (May 2017) (ITC Report).*

[3] *See* section 735(e) of the Act and 19 CFR 351.224(f).

[4] *See* "Estimated Weighted-Average Dumping Margins" section below.

[5] *See* Memorandum, "Less-Than-Fair-Value Investigation of Certain Carbon and Alloy Steel Cut-To-Length Plate from France: Allegation of Ministerial Error in the Final Determination," dated April 28, 2017.

merchandise, we also are revising the "all-others" rate in *Germany Final*.[8 7]

**Korea Amended Final Determination**

Pursuant to section 735(e) of the Act and 19 CFR 351.224(e) and (f), the Department is amending the *Korea Final* to reflect the correction of ministerial errors in the final estimated weighted-average dumping margin calculated for POSCO. In addition, because POSCO's estimated weighted-average dumping margin is the basis for the estimated weighted-average dumping margin for all other Korean producers and exporters of subject merchandise, we also are revising the "all-others" rate in *Korea Final*.[8 9]

**Taiwan Amended Final Determination**

Pursuant to section 735(e) of the Act and 19 CFR 351.224(e) and (f), the Department is amending the *Taiwan Final* to reflect the correction of a ministerial error in the final estimated weighted-average dumping margin calculated for China Steel Corporation. In addition, because the Department determined the estimated weighted-average dumping margin for all other Taiwanese producers and exporters of subject merchandise based on a simple average of the respondents' estimated weighted-average dumping margins, we also are revising the "all-others" rate in *Taiwan Final*.[10 11] In addition, in the *Taiwan Final*, we identified an error in the scope language for Taiwan included in the Appendix. *See* Appendix D, below, for the corrected scope language.

**Antidumping Duty Orders**

As stated above, on May 18, 2017, in accordance with sections 735(b)(1)(A)(i) and 735(d) of the Act, the ITC notified the Department of its determination that the industry in the United States producing CTL plate is materially injured with respect to CTL plate from

Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan and its determination that critical circumstances do not exist with respect to imports of subject merchandise from Austria, Belgium, and Italy that are subject to the Department's affirmative critical circumstances finding[12] Therefore, in accordance with section 735(c)(2) of the Act, we are issuing these antidumping duty orders. Because the ITC determined that imports of CTL plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan are materially injuring a U.S. industry, unliquidated entries of such merchandise from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan, entered or withdrawn from warehouse for consumption, are subject to the assessment of antidumping duties.

Therefore, in accordance with section 736(a)(1) of the Act, the Department will direct U.S. Customs and Border Protection (CBP) to assess, upon further instruction by the Department, antidumping duties equal to the amount by which the NV of the merchandise exceeds the export price (or constructed export price) of the merchandise, for all relevant entries of CTL plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan. Antidumping duties will be assessed on unliquidated entries of CTL plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan entered, or withdrawn from warehouse, for consumption on or after November 14, 2016, the date of publication of the preliminary determinations,[13] but will

not include entries occurring after the expiration of the provisional measures period and before publication in the **Federal Register** of the ITC's injury determination as further described below.

**Continuation of Suspension of Liquidation**

In accordance with section 735(c)(1)(B) of the Act, we will instruct CBP to continue to suspend liquidation on all relevant entries of CTL plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan. These instructions suspending liquidation will remain in effect until further notice.

We will also instruct CBP to require cash deposits for estimated antidumping duties equal to the amounts as indicated below. Accordingly, effective on the date of publication in the **Federal Register** of the ITC's affirmative injury determinations, CBP will require, at the same time as importers would normally deposit estimated duties on this subject merchandise, a cash deposit equal to the estimated weighted-average dumping margins listed below.[14] The relevant "all-others" rates apply to all producers or exporters not specifically listed, as appropriate.

**Provisional Measures**

Section 733(d) of the Act states that instructions issued pursuant to an affirmative preliminary determination may not remain in effect for more than four months, except where exporters representing a significant proportion of exports of the subject merchandise request the Department to extend that four-month period to no more than six months. At the request of exporters that account for a significant proportion of exports of CTL plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan, we extended the four-month period to six months in each proceeding.[15] In the underlying investigations, the Department published the preliminary determinations on November 14, 2016. Therefore, the extended period, beginning on the date of publication of the preliminary determinations, ended on May 12, 2017.

Therefore, in accordance with section 733(d) of the Act and our practice, we

---

[6] *See* the "Estimated Weighted-Average Dumping Margins" section below.

[7] *See* Memorandum, "Less-Than-Fair-Value Investigation of Certain Carbon and Alloy Steel Cut-To-Length Plate from Germany: Allegation of Ministerial Error in the Final Determination," dated May 2, 2017.

[8] *See* the "Estimated Weighted-Average Dumping Margins" section below.

[9] *See* Memorandum, "Antidumping Duty Less-Than-Fair-Value Investigation of Certain Carbon and Alloy Steel Cut-To-Length Plate from the Republic of Korea: Allegation of Ministerial Error in the Final Determination," dated concurrently with this notice.

[10] *See* the "Estimated Weighted-Average Dumping Margins" section below.

[11] *See* Memorandum, "Amended Final Determination of the Less-Than-Fair-Value Investigation of Carbon and Alloy Steel Cut-To-Length Plate from Taiwan: Allegation of Ministerial Error for China Steel Corporation," dated concurrently with this notice.

[12] *See* ITC Letter and ITC Report.

[13] *See Certain Carbon and Alloy Steel Cut-To-Length Plate from Austria: Preliminary Determination of Sales at Less Than Fair Value and Postponement of the Final Determination*, 81 FR 79416 (November 14, 2016) (*Austria Prelim*); *Certain Carbon and Alloy Steel Cut-To- Length Plate from Belgium: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 81 FR 79431 (November 14, 2016) (*Belgium Prelim*); *Certain Carbon and Alloy Steel Cut-To-Length Plate from France: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 81 FR 79937 (November 14, 2016) (*France Prelim*); *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 81 FR 79446 (November 14, 2016) (*Germany Prelim*); *Certain Carbon and Alloy Steel Cut-To-Length Plate from Italy: Preliminary Determination of Sales at Less Than Fair Value, Affirmative Determination of Critical Circumstances, and Postponement of Final Determination*, 81 FR 79423 (November 14, 2016) (*Italy Prelim*); *Certain Carbon and Alloy Steel Cut-To-Length Plate from Japan: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 81 FR 79427 (November 14, 2016) (*Japan Prelim*); *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea: Affirmative Preliminary*

*Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 81 FR 79441 (November 14, 2016) (*Korea Prelim*); and *Certain Carbon and Alloy Steel Cut-To-Length Plate from Taiwan: Preliminary Determination of Sales at Less Than Fair Value*, 81 FR 79420 (November 14, 2016) (*Taiwan Prelim*).

[14] *See* section 736(a)(3) of the Act.

[15] *See Austria Prelim, Belgium Prelim, France Prelim, Germany Prelim, Italy Prelim, Japan Prelim, Korea Prelim, and Taiwan Prelim.*

will instruct CBP to terminate the suspension of liquidation and to liquidate, without regard to antidumping duties, unliquidated entries of CTL plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan entered, or withdrawn from warehouse, for consumption after May 12, 2017, the date on which the provisional measures expired, until and through the day preceding the date of publication of the ITC's injury determinations in the **Federal Register**. Suspension of liquidation will resume on the date of publication of the ITC's determination in the **Federal Register**.

### Critical Circumstances

With regard to the ITC's negative critical circumstances determination on imports of CTL plate from Austria, Belgium, and Italy, we will instruct CBP to lift suspension and to refund any cash deposits made to secure the payment of estimated antidumping duties with respect to entries of subject merchandise entered, or withdrawn from warehouse, for consumption on or after August 16, 2016 (*i.e.*, 90 days prior to the date of publication of the *Austria Prelim, Belgium Prelim*, and *Italy Prelim*), but before November 14, 2016 (*i.e.*, the date of publication of the *Austria Prelim, Belgium Prelim*, and *Italy Prelim*).

### Estimated Weighted-Average Dumping Margins

The estimated weighted-average dumping margins for each antidumping order are as follows:

| Producer/exporter | Estimated weighted-average dumping margin (percent) |
|---|---|
| Austria ............................ Bohler Bleche GmbH & Co KG, Bohler Edelstahl GmbH & Co KG, Bohler International GmbH, voestalpine Grobblech GmbH, and voestalpine Steel Service Center GmbH. | 53.72 |
| All Others ....................................................................................................................... | 53.72 |
| Belgium ........................... Industeel Belgium S.A ...................................................................................................... | 5.40 |
| NLMK Clabecq S.A., NLMK Plate Sales S.A., NLMK Sales Europe S.A., NLMK Manage Steel Center S.A., and/or NLMK La Louviere S.A. | 51.78 |
| All Others ....................................................................................................................... | 5.40 |
| France ............................ Dillinger France S.A ....................................................................................................... | 6.15 |
| Industeel France S.A ...................................................................................................... | 148.02 |
| All Others ....................................................................................................................... | 6.15 |
| Germany .......................... AG der Dillinger Hüttenwerke ............................................................................................. | 5.52 |
| Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH. | 22.90 |
| All Others ....................................................................................................................... | 21.04 |
| Italy ............................... NLMK Verona SpA ......................................................................................................... | 22.19 |
| Officine Tecnosider s.r.l ................................................................................................. | 6.08 |
| Marcegaglia SpA ........................................................................................................... | 22.19 |
| All Others ....................................................................................................................... | 6.08 |
| Japan ............................. Tokyo Steel Manufacturing Co., Ltd ................................................................................... | 14.79 |
| JFE Steel Corporation ................................................................................................... | 48.67 |
| Shimabun Corporation ................................................................................................... | 48.67 |
| All Others ....................................................................................................................... | 14.79 |
| Korea ............................. POSCO ....................................................................................................................... | 7.10 |
| All Others ....................................................................................................................... | 7.10 |
| Taiwan ............................ China Steel Corporation ................................................................................................. | 75.42 |
| Shang Chen Steel Co., Ltd ............................................................................................. | 3.62 |
| All Others ....................................................................................................................... | 39.52 |

### Notifications to Interested Parties

This notice constitutes the antidumping duty orders with respect to CTL plate from Austria, Belgium, France, Germany, Italy, Japan, Korea, and Taiwan pursuant to section 736(a) of the Act. Interested parties can find a list of antidumping duty orders currently in effect at *http:// enforcement.trade.gov/stats/ iastats1.html*.

These amended final determinations and orders are published in accordance with sections 735(e) and 736(a) of the Act and 19 CFR 351.210(c), 351.211(b), and 351.224(e) and (f).

Dated: May 19, 2017.
**Ronald K. Lorentzen,**
*Acting Assistant Secretary for Enforcement and Compliance.*

### APPENDICES

### (A) Scope of the Orders for CTL Plate From Austria, Belgium, France, Germany, and Italy

The products covered by these orders are certain carbon and alloy steel hot-rolled or forged flat plate products not in coils, whether or not painted, varnished, or coated with plastics or other non-metallic substances (cut-to-length plate). Subject merchandise includes plate that is produced by being cut-to-length from coils or from other discrete length plate and plate that is rolled or forged into a discrete length. The products covered include (1) Universal mill plates (*i.e.*, flat-rolled products rolled on four faces or in a closed box pass, of a width exceeding 150 mm but not exceeding 1250 mm, and of a thickness of not less than 4 mm, which are not in coils and without patterns in relief), and (2) hot-rolled or forged flat steel products of a thickness of 4.75 mm or more and of a width which exceeds 150 mm and measures at least twice the thickness, and which are not in coils, whether or not with patterns in relief. The covered products described above may be rectangular, square, circular or other shapes and include products of either rectangular or non-rectangular cross-section where such non-rectangular cross-section is achieved subsequent to the rolling process, *i.e.*, products which have been "worked after rolling" (*e.g.*, products which have been beveled or rounded at the edges).

For purposes of the width and thickness requirements referenced above, the following rules apply:

(1) Except where otherwise stated where the nominal and actual thickness or width

measurements vary, a product from a given subject country is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above, and

(2) where the width and thickness vary for a specific product (*e.g.,* the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, *etc.*), the measurement at its greatest width or thickness applies.

Steel products included in the scope of this order are products in which: (1) Iron predominates, by weight, over each of the other contained elements; and (2) the carbon content is 2 percent or less by weight.

Subject merchandise includes cut-to-length plate that has been further processed in the subject country or a third country, including but not limited to pickling, oiling, leveling, annealing, tempering, temper rolling, skin passing, painting, varnishing, trimming, cutting, punching, beveling, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the order if performed in the country of manufacture of the cut-to-length plate.

All products that meet the written physical description, are within the scope of this order unless specifically excluded or covered by the scope of an existing order. The following products are outside of, and/or specifically excluded from, the scope of this order:

(1) Products clad, plated, or coated with metal, whether or not painted, varnished or coated with plastic or other non-metallic substances;

(2) military grade armor plate certified to one of the following specifications or to a specification that references and incorporates one of the following specifications:

- MIL–A–12560,
- MIL–DTL–12560H,
- MIL–DTL–12560J,
- MIL–DTL–12560K,
- MIL–DTL–32332,
- MIL–A–46100D,
- MIL–DTL–46100–E,
- MIL–46177C,
- MIL–S–16216K Grade HY80,
- MIL–S–16216K Grade HY100,
- MIL–S–24645A HSLA–80;
- MIL–S–24645A HSLA–100,
- T9074–BD–GIB–010/0300 Grade HY80,
- T9074–BD–GIB–010/0300 Grade HY100,
- T9074–BD–GIB–010/0300 Grade HSLA80,
- T9074–BD–GIB–010/0300 Grade HSLA100, and
- T9074–BD–GIB–010/0300 Mod. Grade HSLA115,

except that any cut-to-length plate certified to one of the above specifications, or to a military grade armor specification that references and incorporates one of the above specifications, will not be excluded from the scope if it is also dual- or multiple-certified to any other non-armor specification that otherwise would fall within the scope of this order;

(3) stainless steel plate, containing 10.5 percent or more of chromium by weight and not more than 1.2 percent of carbon by weight;

(4) CTL plate meeting the requirements of ASTM A–829, Grade E 4340 that are over 305 mm in actual thickness;

(5) Alloy forged and rolled CTL plate greater than or equal to 152.4 mm in actual thickness meeting each of the following requirements:

(a) Electric furnace melted, ladle refined & vacuum degassed and having a chemical composition (expressed in weight percentages):

- Carbon 0.23–0.28,
- Silicon 0.05–0.20,
- Manganese 1.20–1.60,
- Nickel not greater than 1.0,
- Sulfur not greater than 0.007,
- Phosphorus not greater than 0.020,
- Chromium 1.0–2.5,
- Molybdenum 0.35–0.80,
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm;

(b) With a Brinell hardness measured in all parts of the product including mid thickness falling within one of the following ranges:

(i) 270–300 HBW,
(ii) 290–320 HBW, or
(iii) 320–350HBW;

(c) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.5, B not exceeding 1.0, C not exceeding 0.5, D not exceeding 1.5; and

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 2 mm flat bottom hole;

(6) Alloy forged and rolled steel CTL plate over 407 mm in actual thickness and meeting the following requirements:

(a) Made from Electric Arc Furnace melted, Ladle refined & vacuum degassed, alloy steel with the following chemical composition (expressed in weight percentages):

- Carbon 0.23–0.28,
- Silicon 0.05–0.15,
- Manganese 1.20–1.50,
- Nickel not greater than 0.4,
- Sulfur not greater than 0.010,
- Phosphorus not greater than 0.020,
- Chromium 1.20–1.50,
- Molybdenum 0.35–0.55,
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm;

(b) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.5, B not exceeding 1.5, C not exceeding 1.0, D not exceeding 1.5;

(c) Having the following mechanical properties:

(i) With a Brinell hardness not more than 237 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 75ksi min and UTS 95ksi or more, Elongation of 18% or more and Reduction of area 35% or more; having charpy V at −75 degrees F in the longitudinal direction equal or greater than 15 ft. lbs (single value) and equal or greater than 20 ft. lbs (average of 3 specimens) and conforming to the requirements of NACE MR01–75; or

(ii) With a Brinell hardness not less than 240 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 90 ksi min and UTS 110 ksi or more, Elongation of 15% or more and

Reduction of area 30% or more; having charpy V at −40 degrees F in the longitudinal direction equal or greater than 21 ft. lbs (single value) and equal or greater than 31 ft. lbs (average of 3 specimens);

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 3.2 mm flat bottom hole; and

(e) Conforming to magnetic particle inspection in accordance with AMS 2301;

(7) Alloy forged and rolled steel CTL plate over 407 mm in actual thickness and meeting the following requirements:

(a) Made from Electric Arc Furnace melted, ladle refined & vacuum degassed, alloy steel with the following chemical composition (expressed in weight percentages):

- Carbon 0.25–0.30,
- Silicon not greater than 0.25,
- Manganese not greater than 0.50,
- Nickel 3.0–3.5,
- Sulfur not greater than 0.010,
- Phosphorus not greater than 0.020,
- Chromium 1.0–1.5,
- Molybdenum 0.6–0.9,
- Vanadium 0.08 to 0.12
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm.

(b) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.0(t) and 0.5(h), B not exceeding 1.5(t) and 1.0(h), C not exceeding 1.0(t) and 0.5(h), and D not exceeding 1.5(t) and 1.0(h);

(c) Having the following mechanical properties: A Brinell hardness not less than 350 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 145ksi or more and UTS 160ksi or more, Elongation of 15% or more and Reduction of area 35% or more; having charpy V at −40 degrees F in the transverse direction equal or greater than 20 ft. lbs (single value) and equal or greater than 25 ft. lbs (average of 3 specimens);

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 3.2 mm flat bottom hole; and

(e) Conforming to magnetic particle inspection in accordance with AMS 2301.

The products subject to the order are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7208.40.3030, 7208.40.3060, 7208.51.0030, 7208.51.0045, 7208.51.0060, 7208.52.0000, 7211.13.0000, 7211.14.0030, 7211.14.0045, 7225.40.1110, 7225.40.1180, 7225.40.3005, 7225.40.3050, 7226.20.0000, and 7226.91.5000.

The products subject to the order may also enter under the following HTSUS item numbers: 7208.40.6060, 7208.53.0000, 7208.90.0000, 7210.70.3000, 7210.90.9000, 7211.19.1500, 7211.19.2000, 7211.19.4500, 7211.19.6000, 7211.19.7590, 7211.90.0000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7214.10.0000, 7214.30.0010, 7214.30.0080, 7214.91.0015, 7214.91.0060, 7214.91.0090, 7225.11.0000, 7225.19.0000, 7225.40.5110, 7225.40.5130, 7225.40.5160, 7225.40.7000, 7225.99.0010, 7225.99.0090, 7226.11.1000, 7226.11.9060, 7226.19.1000, 7226.19.9000,

**24100**     **Federal Register** / Vol. 82, No. 100 / Thursday, May 25, 2017 / Notices

7226.91.0500, 7226.91.1530, 7226.91.1560, 7226.91.2530, 7226.91.2560, 7226.91.7000, 7226.91.8000, and 7226.99.0180.

The HTSUS subheadings above are provided for convenience and customs purposes only. The written description of the scope of the order is dispositive.

**(B) Scope of the Order for CTL Plate From Korea**

The products covered by this order are certain carbon and alloy steel hot-rolled or forged flat plate products not in coils, whether or not painted, varnished, or coated with plastics or other non-metallic substances (cut-to-length plate). Subject merchandise includes plate that is produced by being cut-to-length from coils or from other discrete length plate and plate that is rolled or forged into a discrete length. The products covered include (1) Universal mill plates (*i.e.*, flat-rolled products rolled on four faces or in a closed box pass, of a width exceeding 150 mm but not exceeding 1250 mm, and of a thickness of not less than 4 mm, which are not in coils and without patterns in relief), and (2) hot-rolled or forged flat steel products of a thickness of 4.75 mm or more and of a width which exceeds 150 mm and measures at least twice the thickness, and which are not in coils, whether or not with patterns in relief. The covered products described above may be rectangular, square, circular or other shapes and include products of either rectangular or non-rectangular cross-section where such non-rectangular cross-section is achieved subsequent to the rolling process, *i.e.*, products which have been "worked after rolling" (*e.g.*, products which have been beveled or rounded at the edges).

For purposes of the width and thickness requirements referenced above, the following rules apply:

(1) except where otherwise stated where the nominal and actual thickness or width measurements vary, a product from a given subject country is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above unless the product is already covered by an order existing on that specific country (*i.e.*, *Certain Hot Rolled Steel Flat Products from Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom: Amended Final Affirmative Antidumping Determinations for Australia, the Republic of Korea, and the Republic of Turkey and Antidumping Duty Orders*, 81 FR 67962 (October 3, 2016), and

(2) where the width and thickness vary for a specific product (*e.g.*, the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, *etc.*), the measurement at its greatest width or thickness applies.

Steel products included in the scope of this order are products in which: (1) iron predominates, by weight, over each of the other contained elements; and (2) the carbon content is 2 percent or less by weight.

Subject merchandise includes cut-to-length plate that has been further processed in the subject country or a third country, including but not limited to pickling, oiling, levelling, annealing, tempering, temper rolling, skin passing, painting, varnishing, trimming, cutting, punching, beveling, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the order if performed in the country of manufacture of the cut-to-length plate.

All products that meet the written physical description, are within the scope of this order unless specifically excluded or covered by the scope of an existing order. The following products are outside of, and/or specifically excluded from, the scope of this order:

(1) products clad, plated, or coated with metal, whether or not painted, varnished or coated with plastic or other non-metallic substances;

(2) military grade armor plate certified to one of the following specifications or to a specification that references and incorporates one of the following specifications:

- MIL–A–12560,
- MIL–DTL–12560H,
- MIL–DTL–12560J,
- MIL–DTL–12560K,
- MIL–DTL–32332,
- MIL–A–46100D,
- MIL–DTL–46100–E,
- MIL–46177C,
- MIL–S–16216K Grade HY80,
- MIL–S–16216K Grade HY100,
- MIL–S–24645A HSLA–80;
- MIL–S–24645A HSLA–100,
- T9074–BD–GIB–010/0300 Grade HY80,
- T9074–BD–GIB–010/0300 Grade HY100,
- T9074–BD–GIB–010/0300 Grade HSLA80,
- T9074–BD–GIB–010/0300 Grade HSLA100, and
- T9074–BD–GIB–010/0300 Mod. Grade HSLA115,

except that any cut-to-length plate certified to one of the above specifications, or to a military grade armor specification that references and incorporates one of the above specifications, will not be excluded from the scope if it is also dual- or multiple-certified to any other non-armor specification that otherwise would fall within the scope of this order;

(3) stainless steel plate, containing 10.5 percent or more of chromium by weight and not more than 1.2 percent of carbon by weight;

(4) CTL plate meeting the requirements of ASTM A–829, Grade E 4340 that are over 305 mm in actual thickness;

(5) Alloy forged and rolled CTL plate greater than or equal to 152.4 mm in actual thickness meeting each of the following requirements:

(a) Electric furnace melted, ladle refined & vacuum degassed and having a chemical composition (expressed in weight percentages):

- Carbon 0.23–0.28,
- Silicon 0.05–0.20,
- Manganese 1.20–1.60,
- Nickel not greater than 1.0,
- Sulfur not greater than 0.007,
- Phosphorus not greater than 0.020,
- Chromium 1.0–2.5,
- Molybdenum 0.35–0.80,
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,

- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm;

(b) With a Brinell hardness measured in all parts of the product including mid thickness falling within one of the following ranges:

(i) 270–300 HBW,
(ii) 290–320 HBW, or
(iii) 320–350HBW;

(c) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.5, B not exceeding 1.0, C not exceeding 0.5, D not exceeding 1.5; and

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 2 mm flat bottom hole;

(6) Alloy forged and rolled steel CTL plate over 407 mm in actual thickness and meeting the following requirements:

(a) Made from Electric Arc Furnace melted, Ladle refined & vacuum degassed, alloy steel with the following chemical composition (expressed in weight percentages):

- Carbon 0.23–0.28,
- Silicon 0.05–0.15,
- Manganese 1.20–1.50,
- Nickel not greater than 0.4,
- Sulfur not greater than 0.010,
- Phosphorus not greater than 0.020,
- Chromium 1.20–1.50,
- Molybdenum 0.35–0.55,
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm;

(b) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.5, B not exceeding 1.5, C not exceeding 1.0, D not exceeding 1.5;

(c) Having the following mechanical properties:

(i) With a Brinell hardness not more than 237 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 75ksi min and UTS 95ksi or more, Elongation of 18% or more and Reduction of area 35% or more; having charpy V at -75 degrees F in the longitudinal direction equal or greater than 15 ft. lbs (single value) and equal or greater than 20 ft. lbs (average of 3 specimens) and conforming to the requirements of NACE MR01–75; or

(ii) With a Brinell hardness not less than 240 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 90 ksi min and UTS 110 ksi or more, Elongation of 15% or more and Reduction of area 30% or more; having charpy V at -40 degrees F in the longitudinal direction equal or greater than 21 ft. lbs (single value) and equal or greater than 31 ft. lbs (average of 3 specimens);

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 3.2 mm flat bottom hole; and

(e) Conforming to magnetic particle inspection in accordance with AMS 2301;

(7) Alloy forged and rolled CTL plate over 407 mm in actual thickness and meeting the following requirements:

(a) Made from Electric Arc Furnace melted, ladle refined & vacuum degassed, alloy steel with the following chemical composition (expressed in weight percentages):

- Carbon 0.25–0.30,

- Silicon not greater than 0.25,
- Manganese not greater than 0.50,
- Nickel 3.0–3.5,
- Sulfur not greater than 0.010,
- Phosphorus not greater than 0.020,
- Chromium 1.0–1.5,
- Molybdenum 0.6–0.9,
- Vanadium 0.08 to 0.12
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm.

(b) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.0(t) and 0.5(h), B not exceeding 1.5(t) and 1.0(h), C not exceeding 1.0(t) and 0.5(h), and D not exceeding 1.5(t) and 1.0(h);

(c) Having the following mechanical properties: A Brinell hardness not less than 350 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 145ksi or more and UTS 160ksi or more, Elongation of 15% or more and Reduction of area 35% or more; having charpy V at -40 degrees F in the transverse direction equal or greater than 20 ft. lbs (single value) and equal or greater than 25 ft. lbs (average of 3 specimens);

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 3.2 mm flat bottom hole; and

(e) Conforming to magnetic particle inspection in accordance with AMS 2301.

At the time of the filing of the petition, there was an existing antidumping duty order on certain cut-to-length carbon-quality steel plate products from Korea. *See Notice of Final Determination of Sales at Less Than Fair Value: Certain Cut-To-Length Carbon-Quality Steel Plate Products from Korea*, 64 FR 73,196 (Dep't Commerce Dec. 29, 1999), as amended, 65 FR 6,585 (Dep't Commerce Feb 10, 2000) (1999 Korea AD Order). The scope of the antidumping duty order with regard to cut-to-length plate from Korea covers only (1) subject cut-to-length plate not within the physical description of cut-to-length carbon quality steel plate in the 1999 Korea AD Order, regardless of producer or exporter; and (2) cut-to-length plate produced and/or exported by those companies that were excluded or revoked from the 1999 Korea AD Order as of April 8, 2016. The only revoked or excluded company is Pohang Iron and Steel Company, also known as POSCO.

The products subject to the order are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7208.40.3030, 7208.40.3060, 7208.51.0030, 7208.51.0045, 7208.51.0060, 7208.52.0000, 7211.13.0000, 7211.14.0030, 7211.14.0045, 7225.40.1110, 7225.40.1180, 7225.40.3005, 7225.40.3050, 7226.20.0000, and 7226.91.5000.

The products subject to the order may also enter under the following HTSUS item numbers: 7208.40.6060, 7208.53.0000, 7208.90.0000, 7210.70.3000, 7210.90.9000, 7211.19.1500, 7211.19.2000, 7211.19.4500, 7211.19.6000, 7211.19.7590, 7211.90.0000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7214.10.0000, 7214.30.0010, 7214.30.0080, 7214.91.0015, 7214.91.0060, 7214.91.0090, 7225.11.0000, 7225.19.0000, 7225.40.5110,

7225.40.5130, 7225.40.5160, 7225.40.7000, 7225.99.0010, 7225.99.0090, 7226.11.1000, 7226.11.9060, 7226.19.1000, 7226.19.9000, 7226.91.0500, 7226.91.1530, 7226.91.1560, 7226.91.2530, 7226.91.2560, 7226.91.7000, 7226.91.8000, and 7226.99.0180.

The HTSUS subheadings above are provided for convenience and customs purposes only. The written description of the scope of the order is dispositive.

**(C) Scope of the Order for CTL Plate From Japan**

The products covered by this order are certain carbon and alloy steel hot-rolled or forged flat plate products not in coils, whether or not painted, varnished, or coated with plastics or other non-metallic substances (cut-to-length plate). Subject merchandise includes plate that is produced by being cut-to-length from coils or from other discrete length plate and plate that is rolled or forged into a discrete length. The products covered include (1) Universal mill plates (*i.e.*, flat-rolled products rolled on four faces or in a closed box pass, of a width exceeding 150 mm but not exceeding 1250 mm, and of a thickness of not less than 4 mm, which are not in coils and without patterns in relief), and (2) hot-rolled or forged flat steel products of a thickness of 4.75 mm or more and of a width which exceeds 150 mm and measures at least twice the thickness, and which are not in coils, whether or not with patterns in relief. The covered products described above may be rectangular, square, circular or other shapes and include products of either rectangular or non-rectangular cross-section where such non-rectangular cross-section is achieved subsequent to the rolling process, *i.e.*, products which have been "worked after rolling" (*e.g.*, products which have been beveled or rounded at the edges).

For purposes of the width and thickness requirements referenced above, the following rules apply:

(1) except where otherwise stated where the nominal and actual thickness or width measurements vary, a product from a given subject country is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above unless the product is already covered by an order existing on that specific country (*i.e.*, *Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom: Amended Final Affirmative Antidumping Determinations for Australia, the Republic of Korea, and the Republic of Turkey and Antidumping Duty Orders*, 81 FR 67962 (October 3, 2016), and

(2) where the width and thickness vary for a specific product (*e.g.*, the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, *etc.*), the measurement at its greatest width or thickness applies.

Steel products included in the scope of this order are products in which: (1) Iron predominates, by weight, over each of the other contained elements; and (2) the carbon content is 2 percent or less by weight.

Subject merchandise includes cut-to-length plate that has been further processed in the subject country or a third country, including but not limited to pickling, oiling, leveling, annealing, tempering, temper rolling, skin passing, painting, varnishing, trimming, cutting, punching, beveling, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the order if performed in the country of manufacture of the cut-to-length plate.

All products that meet the written physical description, are within the scope of this order unless specifically excluded or covered by the scope of an existing order. The following products are outside of, and/or specifically excluded from, the scope of this order:

(1) products clad, plated, or coated with metal, whether or not painted, varnished or coated with plastic or other non-metallic substances;

(2) military grade armor plate certified to one of the following specifications or to a specification that references and incorporates one of the following specifications:

- MIL–A–12560,
- MIL–DTL–12560H,
- MIL–DTL–12560J,
- MIL–DTL–12560K,
- MIL–DTL–32332,
- MIL–A–46100D,
- MIL–DTL–46100–E,
- MIL–46177C,
- MIL–S–16216K Grade HY80,
- MIL–S–16216K Grade HY100,
- MIL–S–24645A HSLA–80;
- MIL–S–24645A HSLA–100,
- T9074–BD–GIB–010/0300 Grade HY80,
- T9074–BD–GIB–010/0300 Grade HY100,
- T9074–BD–GIB–010/0300 Grade HSLA80,
- T9074–BD–GIB–010/0300 Grade HSLA100, and
- T9074–BD–GIB–010/0300 Mod. Grade HSLA115,

except that any cut-to-length plate certified to one of the above specifications, or to a military grade armor specification that references and incorporates one of the above specifications, will not be excluded from the scope if it is also dual- or multiple-certified to any other non-armor specification that otherwise would fall within the scope of this order;

(3) stainless steel plate, containing 10.5 percent or more of chromium by weight and not more than 1.2 percent of carbon by weight;

(4) CTL plate meeting the requirements of ASTM A-829, Grade E 4340 that are over 305 mm in actual thickness;

(5) Alloy forged and rolled CTL plate greater than or equal to 152.4 mm in actual thickness meeting each of the following requirements:

(a) Electric furnace melted, ladle refined & vacuum degassed and having a chemical composition (expressed in weight percentages):

- Carbon 0.23–0.28,
- Silicon 0.05–0.20,
- Manganese 1.20–1.60,
- Nickel not greater than 1.0,
- Sulfur not greater than 0.007,
- Phosphorus not greater than 0.020,
- Chromium 1.0–2.5,
- Molybdenum 0.35–0.80,

- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm;

(b) With a Brinell hardness measured in all parts of the product including mid thickness falling within one of the following ranges:

(i) 270–300 HBW,

(ii) 290–320 HBW, or

(iii) 320–350HBW;

(c) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.5, B not exceeding 1.0, C not exceeding 0.5, D not exceeding 1.5; and

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 2 mm flat bottom hole;

(6) Alloy forged and rolled steel CTL plate over 407 mm in actual thickness and meeting the following requirements:

(a) Made from Electric Arc Furnace melted, Ladle refined & vacuum degassed, alloy steel with the following chemical composition (expressed in weight percentages):

- Carbon 0.23–0.28,
- Silicon 0.05–0.15,
- Manganese 1.20–1.50,
- Nickel not greater than 0.4,
- Sulfur not greater than 0.010,
- Phosphorus not greater than 0.020,
- Chromium 1.20–1.50,
- Molybdenum 0.35–0.55,
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm;

(b) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.5, B not exceeding 1.5, C not exceeding 1.0, D not exceeding 1.5;

(c) Having the following mechanical properties:

(i) With a Brinell hardness not more than 237 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 75ksi min and UTS 95ksi or more, Elongation of 18% or more and Reduction of area 35% or more; having charpy V at -75 degrees F in the longitudinal direction equal or greater than 15 ft. lbs (single value) and equal or greater than 20 ft. lbs (average of 3 specimens) and conforming to the requirements of NACE MR01–75; or

(ii) With a Brinell hardness not less than 240 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 90 ksi min and UTS 110 ksi or more, Elongation of 15% or more and Reduction of area 30% or more; having charpy V at -40 degrees F in the longitudinal direction equal or greater than 21 ft. lbs (single value) and equal or greater than 31 ft. lbs (average of 3 specimens);

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 3.2 mm flat bottom hole; and

(e) Conforming to magnetic particle inspection in accordance with AMS 2301;

(7) Alloy forged and rolled steel CTL. plate over 407 mm in actual thickness and meeting the following requirements:

(a) Made from Electric Arc Furnace melted, ladle refined & vacuum degassed, alloy steel with the following chemical composition (expressed in weight percentages):

- Carbon 0.25–0.30,
- Silicon not greater than 0.25,
- Manganese not greater than 0.50,
- Nickel 3.0–3.5,
- Sulfur not greater than 0.010,
- Phosphorus not greater than 0.020,
- Chromium 1.0–1.5,
- Molybdenum 0.6–0.9,
- Vanadium 0.08 to 0.12
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm.

(b) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.5(t) and 0.5(h), B not exceeding 1.5(t) and 1.0(h), C not exceeding 1.0(t) and 0.5(h), and D not exceeding 1.5(t) and 1.0(h);

(c) Having the following mechanical properties: A Brinell hardness not less than 350 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 145ksi or more and UTS 160ksi or more, Elongation of 15% or more and Reduction of area 35% or more; having charpy V at -40 degrees F in the transverse direction equal or greater than 20 ft. lbs (single value) and equal or greater than 25 ft. lbs (average of 3 specimens);

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 3.2 mm flat bottom hole; and

(e) Conforming to magnetic particle inspection in accordance with AMS 2301.

The products subject to the order are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7208.40.3030, 7208.40.3060, 7208.51.0030, 7208.51.0045, 7208.51.0060, 7208.52.0000, 7211.13.0000, 7211.14.0030, 7211.14.0045, 7225.40.1110, 7225.40.1180, 7225.40.3005, 7225.40.3050, 7226.20.0000, and 7226.91.5000.

The products subject to the order may also enter under the following HTSUS item numbers: 7208.40.6060, 7208.53.0000, 7208.90.0000, 7210.70.3000, 7210.90.9000, 7211.19.1500, 7211.19.2000, 7211.19.4500, 7211.19.6000, 7211.19.7590, 7211.90.0000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7214.10.0000, 7214.30.0010, 7214.30.0080, 7214.91.0015, 7214.91.0060, 7214.91.0090, 7225.11.0000, 7225.19.0000, 7225.40.5110, 7225.40.5130, 7225.40.5160, 7225.40.7000, 7225.99.0010, 7225.99.0090, 7226.11.1000, 7226.11.9060, 7226.19.1000, 7226.19.9000, 7226.91.0500, 7226.91.1530, 7226.91.1560, 7226.91.2530, 7226.91.2560, 7226.91.7000, 7226.91.8000, and 7226.99.0180.

The HTSUS subheadings above are provided for convenience and customs purposes only. The written description of the scope of the order is dispositive.

**(D) Scope of the Order for CTL Plate From Taiwan**

The products covered by this order are certain carbon and alloy steel hot-rolled or forged flat plate products not in coils, whether or not painted, varnished or coated with plastics or other non-metallic substances (cut-to-length plate). Subject merchandise includes plate that is produced by being cut-to-length from coils or from other discrete length plate and plate that is rolled or forged into a discrete length. The products covered include (1) Universal mill plates (i.e., flat-rolled products rolled on four faces or in a closed box pass, of a width exceeding 150 mm but not exceeding 1250 mm, and of a thickness of not less than 4 mm, which are not in coils and without patterns in relief), and (2) hot-rolled or forged flat steel products of a thickness of 4.75 mm or more and of a width which exceeds 150 mm and measures at least twice the thickness, and which are not in coils, whether or not with patterns in relief. The covered products described above may be rectangular, square, circular or other shapes and include products of either rectangular or non-rectangular cross-section where such non-rectangular cross-section is achieved subsequent to the rolling process, i.e., products which have been "worked after rolling" (e.g., products which have been beveled or rounded at the edges).

For purposes of the width and thickness requirements referenced above, the following rules apply:

(1) except where otherwise stated where the nominal and actual thickness or width measurements vary, a product from a given subject country is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above unless the product is already covered by an order existing on that specific country (i.e. Notice of Antidumping Duty Order; Certain Hot-Rolled Carbon Steel Flat Products From Taiwan, 66 FR 59563 (November 29, 2001)); and

(2) where the width and thickness vary for a specific product (e.g., the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, etc.), the measurement at its greatest width or thickness applies.

Steel products included in the scope of this order are products in which: (1) Iron predominates, by weight, over each of the other contained elements; and (2) the carbon content is 2 percent or less by weight.

Subject merchandise includes cut-to-length plate that has been further processed in the subject country or a third country, including but not limited to pickling, oiling, levelling, annealing, tempering, temper rolling, skin passing, painting, varnishing, trimming, cutting, punching, beveling, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the order if performed in the country of manufacture of the cut-to-length plate.

All products that meet the written physical description, are within the scope of this order unless specifically excluded or covered by the scope of an existing order. The following products are outside of, and/or specifically excluded from, the scope of this order:

(1) Products clad, plated, or coated with metal, whether or not painted, varnished or coated with plastic or other non-metallic substances;

(2) military grade armor plate certified to one of the following specifications or to a specification that references and incorporates one of the following specifications:

- MIL–A–12560,
- MIL–DTL–12560H,
- MIL–DTL–12560J,
- MIL–DTL–12560K,
- MIL–DTL–32332,
- MIL–A–46100D,
- MIL–DTL–46100–E,
- MIL–46177C,
- MIL–S–16216K Grade HY80,
- MIL–S–16216K Grade HY100,
- MIL–S–24645A HSLA–80,
- MIL–S–24645A HSLA–100,
- T9074–BD–GIB–010/0300 Grade HY80,
- T9074–BD–GIB–010/0300 Grade HY100,
- T9074–BD–GIB–010/0300 Grade HSLA80,
- T9074–BD–GIB–010/0300 Grade HSLA100, and
- T9074–BD–GIB–010/0300 Mod. Grade HSLA115,

except that any cut-to-length plate certified to one of the above specifications, or to a military grade armor specification that references and incorporates one of the above specifications, will not be excluded from the scope if it is also dual- or multiple-certified to any other non-armor specification that otherwise would fall within the scope of this order;

(3) stainless steel plate, containing 10.5 percent or more of chromium by weight and not more than 1.2 percent of carbon by weight;

(4) CTL plate meeting the requirements of ASTM A–629, Grade E 4340 that are over 305 mm in actual thickness;

(5) Alloy forged and rolled CTL plate greater than or equal to 152.4 mm in actual thickness meeting each of the following requirements:

(a) Electric furnace melted, ladle refined & vacuum degassed and having a chemical composition (expressed in weight percentages):

- Carbon 0.23–0.28,
- Silicon 0.05–0.20,
- Manganese 1.20–1.60,
- Nickel not greater than 1.0,
- Sulfur not greater than 0.007,
- Phosphorus not greater than 0.020,
- Chromium 1.0–2.5,
- Molybdenum 0.35–0.80,
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm;

(b) With a Brinell hardness measured in all parts of the product including mid thickness falling within one of the following ranges:

(i) 270–300 HBW,
(ii) 290–320 HBW, or
(iii) 320–350HBW;

(c) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.5, B not exceeding 1.0, C not exceeding 0.5, D not exceeding 1.5; and

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 2 mm flat bottom hole;

(6) Alloy forged and rolled steel CTL plate over 407 mm in actual thickness and meeting the following requirements:

(a) Made from Electric Arc Furnace melted, Ladle refined & vacuum degassed, alloy steel with the following chemical composition (expressed in weight percentages):

- Carbon 0.23–0.28,
- Silicon 0.05–0.15,
- Manganese 1.20–1.50,
- Nickel not greater than 0.4,
- Sulfur not greater than 0.010,
- Phosphorus not greater than 0.020,
- Chromium 1.20–1.50,
- Molybdenum 0.35–0.55,
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm;

(b) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.5, B not exceeding 1.5, C not exceeding 1.0, D not exceeding 1.5;

(c) Having the following mechanical properties:

(i) With a Brinell hardness not more than 237 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 75ksi min and UTS 95ksi or more, Elongation of 18% or more and Reduction of area 35% or more; having charpy V at −75 degrees F in the longitudinal direction equal or greater than 15 ft. lbs (single value) and equal or greater than 20 ft. lbs (average of 3 specimens) and conforming to the requirements of NACE MR01–75; or

(ii) With a Brinell hardness not less than 240 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 90 ksi min and UTS 110 ksi or more, Elongation of 15% or more and Reduction of area 30% or more; having charpy V at −40 degrees F in the longitudinal direction equal or greater than 21 ft. lbs (single value) and equal or greater than 31 ft. lbs (average of 3 specimens);

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 3.2 mm flat bottom hole; and

(e) Conforming to magnetic particle inspection in accordance with AMS 2301;

(7) Alloy forged and rolled steel CTL plate over 407 mm in actual thickness and meeting the following requirements:

(a) Made from Electric Arc Furnace melted, ladle refined & vacuum degassed, alloy steel with the following chemical composition (expressed in weight percentages):

- Carbon 0.25–0.30,
- Silicon not greater than 0.25,
- Manganese not greater than 0.50,
- Nickel 3.0–3.5,
- Sulfur not greater than 0.010,
- Phosphorus not greater than 0.020,
- Chromium 1.0–1.5,
- Molybdenum 0.6–0.9,
- Vanadium 0.08 to 0.12
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm.

(b) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.0(t) and 0.5(h), B not exceeding 1.5(t) and 1.0(h), C not exceeding 1.0(t) and 0.5(h), and D not exceeding 1.5(t) and 1.0(h);

(c) Having the following mechanical properties: A Brinell hardness not less than 350 HBW measured in all parts of the product including mid thickness; and having

a Yield Strength of 145ksi or more and UTS 160ksi or more, Elongation of 15% or more and Reduction of area 35% or more; having charpy V at −40 degrees F in the transverse direction equal or greater than 20 ft. lbs (single value) and equal or greater than 25 ft. lbs (average of 3 specimens);

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 3.2 mm flat bottom hole; and

(e) Conforming to magnetic particle inspection in accordance with AMS 2301.

The products subject to the order are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7208.40.3030, 7208.40.3060, 7208.51.0030, 7208.51.0045, 7208.51.0060, 7208.52.0000, 7211.13.0000, 7211.14.0030, 7211.14.0045, 7225.40.1110, 7225.40.1180, 7225.40.3005, 7225.40.3050, 7226.20.0000, and 7226.91.5000.

The products subject to the order may also enter under the following HTSUS item numbers: 7208.40.6060, 7208.53.0000, 7208.90.0000, 7210.70.3000, 7210.90.9000, 7211.19.1500, 7211.19.2000, 7211.19.4500, 7211.19.6000, 7211.19.7590, 7211.90.0000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7214.10.0000, 7214.30.0010, 7214.30.0080, 7214.91.0015, 7214.91.0060, 7214.91.0090, 7225.11.0000, 7225.19.0000, 7225.40.5110, 7225.40.5130, 7225.40.5160, 7225.40.7000, 7225.99.0010, 7225.99.0090, 7226.11.1000, 7226.11.9060, 7226.19.1000, 7226.19.9000, 7226.91.0500, 7226.91.1530, 7226.91.1560, 7226.91.2530, 7226.91.2560, 7226.91.7000, 7226.91.8000, and 7226.99.0180.

The HTSUS subheadings above are provided for convenience and customs purposes only. The written description of the scope of the order is dispositive.

[FR Doc. 2017–10757 Filed 5–24–17; 8:45 am]

BILLING CODE 3510–DS–P

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

[C–580–888]

## Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Countervailing Duty Order

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** Based on affirmative final determinations by the Department of Commerce (the Department) and the International Trade Commission (the ITC), the Department is issuing a countervailing duty (CVD) order on certain carbon and alloy steel cut-to-length plate (CTL plate) from the Republic of Korea (Korea).

**DATES:** May 25, 2017.

**FOR FURTHER INFORMATION CONTACT:** Yasmin Bordas at (202) 482–3813 or John Corrigan (202) 482–7438, AD/CVD Operations, Office VI, Enforcement and Compliance, International Trade

*Carbon and Alloy Steel Cut-to-Length Plate From the Federal Republic of Germany: Final Determination of Sales at Less Than Fair Value*, 82 Fed. Reg. 16360 (Apr. 4, 2017)

Appx9-Appx12



## Preliminary Determinations by the ITC

The ITC will preliminarily determine, within 45 days after the date on which the Petitions were filed, whether there is a reasonable indication that imports of silicon metal from Australia, Brazil, and/or Kazakhstan are materially injuring, or threatening material injury to, a U.S. industry.[33] A negative ITC determination will result in the investigation being terminated with respect to that country.[34] Otherwise, these investigations will proceed according to statutory and regulatory time limits.

## Submission of Factual Information

Factual information is defined in 19 CFR 351.102(b)(21) as: (i) Evidence submitted in response to questionnaires; (ii) evidence submitted in support of allegations; (iii) publicly available information to value factors under 19 CFR 351.408(c) or to measure the adequacy of remuneration under 19 CFR 351.511(a)(2); (iv) evidence placed on the record by the Department; and (v) evidence other than factual information described in (i)–(iv). Any party, when submitting factual information, must specify under which subsection of 19 CFR 351.102(b)(21) the information is being submitted and, if the information is submitted to rebut, clarify, or correct factual information already on the record, to provide an explanation identifying the information already on the record that the factual information seeks to rebut, clarify, or correct. Time limits for the submission of factual information are addressed in 19 CFR 351.301, which provides specific time limits based on the type of factual information being submitted. Parties should review the regulations prior to submitting factual information in these investigations.

## Extension of Time Limits Regulation

Parties may request an extension of time limits before the expiration of a time limit established under 19 CFR 351.301, or as otherwise specified by the Secretary. In general, an extension request will be considered untimely if it is filed after the expiration of the time limit established under 19 CFR 351.301. For submissions that are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. on the due date. Under certain circumstances, we may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due

from multiple parties simultaneously. In such a case, we will inform parties in the letter or memorandum setting forth the deadline (including a specified time) by which extension requests must be filed to be considered timely. An extension request must be made in a separate, stand-alone submission; under limited circumstances we will grant untimely-filed requests for the extension of time limits. Review *Extension of Time Limits; Final Rule*, 78 FR 57790 (September 20, 2013), available at *http://www.gpo.gov/fdsys/pkg/FR-2013-09-20/html/2013-22853.htm*, prior to submitting factual information in these investigations.

## Certification Requirements

Any party submitting factual information in an AD or CVD proceeding must certify to the accuracy and completeness of that information.[35] Parties are hereby reminded that revised certification requirements are in effect for company/government officials, as well as their representatives. Investigations initiated on the basis of petitions filed on or after August 16, 2013, and other segments of any AD or CVD proceedings initiated on or after August 16, 2013, should use the formats for the revised certifications provided at the end of the *Final Rule*.[36] The Department intends to reject factual submissions if the submitting party does not comply with the applicable revised certification requirements.

## Notification to Interested Parties

Interested parties must submit applications for disclosure under APO in accordance with 19 CFR 351.305. On January 22, 2008, the Department published *Antidumping and Countervailing Duty Proceedings: Documents Submission Procedures; APO Procedures*, 73 FR 3634 (January 22, 2008). Parties wishing to participate in these investigations should ensure that they meet the requirements of these procedures (*e.g.,* the filing of letters of appearance as discussed at 19 CFR 351.103(d)).

This notice is issued and published pursuant to sections 702 and 777(i) of the Act.

---

[35] *See* section 782(b) of the Act.
[36] *See Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings*, 78 FR 42678 (July 17, 2013) ("*Final Rule*"); *see also* frequently asked questions regarding the *Final Rule*, available at *http://enforcement.trade.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf*.

Dated: March 28, 2017.
**Ronald K. Lorentzen,**
*Acting Assistant Secretary for Enforcement and Compliance.*

## Appendix I

### Scope of the Investigations

The scope of these investigation covers all forms and sizes of silicon metal, including silicon metal powder. Silicon metal contains at least 85.00 percent but less than 99.99 percent silicon, and less than 4.00 percent iron, by actual weight. Semiconductor grade silicon (merchandise containing at least 99.99 percent silicon by actual weight and classifiable under Harmonized Tariff Schedule of the United States (HTSUS) subheading 2804.61.0000) is excluded from the scope of these investigations.

Silicon metal is currently classifiable under subheadings 2804.69.1000 and 2804.69.5000 of the HTSUS. While HTSUS numbers are provided for convenience and customs purposes, the written description of the scope remains dispositive.

[FR Doc. 2017–06622 Filed 4–3–17; 8:45 am]

BILLING CODE 3510–DS–P

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–428–844]**

### Certain Carbon and Alloy Steel Cut-to-Length Plate From the Federal Republic of Germany: Final Determination of Sales at Less Than Fair Value

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (the Department) determines that certain carbon and alloy steel cut-to-length plate (CTL plate) from the Federal Republic of Germany (Germany) is being, or is likely to be, sold in the United States at less than fair value (LTFV). The period of investigation (POI) is April 1, 2015, through March 31, 2016. The final dumping margins of sales at LTFV are listed below in the "Final Determination" section of this notice.

**DATES:** Effective April 4, 2017.

**FOR FURTHER INFORMATION CONTACT:** Ross Belliveau or David Goldberger, AD/CVD Operations, Office II, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–4952 and (202) 482–4136, respectively.

**SUPPLEMENTARY INFORMATION:**

---

[33] *See* section 703(a)(2) of the Act.
[34] *See* section 703(a)(1) of the Act.

## Background

On November 14, 2016, the Department published the *Preliminary Determination* of sales at LTFV of CTL plate from Germany.[1] On November 29, 2016, we amended our *Preliminary Determination*.[2] A summary of the events that occurred since the Department published the *Preliminary Determination*, as well as a full discussion of the issues raised by parties for this final determination, may be found in the Issues and Decision Memorandum, which is hereby adopted by this notice.[3]

## Scope of the Investigation

The scope of the investigation covers CTL plate from Germany. For a complete description of the scope of the investigation, *see* Appendix I.

## Analysis of Comments Received

All issues raised in the case and rebuttal briefs by parties in this investigation are addressed in the Issues and Decision Memorandum. A list of the issues raised is attached to this notice as Appendix II. The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https:// access.trade.gov*, and it is available to all parties in the Central Records Unit, room B–8024 of the main Department of Commerce building. In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/ frn/index.html*. The signed and electronic versions of the Issues and Decision Memorandum are identical in content.

## Verification

As provided in section 782(i) of the Tariff Act of 1930, as amended (the Act), in November and December 2016, we conducted verification of the sales and cost information submitted by AG der Dillinger Hüttenwerke (Dillinger) and Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH (collectively, Salzgitter) for use in our final determination. We used standard verification procedures, including an examination of relevant accounting and production records, and original source documents provided by Dillinger and Salzgitter.[4]

## Changes Since the Preliminary Determination

Based on our analysis of the comments received and our findings at verification, we made certain changes to the margin calculations for Dillinger and Salzgitter. For a discussion of these changes, *see* the ''Margin Calculations'' section of the Issues and Decision Memorandum.

## All-Others Rate

Section 735(c)(5)(A) of the Act provides that the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted-average dumping margins established for exporters and producers individually investigated excluding any zero or *de minimis* margins, and margins determined entirely under section 776 of the Act.

For the final determination, the Department calculated the all-others rate based on a weighted average of Dillinger's and Salzgitter's margins using publicly-ranged quantities of their sales of subject merchandise.[5]

## Final Determination

The final weighted-average dumping margins are as follows:

| Exporter/manufacturer | Weighted-average dumping margins (percent) |
|---|---|
| AG der Dillinger Hüttenwerke ... Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH ...................... | 5.38 |
| | 22.90 |
| All Others .................................. | 21.03 |

## Disclosure

We will disclose the calculations performed within five days of the date of publication of this notice to parties in this proceeding in accordance with 19 CFR 351.224(b).

## Continuation of Suspension of Liquidation

In accordance with section 735(c)(1)(B) of the Act, the Department will instruct U.S. Customs and Border Protection (CBP) to continue to suspend liquidation of all appropriate entries of CTL plate from Germany, as described in Appendix I of this notice, which were entered, or withdrawn from warehouse, for consumption on or after November 14, 2016, the date of publication of the preliminary determination of this investigation in the **Federal Register**.

Further, the Department will instruct CBP to require a cash deposit equal to the estimated amount by which the normal value exceeds the U.S. price as shown above.

---

[1] *See Certain Carbon and Alloy Steel Cut-to-Length Plate From the Federal Republic of Germany: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 81 FR 79446 (November 14, 2016) (*Preliminary Determination*).

[2] *See Certain Carbon and Alloy Steel Cut-to-Length Plate From the Federal Republic of Germany: Amended Preliminary Determination of Sales at Less Than Fair Value*, 81 FR 85930 (November 29, 2016) (Amended Preliminary Determination).

[3] *See* Memorandum, ''Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate From Germany,'' dated concurrently with this notice (Issues and Decision Memorandum).

[4] For discussion of our verification findings, *see* the following memoranda: Memorandum, ''Verification of the Sales Response of AG der Dillinger Hüttenwerke in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate From Germany,'' dated December 20, 2016; Memorandum, ''Verification of Berg Steel Pipe Corp. in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate From Germany,'' dated January 4, 2017; Memorandum, ''Verification of the Cost Response of Salzgitter AG in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-To-Length Plate From Federal Republic of Germany,'' dated January 4, 2017; Memorandum, ''Verification of the Sales Response of Berg Steel Pipe Corp. in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany,'' dated January 25, 2017; Memorandum, ''Verification of the Home Market Sales Response of Salzgitter Mannesmann Grobblech GmbH in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate From the Federal Republic of Germany,'' dated January 31, 2017; Memorandum, ''Verification of the Sales Response of Salzgitter Mannesmann International GmbH in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate From the Federal Republic of Germany,'' dated February 1, 2017; Memorandum, ''Verification of the Sales Response of Salzgitter Mannesmann Stahlhandel GmbH International GmbH in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate From the Federal Republic of Germany,'' dated February 1, 2017.

[5] *See* Memorandum, ''Certain Carbon and Alloy Steel Cut-to-Length Plate From Germany: Calculation of the Final Margin for All Other Companies,'' dated March 29, 2017. With two respondents, we normally calculate (A) a weighted-average of the dumping margins calculated for the mandatory respondents; (B) a simple average of the dumping margins calculated for the mandatory respondents; and (C) a weighted-average of the dumping margins calculated for the mandatory respondents using each company's publicly-ranged values for the merchandise under consideration. We compare (B) and (C) to (A) and select the rate closest to (A) as the most appropriate rate for all other companies. *See Ball Bearings and Parts Thereof From France, Germany, Italy, Japan, and the United Kingdom: Final Results of Antidumping Duty Administrative Review, Final Results of Changed-Circumstances Review, and Revocation of an Order in Part*, 75 FR 53661, 53663 (September 1, 2010).

**International Trade Commission (ITC) Notification**

In accordance with section 735(d) of the Act, we will notify the ITC of the final affirmative determination of sales at LTFV. Because the final determination in this proceeding is affirmative, in accordance with section 735(b)(2) of the Act, the ITC will make its final determination as to whether the domestic industry in the United States is materially injured, or threatened with material injury, by reason of imports of CTL plate from Germany no later than 45 days after our final determination. If the ITC determines that material injury or threat of material injury does not exist, the proceeding will be terminated and all cash deposits will be refunded. If the ITC determines that such injury does exist, the Department will issue an antidumping duty order directing CBP to assess, upon further instruction by the Department, antidumping duties on all imports of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the effective date of the suspension of liquidation.

**Notification Regarding Administrative Protective Orders (APO)**

This notice serves as a reminder to parties subject to APO of their responsibility concerning the disposition of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely notification of the return or destruction of APO materials, or conversion to judicial protective order, is hereby requested. Failure to comply with the regulations and the terms of an APO is a sanctionable violation.

This determination and this notice are issued and published pursuant to sections 735(d) and 777(i)(1) of the Act.

Dated: March 29, 2017.

**Ronald K. Lorentzen,**

*Acting Assistant Secretary for Enforcement and Compliance.*

**Appendix I**

**Scope of the Investigation**

The products covered by this investigation are certain carbon and alloy steel hot-rolled or forged flat plate products not in coils, whether or not painted, varnished, or coated with plastics or other non-metallic substances (cut-to-length plate). Subject merchandise includes plate that is produced by being cut-to-length from coils or from other discrete length plate and plate that is rolled or forged into a discrete length. The products covered include (1) Universal mill plates (*i.e.*, flat-rolled products rolled on four faces or in a closed box pass, of a width exceeding 150 mm but not exceeding 1250 mm, and of a thickness of not less than 4 mm, which are not in coils and without

patterns in relief), and (2) hot-rolled or forged flat steel products of a thickness of 4.75 mm or more and of a width which exceeds 150 mm and measures at least twice the thickness, and which are not in coils, whether or not with patterns in relief. The covered products described above may be rectangular, square, circular or other shapes and include products of either rectangular or non-rectangular cross-section where such non-rectangular cross-section is achieved subsequent to the rolling process, *i.e.*, products which have been "worked after rolling" (*e.g.*, products which have been beveled or rounded at the edges).

For purposes of the width and thickness requirements referenced above, the following rules apply:

(1) except where otherwise stated where the nominal and actual thickness or width measurements vary, a product from a given subject country is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above; and

(2) where the width and thickness vary for a specific product (*e.g.*, the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, *etc.*), the measurement at its greatest width or thickness applies.

Steel products included in the scope of this investigation are products in which: (1) Iron predominates, by weight, over each of the other contained elements; and (2) the carbon content is 2 percent or less by weight.

Subject merchandise includes cut-to-length plate that has been further processed in the subject country or a third country, including but not limited to pickling, oiling, leveling, annealing, tempering, temper rolling, skin passing, painting, varnishing, trimming, cutting, punching, beveling, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the investigation if performed in the country of manufacture of the cut-to-length plate.

All products that meet the written physical description, are within the scope of this investigation unless specifically excluded or covered by the scope of an existing order. The following products are outside of, and/or specifically excluded from, the scope of this investigation:

(1) Products clad, plated, or coated with metal, whether or not painted, varnished or coated with plastic or other non-metallic substances;

(2) military grade armor plate certified to one of the following specifications or to a specification that references and incorporates one of the following specifications:

- MIL–A–12560,
- MIL–DTL–12560H,
- MIL–DTL–12560J,
- MIL–DTL–12560K,
- MIL–DTL–32332,
- MIL–A–46100D,
- MIL–DTL–46100–E,
- MIL–46177C,
- MIL–S–16216K Grade HY80,
- MIL–S–16216K Grade HY100,
- MIL–S–24645A HSLA–80;
- MIL–S–24645A HSLA–100,

- T9074–BD–GIB–010/0300 Grade HY80,
- T9074–BD–GIB–010/0300 Grade HY100,
- T9074–BD–GIB–010/0300 Grade HSLA80,
- T9074–BD–GIB–010/0300 Grade HSLA100, and
- T9074–BD–GIB–010/0300 Mod. Grade HSLA115,

except that any cut-to-length plate certified to one of the above specifications, or to a military grade armor specification that references and incorporates one of the above specifications, will not be excluded from the scope if it is also dual- or multiple-certified to any other non-armor specification that otherwise would fall within the scope of this investigation;

(3) stainless steel plate, containing 10.5 percent or more of chromium by weight and not more than 1.2 percent of carbon by weight;

(4) CTL plate meeting the requirements of ASTM A–829, Grade E 4340 that are over 305 mm in actual thickness;

(5) Alloy forged and rolled CTL plate greater than or equal to 152.4 mm in actual thickness meeting each of the following requirements:

(a) Electric furnace melted, ladle refined & vacuum degassed and having a chemical composition (expressed in weight percentages):

- Carbon 0.23–0.28,
- Silicon 0.05–0.20,
- Manganese 1.20–1.60,
- Nickel not greater than 1.0,
- Sulfur not greater than 0.007,
- Phosphorus not greater than 0.020,
- Chromium 1.0–2.5,
- Molybdenum 0.35–0.80,
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm;

(b) With a Brinell hardness measured in all parts of the product including mid thickness falling within one of the following ranges:
(i) 270–300 HBW,
(ii) 290–320 HBW, or
(iii) 320–350HBW;

(c) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.5, B not exceeding 1.0, C not exceeding 0.5, D not exceeding 1.5; and

(d) Conforming to ASTM A576–S9 ultrasonic testing requirements with acceptance criteria 2 mm flat bottom hole;

(6) Alloy forged and rolled steel CTL plate over 407 mm in actual thickness and meeting the following requirements:

(a) Made from Electric Arc Furnace melted, Ladle refined & vacuum degassed, alloy steel with the following chemical composition (expressed in weight percentages):

- Carbon 0.23–0.28,
- Silicon 0.05–0.15,
- Manganese 1.20–1.50,
- Nickel not greater than 0.4,
- Sulfur not greater than 0.010,
- Phosphorus not greater than 0.020,
- Chromium 1.20–1.50,
- Molybdenum 0.35–0.55,
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm;

(b) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.5, B not exceeding 1.5, C not exceeding 1.0, D not exceeding 1.5;

(c) Having the following mechanical properties:

(i) With a Brinell hardness not more than 237 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 75ksi min and UTS 95ksi or more, Elongation of 18% or more and Reduction of area 35% or more; having charpy V at −75 degrees F in the longitudinal direction equal or greater than 15 ft. lbs (single value) and equal or greater than 20 ft. lbs (average of 3 specimens) and conforming to the requirements of NACE MR01–75; or

(ii) With a Brinell hardness not less than 240 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 90 ksi min and UTS 110 ksi or more, Elongation of 15% or more and Reduction of area 30% or more; having charpy V at −40 degrees F in the longitudinal direction equal or greater than 21 ft. lbs (single value) and equal or greater than 31 ft. lbs (average of 3 specimens);

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 3.2 mm flat bottom hole; and

(e) Conforming to magnetic particle inspection in accordance with AMS 2301;

(7) Alloy forged and rolled steel CTL plate over 407 mm in actual thickness and meeting the following requirements:

(a) Made from Electric Arc Furnace melted, ladle refined & vacuum degassed, alloy steel with the following chemical composition (expressed in weight percentages):

- Carbon 0.25–0.30,
- Silicon not greater than 0.25,
- Manganese not greater than 0.50,
- Nickel 3.0–3.5,
- Sulfur not greater than 0.010,
- Phosphorus not greater than 0.020,
- Chromium 1.0–1.5,
- Molybdenum 0.6–0.9,
- Vanadium 0.08 to 0.12
- Boron 0.002–0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm.

(b) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy): A not exceeding 1.0(t) and 0.5(h), B not exceeding 1.5(t) and 1.0(h), C not exceeding 1.0(t) and 0.5(h), and D not exceeding 1.5(t) and 1.0(h);

(c) Having the following mechanical properties: A Brinell hardness not less than 350 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 145ksi or more and UTS 160ksi or more, Elongation of 15% or more and Reduction of area 35% or more; having charpy V at −40 degrees F in the transverse direction equal or greater than 20 ft. lbs (single value) and equal or greater than 25 ft. lbs (average of 3 specimens);

(d) Conforming to ASTM A578–S9 ultrasonic testing requirements with acceptance criteria 3.2 mm flat bottom hole; and

(e) Conforming to magnetic particle inspection in accordance with AMS 2301.

The products subject to the investigation are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7208.40.3030, 7208.40.3060, 7208.51.0030, 7208.51.0045, 7208.51.0060, 7208.52.0000, 7211.13.0000, 7211.14.0030, 7211.14.0045, 7225.40.1110, 7225.40.1180, 7225.40.3005, 7225.40.3050, 7226.20.0000, and 7226.91.5000.

The products subject to the investigation may also enter under the following HTSUS item numbers: 7208.40.6060, 7208.53.0000, 7208.90.0000, 7210.70.3000, 7210.90.9000, 7211.19.1500, 7211.19.2000, 7211.19.4500, 7211.19.6000, 7211.19.7590, 7211.90.0000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7214.10.0000, 7214.30.0010, 7214.30.0080, 7214.91.0015, 7214.91.0060, 7214.91.0090, 7225.11.0000, 7225.19.0000, 7225.40.5110, 7225.40.5130, 7225.40.5160, 7225.40.7000, 7225.99.0010, 7225.99.0090, 7226.11.1000, 7226.11.9060, 7226.19.1000, 7226.19.9000, 7226.91.0500, 7226.91.1530, 7226.91.1560, 7226.91.2530, 7226.91.2560, 7226.91.7000, 7226.91.8000, and 7226.99.0180.

The HTSUS subheadings above are provided for convenience and customs purposes only. The written description of the scope of the investigation is dispositive.

## Appendix II

List of Topics Discussed in the Issues and Decision Memorandum

I. Summary
II. Background
III. Scope of the Investigation
IV. Scope Comments
V. Margin Calculations
VI. Discussion of the Issues
1. Differential Pricing Methodology
2. Application of Adverse Facts Available to Salzgitter
3. Excluding Sales Produced by an Unaffiliated Manufacturer for Salzgitter
4. Shipment Date for Salzgitter's Export Price Sales
5. Level of Trade for Salzgitter
6. Capping Freight Revenue for Berg Steel Pipe Corp.'s (BSPC's) Sales
7. Capping BSPC's Revenues for Further Manufacturing by Associated Expenses
8. Salzgitter's Short-Term Euro-Denominated Interest Rate
9. Treatment of Salzgitter Home Market Resales of Further-Processed CTL Plate
10. Adding a Fabrication Product Characteristic for Salzgitter
11. Salzgitter Credit Expense Revisions at Verification
12. Salzgitter Home Market Revenue Items
13. MGB Underreported Costs
14. MGB Scrap Offset
15. Cost Adjustments for Other Salzgitter Manufacturing Entities
16. MGB's G&A Ratio Denominator
17. Further Manufacturing General and Administrative (G&A) Ratio Denominator
18. Further Manufacturing Scrap Offset
19. Further Manufacturing Verification Minor Corrections
20. Home Market Affiliated Service Center Sales for Dillinger
21. Level of Trade for Dillinger
22. Reassignment of Quality Codes for Dillinger
23. Descaling Product Characteristic for Dillinger
24. Interest Rate for Dillinger's U.S. Credit Expenses
25. Excluding Sales of Military Grade Plate for Dillinger
26. Payment Dates for Certain of Dillinger's Home Market and U.S. Sales
27. Corrections from Verification for Dillinger
28. Currency Conversions for Certain Movement Expenses Reported for Dillinger's U.S. Sales
29. Inclusion of Interest Rate in the Affiliated Input Cost of Production for Dillinger
30. Non-Prime Plate Product Costs for Dillinger
31. Blast Furnace Coke Adjustment for Dillinger
32. Dillinger's Reported Affiliated Party Costs
33. G&A Expense Ratio Adjustment Related to Services Obtained from an Affiliated Party for Dillinger
34. Cost Reconciliation Adjustments for Dillinger
VII. Recommendation

[FR Doc. 2017–06628 Filed 4–3–17; 8:45 am]

**BILLING CODE 3510–DS–P**

## DEPARTMENT OF COMMERCE

**International Trade Administration**

**[A–427–828]**

**Certain Carbon and Alloy Steel Cut-to-Length Plate From France: Final Determination of Sales at Less Than Fair Value**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (the Department) determines that certain carbon and alloy steel cut-to-length plate (CTL plate) from France is being, or is likely to be, sold in the United States at less than fair value (LTFV). The period of investigation (POI) is April 1, 2015, through March 31, 2016. The final dumping margins of sales at LTFV are listed below in the "Final Determination" section of this notice.

**DATES:** Effective April 4, 2017.

**FOR FURTHER INFORMATION CONTACT:** Brandon Custard or Terre Keaton Stefanova, AD/CVD Operations, Office II, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW., Washington, DC 20230; telephone: (202) 482–1823 and (202) 482–1280, respectively.

**SUPPLEMENTARY INFORMATION:**

**Background**

On November 14, 2016, the Department published the *Preliminary*

Issues and Decision Memorandum for the Final Affirmative Determination in the
Final Issues and Decision Memorandum in the Less-Than-Fair-Value Investigation
of Certain Carbon and Alloy Steel Cut-To-Length Please from Germany (March
29, 2017)

Appx13-Appx112



Barcode:3556338-01 A-428-844 INV - Investigation -

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-428-844
Investigation
Public Document
E&C/Office II:
DG/WAM/MVT

DATE:　　　　　　　　March 29, 2017

MEMORANDUM TO:　　　Ronald K. Lorentzen
　　　　　　　　　　　Acting Assistant Secretary
　　　　　　　　　　　  for Enforcement and Compliance

FROM:　　　　　　　　Gary Taverman
　　　　　　　　　　　Associate Deputy Assistant Secretary
　　　　　　　　　　　  for Antidumping and Countervailing Duty Operations

SUBJECT:　　　　　　　Issues and Decision Memorandum for the Final Affirmative
　　　　　　　　　　　Determination in the Less-Than-Fair-Value Investigation of
　　　　　　　　　　　Certain Carbon and Alloy Steel Cut-To-Length Plate from
　　　　　　　　　　　Germany

## I.　　Summary

We analyzed the comments of the interested parties in the less-than-fair-value (LTFV) investigation of certain carbon and alloy steel cut-to-length plate (CTL plate) from Germany.  As a result of our analysis, and based on our findings at verification, we made changes to the margin calculations for AG der Dillinger Hüttenwerke (Dillinger) and Ilsenburger Grobblech GmbH (ILG), Salzgitter Mannesmann Grobblech GmbH (SMSD), Salzgitter Flachstahl GmbH (SZFG), and Salzgitter Mannesmann International GmbH (MGB) (collectively, Salzgitter), the mandatory respondents in this investigation.  We recommend that you approve the positions described in the "Discussion of the Issues" section of this memorandum.  Below is the complete list of the issues in this LTFV investigation for which we received comments from interested parties:

Comment 1: Differential Pricing Methodology

Salzgitter

Comment 2: Application of Adverse Facts Available to Salzgitter

Comment 3: Excluding Sales Produced by an Unaffiliated Manufacturer for Salzgitter

Comment 4: Shipment Date for Salzgitter's Export Price Sales

Comment 5: Level of Trade for Salzgitter

Comment 6: Capping Freight Revenue for Berg Steel Pipe Corp.'s (BSPC's) Sales

Comment 7: Capping BSPC's Revenues for Further Manufacturing by Associated Expenses

Comment 8: Salzgitter's Short-Term Euro-Denominated Interest Rate

Comment 9: Treatment of Salzgitter Home Market Resales of Further-Processed CTL Plate

Comment 10: Adding a Fabrication Product Characteristic for Salzgitter

Comment 11: Salzgitter Credit Expense Revisions at Verification

Comment 12: Salzgitter Home Market Revenue Items

Comment 13: MGB Underreported Costs

Comment 14: MGB Scrap Offset

Comment 15: Cost Adjustments for Other Salzgitter Manufacturing Entities

Comment 16: MGB's General and Administrative (G&A) Ratio Denominator

Comment 17: Further Manufacturing G&A Ratio Denominator

Comment 18: Further Manufacturing Scrap Offset

Comment 19: Further Manufacturing Verification Minor Corrections

<u>Dillinger</u>

Comment 20: Home Market Affiliated Service Center Sales for Dillinger

Comment 21: Level of Trade for Dillinger

Comment 22: Reassignment of Quality Codes for Dillinger

Comment 23: Descaling Product Characteristic for Dillinger

Comment 24: Interest Rate for Dillinger's U.S. Credit Expenses

Comment 25: Excluding Sales of Military Grade Plate for Dillinger

Comment 26: Payment Dates for Certain of Dillinger's Home Market and U.S. Sales

Comment 27: Corrections from Verification for Dillinger

Barcode:3556338-01 A-428-844 INV - Investigation -

Comment 28: Currency Conversions for Certain Movement Expenses Reported for Dillinger's
    U.S. Sales

Comment 29: Inclusion of Interest Rate in the Affiliated Input Cost of Production (COP) for
    Dillinger

Comment 30: Non-Prime Plate Product Costs for Dillinger

Comment 31: Blast Furnace Coke Adjustment for Dillinger

Comment 32: Dillinger's Reported Affiliated Party Costs

Comment 33: G&A Expense Ratio Adjustment Related to Services Obtained from an Affiliated
    Party for Dillinger

Comment 34: Cost Reconciliation Adjustments for Dillinger

## II.    Background

On November 14, 2016, the Department of Commerce (the Department) published the
*Preliminary Determination* of sales of CTL plate from Germany at LTFV.[1]  On November 29,
2016, we amended our *Preliminary Determination*.[2]  The period of investigation (POI) is April
1, 2015, through March 31, 2016.

In October 2016 and November 2016, we received scope case briefs and scope rebuttal briefs.
On November 29, 2016, we issued a final memorandum in response to these scope comments in
which we did not change the scope of this investigation.[3]

In November and December 2016, we conducted verification of the sales and COP data reported
by Dillinger and Salzgitter, in accordance with section 782(i) of the Tariff Act of 1930, as

---

[1] *See Certain Carbon and Alloy Steel Cut-to-Length Plate From the Federal Republic of Germany: Preliminary
Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 81 FR 79446
(November 14, 2016) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum from
Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, to Paul Piquado,
Assistant Secretary for Enforcement and Compliance, entitled "Decision Memorandum for the Preliminary
Determination in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate From
the Federal Republic of Germany" (Preliminary Decision Memorandum).

[2] *See Certain Carbon and Alloy Steel Cut-to-Length Plate From the Federal Republic of Germany: Amended
Preliminary Determination of Sales at Less Than Fair Value,* 81 FR 85930 (November 29, 2016) (Amended
Preliminary Determination).

[3] *See* Memorandum from Scot Fullerton, Director of Antidumping and Countervailing Duty Operations, Office VI,
to Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, entitled
"Certain Carbon and Alloy Steel Cut-to-Length Plate From Austria, Belgium, Brazil, the People's Republic of
China, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, the Republic of South Africa,
Taiwan, and Turkey: Final Scope Comments Decision Memorandum," dated November 29, 2016 (Final Scope
Memorandum).

amended (the Act).  In February 2017, we requested that Salzgitter submit revised home market and U.S. sales databases, including sales made by BSPC, an affiliate of Salzgitter.  We received these databases in the same month.  We invited parties to comment on the *Preliminary Determination*.  In February 2017, one of the petitioners (*i.e.,* Nucor),[4] Dillinger, and Salzgitter submitted case and rebuttal briefs.  On March 8, 2017, we held a public hearing at the request of Dillinger, Salzgitter, and the petitioner.

Based on our analysis of the comments received, as well as our verification findings, we revised the weighted-average dumping margins for Dillinger and Salzgitter from those calculated in the *Preliminary Determination.*

### III.    Scope of the Investigation

The products covered by this investigation are certain carbon and alloy steel hot-rolled or forged flat plate products not in coils, whether or not painted, varnished, or coated with plastics or other non-metallic substances (cut-to-length plate).  Subject merchandise includes plate that is produced by being cut-to-length from coils or from other discrete length plate and plate that is rolled or forged into a discrete length.  The products covered include (1) Universal mill plates (*i.e.*, flat-rolled products rolled on four faces or in a closed box pass, of a width exceeding 150 mm but not exceeding 1250 mm, and of a thickness of not less than 4 mm, which are not in coils and without patterns in relief), and (2) hot-rolled or forged flat steel products of a thickness of 4.75 mm or more and of a width which exceeds 150 mm and measures at least twice the thickness, and which are not in coils, whether or not with patterns in relief.  The covered products described above may be rectangular, square, circular or other shapes and include products of either rectangular or non-rectangular cross-section where such non-rectangular cross-section is achieved subsequent to the rolling process, *i.e.*, products which have been "worked after rolling" (*e.g.*, products which have been beveled or rounded at the edges).

For purposes of the width and thickness requirements referenced above, the following rules apply:

(1) except where otherwise stated where the nominal and actual thickness or width measurements vary, a product from a given subject country is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above; and

(2) where the width and thickness vary for a specific product (*e.g.*, the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, *etc.*), the measurement at its greatest width or thickness applies.

---

[4] The petitioners in this investigation are ArcelorMittal USA LLC, Nucor Corporation (Nucor), and SSAB Enterprises, LLC.  Only Nucor filed comments for consideration in the final determination, and is referred to throughout as "the petitioner."

Barcode:3556338-01 A-428-844 INV - Investigation  -

Steel products included in the scope of this investigation are products in which:  (1) iron predominates, by weight, over each of the other contained elements; and (2) the carbon content is 2 percent or less by weight.

Subject merchandise includes cut-to-length plate that has been further processed in the subject country or a third country, including but not limited to pickling, oiling, levelling, annealing, tempering, temper rolling, skin passing, painting, varnishing, trimming, cutting, punching, beveling, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the investigation if performed in the country of manufacture of the cut-to-length plate.

All products that meet the written physical description, are within the scope of this investigation unless specifically excluded or covered by the scope of an existing order.  The following products are outside of, and/or specifically excluded from, the scope of this investigation:

(1)    products clad, plated, or coated with metal, whether or not painted, varnished or coated with plastic or other non-metallic substances;

(2)    military grade armor plate certified to one of the following  specifications or to a specification that references and incorporates one of the following specifications:

- MIL-A-12560,
- MIL-DTL-12560H,
- MIL-DTL-12560J,
- MIL-DTL-12560K,
- MIL-DTL-32332,
- MIL-A-46100D,
- MIL-DTL-46100-E,
- MIL-46177C,
- MIL-S-16216K Grade HY80,
- MIL-S-16216K Grade HY100,
- MIL-S-24645A HSLA-80;
- MIL-S-24645A HSLA-100,
- T9074-BD-GIB-010/0300 Grade HY80,
- T9074-BD-GIB-010/0300 Grade HY100,
- T9074-BD-GIB-010/0300 Grade HSLA80,
- T9074-BD-GIB-010/0300 Grade HSLA100, and
- T9074-BD-GIB-010/0300 Mod. Grade HSLA115,

except that any cut-to-length plate certified to one of the above specifications, or to a military grade armor specification that references and incorporates one of the above specifications, will not be excluded from the

scope if it is also dual- or multiple-certified to any other non-armor specification that otherwise would fall within the scope of this investigation;

(3)     stainless steel plate, containing 10.5 percent or more of chromium by weight and not more than 1.2 percent of carbon by weight;

(4)     CTL plate meeting the requirements of ASTM A-829, Grade E 4340 that are over 305 mm in actual thickness;

(5)     Alloy forged and rolled CTL plate greater than or equal to 152.4 mm in actual thickness meeting each of the following requirements:

(a) Electric furnace melted, ladle refined & vacuum degassed and having a chemical composition (expressed in weight percentages):

- Carbon 0.23-0.28,
- Silicon 0.05-0.20,
- Manganese 1.20-1.60,
- Nickel not greater than 1.0,
- Sulfur not greater than 0.007,
- Phosphorus not greater than 0.020,
- Chromium 1.0-2.5,
- Molybdenum 0.35-0.80,
- Boron 0.002-0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm;

(b) With a Brinell hardness measured in all parts of the product including mid thickness falling within one of the following ranges:

(i)  270-300 HBW,
(ii) 290-320 HBW, or
(iii) 320-350HBW;

(c) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy):  A not exceeding 1.5, B not exceeding 1.0, C not exceeding 0.5, D not exceeding 1.5; and

(d) Conforming to ASTM A578-S9 ultrasonic testing requirements with acceptance criteria 2 mm flat bottom hole;

(6)     Alloy forged and rolled steel CTL plate over 407 mm in actual thickness and meeting the following requirements:

(a) Made from Electric Arc Furnace melted, Ladle refined & vacuum degassed, alloy steel with the following chemical composition (expressed in weight percentages):

- Carbon 0.23-0.28,
- Silicon 0.05-0.15,
- Manganese 1.20-1.50,
- Nickel not greater than 0.4,
- Sulfur not greater than 0.010,
- Phosphorus not greater than 0.020,
- Chromium 1.20-1.50,
- Molybdenum 0.35-0.55,
- Boron 0.002-0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm;

(b) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy):  A not exceeding 1.5, B not exceeding 1.5, C not exceeding 1.0, D not exceeding 1.5;

(c) Having the following mechanical properties:

(i) With a Brinell hardness not more than 237 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 75ksi min and UTS 95ksi or more, Elongation of 18% or more and Reduction of area 35% or more; having charpy V at -75 degrees F in the longitudinal direction equal or greater than 15 ft. lbs (single value) and equal or greater than 20 ft. lbs (average of 3 specimens) and conforming to the requirements of NACE MR01-75; or

(ii) With a Brinell hardness not less than 240 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 90 ksi min and UTS 110 ksi or more, Elongation of 15% or more and Reduction of area 30% or more; having charpy V at -40 degrees F in the longitudinal direction equal or greater than 21 ft. lbs (single value) and equal or greater than 31 ft. lbs (average of 3 specimens);

(d) Conforming to ASTM A578-S9 ultrasonic testing requirements with acceptance criteria 3.2 mm flat bottom hole; and

(e) Conforming to magnetic particle inspection in accordance with AMS 2301;

Barcode:3556338-01 A-428-844 INV - Investigation  -

(7)     Alloy forged and rolled steel CTL plate over 407 mm in actual thickness and meeting the following requirements:

(a) Made from Electric Arc Furnace melted, ladle refined & vacuum degassed, alloy steel with the following chemical composition (expressed in weight percentages):

- Carbon 0.25-0.30,
- Silicon not greater than 0.25,
- Manganese not greater than 0.50,
- Nickel 3.0-3.5,
- Sulfur not greater than 0.010,
- Phosphorus not greater than 0.020,
- Chromium 1.0-1.5,
- Molybdenum 0.6-0.9,
- Vanadium 0.08 to 0.12
- Boron 0.002-0.004,
- Oxygen not greater than 20 ppm,
- Hydrogen not greater than 2 ppm, and
- Nitrogen not greater than 60 ppm.

(b) Having cleanliness in accordance with ASTM E45 method A (Thin and Heavy):  A not exceeding 1.0(t) and 0.5(h), B not exceeding 1.5(t) and 1.0(h), C not exceeding 1.0(t) and 0.5(h), and D not exceeding 1.5(t) and 1.0(h);

(c) Having the following mechanical properties:  A Brinell hardness not less than 350 HBW measured in all parts of the product including mid thickness; and having a Yield Strength of 145ksi or more and UTS 160ksi or more, Elongation of 15% or more and Reduction of area 35% or more; having charpy V at -40 degrees F in the transverse direction equal or greater than 20 ft. lbs (single value) and equal or greater than 25 ft. lbs (average of 3 specimens);

(d) Conforming to ASTM A578-S9 ultrasonic testing requirements with acceptance criteria 3.2 mm flat bottom hole; and

(e) Conforming to magnetic particle inspection in accordance with AMS 2301.

The products subject to the investigation are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7208.40.3030, 7208.40.3060, 7208.51.0030, 7208.51.0045, 7208.51.0060, 7208.52.0000, 7211.13.0000, 7211.14.0030, 7211.14.0045, 7225.40.1110, 7225.40.1180, 7225.40.3005, 7225.40.3050, 7226.20.0000, and 7226.91.5000.

The products subject to the investigation may also enter under the following HTSUS item numbers:    7208.40.6060,  7208.53.0000,  7208.90.0000,  7210.70.3000,  7210.90.9000, 7211.19.1500, 7211.19.2000, 7211.19.4500, 7211.19.6000, 7211.19.7590, 7211.90.0000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7214.10.0000, 7214.30.0010, 7214.30.0080, 7214.91.0015, 7214.91.0060, 7214.91.0090, 7225.11.0000, 7225.19.0000, 7225.40.5110, 7225.40.5130, 7225.40.5160, 7225.40.7000, 7225.99.0010, 7225.99.0090, 7226.11.1000, 7226.11.9060, 7226.19.1000, 7226.19.9000, 7226.91.0500, 7226.91.1530, 7226.91.1560, 7226.91.2530, 7226.91.2560, 7226.91.7000, 7226.91.8000, and 7226.99.0180.

The HTSUS subheadings above are provided for convenience and customs purposes only. The written description of the scope of the investigation is dispositive.

## IV.    ScopeComments

During the course of this investigation, the Department received numerous scope comments from interested parties.  Prior to the *Preliminary Determination*, the Department modified the language of the scope to clarify the exclusion for stainless steel plate, correct two misidentified HTSUS item numbers, and modify language pertaining to existing steel plate and hot-rolled flat-rolled steel orders.[5]

In October and November 2016, we received scope case and rebuttal briefs.  On November 29, 2016, we issued a final scope memorandum in response to these comments in which we did not change the scope of this investigation.[6]

## V.    MarginCalculations

We calculated export price (EP), constructed export price (CEP), and normal value (NV) using the same methodology as stated in the *Preliminary Determination*,[7] except as follows:[8]

---

[5] *See* Memorandum, "Certain Carbon and Alloy Steel Cut-to-Length Plate From Austria, Belgium, Brazil, the People's Republic of China, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, the Republic of South Africa, Taiwan, and Turkey: Scope Comments Decision Memorandum for the Preliminary Determinations," dated September 6, 2016, and Memorandum, "Certain Carbon and Alloy Steel Cut-to-Length Plate From Austria, Belgium, Brazil, the People's Republic of China, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, the Republic of South Africa, Taiwan, and Turkey:  Additional Scope Comments Preliminary Decision Memorandum and Extension of Deadlines for Scope Case Briefs and Scope Rebuttal Briefs," dated October 13, 2016.

[6] *See* Final Scope Memorandum.

[7] *See Preliminary Determination*, and accompanying Preliminary Decision Memorandum, at 8 and 9.

[8] For Dillinger *see* Memorandum, "Final Determination Calculations for Dillinger ," dated March 29, 2017 (Dillinger Final Calculation Memo), and Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Final Determination," dated March 29, 2017 (Dillinger Final Cost Calculation Memo); *see also* Memorandum,"Verification of the Sales Response of AG der Dillinger Hiittenwerke in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany," dated December 20, 2016 (Dillinger Verification Report); Memorandum, "Verification of the Sales Response of Berg Steel Pipe Corp. in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate From the Federal Republic of Germany," dated January 25, 2017 (BSPC Verification Report); and Memorandum, "Verification of Berg Steel

- We included Salzgitter's downstream further processed home market sales in our calculations. For these sales we deducted the further processing expenses, also known as "transformation costs," from the gross unit price in our calculation of the net home market price. *See* Comment 9.

- We included in our calculations Salzgitter's downstream home market sales made by SMSD where Salzgitter was unable to identify the CTL plate manufacturer. As adverse facts available, we applied the highest non-aberrational net price observed for these sales to all of these sales. *See* Comment 2.

- We revised the calculation of Salzgitter's net home market price to include additional revenue items related to on certain home market sales. *See* Comment 12

- We revised MGB's reported cost of manufacturing based on our findings at verification. See Salzgitter Final Cost Calculation Memo.

- We revised MGB's reported scrap offset to reflect the actual market value of the scrap generated. *See* Comment 14.

- We revised MGB's G&A expense ratio calculation to properly account for scrap offsets. *See* Comment 16.

- We revised Salzgitter's consolidated financial expense ratio based on our findings at verification. *See* Salzgitter Final Cost Calculation Memo.

- We revised Salzgitter's reported sales data to take into account our findings from the sales verifications. *See* Salzgitter Final Calculation Memo.

---

Pipe Corp. in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate From Germany," dated January 4, 2017 (BSPC Cost Verification Report).

For Salzgitter, *see* Memorandum, "Final Determination Calculations for Salzgitter," dated March 29, 2017 (Salzgitter Final Calculation Memo), and Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Final Determination Salzgitter," dated March 29, 2017 (Salzgitter Final Cost Calculation Memo); *see also* BSPC Verification Report; Memorandum, "Verification of the Sales Response of Salzgitter Mannesmann International GmbH in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate From the Federal Republic of Germany," dated February 1, 2017 (SMID Verification Report); Memorandum, "Verification of the Sales Response of Salzgitter Mannesmann Stahlhandel GmbH in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate From the Federal Republic of Germany," dated February 1, 2017 (SMSD Verification Report); Memorandum, "Verification of the Home Market Sales Response of Salzgitter Mannesmann Grobblech GmbH in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate From the Federal Republic of Germany," dated January 31, 2017 (MGB Verification Report); and BSPC Cost Verification Report.

- We recalculated Salzgitter's imputed credit expenses for U.S. sales denominated in Euros using the revised short-term Euro-denominated interest rate for Salzgitter.  *See* Comment 8.

- We recalculated foreign inventory carrying costs for Salzgitter to use the revised inventory days obtained at verification and the revised short-term Euro-denominated interest rate.  *See* Comment 8; *see also* Salzgitter Final Calculation Memo.

- We revised BSPC's reported per-unit further manufacturing costs for certain U.S. sales to take into account our findings from the BSPC verification.  Salzgitter Final Calculation Memo.

- We revised BSPC's G&A expense ratio applied to the further manufacturing costs to include the cost of producing the imported CTL plate, rather than transfer price.  We also adjusted this ratio to account for the full scrap offset.  *See* Comments 17, and 18.

- We used Dillinger's cost database submitted on November 7, 2016, in our margin calculations.  As a result, we are no longer assigning the highest cost to certain of Dillinger's sales.  *See* Dillinger Final Cost Calculation Memo.

- We revised Dillinger's margin calculations to take into account our findings from the sales verification.  *See* Comments 23, 25, 26, and 27.

- We revised our calculations to use Dillinger's net, rather than gross, sales quantities reported on a theoretical weight basis.  *See* Dillinger Final Sales Calculation Memo.

- We reassigned the quality codes reported for certain of Dillinger's home market sales.  *See* Comment 24.

- We revised our treatment of the downstream home market sales made by Dillinger's affiliates to exclude from our analysis the portion of each transaction made from Dillinger France S.A. (Dillinger France)- or third party-supplied CTL plate.  *See* Comment 20.

- We converted Dillinger's reported foreign inland freight expenses to a theoretical weight-basis.  *See* Comment 27.

- We removed sales of Dillinger France-produced CTL plate from our calculations.  *See* Comment 27.

- We corrected certain currency conversion errors in our calculations for Dillinger.  *See* Comment 28.

- We assigned Dillinger's highest non-aberrational downstream net price to all downstream sales for which Dillinger did not report the manufacturer of the CTL plate.  *See* Comment 20.

## VI.    Discussion of Issues

### Comment 1:  Differential Pricing

*Dillinger's and the European Commission's Arguments*

- In the *Preliminary Determination*, we applied our differential pricing methodology in our margin calculations for Dillinger.  Dillinger and the European Commission note that in *US—Washing Machines (Korea)*, the Appellate Body of the World Trade Organization (WTO) determined that the Department's differential pricing methodology is inconsistent "as such" with Article 2.4.2 of the WTO Antidumping Agreement.[9]  Therefore, Dillinger and the European Commission argue that the differential pricing methodology used in this investigation is not in accordance with the WTO Antidumping Agreement.

- Specifically, Dillinger contends that:

  o The language of Article 2.4.2 of the Antidumping Agreement is nearly identical to that of section 777A(d)(l) of the Act.  According to Dillinger: 1) the WTO Agreements constitute treaty obligations of the United States.; and 2) *Charming Betsy* directs that U.S. statutes should never be interpreted to conflict with international obligations, absent language from Congress to the contrary.[10]  Thus, Dillinger contends that, because the language of the Act and the Antidumping Agreement are the same, the Department should find that its differential pricing methodology is not in accordance with the Act.

  o The WTO Appellate Body struck down the Department's use of zeroing in calculating dumping margins.[11]  According to Dillinger, it is the application of zeroing in the differential pricing methodology which accounts for the different results in the average-to-average (A-A) and average-to-transaction (A-T)

---

[9] *See* Letter from Dillinger, "Certain Carbon and Alloy Steel Cut-To-Length from Germany; AG der Dillinger Huttenwerke Case Brief," dated February 13, 2017 (Dillinger's Case Brief), at 19 and Letter from the European Commission, "Antidumping Duty Investigations of Imports of Carbon and Alloy Steel Cut-To-Length Plate from Austria, Belgium, France, Germany and Italy (investigations: A-433-812, A-423-812,, A-427 -828, A- 428-844, A-475-834) Comments from the European Commission Regarding the Preliminary Determinations," dated December 22, 2016 (the European Commission's Case Brief), at 3 (citing *United States Antidumping and Countervailing Measures on Large Residential Washers from Korea*, Report of the Appellate Body, WT/DS464/AB/R (September 7, 2016) (*US—Washing Machines (Korea)*).

[10] *See* Dillinger's Case Brief at 19 (citing *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 81, 2 L. Ed. 208 (1804) (stating that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains") (*Charming Betsy*); and *Federal Mogul Corp. v. United States*, 63 F.3d 1572, 1581 (Fed. Cir. 1995) (stating "absent express Congressional language to the contrary, statutes should not be interpreted to conflict with international obligations.")).

[11] *Id.* (citing *US—Washing Machines (Korea)*, at paras. 5.152-5.155).

methods.  Dillinger contends that the Department's differential pricing methodology does not provide an explanation of why price differences cannot be taken account by the A-A (or transaction-to-transaction) method.  Dillinger states that, in the absence of zeroing, its dumping margin would have been *de minimis* under either the A-A or the A-T method.[12]

o   The WTO Appellate Body found that the Department's differential pricing methodology fails to compare a pool of sales suspected of having a pattern of prices that differs significantly to a distinct pool of sales not suspected of having such a pattern.[13]  Dillinger contends that, while the Department found that 62.96 percent of its sales passed the Cohen's *d* test in the *Preliminary Determination*, this result does not demonstrate a pattern.  Instead, Dillinger argues that it reflects the random price variations inherent in its made-to-order sales and individual negotiations with its customers.[14]  Thus, Dillinger argues that unless the Department revises its differential pricing methodology to isolate a distinct subset of its sales to compare to all other sales, it should use the A-A method to calculate its margin.

o   Specifically, Dillinger argues that, if the Department constructs the product control number (CONNUM) using field PRODCOD2U, rather than QUALITYU, this would lower the overall percentage of U.S, sales passing the Cohen's *d* test.  Dillinger finds it significant that this change would result in fewer than 33 percent of sales by both region and purchaser passing the Cohen's *d* test.  Moreover, Dillinger contends that the percentage of sales passing the Cohen's *d* test by period would fall below 33 percent, if the Department were to remove those transactions that also pass the Cohen's *d* test by either region or time.

o   The WTO Appellate Body found that the Department's pattern must identify prices that are significantly lower than other export prices.[15]  However, Dillinger notes that in the *Preliminary Determination,* the Department included sales in its

---

[12] Dillinger claims that the Department's application of zeroing to it in this proceeding goes against the purpose of an investigation.  *Id.* at 20 (citing *Union Steel v. United States*, 823 F. Supp. 2d 1346, 1358-1359 (CIT 2012) ("The parties who are marginally dumping or not dumping may be excluded from the order pursuant to the looser standards of the investigation, particularly after zeroing is eliminated."); *aff'd Union Steel v. United States*, 713 F.3d 1101 (2013) (*Union Steel CAFC*)).

[13] *Id.* (citing *Korean Washers* at para. 5.1.3) and the European Commission's Case Brief at 3.

[14] Dillinger notes that it produces products to multiple grades and specifications.  However, according to Dillinger, the Department's model match methodology collects these products, which are technically and commercially different, into broad quality baskets.  Dillinger notes that the Department's differential pricing methodology does not account for these differences within CONNUMs when making comparisons across purchasers, regions, or time periods.

[15] *See* Dillinger's Case Brief at 24 (citing *US—Washing Machines (Korea)* at para. 5.29) and the European Commission's Case Brief at 2.

Barcode:3556338-01 A-428-844 INV - Investigation  -

pattern analysis that are both higher and lower than NV.  Nonetheless, Dillinger argues that the U.S. antidumping law is concerned with dumped merchandise, not high-priced goods.  Thus, Dillinger contends that the Department should revise its pattern analysis to consist exclusively of sales that are lower than NV.[16]

o   Dillinger argues that the ratio test is also WTO inconsistent because it combines sales by purchaser, region, and time period that pass the Cohen's *d* test.[17]  Thus, Dillinger claims that the Department cannot determine whether actual prices differences exist or arise from sales made to purchasers in different regions or at different time periods.  As a result, Dillinger contends that the Department should only apply the A-T methodology if it finds a pattern applicable to a particular purchaser, a particular region, or a particular time period.

• Dillinger argues that, in the *Preliminary Determination,* the Department failed to provide an explanation of why differences in prices among purchasers, regions, or time cannot be taken into account by the A-A method because the only difference between the A-A and A-T methods is the use of zeroing.  Further, Dillinger notes that the Department did not provide an explanation: 1) regarding the T-T method[18]; or 2) of why applying the A-A method using shorter averaging periods, as permitted by 19 CFR 351.414(d)(3), would not take the differences into account.[19]

*The Petitioner's Arguments*

• The petitioner disagrees with Dillinger's arguments regarding differential pricing, asserting that the Department should continue to apply its normal methodology for the following reasons:

o   The WTO Appellate Body's decision in *US—Washing Machines (Korea)* has no effect on the Department's differential pricing methodology in this proceeding. According to the petitioner, WTO reports are not self-executing and only apply

---

[16] Dillinger argues that if the Department were to revise its differential pricing analysis in this manner, the percentage of its sales which pass the Cohen's *d* test would fall below 33 percent.

[17] *See* Dillinger's Case Brief at 25 (citing *US—Washing Machines (Korea)* at para. 5.32) and the European Commission's Case Brief at 2.

[18] *See* Dillinger's Case Brief at 27 (citing *US—Washing Machines (Korea)* at para. 5.76 (stating that an investigating authority must explain why both the W-W and T-T comparison methodologies cannot appropriately take into account the differences in export prices that form the pattern).

[19] *Id.* (citing its Submission of New Factual Information on Differential Pricing (Oct. 5, 2016)) for additional documentation on the deficiencies in the differential pricing methodology.

once they have been adopted by the statutory scheme set for in the Uruguay Round Agreement Act.[20]

o   The Department's differential pricing methodology addresses the statutory criteria required by the Act.

o   The Department has addressed and rejected Dillinger claim that it has no legal authority to apply zeroing in previous cases.  Moreover, the petitioner notes that the courts have upheld the Department's authority to apply zeroing.[21]  According to the petitioner, Dillinger provided no new arguments on this issue in this investigation.

o   The Department has previously addressed and rejected all the differential pricing arguments Dillinger raises, including arguments regarding the inclusion of high priced sales in the pattern.[22]  According to the petitioner, the Department should continue to reject such arguments here.

o   In the *Preliminary Determination*, the Department explained that the price differences identified by the Cohen's d test were not accounted for using the A-A method because the weighted-average dumping margins moved across the *de minimis* threshold.  The petitioner notes that, in *Apex*, the U.S. Court of International Trade (CIT) upheld a similar determination by the Department,

---

[20] *See* Letter from Nucor, "Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany: Rebuttal Brief," dated February 21, 2017 (the petitioner's Rebuttal Brief), at 28 (citing *Corus Staal BV v. U.S. Dep't of Commerce*, 395 F.3d 1343, 1347-49 (Fed. Cir. 2005) (*Corus Staal 2005*); *accord Corus Staal BV* v. *United States*, 502 F.3d 1370, 1375 (Fed. Cir. 2007) (*Corus Staal 2007*); *NSK Ltd.* v. *United States*, 510 F.3d 1375, 1379-80 (Fed. Cir. 2007); and *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of Changed Circumstances Review and Reinstatement of Shanghai General Bearing Co., Ltd. in the Antidumping Duty Order),* 82 FR 4853 (January 17, 2017), and accompanying Issues and Decision Memorandum at Comment 5)).

[21] *Id.* at 27 (citing *Union Steel CAFC*, 713 F.3d at 1106; *Diamond Sawblades and Parts Thereof From the People's Republic of China; Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 FR 32344 (June 8, 2015), and accompanying Issues and Decision at Comment 11; *Stainless Steel Plate in Coils from Belgium: Antidumping Duty Administrative Review, 2010-2011*, 77 FR 73013 (December 7, 2012), and accompanying Issues and Decision at Comment 2; and *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea; Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 FR 16247 (March 14, 2013), and accompanying Issues and Decision Memorandum at Comment 1.)

[22] *Id.* at 48 – 51 (citing *Certain Cut-to-Length Carbon-Quality Steel Plate Products From the Republic Korea: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 54264 (September 11, 2014), and accompanying Issues and Decisions Memorandum at Comment 1; *Certain Steel Nails From the People's Republic of China: Final Results of the Fourth Antidumping Duty Administrative Review,* 79 FR 19316 (April 8, 2014)*,* and accompanying Issues and Decision Memorandum at Comment 7; and *Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012,* 78 FR 70533 (November 26, 2013)*,* and accompanying Issues and Decision Memorandum at Comment 4.

Barcode:3556338-01 A-428-844 INV - Investigation -

finding lawful the Department's meaningful difference analysis using zeroed and non-zeroed calculation methods.[23]

**Department'sPosition:**

The Department disagrees with the European Commission's and Dillinger's comments on its differential pricing analysis.  As an initial matter, we note that there is nothing in section 777A(d) of the Act that mandates how the Department measures whether there is a pattern of prices that differs significantly or explains why the A-to-A method or the transaction-to-transaction (T-to-T) method cannot account for such differences.  On the contrary, carrying out the purpose of the statute here is a gap filling exercise properly conducted by the Department.[24] As explained in the *Preliminary Determination*, as well as in various other proceedings,[25] the Department's differential pricing analysis is reasonable, including the use of the Cohen's *d* test as a component in this analysis, and is not contrary to the law.

In carrying out the statutory objective, the Department determines whether "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differs significantly among purchasers, regions, or periods of time, and . . . explains why such differences cannot be taken into account using {the A-to-A or T-to-T comparison method}."[26]  The Department finds that the purpose of section 777A(d)(1)(B) of the Act is to evaluate whether the A-to-A method is the appropriate method to determine whether, and if so to what extent, a given respondent is dumping the merchandise at issue in the U.S. market.[27]

The Department disagrees the arguments set forth by both the European Commission and Dillinger regarding the effect that the WTO Appellate Body's findings in *US – Washing Machines (Korea)* has on the Department's methodology utilized in this investigation. As a general matter, the U.S. Court of Appeals for the Federal Circuit (CAFC) has held that WTO reports are without effect under U.S. law, "unless and until such a {report} has been adopted

---

[23] *Id.* at 25 (citing *Apex Frozen Foods Private Ltd.* v. *United States*, 37 F. Supp. 3d 1286, 1299 (CIT 2014) (*Apex*) ("Because A-T would yield some duties but A-A would yield none, Commerce reasonably decided that the difference between the rates was 'meaningful,' and that A-A could not account for dumping from targeted sales.") (citing *Beijing Tianhai Indus.* v. *United States*, 7 F. Supp. 3d 1318, 1331-32 (CIT 2014) (holding explanation invalid where Commerce provided no basis to conclude that A-A could not account for targeting)).

[24] *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) (*Chevron*) (recognizing deference where a statute is ambiguous and an agency's interpretation is reasonable); *see also Apex*, 37 F. Supp. 3d at 1302 (applying *Chevron* deference in the context of the Department's interpretation of section 777A(d)(1) of the Act).

[25] *See, e.g.*, *Welded Line Pipe From the Republic of Korea:  Final Determination of Sales at Less Than Fair Value*, 80 FR 61366 (October 13, 2015) (*Lipe Pipe from Korea*) and the accompanying Issues and Decision Memorandum at comment 1; *Circular Welded Non-Alloy Steel Pipe From the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2012-2013*, 80 FR 32937 (June 10, 2015) (*CWP from Korea*), and the accompanying Issues and Decision Memorandum at comments 1 and 2, and *Welded ASTM A–312 Stainless Steel Pipe From the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2013–2014*, 81 FR 46647 (July 18, 2016) at comment 4.

[26] *See* section 777A(d)(1)(B) of the Act.
[27] *See* 19 CFR 351.414(c)(1).

pursuant to the specified statutory scheme" established in the Uruguay Round Agreements Act (URAA).[28]  In fact, Congress adopted an explicit statutory scheme in the URAA for addressing the implementation of WTO reports.[29]  Indeed, the Statement of Administrative Action (SAA) noted that "WTO dispute settlement panels will have no power to change U.S. law or order such a change.  Only Congress and the Administration can decide whether to implement a WTO panel recommendation and, if so, how to implement it."[30]  As is clear from the discretionary nature of this scheme, Congress did not intend for WTO reports to automatically trump the exercise of the Department's discretion in applying the statute.[31]  The United States has not adopted changes to its methodology pursuant to the URAA's implementation procedure.  And, as described in detail below, the Department has not revised its use of the differential pricing methodology for this final determination.

Dillinger's reliance on *Charming Betsy* is misplaced.  To follow Dillinger's logic, interpretation of U.S. law would be left to the hands of the WTO simply because the text of U.S. law reflects the language of a WTO agreement.  However, as discussed above, the URAA specifies a statutory process for implementing an adverse WTO report adopted by the Dispute Settlement Body.

For Dillinger, in this final determination, based on the results of the differential pricing analysis, the Department finds that 64.06 percent of the value of U.S. sales pass the Cohen's *d* test,[32] and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  Further, the Department determines that the A-to-A method cannot account for such differences because the weighted-average dumping margin between the A-to-A method and the appropriate alternative method (*i.e.*, the mixed A-to-A and A-to-T method) crosses the *de minimis* threshold.  Thus, for this final determination, the Department finds that there is a meaningful difference between using the different comparison methods, and is applying the A-to-T method to Dillinger's U.S. sales that pass the Cohen's *d* test and the A-to-A method to Dillinger's U.S. sales that do not pass the Cohen's *d* test to calculate the weighted-average dumping margin for Dillinger.

   1.  Zeroing

Dillinger's argument that zeroing is not permitted according to WTO jurisprudence fails.  As discussed above, the URAA provides a statutory process by which adverse WTO reports are implemented under U.S. law.

The Department agrees with Dillinger's assertion that without zeroing, the calculated weighted-average dumping margins will, in every situation, be identical between application of the A-to-A method and application of the A-to-T method.  This is also true when applying the "mixed"

---

[28] *See Corus Staal 2005*, *cert. denied* 126 S. Ct. 1023 (2006); *accord Corus Staal 2007*.

[29] *See*, *e.g.*, 19 U.S.C. § 3533, 3538 (sections 123 and 129 of the URAA).

[30] *See* SAA at 659.

[31] *See*, *e.g.*, 19 U.S.C. § 3538(b)(4) (implementation of WTO reports is discretionary).

[32] *See* Dillinger Final Calculation Memo at Attachment IV (SAS Margin Output at page 132.)

Barcode:3556338-01 A-428-844 INV - Investigation  -

comparison method where the A-to-T method is applied to the U.S. sales which constitute the pattern of prices that differ significantly (pattern) and the A-to-A method is applied to the U.S. sales which are not part of the pattern. Therefore, if the T-to-T method is not appropriate[33] and the A-to-A method is the standard comparison method, then the application of an alternative comparison method pursuant to section 777A(d)(1)(B) of the Act will be rendered inutile without zeroing.

Dillinger's reference to *Union Steel* is misplaced. This litigation involved the sixteenth administrative review of certain corrosion-resistant carbon steel flat products from Korea.[34] At issue in that litigation was whether the Department was permitted to view "dumping margin" and "weighted average dumping margin," pursuant to section 771(35) of the Act, in two different ways, which the CAFC affirmed. In the review underlying *Union Steel*, the Department calculated Union Steel's dumping margins and weighted-average dumping margin using the A-to-T method, with zeroing. However, in a less-than-fair-value investigation, the Department's normal practice was to calculate a respondent's dumping margins and weighted-average dumping margin using the A-to-A method without zeroing.[35] Dillinger points to the court's discussion where it states that in an investigation the Department "focuses on the overall pricing behavior of an exporter"[36] to support its claim that the Department should not be zeroing in the instant investigation because "{s}pecificity is less important in investigations."[37] However, Dillinger fails to recognize the Department's general practice at that time and now. The Department was permitted at that time, and continues to be permitted now, to resort to the A-to-T method in an investigation to address "targeted dumping" when the two requirements of section 777A(d)(1)(B) of the Act had been satisfied.[38] Further, the CAFC recognized that the Department may use zeroing when applying the A-to-T method where patterns of significant price differences are found.[39] Since the time of the administrative review underlying *Union Steel*, the Department has also revised its practice to normally apply the A-to-A method in administrative reviews.[40] Accordingly, Dillinger's argument that the use of zeroing based on a selected quotation from *Union Steel* is baseless.

Finally, Dillinger's assertion that its weighted-average dumping margin would be *de minimis* when either the A-to-A method or the A-to-T method is applied without zeroing is a tautology,

---

[33] *See* 19 CFR 351.414(c)(2); *see also* Uruguay Round Agreement Act, Statement of Administrative Action (SAA), H.R. Doc. No. 103-316 at 843 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4161.

[34] *See generally* Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: *Notice of Final Results of the Sixteenth Administrative Review*, 76 FR 15291 (March 21, 2011).

[35] *See* section 777A(d)(1)(A) of the Act.

[36] See Dillinger France Case Brief at 25 (citing to *Union Steel*, 823 F. Supp. 2d 1346 at 1358-59).

[37] *Id.*

[38] *See Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From Indonesia: Final Determination of Sales at Less Than Fair Value*, 75 FR 59223 (September 27, 2010)..

[39] *See U.S. Steel Corp v. United States*, 621 F. 3d 1351, 1363 (Fed. Cir. 2010) (*U.S. Steel Corp.*)

[40] *See Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification*, 77 FR 8101 (February 14, 2012).

and, therefore, meaningless. From the Dillinger Final Calculation Memo,[41] the sums of the Positive Comparison Results and the Negative Comparison Results are each identical for the three potential comparison methods (*i.e.*, A-to-A method, A-to-T method, "mixed" method).[42] This simply demonstrates that the calculated results, without zeroing, are identical, and will render the alternative comparison method inutile. Therefore, to assert that the Department cannot use zeroing because then Dillinger's weighted-average dumping margin would be *de minimis* is self-serving.

2.  The Differential Pricing Analysis Identifies a Pattern of Prices that Differ Significantly

The Department agrees with Dillinger's assertion "{p}rice differences by themselves do not constitute a pattern or the 'masking of dumping.'"[43] First, as Dillinger highlights, there can be various commercial and economic factors behind a company's pricing behavior which may change depending on the circumstances. Nonetheless, what section 777A(d)(1)(B)(i) of the Act requires (the pattern requirement), is that the Department identify a "pattern of {prices} for comparable merchandise that differ significantly." Accordingly, the Department does not seek to identify just *any* price differences but, rather, prices that differ significantly. As discussed below, this is precisely what the Cohen's *d* test does. Further, the pattern requirement necessitates only that there exist significant differences in prices. It is not incumbent upon the Department to determine why these prices differences are exhibited by the respondent's pricing behavior in the U.S. market.[44]

Second, when it is considering whether there is a pattern of prices that differ significantly, the Department is considering U.S. sales and, therefore, not evaluating whether particular sales are dumped at this stage of its analysis. The pattern requirement examines prices within the U.S. market and does not require a comparison with normal value. The purpose of the pattern requirement is to determine whether conditions exist in the U.S. market where "targeted" or masked dumping might exist.

The Department disagrees with Dillinger's assertion that the results of its Cohen's *d* test in the preliminary determination, in which 64.06 percent of Dillinger's U.S. sales exhibit significant price differences, is only a reflection of "random price variations based upon Dillinger's made-to-order business and its individual negotiations with each separate customer."[45] First, the Department finds unreasonable Dillinger's claim that these price differences represent random

---

[41] *See* Dillinger Final Calculation Memorandum.

[42] See Dillinger Final Calculation Memorandum at Attachment IV (SAS Margin Output at pages 158-160), where the calculation results of the A-to-A method, the A-to-T method and the "mixed" method are summarized. The sum of the "Positive Comparison Results" and the "Negative Comparison Results" for each of the three comparison methods are identical, *i.e.*, with offsets for all non-dumped sales (*i.e.*, negative comparison results), the amount of dumping is identical. As such, the difference between the calculated results of these comparison methods is whether negative comparison results are used as offsets or set to zero (*i.e.*, zeroing).

[43] See Dillinger's Case Brief at 26.

[44] See JBF RAK LLC v United States, 991 F Supp. 2d 1343 (CIT 2014) at 1355. *See also Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, 608 F. App'x 948 (Fed. Cir. 2015).

[45] See Dillinger's Case Brief at 26.

price variations.  Companies are responsive to economic, legal, business, and other forces, and as such differences in prices reflect each company's priorities and goals through its pricing behavior.  Thus, Dillinger's claim that its price differences are merely random is meritless.

Third, Dillinger's claim that its specific business practices render the Cohen's *d* and ratio tests invalid is equally meritless.  It is not abnormal for a company to not inventory stock and to produce to specific customer purchase orders.  Likewise, the Department does not find that sale negotiations which are conducted with individual customers to be abnormal.  Certainly, a company may offer more or less favorable terms to any given customer for any number of reasons, all of which could be reflective of the business, legal, economic, and other forces noted above which are the foundation for establishing a company's pricing behavior.

Fourth, Dillinger's inference that the magnitude of its U.S. sales passing the Cohen's *d* test (in this case 64.06 percent) may be indicative of the unreasonableness of the Cohen's *d* test is also baseless.  Mere reliance on a Dillinger's numerical result from the test does not demonstrate how or that the Cohen's *d* test is unreasonable and, therefore, the Department does not find Dillinger's argument in this respect persuasive.  For example, a company sells a single product to two customers, A and B.  The prices to customer A differ significantly from the prices to customer B, and logically then the prices to customer B differ significantly from the prices to customer A.  Thus, in this example, all of the company's sales are at prices that differ significantly.  The Department finds this result to be reasonable.  Likewise, if the prices to customer A do not differ significantly with the prices to customer B, then the prices to customer B will not be significantly different that the prices to customer A, and no sales will be found to differ significantly.  While either of these situations may be at the outer range of potential results (*i.e.*, 100 percent or 0 percent), neither are unreasonable simply because of the numerical result.  Similarly, the fact that 64.06 percent of Dillinger's U.S. sale prices differ significantly is abnormal simply because of the numerical result.

Similar to its argument above, Dillinger further asserts that its made-to-order products are so unique and embrace such a wide range of grades within a given CONNUM that any comparison of U.S. prices on a CONNUM basis must take into account these inter-CONNUM variations.  The Department disagrees.  The CONNUM and its constituent physical characteristics are all subject to comment during this investigation.[46]  Dillinger provided comments,[47] and Dillinger's arguments have been fully considered.  The established CONNUMs are the foundation for reporting not only comparison and U.S. market sales, but also Dillinger's costs of production, and are the basis for comparison of U.S. prices with normal value.  Since the purpose of the differential pricing analysis is to consider whether the A-to-A method is appropriate to calculate Dillinger's weighted-average dumping margin, and the comparisons on which this calculation is based are defined by CONNUMs, the Department finds that it is appropriate, and reasonable, to use these same CONNUMs as the basis for the comparisons of U.S. prices in the differential pricing analysis.

---

[46] See {Initiation Notice} at 27090 (May 5, 2016); and {request for comments on physical characteristics} (May 19, 2016).

[47] {citation to Dillinger's responses}.

Likewise, Dillinger's suggestion to replace the QUALITYU code[48] within the CONNUM with the PRODCOD2U code[49] is misplaced.  As discussed above, the CONNUM is a foundational element of the Department's dumping analysis, including the comparison of U.S. prices with their normal value and examining whether the A-to-A method is appropriate for making these comparisons.  Accordingly, it is appropriate for the Department to maintain a consistent definition of CONNUM throughout the Department's dumping analysis in a given investigation or review and not changed for one part of the analysis just to meet the desired results of an interested party.  Furthermore, Dillinger's claim that the Department must limit each test group to a specific purchaser and a specific region and a specific time period is addressed below.

Dillinger also bases its arguments as to the inappropriateness of the Department analysis to satisfy the pattern requirement on WTO jurisprudence.  As discussed above, such arguments are inapposite.

3.  Both Higher- and Lower-Priced U.S. Sales May Contribute to a Pattern

The Department disagrees with Dillinger's assertion that higher-priced U.S. sales cannot contribute to a pattern of prices that differ significantly.  Dillinger does not understand the term "targeted dumping" and how price differences may result in "targeted" or masked dumping.  The SAA states that "targeted dumping" is where "an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions."[50] For "targeted" or masked dumping to exist, there must be both lower-priced U.S. sales which evidence dumping as well as higher-priced, non-dumped U.S. sales which "conceal,"[51] mask, hide this evidence of dumping.  Therefore, since the purpose of section 777A(d)(1)(B) is to provide a remedy for "targeted dumping," pursuant to which the Department must satisfy the pattern requirement to demonstrate that the respondent's pricing behavior in the U.S. market exhibits characteristics "where targeted dumping may be occurring,"[52] the Department continues to find reasonable and logical its approach of including both lower-priced and higher-priced U.S. sales as part of a potential pattern of prices that differ significantly.  Whether "targeted" or masked dumping is occurring is considered under the second statutory requirement, section 777A(d)(1)(B)(ii) of the Act, which is addressed below.

4.  Price Differences Are Correctly Examined By Purchaser, Region or Time Period

The Department disagrees with Dillinger that it has improperly compared U.S. prices among purchasers, regions and time periods.  The Cohen's *d* test compares the U.S. sale prices sequentially to each purchaser, region and time period, with all other U.S. sale prices (*i.e.*, the

---

[48] {please define}

[49] {please define}

[50] See SAA at 842.

[51] Id.

[52] Id. at 843.

U.S. sales to all other purchasers, regions or time periods, respectively) of comparable merchandise.  What appears to be the concern of Dillinger, for example with purchasers, is that the U.S. sales to each purchaser may not be evenly distributed across the other two types of groups, regions and time periods.  Thus, Dillinger posits that the "Department therefore cannot determine whether a price difference is actually due to real differences between purchasers or simply due to the fact that the sales are to purchasers in different regions or during different time periods."[53]

The Department finds that this is neither a flaw in the Cohen's $d$ test nor a distortion of the results.  The Department also does not find that there are flaws related to the other two groups (*i.e.*, U.S. sales to a particular region that are equally distributed across all purchasers and time periods, or U.S. sales in a particular time period that are equally distributed across all purchasers and regions).  The one possible distortion that could arise, for example that each purchaser is located in a specific region, is that similar results would occur when comparing prices by purchaser and by region.  However, the ratio test does not double-count the sales value when a given U.S. sale price is found to be significantly different by purchaser and region.  There is no assumption about correlated distribution of sales between purchasers, regions or time periods, and indeed a given U.S. sale price may be found to be significantly different by all three categories.  Yet the ratio test ensures that any such correlation between purchasers, regions and/or time periods does not distort the results of the test and result in a finding that a larger proportion of the U.S. sale value is at prices which differ significantly.

5. The Differential Pricing Analysis Explains Why the A-to-A Method Cannot Account for Such Differences

As an initial matter, the use of shorter averaging periods pursuant to 19 CFR 351.414(d)(3) has not been raised in this investigation by Dillinger until this case brief.  There is no record evidence or prior argument for this change in the Department's dumping analysis, and as such, at this stage of this investigation, there is neither evidence to support such a claim nor the time to permit the Department to analysis such a claim or for interested parties to comment on such a change in the Department's standard practice.[54]

As a second matter, the Department is not required to also examine whether the T-to-T method, in addition to the A-to-A method, can account for the significant price differences.  The Department's regulations state that

> In an investigation or review, the Secretary will use the average-to-average method unless the Secretary determines another method is appropriate in a particular case.[55]

---

[53] See case brief at 30.

[54] *See* 19 CFR 351.414(d)(3) ("When applying the average-to-average method in an investigation, the Secretary normally will calculate weighted-averages for the entire period of investigation.")

[55] *See* 19 CFR 351.414(c)(1).

Barcode:3556338-01 A-428-844 INV - Investigation  -

Both the regulations[56] and the SAA[57] describe situations where application of the T-to-T method would be appropriate. No interested party has argued in this investigation or provided evidence on the record which would support the use of the T-to-T method to calculate the weighted-average dumping margin for Dillinger. Thus, the appropriate standard comparison method[58] for this final determination for Dillinger is the A-to-A method. Accordingly, the appropriate standard comparison method which must be considered in section 777A(d)(1)(B)(ii) of the Act – the A-to-A method "or"[59] the T-to-T method – is the A-to-A method. Lastly, Dillinger's reliance again on WTO precedence, as discussed above, is inapposite.

The Department disagrees, in part, with Dillinger that the difference in the weighted-average dumping margins, calculated using the A-to-A method and the appropriate alternative comparison method based on the A-to-T method, "are not the result of the difference between the A-to-A and the A-to-T methodology."[60] The Department does agree with Dillinger that this difference is due to zeroing, because as stated above, weighted-average dumping margins calculated using the A-to-A method without zeroing and the A-to-T method without zeroing will yield the identical results. This is evidenced above with the calculation results for Dillinger in this final determination.[61]

The difference in the calculated results specifically reveals the extent of the masked, or "targeted," dumping which is being concealed when applying the A-to-A method.[62] The difference in these two results is caused by higher U.S. prices offsetting lower U.S. prices where the dumping, which may be found on lower priced U.S. sales, is hidden or masked by higher U.S. prices,[63] such that the A-to-A method would be unable to account for such differences.[64] Such masking or offsetting of lower prices with higher prices may occur implicitly within the averaging groups or explicitly when aggregating the A-to-A comparison results. Therefore, in order to understand the impact of the unmasked dumping, the Department finds that the

---

[56] *See* 19 CFR 351.414(c)(2).

[57] *See* SAA at 842-843.

[58] *See* section 777A(d)(1)(A) of the Act.

[59] *See* section 777A(d)(1)(B)(ii) of the Act.

[60] *See* case brief at 31.

[61] See above at footnote 42.

[62] *See Koyo Seiko Co., Ltd. v. United States*, 20 F.3d 1156, 1159 (Fed. Cir. 1994) ("The purpose of the antidumping statute is to protect domestic manufacturing against foreign manufacturers who sell at less than fair market value. Averaging U.S. prices defeats this purpose by allowing foreign manufacturers to offset sales made at less-than-fair value with higher priced sales. Commerce refers to this practice as 'masked dumping.' By using individual U.S. prices in calculating dumping margins, Commerce is able to identify a merchant who dumps the product intermittently—sometimes selling below the foreign market value and sometimes selling above it. We cannot say that this is an unfair or unreasonable result." (internal citations omitted)).

[63] *See* SAA at 842.

[64] *See Union Steel v. United States*, 713 F.3d 1101, 1108 (Fed. Cir. 2013) ("{the A-to-A} comparison methodology masks individual transaction prices below normal value with other above normal value prices within the same averaging group.").

comparison of each of the calculated weighted-average dumping margins using the standard and alternative comparison methodologies exactly quantifies the extent of the unmasked "targeted dumping."

The simple comparison of the two calculated results belies the complexities in calculating and aggregating individual dumping margins (*i.e.*, individual results from comparing export prices, or constructed export prices, with normal values). It is the interaction of these many comparisons of export prices or constructed export prices with normal values, and the aggregation of these comparison results, which determine whether there is a meaningful difference in these two calculated weighted-average dumping margins. When using the A-to-A method, lower-priced U.S. sales (*i.e.*, sales which may be dumped) are offset by higher-priced U.S. sales. Congress was concerned about offsetting, and that concern is reflected in the SAA, which states that "targeted dumping" is a situation where "an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions."[65] The comparison of a weighted-average dumping margin based on comparisons of weighted-average U.S. prices that also reflect offsets for non-dumped sales, with a weighted-average dumping margin based on comparisons of individual U.S. prices without such offsets (*i.e.*, with zeroing) precisely examines the impact on the amount of dumping which is hidden or masked by the A-to-A method. Both the weighted-average U.S. price and the individual U.S. prices are compared to a normal value that is independent from the type of U.S. price (*i.e.*, individual or weighted-average) used for comparison, and the basis for normal value will be constant because the characteristics of the individual U.S. sales[66] remain constant whether weighted-average U.S. prices or individual U.S. prices are used in the analysis.

Consider the simple situation where there is a single, weighted-average U.S. price, and this average is made up of a number of individual U.S. sales which exhibit different prices, and the two comparison methods under consideration are the A-to-A method with offsets (*i.e.*, without zeroing) and the A-to-T method with zeroing.[67] The normal value used to calculate a weighted-average dumping margin for these sales will fall into one of five scenarios with respect to the range of these different, individual U.S. sale prices:

    1) the normal value is less than all U.S. prices and there is no dumping;

    2) the normal value is greater than all U.S. prices and all sales are dumped;

---

[65] *See* SAA at 842.

[66] These characteristics may include such items as product, level-of-trade, time period, and whether the product is considered as prime- or second-quality merchandise.

[67] The calculated results using the A-to-A method with offsets (*i.e.*, no zeroing) and the calculated results using the A-to-T method with offsets (*i.e.*, no zeroing) will be identical. Accordingly, this discussion is effectively between the A-to-T method with offsets and the A-to-T method with zeroing. *See* footnote 42 above, which identifies the specific calculation results for Dillinger in this final determination.

3)  the normal value is nominally greater than the lowest U.S. prices such that there is a minimal amount of dumping and a significant amount of offsets from non-dumped sales;[68]

4)  the normal value is nominally less than the highest U.S. prices such that there is a significant amount of dumping and a minimal amount of offsets generated from non-dumped sales;

5)  the normal value is in the middle of the range of individual U.S. prices such that there is both a significant amount dumping and a significant amount of offsets generated from non-dumped sales.

Under scenarios (1) and (2), either there is no dumping or all U.S. sales are dumped such that there is no difference between the weighted-average dumping margins calculated using offsets or zeroing and there is no meaningful difference in the calculated results and the A-to-A method will be used.  Under scenario (3), there is a minimal (*i.e.*, *de minimis*) amount of dumping, such that the application of offsets will result in a zero or *de minimis* amount of dumping (*i.e.*, the A-to-A method with offsets and the A-to-T method with zeroing both result in a weighted-average dumping margin which is either zero or *de minimis*) and which also does not constitute a meaningful difference and the A-to-A method will be used.  Under scenario (4), there is a significant (*i.e.*, non-*de minimis*) amount of dumping with only a minimal amount of non-dumped sales, such that the application of the offsets for non-dumped sales does not change the calculated results by more than 25 percent or cause the weighted-average dumping margin to be *de minimis*, and again there is not a meaningful difference in the weighted-average dumping margins calculated using offsets or zeroing and the A-to-A method will be used.  Lastly, under scenario (5), there is a significant, non-*de minimis* amount of dumping and a significant amount of offsets generated from non-dumped sales such that there is a meaningful difference in the weighted-average dumping margins calculated using offsets or zeroing.  Only under the fifth scenario can the Department consider the use of an alternative comparison method.

Only under scenarios (3), (4) and (5) are the granting or denial of offsets relevant to whether dumping is being masked, as there are both dumped and non-dumped sales.  Under scenario (3), there is only a *de minimis* amount of dumping such that the extent of available offsets will only make this *de minimis* amount of dumping even smaller and have no impact on the outcome.  Under scenario (4), there exists an above-*de minimis* amount of dumping, and the offsets are not sufficient to meaningfully change the results.  Only with scenario (5) is there an above-*de minimis* amount of dumping with a sufficient amount of offsets such that the weighted-average dumping margin will be meaningfully different under the A-to-T method with zeroing as compared to the A-to-A / A-to-T method with offsets.  This difference in the calculated results is meaningful in that a non-*de minimis* amount of dumping is now masked or hidden to the extent where the dumping is found to be zero or *de minimis* or to have decreased by 25 percent of the amount of the dumping with the applied offsets.

---

[68] As discussed further below, note that scenarios 3, 4 and 5 imply that there is a wide enough spread between the lowest and highest U.S. prices so that the differences between the U.S. prices and normal value can result in a significant amount of dumping and/or offsets, both of which are measured relative to the U.S. prices.

Barcode:3556338-01 A-428-844 INV - Investigation  -

This example demonstrates that there must be a significant and meaningful difference in U.S. prices in order to resort to an alternative comparison method. These differences in U.S. prices must be large enough, relative to the absolute price level in the U.S. market, where not only is there a non-*de minimis* amount of dumping, but there also is a meaningful amount of offsets to impact the identified amount of dumping under the A-to-A method with offsets. Furthermore, the normal value must fall within an even narrower range of values (*i.e.*, narrower than the price differences exhibited in the U.S. market) such that these limited circumstances are present (*i.e.*, scenario (5) above). This required fact pattern, as represented in this simple situation, must then be repeated across multiple averaging groups in the calculation of a weighted-average dumping margin in order to result in an overall weighted-average dumping margin which changes to a meaningful extent.

Further, for each A-to-A comparison result which does not result in the set of circumstances in scenario (5), the "meaningfulness" of the difference in the weighted-average dumping margins between the two comparison methods will be diminished. This is because for these A-to-A comparisons which do not exhibit a meaningful difference with the A-to-T comparisons, there will be little or no change in the amount of dumping (*i.e.*, the numerator of the weighted-average dumping margin) but the U.S. sales value of these transactions will nonetheless be included in the total U.S. sales value (*i.e.*, the denominator of the weighted-average dumping margin). The aggregation of these intermediate A-to-A comparison results where there is no "meaningful" difference will thus dilute the significance of other A-to-A comparison results where there is a "meaningful" difference, which the A-to-T method avoids.

Therefore, the Department finds that the meaningful difference test reasonably fills the gap in the statute to consider why, or why not, the A-to-A method (or T-to-T method) cannot account for the significant price differences in Dillinger's pricing behavior in the U.S. market. Congress's intent of addressing "targeted dumping," when the requirements of section 777A(d)(1)(B) of the Act are satisfied,[69] would be thwarted if the A-to-T method without zeroing were applied since this will always produce the identical results when the standard A-to-A method without zeroing is applied. Under that scenario, both methods would inherently mask dumping. It is for this reason that the Department finds that the A-to-A method cannot take into account the significantly different U.S. prices for Dillinger, *i.e.*, the Department identified conditions where "targeted" or masked dumping "may be occurring" in satisfying the pattern requirement, and the Department demonstrated that the A-to-A method could not account for the significant price differences, which are exemplified by those differences found when satisfying the pattern requirement. Thus, the Department continues to find that application of the A-to-T method, with zeroing, is an appropriate tool to address masked or "targeted" dumping,[70] and has applied an alternative comparison method based on the A-to-T method to calculate the weighted-average dumping margin for Dillinger in this final determination.

---

[69] *See* SAA at 842-843.

[70] *See Apex,* 37 F. Supp. 3d at 1296.

Barcode:3556338-01 A-428-844 INV - Investigation  -

**Comment 2: Application of Adverse Facts Available to Salzgitter**

*The Petitioner's Arguments*

- In the preliminary determination, the Department applied adverse facts available (AFA), in part, to  Salzgitter because it did not report certain downstream sales by its affiliated reseller SMSD, where SMSD could not identify the original manufacturer of the CTL plate.  After the *Preliminary Determination,* Salzgitter reported these sales at the Department's request, but was still unable to identify the manufacturer of these sales.[71] The petitioner argues that the Department should continue to apply AFA to Salzgitter for these SMSD sales in the final determination.

- According to the petitioner, Salzgitter failed to respond to at least three requests from the Department to provide SMSD's previously unreported sales, but it instead provided excuses that it was too burdensome for Salzgitter to do so.

- The petitioner claims that, contrary to its normal practice, the Department provided Salzgitter an opportunity after the *Preliminary Determination* to provide the missing SMSD sales.  The petitioner also notes that there are deficiencies in the additional SMSD database, particularly with respect to manufacturer of the CTL plate for these sales, which Salzgitter did not provide.

- According to the petitioner, the verification of SMSD indicated that Salzgitter could obtain the manufacturer or supplier information for the additional SMSD sales in a manner that was not "unduly burdensome."  Specifically, the petitioner argues that SMSD could merge data from its two electronic systems to identify the manufacturer of the CTL plate.[72]  Further, the petitioner disagrees that the SMSD verification report confirms its burden claim that it would be "unreasonably burdensome" for SMSD to provide the requested manufacturer data, the verification report only relates Salzgitter's representations to the Department and does not verify Salzgitter's unsubstantiated claims.[73]

- According to the petitioner, the identification of the manufacturer is critical to ensuring that the Department makes proper comparisons.  Therefore, the petitioner argues that when a respondent has failed to provide this information, the Department has applied AFA.[74]

---

[71] *See* Salzgitter Supplemental Questionnaire Response dated November 28, 2016 (SQRBC5).

[72] The two systems are the SAP accounting system, which each Salzgitter company uses to track financial and sales data, and the separate Certificate Management System (CMS), which SMSD uses to manage mill test certificates for SMSD's material purchases.

[73] *See* the Petitioner's Rebuttal Brief at 11 (citing SMSD Verification Report at page 14).

[74] *See* the Petitioner's Case Brief at 12 (citing *Final Determination of Sales at Less Than Fair Value; StainlessSteel Sheet and Strip in Coils From Germany*, 64 FR 30710, 30741-30743 (June 8, 1999) (*SSSSC from Germany*), where the Department found "… that U.S. Reseller failed to cooperate by acting to the best of its ability in compiling

- In addition, the petitioner notes deficiencies and errors in Salzgitter's reporting of home market price and revenue data, and unexplained changes to U.S. sales fabrication data. The petitioner contends that these issues impact the overall integrity of Salzgitter's data.

- The petitioner recognizes that, although the Department's standard for evaluating a respondent's cooperation does not require perfection, it does not condone inattentiveness, carelessness, or inadequate record keeping.[75]  According to the petitioner, the persistence of errors in Salzgitter's sales data, even after multiple revisions, must be considered evidence of Salzgitter's inattentiveness, carelessness, or inadequate record keeping, and warrants the application of AFA.

- Further, the petitioner notes that the statute does not require that a respondent's noncooperation be intentional. [76]

- The petitioner argues that a large, international company such as Salzgitter represented by experienced counsel should be expected to maintain essential records such as the manufacturers of its CTL plate, and be able to respond to the Department's reporting requirements.  According to the petitioner, Salzgitter's inadequate recordkeeping demonstrates that it did not cooperate to the best of its ability to comply with the Department's requests for necessary information.

- The petitioner maintains that, in similar circumstances, the Department has routinely applied AFA when a respondent has failed to respond to the Department's requests for downstream sales.[77]  According to the petitioner, the Department has also applied AFA

---

information essential to our analysis, such as the identity of the supplying mill, and will make an adverse inference in apportioning the unidentified transactions.")

[75] *See* the Petitioner's Case Brief at 20 (citing *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (CAFC 2003) (*Nippon Steel*)).

[76] *See* the Petitioner's Rebuttal Brief at 5 (citing *Nippon Steel,* 337 F.3d 1373 at 1383, where the Court held, "The statute requires a factual assessment of the extent to which a respondent keeps and maintains reasonable records and the degree to which the respondent cooperates in investigating those records and in providing Commerce with the requested information.").

[77] *See* the Petitioner's Case Brief at 15-16 (citing *Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Critical Circumstances, in Part*, 75 FR 57449 (September 21, 2010)(*Line Pipe from China)*, and accompanying Issues and Decision Memorandum at Comment 17; *Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, From the People's Republic of China: Final Results of Antidumping Duty Administrative Reviews and Final Rescission and Partial Rescission of Antidumping Duty Administrative Reviews*, 71 FR 54269 (September 14, 2006) (*Hand Tools from the PRC*), and accompanying Issues and Decision Memorandum at Comment 10 B; *Certain Hot-Rolled Steel Flat Products From Japan: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 81 FR 53409 (August 12, 2016) (*Hot Rolled Steel from Japan*), and accompanying Issues and Decision Memorandum at Comments 2, 14, and 15; and *Certain New Pneumatic Off-the-Road Tires From India: Final Negative Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances*, 82 FR 4848 (January 17, 2017) (*Tires from India*), and accompanying Issues and Decision Memorandum at Comment 2).

where the respondent eventually submitted the requested information after the preliminary determination, but it contained significant errors.[78]

- Further, the petitioner notes that the Department has applied AFA where, as in the instant case, the respondent has failed to provide requested data because it states that it is allegedly too burdensome to provide it.[79]  The petitioner points out that, where the Department has excused a respondent from reporting sales information because it would be unreasonably burdensome, this situation involved many more affiliated resellers than present in Salzgitter's case, and that respondent did not have the capability to link its electronic data systems in the manner that SMSD does.[80]

- The petitioner points out as additional examples of Salzgitter's failure to cooperate to the best of its ability, its multiple revisions to its home market and U.S. sales databases with little or no explanation and no supporting documentation.  According to the petitioner, these examples include changes to home market sales prices and revenue items,[81] and unexplained changes to fabrication reporting affecting the form product characteristic.

- The petitioner alleges that the Department's application of AFA to Salzgitter's SMSD sales in the *Preliminary Determination* fails to properly account for the severity of Salzgitter's deficient reporting because it only applied the highest home market net price to those SMSD sales which fail the arm's-length test.  Accordingly, the petitioner argues that the Department should apply the highest home market net price to either all of the sales: 1) in the additional SMSD database; or 2) in the additional SMSD database where the supplier is not identified.

*Salzgitter's Arguments*

- Salzgitter asserts that the Department should use the SMSD home market sales data without applying AFA in the final determination because Salzgitter cooperated to the best of its ability.

- Salzgitter states that it timely provided all of SMSD's home market sales of CTL plate where it could identify Salzgitter as the manufacturer, and also timely provided the

---

[78] *See* the Petitioner's Rebuttal Brief at 10 (citing *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cold Rolled Carbon Steel Flat Products From Germany*, 67 FR 62116 (October 3,2002) (*Cold Rolled Steel from Germany*), and accompanying Issues and Decision Memorandum at Comment 1).

[79] *See* the Petitioner's Rebuttal Brief at 16 (citing *Preliminary Results of Antidumping Duty Administrative Review: Stainless Steel Sheet and Strip in Coils From France*, 69 FR 47892, 47896-47897 (August 6, 2004); unchanged in *Stainless Steel Sheet and Strip in Coils From France: Final Results of Antidumping Administrative Review*, 70 FR 7240 (February 11, 2005)).

[80] *See* Petitioner's Rebuttal Brief at 17 (citing *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cut-To-Length Carbon-Quality Steel Plate Products from Jap*an, 64 FR 73215, 73223-73225 (December 29, 1999) (*CTL Plate from Japan*).

[81] The petitioner cites specific examples of these changes to price and revenue items, which include business proprietary information, at 22-23 and Attachment 1 of the Petitioner's Case Brief.

additional SMSD sales database containing all SMSD home-market sales of CTL plate where it could not identify the manufacturer.  Salzgitter points out that the Department verified both of these databases.

- According to Salzgitter, SMSD identified the manufacturer of its CTL plate for approximately 83 percent of its home market downstream sales.  Salzgitter notes that, with respect to the remaining sales, it provided detailed information explaining that SMSD's electronic recordkeeping system does not normally track the manufacturer of the CTL plate that SMSD sells.  Specifically, Salzgitter explains that, only if SMSD's SAP system contains the correct CTL plate melt and sample number for the sale, and the separate CMS system also contains the melt and sample number, as well as the correct supplier code, then SMSD can electronically identify the manufacturer of the CTL plate.

- Salzgitter states that SMSD did merge data from its two systems to identify SMSD's sales of Salzgitter's CTL plate.  However, Salzgitter notes that where it was not possible to identify the CTL plate manufacturer through the electronic data systems, SMSD must identify the CTL plate manufacturer through a manual document search.  According to Salzgitter, this is an unreasonable burden given the large number of sales involved and the time constraints for the investigation.[82]

- Salzgitter maintains that, at verification, the Department examined SMSD's electronic recordkeeping system and confirmed the accuracy of Salzgitter's statements regarding it.[83]  According to Salzgitter, contrary to the petitioner's claim, the verification report supports Salzgitter's explanation.[84]

- Salzgitter argues that, in similar circumstances, the Department has not applied AFA, but instead has recognized that it would be "unreasonably burdensome" to require a respondent to conduct a manual search where its electronic data system did not include manufacturer information.[85]

- Salzgitter maintains that the cases the petitioner cites are distinguishable from the facts in this investigation because in those cases, the respondents did not provide the requested data in a timely manner, did not provide the requested data at all, or did not provide evidence to support the claim that submitting the requested data would be unduly burdensome.[86]  In contrast, Salzgitter argues that it provided the requested data in a

---

[82] See Salzgitter's Case Brief at 7-14 and Salzgitter Rebuttal Brief at 8-11 and 15-16 (citing Salzgitter's September 15, 2016, supplemental questionnaire response (SQRBC1) at Exhibit Supp. 2; Salzgitter's October 17, 2016, supplemental questionnaire response (SQRBC3) at pages 2-5; and SQRBC5 at pages 1-3).

[83] See Salzgitter's Case Brief at 10-11 (citing SMSD Verification Report at page 5).

[84] See Salzgitter's Rebuttal Brief at 9-10 (citing SMSD Verification Report at pages 5 and 8).

[85] See Salzgitter's Rebuttal Brief at 11-12 (citing CTL Plate from Japan, 64 FR at 73225).

[86] See Salzgitter's Rebuttal Brief at 13 (citing Hand Tools from the PRC at Comment 10 B; Hot Rolled Steel from Japan at Comments 2, 14, and 15; and Tires from India at Comment 2).

timely manner to the extent that it was able to identify the manufacturer in its electronic data systems, and Salzgitter provided detailed explanations and support to demonstrate that it would be unreasonably burdensome to submit the manufacturer information where it could only be provided through a manual review.

- According to Salzgitter, the petitioner's claims regarding its reporting of home market sales prices and revenue items, and changes to the form product characteristic for certain U.S. sales, are wrong, misleading and/or exaggerated. Salzgitter points out that, for most of these items, the Department examined Salzgitter's reporting at verification and noted no discrepancies. In addition, Salzgitter provides an explanation for the remaining items of how its reporting addresses the petitioner's claims.[87]

- As a result, Salzgitter maintains that the Department should apply neutral facts available in the final determination to account for the additional SMSD sales database. Salzgitter proposes that the Department include the additional SMSD sales database in its calculations for the final determination and either: 1) treat all sales as if they were Salzgitter-produced merchandise; or 2) adjust the sales quantities based on the ratio of SMSD's POI purchases of Salzgitter-produced CTL plate to SMSD's POI purchases of CTL plate from all sources.

**Department's Position:**

We continued to apply AFA to Salzgitter for those home market downstream sales where SMSD did not identify the original manufacturer of the CTL plate in our calculations for the final determination. In the *Preliminary Determination*, we explained our decision to apply AFA to Salzgitter to account for certain of SMSD's downstream sales (which had not been reported at that time) as follows:

> Specifically, although Salzgitter contends that identifying all SMSD sales of Salzgitter-produced merchandise would be unreasonably burdensome, Salzgitter stated it could report SMSD's sales where the manufacturer could not be identified. However, it failed to do so. Accordingly, we are applying facts available, in part, with an adverse inference, to account for SMSD's unreported downstream sales. As adverse facts available, we applied the highest net price among the reported sales made by SMSD to all of the sales made by SMSD. We intend to examine this issue further at verification and for the final determination.[88]

Although Salzgitter reported these sales after the *Preliminary Determination* in response to our request for them (in the additional SMSD sales database), it nonetheless failed to identify the manufacturer of the CTL plate for these sales. We disagree with Salzgitter's claims that it was

---

[87] *See* Salzgitter's Rebuttal Brief at 18-25, which includes business proprietary information to respond to specific data items raised by the petitioner.

[88] *See Preliminary Determination*, and accompanying Preliminary Decision Memorandum, at 11-12 (footnotes omitted).

"unreasonably burdensome" for SMSD to report the manufacturer for these sales, as discussed below, information which is vital to the Department's margin calculations because products are matched by manufacturer. As a result of this missing information and our evaluation of Salzgitter's arguments, we are unable to conclude that Salzgitter acted to the best of its ability in attempting to provide this requested information to the Department.

We asked Salzgitter on multiple occasions to submit complete home market sales data, inclusive of manufacturer information.[89] Salzgitter failed to fully respond to these requests to provide this information prior to the preliminary determination.[90]

While Salzgitter ultimately submitted all of SMSD's sales, it did not provide us with critical information, *i.e.*, the manufacturer of the CTL plate for certain of the sales.[91] Thus, while Salzgitter provided information and we reviewed the information provided at verification, we find that the information is not usable because it is missing critical information, *i.e.*, the manufacturer of the CTL plate. The manufacturer information is critical for the Department's margin analysis because the Department matches sales by, among other criteria, manufacturer.

In light of the above, the application of facts available is appropriate pursuant to sections 776(a)(1) and (2)(A) and (B) of the Act because necessary information, *i.e.*, the names of manufacturers of the CTL plate at issue, is not on the record, and Salzgitter withheld that information and failed to provide it in a timely manner. At verification, we found that Salzgitter was able to identify the manufacturer of a sale in the additional SMSD sales database when it attempted to obtain that information.[92] Thus, we find that Salzgitter had relevant information available to it, but determined not to invest the time in comprehensively examining its documentation in order to provide the requested information.

Moreover, when selecting from the facts available, the use of an adverse inference (AFA) pursuant to section 776(b) of the Act is appropriate because Salzgitter failed to cooperate with the Department's request for information concerning the manufacturer of certain downstream sales of CTL plate. In determining whether a company has cooperated to the best of its ability and whether AFA is warranted, the Department follows the guidance set forth in *Nippon Steel*:

> Before making an adverse inference, Commerce must examine respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information. Compliance with the "best of its ability" standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation. While the standard does not require perfection

---

[89] *See* the Department's antidumping duty questionnaire, dated May 25, 2016, at page B-5; the Department's supplemental questionnaire, dated August 18, 2016, at page 5; the Department's supplemental questionnaire, dated October 7, 2016, at page 2; and the Department's supplemental questionnaire dated November 8, 2016, at page 2.

[90] *See* Salzgitter's response to sections B, C, and E of the Department's antidumping duty questionnaire, dated July 15, 2016, SQRBC1, and SQRBC3.

[91] *See* SQRBC5.

[92] *See* SMSD Verification Report, at pages 14 -15, and exhibits SMSDVE-11 and SMSDVE-15.

and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping.  It assumes that importers are familiar with the rules and regulations that apply to the import activities undertaken and requires that importers, to avoid a risk of an adverse inference determination in responding to Commerce's inquiries:  (a) take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce; (b) have familiarity with all of the records it maintains in its possession, custody, or control; and (c) conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so.[93]

The information in question (*i.e.*, the identity of the manufacturers of the CTL plate resold by Salzgitter's affiliate, SMSD) is the type of information that a respondent should have reasonably anticipated being required to provide to its customers for quality assurance and warranty claims.  Salzgitter's questionnaire responses and the Department's verification at SMSD demonstrate that Salzgitter was familiar with all of the records that SMSD maintained.  As mentioned above, at verification, we found that Salzgitter was able to identify the manufacturer of a sale in the additional SMSD sales database when it attempted to obtain that information.[94]  While Salzgitter relies on *CTL Plate from Japan from 1999* to support its contention that it would be "unreasonably burdensome" to require a respondent to conduct a manual search where its electronic data system did not include manufacturer information, we note that this position does not take into account the technological advancements in electronic records management since that time, which significantly reduces the burden in obtaining the missing information.  Therefore, we find that Salzgitter would have been able to  provide this information if it had made the appropriate effort when it first received the Department's antidumping duty questionnaire and was notified that it was required to report SMSD's downstream sales, as well as when Salzgitter received the Department's subsequent requests.[95]  Moreover, we find that Salzgitter's failure to report the requested manufacturer information accurately, and in the manner requested, using the records over which it maintained control, indicates that Salzgitter did not act to the best of its ability to comply with our requests for information.  Therefore, in accordance with section 776(b) of the Act, we find that it is appropriate to apply partial AFA for those downstream SMSD sales where Salzgitter did not identify the manufacturer of the CTL plate.[96]  We note that, as discussed above, in accordance with section 782(d) of the Act, the

---

[93] *See Nippon Steel*, 337 F.3d at 1382 (internal citation omitted).

[94] *See* SMSD Verification Report, at pages 14 -15, and exhibits SMSDVE-11 and SMSDVE-15.

[95] *See* the Department's antidumping duty questionnaire issued to Salzgitter, dated May 25, 2016, at page B-5 ("If you had sales to an affiliated party that consumed all or some of the merchandise …, then report all of your sales to that affiliate, whether the merchandise was consumed or resold by the affiliate….  If you cannot demonstrate that your sales to the affiliate were at arm's-length prices, then you must also report the affiliate's sales to unaffiliated customers; however, in any case you must report your sales to the affiliate."); *see also* the Department's supplemental questionnaire, dated August 18, 2016, at page 5; the Department's supplemental questionnaire, dated October 7, 2016, at page 2; and the Department's supplemental questionnaire dated November 8, 2016, at page 2.

[96] *See, e.g.*, *Cold Rolled Steel from Germany* at Comment 1 (where the downstream sales information reported was not complete, the Department determined that the respondent did not cooperate to the best of its ability and that

Barcode:3556338-01 A-428-844 INV - Investigation    -

Department provided Salzgitter with multiple opportunities to remedy the deficiencies in reporting SMSD's downstream sales. [97]

As partial AFA, we determined the highest non-aberrational net price among all of the downstream sales in the additional SMSD sales database, and assigned that price to all of these sales where Salzgitter failed to report the manufacturer of the CTL plate in our margin calculations for the final determination.

Finally, with respect to the petitioner's claims regarding other data deficiencies in Salzgitter's sales reporting, we reviewed the data at verification and found no discrepancies or issues with Salzgitter's reporting of these items.[98]

**Comment 3: Excluding Sales Produced by an Unaffiliated Manufacturer for Salzgitter**

*The Petitioner's Arguments*

- In the *Preliminary Determination*, the Department disregarded a small number of EP sales of CTL plate which Salzgitter reported that were produced by an unaffiliated manufacturer because these sales constituted a very small percentage of Salzgitter's total U.S. sales. The Department also disregarded the home market sales of CTL plate produced by this same unaffiliated manufacturer, which constitute a much higher percentage of the home sales database, because these sales would not be used for matching purposes. The petitioner disagrees with our excluding these sales from our analysis, and argues that these sales, especially those made in the home market, should be included in the final determination.

- The petitioner contends that excluding these sales risks undermining the completeness and accuracy of the Department's margin calculations. Specifically, according to the petitioner, excluding these home market sales distorts the calculations in the Department's program that rely on the entire home market database (*e.g.*, the cost test and CEP profit) given the large volume of these sales.

- The petitioner claims that Salzgitter should not oppose the Department's including these home market sales in its analysis because Salzgitter: 1) reported them; 2) never requested that the Department disregard these sales; and 3) acknowledged that these sales should be treated like any other Salzgitter sales.

- Finally, the petitioner states that a substantial share of Salzgitter's sales produced by this unaffiliated manufacturer were further processed by Salzgitter's affiliated resellers.

---

AFA was warranted.)

[97] *See* the Department's antidumping duty questionnaire, dated May 25, 2016, at page B-5; the Department's supplemental questionnaire, dated August 18, 2016, at page 5; the Department's supplemental questionnaire, dated October 7, 2016, at page 2; and the Department's supplemental questionnaire dated November 8, 2016, at page 2.

[98] *See, e.g.,* SMSD Verification Report at pages 7-8 and 12-14. *See also* Salzgitter's Rebuttal Brief at 18-25, which includes business proprietary information to respond to specific data items raised by the petitioner.

According to the petitioner, regardless of the source of the CTL plate, Salzgitter's affiliated resellers performed the final production (or further processing) of the foreign like product. As a result, the petitioner contends that the original producer of the CTL plate is not relevant because Salzgitter further manufactured the plate into a new product before selling it.

*Salzgitter's Arguments*

- Salzgitter disagrees, asserting that the Department should continue to exclude its sales produced by an unaffiliated manufacturer in the final determination.

- Salzgitter states that the products produced by the unaffiliated manufacturer are not a "foreign like product" and, therefore, should not be included in the Department's calculations for the sales below-cost test or for any other purpose. According to Salzgitter, the foreign like product used for comparisons to U.S. price must be produced in the same country and by the same person as the subject merchandise.[99]

**Department's Position:**

As in the *Preliminary Determination*, we continue to disregard Salzgitter's U.S. sales produced by an unaffiliated manufacturer from our analysis in the final determination because of their small quantity. In addition, we continued to disregard Salzgitter's home market sales produced by the same unaffiliated manufacturer because these sales do not meet the definition of foreign like product. Section 771(16)(B)(i) of the Act defines foreign like product as merchandise "produced in the same country and by the same person as the merchandise which is the subject of the investigation." Therefore, because Salzgitter's unaffiliated manufacturer is not "the same person" as Salzgitter, merchandise produced by this unaffiliated manufacturer may not be considered foreign like product and compared to Salzgitter's U.S. sales.[100] Moreover, the Department conducts the cost test on a manufacturer-specific basis as well as a product-specific (CONNUM-specific) basis. Because the Department would not match any home market sales produced by the unaffiliated manufacturer to the U.S. sales produced by Salzgitter, there is no distortion to the cost test. Further, because we are disregarding the U.S. sales produced by the unaffiliated manufacturer, it would be inappropriate to include the home market sales data for this manufacturer's sales in the calculation of the CEP profit ratio when we will not be applying CEP profit to any of the unaffiliated manufacturer's U.S. sales.

---

[99] *See* Salzgitter's Rebuttal Brief at 26 (citing the Department's 2015 Antidumping Manual, Chapter 8, at 7 (The Act "precludes our using sales of merchandise produced by persons other than the manufacturer/producer of the particular U.S. sale or sales being analyzed in our calculation of the NV")).

[100] *See, e.g., Final Determination of Sales at Less than Fair Value: Certain Pasta from Italy*, 61 FR 30326, 30333 (June 14, 1996) ("…because section 773(a)(1)(B)(i) of the Act incorporates, by reference, the definition of foreign like product in section 771(16) of the Act, it prohibits our using sales of merchandise produced by persons other than the respondents in our calculation of normal value. Accordingly, we have excluded from our analysis all of the sales from each of the companies of subject merchandise in the Italian market that were not produced by the respondent companies.")

We also disagree with the petitioner's claim that Salzgitter should be considered the manufacturer of the CTL plate further processed by Salzgitter's affiliated resellers into a new product. Despite the petitioner's contentions, there is no evidence on the record demonstrating what specific further processing activities Salzgitter's affiliates performed on merchandise obtained from the unaffiliated manufacturer. However, we note that this further processing did not transform this merchandise such that it is no longer in-scope CTL plate. As a result, we find no evidence that the processing Salzgitter's affiliated resellers performed transformed this merchandise to such a degree that we would consider the unaffiliated manufacturer's further processed CTL plate to be a new product manufactured by Salzgitter. Accordingly, we find no basis to include Salzgitter's home market sales produced by the unaffiliated manufacturer in our analysis for the final determination.

**Comment 4: Shipment Date for Salzgitter's EP Sales**

*Salzgitter's Arguments*

- At verification, the Department found that: 1) Salzgitter reported the bill of lading date as the shipment and sale date for Salzgitter's EP sales sold by SMID; 2) Salzgitter's mill shipped the merchandise several weeks earlier.[101] Nonetheless, Salzgitter asserts that the Department should continue to use the bill of lading date for the date of shipment for SMID's EP sales. According to Salzgitter, this approach is consistent with the Department's practice where a single bill of lading corresponds to multiple mill shipments to the port.[102]

- In addition, Salzgitter asserts that the mill shipment date does not properly reflect the date of shipment to the unaffiliated customer because that date reflects the shipment from the mill to SMID, not to the customer. According to Salzgitter, the bill of lading date better reflects the date of shipment to the unaffiliated customer because it is the date SMID takes title to the merchandise and the merchandise is ready for onward shipment.

- Further, Salzgitter points out that, if the Department concludes that it should use the mill shipment date for these sales, it should also exclude from its analysis the SMID EP sales which were shipped from the mill prior to the POI. In any event, Salzgitter notes that the Department found no evidence at verification that that SMID failed to report any mill shipments at the end of the POI.[103]

The petitioner did not comment on this issue.

---

[101] *See* SMID Verification Report at page 9.

[102] *See* Salzgitter's Rebuttal Brief at 28 (citing *Welded Line Pipe from the Republic of Turkey: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 80 FR 29617 (May 22, 2015) (*Welded Line Pipe from Turkey*) and accompanying Decision Memorandum at page 14, footnote 63, unchanged in *Welded Line Pipe From the Republic of Turkey: Final Determination of Sales at Less Than Fair Value*, 80 FR 61362 (October 13, 2015).

[103] *See* Salzgitter's Case Brief at 30 (citing SMID Verification Report at 2).

Barcode:3556338-01 A-428-844 INV - Investigation    -

**Department's Position:**

We normally consider the date merchandise is shipped from a respondent's factory or warehouse as the date of shipment, rather than using the bill of lading date for shipments from a port.[104] However, we have used the bill of lading date as the date of shipment when a single invoice covers multiple shipments from the mill.[105] At the SMID sales verification, we observed that certain of Salzgitter's EP sales were transported from the mill to the port in multiple shipments.[106] Therefore, we have accepted Salzgitter's date of shipment reporting methodology for its EP sales in the final determination, in accordance with our practice.

**Comment 5: Level of Trade for Salzgitter**

*Salzgitter's Arguments*

- Salzgitter reported making its home market sales through five channels of distribution. In the *Preliminary Determination*, we found that there were no significant differences in selling activities performed by Salzgitter to sell to its home market customers, and as a result, the Department determined that Salzgitter made home market sales at a single level of trade (LOT). Salzgitter disagrees, arguing that its home market sales by affiliated resellers that are further processed (*i.e.*, Channel 4) are at a different and higher LOT than its other home market sales.

- Salzgitter contends that in past cases, the Department has found that the level of intensity in producing or selling a product can differentiate LOTs. In *HWR from Mexico*, for example, the Department found two separate LOTs in the home market where one HM channel of distribution involved significantly higher levels of selling activities performed for original equipment manufacturer (OEM) customers than the other HM channels of distribution.[107]

---

[104] *See Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 81 FR 47347 (July 21, 2016), and accompanying Issues and Decision Memorandum at Comment 1; and *Lightweight Thermal Paper From Germany: Final Results of Antidumping Duty Administrative Review; 2011-2012* 79 FR 34719 (June 18, 2014) (*Thermal Paper from Germany*), and accompanying Issues and Decision Memorandum at Comment 2.=Salzgitter's argument that it does not take title to the merchandise until the bill of lading date overlooks that we have collapsed Salzgitter's mills and SMID and are treating them as a single entity; thus, the transfer of title from one entity to another within the collapsed entity is irrelevant.

[105] *See Welded Line Pipe from Turkey,* Decision Memorandum at page 14, footnote 63. ("In this case, both {respondents} reported the bill of lading date as the date of shipment for their U.S. sales because they shipped subject merchandise sold under a single invoice to the port over a period of several days… Because a single shipment date from the factory did not exist, we have accepted the bill of lading date as the date of shipment…"

[106] *See* SMID Verification Report at 9 and Exhibit SMSDVE-7.

[107] *See* Salzgitter's Case Brief at 17 (citing *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Mexico: Final Determination at Less Than Fair Value* 81 FR 47352 (July 21, 2016) (*HWR from Mexico*), and accompanying Issues and Decision Memorandum at Comment 8; and=*Ball Bearings and Parts Thereof From Japan and the United Kingdom: Preliminary Results of Antidumping Duty Administrative Review; 2010-2011,* 79 FR

Barcode:3556338-01 A-428-844 INV - Investigation  -

- Salzgitter argues that the products it sold through Channel 4 represent a distinct LOT because they are further processed products, primarily machine parts, which are sold to OEMs, unlike the commodity steel products sold in Salzgitter's other home market channels of distribution.

- According to Salzgitter, the Department routinely finds that channels of distribution involving OEM customers, where the respondent performs selling activities at a higher level of intensity than for sales in other channels, constitute a more advanced LOT.

- Salzgitter argues that it performed the following selling functions at a higher level of intensity for Channel 4 sales than for its home market sales in other channels:  inventory maintenance (resellers must maintain significant inventories of plate)[108]; general promotion/marketing activities (resellers specifically promote their further manufactured parts); sales/marketing support (resellers directly service customer accounts); product defect claim-related services (defect claims occur more for further manufactured products); qualification and quality control (resellers must maintain high quality control standards);[109] order processing and invoicing (further manufactured products are customized and must be reviewed at several stages); technical service and support/after sales service (further processed products are more technically demanding); and further processing (further processed products require a range of value-added further-processing services).

- Finally, Salzgitter contends that its Channel 4 sales are at a distinct and higher LOT than either the EP or CEP LOTs.  According to Salzgitter, its selling function chart shows that it performed selling activities at a lower level of intensity (or did not perform activities at all) for its EP LOT than for home market Channel 4 sales, other than freight/delivery services.  Further, Salzgitter notes that it performed no selling functions for its CEP LOT (other than order processing and freight/delivery arrangements).  As a result, Salzgitter argues that Channel 4 sales should not be compared to U.S. sales, but rather the Department should use sales in its other home market channels of distribution (designated as LOTH 1) for its comparisons.

---

56771 (September 23, 2014), and accompanying Preliminary Decision Memorandum at 14-15, unchanged in *Ball Bearings and Parts Thereof From Japan and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews; 2010-2011*, 80 FR 4248 (January 27, 2015).

[108] *See* Salzgitter's Case Brief at 19 (citing *Notice of Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission and Postponement of the Final Results: Certain Softwood Lumber Products from Canada*, 71 FR 33964, 33980 (June 12, 2006) (*Softwood Lumber*).=While Salzgitter contends that the Department's LOT analysis was unchanged in the final results, we note that the Department never completed this administrative review because it revoked the softwood lumber order.=*See Notice of Rescission of Antidumping Duty Reviews and Revocation of Antidumping Duty Order: Certain Softwood Lumber Products From Canada*, 71 FR 61714 (October 19, 2006)).

[109] *See* Salzgitter's Case Brief at 21 (citing *Final Results of Antidumping Duty Changed-Circumstances Review: Gray Portland Cement and Clinker from Mexico*, 72 FR 61863 (November 1, 2007), and accompanying Issues and Decision Memorandum at Comment 2 (*Cement from Mexico)).*

Barcode:3556338-01 A-428-844 INV - Investigation -

- Nonetheless, Salzgitter notes that, because LOTH 1 is considerably more advanced than the U.S. LOTs, the Department should continue to grant Salzgitter a CEP offset as it did in the *Preliminary Determination*.

*The Petitioner's Arguments*

- The petitioner disagrees, arguing that the Department correctly found that Salzgitter's sales in the home market were at one LOT in the *Preliminary Determination*. The petitioner maintains that there is nothing on the record to warrant reversing this finding.

- Additionally, the petitioner points that Salzgitter relies heavily on the fact that its Channel 4 sales were to OEM customers. However, the petitioner asserts that Salzgitter actually reported home market sales to OEM customers in other channels of distribution, not just Channel 4. According to the petitioner, the Department has found that while different customer categories may be useful in identifying LOTs, they are insufficient by themselves to do so.[110]

- Therefore, the petitioner asserts that, while Salzgitter may have performed certain selling activities at different levels of intensity for Channel 4 sales than for other home market sales, these differences are not sufficient to find that Channel 4 sales represent a different LOT.

Department's Position:

We continue to find that Salzgitter's home market channels of distribution constitute one LOT. Section 773(a)(1)(B)(i) of the Act states that, to the extent practicable, the Department will calculate normal value based on sales at the same LOT as the U.S. sales. Sales are made at different LOTs if they are made at different marketing stages (or their equivalent).[111] The Department's regulations at 19 CFR 351.412(c)(2) outline the Department's policy regarding differences in the LOT as follows:

> The Secretary will determine that sales are made at different levels of trade if they are made at different marketing stages (or their equivalent). *Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stages of marketing*.[112]

In the *Preliminary Determination*, we analyzed Salzgitter's home market selling functions, and we organized them into the following four categories for analysis: 1) sales and marketing; 2) freight and delivery; 3) inventory maintenance and warehousing; and 4) warranty and technical

---

[110] *See* Petitioner's Rebuttal Brief at 22 (citing *Certain Pasta From Italy: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 81 FR 91120 (December 16, 2016), and accompanying Issues and Decision Memorandum at Comment 6).

[111] *See* 19 CFR 351.412(c)(2).

[112] *Id.* (emphasis added).

support.  Salzgitter reported that it made sales through five channels of distribution in the home
market and reported performing the following selling functions for all home market sales:

> ….Sales promotion and marketing, sales forecasting, solicitation of bids and
> orders, arranging for freight and delivery, inventory maintenance, product claim
> processing, provision of technical advice and service, quality control support,
> order processing and invoicing, and customer services.  Salzgitter states that sales
> by its affiliated resellers that are further processed constitute a more advanced
> level of trade than sales through the other four channels because Salzgitter
> performs the following selling activities at a higher level of intensity for channel 4
> sales and a low or medium intensity for sales through other channels: sales
> promotion and marketing, product claim processing, provision of technical advice
> and service, quality control support, order processing and invoicing, and
> inventory maintenance.[113]

For Salzgitter's home market sales, we found that:

> Based on these selling function categories, we find that Salzgitter performed sales
> and marketing, freight and delivery services, inventory management and
> warehousing, and warrant and technical support for all of its home market sales.
> Salzgitter claims that it performed sales promotion and marketing, inventory
> maintenance and warehousing, and warranty and technical support functions at a
> higher level of intensity for channel 4 sales than for other home market sales.
> However, we find that the information Salzgitter provided does not demonstrate
> that it performed each of these activities at a significantly higher intensity level
> for channel 4 sales.[114]  Accordingly, because we find that there were no
> significant differences in selling activities performed by Salzgitter to sell to its
> home market customer, we determine that there is one LOT in the home market
> for Salzgitter.

As described above, in its case brief Salzgitter contends that the Department should find that its
home market Channel 4 sales (sales by affiliated resellers that are further processed) are at a
different and higher LOT than Salzgitter's home market sales in other channels of distribution.
For the reasons discussed below, we disagree and continue to find one LOT in the home market.

As an initial matter, we disagree with Salzgitter that the Department routinely finds that channels
of distribution involving OEM customers constitute a more advanced LOT.=While the
Department may in certain cases determine that sales through channels of distribution involving
OEM customers are made at a separate LOT, its LOT analysis is based on the selling activities a
respondent performs, not the category of customer to which it makes sales.=According to the
*Preamble* to the Department's regulations:=“Although the type of customer will be an important
indicator in identifying differences in levels of trade, the existence of different classes of

---

[113]=*See* Preliminary Decision Memorandum at 15.

[114]=*Id.*

Barcode:3556338-01 A-428-844 INV - Investigation -

customers is not sufficient to establish a difference in the levels of trade."[115] In any event, we note that Salzgitter reported making sales to home market OEM customers in multiple channels of distribution, not simply Channel 4. [116]

Salzgitter's argument that its Channel 4 sales represent a separate LOT rests largely on its claim that it performed numerous selling functions at higher level of intensity in this channel when compared to other home market channels of distribution. However, an analysis of the information on the record, including Salzgitter's responses to our specific questions regarding the selling functions and levels of intensity for the home market channels of distribution,[117] demonstrates that this is not so. Below, we address each of the selling functions for which Salzgitter claims a difference in the level of intensity.

Regarding inventory maintenance, Salzgitter states that it performed this activity at high level of intensity for Channels 3 and 4, and at a medium level of intensity for Channels 1 and 2. According to Salzgitter, it performed this activity at a higher intensity level for Channel 4 sales because affiliated resellers "maintain high levels of inventory of slow-moving products."[118] However, Salzgitter did not describe or provide evidence concerning how it performed inventory maintenance at a medium level of intensity for sales in Channels 1 and 2, and, thus, we are unable to evaluate how its purported "medium" and "high" classifications differ. Therefore, we lack evidence on which to determine that the claimed differences are significant, and absent evidence to that effect, we find that inventory maintenance is performed at a single level of intensity.

Regarding general promotion/ marketing activities, Salzgitter states that it performed this activity at high level of intensity for Channel 4, and at a medium level of intensity for Channels 1, 2, and 3. According to Salzgitter, it performed this activity at a higher intensity level for Channel 4 sales because affiliated resellers' promotion and marketing activities are carefully focused on the needs of OEMs.[119] However, Salzgitter did not describe or provide evidence concerning how it performed general promotion/ marketing activities at a medium level of intensity for sales in Channels 1, 2, and 3, and, thus, we are unable to evaluate how its purported "medium" and "high" classifications differ. Therefore, we lack evidence on which to determine that the claimed differences are significant, and absent evidence to that effect, we find general promotion/ marketing activities are performed at a single level of intensity.

Regarding sales/ marketing support, Salzgitter states that it performed this activity at high level of intensity for Channels 2, 3, and 4, and at a medium level of intensity for Channel 1.

---

[115] See Antidumping Duties; Countervailing Duties: Final rule, 62 FR 27296, 27349 (May 19, 1997) (Preamble).

[116] See Petitioner's Rebuttal Brief at 22 (citing information obtained through analysis of Salzgitter's home market sales database.

[117] See the Department's supplemental questionnaire, dated September 26, 2016, and Salzgitter's Second Sections B and C Supplemental Questionnaire Response, dated October 12, 2016 (Salzgitter SQRBC2), at Exhibit 2nd Supp. BC-2.

[118] See Salzgitter SQRBC2 at Exhibit 2nd Supp. BC-2.

[119] Id.

Barcode:3556338-01 A-428-844 INV - Investigation  -

According to Salzgitter, it performed this activity at a higher intensity level for Channel 4 sales "because affiliated resellers exist to provide a higher level of sales and marketing support to the customer."[120]  However, Salzgitter did not describe or provide evidence concerning how it performed sales/ marketing support activities at a medium level of intensity for sales in Channel 1, or how it performed how it performed these activities differently for Channels 2 and 3, and, thus, we are unable to evaluate how its purported classifications differ.  Therefore, we lack evidence on which to determine that the claimed differences are significant, and absent evidence to that effect, we find that sales/ marketing support is performed at a single level of intensity.

Regarding product defect claim-related services, Salzgitter states that it performed this activity at high level of intensity for Channel 4, and at a medium level of intensity for Channels 1, 2, and 3. According to Salzgitter, it performed this activity at a higher intensity level for Channel 4 sales because affiliated resellers' product defect claim-related services are carefully focused on the needs of OEMs and failure to meet the customer's requirements "could" result in claims.[121] However, Salzgitter did not: 1) provide any indication that its affiliated resellers' customers made defect-related claims during the POI; and 2) describe or provide evidence concerning how it performed product defect claim-related services at a medium level of intensity for sales in Channels 1, 2, and 3.  As a result, it is unclear if Salzgitter's affiliated resellers actually performed this activity during the POI, and even assuming that they did, we are unable to evaluate how its purported classifications differ.  Therefore, we lack evidence on which to determine that the claimed differences are significant, and absent evidence to that effect, we find that product defect claim-related services are performed at a single level of intensity.

Regarding qualification and quality control activities, Salzgitter states that it performed this activity only for Channel 4 sales, and not at all for the other channels of distribution.  According to Salzgitter, suppliers involved in further manufacturing and "simple trading" are subject to much stricter quality control requirements than the other channels in order to qualify as a supplier.[122]  However, Salzgitter reported that its Channel 3 sales are also sales by affiliated resellers, which would appear to be involved in "simple trading" (*i.e.*, resales of merchandise without further manufacturing).[123]  Therefore, Salzgitter did not describe or provide evidence concerning why, at a minimum, its affiliated resellers for Channel 3 sales would not be subject to similar quality control requirements as for Channel 4, or for that matter why Salzgitter companies for Channels 1 and 2 sales would not also be subject to such requirements. Consequently, we lack evidence on which to determine that the claimed differences are significant, and absent evidence to that effect, we find that qualification and quality control activities are performed at a single level of intensity.

Regarding order processing and invoicing, technical service and support, and after sales service activities, Salzgitter states that it performed these activities at a high level of intensity for

---

[120] *Id.*

[121] *Id.*

[122] *Id.*

[123] *Id.*

Barcode:3556338-01 A-428-844 INV - Investigation  -

Channel 4, and at a medium level of intensity for Channels 1, 2, and 3.  According to Salzgitter, it performed these activities at a higher intensity level for Channel 4 sales because the order process for parts is more demanding than for other channels.[124] However, Salzgitter did not describe or provide evidence concerning how it performed: 1) order processing and invoicing activities at a medium level of intensity for sales in Channels 1, 2, and 3; and 2) technical service and support and after sales service activities at a medium level of intensity for sales in Channels 1, 2, and 3. As a result, we are unable to evaluate how its classifications of these intensity levels differ. Therefore, we lack evidence on which to determine that the claimed differences are significant, and absent evidence to that effect, we find that order processing and invoicing, technical service and support, and after sales service activities are each performed at a single level of intensity

Moreover, regarding further processing activities, we note that this item is not actually a selling function and, thus, it is not contained in the list provided in the Department's standard section A questionnaire or in the categories the Department uses in its analysis of LOT, listed above.[125] Instead, we find that further processing is part of the cost to produce the downstream product. Therefore, we have not considered it in our LOT analysis for Salzgitter in the final determination.

We also disagree with Salzgitter that the cases its cites necessitate that we find Salzgitter's Channel 4 sales to be a second LOT in this case. In *HWR from Mexico*, the Department found two separate levels of trade in the home market where one channel of distribution involved significantly higher levels of selling activities performed for OEM customers than other channels.[126] In *Ball Bearings*, the Department found a separate LOT when the respondent performed numerous selling activities for sales to OEM customers at a different level of intensity than for other channels.[127] However, neither of these fact patterns is present in the instant case, where, as described above, Salzgitter performed substantially the same selling to make Channel 4 sales as it did in its other home market channels of distribution, and provided no record evidence to demonstrate sufficient differences in the levels of intensity to perform these functions.

Finally, we disagree that the cases Salzgitter cites to support its argument that the Department has found that differences in the intensity of selling activities, such as inventory maintenance or qualification and quality control, support its arguments in this case. In *Softwood Lumber*, the Department found certain of Weyerhauser's home market sales were at a different LOT because they involved significantly more selling functions than other sales, including inventory maintenance.[128] Further, in *Cement from Mexico*, the Department found that the respondent made home market sales at two LOTs because of differences in numerous selling activities.[129]

---

[124] *Id.*

[125] *See* Letter from the Department to Salzgitter, "Questionnaire," dated May 25, 2016, at A-16.

[126] *See HWR from Mexico* at Comment 8.

[127] *See Ball Bearings* at 14.

[128] *See Softwood Lumber*, 71 FR at 33980.

[129] *See Cement from Mexico* at Comment 2.

Barcode:3556338-01 A-428-844 INV - Investigation  -

Therefore, the circumstances of these cases differ from that of Salzgitter because, as noted above, we do not find a substantial difference in the selling functions Salzgitter's affiliated resellers performed to make home market Channel 4 sales which would warrant a separate LOT. Consequently, we have not revised our LOT analysis for Salzigtter and continue to find that Salzgitter's home market channels of distribution constitute one LOT.

**Comment 6: Capping Freight Revenue for BSPC's Sales**

*Salzgitter's Arguments*

- In the Preliminary Determination, the Department capped BSPC's reported freight revenue by the amount of U.S. inland freight from warehouse to customer expenses incurred on each applicable sale.  Salzgitter disagrees with this methodology, arguing that the Department should not cap BSPC's freight revenue in the final determination.

- Salzgitter argues that the Department should only cap revenues for services that are separately provided and charged, not for those revenues for services that are within the terms of sale.[130]  Salzgitter claims that delivery is part of BSPC's terms of sale and an essential part of the sales contract between BSPC and its customers, not a separate service, as demonstrated at verification.[131]

*The Petitioner's Arguments*

- The petitioner disagrees, asserting that the Department should continue to cap freight revenue by the corresponding freight expenses in accordance with its long-standing practice, which has been upheld by the CIT.[132]

---

[130] *See* Salzgitter's Case Brief at 31-33 (citing *Certain Orange Juice From Brazil: Final Results of Antidumping Administrative Review and Final No Shipment Determination*, 77 FR 63291 (October 16, 2012), and accompanying Issues and Decision Memorandum at Comment 6; and *Ball Bearings and Parts Thereof From France, Germany, Italy, Japan, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews and Revocation of an Order in Part*, 74 FR 44813 (August 31, 2009) (*Ball Bearings 2009*), and accompanying Issues and Decision Memorandum at Comment 12).

[131] *See* Salzgitter's Case Brief at 33 (citing *Hot Rolled Steel from Australia* at Comment 2 (where the Department found that the freight revenue and fuel surcharge were not part of the sales price, as claimed by the respondent, and thus the Department applied the freight revenue cap) and BSPC Sales Verification Report at Exhibit BGVE-4 (in which Salzgitter claims that the documents support its contention that the delivery is part of the sales terms)).

[132] *See* the Petitioner's Rebuttal Brief at 24, 27-28 (citing *Circular Welded Carbon-Quality Steel Pipe From the Socialist Republic of Vietnam: Final Determination of Sales at Less Than Fair Value*, 81 FR 75042 (October 28, 2016), and accompanying Issues and Decision Memorandum, at Comment 7; *Multilayered Wood Flooring From the People's Republic of China: Final Determination of Sales at Less than Fair Value*, 76 FR 64318 (October 18, 2011) (*Wood Flooring from PRC*), and accompanying Issues and Decision Memorandum at Comment 39; *Certain Orange Juice From Brazil: Final Results of Antidumping Duty Administrative Review and Notice of Intent Not to Revoke Antidumping Duty Order in Part*, 75 FR 50999 (August 18, 2010) (*OJ from Brazil 2010*), and accompanying Issues and Decision Memorandum at Comment 2; and *Dongguan Sunrise Furniture Co., Ltd. v. United States*, 865 F. Supp. 2d 1216, 1249-50 (CIT 2012) (*Dongguan*)).

Barcode:3556338-01 A-428-844 INV - Investigation -

- The petitioner disputes Salzgitter's contention that delivery is not a separate service from the sale of BSPC's merchandise. According to the petitioner, there is no record evidence to demonstrate that BSPC's delivered terms are any different from those presented in the many cases where the Department has capped freight revenue; thus, it is irrelevant when capping freight revenue for the Department to consider whether a customer negotiates delivery at the same time it purchases BSPC's products.

**Department's Position:**

We have continued to cap BSPC's reported freight revenue in each instance where it exceeds the amount of expenses for "U.S. inland freight from warehouse to customer," in accordance with our practice.[133]

The Department adjusts for U.S. movement expenses under section 772(c)(1) of the Act. Further, the Department's regulations at 19 CFR 351.401(c) direct the Department to use, in calculating U.S. price, a price which is net of any price adjustment that is reasonably attributable to the subject merchandise. The term "price adjustment" is defined under 19 CFR 351.102(b)(38) as "any change in the price charged for subject merchandise or the foreign like product, such as discounts, rebates and or other adjustments, including, under certain circumstances, a change that is made after the time of sale that is reflected in the purchaser's net outlay." Thus, it would be inappropriate to treat the revenues associated with BSPC's freight expenses as price adjustments under 19 CFR 351.401(c) because these revenues do not represent "changes in the price for subject merchandise," such as discounts, rebates, and post-sale price adjustments. Therefore, the fact that Salzgitter's freight revenue is part of the purchaser's net outlay is immaterial.

In past cases, the Department has declined to treat freight-related revenues as additions to U.S. price under section 772(c) of the Act or as price adjustments under 19 CFR 351.102(b). Rather, we have incorporated freight-related revenues as offsets to movement expenses because they relate to the movement and transportation of subject merchandise.[134] Moreover, we find that it would be inappropriate to increase the gross unit price for subject merchandise because of profits earned on the provision or sale of freight; such profits should be attributable to the sale of the freight service, not to the subject merchandise. Therefore, we have continued to treat these revenues as an offset to the underlying expenses. In so doing, we set BSPC's expenses for "U.S. inland freight from warehouse to the unaffiliated customer" to zero where the corresponding revenue exceeded the expenses, in accordance with our past practice.

---

[133] *See, e.g., Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 64170 (October 28, 2014) (*Pipes and Tubes from Thailand*), and accompanying Issues and Decision Memorandum at Comment 4; *Wood Flooring from PRC* at Comment 39; and *OJ from Brazil 2010* at Comment 2.

[134] *See, e.g., Pipes and Tubes from Thailand* at Comment 4; *Wood Flooring from PRC* at Comment 39; and *OJ from Brazil* at Comment 2.

Barcode:3556338-01 A-428-844 INV - Investigation  -

We disagree with Salzgitter's contention that the Department in *Ball Bearings 2009* capped revenues for transportation and insurance services because they were separately provided and charged and not included in the terms of sale.[135]  Instead, our focus in both *Ball Bearings 2009* and the instant case is whether the respondent realized revenue for services it performed that are unrelated to the gross unit price of subject merchandise.  It is immaterial to the Department's analysis whether such services are included in the terms of sale or separately invoiced by the respondent.

Finally, we disagree with Salzgitter's assertion that the Department capped freight revenue for the respondent BlueScope in *Hot Rolled Steel from Australia* because the respondent failed to demonstrate that freight surcharges were part of the sales price.  Rather, the Department observed "{t}he record shows that BlueScope charges separately for product and freight and classifies both under its own accounting code.  In addition, BlueScope reported that its freight and fuel surcharges "are intended to be a pass-through of charges (*e.g.*, Steelscape {affiliate} charges the customer based on what it pays for freight)."[136]  Thus, the facts in this investigation are not distinguishable from *Hot Rolled Steel from Australia* with respect to capping freight revenue.

### Comment 7: Capping BSPC's Revenues for Further Manufacturing by Associated Expenses

*The Petitioner's Arguments*

- The petitioner argues that the Department should apply its revenue cap methodology to revenue Salzgitter reported for BSPC's further manufacturing, including internal lining of pipe, external coating of pipe, girthwelding pipes, and testing, because if not capped by the costs associated with these items, these revenues will distort the U.S. prices of the merchandise under investigation.

- The petitioner asserts that profits earned on ancillary elements of a sale should not be shifted to the price of the merchandise under investigation; rather, the Department should limit any adjustment for these revenues to the amount of the associated expenses for these elements.[137]

- The petitioner contends that the Department has limited adjustments for revenue to the amount of the associated expenses for items such as freight, import-related services, testing services, tooling, and port expenses.[138]

---

[135] *See Ball Bearings 2009* at Comment 12.

[136] *See Hot Rolled Steel from Australia* at Comment 2.

[137] *See* the Petitioner's Case Brief at 38-39 (citing *Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 FR 64170 (October 28, 2014)=(*Pipes and Tubes From Thailand*), and accompanying Issues and Decision Memorandum at Comment 4).

[138] *Id.*, at 39 (citing *OJ from Brazil 2010* at Comment 2; and *Large Power Transformers From the Republic of*

Barcode:3556338-01 A-428-844 INV - Investigation -

- The petitioner argues that testing, like freight, is clearly an ancillary service that should be capped according to the Department's standard methodology.  In addition, the petitioner contends that the further processing services (*i.e.*, internal lining, external coating, and girthwelding) are not related to the subject merchandise, but rather relate to the downstream pipe product.  Thus, the petitioner claims that these items are no different than additional services such as delivery offered by BSPC and, as a result, they should also be capped.

- According to the petitioner, not capping these revenue items distorts the U.S. price.[139] Therefore, the petitioner argues that, in order to eliminate this distortion, the Department should use the price of the bare pipe (reported in the field "PIPE"), as the starting gross unit price for BSPC's further manufactured sales and cap additional revenues by their associated costs before including them as adjustments.

*Salzgitter's Arguments*

- Salzgitter disagrees with the petitioner's suggested approach, noting that the petitioner cites to no authority which supports capping: 1) any revenues other than movement expenses; or 2) revenue items based on further manufacturing operations specifically.

- Salzgitter asserts that the petitioner appears to conflate revenue from items like freight services with production and further processing elements of the subject merchandise. According to Salzgitter, the Department has never applied its practice of capping freight revenue to cap revenue earned from production or further processing activities.

**Department's Position:**

We find it is inappropriate to cap BSPC's revenues from further manufacturing operations.[140] In the Department's position in Comment 7, above, we explain our practice of capping movement-related revenues realized by respondents. We find that further manufacturing relates directly to the price of subject merchandise or, in this instance, to the production of the downstream product from subject merchandise. In *Woven Ribbons*, we declined to cap revenues that a respondent "charge{d} its customers for the expenses incurred in meeting the customer's special requirements in product design or color, such as dyeing fee, printing fee, molding fee, etc." where the "additional processing charges {were} associated directly with the production of

---

*Korea: Final Results of Antidumping Duty Administrative Review*; 2013-2014, 81 FR 14087 (March 16, 2016), and accompanying Issues and Decision Memorandum at Comment 3).

[139] The petitioner provides numerical examples of its arguments on page 40 of its case brief; however, because these examples are business proprietary information, we cannot discuss them here.

[140] Regarding testing revenues, Salzgitter did not report testing revenues, and thus, we do not have any reported testing revenues to cap even if were to find capping them to be appropriate.

merchandise under consideration."[141]  We find BSPC's revenues for internal lining, external coating, and girthwelding to be analogous because these revenues also relate to customers' special requirements and are directly associated with the production  and price of further manufactured CTL plate.  While the revenues in question in *Woven Ribbons* pertained to the sale of subject merchandise, not further manufacturing revenues associated with production of a downstream product, the concept is the analogous; the revenues were directly related to the price of the subject merchandise.

We also note that the petitioner does not to cite to any case where we have capped revenues for further manufacturing operations.[142]  Accordingly, we find it inappropriate to cap these revenues by related costs.

**Comment 8: Salzgitter's Short-Term Euro-Denominated Interest Rate**

*Salzgitter's Arguments*

- Following verification, the Department instructed Salzgitter to revise its reporting of imputed home market credit and inventory carrying expenses to use the POI average short-term interest rate based on the borrowings from unaffiliated lenders by Salzgitter's affiliate, Salzgitter Mannesman Klöckner Werke GmbH (SKWG), rather than the intracompany interest rate used in Salzgitter's questionnaire responses.  Salzgitter asserts that the Department should rely on these revised expenses for the final determination.

- In addition, Salzgitter notes that the Department should revise the imputed credit and inventory carrying expenses for U.S. sales sold in Euros using this revised interest rate.

- Alternatively, Salzgitter states that the Department may revise these imputed expenses to use the publicly-available short-term Euro-denominated interest rate in Germany of 2.8 percent, which the Department observed at verification.[143]

The petitioner did not comment on this issue.

Department's Position:

We used Salzgitter's revised home market imputed credit and inventory carrying expenses calculated using SKWG's Euro-denominated borrowing rate from unaffiliated lenders in our

---

[141] *See Narrow Woven Ribbons With Woven Selvedge From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 75 FR 41808 (July 19, 2010), and accompanying Issues and Decision Memorandum, at Comment 3 (*Woven Ribbons*).

[142] In *LPTs from Korea*, the Department applied a cap to installation revenue, but not to any further manufacturing operations. *See LPTs from Korea*, at Comment 3.

[143] *See* Salzgitter's Case Brief at 25 (citing MGB Verification Report Exhibit MGBVE-17).

calculations for the final determination.  In addition, we recalculated Salzgitter's imputed credit and inventory carrying expenses for U.S. sales sold in Euros to also use this borrowing rate.[144]

Comment 9:    *Treatment of Salzgitter Home Market Resales of Further-Processed CTL Plate*

*The Petitioner's Arguments*

- In the *Preliminary Determination*, the Department did not include in its analysis certain home market downstream sales by Salzgitter's affiliates which underwent further processing that resulted in changes to the CONNUM because it did not have information regarding the product characteristics of these sales as produced by Salzgitter's mills.  The petitioner notes that, for the final determination, the Department now has the necessary information to include these sales in its calculation of NV and should do so.

- However, the petitioner argues that the Department should calculate NV for these further processed home market sales based on the CTL plate as sold to the downstream unaffiliated customer, without deducting the further processing (or transformation) costs and mill-to-reseller warehouse movement expenses.

- According to the petitioner, the transformation costs for these sales should be included in the COP, based on the weighted-average amount of the reported transformation costs for each product.

- The petitioner contends that the facts of this investigation are almost identical to *Hot Rolled Steel from Australia*, where the affiliates of the respondent were treated as a single entity.[145]  As a result, the petitioner notes that in that case the Department determined that the processing costs for all entities were part of the total COP and did not include the affiliate processing costs as an adjustment to the home market price.

*Salzgitter's Arguments*

- Salzgitter disagrees that it would be appropriate for the Department to include these downstream further processed home market sales in its analysis because they are made at a separate and higher level of trade than Salzgitter's other home market sales.

- However, Salzgitter asserts that, if the Department does include these sales in its analysis, it should base its comparisons on the home price net of transformation costs and all other expenses.  According to Salzgitter, if the Department did not remove the transformation costs from the net home market price, it would result in unfair comparisons of these further processed sales to unprocessed U.S. sales.

---

[144] *See* Salzgitter Final Determination Calculation Memorandum.

[145] *See* the Petitioner's Case Brief at 30-31 (citing *Certain Hot-Rolled Steel Flat Products From Australia: Final Determination of Sales at Less Than Fair Value*, 81 FR 53406 (August 12, 2016) (*Hot Rolled Steel from Australia*), and accompanying Issues and Decision Memorandum at Comment 5).

- Salzgitter notes that, contrary to the petitioner's contention, the facts of this investigation are distinguishable from *Hot Rolled Steel from Australia* because the type of further processing performed by Salzgitter's affiliates is more complex and varied than were performed in that case.  Further, Salzgitter states that the Department requested the further processing costs from the Australian respondent in order to properly include them in the COP of the further processed merchandise.  However, Salzgitter points out that the Department did not request that Salzgitter report its transformation costs in this manner.

- Salzgitter maintains that the type of transformation performed, and the associated costs, vary widely within a given product.  Thus, Salzgitter argues that if the Department were to apply a weighted-average transformation cost to the COP, it would lead to unfair comparisons.[146]

- Finally, Salzgitter points out that the petitioner's proposal to disregard mill-to-reseller warehouse movement expenses makes no sense because the Department deducts all movement expenses back to the factory, even when a product is further processed.  According to Salzgitter, the petitioner's reliance on *Hot Rolled Steel from Australia* as support for this position is misplaced because, in that case, the respondent was unable to establish that its mill was the original place of shipment for the further processed merchandise.  However, Salzgitter notes that, in this case, there is no dispute that Salzgitter's mill is the original place of shipment.

**Department's Position:**

For the final determination, we have included in our analysis the affiliated resellers' downstream home market sales where Salzgitter's sales to its affiliated resellers failed the arm's length test,= including the downstream sales that underwent further processing.=As discussed above in Comment 5, we do not find that these further processed downstream sales are made at a separate, higher level of trade than Salzgitter's other home market sales.=Consistent with our treatment of similar downstream sales involving Dillinger's affiliated resellers, we calculated NV based on the product characteristics and corresponding CONNUM of CTL plate produced by the mill, rather than the further processed CTL plate.[147]= Accordingly, we deducted the transaction-specific transformation costs and the factory-to-warehouse expenses for these products to calculate the net home market prices.

The petitioner contends that the Department should treat the reseller's further processing expenses as part of the COP, consistent with *Hot Rolled Steel from Australia*.= However, in that case, we determined that it was appropriate to collapse the producer and its affiliated resellers and treat them as a single entity, pursuant to 19 CFR 351.401(f).=As a result of the collapsing

---

[146]=Salzgitter provides an example of the problem in incorporating its transformation costs as part of the reported COP, which includes business proprietary information that cannot be discussed here.=*See* Salzgitter's Rebuttal Brief at 30.

[147]=*See* Comment 20, below.

Barcode:3556338-01 A-428-844 INV - Investigation  -

decision in that case, we determined that it was appropriate to treat all further processing performed by the respondent's affiliated resellers as part of the COP.[148]

In the instant investigation, however, we limited our collapsing determination for Salzgitter to its three mills, ILG, MGB, and SZFG, as well as its affiliated trading company SMID, and did not include Salzgitter's affiliated home market resellers in our collapsing analysis.[149]  We find that the differences between the collapsing determinations distinguishes *Hot Rolled Steel from Australia* from the instant case.

In *Hot Rolled Steel from Australia,* we calculated the net home market price based on the merchandise shipped from the last company in the distribution chain within the collapsed entity, *i.e.*, the reseller.  In this case, the last Salzgitter company in the home market distribution chain within the collapsed entity is the mill.  Because we are not treating the affiliated resellers as part of the collapsed Salzgitter group, we based our comparisons for these sales on the product characteristics and corresponding CONNUM of the CTL plate as produced by the mill before the downstream reseller further processes it.  As a result, it would not be appropriate to consider the further processing performed by these resellers to be part of the COP of the CTL plate used to calculate NV.  Consequently, in order to calculate the net home market prices for these sales using the product characteristics and CONNUM as produced by the mill, we deducted from the starting price the mill-to-warehouse freight expenses as movement expenses, and the further processing (transformation) expenses as selling expenses in our calculations for the final determination.

**Comment 10: Adding a Fabrication Product Characteristic for Salzgitter**

*Salzgitter's Arguments*

- Salzgitter contends that the Department should include an additional product characteristic regarding the fabrication process (FABRH/U) for further manufactured products as part of the CONNUM for Salzgitter's home market and U.S. sales.

- Salzgitter argues that further processing has a significant effect on the cost and price of the further manufactured product.  According to Salzgitter, many of these products are custom made, often have very high prices, and the transformation costs may exceed the cost of the CTL plate.

- Salzgitter contends that its proposed fabrication product characteristic should be included in the CONNUM before the form product characteristic.  According to Salzgitter, this placement is appropriate because:  1) of the significance of fabrication on the cost and price of CTL plate; and 2) fabrication relates to the form of the product.

---

[148] *See Hot Rolled Steel from Australia* at Comment 5.

[149] *See* Memorandum, "Whether to Collapse Salzgitter Mannesmann International GmbH and its Affiliated Producers in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate (CTL Plate) from the Federal Republic of Germany (Germany)," dated October 27, 2016.

*The Petitioner's Arguments*

- The petitioner disagrees, stating that the Department should decline to use Salzgitter's reported fabrication product characteristic. The petitioner notes that the Department correctly disregarded this product characteristic in its calculations for the *Preliminary Determination*, and it should continue to do so in the final determination.

- The petitioner claims that it is unnecessary to include Salzgitter's fabrication product characteristic to ensure fair comparisons because the Department will not consider products to be potentially comparable if they do not pass the difference-in-merchandise (DIFMER) test. Thus, the petitioner notes that products that are so dissimilar as to fail the DIFMER test cannot be used as potential matches. Therefore, the petitioner maintains that the Department should continue to use the CONNUMs set forth in the questionnaire for the final determination.

**Department's Position:**

We have not revised our model-matching methodology for the final determination, and therefore we have not included Salzgitter's reported fabrication product characteristic for model-matching purposes. As explained in further detail in Comment 22 below, and based on our general practice, we developed the model-matching methodology for this investigation, as well as the companion CTL plate investigations, in the early stages of this investigation and in consultation with the interested parties. Salzgitter did not propose this product characteristic at that time.[150] Furthermore, Salzgitter's proposed fabrication product characteristic is only relevant to CTL plate that is further processed by affiliates because these fabrication processes are only performed by the downstream resellers and not by the mill. As discussed in Comment 9 above, while we have included Salzgitter's downstream further processed home market sales in our calculations for the final determination, we based our comparisons for these sales on the product characteristics and corresponding CONNUM of the CTL plate as produced by the mill before the downstream reseller further processes it. Therefore, we are deducting from the starting price as selling expenses any of the reseller's processing expenses that Salzgitter argues may be reflected in the fabrication product characteristic. Consequently, even assuming, *arguendo*, that it would be appropriate to revise our model-matching methodology in the final determination, we disagree that it would be necessary to include Salzgitter's proposed fabrication product characteristic because we are relying on the product characteristics and the corresponding CONNUM of the merchandise before further processing in our calculations for the final determination.

**Comment 11: Salzgitter's Credit Expense Revisions at Verification**

*Salzgitter's Arguments*

- At the start of the verification of Salzgitter's U.S. affiliate BSPC, Salzgitter submitted revisions to the calculation of credit days used to calculate U.S. credit expenses.

---

[150] *See* Salzgitter's Letter re: Comments Regarding Product Characteristics, dated June 2, 2016.

Barcode:3556338-01 A-428-844 INV - Investigation -

Therefore, Salzgitter states that the Department should use this information in its calculations for the final determination.

The petitioner did not comment on this issue.

**Department's Position:**

We have incorporated BSPC's revised credit days, and corresponding revised U.S credit expenses, in our calculations for the final determination. Salzgitter included these revisions, as well as the others noted in the Department's BSPC sales verification report, in the U.S. sales database Salzgitter submitted on February 3, 2017, in response to the Department's request.

**Comment 12: Salzgitter's Home Market Revenue Items**

*Salzgitter's Arguments*

- For certain home market sales, Salzgitter reported freight revenue in a separate field. However, Salzgitter notes that its reported home market gross unit prices already include freight revenue. Therefore, Salzgitter states that the Department should not add freight revenue to gross unit price in the calculation of NV.

- In addition, Salzgitter points out that it reported testing revenue, certificate revenue, processing revenue, and/or other revenue for certain home market sales. According to Salzgitter, its reported home market gross unit prices do not include these revenue items.

The petitioner did not comment on this issue.

**Department's Position:**

We have not added freight revenue to the reported gross unit price of Salzgitter's home market sales in our calculations for the final determination because these prices are inclusive of freight revenue. However, because Salzgitter did not include its other revenue items in the reported gross unit price for its home market sales, we added these items as an adjustment in our calculations for the final determination.

**Comment 13: MGB's Underreported Costs**

*The Petitioner's Arguments*

- The petitioner contends that the Department should adjust MGB's per-unit manufacturing costs to include the additional production-related expenses that were discovered at the MGB COP verification (*i.e.*, spare part inventory adjustments, testing expenses, external services, and transportation costs), as well as the additional production-related expenses

Barcode:3556338-01 A-428-844 INV - Investigation  -

Salzgitter presented at the start of verification (*i.e.*, sick leave, internal maintenance, and other operating expenses).[151]

Salzgitter did not comment on this issue.

Department's Position:

For the *Final Determination*, we adjusted MGB's reported costs for the additional production-related expenses that the Department discovered at the MGB COP verification, or that Salzgitter presented at the start of the MGB verification.

## Comment 14: MGB Scrap Offset

*The Petitioner's Arguments*

- The petitioner asserts that the Department's practice is to value scrap offsets based on the actual sales price of the scrap generated.[152]  Therefore, the petitioner contends that the Department should recalculate MGB's scrap offset to value the scrap quantities generated during the POI at the actual average sales price received for scrap.

Salzgitter did not comment on this issue.

Department's Position:

The Department's normal practice is to grant scrap offsets that reflect the actual sales value of the scrap generated during the production of the merchandise under consideration.[153]  Based on our findings at verification, the POI standard costs that MGB assigned to the scrap quantities generated were not similar to the POI revenue that MGB received on its scrap sales.[154]  Consequently, we revised MGB's total reported scrap offset to value the quantities generated at the POI average scrap sales price (*i.e.*, revenue) in our calculations for the final determination.

---

[151] *See* the Petitioner's Case Brief at 31-32 (citing MGB COP Verification Report at 2-3 and 25-26).

[152] *See* the Petitioners' Case Brief at 33 (citing *Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea*, 73 FR 14220 (March 17, 2008) *(CORE from Korea)*, and accompanying Issues and Decision Memorandum at Comment 5).

[153] *See, e.g.*, *CORE from Korea* at Comment 5; *Steel Concrete Reinforcing Bar from Turkey: Final Negative Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances*, 79 FR 54965 (September 15, 2014), and accompanying Issues and Decision Memorandum at Comment 16; and *Notice of Final Determination of Sales at Less Than Fair Value, and Negative Determination of Critical Circumstances: Certain Lined Paper Products from India*, 71 FR 45012 (August 8, 2006), and accompanying Issues and Decision Memorandum at Comment 4.

[154] *See* Memorandum "Verification of the Cost Response of Salzgitter AG in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-To-Length Plate from Federal Republic of Germany," dated January 4, 2016 (Salzgitter Cost Verification Report) at 17-18.

**Comment 15: Cost Adjustments for Other Salzgitter Manufacturing Entities**

*The Petitioner's Arguments*

- The petitioner observes that Salzgitter produced the merchandise under consideration at three manufacturing entities during the POI (*i.e.*, MGB, ILG, and SZFG); however, the Department only verified MGB's COP information. Consequently, the petitioner contends that, as neutral facts available, the Department should rely on its findings from the MGB COP verification to apply similar adjustments to ILG's and SZFG's COP data.

*Salzgitter's Arguments*

- Salzgitter disagrees, noting that the adjustments at issue apply only to MGB's reported costs and should not be applied as facts available to ILG and SZFG.

- According to Salzgitter, the application of facts available requires that the necessary information must be missing from the record or unverifiable. Salzgitter asserts that the petitioner's presumption that, because an affiliate's reported information was not verified, the affiliate's information is therefore missing or cannot be verified, is contrary to law and unfair.

- Salzgitter argues that, because there is no evidence, nor any allegation by the petitioner, of any missing or unverifiable COP data relating to ILG and SZFG, there is no basis to apply facts available to these manufacturing entities.

<u>Department's Position:</u>

We have not applied the cost adjustments identified at the MGB COP verification to the costs reported by ILG and SZFG.=Verification is intended to provide an examination of representative data rather than a complete review of all information submitted to the Department.[155]= While the Department does draw general conclusions regarding all of a respondent's data based on our verification findings, in this case, our findings at the MGB COP verification are omissions or mistakes that are relevant only to MGB's total reported costs, rather than methodological flaws that would be applicable to the cost calculations submitted by all of Salzgitter's manufacturing entities.

---

[155]=*See, e.g., Polyethylene Retail Carrier Bags from Thailand: Final Results of Antidumping Duty Administrative Review*, 72 FR 1982 (January 17, 2007), and accompanying Issues and Decision Memorandum at Comment 2; *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.; Final Results of Antidumping Duty Administrative Reviews, Partial Termination of Administrative Reviews, and Revocation in Part of Antidumping Duty Orders*, 60 FR 10900, 10928 (February 28, 1995) (*AFBs from France*); and <u>Micron Tech. v.= United States, 117 F.3d 1386, 1396 (CAFC . 1997)</u>, citing <u>Monsanto Co. v. United States, 733 F. Supp. 1507, 1508= (Ct. Int'l Trade 1990)</u> ("[v]erification is a spot check and is not intended to be an exhaustive examination of the respondent's business").

Barcode:3556338-01 A-428-844 INV - Investigation -

For example, in *AFBs from France*, the Department verified only one of the respondent's three factories, but found that the verification findings at the verified factory were relevant to all three factories. Specifically, in that case, the Department found distortions in the methodology used to report costs for subject and non-subject merchandise.[156] Conversely, in the instant case, the verification findings were not related to the methods used by Salzgitter to allocate costs, but rather were factory-specific omissions or mistakes. We note that our findings include MGB's exclusion of certain spare part inventory adjustments, testing expenses, external services, and transportation costs from the total reported costs in its overall cost reconciliation.[157] However, a review of the overall cost reconciliations on the record for ILG and SZFG do not show that such expenses were excluded from their respective reported costs.[158] Thus, we find that it would be inappropriate to adjust ILG's and SZFG's reported costs for mistakes or omissions that pertain to items specific to MGB's cost reporting.

## Comment 16: MGB's G&A Ratio Denominator

*The Petitioner's Arguments*

- The petitioner states that the Department's practice is to ensure consistency between the denominator of the G&A expense ratio and the costs to which the ratio is applied.[159]

- To reflect a consistent basis with the per-unit manufacturing costs, the petitioner contends that the Department should adjust the denominator of MGB's G&A expense ratio to include scrap offsets.

Salzgitter did not comment on this issue.

Department's Position:

To ensure a proper mathematical calculation, the denominator to the G&A expense ratio and the per-unit costs to which the ratio is applied should be on the same basis, *i.e.*, they should reflect the same pool of costs. Because MGB's reported per-unit manufacturing costs include an offset for scrap, the denominator to the G&A expense ratio should likewise include the total scrap offset.[160] Therefore, for the final determination, we revised MGB's G&A expense ratio to include scrap offsets in the denominator of the calculation.[161]

---

[156] *See AFBs from France*, 60 FR at 10928.

[157] *See* Salzgitter Cost Verification Report at 2.

[158] *See* Salzgitter's section D questionnaire response, dated July 15, 2016, at Exhibit D-19; and Salzgitter's supplemental section D questionnaire response, dated September 21, 2016, at Exhibits Supp. D-15a, D-15b, and D-20.

[159] *See* the Petitioners' Case Brief at 33 (citing *Orange Juice from Brazil 2009* at Comment 6).

[160] *See* Salzgitter Cost Verification Report at 16-18.

[161] *See* Salzgitter Final Cost Calculation Memo

Barcode:3556338-01 A-428-844 INV - Investigation  -

**Comment 17: Further Manufacturing G&A Ratio Denominator**

*The Petitioner's Arguments*

- In the *Preliminary Determination,* the Department calculated BSPC's G&A expense ratio using its full cost of sales in the denominator, and we then applied this ratio to the reported further cost of manufacturing of each CONNUM plus the COP of the underlying CTL plate used to produce the CONNUM.  The petitioner disagrees with this approach, which it claims does not conform to the Department's normal practice and results in an understatement of costs.

- The petitioner contends that the Department's practice is to ensure consistency between the denominator of the G&A expense ratio and the costs to which the ratio is applied.[162]

- According to the petitioner, the Department should adjust the denominator of BSPC's G&A expense ratio to include scrap offsets and exclude outbound freight, so that the denominator is on a consistent basis with the per-unit further manufacturing costs. Further, the petitioner claims that, because the imported plate costs are not included in the per-unit costs to which the G&A expense ratio is applied, such costs should likewise be excluded from the G&A expense ratio denominator.

*Salzgitter's Arguments*

- According to Salzgitter, the Department's practice is to include the cost of the product that is to be further manufactured in the denominator of the G&A expense ratio when the respondent engages in both further manufacturing and reselling activities.[163]  As the Department verified that BSPC also purchases finished goods for resale, Salzgitter maintains that it is appropriate to include the cost of the CTL plate acquired by BSPC in the denominator to the G&A expense ratio calculation.

- Salzgitter contends that, if the Department determines it is appropriate to exclude the cost of the CTL plate from the G&A expense ratio denominator, the CTL plate yield loss should likewise be excluded from the per-unit further manufacturing costs to which the G&A ratio is applied.

Department's Position:

The record evidence indicates that BSPC engages in both further manufacturing and reselling activities.[164]  Therefore, consistent with our decisions in *Cold-Rolled Steel from Brazil*, *Line Pipe*

---

[162] *See* the Petitioners' Case Brief at 35 (citing *Orange Juice from Brazil 2009* at Comment 6).

[163] *See* Salzgitter's Rebuttal Brief at 33 (citing *Certain Cold-Rolled Steel Flat Products from Brazil*, 81 FR 44946 (July 29, 2016) (*Cold-Rolled Steel from Brazil*) and accompanying Issues and Decision Memorandum at Comment 7.

[164] See BSPC Further Manufacturing Verification Report at page 8.

*from Korea*, and *Hot-Rolled Steel from Brazil,* [165] we find that it is appropriate to allocate G&A expenses to all company activities. In such instances, it is appropriate to revise the denominator of the G&A expense ratio to include not only the further processing costs, but also the cost of the imported subject merchandise that was further processed and the cost of all non-further manufactured products (*i.e.*, the total cost of goods sold). Further, to ensure that the denominator of the ratio and the per-unit cost to which it is applied are on the same basis, we are applying the G&A expense ratio to the per-unit further manufacturing costs plus the cost of production of the underlying subject merchandise. Thus, contrary to the petitioners' assertions, the denominator of the G&A ratio and the per-unit costs (*i.e.*, the per-unit further manufacturing costs plus the per-unit cost of the imported subject merchandise) are on the same basis.

We agree with the petitioner that in some instances this methodology could result in a theoretical distortion based on the fact that the total cost of goods sold includes the cost of the imported subject merchandise (in this case, CTL plate) at the transfer price and that the per-unit costs to which the ratio is applied include the same merchandise at COP. While we found in *Line Pipe from Korea* that this difference was negligible,[166] for BSPC, the difference is significant enough to represent a potential distortion. Therefore, we have adjusted the cost of the consumed subject plate that is included in the cost of goods sold denominator to reasonably reflect the COP, rather than the transfer price.[167]

With regard to the petitioner's assertion that we should exclude outbound freight from, and include scrap offsets in, the denominator of BSPC's G&A ratio, we note that both of these adjustments were made in the *Preliminary Determination*[168] and we have continued to apply these adjustments in the final determination. We have also revised the cost of goods sold denominator to reflect the changes made to BSPC's scrap offset adjustment as described in Comment 18 below. As a result of these changes, the denominator of the G&A expense ratio and the per-unit costs to which it is applied are stated on a consistent basis, in accordance with our practice,[169] and any theoretical difference has been negated.

---

[165] *See Cold-Rolled Steel from Brazil at Comment 7; Line Pipe from Korea and accompanying Issues and Decision Memorandum at Comment 20; and Certain Hot-Rolled Steel Flat Products from Brazil: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part, 81 FR 53424 (August 12, 2016)  (Hot-Rolled Steel from Brazil) a nd accompanying Issues and Decision Memorandum at Comment 5.*

[166] *See Line Pipe from Korea* at Comment 20.

[167] *See* Salzgitter Final Cost Memo.

[168] *See* Memorandum "Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – Salzgitter AG," dated November 4, 2016.

[169] *See, e.g.*, *Certain Pasta From Italy: Notice of Final Results of the Thirteenth Administrative Review*, 75 FR 81212 (December 27, 2010), and accompanying Issues and Decision Memorandum at Comment 4.

**Comment 18: Further Manufacturing Scrap Offset**

*The Petitioner's Arguments*

- The petitioner asserts that the Department's practice is to limit the scrap offset to the quantity of scrap generated during the period valued at the average scrap sales price.[170] Therefore, consistent with the *Preliminary Determination*, the petitioner contends that the Department should continue to limit BSPC's scrap offset to the scrap quantity generated (*i.e.*, only the cut-offs tracked in the production system, and not the turnings or tabs).

*Salzgitter's Arguments*

- Salzgitter states that BSPC's production system only tracks the quantity of the larger pipe sections that are scrapped, *i.e.*, cut-offs, and not the quantities of turnings and tabs, which are very small shavings and pieces of metal. Salzgitter asserts that, because of the size of the turnings and tabs, it is reasonable that BSPC accounts for them only at the time of their sale.

- Salzgitter notes that the record demonstrates that BSPC weighed and sold, and thus generated, the turnings and tabs on a regular basis. Therefore, Salzgitter maintains that the Department should accept BSPC's reporting of the total scrap sold during the POI, including the turnings and tabs.

Department's Position:

Our practice is to allow for a scrap offset related to the quantity of scrap generated during the POI.[171] When the quantity sold exceeds the quantity generated, we limit the scrap offset to the quantity generated during production because it would be unreasonable to offset the POI costs for scrap produced prior to the POI.[172]

While BSPC does track the quantity of cut-offs generated during production in its normal books and records, it does not track the quantity of tab pieces and turnings generated, which are weighed as they are sold. Thus, because BSPC is not able to determine the total quantity of

---

[170] *See* the Petitioners' Case Brief at 37 (citing *Certain Oil Country Tubular Goods from Saudi Arabia*, 79 FR 41986 (July 18, 2014), and accompanying Issues and Decision Memorandum at Comment 5).

[171] *See, e.g., Circular Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 FR 65272 (October 31, 2013) (*CWP from Thailand*), and accompanying Issues and Decision Memorandum at Comment 11; *Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Notice of Final Results of the Thirteenth Administrative Review*, 73 FR 14220 (March 17, 2008), and accompanying Issues And Decision Memorandum at Comment 5; and *Circular Welded Carbon-Quality Steel Pipe from the Sultanate of Oman: Final Determination of Sale at Less Than Fair Value*, 77 FR 64480 (October 22, 2012) (*CWP from Oman*), and accompanying Issues And Decision Memorandum at Comment 3. *See also Mid Continent Nail Corp.* v. *United States*, 34 C.I.T. 498 (CIT 2010) (*Mid Continent*) (affirming the Department's practice concerning the scrap offset).

[172] *See, e.g., CWP from Oman* at Comment 3.

scrap generated during the POI inclusive of turnings and tab pieces, we look to the available record evidence to determine the total quantity of scrap that could have reasonably been generated during production, in accordance with our practice.[173]  Specifically, we used BSPC's POI average yield loss ratio and the total CTL plate that was consumed by BSPC in production to approximate the quantity of scrap that could have been generated during the POI.  Based on this analysis, we found that BSPC could have reasonably generated more scrap than it sold during the POI.[174]  Accordingly, we find that the quantity of scrap BSPC sold during the POI is a reasonable approximation of the quantity of scrap it generated and, thus, we allowed BSPC's full scrap offset for the final determination.

## Comment 19: Further Manufacturing Verification Minor Corrections

*Salzgitter's Arguments*

- Salzgitter states that the Department should make the various adjustments from the further manufacturing cost verification in its calculations for the final determination.

  o First, the Department should accept BSPC's correction of the wall thickness classifications for two item numbers.

  o Second, the Department should accept BSPC's correction to include foreign exchange gains in the calculation of the financial expense ratio because these gains fully offset BSPC's financial expenses, and thus, BSPC's resulting financial expense ratio is zero.

The petitioner did not comment on this issue.

<u>Department's Position</u>:

We incorporated the corrections submitted at the start of the further manufacturing cost verification in our calculation of BPSC's reported costs for the final determination. We noted at verification that the correction regarding wall thickness classifications was the result of a clerical error, and that the revised data was accurate and supported by source documents. With regard to the second correction, we noted that the foreign exchange gains in BSPC's parent company's financial statements was mistakenly omitted from the calculation of the financial expense ratio.[175]  Our practice is to include the total net foreign exchange gain or loss reported in the financial statements of the same entity used to compute a respondent's net financial expense in the calculation of the financial expense ratio .[176]  Consequently, in accordance with our practice,

---

[173] *See CWP from Thailand* at Comment 11.

[174] *See* Salzgitter Final Cost Calculation Memo.

[175] *See* Memorandum "Verification of Berg Steel Pipe Corp. in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany," dated January 4, 2017 (BSPC Further Manufacturing Verification Report) at 2 and 13.

[176] *See, e.g., Magnesium Metal from the Russian Federation: Final Determination of Sales at Less-than-Fair Value,* 70 FR 9041 (February 24, 2005), and accompanying Issues and Decision Memorandum at Comment 12.

Barcode:3556338-01 A-428-844 INV - Investigation  -

we included the total net foreign exchange gains in the calculation of the financial expense ratio for the final determination.

**Comment 20: Home Market Affiliated Service Center Sales for Dillinger**

**Dillinger Arguments**

- In the *Preliminary Determination*, the Department included downstream home market sales by Dillinger's affiliated resellers, Ancofer and Jebens, in our analysis because Dillinger sales to both affiliates failed the arm's length test.[177] Dillinger disagrees with this approach, arguing that the Department should use its home market sales to Ancofer and Jebens in the margin calculations for the final determination.

- According to Dillinger, the Department found that its sales to Ancofer and Jebens failed the arm's length test in the *Preliminary Determination* because it did not consider home market LOT differences in its analysis.[178]

- Further, Dillinger notes that Ancofer's and Jebens' home market sales of its CTL plate represent only a small quantity of Dillinger total home market sales during the POI. Thus, Dillinger argues that, pursuant to 19 CFR 351.403(d), Ancofer's and Jebens' downstream sales are insignificant and should not be used in the Department's margin calculations.

- However, Dillinger states that, if the Department continues to use Ancofer's and Jebens' downstream sales, it should not treat all of Ancofer and Jebens' downstream sales as Dillinger-produced CTL plate, but instead rely on the data Dillinger provided indicating the amount of CTL plate Dillinger supplied for each downstream sales transaction.

*The Petitioner's Arguments*

- The petitioner asserts that the Department should continue to use Ancofer's and Jebens' downstream sales in its calculations for the final determination.

- The petitioner disagrees with Dillinger's contention that Ancofer's and Jebens' sales are insignificant when compared to Dillinger's sales to unaffiliated customers, noting that Dillinger itself acknowledges that its sales to these affiliates exceed five percent of home market sales.[179]

---

[177] In our analysis, we assumed that all of Ancofer's and Jebens' downstream sales consisted entirely of Dillinger-produced CTL plate.

[178] For further discussion of this LOT issue, *see* Comment 4, above.

[179] The petitioner cites to Dillinger's Case Brief at page 13.

Barcode:3556338-01 A-428-844 INV - Investigation    -

**Department's Position**:

We have continued to rely on Ancofer's and Jebens' downstream sales in our margin calculations for the final determination.

Section 351.403(c) of the Department's regulations directs that:

> If an exporter or producer sold the foreign like product to an affiliated party, the Secretary may calculate normal value based on that sale only if satisfied that the price is comparable to the price at which the exporter or producer sold the foreign like product to a person who is not affiliated with the seller.

Moreover, 19 CFR 351.403(d) states that:

> If an exporter or producer sold the foreign like product through an affiliated party, the Secretary may calculate normal value based on the sale by such affiliated party. However, the Secretary normally will not calculate normal value based on the sale by an affiliated party if sales of the foreign like product by an exporter or producer to affiliated parties account for less than five percent of the total value (or quantity) of the exporter's or producer's sales of the foreign like product in the market in question or if sales to the affiliated party are comparable, as defined in paragraph (c) of this section.

In our final determination margin calculations, Dillinger's sales to Ancofer and Jebens continue to fail the arm's length test.[180] Therefore, pursuant to 19 CFR 351.403(c), we may not rely on these sales to calculate NV. Furthermore, because Dillinger sales to Ancofer and Jebens exceed five percent of its total reported home market sales during the POI, the exemption provided in 19 CFR 351.403(d) to not include Ancofer's and Jebens' downstream sales in our analysis does not apply.

Nonetheless, we agree with Dillinger's assertion that we should not treat all of Ancofer and Jebens' downstream sales as Dillinger-produced CTL plate. Dillinger provided the percentage of each downstream sale that was sourced from CTL plate produced by: 1) Dillinger itself; 2) Dillinger France; 3) either Dillinger or Dillinger France; 4) unaffiliated third parties; or 5) unknown manufacturers. Therefore, for the final determination, we have included the portion of each sale which Dillinger reported as produced by itself, either Dillinger or Dillinger France, or unknown manufacturers, because this merchandise is either certainly or possibly produced by Dillinger. Similarly, we excluded the portions of Ancofer's and Jebens' sales which were sourced from either Dillinger France or unaffiliated third party suppliers from our analysis.

Moreover, regarding the CTL plate produced by unknown manufacturers, we find that pursuant to sections 776(a) and (b) of the Act, the use of facts otherwise available with an adverse inference is warranted.

---

[180] As explained in Comment 21, above, we continue to find that Dillinger made sales at only one LOT in the home market.

Barcode:3556338-01 A-428-844 INV - Investigation  -

We asked Dillinger to identify the manufacturers of the CTL plate it identified as "unknown" in the Ancofer and Jebens downstream sales databases and revise its reporting to: 1) include sales of CTL plate manufactured by Dillinger; and 2) exclude merchandise produced by other manufacturers.[181]

Dillinger responded that, while it attempted to identify the manufacturers identified as "unknown," there was insufficient information in the automated material records to determine the manufacturers' identities for these sales.[182]

In light of the above, the application of facts available is appropriate pursuant to sections 776(a)(1) and (2)(A) of the Act because necessary information, *i.e.*, the names of the manufacturers of the CTL plate at issue is not on the record, and Dillinger withheld that information and failed to provide this information in a timely manner. As evidenced by its supplemental questionnaire response,[183] Dillinger possessed the necessary information but did not put forth its maximum effort to conduct the necessary investigation of its records to provide the information that was in its possession.

Moreover, when selecting from the facts available, the use of AFA pursuant to section 776(b) of the Act is appropriate because Dillinger did not act to the best of its ability in attempting to provide the requested manufacturer information for these downstream sales. In determining whether a company has cooperated to the best of its ability and whether AFA is warranted, the Department follows the guidance set forth in *Nippon Steel*:

> Before making an adverse inference, Commerce must examine respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information. Compliance with the "best of its ability" standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation. While the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping. It assumes that importers are familiar with the rules and regulations that apply to the import activities undertaken and requires that importers, to avoid a risk of an adverse inference determination in responding to Commerce's inquiries: (a) take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce; (b) have familiarity with all of the records it maintains in its possession, custody, or control; and (c) conduct prompt, careful, and comprehensive

---

[181] *See* Letter from the Department to Dillinger dated October 31, 2016.

[182] *See* Dillinger's Third Supplemental Section B&C Questionnaire Response, dated November 7, 2016, (Dillinger Third Supplemental Response) at 4.

[183] *Id.*, at 5.

investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so.[184]

The information in question (*i.e.*, the identity of the unknown manufacturers of the CTL plate resold by Dillinger's affiliates, Ancofer and Jebens) is the type of information that a large steel manufacturer such as Dillinger should reasonably be able to provide, in order to provide its customers with the mill test certificates for the CTL plate they purchase. Dillinger's supplemental questionnaire responses demonstrate that it was familiar with all of the records that Ancofer and Jebens maintained, and Ancofer and Jebens possessed information about the manufacturers of the CTL plate at issue,[185] yet reported the producers of only some of the CTL plate, but not all. Thus, we find that Dillinger would have been able to provide this information if it had made the appropriate effort when it received the Department's antidumping duty questionnaire and was notified that it was required to report Ancofer's and Jebens' downstream sales.[186] Therefore, we find that Dillinger's failure to report the requested manufacturer information, accurately and in the manner requested, using the records over which it maintained control, indicates that Dillinger did not act to the best of its ability to comply with our requests for information. Consequently, in accordance with section 776(b) of the Act, we find that it is appropriate to apply partial AFA to those downstream sales by Ancofer and Jebens where Dillinger did not identify the manufacturer of the CTL plate.[187] We note that, in accordance with section 782(d) of the Act, the Department provided Dillinger with the opportunity to remedy the deficiencies in reporting the manufacturer for all of Ancofer's and Jebens' downstream sales.[188]

Therefore, as partial AFA, we determined the highest non-aberrational net price among Dillinger's downstream home market sales, and assigned that price to all of these sales where Dillinger failed to report the manufacturer of the CTL plate in our margin calculations for the final determination.

**Comment 21: Level of Trade for Dillinger**

*Dillinger's Arguments*

- In the *Preliminary Determination*, the Department found that Dillinger made home market and U.S. sales at a single level of trade (LOT) and this LOT was the same in both

---

[184] *See Nippon Steel*, 337 F.3d at 1382 (internal citation omitted).

[185] *See* Dillinger Third Supplemental Response at 5.

[186] *See* the Department's antidumping duty questionnaire issued to Dillinger, dated May 25, 2016, at page B-5 ("If you had sales to an affiliated party that consumed all or some of the merchandise …, then report all of your sales to that affiliate, whether the merchandise was consumed or resold by the affiliate…. If you cannot demonstrate that your sales to the affiliate were at arm's-length prices, then you must also report the affiliate's sales to unaffiliated customers; however, in any case you must report your sales to the affiliate.").

[187] *See, e.g.*, *Cold Rolled Steel from Germany* at Comment 1*(*where the downstream sales information reported was not complete, the Department determined that the respondent did not cooperate to the best of its ability and that AFA was warranted.)

[188] *See* Letter from the Department to Dillinger, dated October 31, 2016.

markets.[189]  Dillinger disagrees, arguing the Department should have recognized that it made sales at four LOTs in the home market and accepted Dillinger's LOT classification of its home market sales in its margin calculations.

- Dillinger describes its four home market LOTs as follows:

  o LOT 1.1 represents direct sales from the mill to end users.  According to Dillinger, each order is unique and requires extensive consultations to ensure the final product meets the customer's needs.  Therefore, Dillinger argues that these orders require a number of highly trained sales and technical personnel who are familiar with Dillinger's production capabilities as well as the needs of the customer.

  o LOT 1.2 represents direct sales from the mill to distributors.  According to Dillinger, these orders are not unique and require fewer consultations with the customer and, thus, fewer sales personnel.  Dillinger contends that its sales to distributors are made at a different marketing stage than sales to end users because the distributors resell the purchased products to end users.

  o LOT 2.0 represents sales by affiliated service centers and the Heavy Fabrication Division to down-stream customers.  According to Dillinger, the Department has previously found that sales by affiliated service centers to downstream customers are at a different LOT than direct sales by mills.[190]  Therefore, Dillinger argues that the Department should find that downstream sales by its affiliated service centers, Ancofer and Jebens, are at a different marketing stage than Dillinger's sales from the mill to end users.  Dillinger notes that not only do Ancofer and Jebens incur substantial processing costs, but they also perform warehousing and service center functions which are not performed for sales in other LOTs.

  o LOT 3.0 represents sales of non-prime merchandise.  Dillinger notes that it has a few regular customers who purchase non-prime merchandise and Dillinger performs minimal sales activities to make these sales.  According to Dillinger, it performs few freight and delivery arrangements for non-prime sales and does not perform technical assistance or warranty service activities because it sells this merchandise without any warranty.  Dillinger points out that the Department did

---

[189] *See Preliminary Determination,* and accompanying Preliminary Decision Memorandum at 14.

[190] *See* Dillinger's Case Brief at 17 (citing *Notice of Final Determination of Sales at Less than Fair Value: Certain Cold-Rolled Steel Flat Products from the United Kingdom,* 81 FR 49929 (July 29, 2016), and accompanying Issues and Decision Memorandum at Comment 1 (where the Department found that "direct sales from the mill and sales through a distribution center represent two different stages in the marketing process" and therefore constituted different LOTs); *Notice of Final Determination of Sales at Less than Fair Value: Structural Steel Beams from Germany,* 67 FR 35497 (May 20, 2002), and accompanying Issues and Decision Memorandum at Comment 3 (where the Department found that warehouse sales by affiliated resellers occur at a more advanced stage of distribution, and are consequently at a different LOT, than sales by mills); and *Stainless Steel Bar from Germany: Final Results of Antidumping Duty Administrative Review*, 69 FR 32982 (June 14, 2004), and accompanying Issues and Decision Memorandum at Comment 1 (where the Department found that the presence of "service center selling functions" shows a separate LOT)).

Barcode:3556338-01 A-428-844 INV - Investigation -

not analyze this channel of distribution in the *Preliminary Determination* because Dillinger did not report U.S. sales of non-prime merchandise. Nonetheless, Dillinger argues that the Department should analyze this LOT because it may affect other calculations such as the arm's-length test.

*The Petitioner's Arguments*

- The petitioner disagrees with Dillinger, arguing that the Department correctly found that Dillinger's home market and U.S. sales were made at the same LOT. According to the petitioner, Dillinger's inconsistent and contrasting explanations of its LOTs and channels of distribution raise doubts about its submissions.

- The petitioner states that the narrative description of Dillinger's LOT categories by customer type differs between Dillinger's case brief and its selling functions chart. The petitioner notes that the Department verified Dillinger's reported selling activities and found nothing to contradict its analysis in the *Preliminary Determination*.[191]

- The petitioner points out that Dillinger reported its home market and U.S. sales in LOT 1 as two separate categories but failed to provide anything to distinguish them beyond customer category. According to the petitioner, a mere difference in customer category is not sufficient for the Department to find that sales are made at separate LOTs.

- According to the petitioner, Dillinger attempts to highlight differences in the selling activities it performed for its direct sales from the mill (reported as LOT 1) and downstream sales by its affiliated service center (reported as LOT 2). However, the petitioner asserts that, with the exception of providing rebates, inventory maintenance, and personnel training/exchange, there are no significant differences in the levels of selling activities Dillinger performed for sales to these channels.[192]

- The petitioners contend that, regarding Dillinger's claim that its home market sales of non-prime merchandise represent a separate LOT, the Department only examines the selling functions and selling activities performed to make sales to different customer categories. Therefore, the petitioner asserts that the Department should not examine Dillinger's home market sales of non-prime merchandise as part of its LOT analysis.

Department's Position:

We continue to find that Dillinger's home market channels of distribution constitute one LOT. Section 773(a)(1)(B)(i) of the Act states that, to the extent practicable, the Department will

---

[191] *See* the Petitioner's Rebuttal Brief at 38 (citing Memorandum, *Verification of the Sales Responses of AG der Dillinger Huttenwerke. in the Antidumping Duty Investigation of Certain Cut-To-Length Plate from Germany,* dated December 20, 2016, at 4-5).

[192] *See* the Petitioner's Rebuttal Brief at 38 (citing Dillinger's Second Supplemental Section A, B & C Response at Appendix SA-17).

Barcode:3556338-01 A-428-844 INV - Investigation  -

calculate normal value based on sales at the same level of trade as the U.S. sales. Sales are made at different LOTs if they are made at different marketing stages (or their equivalent).[193] The Department's regulations at 19 CFR 351.412(c)(2) outline the Department's policy regarding differences in the LOT as follows:

> The Secretary will determine that sales are made at different levels of trade if they are made at different marketing stages (or their equivalent). *Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stages of marketing.*[194]

In the *Preliminary Determination*, we analyzed Dillinger's home market selling functions, and we organized them into the following four categories for analysis: 1) sales and marketing; 2) freight and delivery; 3) inventory maintenance and warehousing; and 4) warranty and technical support. Dillinger reported that it made sales through two channels of distribution in the home market and reported performing the following selling functions:

> ….For its made-to-order sales: advertising; direct sales personnel, sales promotion; freight and delivery arrangements; order input/processing; packing; commissions; rebates; sales forecasting, strategic economic planning, market research; sales/marketing support; technical assistance, after-sales services, engineering services; guarantees/warranty services; and personnel training/ exchange. For sales by affiliated service centers, Dillinger reported that in addition to the selling functions listed above, the service centers performed inventory maintenance, but did not provide rebates or personnel training/exchange.[195,196]

For Dillinger's home market sales, we found that:

> ….Dillinger performed sales and marketing, freight and delivery services, and warranty and technical support for all of its home market sales, and its affiliated service centers also performed inventory maintenance for home market sales. Because we find that there were no significant differences in selling activities performed by Dillinger to sell to its home market customers, we determine that there is one LOT in the home market for Dillinger.[197]

---

[193] *See* 19 CFR 351.412(c)(2).

[194] *Id.* (emphasis added).

[195] As noted in the *Preliminary Determination*, Dillinger identified its home market sales of non-prime merchandise as a third channel of distribution, but Dillinger did not report U.S. sales of non-prime merchandise.=Therefore, these home market sales will not be used for comparison purposes in the Department's margin calculation and, as a result, we have not analyzed this channel of distribution.=*See Preliminary Determination*, and accompanying Preliminary Decision Memorandum at 13.

[196] *See Preliminary Decision Memorandum* at 14.

[197] *Id.*

Barcode:3556338-01 A-428-844 INV - Investigation  -

As described above, Dillinger stated that it sold CTL plate in the home market at four different channels of distribution, which it claims constitute different LOTs: 1) direct sales from the mill to end users (LOT 1.1); 2) direct sales from the mill to distributors (LOT 1.2); 3) sales by affiliated service centers to downstream customers (LOT 2); and 4) sales of non-prime merchandise (LOT 3).[198] For the reasons discussed below, we disagree and continue to find one LOT in the home market.

First, we disagree with Dillinger's contention that there are substantial differences in the selling activities it performed between its proposed LOTs 1.1 and 1.2.=In its case brief, Dillinger contends that these proposed LOTs differ because: 1) they involve different numbers of sales personnel; and 2) sales to LOT 1.2 are sales to distributors, which are resold to end users.=As an initial matter, in its most recently submitted selling functions chart, we note that Dillinger did not distinguish between its proposed LOTs 1.1 and 1.2, but instead treated them as a single channel of distribution.[199] We disagree with Dillinger's claim that the fact that these proposed LOTs involve different numbers of sales personnel is sufficient to distinguish these LOTs.=To support this claim, Dillinger provided in Appendix SA-16 a series of organizational charts.=These charts do not indicate the selling activities Dillinger performed to make sales at its proposed LOTs; instead, they simply provide the number of employees by corporate division for several Dillinger companies.=Therefore, we find that the information contained in Appendix SA-16 is insufficient to establish substantial differences in selling activities, as is required to established separate LOTS.[200] Similarly, we disagree with Dillinger that, because sales at these two proposed LOTs are made to different customer categories, this demonstrates that they are at different marketing stages.=A difference in customer categories between proposed LOTs 1.1 and 1.2 does not demonstrate a substantial difference in selling activities.=Thus, because Dillinger did not perform substantially different selling activities to make these sales, we continue to find that they are at the same LOT.

With respect to Dillinger's proposed LOT 2.0, sales by affiliated service centers and the Heavy Fabrication Division to downstream customers, we continue to find that the additional selling activities Dillinger performed for these sales are insufficient to determine that they constitute a separate LOT.=While Ancofer and Jebens performed inventory maintenance for certain downstream sales, and Dillinger did not perform this function for its other home market sales, we continue to find that this alone is not a substantial difference in selling activities that warrants finding such sales to be at a separate LOT.[201] Dillinger also points to the fact that Ancofer and

---

[198] See Dillinger's Case Brief at 15-19.

[199] See Letter from DeKieffer & Horgan, PLLC to Secretary of Commerce, re: *Certain Carbon and Alloy Steel Cut-To-Length Plate from Germany; Dillinger S.A. and Berg Steel Pipe Corp; Second Supplemental Section A, B & C Response* (October 20, 2016) at Appendix SA-17.

[200] See 19 C.F.R. 351.412(c)(2).

[201] As noted in the *Preliminary Determination*, Dillinger's affiliated service center did not perform rebates or personnel training/exchange for its downstream sales, while Dillinger reported performing these functions for its home market sales.=We found these differences insufficient to warrant finding separate LOTs in the home market. *See Preliminary Determination*, and accompanying Preliminary Decision Memorandum at 14.=Moreover, we note that Dillinger did not report any rebates in its home market sales listing.

Barcode:3556338-01 A-428-844 INV - Investigation  -

Jebens incurred processing costs and performed service center functions to make downstream sales; however, these items (*i.e.*, cutting, sawing, drilling and, bending) are not selling functions and, thus, they are not contained in the list provided in the Department's standard section A questionnaire or in the categories the Department uses in its analysis of LOT, listed above.[202] Instead, we find that these items are performed in connection with the further processing of the merchandise, which are part of the cost to produce the downstream product. Therefore, we did not consider them in our LOT analysis for Dillinger in the final determination.

Further, we disagree that the cases Dillinger cites require that we find sales by affiliated service centers to constitute a separate LOT. In *Cold-Rolled Steel*, the Department found that the respondent made home market sales at two different LOTs because, after analyzing the facts in that case, it determined that direct sales from the mill and sales through a distribution center represented two different stages in the marketing process.[203] Specifically, in that case, we found significant differences in numerous selling functions performed between the two home market channels of distribution.[204] However, in this case, as noted above, we find that the only additional selling function Dillinger performed for sales in its proposed LOT 2 is inventory maintenance. Otherwise, Dillinger performed significantly the same selling functions for sales to all of its home market customers.

In *Steel Beams* and *Steel Bar*, the Department found sales by resellers to be at a more advanced LOT.[205] However, at the time those cases were decided, the Department's LOT analysis was substantially different. Specifically, the Department did not group respondents' reported selling functions into four selling function categories for analysis, as described above. Further, in these cases, the Department found sales by resellers to be at a more advanced LOT because the resellers performed further processing activities. Under our current analytical framework, as discussed above, we find it inappropriate to consider further processing as a selling function relevant to our LOT analysis. We note that the CIT has upheld the Department's use of this analytical framework.[206] Therefore, based on the facts and circumstances of this case, as well as the Department's current analytical framework, we continue to find that the differences between Dillinger's proposed home market LOTs 1 and 2 are insufficient to find that they represent separate LOTs.

Finally, we continue to disagree with Dillinger that it is necessary to analyze its home market sales of non-prime merchandise as a separate channel of distribution and determine that they are

---

[202] *See* Letter from the Department "Questionnaire," dated May 25, 2016, at A-6- A-9.

[203] *See Cold-Rolled Steel* at Comment 1.

[204] *Id.*

[205] *See Steel Beams* at Comment 3; and *Steel Bar* at Comment 1.

[206] *See Alloy Piping Products, Inc. v. United States,* Slip Op. 2008-30, at 19 (CIT March 13, 2008), where the court rejected the plaintiffs argument that the Department had failed to consider certain selling activities in its LOT analysis, stating that "Commerce, however, explicitly states that it 'examined the selling activities reported for each channel of distribution and organized the reported selling activities into the following four selling functions: sales process and marketing support, freight and delivery, inventory maintenance and warehousing, and warranty and technical services".

at a different LOT.  As we noted in the *Preliminary Determination*, Dillinger made no U.S. sales of non-prime merchandise and, as a result, its home market non-prime sales will not be used for comparison purposes.[207]  We also disagree with Dillinger's contention that by not analyzing its non-prime sales as a separate LOT, we are affecting the results of the arm's-length test.  Specifically, because the arm's-length test already considers prime and non-prime sales separately, we find it unnecessary to also analyze such sales as a separate LOT.  Moreover, Dillinger did not cite any cases where the Department analyzed non-prime sales as a separate channel of distribution in the home market in support of its argument.  Therefore, we did not analyze this channel of distribution for purposes of the final determination.

**Comment 22: Reassignment of Quality Codes for Dillinger**

*Dillinger's Arguments*

- In its questionnaire response, Dillinger created four additional codes for the quality product characteristic (*i.e.,* 771, 764, 475, and 759) for its home market sales which were not provided in the Department's questionnaire.  In the *Preliminary Determination*, we reassigned these quality codes to be quality codes 772, 782, 480, and 760, respectively, which were codes included in the questionnaire.  Dillinger disagrees that it was appropriate for the Department to reassign the quality codes it reported for these products.

- Dillinger argues that the Department's questionnaire instructed respondents to report additional quality codes beyond those listed in the questionnaire, stating "use additional number codes for each additional Quality you propose."[208]  Further, Dillinger notes that while the Department instructed the company to exclude these proposed codes from its response, it noted no deficiencies with the new codes, nor did it explain its rationale for instructing Dillinger to exclude them.

- According to Dillinger, the Department has failed to ensure a fair comparison between NV and EP by not recognizing Dillinger's reported additional quality codes, which is not in accordance with either the Act or Article 2.4 of the WTO Antidumping Agreement.

- With regard to quality code 475, which Dillinger created to report chromium-vanadium alloyed steels used in the production of springs, blades, and knives, Dillinger states that the U.S. equivalent grade for such steel is SAE 6150.  Dillinger claims that this steel is not a mold steel (*i.e.*, quality code 480), the code which the Department used for these products in the *Preliminary Determination*.

- With regard to quality code 759, which Dillinger created to report steels manufactured for use in pressure vessels designed for the storage of petroleum in sour service, Dillinger argues that it provided the Department with extensive information on the chemical

---

[207] *See* Preliminary Decision Memorandum at 14.

[208] *See* letter from Irene Darzenta Tzafolias, *"Product Characteristics for the Antidumping Duty Investigation of Certain Carbon and Alloy Cut-to-Length Plate from Germany,"* dated June 10, 2016, at Attachment 1, p. 6-15.

composition and physical properties of such steels.  According to Dillinger, the Department incorrectly assigned these steels a quality code for pressure vessel and boiler quality steels (*i.e.*, quality code 760), which has no distinction for sour service.

- With regard to quality code 771, which Dillinger created to report steels manufactured for the transport of petroleum products in sour service, Dillinger argues that it provided the Department with extensive information on the chemical composition and physical properties of such steels, similar to quality code 759.  According to Dillinger, the Department incorrectly in assigning these steels a quality code for line pipe steels (*i.e.*, quality code 771), which has no distinction for sour service.

- Dillinger asserts that its proposed quality codes have a significant effect upon price comparability, and if the Department had accepted its reporting of these codes, it would have resulted in a *de minimis* margin for Dillinger.

*The Petitioner's Arguments*

- The petitioner disagrees that the Department should accept Dillinger's additional reported quality codes, noting that Dillinger proposed them during the model match comment period at the beginning of this investigation, when the Department considered and rejected them.[209]

- The petitioner argues that Dillinger failed to justify why its proposed quality codes were necessary during the model match comment period, and that Dillinger's argument that the Department is failing to make a fair comparison between NV and EP is therefore unwarranted.  The petitioner argues that the model match criteria are not required to capture every possible physical difference between products, but rather only those that are commercially significant.  The petitioner notes that Dillinger's proposed quality codes do not capture significant cost and price differences and are therefore unnecessary.

- The petitioner contends that, with regard to chromium-vanadium alloy steel plate, which Dillinger reported as quality code 475, Dillinger's claim that such steel is equivalent to U.S. grade SAE 6150 is unsubstantiated.  According to the petitioner, such steel is used in aerospace applications, which are not the applications for which Dillinger reports using it.  Further, the petitioner argues that Dillinger has provided nothing to support that these products are not mold steel.

- The petitioner argues that Dillinger's proposed quality codes 759 and 771, for pressure vessel steel and line pipe steel for use in sour service, respectively, are incorrect.  The petitioner notes that the quality code the Department used for these products in the

---

[209] See the Petitioner's Rebuttal Brief at 29 (citing letter from deKieffer & Horgan, PLLC, "Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, Brazil, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, the People's Republic of China, South Africa, Taiwan, and the Republic of Turkey:=Comments on the Proposed List of Product Characteristics," dated June 2, 2016, at 2).

Barcode:3556338-01 A-428-844 INV - Investigation    -

*Preliminary Determination,* quality code 772, includes the API 5L standard, which is a steel grade that covers certain sour service grades.

- The petitioner points out that Dillinger in its model match comments used NACE International standards as examples of types of sour service products; however, the petitioner notes that the NACE standards appear to govern testing requirements, not steel grades. According to the petitioner, basing quality codes on testing standards could result in erroneous model matches which are based not on physical characteristics, but on whether a product has undergone certain testing.

- Therefore, the petitioner maintains that the Department should continue to use quality codes it assigned to these products in the *Preliminary Determination* for purposes of the final determination.

<u>Department's Position</u>:

The courts have recognized that the statute is silent with respect to the methodology that the Department must use to match a U.S. product with a suitable home market product, and this silence is an indication that Congress afforded the Department considerable discretion in this regard.[210] The courts have noted that it is the Department's responsibility to establish the model matching methodology, given that reasonable minds may differ over what might be a complex task, and an interested party might be expected to support an alternative advantageous to itself.[211] The courts have also have acknowledged that the Department constructs a methodology for identifying the "foreign like product" by devising a hierarchy of commercially significant characteristics suitable to each class or kind of merchandise, and then utilizes these characteristics to compare United States sales to sales in the comparison market.[212] Pursuant to this statutory scheme, the Department must first look for identical merchandise with which to match the United States model to the comparable home market model.[213] The Department has a long-standing practice of developing a model matching methodology in the early stages of each proceeding, and in consultation with the interested parties.[214] The Department has frequently

---

[210] *See JTEKT Corp. v. United States*, 717 F. Supp. 2d 1322, 1329 (CIT 2010), citing *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1379 (Fed. Cir. 2008) (quoting *Koyo Seiko Co. v. United States*, 66 F.3d 1204, 1209 (Fed. Cir. 1995)), and *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1384 (Fed. Cir. 2001).

[211] *See United Engineering & Forging v. United States*, 779 F. Supp 1375, 1380 (CIT 1991) (quoting *Timken Company v. United States*, 630 F. Supp. 1327, 1338 (CIT 1986)).

[212] *See, e.g., Fagersta Stainless AB v. United States*, 577 F. Supp. 2d 1270, 1275-76 (CIT 2008), and *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1379 (Fed. Cir. 2008).

[213] *See Fagersta Stainless AB v. United States*, 577 F. Supp. 2d 1270, 1276 (CIT 2008), citing *Viraj Forgings, Ltd. v. United States*, 283 F. Supp. 2d 1335, 1340 (CIT 2003), citing, in turn, *Torrington v. U.S.*, 146 F. Supp. 2d 845, 874 (CIT 2001).

[214] *See, e.g., Welded ASTM A-312 Stainless Steel Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*, 81 FR 46647 (July 18, 2016), and accompanying Issues and Decision Memorandum at Issue 1; *Notice of Final Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the Republic of Korea*, 71 FR 29310 (May 22, 2006), and accompanying Issues and Decision Memorandum at Comment 1; *Gray Portland Cement and Clinker From*

Barcode:3556338-01 A-428-844 INV - Investigation  -

stated it does not attempt to account for every conceivable difference between products when determining which products are identical to others,[215] and the Federal Circuit has established that merchandise need not be exactly the same in order to be considered "identical," noting also that the Department has "considerable discretion in defining 'identical in physical characteristics.'"[216] Furthermore, section 771(16)(A) of the Act requires that the Department base its model matching criteria on "physical characteristics,"[217] regardless of whether such physical characteristics result in cost differences between products.[218] The Department's model matching methodology in a

_____

*Mexico; Final Results of Antidumping Duty Administrative Review*, 66 FR 14889 (March 14, 2001), and accompanying Issues and Decision Memorandum at Comment 9; and *Gray Portland Cement and Clinker From Mexico; Final Results of Antidumping Duty Administrative Review*, 65 FR 13943 (March 15, 2000), and accompanying Issues and Decision Memorandum at Comment 12.

[215] *See, e.g., Welded Carbon Steel Standard Pipe and Tube Products From Turkey: Final Results of Antidumping Duty Administrative Review: 2012-2013*, 79 FR 71087 (December 1, 2014), and accompanying Issues and Decision Memorandum at General Issues Comment 1; *Notice of Final Results of the Tenth Administrative Review and New Shipper Review of the Antidumping Duty Order on Certain Corrosion Resistant Carbon Steel Flat Products from the Republic of Korea*, 70 FR 12443 (March 14, 2005), and accompanying Issues and Decision Memorandum at General Issues Comment 1; *Light Walled Rectangular Pipe and Tube From Mexico: Notice of Final Determination of Sales at Less Than Fair Value*, 69 FR 53677 (September 2, 2004), and accompanying Issues and Decision Memorandum at Comment 13; and *Final Results of Antidumping Duty Administrative Review: Certain Cold Rolled Carbon Steel Flat Products from Germany*, 60 FR 65264, 65271 (December 19, 1995).

[216] *See Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1384 (Fed. Cir. 2001), and *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1381 (Fed. Cir. 2008).

[217] *See NSK v. United States*, 217 F. Supp. 2d 1291, 1299-1300 (CIT 2002) ("Section 771(16) establishes a descending hierarchy of preferential modes that Commerce must select for matching purposes.").

[218] *See, e.g., Certain Cold-Rolled Steel Flat Products From the United Kingdom: Final Determination of Sales at Less Than Fair Value*, 81 FR 49929 (July 29, 2016), and accompanying Issues and Decision Memorandum at Comment 5 ("With respect to cost differences, while we may consider cost differences attributable to significant differences in physical characteristics in determining whether to accept proposed respondent-specific code categories, cost differences alone are not dispositive as to whether to create additional categories. There may be other factors that explain differences in costs between different products besides differences in physical characteristics, such as differences in production quantities, differences in the timing of production, etc."); *Welded Carbon Steel Standard Pipe and Tube Products From Turkey: Final Results of Antidumping Duty Administrative Review: 2012-2013*, 79 FR 71087 (December 1, 2014), and accompanying Issues and Decision Memorandum at General Issues Comment 1; *Circular Welded Carbon-Quality Steel Pipe From the Sultanate of Oman: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 77 FR 32531, 32534 (June 1, 2012), unchanged at *Notice of Final Determination of Sales at Less Than Fair Value: Circular Welded Carbon-Quality Steel Pipe From the Sultanate of Oman*, 77 FR 64480 (October 22, 2012) ("The goal of the product characteristic hierarchy is to identify the best possible matches with respect to the characteristics of the merchandise. While variations in cost may suggest the existence of variation in product characteristics, such variations do not constitute differences in products in and of themselves. Furthermore, the magnitude of variations in cost may differ from company to company, and even for a given company over time, and therefore do not, in and of themselves, provide a reliable basis for identifying the relative importance of different product characteristics."); *Stainless Steel Wire Rod From Sweden: Final Results of Antidumping Duty Administrative Review*, 73 FR 12950 (March 11, 2008), and accompanying Issues and Decision Memorandum at Comment 1 ("cost variations are not the determining factor in assigning product characteristics for model-matching purposes."); *Notice of Final Determination of Sales at Less Than Fair Value; Certain Cold-Rolled Flat-Rolled Carbon-Quality Steel Products from Turkey*, 65 FR 15123 (March 21, 2000), and accompanying Issues and Decision Memorandum at Model Match Comment 1 ("...the Department focuses its selection of model match characteristics on unique measurable physical characteristics that the product can possess... " and "...differences in price or cost, standing alone, are not sufficient to warrant inclusion in the Department's model-match of characteristics which a respondent claims to be the cause of such

proceeding would not be rendered "unreasonable" by the discovery of an alternative model matching methodology which is in some sense "better" than that the Department established.[219] Finally, the courts have upheld the Department's authority to ignore model matching proposals from interested parties after the Department has requested that respondents submit data reflecting the model matching criteria the Department has established.[220]

With regard to the three sub-groups of products for which Dillinger reported revised quality codes (*i.e.*, certain chromium-vanadium alloy steel plate, sour service pressure vessel plate, and sour service petroleum transport plate), Dillinger argues that cost and price differences between each of these sub-groups and the other products in the existing quality codes justify the use of these additional quality codes.[221]  However, Dillinger did not provide any evidence of significant systematic variations in pricing patterns between:  1) certain chromium-vanadium alloy steel plate and any other quality grouping of plate; 2) sour service pressure vessel plate and other pressure vessel/boiler quality plate; or 3) sour service petroleum transport plate and other petroleum transport plate.

Dillinger argues, without supporting documentation, that the cumulative effect of the Department's failure to accept its reported revised quality codes raised its weighted-average margin in the *Preliminary Determination* from 1.86 percent to 6.56 percent.[222]  However, Dillinger assumes a correlation between the magnitude of its weighted-average dumping margin and the extent to which the Department's model matching methodology may be flawed.  The commercial impact on the pricing of claimed differences between products cannot rely on an analysis of the prices charged by the very parties which are under investigation for unfair pricing practices.  In any event, Dillinger has not provided such an analysis when it simply claims that the changes it proposes would have an impact on its weighted-average dumping margin.

Dillinger argues that the products in each proposed sub-group possess physical characteristics that distinguish them sufficiently from the other products classified under the respective existing

---

differences...."); and *Certain Hot-Rolled Lead and **Bismuth** Carbon Steel Flat Products From the United Kingdom; Final Results of Antidumping Duty Administrative Review*, 63 FR 18879, 18880-18881 (April 16, 1998) ("The creation of a product concordance inherently relies upon the matching of significant physical characteristics, not on cost groupings in a company's cost accounting system.").

[219] *See JBF RAK LLC v. United States*, 961 F. Supp. 2d 1274, 1286 (CIT 2014).

[220] *See Maverick Tube Corp. v. United States*, 107 F. Supp. 3d 1318, 1330 (CIT 2015), citing *JTEKT Corp. v. United States*, 37 F. Supp. 3d 1326, 1336 (CIT 2014) ("The court has upheld Commerce's decision not to revise model-matching criteria when the request was made 'at a time that did not allow Commerce to distribute to the various respondents initial questionnaires that would solicit the necessary information to adopt' the model-matching criteria changes," and concluding the "arguments were thus untimely and Commerce's decision not to revise the model-matching method was reasonable.")

[221] For certain chromium-vanadium alloy steels (regarding pricing only), *see* Dillinger Supplemental Section BC response at 12; for sour service pressure vessel plate, *see* Dillinger Supplemental Section BC response at 12; and for sour service petroleum transport plate, *see* Dillinger Model Match Comments at 2, Dillinger Section B at B-16, and Dillinger Supplemental Section BC response at 10.

[222] *See* Dillinger's Case Brief at 11.

Barcode:3556338-01 A-428-844 INV - Investigation -

quality codes to justify use of their proposed distinct quality reporting codes.  Below we address those arguments for each proposed sub-group.

Chromium Vanadium Steel

Dillinger argues that certain chromium-vanadium alloy steel plate (which it defines as steels which contain the following combinations of elements by weight, respectively:=(i) 0.45 to 0.55 percent carbon, (ii) 0.80 to 1.20 percent chromium and (iii) more than 0.1 percent vanadium (*e.g.,* ASTM A829 grade 6150, or EN-10083-3 grade 51CrV4)) should be assigned quality code 475.[223]= Dillinger first proposed this change in its Supplemental BC response, stating this type of CTL plate "{is} made according to distinct specifications and its special combination of elements and physical/mechanical properties make it suited to only an exclusive number of applications, greatly affecting its price comparability with other steels."[224]

Dillinger did not provide any additional information regarding the price comparability of these products.=Regarding physical properties and product classification, Dillinger argues that the product is not a mold steel, and therefore should not be assigned the reporting code the Department assigned to such products.[225]= However, Dillinger did not indicate how this product compares to the products covered by the other quality subcategories identified by the Department, an explanation which the Department required for parties proposing additional quality subcategories.[226]

As defined by Dillinger, these are steels with relatively low alloy levels of two elements,= chromium and vanadium.=We note that one of these elements, chromium, is covered by a separate existing product characteristic, which distinguishes products based on the minimum required content of chromium.=That product characteristic, and its range of subcategories, distinguishes among various products, including certain chromium-vanadium alloy steel plate, depending on their minimum required chromium content.=In addition, the existing product characteristic "minimum specified carbon content" further distinguishes among these products because certain chromium-vanadium alloy steel plate also has a specific minimum carbon content.[227]

Finally, ASTM A829 (*i.e.,* the specification covering the grade 6150 referenced in Dillinger's description of certain chromium-vanadium alloy steel plate), is identified as a structural steel.[228]

---

[223]=*See, e.g.,* Dillinger's Case Brief at 9-10.

[224]=*See* Dillinger Supplemental BC response at 11-12.

[225]=*See, e.g.,* Dillinger's Case Brief at 10.

[226]=*See, e.g.,* Dillinger's Section B response at B-15 for a restatement of the Department's requirement that the proposal of a new subcategory be accompanied by an explanation of "what differentiates {the additional proposed QUALITY} from each of the ones listed above with respect to actual physical properties," and the requirement that the respondent "explain why {it has} assigned the particular numeric code with the Quality code hierarchy for matching purposes."

[227]=*See* Final Model Match at 8.

[228]=*See, e.g.,* Exhibit I-A of POSCO's June 8, 2016, model match rebuttal comments, identifying ASTM A829 as

Barcode:3556338-01 A-428-844 INV - Investigation  -

We note that, in the *Preliminary Determination*, we reassigned sales which Dillinger reported with a quality code of 475 to a quality code of 480, because Dillinger used this quality code to report these sales in its original home market sales listing.=However, after further examination, we find that this product does not appear to qualify as any of the quality subgroupings identified for this product characteristic in the questionnaire other than "other structural steel products."= We therefore reassigned all products which Dillinger reported with a quality code of 475 to a quality code of 785 for our final determination margin calculations.

<u>Sour Service Pressure Vessel Plate</u>

Dillinger first proposed a separate quality code for sour service pressure vessel plate in its response to the Department's first supplemental questionnaire.[229]= Dillinger stated that its proposed quality code of 759 would cover "steels made for pressure vessels designed for the storage of petroleum products in sour service," and defined those products as "fine grained pressure vessel steel adapted to sour service conditions (verified in the hydrogen induced cracking (HIC) test in accordance with NACE TM 0284."[230]= Several terms Dillinger uses in this definition (*i.e.,* "fine grained," "adapted," "sour service conditions," "hydrogen induced cracking," and "in accordance with NACE TM 0284") are taken verbatim from product data sheets for a few Dillinger products.[231]= Dillinger did not provide evidence indicating: 1) the extent to which these product characterizations would not also apply to pressure vessel plate products beyond those few Dillinger products; or 2) how those Dillinger products compare to other pressure vessel products across the broad range of all product properties, rather than a few self-selected ones.=With regard to chemical composition, the data sheets Dillinger provided appear to only reference low levels of sulfur and phosphorus, but not other elements, and do not indicate that the levels of other elements vary from the levels of those elements for other pressure vessel plate.[232]

In its second supplemental questionnaire response, Dillinger references the Dillinger Model Match Comments, and its Supplemental BC response, for "extensive information" regarding the sour service pressure vessel plate products.[233]= As discussed below in the context of sour service petroleum transport plate, the Dillinger Model Match Comments focus not only upon various levels of sulfur and phosphorus, but also upon other elements not referenced in the data sheets

---

"Alloy Structural Steel Plates."  Furthermore, Dillinger claimed that "{s}pecifications covering chromium-vanadium steel are contained in Appendix SBC-10" of its Supplemental Section BC response.=*See* Dillinger Supplemental Section BC response at 12.=That appendix contains only one specification, and nothing in that specification contains any information suggesting it covers products that cannot be classified as structural steels.

[229]=*See* Dillinger Supplemental BC response at 11-12.

[230]=*Id.*

[231]=*Id.*, at Appendix SBC-11 ("Data Sheets").

[232]=*See* Dillinger Supplemental BC response at Appendix SBC-11 in its entirety.  Of the very few specifications which Dillinger provided to the Department, none of them cover pressure vessel plate products.=*See* Dillinger Section A response at Appendix A-33 and Dillinger Supplemental Section A response at Appendix S-5.

[233]=*See* Dillinger Second Supplemental ABC response at 10, citing Dillinger Model Match Comments at 2-3 and Appendix 1.

Barcode:3556338-01 A-428-844 INV - Investigation  -

(*i.e.*, required levels of "expensive alloys" (nickel and copper), and specific carbon content requirements).=These other elements are also not referenced in the document Dillinger included in its second supplemental response identified as "Sour Service Pressure Vessel Steel Plates with Homogeneous HIC-Properties."[234]= This document appears to be a slide-based presentation which, like Dillinger's Sour Service Presentation, discussed below, does not provide either explanatory narrative or clear and complete descriptions of the product requirements.

Finally, Dillinger's proposal with respect to sour service pressure vessel plate was not made during the model match comment period for all the concurrent CTL plate AD investigations.[235]= Dillinger did not propose distinguishing sour service pressure vessel plate products from other pressure vessel plate products in the Dillinger Model Match Comments, even though it appears to have been aware of such sour service products at the time.[236]= As discussed further below, Dillinger did not subsequently provide information that would justify either allowing Dillinger to report revised quality codes for different pressure vessel plate products, or revisiting this issue once parties had submitted their questionnaire responses. Therefore, consistent with the *Preliminary Determination*, we continued to reassign all products which Dillinger reported with a quality code of 759 to have a quality code 760, thereby assigning all pressure vessel/boiler quality steels the same quality code.

<u>Sour Service Petroleum Transport Plate</u>

Dillinger first proposed a distinct quality reporting code for sour service petroleum transport plate in its Dillinger Model Match Comments.[237]= Dillinger claimed that such sour service products "are made to special specifications and have a higher cost of production and price than steels used in non-corrosive environments because of the different chemical composition and physical properties."[238]= Dillinger stated that "steels for sour service must be very clean, having a very low level of phosphorus and sulfur," and that they "must also have a low carbon content but high levels of expensive alloys, like copper and nickel."[239]= In its Dillinger Model Match Comments, Dillinger identified two examples of products contained in its proposed sour service

---

[234]=*See* Dillinger Second Supplemental ABC responses at Appendix SBC-31 (Sour Service Pressure Vessel Plate Presentation).

[235]=*See* Letter from the Department to interested parties in all CTL plate AD investigations, dated May 19, 2016 (providing all interested parties an opportunity to submit comments on the appropriate physical characteristic and product comparison criteria for CTL plate within a specified time period).

[236]=*See* Dillinger Model Match Comments in their entirety.  The Sour Service Presentation makes various references to pressure vessels, but the Dillinger Model Match Comments makes no reference to a proposed subcategory for sour service pressure vessel plate.=However, in that document Dillinger does note, "Dillinger will also propose additional Quality subcategories at the time of submitting its section B & C responses should that be necessary." *Id.*, at 3.=It is not clear why Dillinger would have needed to perform additional analysis, unless it wanted further time to estimate the margin impact of such a proposal.=As noted above, Dillinger only discussed pricing data associated with its proposed product characteristic changes in the context of the overall impact on Dillinger's weighted-average margin.

[237]=*See* Dillinger Model Match Comments at 2-3.

[238]=*Id.*, at 2.

[239]=*Id.*

Barcode:3556338-01 A-428-844 INV - Investigation  -

petroleum transport plate quality subcategory:  NACE TM0284/ISO 15156-2 and NACE MR0175/ISO 15156.[240] We did not adopt this suggested quality subcategory in the final model match methodology issued to interested parties, and instead we identified a single quality code for petroleum transport plate.[241]

Nonetheless, Dillinger reported sales in its questionnaire responses using its proposed quality code subcategory for this product, and also changed the examples it provided for the subcategory to be "steel grades L450MS-PSL2, 5L-X65MS-PSL2, etc." without explanation.[242] Dillinger did not identify what standards it had provided, if any, to identify the products to which it refers.[243] The absence of any actual standards, identifying the full range of properties for such products, limits our ability to evaluate how such products compare to other petroleum transport plate products.

Dillinger provided a "Presentation on Requirements for Steel Plates in Sour Service" (Sour Service Presentation), which appears to be a slide presentation containing information about sour service.[244] However, the Sour Service Presentation does not provide a systematic or clear reference to the range of properties of the products in question.=Of the four example products Dillinger listed in the Dillinger Model Match Comments and its section B response, only one of them (*i.e.*, NACE FR0175/ISO 15156) appears to be clearly identified in the Sour Service Presentation for use in the corrosive hydrogen sulfide environments Dillinger indicates require such plate, while the example products listed in Dillinger's section B response are not referenced at all.[245]

Dillinger indicates that the sulfur content must be strictly limited for sour service petroleum transport plate, and we note that the Sour Service Presentation does appear to refer to a maximum allowable percentage level, which it refers to as "low."[246] However, it is not evident that such a requirement applies to the two example "grades" (L450MS-PSL2, 5L-X65MS-PSL2) identified in Dillinger's section B response.=Even assuming, arguendo, that those grades are within the API 5L line pipe specification, as the petitioner states, that would support the petitioner's argument that Dillinger's petroleum transport plate products are covered under the same specification as other petroleum plate products identified by the quality code established by the Department.=The Sour Service Presentation also does not refer to the content requirements of

---

[240] *Id.*, at 3.

[241] *See* the June 10, 2016, letter to Dillinger entitled, "Product Characteristics for the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Germany" (Final Model Match).

[242] *See* Dillinger Section B response at B-15.

[243] *See* Dillinger Section A response at Appendix A-33 and Dillinger Supplemental Section A response at Appendix S-5.

[244] *See* Model Match Comments at Appendix 1.

[245] *Id.*, at 2 and Appendix 1.

[246] *Id.*, at Appendix 1 (page 44).

carbon or the "expensive alloys" (*i.e.*, copper and nickel) discussed in the Dillinger Model Match Comments.

Furthermore, assuming these elements are pertinent to the analysis, the Department's model match methodology contains product characteristic fields that segregate products based on minimum specified content of two of those three elements (*i.e.*, carbon and nickel).[247]  If the levels of these chemical elements are important distinguishing factors for sour service petroleum transport plate, as Dillinger indicates, the separate product characteristic fields for those elements would distinguish sour service petroleum transport plate products from other plate products.

Similarly, the heat treatment product characteristic may also distinguish these products from other petroleum transport plate products.  The Sour Service Presentation refers to the use of "Q&T" (*i.e.*, quenching and tempering) to effect the desired end properties of the sour service petroleum transport plate.[248]  Products that have been quenched and tempered will be assigned a different heat treatment code than those which have not undergone that treatment.[249]

Therefore, we do not agree that a new quality reporting code is required to distinguish sour service petroleum transport plate from other products.  We find that Dillinger did not subsequently provide information that would justify either allowing it to report revised quality codes for different petroleum transport plate products or revisiting this issue once parties had submitted their questionnaire responses.  Instead, we find that Dillinger has failed to both: 1) justify creating a quality code subcategory for this product; and 2) clearly identify the products that would be classified in its proposed subcategory.  Consequently, consistent with the *Preliminary Determination*, we continued to reassign all products which Dillinger reported with a quality code of 771 to have a quality code 772, thereby assigning all petroleum transport plate products the same quality code.

**Comment 23: Descaling Product Characteristic for Dillinger**

*Dillinger's Arguments*

- One of the product characteristics in the Department's model matching hierarchy in this investigation is descaling.  At verification, the Department found that Dillinger did not report one of the sales it examined sales as descaled, although the technical order indicated that the product had been descaled after rolling.  In response to the Department's request, Dillinger provided a list of small number of home market and U.S. sales which were descaled in the same manner as the examined sale.  Dillinger argues that it properly reported that neither the sale examined at verification was descaled, nor were the sales on the list it provided at verification.

- Dillinger notes that for the sale examined at verification, its customer did not order the CTL plate as descaled (or shot blasted), nor did Dillinger and the customer negotiate a

---

[247] *See* Final Model Match at 8-9.

[248] *See* Dillinger Model Match Comments at Appendix 1 (page 38).

[249] *See* Final Model Match at 13.

Barcode:3556338-01 A-428-844 INV - Investigation  -

price for a descaled product.  Dillinger argues that the order confirmation, dispatch note, invoice, and mill test certificate also indicate that this product was not sold as descaled.  According to Dillinger, the reason that this product was descaled, as listed on the technical order, was for production-related reasons.

- Dillinger argues that because the customer did not order descaled plate, and because the plate was not certified as descaled, it properly reported this sale as not descaled.  Dillinger contends that this situation is analogous to the reporting of the thickness and with product characteristics, which are reported nominally (instead of using the actual dimensions of the plate as produced).  Similarly, Dillinger argues that the product characteristics for minimum specified carbon content, minimum specified chromium content, minimum specified nickel content, and minimum specified yield strength, also relate to the product as ordered by the customer, not the product as produced.

- Dillinger claims that relying on the product characteristics based on the product the customer ordered serves to identify those characteristics relevant to price negotiations and, thus, the Department's price comparisons.  According to Dillinger, unilateral product modifications, such as Dillinger's descaling of these products, do not alter the product characteristics ordered by the customer.  As a result, Dillinger argues, that it properly reported the descaling codes for all of its home market and U.S. sales.

*The Petitioner's Arguments*

- The petitioner asserts that Dillinger reported the descaling product characteristic incorrectly for the sales in question, and that these incorrect descaling codes have an adverse impact on Dillinger's margin calculation.  Therefore, the petitioner maintains that the Department should correct the descaling code for these sales in its margin calculation for the final determination.

**Department's Position:**

We revised the descaling codes for Dillinger's home market and U.S. sales examined at verification to treat them as descaled in our margin calculations for the final determination.  Our June 10, 2016, product characteristics letter instructed respondents to report descaling as follows:

**FIELD NUMBER 3.12:**      **Descaled**

      FIELD NAME:      DESCALEH/U

      DESCRIPTION:      1 = Descaled after the plate was rolled or forged (*e.g.*, pickled, shot blasted, *etc.*)
                      2 = Not descaled after the plate was rolled or forged

                      State precisely how the products were descaled after rolling or forging, and how descaled products are distinguished from other products with respect to product coding, production documentation

Barcode:3556338-01 A-428-844 INV - Investigation  -

> (*e.g.*, mill test certificates, *etc.*), and sales documentation (*e.g.*, order documents, invoices, *etc.*).  Do not create any additional reporting codes for this field.

Therefore, we find that the description of this product characteristic clearly instructs respondents to report products which are descaled after the plate is rolled as descaled plate.

We disagree with Dillinger that we should accept its reporting of the descaling product characteristic for these sales based on the characteristics of CTL plate its customer ordered because this is consistent with its reporting of the thickness and width product characteristics on a nominal basis (which are the dimensions agreed at the time of sale).  Thickness and width, which are dimensions, are the only product characteristics which we instructed respondents to report on a nominal basis because CTL plate is produced to meet dimensional tolerances.  Descaling is distinctly different from thickness and width, because it is not a dimension or measurement.  It is a process that is either performed or not, and we instructed respondents to report this quality characteristic as such.  If we permitted respondents to report product characteristics based on what customers ordered, and not what was actually produced, respondents would be free to substitute products of greater or lesser value to their customers.  This would allow for the manipulation of what constitutes the very essence of a dumping margin calculation, which is to compare prices of identical or similar products.

We also disagree with Dillinger's claim that the product characteristics for carbon/chromium/nickel content and minimum specified yield strength relate to the specifications/grades "ordered by the customer," rather than the properties of the plate as produced.  The questionnaire instructs respondents to "report the code based on the minimum {carbon/chromium/nickel} content for the product under the specification/grade," and to "identify the appropriate reporting code based upon the required minimum specified yield strength under the specification/type/designation/grade in question."  Thus, respondents are required to report these product characteristics based on the specification/grade to which the merchandise was produced.

**Comment 24: Interest Rate for Dillinger's U.S. Credit Expenses**

*Dillinger's Arguments*

- In the *Preliminary Determination*, we instructed Dillinger to calculate its imputed U.S. credit expenses using the average U.S. Federal Reserve borrowing rate during the POI for commercial and industrial loans between 31 and 365 days made to all borrowers by all commercial banks (*i.e.*, 2.52 percent).  Dillinger disagrees with the Department's use of this interest rate in the *Preliminary Determination*.

- Dillinger argues that although it had no actual short-term U.S. dollar borrowings during the POI with which to establish an interest rate for use in the calculation of its imputed credit expenses, the Department should use the interest rate Dillinger's U.S. bank offered through its working capital credit facility during the POI.  According to Dillinger, that

rate provides the best evidence of Dillinger's U.S. dollar borrowing expense during the POI.

- According to Dillinger, the Department's use of the Federal Reserve borrowing rate distorts Dillinger's margin calculations because the Department used the actual terms of the same type of working capital credit facility for Dillinger's POI home market short-term borrowings in Euros.  Dillinger argues that this inconsistent treatment of the borrowing rates used to calculate home market and U.S. credit expenses creates differences between NV and EP which are unrelated to dumping.

- Finally, Dillinger observes that the Federal Reserve rate of 2.52 percent is the average of loans made to companies with varying levels of credit risk.  Dillinger argues that, if the Department does not use Dillinger's working capital credit facility rate to calculate Dillinger's U.S. credit expenses, it should instead rely on the average U.S. Federal Reserve borrowing rate during the POI for commercial and industrial loans between 31 and 365 days made to low-risk borrowers by all commercial banks (*i.e.*, 1.76 percent).  According to Dillinger, it is a low-risk borrower, which it claims can be established by comparing the interest rate the company's bank charged Dillinger for its home market credit facilities to the German Federal Bank's and European Central Bank's published rates.

*The Petitioner's Arguments*

- The petitioner disagrees with Dillinger, noting that it had no short-term borrowings in U.S. dollars during the POI.  According to the petitioner, when a company has no short-term borrowings with which to establish an interest rate, it is the Department's practice to use a published interest rate to calculate imputed credit expenses.

- As a result, the petitioner maintains that the Department should continue to use the POI Federal Reserve rate it used in the *Preliminary Determination* to calculate Dillinger's U.S. credit expenses.

Department's Position:

We have continued to calculate Dillinger's U.S. credit expenses using the U.S. Federal Reserve interest rate of 2.52 percent in the final determination.=Dillinger acknowledges that it had no short-term U.S. dollar borrowings during the POI.=In the absence of actual short-term U.S. dollar borrowings, it is the Department's longstanding practice to use the average rates from the U.S. Federal Reserve.[250]= Further, we disagree with Dillinger that it would be appropriate to revise this

---

[250]=See Import Administration Policy Bulletin, "Imputed credit expenses and interest rates," issued February 23, 1998; and *Light-Walled Rectangular Pipe and Tube From the People's Republic of China: Preliminary Results of the 2008-2009 Antidumping Duty Administrative Review*, 75 FR 27308, 27310 (May 14, 2010), unchanged in *Light-Walled Rectangular Pipe and Tube From the People's Republic of China: Final Results of the 2008-2009 Antidumping Duty Administrative Review*, 75 FR 57456 (September 21, 2010); and *Notice of Final Results of Antidumping Duty Administrative Review: Steel Concrete Reinforcing Bars from Latvia*, 71 FR 7016 (February 10, 2006), and accompanying Issues and Decision Memorandum at Comment 4.

Barcode:3556338-01 A-428-844 INV - Investigation  -

rate to include only loans to low-risk borrowers, instead of all borrowers.  When determining the U.S. interest rate for purposes of calculating imputed credit expenses, it is beyond the scope of an antidumping duty proceeding for the Department to also analyze the credit risk of a respondent.  Even if the Department were to depart from its practice and attempt to assess Dillinger's creditworthiness, there is no information on the record of this investigation with which to do so.  As a result, we have continued to include the average of the interest rates for commercial and industrial loans between 31 and 365 days made to all borrowers by all commercial banks during the POI, as published by the Federal Reserve, in the interest rate used for our calculation of Dillinger's U.S. credit expenses.

## Comment 25: Excluding Sales of Military Grade Plate for Dillinger

*Dillinger's Arguments*

- In the *Preliminary Determination*, the Department included in its margin calculations certain of Dillinger's home market sales of CTL plate with a quality code of 764. Dillinger states that these sales are military grade CTL plate certified to MIL-S-16216K Grade HY 80 and MIL-S-16216K Grade HY 100, which are specifically excluded from the scope of this investigation.  As a result, Dillinger asserts that the Department should remove all sales with this quality code from its margin calculations for the final determination.

The petitioner did not comment on this issue.

Department's Position:

At verification, we determined that Dillinger's sales of military grade plate, reported with a quality code of 764, meet the definition of the exclusion for such products described in the scope of the investigation.[251]  Therefore, we removed these sales from our margin calculations for the final determination.

## Comment 26: Payment Dates for Certain of Dillinger's Home Market and U.S. Sales

- In the *Preliminary Determination*, the Department assigned a payment date of November 4, 2016, to home market sales for which Dillinger had not yet received payment and recalculated Dillinger's home market imputed credit expenses accordingly.  At verification, we found that Dillinger had received payment for certain of these home market sales through an affiliated selling agent.[252]  In addition, we found that: 1) for a home market sale paid in multiple installments, Dillinger reported the date of the second payment as the payment date;[253] and 2) Dillinger incorrectly reported a payment date for four U.S. sales it made to a customer who went out of business and did not pay for these

---

[251] *See* Dillinger Sales Verification Report at 6.

[252] *See* Dillinger Sales Verification Report at 13-14.

[253] *Id.*, at 14.

Barcode:3556338-01 A-428-844 INV - Investigation -

sales.[254] Dillinger makes the following arguments regarding how the Department should assign the payment dates for these sales:

o The Department should assign payment dates to its home market sales made through an affiliated selling agent using the information obtained at verification.

o For the sale paid in multiple installments, the Department should accept the date of the final installment as the payment date because calculating weighted-average payment dates for such sales would be difficult.

o For the unpaid U.S. sales to a customer that went out of business, the Department should avoid assigning a payment date that would result in extraordinarily large imputed credit expenses which would distort Dillinger's margin calculations. Dillinger proposes that the Department assign those sales a payment date based upon the average number of days between the dates of sale and payment for all other U.S. sales to this customer. Dillinger contends that the Department should not assign these sales a payment date later than December 31, 2015, the date when Dillinger claims it wrote off the open accounts receivable for this customer.

*The Petitioner's Arguments*

• The petitioner argues that, for Dillinger's unpaid U.S. sales to its customer that went out of business, the Department should either: 1) treat them as zero price sales and use the total cost of the unpaid sales, including COP, freight, and all price adjustments, as a selling expense allocated over POI sales to this customer; or 2) assign these sales a payment date equal to the date of the final determination.

Department's Position:

For Dillinger's home market sales where it received payment through an affiliated selling agent, we assigned payment dates using the information we obtained at verification.=Further, for the home market sale for which Dillinger received payment in multiple installments, we assigned a weighted-average payment date based on our findings at verification.[255]= With regard to the unpaid U.S. sales to Dillinger's customer that went out of business, Dillinger did not provide evidence that it wrote off the open accounts receivable for this customer.=Furthermore, it is not the Department's practice to assign payment dates based upon customer payment history.=In= accordance with our practice, we assigned these sales a payment date equal to the last day on= which Dillinger had an opportunity to submit new information, which, here, is the last day of verification.[256]= In each of these instances where we revised Dillinger's reported payment dates,

---

[254]*Id.*, at 10.

[255]See Dillinger Sales Verification Report at 14.

[256]See, e.g., *Certain Frozen Warmwater Shrimp From India: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 73 FR 40492 (July 15, 2008), and accompanying Issues and Decision Memorandum at Comment 5; While Dillinger claims that it wrote of these sales on December 31, 2015, the only information Dillinger cites in support of this claim is an untranslated page from a verification exhibit.=*See* Dillinger Sales

Barcode:3556338-01 A-428-844 INV - Investigation  -

we also recalculated home market and U.S. credit expenses in our calculations for the final determination.

## Comment 27: Corrections from Verification for Dillinger

*Dillinger's Arguments*

- At verification, the Department found minor discrepancies in Dillinger's reported foreign inland freight expenses (*i.e.*, in field DINLFTPU) for a number of U.S. sales.[257] Dillinger argues that these discrepancies are inconsequential and, as a result, the Department should instead rely on Dillinger's originally reported freight expenses.

- The Department also found at verification that one of Dillinger's reported U.S. sales was actually a sale of Dillinger France's CTL plate.[258] Dillinger requests that the Department exclude this sale from its margin calculations for the Final Determination.

- The Department also examined Dillinger's reported bank charge ratio at verification.[259] Dillinger asserts that the Department's verification findings confirm that its bank charges are so small that they do not affect the company's indirect selling expense ratio.

- In the *Preliminary Determination*, the Department relied on the foreign inland freight expense amounts reported in the field DINLFTPU, rather the amounts reported on a theoretical-weight basis (*i.e.*, in the field DINLFTP2U), because the expenses reported in the latter field appeared to contain obvious errors. Dillinger requests that the Department convert the amounts reported in the field DINLFTPU to a theoretical-weight basis using the formula Dillinger provided at verification (*i.e.*, the ratio of the reported quantity to the theoretical quantity).[260]

- In the *Preliminary Determination*, the Department did not include the field QTYDIS2H in our margin calculations because the Dillinger reported no values in the field QTYDISH (*i.e.*, quantity discounts) and we understood that the field QTYDIS2H reported QTYDISH on a theoretical-weight basis. However, Dillinger states that it explained at verification that field QTYDIS2H is the company's post-sale quantity adjustments (*i.e.*, field QTYADJH) converted to a theoretical-weight basis.

*The Petitioner's Comments*

- The petitioner assert that, at verification, the Department found that Dillinger underreported its foreign inland freight expenses for a number of U.S. sales. Thus, the

---

Verification Report at Exhibit 24 p. 20.

[257] *See* Dillinger Sales Verification Report at 13.

[258] *See* Dillinger Sales Verification Report at 10.

[259] *See* Dillinger Sales Verification Report at 14.

[260] *See* Dillinger Sales Verification Report at 9.

Barcode:3556338-01 A-428-844 INV - Investigation  -

petitioner states that the Department should use these verified amounts in its calculations for the final determination.

The petitioner did not comment on the remaining issues Dillinger raised.

**Department's Position:**

We find that it is appropriate to rely on Dillinger's verified sales data in our calculations for the final determination. As a result, we made the following changes to our calculations: 1) we used the foreign inland freight expenses obtained at verification; 2) we excluded Dillinger's reported U.S. sale of Dillinger France-produced merchandise; 3) we included Dillinger's bank charge ratio as part of its indirect selling expenses; and 4) we used the formula obtained at verification to convert Dillinger's reported foreign inland freight expenses to a theoretical-weight basis.

Regarding the amounts Dillinger reported in the field QTYDIS2H, we note that we are using in our calculations the net quantity on a theoretical-weight basis which Dillinger reported in the field QTYCNVNETH, which includes these reported quantity adjustments. Therefore, we did not include the field QTYDIS2H in our final determination margin calculations.

Regarding the foreign inland freight amounts Dillinger reported in field DINLFTPU, we are using the formula provided at verification to convert those values to a theoretical weight basis.

**Comment 28: Currency Conversions for Certain Movement Expenses Reported for Dillinger's U.S. Sales**

*Dillinger's Arguments*

- In the *Preliminary Determination*, the Department treated Dillinger's reported domestic inland freight and domestic brokerage expenses for U.S. sales as reported on a mixed-currency basis (*i.e.*, dollars and Euros). Dillinger notes that it reported these expenses in Euros for all U.S. sales and requests that the Department revise its margin program to treat them as such.

*The Petitioner's Arguments*

- The petitioner contends that the Department failed to convert Dillinger's reported domestic inland freight and domestic brokerage expenses from Euros to U.S. dollars where the currency of the U.S. sale is reported in U.S. dollars.

- The petitioner also notes that, while the Department converted international freight expenses (*i.e.*, reported in field INTNFR3U) to U.S. dollars in the *Preliminary Determination*, it failed to use the converted variable in its margin calculations.

Barcode:3556338-01 A-428-844 INV - Investigation  -

**Department's Position:**

We examined the currency of Dillinger's domestic inland freight and domestic brokerage and handling expenses for U.S. sales and determined that Dillinger reported these expenses exclusively in Euros.[261]  Therefore, we converted these expenses to U.S. dollars in our margin calculations for the final determination.  We also revised our final determination margin calculations to use Dillinger's international freight expenses converted into U.S. dollars (*i.e.*, INTNFR3U_USD).

**Comment 29: Inclusion of Interest Rate in the Affiliated Input COP for Dillinger**

*The Petitioner's Arguments*

- The petitioner notes that the transfer price, market price, and affiliate's COP that are compared under section 773(f)(3) of the Act should be on the same basis.  The petitioner argues that because the transfer and market prices would conceptually cover the full cost of production, including interest expenses (and profit), the affiliate's COP should likewise include interest expenses.

- According to the petitioner, the underlying objective of this provision of the Act is to determine the value of the transaction had it occurred between unaffiliated persons.  The petitioner contends that, because such an amount would enable the seller to recover all cost including financial costs, the exclusion of this component from the affiliate's COP would understate the affiliate's cost.

- The petitioner argues that the Department's presumed rationale that the inclusion of interest expenses where the affiliated supplier is also a member of the same consolidated group as the responding company (*i.e.*, part of the same consolidated interest expense ratio) not only displays a fundamental misunderstanding of the intent of sections 773(f)(2) and (3) of the Act, but is also contrary to the Department's own long-standing instructions in section D of its questionnaire.[262]

- The petitioner argues that the adoption of this approach would create illogical results in cases where one of the affiliated suppliers is part of a consolidated group, but another is not.  According to the petitioner, the very same input obtained from these two suppliers would have different values and different outcomes in the major input rule analysis.

*Dillinger's Arguments*

- Dillinger argues that its COP is inclusive of interest expenses, and that the affiliated party's COP is included in Dillinger's total manufacturing costs (TOTCOM).  Therefore,

---

[261] *See* letter from Dillinger entitled "Certain Carbon and Alloy Steel Cut-To-Length Plate from Germany; AG der Dillinger Huttenwerke Supplemental Section B & C Response," dated September 20, 2016, at Appendix SBC-2.

[249] *See* the Petitioner's Case Brief at 42 (citing the Department's Questionnaire dated May 25, 2016, at D-5, number 9).

according to Dillinger, increasing the affiliated party's COP to reflect interest expenses would result in the double counting of interest expenses.

- However, Dillinger argues that, if the Department increases the COP of the related-party inputs to include interest expenses, it should be for the sole purpose of determining whether the major input or transaction disregarded rules are applicable, and not for applying the adjustment.

<u>Department's Position</u>:

The COP for inputs purchased from affiliated suppliers generally should include the affiliated suppliers' financial expenses, and in instances when the supplier is not consolidated with the respondent, we include the supplier's financial expense in the COP.  However, when a supplier is consolidated with the respondent and the same set of consolidated financial statements is used to calculate both the supplier's COP and the respondent's COP, the inclusion of financial expenses in the supplier's COP results in double counting.  Thus, in such instances, to avoid double-counting when making an adjustment to the affiliated supplier's COP under the major input rule, we exclude the supplier's financial expenses.[263]  While the petitioner contends that the Department misunderstands the intend of sections 773(f)(2) and (3) of the Act, we do not find that those sections require us to double count.  Accordingly, for the final determination, we have continued to exclude financial expenses from the COP of Dillinger's affiliated suppliers where that supplier is a part of the same consolidated entity.

**Comment 30:** *Non-Prime Plate Product Costs for Dillinger*

*Dillinger's Arguments*

- Dillinger argues that the Department erred in the *Preliminary Determination* by shifting the COP from non-prime to prime CTL plate.

- Dillinger asserts that, because non-prime plate cannot be identified until the end of production, it undergoes the same production steps and incurs the same costs as prime plate.

- According to Dillinger, the profit or loss on sales of the merchandise under consideration is not properly part of COP, but rather is only an element in the calculation of constructed value (CV).  Therefore, Dillinger argues that it is inappropriate to take the loss incurred on the sales of non-prime plate and add it to the cost of prime plate as if it were a proper element in the calculation of COP.

---

[263] *See Sugar From Mexico: Final Determination of Sales at Less Than Fair Value*, 80 FR 57341 (September 23, 2015), and accompanying Issues and Decision Memorandum at Comment 9; and *Certain Cold-Rolled Steel Flat Products From the Russian Federation: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 81 FR 49950 (July 29, 2016), and accompanying Issues and Decision Memorandum at Comment 9.

Barcode:3556338-01 A-428-844 INV - Investigation  -

- Dillinger contends that the Department incorrectly claims that it values non-prime plates at their sales value in its normal books and records.  Dillinger claims that it books all costs for prime and non-prime products to the same cost object for inventory valuation purposes, and only in the Factory Results (FER) report and cost order sheets (*i.e.*, Dillinger's internal management reports) are non-prime products valued at sales value.

- Dillinger argues that in *HWR from Korea,* the Department recognized that it was not appropriate to shift costs of production from non-prime merchandise to prime merchandise.[264]

*The Petitioner's Arguments*

- The petitioner disagrees, arguing that the Department should continue to adjust the cost of non-prime products as it did at the *Preliminary Determination*.

- The petitioner asserts that Dillinger's reliance on *HWR from Korea* is unavailing because the prime and non-prime products in that case could be used in the same general applications.  However, the petitioner notes that, in this investigation, Dillinger's non-prime plate cannot be used in the same general applications as prime plate.

<u>Department's Position</u>:

Consistent with the *Preliminary Determination*, we have disallowed the adjustment to Dillinger's reported costs to revalue non-prime products to reflect the full weighted-average cost of prime plate production.=Our practice with respect to non-prime products is to analyze the products sold as non-prime on a case-by-case basis to determine how the respondent records such products in its normal books and records, whether the products remain in scope, and whether the products= can still be used in the same applications as prime products.[265]= Sometimes the downgrading is minor, and the product remains within a product group.=Other times the downgraded product differs significantly, no longer belongs to the same group, and cannot be used for the same applications as the prime product.=If the product cannot be used for the same applications, the product's market value is usually significantly impaired to a point where its full cost cannot be recovered.=In such cases, assigning full costs to that product would be unreasonable.[266]= Therefore, instead of attempting to judge the relative values and qualities between grades of products, the Department has adopted the reasonable practice of looking at whether the

---

[264]=*See* Dillinger's Case Brief at 39 (citing *Notice of Final Determination of Sales at Less than Fair Value: Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea,* 81 FR 47347 (July 21, 2016) (HWR from Korea), and accompanying Issues and Decision Memorandum at Comment 3).

[265]=*See Welded Line Pipe from the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 80 FR 61366 (October 13, 2015) (*Line Pipe from Korea*), and accompanying Issues and Decision Memorandum at Comment 9; and *Steel Concrete Reinforcing Bar From Turkey: Final Negative Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances*, 79 FR 21986 (September 15, 2014), and accompanying Issues and Decision Memorandum at Comment 15.

[266]=*See Line Pipe from Korea* at Comment 9.

downgraded product can still be used in the same general applications as its prime counterparts.[267]

In accordance with this practice, we reviewed the information on the record of this investigation with regard to Dillinger's downgraded merchandise.  Dillinger reconciled its reported costs from the audited financial statements to the costs reported in its internal factory results report (FER).  In its FER, Dillinger values non-prime products at their likely selling price, and uses this value as an offset to prime production.[268]    The record shows that this value is significantly lower than the average value of prime production that Dillinger assigned for purposes of reporting costs to the Department.[269]    Further, Dillinger has explained that non-prime products are sold without any certifications or warranty as to type, grade, specification or chemistry, and that they cannot be used for the same end use applications as prime CTL plate.  Prime merchandise is used in applications that require certifications of grade, type and chemistry, while non-prime merchandise is used in applications such as counterweights for cranes and floor plates.[270]  Thus, contrary to Dillinger's contention, this fact pattern is the opposite of that found in *HWR from Korea*, where we determined that prime and non-prime products could be used for the same applications.[271]

Accordingly, we find there is no evidence on the record to indicate that Dillinger's non-prime merchandise can be used in the same general applications as its prime merchandise.  Therefore, consistent with the *Preliminary Determination*, we have continued to adjust Dillinger's reported costs for non-prime products to reflect the full weighted-average cost of prime plate production.

## Comment 31: Blast Furnace Coke Adjustment for Dillinger

*The Petitioner's Arguments*

- During the POI, Dillinger obtained a raw material input (*i.e.,* pig iron) used to produce CTL plate from an affiliated producer, Rogesa Roheisengesellschaft (Rogesa), and Rogesa obtained a raw material input (*i.e.,* blast furnace coke) used to produce pig iron from an affiliated producer Zentralkokerei Saar Gesellschaft (ZKS).  For the *Preliminary Determination*, we tested the arm's length nature of these affiliated party transactions, in accordance with section 773(f)(3) of the Act, and adjusted the reported costs accordingly.  The petitioner disagrees with the Department's methodology in making this adjustment.

- The petitioner acknowledges that the Department normally analyzes the arm's length nature of affiliated transfer prices based on the average purchase prices from affiliated and unaffiliated parties.  However, the petitioner argues that, because more precise

---

[267] *Id.*

[268] *See* Dillinger's September 28, 2016 Section D Response at page 22.

[269] *See* Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – Dillinger Hüttenwerke," dated November 4, 2016 (Dillinger Preliminary Cost Memo).

[270] *See* Dillinger's September 28, 2016, Section D Response at 21.

[271] *See HWR from Korea* at Comment 3.

information is available in this case, the Department should revise the major input adjustment from the *Preliminary Determination* to base its comparison on the affiliated and unaffiliated running average inventory values (*i.e.,* consumption values), rather than the purchase prices for coke.

- According to the petitioner, using consumption values instead of purchase prices for coke is more accurate because it avoids the inconsistency between purchase prices of the raw material and the cost of production when applying the major input rule.

- The petitioner argues that, should the Department not rely on the consumption values, it should revise the adjustment from the *Preliminary Determination* to incorporate its verification findings (*i.e.*, an omitted credit note, as well as the dry weight based market price).

- The petitioner contends that Dillinger's understanding of the transaction disregarded and major input rule is incorrect.  According to the petitioner, pursuant to the rule, the Department values the major input using the highest of the transfer price, the market price, or the affiliate's COP.[272]

- The petitioner disagrees with Dillinger's argument, discussed below, that the Department should not apply the major input rule to ZKS (even though it is a separate legal entity) because it operates as an internal business unit.  According to the petitioner, the Department rejected a similar argument in *Pasta from Italy*.[273]

- The petitioner also disagrees with Dillinger's argument, discussed below, that Rogesa's purchases of blast furnace coke from unaffiliated parties are insignificant and should not be used as a market price, noting that Rogesa purchases ten percent of its blast furnace coke from unaffiliated suppliers, an amount which is not negligible.

- Finally, the petitioner argues that freight costs should be included in the market price of the blast furnace coke purchased from unaffiliated parties because: 1) the inclusion of freight costs is a normal accounting principle; 2) it is consistent with the Department's practice; and 3) it is necessary to compare prices on the same basis.

*Dillinger's Arguments*

- Dillinger argues that the Department erred in adjusting Rogesa's transfer price for blast furnace coke to an unaffiliated market price in the preliminary determination.  According to Dillinger, section 773(f)(3) of the Act only applies when the Department "has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input."  Dillinger asserts that the

---

[272] *See* the Petitioner's Rebuttal Brief at 42 (citing 19 CFR 351.407(b)).

[273] *See* the Petitioner's Rebuttal Brief at 43 (citing *Notice of Final Results and Partial Rescission of Antidumping Duty Administrative Review: Certain Pasta From Italy*, 64 FR 6615(February 10, 1999) (*Pasta from Italy*) at Comment 6).

Barcode:3556338-01 A-428-844 INV - Investigation  -

provision does not direct the Department to value the input at more than the cost of production.

- Dillinger disagrees with the petitioner's argument that the consumption values for coke, rather than the POI purchase prices, should be used when applying the major input rule. Dillinger asserts that the use of the historic inventory costs of blast furnace coke (*i.e.,* consumption values) cannot be used as a surrogate for the market value of coke produced during the POI because coke prices fluctuate over time  and the price of coke in one period cannot be taken to represent the price of coke in subsequent periods.

- Dillinger argues that section 773(f)(3) of the Act must be read in conjunction with the general obligation of section 773(f)(1) of the Act, as well as Article 2.2.1.1 of the WTO Antidumping Agreement, which state that costs should normally be calculated based upon the records of the exporter or producer under investigation, provided that such records are in accordance with the generally accepted accounting principles (GAAP) of the exporting country and reasonably reflect the costs associated with the production and sale of the merchandise under consideration.

- Dillinger argues that whether it owns the coke-producing assets and operates them as an internal business unit, or whether the productive assets are held by a subsidiary, is irrelevant and does not change the nature of the transaction.  According to Dillinger, ZKS produces blast furnace coke entirely for internal consumption and all costs related to ZKS's production of coke are fully passed on to the finished product.

- Dillinger claims that the major input rule does not direct the use of the higher of the transfer price, market value, or COP in all situations, but instead directs that the Department will "normally" determine the value of a major input in this manner.  Thus, Dillinger argues that the use of "normally" indicates that it is not appropriate to apply the major input rule in all situations.

- Dillinger notes that Rogesa purchased 90 percent of its blast furnace coke from ZKS, and purchased the remaining ten percent on the spot market.  According to Dillinger, these spot-market prices for small quantities cannot be used as an appropriate market value for the large quantities purchased on a regular basis from ZKS.  Moreover, Dillinger argues that the reported unaffiliated blast furnace coke purchases are on a delivered basis and therefore include significant freight expenses, while the coke produced by ZKS is produced in the same factory complex as Dillinger and Rogesa.

<u>Department's Position:</u>

After considering the facts on the record of this case, we used the affiliated and unaffiliated consumption values, rather than purchase prices in applying the major input rule.=The purpose of the major input rule is to evaluate whether the purchases of a major input from an affiliate reflects an arm's length transaction.=The Department normally determines whether a transaction

Barcode:3556338-01 A-428-844 INV - Investigation  -

is made at arm's length by comparing the transfer price to the market price and the affiliate's COP in accordance with sections 773(f)(2) and (3) of the Act.[274]

In all cases, available record evidence defines the information that is used as the transfer price and market price in applying the major input rule. Normally the available information regarding the transfer price is the respondent's purchases directly or indirectly of inputs or services from affiliated suppliers during the POI. For the market price it could be the same inputs or services purchased by the respondent from unaffiliated suppliers during the POI. However, for example, if the respondent did not purchase any of the same inputs or services from unaffiliated parties, the market price could be defined as the price the affiliated supplier charged its unaffiliated customers during the POI. Accordingly, in every case the record information is evaluated to determine appropriate comparisons to use in applying the major input rule. In the instant case, unique to Rogesa's normal books and records, Rogesa maintains separate inventory movement records for coke by supplier. Normally, companies co-mingle the physical inventory and records for purchases of raw materials from differing suppliers, and thus are not able to provide consumption value information by input and supplier. However, because Rogesa maintained separate inventory movement information by input and supplier, it provided consumption values for coke by supplier (*i.e.,* affiliated and unaffiliated consumptions values). With both affiliated and unaffiliated coke consumption values by supplier, and coke purchase prices available on the record of this case, we must decide which values should be used as the transfer price and market price in applying the major input rule, *i.e.*, purchase prices or consumption values. Because the affiliated and unaffiliated consumption values are in line with how ZKS reported the COP of coke (*i.e.,* on a consumption-value basis), we consider it appropriate in this instance to compare Rogesa's affiliated coke consumption values to its unaffiliated coke consumption values and ZKS's reported COP of coke in applying the major input rule.

However, regarding freight expenses, we note that, under the major input rule, it is necessary to compare prices that are on the same basis, which is not true of the affiliated and unaffiliated consumption values in this case. Specifically, Rogesa's coke consumption values from ZKS are freight exclusive (because both companies are located on the same factory premises), while the unaffiliated coke consumption values are freight inclusive. As a result, to ensure that the comparison between the affiliated and unaffiliated consumption values is on the same basis, we adjusted the unaffiliated consumption values to reflect freight-exclusive values. Therefore, for the final determination, we adjusted Rogesa's reported coke cost to reflect the higher of the Rogesa's consumption value of coke from its affiliate, ZKS, Rogesa's adjusted consumption value of coke from unaffiliated suppliers, or the reported COP of coke.

Additionally, we have accounted for the omitted credit note that ZKS issued to Rogesa for coke supplied during the POI in applying the major input rule. Specifically, for the final determination, we reduced the reported affiliated coke consumption values used in applying the major input rule by the credit note issued by ZKS. However, we find that the petitioner's argument that the comparison of the transfer and market prices be made on the same dry-weight basis is moot because we are using reported coke consumption values that are on the same weight basis, rather than the purchase prices.

---

[274] *See* 19 C.F.R. § 351.207(b).

Barcode:3556338-01 A-428-844 INV - Investigation   -

Moreover, we disagree with Dillinger that section 773(f)(3) of the Act directs the Department to not value the input at more than the cost of production.=Section 773(f)(3) of the Act directs the Department to value the input at COP, "if such cost is greater than the amount that would be determined for such input under paragraph (2)", and paragraph (2) directs the Department to value the input at the higher of the transfer price or market price.=Therefore, the Department applies the major input rule by comparing the transfer price to the market price and the affiliate's COP and uses the highest of the three in its calculations in accordance with sections 773(f)(2) and (3) of the Act.[275]= Further, we disagree with Dillinger that the Department should not apply the major input rule to Rogesa's purchases of coke from ZKS.=While Dillinger attempts to portray both Rogesa and ZKS as internal business units of the same company and asserts that all= blast furnace coke is produced entirely for internal consumption and all costs related to ZKS's production of coke are fully passed on to the finished product, the fact remains, as the record= shows, that Dillinger, Rogesa and ZKS were separate legal entities throughout the POI.[276]= Under the Department's established practice, transactions between separate legal entities are valued at the affiliate's cost of production only if the entities are treated as a single collapsed entity.[277]

The Department's regulations at 19 CFR 351.401(f) state that it will treat two or more affiliated producers as a single entity "where those producers have production facilities for similar or identical products that would not require substantial retooling in order to restructure manufacturing priorities and the Secretary concludes that there is significant potential for the manipulation of price or production."=In this case, Dillinger, Rogesa, and ZKS do not have production facilities for similar or identical products.=Dillinger produces the subject merchandise, CTL plate, while Rogesa produces pig iron and ZKS produces coke.=Neither Rogesa nor ZKS owns equipment that would enable it to produce CTL plate or a similar product without substantial retooling.=In addition, neither Rogesa nor ZKS were involved in the export or sale of subject merchandise during the POI, and there is no basis to conclude that a significant potential for the manipulation of price or production exists.=Thus, we find that the regulatory criteria for treating affiliated companies as a single entity are not met here, and we have not treated Dillinger, Rogesa, and ZKS as a single entity.=Accordingly, for the final determination, we have continued to analyze Rogesa's purchases of coke from ZKS in accordance with the major input rule as set forth in section 773(f)(3) of the Act.[278]

Finally, regarding Dillinger's argument that Rogesa's reported unaffiliated purchases of coke should be rejected because they were at volumes too small to be considered a fair reflection of

---

[275] *See* 19 C.F.R. § 351.207(b).

[276] *See* Dillinger's June 29, 2016, Section A Response at Appendix 4.

[277] *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value: Citric Acid and Certain Citrate Salts from Canada*, 14 FR 1 6843 (April 13, 2009) (*Citric Acid from Canada*), and accompanying Issues and Decision Memorandum at Comment 5; and *Chlorinated Isocyanurates From Spain: Final Results of Antidumping Duty Administrative Review*, 72 FR 64194 (November 15, 2007) (*Chlor-lsos from Spain*), and accompanying Issues and Decision Memorandum at Comment 3.

[278] *See, e.g., Citric Acid from Canada* at Comment 5; *Chlor-lsos from Spain* at Comment 3; and *Xanthan Gum from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 78 FR 33351 (June 4, 2013), and accompanying Issues and Decision Memorandum at Comment 13.

market value, we disagree.  Rogesa purchased a substantial amount of coke from unaffiliated sources (approximately 10 percent of its total purchases).  In addition, the purchase transactions were at volumes that represent commercial quantities.  As such, we consider the consumption values associated with these unaffiliated purchases to be a reasonable reflection of market prices in  applying the major input rule.

The Department's determination here is consistent with U.S. law, which is in turn consistent with the WTO Antidumping Agreement.

## Comment 32: Dillinger's Reported Affiliated Party Costs

*The Petitioner's Arguments*

- The petitioner notes that while Rogesa and ZKS indirectly provided inputs to Dillinger, Dillinger also provided inputs and services (*i.e.,* raw materials, movement, and maintenance costs) to Rogesa and ZKS.  The petitioner asserts that Dillinger provided these inputs and services at cost, and therefore, the Department should increase Rogesa's cost of producing pig iron by the amount of Dillinger's overhead, SG&A and interest expenses.

*Dillinger's Arguments*

- Dillinger contends that it fully explained in its responses to the Department's questionnaire that services it provided are in large part related to the labor which Dillinger provided to Rogesa and ZKS because the two companies don't have their own personnel.  According to Dillinger, and it provided information to demonstrate that the transfer price it charged for the services and materials included a small markup, exceeding the cost.

- Dillinger also argues that increasing Rogesa's reported costs by Dillinger's G&A and interest expenses on purchased materials and services would have no effect on the application of the major input rule, but would double count Dillinger's G&A and interest expenses.  Dillinger contends, that, because Dillinger's cost of producing CTL plate already includes Rogesa's reported COP (inclusive of the full cost of producing pig iron), the Department would be double counting if it were to apply Dillinger's G&A and interest expense ratios both to: 1) Rogesa's cost of producing pig iron; and 2) Dillinger's cost of producing CTL plate.

- Dillinger notes that the petitioner ignores that only a very small portion of the miscellaneous services it provided to affiliated and unaffiliated parties relate to Rogesa and ZKS.

- Dillinger argues that the production process is a "closed circuit," with all costs flowing into the final product.  Thus, according to Dillinger, increases to the transfer price of services and materials Dillinger supplied to ZKS and Rogesa would be offset by the exclusion of the cost of those services and materials from Dillinger's cost calculations.

Barcode:3556338-01 A-428-844 INV - Investigation   -

Department's Position:

For purposes of applying sections 773(f)(2) and (3) of the Act in the final determination, we adjusted the COP of the inputs and services that Dillinger provided to Rogesa and ZKS to include a portion of Dillinger's G&A expenses.=In making this determination, we considered the components of the cost of goods sold denominator of Dillinger's G&A expense ratio.=Our treatment of the COP of the inputs and services addressed by this comment stems from the fact that, consistent with the Department's practice, [279] Dillinger's unconsolidated financial statements serve as the basis for the G&A expense ratio.[280] Because the G&A expense ratio is calculated using Dillinger's unconsolidated financial statements, the transactions between Dillinger and its affiliates, Rogesa and ZKS, have not been eliminated from these financial statements.=Thus, Dillinger's cost of goods sold includes both the cost of the inputs and services that Dillinger sold to Rogesa and ZKS, as well as the cost of the CTL plate that Dillinger sold to third parties.=In producing CTL plate, Dillinger consumes inputs produced by Rogesa and ZKS (*e.g.*, pig iron); thus, embedded in the cost of the CTL plate Dillinger sold is also the cost the inputs provided by Rogesa and ZKS, including the inputs and services that Rogesa and ZKS obtained from Dillinger.

Therefore, in calculating the G&A expense ratio, we have essentially included the cost of the inputs and services provided to Rogesa and ZKS in the denominator twice; once when they were sold to the affiliates, and again when Dillinger consumed the inputs provided by Rogesa and ZKS.=Based on this calculation, in order to account for all of Dillinger's G&A expenses, it is appropriate to apply Dillinger's G&A expense ratio to both the costs of: 1) the CTL plate; and 2) the inputs and services.=As a result, we disagree with Dillinger that application of the G&A expense ratio to the cost of the inputs and services Dillinger provided to its affiliates results in the double counting of Dillinger's G&A expenses.=Conversely, however, we agree with Dillinger that it is not appropriate to apply the consolidated financial expense ratio to the cost of these inputs and services.=Following the same logic, we note that Dillinger's financial expense ratio is calculated based on consolidated financial statements that include Dillinger, Rogesa and ZKS.=Thus, the transactions between the consolidated parties would be eliminated from the consolidated financial statements, and consequently, the cost of the inputs and services in question would not be double counted in the consolidated denominator.=Accordingly, the application of the consolidated financial expense ratio to both the cost of CTL plate and the cost of the inputs and services would overstate financial expenses.=*See also* Comment 29 above,

---

[279] *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Large Residential Washers from the Republic of Korea*, 77 FR 75988 (December 26, 2012) and accompanying Issues and Decision Memorandum at Comment 7; and *Notice of Final Results of the Eighth Administrative Review of the Antidumping Duty Order on Certain Pasta From Italy and Determination to Revoke in Part,* 70 FR 71464 (November 29, 2005), and accompanying Issues and Decision Memorandum at Comment 5.

[280] While G&A expenses are calculated based on the producer's own company-wide audited financial statements, financial expenses are calculated based on the highest level of consolidated financial statements.=*See, e.g., Notice of Final Results of Antidumping Duty Administrative Review: Fresh Atlantic Salmon from Chile*, 65 FR 78472 (December 15, 2000), and accompanying Issues and Decision Memorandum at Comment 7; and=*Final Results and Partial Rescission of Antidumping Duty Administrative Review: Certain Frozen Warmwater Shrimp from India*, 72= FR 52055 (September 12, 2007), and accompanying Issues and Decision Memorandum at Comment 9.

Barcode:3556338-01 A-428-844 INV - Investigation -

regarding the inclusion of consolidated financial expenses in the calculation of an affiliated party's COP. Accordingly, for the final determination, we have applied only Dillinger's G&A expense ratio in calculating the COP of the inputs and services provided by Dillinger to Rogesa and ZKS.

**Comment 33: G&A Expense Ratio Adjustment Related to Services Obtained from an Affiliated Party for Dillinger**

*The Petitioner's Arguments*

- Dillinger obtains G&A services from an affiliated party, SHS Stahl-Holdings-Saar (SHS Holdings). For the *Preliminary Determination*, we increased Dillinger's reported G&A expenses to include SHS Holdings' unrecovered costs. The petitioner argues that Department should revise its calculation for the final determination as follows:

  o The Department should exclude the income from other investments held as financial assets and the amortization of financial assets and current securities.

  o The Department should increase the percentage of SHS Holdings' unrecovered costs that are allocated to Dillinger after including the cost for "other services" SHS Holdings provided to its affiliates as part of the allocation ratio.

  o The Department should include SHS Holdings' financial expenses in the calculation of the unrecovered costs, because Dillinger and SHS Holdings are not part of the same consolidated financial statements; therefore, the consolidated interest expense ratio applied to Dillinger's reported costs does not include SHS Holding's financial expenses.

*Dillinger's Arguments*

- Dillinger disagrees with the Department that SHS Holdings did not fully recover its costs related to G&A services, and argues that the Department based its findings on an incomplete analysis of SHS Holdings' profit and loss statement.

- Dillinger asserts that the Department should exclude the company's financial expenses in the calculation of SHS Holdings' unrecovered costs.

Department's Position:

We excluded income from other investments held as financial assets and the amortization of financial assets and current securities from the calculation of SHS Holdings' unrecovered costs in our calculations for the final determination. It is the Department's practice to exclude

investment-related gains and losses from the calculation of the cost of production.[281] Investment activities are a separate profit-making activity not related to the company's normal operations. Therefore, for the final determination, we have excluded these investment gains and losses from the calculation of the unrecovered costs.

However, we find that the portion of SHS Holdings' unrecovered costs allocated to its affiliates (*e.g.*, Dillinger and Rogesa) should be increased. Specifically, costs related to certain other services SHS Holdings provided to its affiliates were excluded from the corporate compensation costs used as the basis for allocating the unrecovered costs to SHS Holdings' affiliates. Therefore, for the final determination, we have included the other services costs in the methodology used to allocate SHS Holdings' unrecovered costs to its affiliates, thereby increasing the portion of the unrecovered costs included in Dillinger's G&A expenses.

Finally, we disagree with Dillinger's contention that our analysis of SHS Holding's profit and loss statement was incomplete and, as a result, we should not have included SHS Holdings' financial expenses in the calculation of the unrecovered costs. However, the purpose of the transactions disregarded rule being applied here is to evaluate whether transactions with affiliated parties are at arm's length. Thus, in accordance with section 773(f)(2) of the Act, the Department normally determines whether transactions are made at arm's length by comparing the transfer price to the market price. In the instant case, Dillinger did not obtain the services provided by SHS Holdings from unaffiliated parties, nor did SHS Holdings provide the services to unaffiliated parties, and the record contains no other information that could be used to determine a market price. Therefore, we compared the total transfer prices charged by SHS Holdings to its affiliates to the total cost of the services it provided. Because the Act does not provide a specific methodology for calculating the components of the cost of producing goods (or, in this case, providing services), *e.g.*, G&A, the Department has developed a consistent and predictable approach of using an affiliate's total cost of providing the services, including company-wide SG&A costs and financial expenses, where the affiliate is not included as part of the consolidated financial expenses as described in Comment 29, above. In addition to being consistent and predictable, we believe this methodology is a reasonable application of the statute that discourages "results-oriented" approaches to calculating the COP for use in analyzing affiliated party transactions. Therefore, for the final determination, we have continued to include financial expenses in SHS Holdings' total cost of services for purposes of applying the transactions disregarded rule.

In summary, for the final determination, we have revised our *Preliminary Determination* adjustment to Dillinger's G&A expenses for SHS Holdings' unrecovered costs to: 1) exclude SHS Holdings' investment activity; and 2) increase Dillinger's proportional share of these unrecovered costs by including SHS Holdings' other services as part of our allocation ratio. However, we continued to include SHS Holdings' financial expenses in the calculation of its unrecovered costs.

---

[281] *See Certain Cold-Rolled Steel Flat Products from the Russian Federation: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part,* 81 FR 49950 (July 29, 2016) at Comment 6 and Comment 10.

Barcode:3556338-01 A-428-844 INV - Investigation  -

**Comment 34: Cost Reconciliation Adjustments for Dillinger**

*The Petitioner's Arguments*

- The petitioner asserts that Dillinger's reported costs should be increased to include the unamortized maintenance costs recorded in the company's cost accounting system.

- The petitioner further argues that Dillinger's reported costs should be increased to include the imminent loss and warranty expenses that were recognized in Dillinger's 2015 audited financial statements.

*Dillinger's Arguments*

- Dillinger asserts that it properly accounted for the maintenance costs.  According to Dillinger, its maintenance costs were fully expensed and recognized in previous fiscal years in the company's financial accounting system; however, the same maintenance costs were amortized rather than fully expensed in the cost accounting system. Therefore, Dillinger argues that the amortized costs in the cost accounting system were reversed to match the total costs reported in the financial accounting system.

- Dillinger notes that the accrual for the imminent loss pertains to anticipated losses on future orders of finished goods as required by German GAAP.  According to Dillinger, this year-end entry simply moves the net effect of the loss from one accounting period to another, and is reversed in the subsequent year-end when the provision account is revalued.  Dillinger states that it properly reported the full gross unit price of these transactions in its sales databases, and included the full COP in its cost database.

- Dillinger points out that it did not report the accrued warranty expenses in its reported COP or in the POI home market and US sales databases because the warranty expenses relate to a pre-POI third country sale of non-subject merchandise.

Department's Position:

We did not include Dillinger's maintenance costs, imminent loss, and warranty expenses in question in its reported COP for the final determination.=As Dillinger notes, the maintenance costs were fully expensed when incurred and recognized in a prior year's financial statements in accordance with German GAAP.[282]= However, in its cost accounting system, Dillinger incorrectly capitalized these costs and amortized them over a five-year period.=Therefore, in the cost reconciliation, Dillinger adjusted its product costs from its the cost accounting system to reflect the costs in its financial accounting system to ensure that the reported costs were not overstated by maintenance costs incurred and fully recognized in a prior year.=Consequently, to avoid overstating Dillinger's reported costs, we have excluded the maintenance costs in question from its reported costs.

---

[282] *See* Dillinger Cost Verification Report at 10.

Barcode:3556338-01 A-428-844 INV - Investigation  -

With respect to the imminent loss, we note that the loss relates to expected losses on future sales of finished goods.  It is the Department's practice to exclude inventory write-downs which are attributable to finished goods from a respondent's cost of production.[283]  The reason for this practice is that we consider the write-down of finished goods to be more closely related to the sale of merchandise than to its production.  Therefore, we have excluded the imminent loss on finished goods from Dillinger's reported costs, in accordance with our practice.

Regarding warranty expenses, we note that these expenses are not normally included in the COP, but are usually captured as part of the selling expenses reported in a respondent's sales databases.  Record evidence shows that the specific warranty expenses in question are associated with sales of third country non-subject plate outside the POI; thus, they were properly excluded from Dillinger's reported selling expenses.  Accordingly, we did not include these expenses either as part of Dillinger's COP or as part of is selling expenses in our calculations for the final determination.

## VII.    Recommendation

Based on our analysis of the comments received, we recommend adopting the above positions.  If this recommendation is accepted, we will publish the final determination in the investigation and the final weighted-average dumping margins in the *Federal Register*.

☒                                    ☐

_____            _____
Agree                             Disagree

3/29/2017

X  *Ronald K. Lorentzen*

Signed by: RONALD LORENTZEN

_____
Ronald K. Lorentzen
Acting Assistant Secretary
  for Enforcement and Compliance

---

[283] *See, e.g.*, *Polyethylene Retail Carrier Bags from Thailand: Final Results of Antidumping Duty Administrative Review*, 76 FR 12700 (March 8, 2011), and accompanying Issues and Decision Memo at Comment 6; and *Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*, 69 FR 19153 (April 12, 2004), and accompanying Issues and Decision Memorandum at Comment 7.

*AG der Dillinger Hüttenwerke v. United States*,
399 F. Supp. 3d 1247 (July 16, 2019)

Appx113-Appx123

*Ins. Co.*, 273 Mich.App. 388, 729 N.W.2d 277, 286 (2006) (denying motion to amend complaint to add bad faith claims because "they fail to state an action independent from [the] breach of contract claim"). Therefore, Morse has failed to state a claim for bad faith.

## IV.  CONCLUSION AND ORDER

For all these reasons, LINA's motion to dismiss is **GRANTED** as to the bad faith claim, and **DENIED** as to the breach of contract claim.

**DONE** the 2nd day of July, 2019.



# AG DER DILLINGER HUTTENWERKE,
**Plaintiff,**

**Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann International GmbH, and Friedr. Lohmann GmbH, Consolidated Plaintiffs,**

**and**

**Thyssenkrupp Steel Europe AG, Plaintiff-Intervenor,**

**v.**

**UNITED STATES, Defendant,**

**Nucor Corporation and SSAB Enterprises LLC, Defendant-Intervenors.**

**Slip Op. 19 - 87**
**Consol. Court No. 17-00158**

United States Court of International Trade.

July 16, 2019

**Background:** Exporters filed suit challenging Department of Commerce's final affirmative antidumping duty investigation of carbon and alloy steel cut-to-length (CTL) plate from Federal Republic of Germany. Exporters moved for judgment on agency record.

**Holdings:** The Court of International Trade, Leo M. Gordon, J., held that:

(1) Commerce reasonably relied on facts otherwise available, and

(2) Commerce reasonably applied adverse facts available (AFA).

Sustained in part and remanded.

### 1. Customs Duties ⟜84(6)

When reviewing Department of Commerce's antidumping determinations, findings, or conclusions for substantial evidence, Court of International Trade assesses whether the agency action is reasonable given the record as a whole. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

### 2. Customs Duties ⟜84(6)

"Substantial evidence," as required to uphold Department of Commerce's antidumping determination, is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

> See publication Words and Phrases for other judicial constructions and definitions.

### 3. Customs Duties ⟜84(6)

"Substantial evidence," as required to uphold Department of Commerce's antidumping determination, is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent the administrative agency's finding from being supported by substantial evi-

dence. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

> See publication Words and Phrases for other judicial constructions and definitions.

**4. Customs Duties ⟺84(6)**

Substantial evidence, as required to uphold Department of Commerce's antidumping determination, is best understood as a word formula connoting reasonableness review. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

**5. Customs Duties ⟺84(6)**

When addressing a substantial evidence issue raised by a party, Court of International Trade analyzes whether the Department of Commerce's challenged antidumping action was reasonable given the circumstances presented by the whole record. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

**6. Customs Duties ⟺21.5(5)**

In an antidumping duty investigation, an exporter's notice to Department of Commerce that the exporter is unable to submit the information in the requested form and manner must include a full explanation and suggested alternative forms in which the information could be provided to Commerce. Tariff Act of 1930 § 782, 19 U.S.C.A. § 1677m(c)(1).

**7. Customs Duties ⟺21.5(5)**

Exporter's notice to Department of Commerce regarding exporter's difficulty in tracing cut-to-length (CTL) plate manufacturer for some transactions for which Commerce had requested information, in antidumping investigation of carbon and alloy steel CTL plate from Germany, did not trigger Commerce's statutory obligation to provide any assistance to exporter that was practicable in supplying such information, where exporter's notice failed to include suggested alternative forms of information that Commerce could use in

place of missing information. Tariff Act of 1930 § 782, 19 U.S.C.A. § 1677m(c)(1).

**8. Customs Duties ⟺21.5(5)**

Department of Commerce reasonably relied on facts otherwise available to fill gap in administrative record regarding missing information concerning cut-to-length (CTL) plate manufacturers that exporters failed to identify, in antidumping duty investigation of carbon and alloy steel CTL plate from Germany, where identity of CTL plate manufacturers was relevant to whether exporters' home market transactions should or should not be included in dumping margin calculations, but exporters failed to identify all CTL plate manufacturers in response to Commerce's request. Tariff Act of 1930 §§ 776, 782, 19 U.S.C.A. §§ 1677e(a)(2), 1677m(e).

**9. Customs Duties ⟺21.5(5)**

In deciding whether to apply adverse facts available (AFA) for a respondent to an antidumping duty investigation that fails to cooperate by not acting to the "best of its ability" to comply with a request for information from Department of Commerce, this standard requires the respondent to do the maximum it is able to do. Tariff Act of 1930 § 776, 19 U.S.C.A. § 1677e(b).

> See publication Words and Phrases for other judicial constructions and definitions.

**10. Customs Duties ⟺21.5(5)**

The statutory trigger for Department of Commerce's consideration of an adverse inference in facts otherwise available in an antidumping duty investigation is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent. Tariff Act of 1930 § 776, 19 U.S.C.A. § 1677e(b).

**11. Customs Duties ⟺21.5(5)**

In deciding whether to apply adverse facts available (AFA) for a respondent to

an antidumping duty investigation that fails to cooperate by not acting to the best of its ability to comply with a request for information from Department of Commerce, it is irrelevant whether the respondent was intentionally evasive, or whether respondent thought it had a valid legal basis for withholding the requested information. Tariff Act of 1930 § 776, 19 U.S.C.A. § 1677e(b).

**12. Customs Duties** ⚖**21.5(5)**

In an antidumping duty investigation, respondents are required to: (1) take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce, (2) have familiarity with all of the records it maintains in its possession, custody, or control, and (3) conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so.

**13. Customs Duties** ⚖**21.5(5)**

Department of Commerce reasonably applied adverse facts available (AFA) to fill gap from missing information regarding cut-to-length (CTL) plate manufacturers that exporters failed to identify, in antidumping duty investigation of carbon and alloy steel CTL plate from Germany, since exporters failed to cooperate by not acting to best of their ability in not reporting requested manufacturer information accurately and in manner requested, using records over which they maintained control, as information was type of data that exporters should reasonably have anticipated being required to provide to customers for quality assurance and warranty claims, and exporters had multiple opportunities to remedy deficiencies and at verification were able to identify one manufacturer in separate database. Tariff Act of 1930 § 776, 19 U.S.C.A. § 1677e(b).

Marc E. Montalbine, Gregory S. Menegaz, and Alexandra H. Salzman, deKieffer & Horgan, PLLC, of Washington, DC for Plaintiff AG der Dillinger Hüttenwerke and Consolidated Plaintiff Friedr. Lohmann GmbH.

David E. Bond, Richard G. King, Ron Kendler, and Allison J. Kepkay, White and Case LLP, of Washington, DC, for Consolidated Plaintiffs Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH.

Robert L. LaFrankie, Crowell & Moring LLP, of Washington, DC, for Plaintiff-Intervenor thyssenkrupp Steel Europe AG.

Vito S. Solitro, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. With him on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director. Of counsel was Natan P. L. Tubman, Attorney, U.S. Department of Commerce, Office of Chief Counsel for Trade Enforcement and Compliance, of Washington, DC.

Alan H. Price, Christopher B. Weld, and Stephanie M. Bell, Wiley Rein LLP, of Washington, DC, for Defendant-Intervenor Nucor Corporation.

**OPINION and ORDER**

Gordon, Judge:

This action involves the final affirmative antidumping duty investigation of certain carbon and alloy steel cut-to-length plate ("CTL plate") from the Federal Republic of Germany. See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany, 82 Fed. Reg. 16,360 (Dep't of Commerce Apr. 4, 2017) ("Final Determination"), and accom-

panying Issues and Decision Memorandum, A-428-844 (Dep't of Commerce Mar. 29, 2017), available at http://enforcement.trade.gov/frn/summary/germany/2017-06628-1.pdf (last visited this date) ("Decision Memorandum").

Before the court are the motions for judgment on the agency record filed by Plaintiff AG der Dillinger Hüttenwerke ("Dillinger") and Consolidated Plaintiffs Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann International GmbH (collectively, "Salzgitter"), and Friedr, Lohmann GmbH (all, together with Dillinger, "Plaintiffs"). See Pl. Dillinger Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R., ECF No. 40[1] ("Dillinger Br."); Salzgitter Consol. Pls.' Rule 56.2 Mot. for J. on the Agency R., ECF No. 43 ("Salzgitter Br."); Def.'s Mem. Opp. Pls.' Rule 56.2 Mots. for J. on the Admin. R., ECF No. 55 ("Def.'s Resp."); Def.-Intervenor Nucor Corporation Resp. Br., ECF No. 58; Reply Br. of Pl. Dillinger, ECF No. 62 ("Dillinger Reply"); Reply in Supp. of Consol. Pls.' Rule 56.2 Mot. for J. on the Agency R., ECF No. 64 ("Salzgitter Reply"). Plaintiff-Intervenor thyssenkrupp Steel Europe AG ("thyssenkrupp") has also filed a brief in support of Plaintiff Salzgitter's Rule 56.2 Motion. See Pl.-Intervenor's Memorandum of Law in Support of Pl. Salzgitter's Rule 56.2 Mot., ECF No. 41 ("thyssenkrupp Br."). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[2] and 28 U.S.C. § 1581(c) (2012).

This opinion addresses Plaintiffs' claims regarding the application of partial adverse facts available ("AFA") by the U.S. Department of Commerce ("Commerce") for certain home market CTL plate sales made by their respective affiliates. The remaining issues, which are raised only by Dillinger, will be addressed in a separate opinion.

## I. Background

In its initial questionnaire, Commerce asked respondents Dillinger and Salzgitter to provide, among other things, the identity of the manufacturer of each CTL plate sold during the period of investigation ("POI") (April 1, 2015, through March 31, 2016), along with its respective price, in their respective United States' and German sales databases. See Salzgitter Questionnaire at B-25, C-31; Dillinger Questionnaire at B-25, C-31. Commerce sent multiple supplemental questionnaires to Dillinger and Salzgitter requesting additional information covering various subjects, including the identity of the manufacturer(s) of certain home market CTL plate sales that they claimed could not be provided without inordinate difficulty.

Dillinger and Salzgitter made sales during the POI in the home market to affiliated parties, as defined in 19 U.S.C. § 1677(33). Commerce accordingly tested those sales to determine whether they were made at arm's-length prices. See 19 C.F.R. § 351.403(c).

Commerce preliminarily found that Dillinger's reported sales to two affiliated resellers did not pass the arm's-length test. Id. Because of gaps in the reported downstream sales of those affiliates, Commerce preliminarily treated all of their sales as being Dillinger-produced CTL plate. Id. Commerce then requested additional information from Dillinger for consideration of these sales for the final determination. Dil-

---

**1.**  All citations to parties' briefs and the agency record are to their confidential versions unless otherwise noted.

**2.**  Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

linger's affiliates were eventually able to gather some of the missing CTL plate manufacturer information. See Dillinger's Third Supplemental Section B&C Questionnaire Response at 5, PD 434.

Salzgitter, for its part, responded to Commerce's initial questionnaire by stating that certain downstream sales by its affiliated reseller were not being reported because it could not identify the original manufacturer of the CTL plate sold without performing a burdensome manual check. See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany, 81 Fed. Reg. 79,446 (Dep't of Commerce Nov. 14, 2016) and accompanying Preliminary Decision Memorandum at 12, PD 436, available at http://ia.ita.doc.gov/frn/summary/germany/2016-27313-1.pdf (last visited this date). Salzgitter specifically noted that "while it is able to do so for customers upon request, its accounting system does not track merchandise by manufacturer once placed into inventory and, thus, it would be 'unreasonably burdensome' to obtain the requested information." Id. Commerce requested in two separate supplemental questionnaires that Salzgitter provide these unreported sales in case the sales to the affiliated reseller failed the arm's-length test. Commerce preliminarily found that Salzgitter was able to report these sales but chose not to identify all of its affiliated reseller's sales of Salzgitter-produced merchandise, therefore Commerce applied facts available, in part, with an adverse inference to account for the affiliated reseller's unreported downstream sales. Id. Commerce indicated that it intended to examine the issue further at verification before coming to a conclusion in the final determination. See id.

In the end, Commerce found both Dillinger's and Salzgitter's efforts insufficient to complete identification of the manufacturer and applied partial AFA to those CTL plate sales when determining the applicable dumping margins. See Decision Memorandum at 27–34, 61–64. For Dillinger, because its sales to its home market affiliate failed the arm's-length test and exceeded five percent of Dillinger's total reported home market sales during the POI, Commerce continued to include all affiliate transactions of CTL plate of unidentified manufacturers but substituted for Dillinger's reported prices the "highest non-aberrational net price among Dillinger's downstream home market sales." For Salzgitter, Commerce included all of Salzgitter's affiliates' downstream home market CTL plate sales with unidentified manufacturers, but applied the highest non-aberrational net price among those sales to all such sales.

## II. Standard of Review

**[1–5]** The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evi-

dence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr. Administrative Law and Practice § 9.24[1] (3d ed. 2019). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2019).

### III. Discussion

#### A. Resort to "Facts Available"

"The manufacturer information is critical for the Department's margin analysis because the Department matches sales by, among other criteria, manufacturer." Decision Memorandum at 32. Without the identity on the record of the manufacturers of all CTL plate transactions sold in the home market, Commerce faced the dilemma of how to treat those sales in the margin calculation. The sole issue for the purpose of this opinion is whether, as a solution to that problem, Commerce's resort to "facts otherwise available" (or "facts available") with an adverse inference in its selection is reasonable (supported by substantial evidence).

[6, 7] Dillinger first challenges Commerce's determination by arguing that it notified Commerce of its difficulty in tracing the CTL plate manufacturer for some transactions and requested accommodation pursuant to 19 U.S.C. § 1677m(c)(1) and contending that Commerce never properly responded to that notification. Dillinger Br. at 20 (citations omitted). However, as explained in Dillinger France S.A. v. United States, 42 CIT ——, ——, 350 F. Supp. 3d 1349, 1364 (2018), a § 1677m(c)(1) notice to Commerce must include "a full explanation and suggested alternative forms in which" the information could be provided. Dillinger's notification to Commerce in the underlying proceeding here did not suggest any alternative form(s) of information that Commerce could use in place of the missing information. Dillinger's notification lacked the required "suggested" alternatives, and therefore did not trigger Commerce's obligations under § 1677m(c). By contrast, Commerce properly alerted Dillinger and Salzgitter of their deficiencies in providing the identities of all the manufacturers of all CTL plate sold by their affiliates. See 19 U.S.C. § 1677m(d) (upon receipt of non-compliant response to request for information, Commerce required to inform respondent promptly about "the nature of the deficiency").

Whenever information necessary to a determination is missing from the record, Commerce must rely on other facts of record as an appropriate surrogate. 19 U.S.C. § 1677e(a)(1). Subsection 1677e(a)(2) specifies that whenever an interested party or other person (A) "withholds," or (B) "fails" to provide requested information by the deadlines set for its submission and in the form and manner requested, or (C) "significantly impedes" the proceeding, or (D) provides requested information that cannot be verified, Commerce must resort to facts available. 19 U.S.C. § 1677e(a)(2).

A § 1677e(a)(2)(B) "failure" generally covers, but is not limited to, the process of responding to and providing requested information. Such a "failure" is subject to the notification to Commerce of difficulties in responding, discussed above. See 19 U.S.C. § 1677m(c). It is also subject to 19 U.S.C. § 1677m(e), which provides that Commerce "shall not decline to consider" necessary "information" if (1) the submission is timely, (2) the information is verifiable, (3) it is "not so incomplete that it cannot serve as a reliable basis for reach-

ing the applicable determination," (4) the interested party "acted to the best of its ability" to provide it, and (5) the information can be used without undue difficulties. 19 U.S.C. § 1677m(e).

[8] Plaintiffs argue that their submissions in response to Commerce's questionnaires met all of these criteria. However, the "information" to which § 1677m(e) refers, in the context of this proceeding, is the missing manufacturer information, not the remainder of "the information" that Plaintiffs submitted. Plaintiffs acknowledge that the identity of the CTL plate manufacturers is relevant to whether home market transactions should or should not be included in margin calculations, and that they did not identify all of them. Plaintiffs thus cannot escape the conclusion that they failed to satisfy § 1677m(e) with respect to that information. In short, Plaintiffs' reliance upon § 1677m(e) is misplaced.

As noted, Commerce disagreed with Plaintiffs that there was no "gap" in the record. Plaintiffs argue, however, that the affected transactions were "small," and they attempt to minimize the lack of full information on the identities of the CTL plate manufacturers and that information's relevance by arguing that there were no "gaps" in their respective, verified, affiliate home market price databases. See Salzgitter Br. at 4–16; Dillinger Br. at 20–22, 24.

However, the price data for those transactions were not the problem. Indeed, they were irrelevant to solving Commerce's conundrum of an incomplete record. The real problem for Commerce was that it could not determine whether to include or exclude the CTL plate transactions from Dillinger's and Salzgitter's margin calculations because of the missing manufacturer information. Accordingly, Commerce reasonably determined that it must resort to "facts available" pursuant to 19 U.S.C. § 1677e(a).

**B. Adverse Inference**

Having determined that it had to resort to facts available to substitute for the missing CTL plate manufacturer information, Commerce then faced the related question of whether the circumstances called for an adverse inference. Commerce concluded that the responsibility for the dilemma before it rested with respondents Dillinger and Salzgitter, who had failed to provide the necessary information. Cf. QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (adequacy of record).

[9–11] 19 U.S.C. § 1677e(b) provides that if Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information, it "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." This standard "requires the respondent to do the maximum it is able to do." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003). "The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent." Id. Pursuant to this standard, it is irrelevant whether the respondent was intentionally evasive, or whether respondent thought it had a valid legal basis for withholding the requested information. See Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1347 (Fed. Cir. 2016) ("Congress decided what requirements Commerce must fulfill in reaching its determinations, § 1677e(b), and we do not impose conditions not present in or suggested by the statute's text").

[12, 13] Respondents are required to "(a) take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called

upon to produce; (b) have familiarity with all of the records it maintains in its possession, custody, or control; and (c) conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so." Nippon Steel, 337 F.3d at 1382. Applying these standards, Commerce explained that "[t]he information in question . . . is the type of information that a large steel manufacturer such as Dillinger should reasonably be able to provide, in order to provide its customers with the mill test certificates for the CTL plate they purchase." Decision Memorandum at 64. Commerce presumed that Dillinger was "familiar with all of the records" maintained by its affiliates and that those affiliates "possessed information about the manufacturers of the CTL plate at issue, yet reported the producers of only some of the CTL plate, but not all." Id. Commerce found that "Dillinger's failure to report the requested manufacturer information, accurately and in the manner requested, using the records over which it maintained control, indicates that Dillinger did not act to the best of its ability to comply with our requests for information." Id.

Commerce reasoned similarly as to Salzgitter that the identity of the manufacturers of the CTL plate resold by its affiliate "is the type of information that a respondent should have reasonably anticipated being required to provide to its customers for quality assurance and warranty claims[,]" and at verification "Salzgitter was able to identify the manufacturer of a sale in the [separate] sales database when it attempted to obtain that information." Decision Memorandum at 33.

Commerce stressed that it provided Dillinger and Salzgitter "multiple" opportunities to remedy the deficiencies in their affiliates' downstream sales, and that Plaintiffs did not remedy those deficien-

cies. Id. at 33–34, 64. Because the additional requested information was not forthcoming, Commerce determined that Dillinger and Salzgitter had not cooperated to the best of their ability by providing the necessary information to determine how to attribute the transactions with unknown manufacturers.

Plaintiffs vigorously contest this determination. They argue that they exerted their best efforts to comply with Commerce's requests for information, and that there was no need or justification for imposing an adverse inference upon resort to facts available. Both Plaintiffs contend that it was unreasonable for Commerce to determine that they "withheld" information or "failed" to (fully) respond because Nippon Steel does not require perfection.

Dillinger argues that it exerted considerable efforts in complying with Commerce's information requests, and that "[f]ar from showing that Dillinger failed to put forth its maximum effort to provide the Department with information, the record shows that Dillinger expended Herculean efforts to provide the Department with all the information it requested." Dillinger Reply at 30–32. Dillinger also maintains that the very fact that Commerce treated all the transactions for which a manufacturer could not be identified as if they had been produced by Dillinger and included all of them in the margin calculation implies that this "fully resolved" the issue of the missing manufacturer information. Id. Dillinger's conclusion, though, is not apparent from the record. The record does not disclose whether attribution of the manufacture of all downstream sales of CTL plate in the home market to Dillinger and inclusion of unadjusted prices for all such sales in the margin calculation would have been adverse, neutral, or beneficial. Dillinger's best efforts arguments are therefore unpersuasive.

Salzgitter, for its part, emphasizes that it "did not refuse" to provide requested information. It contends that its affiliate's record-keeping systems during the POI complied with the rules and regulations that apply to its commercial activities, and that a manual search for the missing information was only theoretically possible. Further, Salzgitter argues that Commerce "verified," based on the 10-minute turn-around time it took to locate and match one CTL plate manufacturer at that time, that it would have taken 4,667 hours for Salzgitter to provide the missing manufacturer information by manually correlating its two disparate financial accounting and mill certificate management systems. See Salzgitter Reply at 4–5 (citations omitted).

Nevertheless, whether that single incident amounts to verification of the time and effort involved to "resolve" the missing manufacturer information for the affected CTL plate transactions, it neither excuses nor resolves the problem that Commerce still faced as to whether to include or exclude those transactions in Salzgitter's margin calculation. Salzgitter reiterates that in response to one of Commerce's requests, it submitted a "separate database" of CTL plate sales pertaining to transactions with missing manufacturer data. Salzgitter proposed three options to Commerce for using this "separate"/revised database in its margin calculation, namely, that Commerce could (1) treat all such sales as if they were not Salzgitter-manufactured plate, (2) treat all such sales as if they were Salzgitter-manufactured plate, or (3) treat some of the sales in the separate database as if they were Salzgitter-manufactured plate based on the ratio of plate purchased from Salzgitter affiliates versus other mills during the period of investigation, and that if any of these proposals had been adopted the dumping margins "would have been nil." Salzgitter Br. at 14–15; Salzgitter Reply at 10.

Commerce interpreted Salzgitter's proposals as arguing for "neutral" facts available to substitute for the missing CTL plate manufacturer information. See Decision Memorandum at 31. Commerce, at verification, highlighted that Salzgitter "was able to identify the manufacturer of a sale in the additional SMSD sales database when it attempted to obtain that information" for the final determination. Decision Memorandum at 32 (footnote omitted). Commerce further found that Salzgitter's three proposals lacked the type of "connectivity" or indication that any of these proposals would reasonably reflect the missing CTL plate manufacturer information for the relevant transactions.

The court cannot understand why Salzgitter did not just simply conduct a statistical analysis of the 28,000 CTL plate sales with missing manufacturer information, using a sufficient and randomized sample size that was then manually matched to the missing manufacturer information from its legacy mill certificate management system. This approach might have established a statistically valid extrapolation, rather than Salzgitter's mere speculation, of the missing manufacturer information based on the sample's actual ratio of Salzgitter-manufactured to non-Salzgitter-manufactured CTL plate sales. This approach would also have presented Commerce with an evidentiary proffer that Commerce would have been hard pressed to reasonably reject, and it would have better carried Salzgitter's burden to create an adequate record. QVD Food, supra, 658 F.3d at 1324. And the court cannot understand why Salzgitter, having failed to figure out that relatively straightforward approach out on its own, did not more completely avail itself of the full operation of 19 U.S.C. § 1677m(c)(1) & (2) and promptly disclose its difficulties to Commerce and request assistance to figure out a path to ascertain the necessary

information. An interested party's unilateral assertion of difficulty, like Salzgitter's here, rather than a more straightforward request for help, is fraught with risk. See Maverick Tube Corp. v. United States, 857 F.3d 1353, 1360–61 (Fed. Cir. 2018) (affirming Commerce's application of AFA where respondent failed to indicate that it was unable to provide relevant information nor suggest alternative for provision of that information).

In conclusion, the record does not appear as detailed with Plaintiffs' efforts to obtain the missing information as they argue before the court, and on those points the court mainly confronts only self-serving statements or interpretations of the record. Importantly, Plaintiffs fail to identify where the record indicates the effect, if any, on Dillinger's and Salzgitter's margins if complete manufacturer information had been provided for all home market CTL plate sales. Accordingly, taking the record as a whole, Commerce's imposition of an adverse inference in the selection of facts available is reasonable.

### C. The Selected Adverse
### Facts Available

As partial AFA, for the final margin calculations Commerce applied the highest non-aberrational net price observed among Plaintiffs' downstream home market sales for which the identity of the manufacturer of the CTL plate had not been reported to all such sales. Decision Memorandum at 10, 11, 34, 64. Given this determination, Plaintiffs challenge whether it was reasonable for Commerce to substitute downstream price information covering CTL plate for which manufacturer information was missing from the record.

In Dillinger France, supra, the court was confronted with a near identical issue. Compare Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Carbon and Alloy Steel

Cut-To-Length Plate from France, A-427-828, at Cmt. 5 (Dep't of Commerce Mar. 29, 2017), available at https://enforcement. trade.gov/frn/summary/france/2017-06627-1.pdf (last visited this date), with Decision Memorandum at Cmts. 2 & 20; see also Dillinger France, 42 CIT at ——, 350 F. Supp. 3d at 1361–64 (discussing application of partial AFA to Dillinger France for failure to report manufacturer of CTL plate in certain downstream home market sales of affiliates). Plaintiff in that case argued that it (1) put forth its best efforts to provide the price and manufacturer data requested by Commerce, and that (2) for transactions where the manufacturer data was unknown but the sales price was contained in the record, Commerce impermissibly replaced the record sales prices with the highest non-aberrational net price among that plaintiff's downstream home market sales. There, the court upheld Commerce's decision that an adverse inference was warranted, but also noted that "Commerce did not explain what authority permitted it to replace known information with adverse facts available[,]" 42 CIT at ——, 350 F. Supp. 3d at 1364, and remanded for further consideration. Here, the court does not reach the same conclusion, as Commerce has clear statutory authority pursuant to 19 U.S.C. § 1677m(d) to "disregard all or part of the original and subsequent responses" in an adverse inference scenario. 19 U.S.C. § 1677m(d) (emphasis added).

In any event, and importantly as to this issue, on remand Commerce "relied on the Court's statement that 'the reliability of the reported sales prices has not been called into question and there is no informational gap in the sale prices for Commerce to fill." See Final Results of Redetermination Pursuant to Court Remand at 6, Dillinger France S.A. v. United States, No. 17-00159 (CIT Mar. 11, 2019), ECF No. 56-1. Commerce elaborated that "[g]iv-

en this holding, and contrary to Nucor's argument that we should use the highest non-aberrational price as partial AFA, we find that we cannot ignore record information that is not in dispute, pursuant to the facts on the record of this investigation and the Court's decision." Id. As a result, Commerce changed its application of partial AFA and "1) treated these downstream home market sales transactions as Dillinger-France produced plate, rather than treating these transactions as sales of plate produced by an unrelated manufacturer; and 2) relied on the sales prices as reported." Id. at 6–7. However, in doing so, Commerce found that "because of the small number of affected transactions whose prices are used as a basis for normal value and which are actually compared to U.S. sale prices, these home market transactions have no measurable impact on Dillinger-France's estimated weighted-average dumping margin." Id. at 6.

Reasoned decision-making requires a certain measure of consistency, which is not present across the France and Germany investigations. As noted, the cases share near identical (almost verbatim) Issues and Decision Memoranda on the AFA issue. The court therefore orders Commerce and the parties to review whether the same correction made in Dillinger France would have any material effect on the margins in this case, or if it would be immaterial. If the parties conclude that a similar correction as ordered in Dillinger France would materially affect the margins, the court will then remand this matter to Commerce to make a similar adjustment to its application of partial AFA to Dillinger and Salzgitter as it did in the Dillinger France remand with resulting adjustment of the investigation's margins.[3] Accordingly, it is hereby

**ORDERED** that Commerce shall determine whether a similar correction as or-

dered in Dillinger France would materially affect the margins in this action; and it is further

**ORDERED** that Commerce shall notify the court with the results of its analysis on or before August 7, 2019.



**NEW IMAGE GLOBAL, INC., Plaintiff,**

v.

**UNITED STATES, Defendant,**

**Slip Op. 19-90**
**Consol. Court No. 15-00175**

United States Court of International Trade.

July 23, 2019

**Background:** Importer filed suit challenging procedures used by Customs and Border Protection (CBP) to weigh importer's tobacco wrappers in order to assess federal excise tax. Parties cross-moved for summary judgment.

**Holdings:** The Court of International Trade, Jane A. Restani, Senior Judge, held that:

(1) CBP impliedly consented to judicial review of claims that were raised in importer's summary judgment motion, but not made in its complaint;

(2) CBP's consideration of ruling by Alcohol and Tobacco Tax and Trade Bureau when it determined that wrappers were subject to tax based on their weight that included volatile flavor additives was in accordance with law;

---

**3.** Including the ''All Others'' rate. See thys-    senkrupp Br. at 4.

*AG Der Dillinger Huttenwerke, v. United States*
Final Results of Redetermination Pursuant to Court Remand Certain Carbon and
Alloy Steel Cut-to-Length Plate from Germany
Court No. 17-00158, Slip. Op. 19-87 (CIT July 16, 2019)

Appx124-Appx128

Barcode:3898115-01 A-428-844 REM - Remand  -  CIT 17-00158

A-428-844
Remand
Slip. Op. 19-87
**Public Document**
E&C/OII:  EE

### Final Results of Redetermination Pursuant to Court Remand
### Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany
### *AG Der Dillinger Huttenwerke, v. United States*
### Court No. 17-00158, Slip. Op. 19-87 (CIT July 16, 2019)

**Summary**

The Department of Commerce (Commerce) has prepared these final results of redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court) in *AG Der Dillinger Huttenwerke, v. United States*, Court No. 17-00158, Slip. Op. 19-87 (July 16, 2019) (*Dillinger Germany*) and the Court's subsequent remand order dated September 6, 2019 (Sept. 6, 2019 Order).  This action arises out of the final determination in the less-than-fair-value (LTFV) investigation of *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany:  Final Determination of Sales at Less Than Fair Value*, 82 FR 16360 (April 4, 2017) (*Final Determination*); *see also Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan:  Amended Final Affirmative Antidumping Determinations for France, the Federal Republic of Germany, the Republic of Korea and Taiwan, and Antidumping Duty Orders*, 82 FR 24096 (May 25, 2017) (*Amended Final Determination*).  The sole issue remanded by the Court at this time is the application of partial adverse facts available (AFA) pursuant to section 776 of the Tariff Act of 1930, as amended (the Act) to certain downstream home market sales reported by the mandatory respondents in the LTFV investigation:  AG Der Dillinger Hüttenwerke (Dillinger); and Ilsenburger Grobblech GmbH, Salzgitter Mannesmann

Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH (collectively, Salzgitter).

On July 16, 2019, the Court upheld Commerce's application of partial AFA, but instructed Commerce to recalculate the margins from the LTFV investigation for Dillinger and Salzgitter.  Specifically, the Court instructed Commerce to determine whether the same adjustment regarding the application of partial AFA made in *Dillinger France*[1] would materially affect the margins for Dillinger and Salzgitter, and to notify the Court of the results.[2]  Further, the Court held that if the adjustment would materially affect the margins, the Court would then issue a remand order directing Commerce to make the adjustment, and include any change to the all others rate.[3]  In response to these instructions, on August 7, 2019, Commerce applied the same partial AFA methodology at issue in *Dillinger France*, *i.e.*, Commerce:  (1) continued to treat all unidentified manufacturer sales as produced by the respondent, and (2) relied on the reported sales prices.  Commerce reported to the Court that, based on its recalculations, the margin for Dillinger was not materially affected, while the margin for Salzgitter was materially affected.  As a result, on September 6, 2019, the Court instructed Commerce to recalculate the margin for Salzgitter.[4]

On September 16, 2019, Commerce released the draft results of redetermination recalculating Salzgitter's margin to all interested parties, and invited parties to comment.  On September 25, 2019, we received comments from Nucor Corporation (Nucor), Salzgitter, and Friedr. Lohmann GmbH/thyssenkrupp Steel Europe AG (Lohmann/thyssenkrupp).  Salzgitter did

---

[1] *See Dillinger France S.A., v. United States*, Slip Op. 18-150 (CIT 2018) *(Dillinger France); see also* Final Results of Redetermination Pursuant to Court Remand, Certain Carbon and Alloy Steel Cut-to-Length Plate from France, Dillinger France S.A. v. United States, Court No. 17-00159, Slip Op. 18-150 (CIT October 31, 2018), dated March 11, 2019.

[2] *See Dillinger Germany* at 17-18.

[3] *Id.* at 18 and n.3.

[4] *See* Sept. 6, 2019 Order.

not object to Commerce's draft results of redetermination.  Nucor's and

Lohmann/thyssenkrupp's comments are summarized below.

**Interested Party Comments**

*Nucor's Comments*

- There are critical distinctions between this proceeding and *Dillinger France*.  In *Dillinger France*, Commerce explained that there were only a small number of affected transactions and the adjustment to the application of AFA there had no impact on Dillinger France's margin.[5]
- In this case, a substantial number of sales are affected, and the modification removes Salzgitter from the order.  These factual distinctions justify a different approach here than in *Dillinger France*.
- The Court did not dispute Commerce's application of AFA in the *Final Determination*. However, Commerce's draft remand determination not only fails to fulfill the purpose of AFA to provide respondents with an incentive to cooperate with Commerce in unfair trade proceedings, but also fails to apply AFA for Salzgitter's refusal to cooperate to the best of its ability in the less-than-fair-value (LTFV) investigation.[6]
- The results in the draft remand, which result in a zero margin and thus Salzgitter's exclusion from the antidumping duty order, do not provide any deterrent effect and permit Salzgitter to avoid the consequences for its non-cooperation.  This result would undermine Commerce's ability to induce parties' compliance in future proceedings.
- Commerce must, therefore, defend its application of AFA in the *Final Determination* by issuing its final remand determination under protest and include a full explanation why the Court's approach is not consistent with the law or facts.

*Lohmann/thyssenkrupp's Comments*

- According to the Court's July 16 opinion, Commerce was ordered not only to adjust the margins for Dillinger and Salzgitter, but also to make adjustments to the "all others" rate.[7]
- Contrary to the Court's instructions, Commerce's draft results of redetermination do not adjust the "all others" rate as a result of the adjustment to Salzgitter's margin.  Therefore, Commerce should recalculate the "all others" rate to incorporate this adjustment.
- While the Court may remand this case to Commerce after adjudicating remaining issues, Commerce should not wait to revise the "all others" rate.  Doing so in the final remand determination would serve the interests of judicial and administrative economy.

---

[5] *See Dillinger France*, at 5-6.
[6] *See* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No.1 03-316, vol. I, at 870 *(1994), reprinted in* 1994 U.S.C.C.A.N. 4040, 4199; *Maverick Tube Corp. v. United States,* 857 F.3d 1353, 1360 (CAFC 2017) (quoting *Elli De Cecco Di Filippo Fara S. Martin S.p.A. v. United States,* 216 F.3d 1037, 1032 (CAFC. 2000)); *Nan Ya Plastics Corp. v. United States,* 810 F.3d 1333, 1348 (Fed. Cir. 2016); and *ArcelorMittal USA LLC v. United States*, Consol. Court No. 16-00168, Slip Op. 18-121 at 20 (CIT 2018).
[7] *See Dillinger Germany*, at 18, n.3.

Barcode:3898115-01 A-428-844 REM - Remand  -  CIT 17-00158

*Commerce's Position*

We have evaluated the comments submitted by Nucor, Salzgitter, and Lohmann/thyssenkrupp.  We agree with Nucor that the facts of *Dillinger Germany* differ significantly from those of *Dillinger France*, where there were only a small number of downstream sales transactions which were compared to U.S. sales and the resulting margin did not change.  In *Dillinger Germany*:  1) the number of Salzgitter's reported downstream sales of cut-to-length plate with missing manufacturer information was 28,000; and 2) the result of accepting the data as reported for these sales is that Salzgitter's margin becomes zero, meaning that Salzgitter will be excluded from the order.

Additionally, Commerce agrees with Nucor that the Court's order did not provide Commerce with the opportunity to consider an alternative partial AFA methodology, in light of the factual differences between the two cases.  We also agree that it is the role of Commerce to consider, in the first instance, whether a particular AFA methodology complies with the statute's directive in any particular case.  Pursuant to the Court's order, Commerce was unable to consider whether an alternative methodology would have been more appropriate in the instant case.  Due to this limitation, Commerce further agrees with Nucor that the Court's order deprives Commerce of the ability to further consider whether the purpose of section 776 of the Act, *i.e.*, inducing cooperation, has been satisfied.  Accordingly, it is under respectful protest[8] that Commerce has followed the Court's instructions directing us to recalculate Salzgitter's margin utilizing the partial AFA methodology discussed above.

With respect to Lohmann/thyssenkrupp's arguments concerning the "all-others" rate, we have recalculated the rate in this final remand determination, as discussed below.

---

[8] *See Viraj Group v. United States*, 476 F.3d 1349 (Fed. Cir. 2007).

**Final Remand Results**

Consistent with the instructions of the Court, under respectful protest, we have recalculated Salzgitter's margin in the same manner as in the draft results of redetermination. In addition, we have also recalculated the "all-others" rate. As a result of our redetermination, Salzgitter's estimated weighted-average dumping margin is 0.00 percent. In accordance with section 735(c)(5)(A) of the Tariff Act of 1930, as amended, which provides that the estimated "all-others" rate shall be an amount equal to the weighted average of the estimated weighted-average dumping margins established for exporters and producers individually investigated, excluding any zero, and *de minimis* margins, we based the "all-others" rate on the estimated weighted-average dumping margin calculated for Dillinger, the other mandatory respondent in the underlying LTFV investigation. Accordingly, as a result of our redetermination, the "all-others" rate is 5.52 percent.[9]

Should the Court sustain this redetermination, Commerce will publish an amended final determination with the revised margins.

10/8/2019

X _____

Signed by: JEFFREY KESSLER

_____
Jeffrey I. Kessler
Assistant Secretary
  for Enforcement and Compliance

---

[9] *See Amended Final Determination.*

*AG der Dillinger Hüttenwerke v. United States*,
534 F. Supp. 3d 1403 (Ct. Int'l Trade 2021)

Appx129-Appx140

ment on the agency record and grants judgment on the agency record in favor of the government and the Coalition. *See* US-CIT R. 56.2(b) (authorizing the court to enter judgment in favor of a party opposing a motion for judgment on the agency record, "notwithstanding the absence of a cross-motion"). A separate judgment will enter. *See* USCIT R. 58(a).



**AG DER DILLINGER
HÜTTENWERKE,
Plaintiff,**

**and**

**Ilsenburger Grobblech GMBH, Salzgitter Mannesmann Grobblech GMBH, Salzgitter Flachstahl GMBH, Salzgitter Mannesmann International GMBH, and Friedr. Lohmann GMBH, Consolidated Plaintiffs,**

**and**

**Thyssenkrupp Steel Europe AG, Plaintiff-Intervenor,**

**v.**

**UNITED STATES, Defendant,**

**Nucor Corporation and SSAB Enterprises LLC, Defendant-Intervenors.**

**Slip Op. 21-101
Consol. Court No. 17-00158**

United States Court of International Trade.

August 18, 2021

**Background:** Exporters filed suit challenging Department of Commerce's final affirmative antidumping duty investigation of carbon and alloy steel cut-to-length (CTL) plate from Federal Republic of Germany. Exporters moved for judgment on agency record. The Court of International Trade, Leo M. Gordon, J., 399 F.Supp.3d 1247, sustained in part and remanded. On remand, Department of Commerce issued final results of remand redetermination.

**Holdings:** The Court of International Trade, Gordon, J., held that:

(1) decision not to rely on exporter's actual cost data violated antidumping statute;

(2) coke consumption values distorted calculations in applying major input rule;

(3) treatment of general and administrative (G&A) expenses required further explanation; and

(4) application of adverse facts available (AFA) required further explanation.

Remanded.

---

**1. Customs Duties ⚖84(6)**

When reviewing agency antidumping determinations, findings, or conclusions for substantial evidence, Court of International Trade assesses whether the agency action is reasonable given the record as a whole.    Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

**2. Customs Duties ⚖84(6)**

"Substantial evidence," as required to uphold Department of Commerce's antidumping determination, is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

See publication Words and Phrases for other judicial constructions and definitions.

**3. Customs Duties ⚖84(6)**

"Substantial evidence," as required to uphold Department of Commerce's anti-

dumping determination, is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent the agency's finding from being supported by substantial evidence. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

> See publication Words and Phrases for other judicial constructions and definitions.

### 4. Customs Duties ⚖84(6)

Substantial evidence, as required to uphold Department of Commerce's antidumping determination, is best understood as a word formula connoting reasonableness review. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

### 5. Customs Duties ⚖84(6)

When addressing a substantial evidence issue raised by a party, Court of International Trade analyzes whether the challenged agency antidumping action was reasonable given the circumstances presented by the whole record. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

### 6. Administrative Law and Procedure ⚖2249

### Customs Duties ⚖84(6)

The two-step framework provided in *Chevron* governs judicial review of Department of Commerce's interpretation of the antidumping statute.

### 7. Customs Duties ⚖21.5(3)

Department of Commerce's cost of production (COP) decision, in final results of remand redetermination for affirmative antidumping duty investigation of carbon and alloy steel cut-to-length (CTL) plate from Germany, to rely on exporter's internal factory results report to reallocate cost between exporter's prime and non-prime plates, was contrary to antidumping stat-

ute, since Commerce relied on information reflecting exporter's likely selling price, rather than actual cost data. Tariff Act of 1930 § 773, 19 U.S.C.A. §§ 1677b(e), 1677b(f)(1)(A).

### 8. Customs Duties ⚖21.5(3)

Department of Commerce's selection of consumption values over purchase prices for determining coke value under major input rule, in final results of remand redetermination for affirmative antidumping duty investigation of carbon and alloy steel cut-to-length (CTL) plate from Germany, did not contravene antidumping regulation that did not require Commerce to use unaffiliated purchase prices as basis for valuation; Commerce preferred reported consumption values for coke as more accurate than recorded purchase prices in that consumption values reflected both affiliated and unaffiliated suppliers, thereby enabling comparison, and because another exporter also reported its cost of production (COP) information on consumption value basis. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(f)(3); 19 C.F.R. § 351.407(b).

### 9. Customs Duties ⚖21.5(3)

Department of Commerce's use of coke consumption values in applying major input rule, in final results of remand redetermination for affirmative antidumping duty investigation of carbon and alloy steel cut-to-length (CTL) plate from Germany, unreasonably distorted coke value calculations, since Commerce's comparison of affiliated and unaffiliated consumption values failed to appropriately account for contemporaneity, freight expenses, credit note, and general and administrative (G&A) and interest expenses. Tariff Act of 1930 § 773, 19 U.S.C.A. § 1677b(f)(3); 19 C.F.R. § 351.407(b).

**10. Customs Duties** ⟜21.5(3)

Department of Commerce's adjustment of cost of production (COP) of inputs and services that exporter provided to affiliated producers to include portion of exporter's general and administrative (G&A) expenses required further explanation, in final results of remand redetermination for affirmative antidumping duty investigation of carbon and alloy steel cut-to-length (CTL) plate from Germany; Commerce failed to reasonably address exporter's argument that it made no sense to increase G&A expenses at one level and offset them by income at another level as adjustment resulted in illogical multiplication of G&A expenses by having exporter charge itself its own G&A expenses and then have those expenses flow into total cost of manufacture for end product which was again charged with G&A expenses.

**11. Customs Duties** ⟜84(8.1)

Department of Commerce's recalculation of exporter's antidumping duty margin, in final results of remand redetermination for affirmative antidumping duty investigation of carbon and alloy steel cut-to-length (CTL) plate from Germany, while noting that remand order did not provide Commerce with opportunity to consider alternative partial adverse facts available (AFA) methodology due to factual differences with parallel proceeding concerning French investigation, warranted remand for further explanation as to why alternative AFA methodology would be appropriate, since Commerce failed to explain why virtually identical decisions and AFA treatment were issued for two investigations but then Commerce argued on remand that there were material factual differences across both investigations.

───────

Marc E. Montalbine, Gregory S. Menegaz, and Alexandra H. Salzman, deKieffer & Horgan, PLLC of Washington, D.C. for Plaintiff AG der Dillinger Hüttenwerke.

Robert L. LaFrankie, Crowell & Moring LLP, of Washington, D.C. for Plaintiff-Intervenor thyssenkrupp Steel Europe AG.

Kelly Ann Krystyniak, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, D.C. for Defendant United States. On the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Tara K. Hogan, Assistant Director, and Vito S. Solitro, Trial Attorney. Of counsel were Natan P. L. Tubman and Ayat Mujais, Attorneys, U.S. Department of Commerce, Office of Chief Counsel for Trade Enforcement and Compliance of Washington, D.C.

Alan H. Price, Christopher B. Weld, and Stephanie M. Bell, Wiley Rein LLP of Washington, D.C. for Defendant-Intervenor Nucor Corporation.

## OPINION and ORDER

GORDON, Judge:

This consolidated action involves a challenge to the final determination in the antidumping duty investigation conducted by the U.S. Department of Commerce ("Commerce") of certain carbon and alloy steel cut-to-length plate ("CTL plate") from the Federal Republic of Germany. See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany, 82 Fed. Reg. 16,360 (Dep't of Commerce Apr. 4, 2017) ("Final Determination"), and accompanying Issues and Decision Memorandum, A-428-844 (Mar. 29, 2017), http://enforcement.trade.gov/frn/summary/germany/2017-06628-1.pdf (last visited this date) ("Decision Memorandum").

Before the court are the motions for judgment on the agency record of Plaintiff AG der Dillinger Hüttenwerke ("Dillinger") and Consolidated Plaintiffs Ilsenburger Grobblech GMBH, Salzgitter Mannesmann Grobblech GMBH, Salzgitter Flachstahl GMBH, and Salzgitter Mannesmann International GMBH (collectively "Salzgitter"). See Pl. Dillinger Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R., ECF No. 40[1] ("Dillinger Br."); Salzgitter Consol. Pls.' Rule 56.2 Mot. for J. on the Agency R., ECF No. 43 ("Salzgitter Br."); Def.'s Mem. Opp. Pls.' Rule 56.2 Mots. for J. on the Admin. R., ECF No. 55 ("Def.'s Resp."); Def.-Int. Nucor Corporation Resp. Br., ECF No. 58; Reply Br. of Pl. Dillinger, ECF No. 62 ("Dillinger Reply"); Reply in Supp. of Consol. Pls.' Rule 56.2 Mot. for J. on the Agency R., ECF No. 64 ("Salzgitter Reply"). Plaintiff-Intervenor thyssenkrupp Steel Europe AG ("thyssenkrupp") also filed a brief in support of Plaintiff Salzgitter's Rule 56.2 Motion. See Pl.-Int.'s Memorandum of Law in Support of Pl. Salzgitter's Rule 56.2 Mot., ECF No. 41 ("thyssenkrupp Br."). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2018),[2] and 28 U.S.C. § 1581(c) (2018).

The court previously addressed Dillinger and Salzgitter's claims regarding the application of partial adverse facts available by Commerce for certain home market CTL plate sales made by Dillinger and Salzgitter's respective affiliates. See AG der Dillinger Hüttenwerke v. United States, 43 CIT ——, 399 F. Supp. 3d 1247 (2019) ("Dillinger I"). Subsequently, the court remanded the action to Commerce. See Remand Order, ECF No. 83. Before the court are Commerce's Final Results of Redetermination Pursuant to Court Remand ("Remand Results"), ECF No. 85-1, filed pursuant to Dillinger I and the Remand Order. See Def.-Int. SSAB Enter. LLC's Comments Opposing Remand Results, ECF No. 96; Def.-Int. Nucor Corp.'s Revised Comments on Remand Determ., ECF No. 100; Def.'s Resp. to Comments on Remand Redeterm., ECF No. 104; Consol. Pls.' Resp. Comments in Support of Remand Determ., ECF No. 106.

The court again remands the Final Determination to Commerce for reconsideration of Dillinger's challenges to non-prime CTL plate cost shifting, application of the major input rule, treatment of certain general and administrative ("G&A") expenses, and the AFA issue. The court, in a separate opinion, see AG der Dillinger Huttenwerke v. United States, 45 CIT ——, Slip Op. 21-102 (Aug. 18, 2021), sustains the Final Determination as to Dillinger's challenges on differential pricing and adjustment of interest expenses to include a portion of Dillinger's parent holding company's interest expense.

### I. Standard of Review

[1–5] The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006). Substantial evidence has been described as

---

1. All citations to the parties' Rule 56.2 briefs and the agency record are to their confidential versions unless otherwise noted.

2. Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2021). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2021).

[6] Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. See United States v. Eurodif S.A., 555 U.S. 305, 316, 129 S.Ct. 878, 172 L.Ed.2d 679 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. Discussion

### A. Cost Shifting (Non-Prime Plate Adjustment)

[7] Dillinger challenges Commerce's cost of production ("COP") determination

for its prime and non-prime plates. Dillinger Br. at 33–37; see also 19 U.S.C. § 1677b(e) & 19 U.S.C. § 1677b(f)(1)(A). Commerce found that Dillinger uses an internal "factory results report" to "value[ ] non-prime products at their likely selling price, and uses this value as an offset to prime production." Decision Memorandum at 90 (footnote omitted). Commerce considered it reasonable to rely on this report to reallocate cost between prime and non-prime plates. Id. at 89–90. Dillinger argues that this reallocation contravened the statute and applicable case law. See Dillinger Br. at 33–37.

The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has held that Commerce's decision to rely on information reflecting a respondent's "likely selling price," rather than actual cost data, violates the requirements of § 1677b(f). Dillinger France S.A. v. United States, 981 F.3d 1318, 1321–24 (Fed. Cir. 2020) ("Dillinger France II"). Accordingly, the court remands this issue to Commerce to reconcile its COP determination with the Federal Circuit's decision in Dillinger France II.

### B. Major Input Rule (re: Blast Furnace Coke)

Dillinger describes itself as an "integrated" steel mill, meaning that it performs all steps necessary for producing steel internally from raw materials, such as iron ore and blast furnace coke, to the finished rolled steel product. Dillinger Br. at 37. During the period of investigation ("POI"), Dillinger obtained pig iron, a major raw material input used to produce CTL plate, from its affiliated producer, Rogesa Roheisengesellschaft ("Rogesa"). Rogesa obtained blast furnace coke, a major raw material input used to produce pig iron, from an affiliated producer, Zentralkokerei Saar Gesellschaft ("ZKS"). See Decision Memorandum at 90.

[8] Dillinger challenges Commerce's use of Rogesa's affiliated and unaffiliated consumption values in applying the major input rule. See Dillinger Br. at 39–44; Dillinger Reply at 18–19; see also 19 U.S.C. § 1677b(f)(3) (major input rule); 19 C.F.R. § 351.407(b). Dillinger argues that Commerce deviated from the requirements of the applicable regulation, 19 C.F.R. § 351.407(b), when it selected Rogesa's reported consumption values instead of Rogesa's spot purchases of coke from unaffiliated suppliers as the basis for determining the value of coke under the major input rule. See Dillinger Br. at 38–39; Dillinger Reply at 17–20. The court does not agree.

19 C.F.R. § 351.407(b) provides that Commerce "normally" will determine the value of a major input purchased from an affiliated person based on the "higher" of the price paid to an affiliated party, the amount usually reflected in sales of the major input, or the affiliate's cost of producing the input. The regulation does not "require" Commerce to use unaffiliated purchase prices as the basis for the valuation. Here, Commerce explained that Rogesa's consumption values were usable as opposed to most companies Commerce deals with that typically "co-mingle the physical inventory and records for purchases of raw materials from differing suppliers, and thus are not able to provide consumption value information by input and supplier." Decision Memorandum at 93. Commerce preferred the reported Rogesa consumption values for coke as more accurate than the recorded purchase prices because the consumption values reflected both affiliated and unaffiliated suppliers (enabling a comparison) and because ZKS also reported its COP information on a consumption-value basis. See id. Since Rogesa provided consumption values for its coke by supplier, Commerce reasonably decided to use those values in applying the major input rule. Accordingly, the court is not persuaded by Dillinger's argument that Commerce contravened § 351.407(b) by selecting consumption values over purchase prices for determining coke value under the major input rule.

Dillinger next argues that Commerce's use of coke consumption values unreasonably distorted the coke value calculations because Commerce's comparison of affiliated and unaffiliated consumption values failed to properly account for (1) contemporaneity, (2) freight expenses, (3) a certain credit note that ZKS issued to Rogesa, and (4) G&A and interest expenses. See Dillinger Br. at 39–42; Dillinger Reply at 22–25.

[9] Dillinger notes that the recorded consumption values reflect the value of coke purchased "in large part prior to the POI." Dillinger Br. at 40. Dillinger also notes that Rogesa's purchases of blast furnace coke during the POI from unaffiliated suppliers involved different countries and significantly lower prices than purchases prior to the POI. Id. Dillinger argues that because Rogesa's consumption values reflect the value of coke purchased prior to the POI "at a time when market prices were considerably higher and are obviously influenced by higher freight costs," the consumption values "cannot reasonably be used as an indicator of what the transfer price of ZKS' coke sales during the POI would have been had it not been affiliated with R[ogesa]." Id. Defendant notes that "[n]othing in the regulation places a temporal limitation on the data that Commerce may use." Def.'s Resp. at 36. Defendant adds that "Commerce's selection of consumption values from Rogesa's records, some of which were during the [POI], ensured that the transfer prices reflected the market under consideration, of which Rogesa was indisputably a participant." Id.

These two responses, although true in the abstract, do not address the issue Dillinger is arguing—that the consumption values selected distort the input calculation. The regulation, of course, has an implicit temporal limitation on the data Commerce selects, and it is foolish for Commerce to contend otherwise. Likewise, saying that some of the records were during the POI does not respond to Dillinger's contention that most (or "in large part") were not. The upshot is that the court cannot sustain this aspect of Commerce's decision as reasonable. More explanation is needed. The court will therefore remand this issue to Commerce for further analysis and explanation, and if necessary, reconsideration.

As for freight expenses (and potential distortions), Commerce acknowledged that it was necessary to adjust Rogesa's coke consumption values to ensure that those values were on the same basis as unaffiliated consumption values. See Decision Memorandum at 93. Commerce explained:

> Rogesa's coke consumption values from ZKS are freight exclusive (because both companies are located on the same factory premises), while the unaffiliated coke consumption values are freight inclusive. As a result, to ensure that the comparison between the affiliated and unaffiliated consumption values is on the same basis, we adjusted the unaffiliated consumption values to reflect freight-exclusive values. Therefore, for the final determination, we adjusted Rogesa's reported coke cost to reflect the higher of . . . Rogesa's consumption value of coke from its affiliate, ZKS, Rogesa's adjusted consumption value of coke from unaffiliated suppliers, or the reported COP of coke.

Id.

Dillinger contends that Commerce did not have information on the historic inventory values Commerce was using net of freight expenses because it never requested such information, having changed its methodology for the final determination. Dillinger Br. at 40. Dillinger explains that Rogesa's inventory of unaffiliated coke purchases made prior to the POI came from different countries than its unaffiliated purchases of coke during the POI, and thus they involved significantly different per ton freight costs. See id. at 41. Dillinger highlights that Commerce calculated an average per ton freight cost based upon purchases of blast furnace coke from unaffiliated suppliers during the POI. See id. at 40–41. Therefore, according to Dillinger, Commerce's freight adjustment to Rogesa's unaffiliated consumption values unreasonably assumes that the freight expense for its pre-POI inventory is the same as that for unaffiliated purchases of coke during the POI. See id. Adjusting consumption values to ensure either a freight inclusive or freight exclusive comparison does seem reasonable. The court remands this issue to Commerce for further analysis and explanation, and, if necessary, reconsideration.

Dillinger also argues that Commerce erred in multiplying the freight cost per ton by the quantity of coke on a dry basis and should have adjusted for the fact that the freight factor used by Commerce was based on the wet weight of coke. Dillinger Br. at 42; Dillinger Reply at 22. Commerce did not address this issue below, believing it was moot because Commerce used reported coke consumption values that were on the same weight basis, rather than purchase prices that may have reflected either a dry-weight or wet-weight basis. See Decision Memorandum at 93. Commerce though does need to address the potential unreasonableness of using a wet-weight basis freight factor for the adjustment of dry-weight basis consumption values. Therefore, the court remands this issue to

Commerce for further analysis and explanation, and if necessary, reconsideration.

As for the credit note (and its potential distortionary effect), Commerce reduced the reported affiliated coke consumption values used in applying the major input rule by the credit note issued by ZKS to Rogesa. See id. Dillinger challenges this adjustment, which resulted in an additional cost to ZKS's reported cost of manufacture. See Dillinger Br. at 41–42; Dillinger Reply at 24. Defendant explains that to the extent Commerce's methodology resulted in a larger adjustment associated with ZKS's coke sales to Rogesa, it nevertheless more accurately reflects the average unit consumption values. Def.'s Resp. at 39. This though is a post hoc rationale that the court cannot sustain. See Motor Vehicle Mfrs. Ass'n v. State Farm Ins., 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ("courts may not accept appellate counsel's post hoc rationalizations for agency action" (citing Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962))). Commerce should have requested a remand to address this issue directly in the first instance (if in fact it has a material effect on the margin). Accordingly, the court remands this issue to Commerce for further analysis and explanation, and if necessary, reconsideration.

Dillinger also maintains that to have a comparison on the same basis, Commerce must use the "full value including G&A and INTEX (interest expenses) in analyzing whether the affiliated transfer price is below comparable market value." Dillinger Br. at 41. Defendant responds that Commerce's use of consumption values as a basis for comparison obviated the need to make Dillinger's suggested adjustments to G&A and interest expenses, Def.'s Resp. at 39, but here again, this is post hoc rationalization of agency counsel, and the court

will therefore remand this issue to Commerce for further consideration.

### C. Expenses for Inputs & Services Provided to Affiliates

[10]  Commerce adjusted the COP of the inputs and services that Dillinger provided to Rogesa and ZKS to include a portion of Dillinger's G&A expenses. Decision Memorandum at 96. Commerce explained:

> Because the G&A expense ratio is calculated using Dillinger's unconsolidated financial statements, the transactions between Dillinger and its affiliates, Rogesa and ZKS, have not been eliminated from these financial statements. Thus, Dillinger's cost of goods sold includes both the cost of the inputs and services that Dillinger sold to Rogesa and ZKS, as well as the cost of the CTL plate that Dillinger sold to third parties. In producing CTL plate, Dillinger consumes inputs produced by Rogesa and ZKS (e.g., pig iron); thus, embedded in the cost of the CTL plate Dillinger sold is also the cost the inputs provided by Rogesa and ZKS, including the inputs and services that Rogesa and ZKS obtained from Dillinger.

> Therefore, in calculating the G&A expense ratio, we have essentially included the cost of the inputs and services provided to Rogesa and ZKS in the denominator twice; once when they were sold to the affiliates, and again when Dillinger consumed the inputs provided by Rogesa and ZKS.

> Based on this calculation, in order to account for all of Dillinger's G&A expenses, it is appropriate to apply Dillinger's G&A expense ratio to both the costs of: 1) the CTL plate; and 2) the inputs and services. As a result, we disagree with Dillinger that application of the G&A expense ratio to the cost of the inputs and services Dillinger provided to

its affiliates results in the double counting of Dillinger's G&A expenses.
Id.

Dillinger provided the labor to Rogesa and ZKS for production of blast furnace coke and pig iron. Commerce found that the provision of these services by Dillinger, and the cross-charges for them by Dillinger to its affiliates and from its affiliates to Dillinger, is ultimately both cost and income to Dillinger. Dillinger argues that "any increase in the transfer price would merely result in other income being realized by Dillinger" and "[t]herefore it makes no sense to increase G&A expenses at one level and offset them by income at another level." Dillinger Br. at 43. Dillinger points to Commerce's long-standing practice of using "other income" to offset to G&A expenses. See Circular Welded Non-Alloy Steel Pipe from the Republic of Korea, 79 Fed. Reg. 37,284 (Dep't of Commerce July 1, 2014) (Final Results), and accompanying Issues and Decision Memorandum at cmts. 3 & 4.

Commerce, however, explained that its determination to rely on Dillinger's unconsolidated financial statements as the basis for the G&A expense ratio is consistent with its past practice. See Decision Memorandum at 96 & n.279 (citing Large Residential Washers from the Republic of Korea, 77 Fed. Reg. 75,988 (Dep't of Commerce Dec. 26, 2012), and accompanying Issues and Decision Memorandum ("Korean Washers IDM") at cmt. 7). Commerce's "methodology is to calculate the rate based on the company-wide G&A costs incurred by the producing company allocated over the producing company's company-wide cost of sales, and not on a consolidated, divisional, or product-specific basis." Korean Washers IDM at 44. When relying on unconsolidated financial statements as the basis of the G&A expense ratio, Commerce must account for trans-

actions between affiliates that otherwise are not eliminated from those statements. Decision Memorandum at 96 & n.280.

Commerce appears to have first determined the difference between the transfer price and market price for pig iron. Def.'s Resp. at 42 (citing Final Dillinger COP Memorandum, CD 767, Attach. 3). Commerce then multiplied the above difference by the percentage of Rogesa's operations related to the production of pig iron, and further multiplied this by the percentage of pig iron used in the cost of manufacturing CTL plate to calculate the total adjustment to add to Dillinger's cost of manufacturing. Id. The calculated total reflects only the percentage of Rogesa's production pertaining to pig iron used in the manufacture of CTL plate. Id. Commerce used the same methodology for its calculations with respect to ZKS and coke. Id.

Defendant dismisses Dillinger's argument that Commerce allegedly "treats the entire absolute cost of manufacture (COM) of plate and then builds a ratio where the denominator is limited only to COM of plate," Dillinger Br. at 44, as lacking merit because the contested increase was already calculated to pertain solely to the cost of pig iron and coke used in manufacturing CTL plate. See Def.'s Resp. at 42 (citing Final Dillinger COP Memorandum, CD 767, Attach. 3). Defendant maintains that Commerce thus built a denominator likewise limited to the cost of manufacturing CTL plate.

Dillinger argues that Commerce ignores the fact that the same total increase in the amount of the costs paid by the affiliates for Dillinger's labor services would have resulted in an equal amount of income to Dillinger for those services, and additional income to Dillinger is used as an offset to G&A expenses under Commerce's long-standing practice. See Dillinger Br. at 43 (citing Circular Welded Non-Alloy Steel

Pipe from the Republic of Korea, 79 Fed. Reg. 37,284 (Dep't of Commerce July 1, 2014) (Final Results), and accompanying Issues and Decisions Memorandum at cmts. 3 & 4). Dillinger notes that Commerce failed to address its "prior" (or current) practice of off-setting G&A expenses with other income in its Decision Memorandum. Moreover, in its response brief, Defendant states only that "Dillinger's earnings on other activities simply do not relate to the cost of producing subject merchandise." See Def.'s Resp. 41. Dillinger contends that this statement has no support in the record and that the labor services provided by Dillinger to Rogesa and ZKS are directly related to the production of pig iron and blast furnace coke and have been included in Dillinger's reported COPs. Therefore, Dillinger argues that any income earned on providing these labor services to Rogesa and ZKS are, by definition, activities directly related to the cost of producing subject merchandise.

Dillinger further contends that Commerce has provided no response to Dillinger's argument that Commerce's adjustment results in an illogical multiplication of G&A expenses by having Dillinger charge itself its own G&A expenses and then having these expenses flow into the total cost of manufacture for the end product, which is again charged with G&A expenses. See Dillinger Br. at 43. Dillinger insists that prior to Commerce's final adjustment there has been no double-counting of the cost of Dillinger's labor services to Rogesa and ZKS in the G&A expense ratio denominator. Dillinger argues that the record shows pig iron produced by Rogesa was used in the production of both subject and non-subject merchandise, and that the remaining pig iron was consumed by a different company to make non-subject merchandise. Id. at 43–44. Defendant dismisses Dillinger's argument, contending that "Commerce took account of [the fact

that not all of the pig iron produced by Rogesa was consumed by Dillinger for subject merchandise] by utilizing a methodology that only included pig iron used in the production of CTL plate." Def.'s Resp. at 43. Dillinger, however, rightfully highlights that Commerce's calculations for this adjustment on the record appear to be inconsistent with the agency's purported acknowledgment that not all pig iron produced by Rogesa was consumed in the production of subject merchandise. See Dillinger Reply at 27–28.

In support of its argument, Dillinger highlights that on the third line of Attachment 3 to the Cost Calculation Memorandum, Commerce lists a certain amount in Euros as the adjustment for the labor services Dillinger provided to Rogesa, which is based upon 100% of the labor services provided by Dillinger to Rogesa. Dillinger points out that the amount is not in any way reduced to reflect the fact that more than half of Rogesa's pig iron was used in non-subject products. See id. Dillinger further notes that on the fourth line of the same attachment, Commerce calculates a "Percentage of Operations Related to the Production of Pig Iron," but this percentage only shows that a certain percentage of Rogesa's total sales related to pig iron, with the rest relating to non-pig iron products or other operating income. Id. at 28. Dillinger argues that this calculation does not take into account the fact that of these pig iron sales, less than half were consumed in the production of subject CTL plate. Further, Dillinger offers that the rate of the certain percentage used by Commerce on the fifth line of Attachment 3 also does not adjust for the fact that most of the pig iron was used in non-subject products, but rather indicates the percentage of the total cost of CTL plate that is accounted for by pig iron. Id. Dillinger contends that the calculation for

ZKS follows the same pattern and does not adjust for the pig iron and coke consumed in the production of non-subject merchandise. In summary, Dilllinger argues that Commerce is simply taking the entire amount of the adjustment related to pig iron sales and applying it exclusively to subject CTL plate. Id.

Commerce's explanation in the Decision Memorandum does not reasonably address or resolve Dillinger's arguments. This issue therefore requires further explanation or consideration, and accordingly is remanded.

### D. Remand Results on Partial Adverse Facts Available

In Dillinger I, the court sustained Commerce's application of partial AFA, but remanded the Final Results for Commerce to review whether the same correction made to partial AFA by Commerce in a parallel proceeding, Dillinger France S.A. v. United States, 43 CIT ——, 350 F. Supp. 3d 1349 (2018) ("Dillinger France I"), involving the same issue, "would have any material effect on the margins in this case, or if it would be immaterial." Dillinger I, 43 CIT at ——, 399 F. Supp. 3d at 1257. Commerce determined that a similar correction as ordered in Dillinger France I would have a material effect, and the court remanded to Commerce to recalculate the antidumping duty margin for Salzgitter. See Remand Order.

[11] On remand, Commerce, under protest, recalculated Salzgitter's antidumping duty margin. Commerce noted that "the Court's order did not provide Commerce with the opportunity to consider an alternative partial AFA methodology, in light of the factual differences between the two cases." See Remand Results at 4. Commerce observed:

[I]t is the role of Commerce to consider, in the first instance, whether a particu-

lar AFA methodology complies with the statute's directive in any particular case. Pursuant to the Court's order, Commerce was unable to consider whether an alternative methodology would have been more appropriate in the instant case. Due to this limitation, Commerce further agrees with Nucor that the Court's order deprives Commerce of the ability to further consider whether the purpose of section 776 of the Act, i.e., inducing cooperation, has been satisfied. Accordingly, it is under respectful protest that Commerce has followed the Court's instructions directing us to recalculate Salzgitter's margin utilizing the partial AFA methodology discussed above.

Id. As the court explained in Dillinger I, "[r]easoned decision-making requires a certain measure of consistency, which is not present across the French and German investigations. As noted, the cases share near identical (almost verbatim) Issues and Decision Memoranda on the AFA issue." See Dillinger I, 43 CIT at ——, 399 F. Supp. 3d at 1257. Commerce now argues in the Remand Results that the French and German investigations are somehow factually distinguishable so that the AFA methodology applied in the Dillinger France decisions may not be appropriate for the German investigation. Given the remand for the other issues, the court will also remand the AFA issue so that Commerce may explain why, if there were material factual differences between the French and German investigations on the AFA issue, those differences were not reflected in the decision memoranda or Commerce's handling of AFA between the cases, which the court noted were nearly identical (virtually verbatim). Commerce may reconsider this issue and may explain why an alternative AFA methodology might be appropriate, but Commerce must first provide a reasoned explanation for issuing

virtually identical decision memoranda and AFA treatment across the two investigations, and then arguing on remand that there were material factual differences not previously identified or explained that warrant differing AFA treatment across the two investigations. If Commerce wishes to apply a different AFA approach in this proceeding than the one it ultimately applied in the French investigation, the agency must explain why such a disparate approach is reasonable.

### III. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Commerce address the issues remanded above; and it is further

**ORDERED** that Commerce shall file its remand results on or before November 16, 2021; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.



*AG Der Dillinger Hüttenwerke, v. United States*
Court No. 17-00158, Slip. Op. 21-101 (CIT August 18, 2021)
Final Results of Redetermination Pursuant to Court Remand Certain Carbon and
Alloy Steel Cut-to-Length Plate from Germany
(Public Version)

Appx141-Appx198

A-428-844

Remand: Slip Op. 21-101

Court No. 17-00158

~~Business Proprietary~~

E&C/OII: DJG

*PUBLIC VERSION*

### AG Der Dillinger Hüttenwerke, v. United States
### Court No. 17-00158, Slip. Op. 21-101 (CIT August 18, 2021)

### Final Results of Redetermination Pursuant to Court Remand
### Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany

## I.    SUMMARY

The Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court)

in *AG Der Dillinger Hüttenwerke, v. United States*, Court No. 17-00158, Slip. Op. 21-101

(August 18, 2021) (*Dillinger Germany II*).  This action arises out of the final determination in the

less-than-fair-value (LTFV) investigation of certain carbon and alloy steel cut-to-length (CTL)

plate from Germany.[1]  The mandatory respondents in the underlying LTFV investigation are AG

Der Dillinger Hüttenwerke (Dillinger), and Ilsenburger Grobblech GmbH, Salzgitter

Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann

International GmbH (collectively, Salzgitter).

The Court remanded to Commerce to consider its:  (1) reallocation of costs between

prime and non-prime steel plate for Dillinger; (2) application of the major input rule with respect

to contemporaneity and the freight factor applied to Dillinger's coke input; (3) adjustments to

---

[1] *See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany:  Final Determination of Sales at Less Than Fair Value*, 82 FR 16360 (April 4, 2017) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); *see also Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan:  Amended Final Affirmative Antidumping Determinations for France, the Federal Republic of Germany, the Republic of Korea and Taiwan, and Antidumping Duty Orders*, 82 FR 24096 (May 25, 2017) (*Amended Final Determination*).

Dillinger's cost of production (COP) for inputs and services provided to affiliates; and (4) application of a partial adverse facts available (AFA) methodology to certain downstream home market sales reported by Salzgitter.  In light of the Court's remand order, on remand Commerce: (1) relied on the total cost assigned to the prime and non-prime products as recorded in Dillinger's normal books and records in accordance with section 776(a) of the Tariff Act of 1930, as amended (the Act); (2) provided further explanation and revised the major input rule adjustment for Dillinger's coke inputs to reflect a contemporaneous comparison of coke consumption values and freight costs sourced from affiliated and unaffiliated suppliers; (3) provided further explanation and revised the adjustments to Dillinger's COP for inputs and services provided to affiliates; and (4) provided further explanation regarding the application of partial AFA to Salzgitter and revised the margin according to the AFA methodology applied in the *Final Determination*.  As a result of our analysis, we made changes to Dillinger's margin calculations, which result in a revised weighted-average dumping margin of 4.98 percent, and we have reverted to the margin calculated in the *Final Determination* for Salzgitter, which resulted in a weighted-average dumping margin of 22.90 percent.  Moreover, as a result of Commerce's revision to the weighted-average dumping margins for both Dillinger and Salzgitter, the revised all-others rate is 20.99 percent.

## II.    BACKGROUND

Commerce published the *Final Determination* on April 4, 2017.[2]  As discussed in the *Final Determination*, Commerce:  (1) adjusted Dillinger's reported costs for non-prime products to reflect the products' sales value as recorded in Dillinger's normal books and records and then reallocated the difference to the cost of prime plate;[3] (2) adjusted the reported coke cost of

---

[2] *See Final Determination*; *see also Amended Final Determination*.
[3] *See Final Determination* IDM at Comment 31.

Dillinger's affiliate, Rogesa Roheisengesellschaft (Rogesa), to reflect the higher of: (A)
Rogesa's consumption value of coke from its affiliate, Zentralkokerei Saar Gesellschaft (ZKS),
(B) Rogesa's adjusted consumption value of coke from unaffiliated suppliers, or (C) the reported
COP of coke;[4] (3) adjusted the COP of the inputs and services Dillinger provided to Rogesa and
ZKS to include a portion of Dillinger's general and administrative (G&A) expenses;[5] and (4)
applied partial AFA on sales made by one of Salzgitter's affiliated downstream resellers where
Salzgitter did not identify the manufacturer of the CTL plate, assigning the highest non-
aberrational net price among all of the downstream sales by that reseller to all of these sales
where Salzgitter failed to report the manufacturer of the CTL plate.[6]

In its August 18, 2021 opinion, the Court remanded Commerce's *Final Determination*.
First, the Court remanded for Commerce to reconcile its reallocation of costs between prime and
non-prime plate consistent with the Court of Appeals for the Federal Circuit (CAFC)'s opinion in
*Dillinger France II* and rely on the actual costs of production for prime and non-prime plate.[7]

Further, regarding the major and minor input rules, the Court remanded to Commerce
certain elements of Commerce's calculation of the major input adjustment factor. The Court
requested further explanation with respect to: (1) the use of non-contemporaneous affiliated and
unaffiliated consumption values; (2) the use of freight costs that were not contemporaneous with
the coke values used and were calculated on wet-weight basis but applied to a quantity of coke
on a dry-weight basis, (3) whether transfer prices should be adjusted to include G&A and interest
expenses; and (4) the potentially distortive impact of a credit note adjustment on the average

---

[4] *Id.* at Comment 31.
[5] *Id.* at Comment 33.
[6] *Id.* at Comment 2.
[7] *See Dillinger Germany II*, Slip Op. 21-101 at 5-6 (citing *Dillinger France S.A. v. United States*, 981 F. 3d 1318
(CAFC 2020) (*Dillinger France II*)).

consumption values used in the calculations. Regarding Commerce's adjustment to Dillinger's COP for the services provided to Rogesa and ZKS, the Court stated that Commerce failed to address Dillinger's comments on the issue. The Court remanded these issues for further explanation or reconsideration because Commerce did not provide sufficient explanation for the Court to determine if Commerce's determination was reasonable.[8]

Finally, the Court remanded to Commerce the opportunity to address its use of partial AFA to calculate Salzgitter's margin in the *Final Determination*. In *Dillinger Germany I*, the Court ordered Commerce to recalculate the antidumping duty (AD) margin for Salzgitter using the same partial AFA methodology it used in *Dillinger France I*, a parallel proceeding.[9] Commerce, under protest, recalculated Salzgitter's margin using partial AFA, stating that the Court had not provided Commerce an opportunity to consider alternative partial AFA methodologies in light of the factual differences between *Dillinger Germany I* and *Dillinger France I*.[10] Thus, the Court remanded this issue again to allow Commerce to explain why a different approach may be reasonable.

On September 21, 2021, we reopened the administrative record and issued a supplemental questionnaire to Dillinger to obtain the physical characteristics of the non-prime products produced and the actual cost of producing the non-prime products, to obtain

---

[8] *Id.* at 6-11.

[9] *See AG Der Dillinger Hüttenwerke, v. United States*, 399 F. Supp. 3d 1247 (CIT 2019) (*Dillinger Germany I*); *Dillinger France S.A., v. United States*, 350 F. Supp. 3d 1349 (CIT 2018) (*Dillinger France I*); and Final Results of Redetermination Pursuant to Court Remand, Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany, *AG Der Dillinger Hüttenwerke, v. United States*, Court No. 17-00158, Slip Op. 19-87 (CIT July 16, 2019), dated October 8, 2019 (*Dillinger I* Remand Redetermination).

[10] *See* Final Results of Redetermination Pursuant to Court Remand, Certain Carbon and Alloy Steel Cut-to-Length Plate from France, *Dillinger France S.A. v. United States*, Court No. 17-00159, Slip Op. 18-150 (CIT October 31, 2018), dated March 11, 2019 (*Dillinger France I* Remand Redetermination).

information to ensure we have comparable consumption values to apply the major input rule, and

to analyze the inputs and services that Dillinger provided to Rogesa and ZKS.[11]

On October 5, 2021, Dillinger submitted its response to this supplemental

questionnaire.[12]

## III.   ANALYSIS

### A.  *Non-Prime Plate Adjustment*

As summarized above, the Court remanded Commerce's *Final Determination* to

reconcile its reallocation of costs between prime and non-prime plate consistent with the CAFC's

opinion in *Dillinger France II* and rely on the actual costs of production for prime and non-prime

plate.[13]  Therefore, analogous with *Dillinger France II*, Commerce reopened the record and

issued a supplemental questionnaire to Dillinger to obtain the physical characteristics of the non-

prime products produced and the actual cost of producing the non-prime products.[14]  Because

Commerce has an obligation to ensure that the reported costs of production reasonably reflect the

cost of producing the merchandise under consideration,[15] we specifically explained that it was

not appropriate to rely on the overall average cost of producing all prime products as a surrogate

---

[11] *See* Commerce's Letter, "Remand Supplemental Questionnaire," dated September 21, 2021 (Remand Supplemental Questionnaire).

[12] *See* Dillinger's Letter, "Response to Remand Questionnaire," dated October 5, 2021 (Remand Supplemental Response).

[13] *See Dillinger Germany II*, Slip Op. 21-101 at 5-6.

[14] *See* Remand Supplemental Questionnaire.  On March 25, 2021, Dillinger filed a motion to clarify the scope of the remand.  *See* Motion to Clarify Scope of Remand (March 25, 2021) (ECF 74, 75).  On March 26, 2021, the Court issued a stay order.  *See* Order to Stay Proceedings (March 26, 2021) (ECF 76).  On April 15, 2021, Commerce filed its response to the motion to clarify.  *See* Response to Motion to Clarify (April 15, 2021) (ECF 77).  On April 21, 2021, the Court issued an order denying the motion to clarify.  *See* Order Denying Motion to Clarify Scope of Remand (April 21, 2021) (ECF 78).

[15] *See* section 773(f)(1)(A) of the Act (stating that "{c}osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and *reasonably* reflect the costs associated with the production and sale of the merchandise." (emphasis added.))  Additionally, the Court has recognized that Commerce "must ensure that {a respondent's} reported costs capture all of the costs incurred by the respondent in producing the subject merchandise' before it can appropriately use that respondent's cost allocation methodology."  *See Sidenor Indus. SL v. United States*, 664 F. Supp. 2d 1349 (CIT 2009) (quoting *Myland Indus., Ltd. v. United States*, 31 CIT 1696, 1703 (CIT 2007)).

for the actual cost of producing the specific non-prime products at issue and requested that

Dillinger provide the actual product-specific COP of the non-prime products.[16]  Commerce

requires accurate and complete product-specific production cost information because such

information:  (1) provides the basis for determining whether comparison market sales were made

in the ordinary course of trade and can be used to calculate normal value (NV); (2) is used in the

difference-in-merchandise analysis; and (3) in certain other instances, is used as the basis for NV

itself.[17]  Indeed, both the CAFC and this Court have recognized that Commerce appropriately

analyzes reported product-specific costs of production.[18]  Moreover, the CAFC has recognized

that requiring costs to reflect cost differences attributable to physical characteristics ensures that

product-specific costs are reflective of the actual costs incurred to produce specific products and

has explained that "{r}eliance on physical characteristics, because of its ability to promote

consistency, is a predictable methodology that is administrable across all investigations and

administrative reviews."[19]

    In its supplemental questionnaire response on the issue of non-prime products, Dillinger

provided neither the physical characteristics of non-prime products produced, nor the actual

product-specific costs of production for the non-prime products.[20]  Specifically, concerning

Commerce's request for the physical characteristics of non-prime products, as Dillinger

explained during the investigation, it was not able to identify all physical characteristics of the

non-prime merchandise and it had already reported the physical characteristics at the greatest

---

[16] *See* Remand Supplemental Questionnaire at 3.
[17] *See, e.g.*, *Notice of Final Results of Antidumping Duty Administrative Review:  Stainless Steel Bar from India*, 70 FR 54023 (September 15, 2005), and accompanying IDM at Comment 1.
[18] *See generally Thai Plastic Bags Indus. Co. v. United States*, 853 F. Supp. 2d 1267 (CIT, 2012), *aff'd, Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358 (Fed. Cir. 2014) (*Thai Plastic Bags*); *see also Hyundai Electric & Energy Systems Co., Ltd, v. United States*, 466 F. Supp. 3d 1303, 1309 (CIT 2020).
[19] *See Thai Plastic Bags*, 746 F.3d at 1368.
[20] *See* Remand Supplemental Response at 2-15.

level of detail possible.[21]  Moreover, despite Commerce's explicit request that Dillinger provide

the actual product-specific costs of production for the non-prime products, Dillinger again

explained how its systems capture costs,[22] and that production for these products are not

differentiated between prime and non-prime merchandise.[23]  Dillinger then reiterated that it

based its costs for producing non-prime products on the "average **_actual_** total cost of

manufacture for all plate produced during the {period of investigation (POI)}."[24]  In other words,

Dillinger did not provide the product-specific actual COP for the non-prime products, even

though it explained that all production "is made to order and non-prime plate results from the

normal production of making plate for the specific customer order."[25]

      During the investigation, Dillinger provided the information necessary to calculate the

actual costs of production for prime products.  As explained in detail here, in response to our

remand supplemental questionnaire, Dillinger did not provide Commerce with the information

needed to calculate the actual costs of production for the non-prime products.  Specifically,

Dillinger provided Commerce neither with the actual product-specific costs of producing the

non-prime products nor with the physical characteristics of the non-prime products produced.  As

the total actual costs incurred by Dillinger, and verified by Commerce,[26] must be allocated to all

products produced, including prime and non-prime products, not knowing the actual cost of

producing the non-prime merchandise directly impacts the amount of costs assigned to the

production of the prime products.  If too much or too little cost is assigned to the non-prime

---

[21] _Id._ at 8.
[22] _Id._ at 7.
[23] _Id._ at 8.
[24] _Id._ at 6 (emphasis in the original).
[25] _Id._ at 11.
[26] _See_ Memorandum, "Verification of the Cost Response of AG de Dillinger Hüttenwerke in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-To-Length Plate from Germany," dated January 27, 2017 (Dillinger Cost Verification Report), at 21-22.

products, then too little or too much cost is assigned to the prime products produced. Simply put, Dillinger has not provided the actual costs of production of non-prime products.[27] Therefore, because necessary information is missing from the record, pursuant to section 776(a)(1) of the Act, we have relied on the total COP for both prime and non-prime merchandise as recorded in Dillinger's normal books and records as facts otherwise available to comply with the Court's order.

### 1. Necessary Information Is Missing from the Record

While Dillinger attempts to downplay the necessity of the product-specific actual COP information by arguing that because the "COM {cost of manufacturing} for the non-prime {control numbers (CONNUMs)} reported by Dillinger corresponds to the average **actual** total cost of manufacture for all plate sold during the POI,"[28] it had "properly reported the COP for non-prime merchandise based upon actual costs of production,"[29] we disagree. It is well established that Commerce analyzes and relies upon product-specific costs.[30] It is not appropriate to substitute the "average actual total cost of manufacturing for all plate sold during the POI" for the actual product-specific costs. The use of an "average cost" would not, by definition, comply with the CAFC's order to determine the "actual costs of prime and non-prime products"[31] because it assigns the same cost to products with varying physical characteristics. Indeed, the distortive nature of simply taking the average cost of all products can be seen by the wide disparity in the reported actual total cost of manufacturing (TOTCOM) amounts for prime

---

[27] *See* Remand Supplemental Response at 8-9.
[28] *Id.* at 5 (emphasis in the original).
[29] *Id.* at 6.
[30] *See* Dillinger France S.A. v. United States, Court No. 17-00159; Final Results of Redetermination Pursuant to Court Remand (CIT February 18, 2021) (Dillinger France Final Remand 2021) at 7.
[31] *Id.*

products.[32]  Moreover, Dillinger acknowledged that the non-prime products can vary by size,

specification, and grade, which indicates that the associated costs vary, as well.[33]

Commerce does not have information on the record of this proceeding that is necessary

within the meaning of section 776(a)(1) of the Act.  Specifically, despite Commerce's request

that Dillinger submit the product characteristics of the non-prime products and the actual

product-specific cost of producing non-prime products to determine the actual COP for the prime

and non-prime products, Dillinger did not submit either the physical characteristics of the non-

prime products or the product-specific actual cost information.[34]  Dillinger is the sole party in

control of the actual production information.  It is incumbent on the company to make a

reasonable attempt to provide the actual product-specific cost information.  Dillinger explained

that it was unable to provide the actual COP of the non-prime merchandise and, as a result, we

do not have the actual COP information for the non-prime products produced.  Section 776(a)(1)

of the Act provides, subject to section 782(d) of the Act, that Commerce shall select from among

the facts otherwise available on the record if necessary information is not available on the record

of a proceeding.

While Dillinger attempts to downplay the necessity of the product-specific actual COP

information by arguing that because the "COM for the non-prime CONNUMs reported by

Dillinger corresponds to the average **actual** total cost of manufacture for all plate sold during the

POI,"[35] it had "properly reported the COP for non-prime merchandise based upon actual costs of

production,"[36] we disagree.  It is well established that Commerce analyzes and relies upon

---

[32] *See* Dillinger's Letter, "AG der Dillinger Hüttenwerke Second Supplemental Section D Response," dated
November 7, 2016 (Dillinger SQRD2), at Exhibit SD-50 (containing a printout of Dillinger's COP database labeled
"dhcop03").
[33] *Id.*
[34] *Id.*
[35] *Id.* at 5 (emphasis in the original).
[36] *Id.* at 6.

product-specific costs.[37]  It is not appropriate to substitute the "average actual total cost of manufacturing for all plate sold during the POI" for the actual product-specific costs.  The use of an "average cost" would not, by definition, comply with the CAFC's order to determine the "actual costs of prime and non-prime products"[38] because it assigns the same cost to products with varying physical characteristics.  Indeed, the distortive nature of simply taking the average cost of all products can be seen by the wide disparity in the reported actual TOTCOM amounts for prime products.[39]  Moreover, Dillinger acknowledged that the non-prime products can vary by size, specification, and grade, which indicates that the associated costs vary, as well.[40]

Dillinger's acknowledgment that non-prime products can vary by size, specification, and grade illustrates how Dillinger's inability to provide the actual physical characteristics of the non-prime products prevents Commerce from adjusting the reported overall average cost of prime products in an effort to estimate the actual product-specific costs of non-prime products. We note that, while Dillinger implies that it reported some of the physical characteristics (*i.e.*, "Dillinger is not able to identify all physical characteristics of the non-prime merchandise"),[41] the record demonstrates that Dillinger did not report any of the physical characteristics of the non-prime products in a useable manner.  In other words, while Dillinger submitted invoices to demonstrate that the non-prime products were plate (*i.e.*, the merchandise under consideration), the invoices did not contain precise information pertaining to the actual physical characteristics of the non-prime products.[42]  Therefore, because the CAFC has recognized that requiring costs to reflect cost differences attributable to physical characteristics ensures that product-specific costs

---

[37] *See* Dillinger France Final Remand 2021 at 7.
[38] *Id.*
[39] *See* Dillinger SQRD2 at Exhibit SD-50 (containing a printout of Dillinger's COP database labeled "dhcop03").
[40] *Id.*
[41] *Id.* at 8 and 10.
[42] *See, e.g.*, Remand Supplemental Response at Appendices R-3 and R-8.

reflect the actual costs to produce specific products,[43] Dillinger's failure to submit the physical characteristics of the non-prime products precludes Commerce from being able to determine the actual costs of the non-prime products.

Because Dillinger did not submit the physical characteristics of the non-prime products and incorrectly claimed that the reported overall average cost of prime products was sufficient, rather than submit the requested product-specific actual COP data as requested, Commerce does not have the necessary information to determine the actual COP of non-prime products. Therefore, Commerce must select from among the facts otherwise available to replace that missing information, pursuant to section 776(a)(1) of the Act.

### 2. Commerce Satisfied Its Obligation to Provide Dillinger with the Opportunity to Supply the Necessary Information

Commerce satisfied its obligation under section 782(d) of the Act, because Commerce notified Dillinger of the deficiencies in the information it had reported and afforded Dillinger the opportunity to submit the necessary information.[44]  Section 782(d) of the Act provides that if Commerce determines that a response to a request for information does not comply with the request, Commerce will so inform the party submitting the response and will, to the extent practicable, provide that party the opportunity to remedy or explain the deficiency.  If the party fails to remedy the deficiency within the applicable time limits, Commerce may, subject to section 782(e) of the Act, disregard all or part of the original and subsequent responses, as appropriate.  Section 782(e) of the Act states further that Commerce shall not decline to consider submitted information if all of the following requirements are met:  (1) the information is submitted by the established deadline; (2) the information can be verified; (3) the information is

---

[43] *See Thai Plastic Bags*, 746 F.3d at 1368.
[44] *See* Remand Supplemental Questionnaire at 1-2.

not so incomplete that it cannot serve as a reliable basis for reaching the applicable

determination; (4) the interested party demonstrated that it acted to the best of its ability; and (5)

the information can be used without undue difficulties.

As explained above, Commerce satisfied its obligation under section 782(d) of the Act

when it reopened the record and issued a supplemental questionnaire to Dillinger with the

explanation that the information submitted during the LTFV investigation (*i.e.*, the overall

average actual cost of products sold during the POI) was insufficient and that Commerce

required the actual product-specific COP of the non-prime products produced. Rather than

submit the requested product-specific information, Dillinger maintained that the information that

it had submitted previously was sufficient because it was based on production value, rather than

sales value.[45] Moreover, section 782(e) of the Act does not require that Commerce use the

overall average cost data because, as explained above, the use of the overall average cost of all

products as a proxy for the actual product-specific COP of the non-prime products cannot serve

as a reliable basis for calculating an AD margin within the meaning of section 782(e)(3) of the

Act.[46] Therefore, because the physical characteristics of the non-prime products and the product-

specific COP of non-prime products is necessary information that is missing from the record,

despite Commerce's reopening of the record to obtain the information, Commerce is selecting

from among the facts otherwise available on the record to determine the COP of prime and non-

prime products, pursuant to section 776(a)(1) of the Act.

**3. Use of Facts Available**

Pursuant to section 776(a) of the Act, Commerce will use "facts otherwise available" to

fill gaps in the record if: (1) necessary information is not available; or (2) an interested party

---

[45] *See* Remand Supplemental Response at 6.
[46] *See Dillinger France I* Remand Redetermination at 10.

withholds information requested by Commerce, fails to provide the information by the deadline or in the manner requested, significantly impedes the proceedings, or provides information that cannot be verified.  As discussed above, because Dillinger failed to provide Commerce with the requested information, and because such information is necessary and missing from the record, we are selecting from among the facts otherwise available to fill the gap, pursuant to section 776(a)(1) of the Act.

In particular, Dillinger has explained that its system does not record the physical characteristics of the non-prime products produced or the actual product-specific costs of producing the non-prime products.[47]  Indeed, we acknowledge that Dillinger informed us of its inability to report the physical characteristics of non-prime products during the investigation.[48]  Moreover, there is no evidence on the record to demonstrate that Dillinger does, in fact, track the physical characteristics of non-prime products produced or the actual product-specific costs of the non-prime products.[49]

As a result, Commerce is using the cost assigned to the prime and non-prime merchandise as recorded in Dillinger's normal books and records, as facts otherwise available. We have selected the selling prices of the non-prime products as facts otherwise available because this amount is used by Dillinger in its normal books and records; importantly, was verified by Commerce; and it is the best information available on the record.[50]

---

[47] *See* Remand Supplemental Response at 8-9.
[48] *Id.* at 4.
[49] *See, e.g.*, Dillinger Cost Verification Report.
[50] *See* Dillinger Cost Verification Report at 22 ("We also reviewed the FER during the POI.  In the line item "Seconds," the cost is equal to the net sales for these non-prime items").

### B.  *Major Input Rule Applied to Blast Furnace Coke*

During the POI, Dillinger obtained pig iron, a major input in the production of the CTL plate, from its affiliate, Rogesa.[51]  Rogesa obtained blast furnace coke, a major input in the production of pig iron from an affiliate, ZKS.[52]  In analyzing the value of the affiliated coke inputs recorded in Rogesa's books during the investigation, Commerce compared the POI average consumption values for large and small coke purchased from ZKS (the transfer prices) to the POI average consumption values for large and small coke purchased from unaffiliated parties (the market prices).[53]  While Dillinger challenged Commerce's use of Rogesa's affiliated and unaffiliated consumption values, rather than using purchase prices, in applying the major input rule, the Court found Commerce's use of consumption values was reasonable.[54]  However, the Court remanded for Commerce to consider whether the comparison of unaffiliated and affiliated consumption values and associated freight costs used in applying the major input rule for the specific input (coke) were on a contemporaneous basis, and further whether the freight costs for the coke were calculated on a consistent basis (*i.e.*, dry- versus wet-weight).[55]

In this regard, Dillinger argued that Rogesa's consumption values from unaffiliated suppliers reflect the values of coke purchased prior to the POI at the time when market prices were considerably higher, that freight costs were significantly different because the coke came from different countries than what was sourced during the POI, and that the calculated freight costs and the coke values to which they were applied were on different bases.[56]  After further

---

[51] *See* Dillinger's Letter, "AG der Dillinger Hüttenwerke Section D Response," dated July 15, 2016, at D-7.
[52] *Id.* at D-8.
[53] *See* Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – AG der Dillinger Hüttenwerke," dated March 29, 2017 (Dillinger Final Cost Calc Memo), at 2 and Attachments 2.1 and 2.2.
[54] *See Dillinger Germany II*, Slip Op. 21-101 at 7.
[55] *Id.* at 8 to 10.
[56] *Id.* at 9 and 10.

review, we agree with Dillinger that certain unaffiliated suppliers' consumption values used in the major input analysis were predominately based on purchases made prior to the POI and those associated freight costs distorted the unaffiliated consumption values.[57]  Further, we agree with Dillinger that the calculated freight costs used in the major input analysis were not on a consistent basis with the coke values to which they were applied.[58]  Therefore, to comply with the Court's order and mitigate the non-contemporaneous nature of the comparison of affiliated and unaffiliated consumption values, we obtained POI monthly inventory movement schedules for coke from each affiliated and unaffiliated supplier, information regarding when the last coke purchases were made by Rogesa from each supplier, and a schedule detailing the freight cost by supplier for each month of the POI.[59]  Accordingly, using the suppliers' POI inventory movement schedules that show the beginning inventory, purchases, consumption, and ending inventory, we were able to determine the appropriate contemporaneous population of POI coke consumption values from unaffiliated suppliers.[60]  In this regard, we eliminated from our calculation the consumption values from unaffiliated suppliers that had a significant POI beginning inventory balances of coke and/or had no purchases of coke during the POI.  We then recalculated the POI unaffiliated consumption values by weight averaging the consumption values for the remaining unaffiliated suppliers.  Likewise, using the detailed freight cost schedule,[61] we were able to recalculate a freight cost that represents an amount that is contemporaneous with the POI, only associated with coke supplied during the POI, and reflects a

---

[57] *See* Dillinger SQRD2 at Appendix SD-34.
[58] *Id.*
[59] *See* Remand Supplemental Response at Appendix R-11.
[60] *Id.* at Appendices R-9 and R-12.
[61] *Id.* at Appendix R-11.

dry weight basis.  As a result of these changes, the major input adjustment decreases from [      ]

percent to [    ] percent.

We note, however, that because of the foregoing methodological change, we found that

small blast furnace coke was not purchased from unaffiliated suppliers during the POI.

Accordingly, because small blast furnace coke consumed during the POI was only sourced from

Rogesa's affiliate ZKS during the POI, we do not have a market consumption value to use in the

application of the major input rule.[62]  Accordingly, pursuant to section 776(a) of the Act,

Commerce will use "facts otherwise available" to fill gaps in the record if:  (1) necessary

information is not available; or (2) an interested party withholds information requested by

Commerce, fails to provide the information by the deadline or in the manner requested,

significantly impedes the proceedings, or provides information that cannot be verified.

Specifically, for small blast furnace coke, after changing the methodology in determining the

population of the unaffiliated consumption values that should be used as a comparison to the

affiliated consumption values in the application of the major input rule, we found that Dillinger

did not have any contemporaneous purchases of small blast furnace coke during the POI on the

record.  Because it is necessary to have contemporaneous purchases of small blast furnace coke

information on the record to use in the application of the major input rule, and such information

is missing from the record, we are selecting from among the facts otherwise available to fill the

gap, pursuant to section 776(a)(1) of the Act.  Therefore, as facts available, we applied the results

of the ZKS-sourced large coke major input analysis to the ZKS-sourced small coke consumption.

The Court also remanded for Commerce to consider whether G&A and financial

expenses must be added to ZKS' transfer prices to place them on the same basis as the market

---

[62] *Id*. at 19.

prices to which they are compared.[63]  In this regard, Dillinger argued that the market prices are fully-loaded prices that cover all costs of the unaffiliated seller including selling, G&A, and financial expenses, while the transfer prices to which they are compared are based only on ZKS' TOTCOM.[64]  According to Dillinger, Commerce's cost calculations ultimately add G&A and financial expenses to the reported TOTCOM; thus, the actual end value of the affiliated input is the transfer price plus the additional amounts for G&A and financial expenses.[65]  Hence, Dillinger concluded that in order for the transfer price to be on the same basis as the unaffiliated sales price, this fully loaded transfer price must be used in the analysis.[66]

In this argument, Dillinger ambiguously refers to G&A and financial expenses; thus, we are uncertain whether these are the G&A and financial expenses incurred by ZKS or those incurred by Dillinger.  Nevertheless, as it pertains to G&A and financial expenses, we find that all elements of our major input analysis are on a consistent basis.  The goal of the minor (*i.e.*, transactions disregarded) and major input rules is to determine whether the prices paid to affiliated parties for a specific input (in this case, coke) reflect arm's-length values.  Since arm's-length values when applying these rules represent transactions between two unrelated parties (*i.e.*, market prices) and prices that recover the COP as defined by the statute,[67] we are testing the affiliated purchase price for a specific input as recorded in a respondent's normal books and records to ensure it reflects the higher of market price (transactions disregarded) or both the market price and COP (*i.e.*, major input rule).  In this case, ZKS is an affiliated producer of a major input (*i.e.*, coke) used by Rogesa, and an affiliated producer of a major input (*i.e.*, pig iron)

---

[63] *See Dillinger Germany II*, Slip Op. 21-101 at 11.
[64] *See* Dillinger's Letter, "Plaintiff AG der Dillinger Hüttenwerke's Rule 56.2 Memorandum in Support of Motion for Judgment Upon the Agency Record," dated March 12, 2018 (Dillinger Brief), at 41.
[65] *Id.*
[66] *Id.*
[67] *See* section 773(b)(3)(A)(B) of the Act.

used by Dillinger to produce CTL plate. Accordingly, we tested whether the price that ZKS charged Rogesa for coke, that passed to Dillinger through its purchases of pig iron from Rogesa, are arm's-length and above-cost transactions by comparing those transactions to the market price and COP. In analyzing the value of the affiliated coke inputs recorded in Rogesa's books, Commerce compared the POI average consumption values for coke purchased from ZKS (the transfer price) to the POI average consumption value for Rogesa coke purchased from unaffiliated parties (the market price).[68] Contrary to Dillinger's claim, it is not relevant how ZKS may have set its sales prices for the coke it sold to its affiliate Rogesa. It is the amount actually charged by ZKS and paid and recorded by Rogesa in its normal books and records for the affiliated purchases of coke that is being tested, regardless of how that transfer price was determined by the affiliated seller. Accordingly, Commerce compared the consumption value for coke inputs that Rogesa purchased from ZKS to the consumption value for the coke inputs that Rogesa purchased from unaffiliated parties. Although Dillinger argues that Commerce will add G&A and financial expenses to the affiliated coke inputs in its cost calculations, these are downstream costs incurred by Dillinger that have nothing to do with the market price for coke purchases. Furthermore, Dillinger's G&A and financial expenses will be added to all Dillinger activity; thus, both the affiliated and unaffiliated coke inputs would be part of the denominator used to calculate Dillinger's G&A and financial expense ratios and both the affiliated and unaffiliated coke inputs would be allocated a proportionate share of Dillinger's G&A and financial expenses. In summary, our statutorily directed endeavor here is to test whether the affiliated transfer price paid by Dillinger reflects the higher of the market price or COP to ensure it represents an arm's-length transaction.[69] Thus, we disagree that, with regard to G&A and

---

[68] See Dillinger Final Cost Calc Memo at Attachment 2.1.
[69] See Dillinger Final Cost Calc Memo at 2.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Barcode:4203167-01 A-428-844 REM - Remand  -  CIT 17-00158, Slip Op. 21-101

financial expenses, there is an imbalance in our comparison of Dillinger's purchases of coke from affiliated and unaffiliated parties.

With respect to the credit note referenced by the Court,[70] we have revisited Dillinger's original objections and find it is necessary to first clarify the issue before the Court.  While the Court refers to our credit note adjustment applied at Attachment 2.1 of the final calculation memorandum, Dillinger does not contest the credit note adjustment for coke.  Rather, Dillinger argues that "{t}he Department also did not account for the fact that, in Attachment 3 of its final cost calculation memorandum, it added over [            ] Euros in additional costs to ZKS' reported cost of manufacture."[71]  Thus, the adjustment at issue stems from Attachment 3 of our final cost calculation memorandum, which addresses the fair market value of the inputs and services that Dillinger provided to Rogesa and ZKS.  Specifically, at Attachment 3, Commerce applied a minor input adjustment to ZKS' cost of manufacturing (COM) that increased, to a market value, the transfer price of the inputs and services provided by Dillinger to ZKS.[72] Dillinger contends that this amount must be factored into the Attachment 2.1 major input (coke) adjustment calculation because "when the Department compares unaffiliated sales prices with the affiliated cost of production under the major input rule, it must use the final affiliated cost of production {of coke} after all of the other adjustments made by the Department."[73]

In this regard, we disagree with Dillinger that the additional ZKS manufacturing costs calculated in Attachment 3 need to be accounted for in the calculation of our major input adjustment for affiliated coke inputs.  Here, once again, Dillinger misplaces the purpose of the

---

[70] See Dillinger Germany II, Slip Op. 21-101 at 10.
[71] See Dillinger Brief at 41-42.
[72] See Dillinger Final Cost Calc Memo at Attachment 3.
[73] See Dillinger's Letter, "Reply Brief on Behalf of Plaintiff AG der Dillinger Hüttenwerke," dated August 22, 2018, at 24.

major input rule and, specifically, how the rule is applied in determining Dillinger's COM for CTL plate. ZKS is an affiliated producer of a major input (*i.e.*, coke) used by Rogesa, and an affiliated producer of a major input (*i.e.*, pig iron) used by Dillinger to produce CTL plate. Accordingly, the purpose of calculating ZKS' COP of coke is to ensure that the price ZKS charges Rogesa for coke, that passes to Dillinger through its purchases of pig iron from Rogesa, are arm's-length and above-cost transactions, by comparing those transactions to the market price and COP. Therefore, despite our revision to ZKS' actual cost of producing the coke, our major input analysis determined that the market price for coke was higher than the transfer price or ZKS' COP for the coke. Consequently, at Attachment 2.1, we adjusted Dillinger's reported costs to reflect the market value of the coke supplied by ZKS.[74] In doing so, we based our adjustment factor on the difference between the average market price of coke and the average transfer price of coke (*i.e.*, the difference between the average consumption values for coke Rogesa obtained from unaffiliated parties and the average consumption values for coke Rogesa obtained from ZKS). Because the reported costs reflect the transfer price of the coke (and not ZKS' adjusted COP for the coke), it is appropriate to calculate the major input adjustment as the difference between the market value of the coke and the value that needs to be adjusted, *i.e.*, the transfer price of the coke. Because we are adjusting those transfer prices to reflect market prices (and not to reflect ZKS' adjusted COP of coke), there is no need to factor in the additional coke manufacturing costs calculated at Attachment 3. In fact, with regard to our adjustment of ZKS' COM, Attachment 3 confirms that "{t}his adjustment applies to the coke COM. Since the market price of coke as calculated at Attachment 2.1 exceeds the transfer price and COP, the adjustment to the transfer price {of the Dillinger inputs and services} has no effect on the

---

[74] *See* Dillinger Final Cost Calc Memo at Attachment 2.1.

Barcode:4203167-01 A-428-844 REM - Remand  -  CIT 17-00158, Slip Op. 21-101

reported cost."[75]  Since we did not rely on ZKS' adjusted COP, but rather relied on the difference between the market and transfer prices of coke to calculate our major input adjustment to Dillinger's reported costs, we disagree that the additional ZKS manufacturing costs calculated at Attachment 3 need to be factored into our calculation of the major input adjustment to the coke inputs.

### C.  *Adjustment to Expenses for Inputs and Services Provided to Affiliates*

The Court also found that Commerce failed to fully address Dillinger's arguments that the addition of Dillinger's G&A expenses to the cost of the labor services that Dillinger provided to ZKS and Rogesa overstates costs.[76]  Accordingly, we have reexamined Dillinger's arguments as directed by the Court.

During the POI, Dillinger provided labor services to its affiliates Rogesa and ZKS, who paid Dillinger for these services and those costs became part of ZKS and Rogesa's COMs of the coke ZKS provided to Rogesa and the pig iron Rogesa provided to Dillinger.[77]  To test whether the affiliated labor service transactions were at arm's length, in the investigation we compared the transfer prices Rogesa and ZKS paid Dillinger to Dillinger's cost of the services.[78]  While these labor services are considered to be a minor input, we used the cost of providing the services as a reasonable proxy for a market price because no market price for such services was available.[79]  To calculate Dillinger's total cost of the services, we included a portion of Dillinger's G&A expenses.  Commerce explained that this was appropriate because Dillinger's G&A expense ratio was based on the unconsolidated financial statements, which do not

---

[75] *Id.* at Attachment 3.
[76] *See Dillinger Germany II*, Slip Op. 21-101 at 12-17.
[77] *See* Dillinger's Letter, "AG der Dillinger Hüttenwerke Supplemental Section D Response," dated September 28, 2016 (SQRD1), at 15.
[78] *See* Dillinger Final Cost Calc Memo at Attachment 3.
[79] *Id.* at 2.

eliminate transactions between the affiliated parties; therefore, Dillinger "essentially included the cost of the inputs and services provided to Rogesa and ZKS twice; once when they were sold to the affiliates, and once when Dillinger consumed the inputs provided by Rogesa and ZKS."[80] Consequently, in order to fully account for Dillinger's G&A expenses, it was necessary to include a portion of Dillinger's G&A expenses when calculating the total cost of the services Dillinger provided to Rogesa and ZKS.

Dillinger countered that, in adding the G&A expenses, Commerce failed to consider the payments from Rogesa and ZKS to Dillinger for the services.[81]  According to Dillinger, these payments were other income to Dillinger that Commerce allows as an offset to G&A expenses; thus, any increase in the Rogesa and ZKS costs at one level merely results in an increase in the other income that is allowed as an offset at another level.[82]  Essentially, Dillinger argued that by including both the cost of the labor services and the associated other income in the calculation of Dillinger's G&A expense ratio, Dillinger effectively eliminated the double-counting of the labor service costs in the denominator to the G&A expense ratio.[83]  As a result, Dillinger claimed that there was no need to also apply G&A expenses to the cost of the labor services that Dillinger provided to Rogesa and ZKS.

While we agree with Dillinger's logic in this matter, we disagree that Dillinger did, in fact, offset the cost of the labor services included in the denominator of the G&A expense ratio with the associated other income received from Rogesa and ZKS when Dillinger calculated its reported G&A expense ratio.  Our conclusions in the investigation were based on the detailed records of this case; however, in the Remand Supplemental Questionnaire, we requested

---

[80] *See Final Determination* IDM at Comment 32.
[81] *See* Dillinger Brief at 43.
[82] *Id.*
[83] *Id.*

# CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

additional written confirmation of these facts from Dillinger.[84]  In its response, Dillinger confirmed that, although the labor service costs were included in the denominator to the G&A expense ratio, the associated other income was not included anywhere in the G&A expense ratio calculation.[85]  Therefore, by not offsetting the costs of the labor services with the associated income, Dillinger relied on a larger denominator in the calculation and thereby reduced the G&A expense ratio.  Therefore, Dillinger's chosen methodology for calculating the G&A expense ratio compelled Commerce to apply the diluted G&A expense ratio to the cost of the labor services (which are included in the denominator of the ratio calculation) to ensure that all of Dillinger's G&A expenses, as they relate to the production of CTL plate, were absorbed in the cost calculations.[86]

Dillinger also argued that including Dillinger's own G&A expenses (as they relate to the labor services) in the cost of the coke and pig iron that flow into Dillinger's TOTCOM, and then applying the G&A expense ratio to Dillinger's TOTCOM, which includes the coke and pig iron costs, double counts G&A expenses that relate to the labor services.[87]  We reviewed our final cost calculations to confirm that Dillinger's G&A expenses were not double counted in this manner.  In the investigation, Commerce increased Dillinger's TOTCOM by [   ] percent for the portion of the labor service adjustment that was related to CTL plate.[88]  When Commerce calculated Dillinger's G&A expenses, we applied Dillinger's G&A expense ratio to a CTL plate TOTCOM that did not include the affiliated transaction adjustments.[89]  Hence, Dillinger's G&A

---

[84] *See* Remand Supplemental Questionnaire.

[85] *See* Remand Supplemental Response at 21-22.

[86] *See* Memorandum, "Margin Calculations for AG der Dillinger Hüttenwerke S.A. Pursuant to Draft Results of Remand Redetermination," dated December 3, 2021 (Draft Remand Calculation Memorandum), at Attachment 4.

[87] *See* Dillinger Brief at 43-44.

[88] *See* Dillinger Final Cost Calc Memo at Attachment 3.

[89] *Id.* at 4.  Specifically, Commerce applied Dillinger's G&A expense ratio of [   ] percent to the following net figure:  Dillinger's revised TOTCOM (*i.e.*, TCOMCOP) less TOTCOM * [   ] percent (the [   ] percent reflects

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

expense ratio was not applied on top of the [    ] percent adjustment and the G&A expenses related to the labor services were not double counted.

Finally, Dillinger argued that Commerce did not allocate any portion of the labor services adjustment to the non-subject products that were produced with Rogesa's pig iron, but rather allocated the entire adjustment to CTL plate.[90]  According to Dillinger, only [    ] percent of the pig iron produced by Rogesa was used by Dillinger.  Further, of the amount related to Dillinger, Commerce's calculation erroneously "treats the entire absolute increase in the costs of coke and pig iron as if they flow 100% into the cost of manufacturing (COM) of plate and then builds a ratio where the denominator is limited to only the COM of plate."[91]  However, according to Dillinger, it used the Rogesa pig iron to produce both subject and non-subject products and Commerce's calculation failed to reflect this.

After further review, we agree with Dillinger that there are errors in our calculation of the labor services adjustment factor.  In the final cost calculation memo at Attachment 3, we calculated the difference between the total transfer price that Rogesa paid Dillinger for the labor services and Dillinger's total cost of the services (*i.e.*, the total adjustment of [    ] thousand Euros).[92]  This total adjustment value is related to all Rogesa activity.  Therefore, to determine what portion of this total adjustment was related to CTL plate production, we first excluded the portion of the total adjustment that was related to Rogesa's non-pig iron activities (*i.e.*, multiplied the total adjustment value by the [    ] percent that pig iron represents of Rogesa's

---

two adjustments – the [    ] percent minor input labor service adjustment from Attachment 3 and the [    ] percent major input coke adjustment from Attachment 2.1).

[90] While we calculated the additional G&A expenses that were related to the labor services Dillinger provided to ZKS, we did not adjust the transfer price Dillinger paid to ZKS to reflect ZKS' actual COP, but rather relied on the market price of the coke inputs.  *See* Dillinger Final Cost Calc Memo at Attachment 3.

[91] *See* Dillinger Brief at 44.

[92] *See* Dillinger Final Cost Calc Memo at Attachment 3.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

total activities, excluding the difference).[93]  Next, we multiplied the result, *i.e.*, the portion of the total adjustment value that was related to pig iron, by the percentage that pig iron represents of Dillinger's TOTCOM (*i.e.*, [    ] percent).[94]  However, this step was incorrect.  Instead, the second step should allocate the total adjustment related to Rogesa's pig iron production to the entities that purchased and consumed the pig iron (*e.g.*, Dillinger, *etc.*).  Therefore, this step should reflect the percentage of Rogesa's total pig iron production that was sold to Dillinger (*i.e.*, the [    ] percent referenced by Dillinger, calculated as [        ] metric tons (MT) of Rogesa's total [        ] MT in pig iron production).[95]  Next, in our final cost calculations, we divided the result from the prior step by Dillinger's TOTCOM for CTL plate.[96]  However, this step was also incorrect.  Because Dillinger consumed pig iron in the production of both subject and non-subject merchandise, Dillinger's portion of the pig iron adjustment should be allocated to all products that were produced with pig iron.  Therefore, we agree with Dillinger that the denominator here should reflect Dillinger's COM for all products that were produced with Rogesa's pig iron, and not just the manufacturing costs for CTL plate.  The revised calculation is as follows:  ([    ] thousand Euros * [    ]% * [    ]%) / [        ] thousand Euros, which reflects [    ] thousand Euros for CTL plate costs + [        ] thousand Euros for Dillinger France slab costs + [    ] thousand Euros for non-subject slab costs + [    ] thousand Euros for foundry costs.[97]  As a result, correcting this calculation decreases the labor services minor input adjustment that is related to Dillinger's cost of CTL plate from [    ] percent to [    ] percent.

### D. Remand Results on Partial AFA

---

[93] *Id.*

[94] *Id.*

[95] *See* Dillinger Brief at 44; and SQRD1 at Appendix SD-10.

[96] *See* Dillinger Final Cost Calc Memo at Attachment 3.

[97] *See* Dillinger Final Cost Calc Memo at Attachment 3; Dillinger SQRD1 at Appendix SD-10; and SQRD2 at Appendix SD-44.

As noted above, in *Dillinger Germany I*, while the Court sustained Commerce's use of partial AFA to Dillinger and Salzgitter, the Court did not agree with how Commerce applied partial AFA in this instance, and thus instructed Commerce to recalculate the margins from the LTFV investigation for Dillinger and Salzgitter according to the methodology used in *Dillinger France II*.[98]  In response, Commerce recalculated Salzgitter's margin under protest, explaining that due to the Court's specific instructions, "Commerce was unable to consider whether an alternative methodology would have been more appropriate in the instant case … the Court's order deprives Commerce of the ability to further consider whether the purpose of section 776 of the Act, *i.e.*, inducing cooperation has been satisfied."[99]  Thus, in *Dillinger Germany II*, the Court remanded this issue to Commerce, allowing that "{i}f Commerce wishes to apply a different AFA approach in this proceeding than the one it ultimately applied in the French investigation, {Commerce} must explain why a disparate approach is reasonable."[100]

The Court noted that the fact patterns that led to Commerce's application of partial AFA in both the LTFV investigations underlying *Dillinger Germany I* and *Dillinger France I* did not appear distinguishable.[101]  Commerce acknowledges that the circumstances that led to Commerce's determination to resort to partial AFA in each investigation are essentially the same; in each investigation, the respondent (*i.e.*, Dillinger France S.A. (Dillinger France) in the CTL plate from France LTFV investigation and Dillinger and Salzgitter in the CTL plate from Germany LTFV investigation) failed to report the manufacturer for certain downstream sales of CTL plate resold by an affiliated reseller.[102]  However, as discussed below, the scope of

---

[98] *See Dillinger Germany* I, 399 F. Supp. 3d at 1257.
[99] *See Dillinger Germany I* Remand Redetermination at 4.
[100] *See Dillinger Germany II*, Slip Op. 21-101 at 18.
[101] *Id.* at 17-18.
[102] *See Final Determination* IDM at Comments 2 and 20; and *Certain Carbon and Alloy Steel Cut-to-Length Plate from France:  Final Determination of Sales at Less Than Fair Value*, 82 FR 16363 (April 4, 2017), and accompanying IDM at Comment 5.

Salzgitter's failure to cooperate is substantially different than the scope of Dillinger's (or Dillinger France's) failure to cooperate.

Specifically, Salzgitter reported approximately 28,000 downstream sales of CTL plate for which it did not identify the manufacturer,[103] out of a total of [    ] Salzgitter-produced home market sales used in our analysis.[104]  Thus, these sales represented more than [  ] percent of Salzgitter's home market sales used in our analysis.  In contrast, Dillinger reported only [  ] downstream sales for which it did not identify the manufacturer, out of a total of [    ] home market sales examined (*i.e.*, less than [  ] percent).[105]  With this number of impacted downstream sales, the application of partial AFA, regardless of any methodology, had no measurable impact on Dillinger's margin.  While the number of sales with missing manufacturer information for Dillinger France is not on the record of this proceeding, Commerce notes that only a small number of Dillinger France's downstream home market sales lacked manufacturer information.  Thus, the application of partial AFA, regardless of any methodology, had no measurable impact on Dillinger France's margin.[106]

The difference between Salzgitter's, Dillinger's, and Dillinger France's missing information warrants the application of different partial AFA methodologies.  For Dillinger and Dillinger France, applying the partial AFA methodology in *Dillinger France I* (*i.e.*, treating all unidentified manufacturer sales as produced by the respondent, and relying on the reported sales prices on the record) had no effect on the margins calculated in the underlying LTFV

---

[103] These downstream sales were made by Salzgitter's affiliate Salzgitter Mannesmann Stahlhandel GmbH (SMSD). *See* Memorandum, "Final Determination Calculations for Salzgitter," dated March 29, 2017 (Salzgitter Final Calculation Memo), at Attachment I, SAS Log at page 55 (indicating that the number of observations where the seller is SMSD and the manufacturer is "UNKNOWN" is [    ]).

[104] *Id*. at Attachment I, SAS Log at page 56.

[105] *See* Memorandum, "Final Determination Calculations for Dillinger," dated March 29, 2017 (Dillinger Final Calculation Memo), at Attachment I, SAS Log at pages 67-68.

[106] *See Dillinger France I* Remand Redetermination at 6.

investigations.[107]  Therefore, Commerce's intended purpose in selecting the partial AFA methodology, discussed in detail below, continued to be undisturbed on remand.  However, for Salzgitter, applying this methodology had a material effect on the margin, resulting in a change from the 22.90 percent calculated in the *Final Determination*, to a rate of zero percent and Salzgitter's potential exclusion from the AD order.[108]  Thus, this methodology did not support Commerce's goals in applying partial AFA, as stated below.

The Court sustained Commerce's use of partial AFA to Salzgitter.[109]  Specifically, the Court agreed first with Commerce's application of facts otherwise available, noting that Salzgitter was incorrect in stating it had provided Commerce with sufficient information.[110]  The Court stated that it agreed Commerce could not determine whether to include or exclude certain CTL plate transactions because of the missing manufacturer information and, thus, Commerce's gap filling with facts otherwise available was required.[111]  Next, when looking at Commerce's application of partial AFA and Salzgitter's arguments against this, the Court stated that Salzgitter's arguments were unpersuasive.  Specifically, the Court was perplexed as to why Salzgitter did not conduct its own statistical analysis to attempt to tie the missing manufacturer information to the 28,000 CTL plate sales.[112]  The Court further pointed to the record, stating that Salzgitter presented the Court with only "self-serving statements or interpretations of the record" to show that Salzgitter had attempted to obtain the missing information, which were not supported by the record itself, and thus Commerce's application of partial AFA was reasonable when looking at the record as a whole.[113]

---

[107] *See Dillinger I* Remand Redetermination at 2; and *Dillinger France I* Remand Redetermination at 4.
[108] *Id*. at 2 and 4-5.
[109] *See Dillinger Germany I*, 399 F. Supp. 3d at 1256.
[110] *Id.* at 1253.
[111] *Id.*
[112] *Id.* at 1255 – 1256.
[113] *Id.*

Accordingly, Commerce's authority to apply partial AFA to Salzgitter for its failure to provide the requested manufacturer information for its downstream sales is not in dispute. However, the application of the *Dillinger France I* partial AFA methodology to Salzgitter deprives Commerce of the ability to apply section 776 of the Act meaningfully in this proceeding.  It is well established that Congress intended Commerce to use AFA as a means to induce cooperation in its proceedings and address evasion concerns.[114]  The purpose of AFA is to provide respondents with an incentive to cooperate in Commerce's investigations and reviews and ensure that necessary information is placed on the record to enable Commerce to reach a reasonable determination.[115]  However, the change in the AFA methodology prescribed by the Court in *Dillinger France I* and applied to Salzgitter in the *Dillinger I* Remand Redetermination frustrates Commerce's goals of inducing cooperation by ensuring that a non-cooperating respondent does not receive a more favorable AFA rate than it would have received if the company had cooperated fully.

Here, Commerce considered the extent to which Salzgitter may benefit from its own lack of cooperation.[116]  In selecting a partial AFA methodology, Commerce seeks to adopt a methodology that would induce future cooperation and ensure that necessary information is placed on the record.  If respondents find there is no benefit to their cooperation, they may conclude that withholding information or providing only certain information, rather than providing a fulsome response, is more advantageous.  These concerns now arise here because, using the *Dillinger France I* methodology, Salzgitter may well receive a more favorable

---

[114] *See Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*, 753 F.3d 1227, 1235 (Fed. Cir. 2014).
[115] *See F.Lii De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1028, 1032 (Fed. Cir. 2000).
[116] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol. 1 (1994) (SAA) at 870.

dumping margin than it would have received if the company had fully cooperated with Commerce, and, as a result, Salzgitter would ultimately be excluded from the AD order.

Because of Salzgitter's reporting failures, which are significant, representing more than [  ] percent of Salzgitter's home market sales used in our analysis, we are unable to determine what Salzgitter's margin would have been if Salzgitter had fully cooperated with our requests for information and properly reported the manufacturer of the downstream sales at issue. Commerce relies on the manufacturer information to match U.S. sales to comparison market sales produced by the same manufacturer for comparison purposes in calculating the dumping margin. Without this critical information, Commerce cannot properly identify which home market sales to compare to U.S. sales. Thus, Commerce cannot determine which of the nearly 28,000 downstream sales without a reported manufacturer were produced by Salzgitter (and are thus potentially comparable to Salzgitter's U.S. sales), and which were produced by other manufacturers (and are thus excluded from the comparison pool).

The impact of the missing manufacturer information is further demonstrated by the pricing of the sales with this missing information. To determine the highest non-aberrational net price (*i.e.*, [       ] Euros) to be assigned to the downstream sales with missing manufacturer information, Commerce sorted all of SMSD's net prices for these sales in descending order and selected the transaction at the beginning of a smooth continuum of net prices.[117] Because Salzgitter failed to report the manufacturer of these sales, we cannot determine if the net prices correlated to the manufacturer of the CTL plate. Commerce cannot rule out the possibility that the sales with the highest prices were entirely or primarily of CTL plate manufactured by

---

[117] *See* Salzgitter Final Calculation Memo at 2, Attachment I, SAS Log at page 55, and Attachment I, SAS Output at 81.

Salzgitter, and Salzgitter's failure to report the manufacturer information was an attempt to obscure this fact, thereby distorting the margin.

The Court notes that Commerce did not raise the material factual differences between Salzgitter, Dillinger, and Dillinger France in the underlying final determinations of the LTFV investigations.[118]  The differences described above were not relevant to our LTFV final determinations because the partial AFA methodology applied in the final determinations would ensure cooperation from respondents in future proceedings, particularly as applied to Salzgitter. However, after the Court ordered Commerce to apply the revised partial AFA methodology in *Dillinger France I*, these differences between the respondents became both apparent and relevant, as demonstrated in the different impact on the respondents' margins by applying this methodology and Commerce's inability to obtain its goals in applying partial AFA for Salzgitter.

Further, the Court in *Dillinger France I* considered the application of partial AFA only as it pertained to one respondent, Dillinger France, based on a different record in a different case. The Court in that proceeding (and Commerce in its remand redetermination) did not need to consider whether any differences between the respondents in the CTL plate from Germany LTFV investigation and CTL plate from France LTFV investigation were relevant.  In this proceeding, we find that the difference in the application of partial AFA to the respondents, as described above, is relevant.  Accordingly, Commerce's *Final Determination* partial AFA methodology for Salzgitter, which results in an estimated weighted-average dumping margin of 22.90 percent, should be sustained on remand.

---

[118] *See Dillinger Germany II,* Slip Op. 21-101 at 18.

## IV.    INTERESTED PARTY COMMENTS

On December 3, 2021, Commerce released the draft results of redetermination to all interested parties and invited interested parties to comment.[119]  On December 21, 2021, we received comments from Nucor Corporation (Nucor);[120] SSAB Enterprises LLC (SSAB);[121] Dillinger;[122] and Salzgitter.[123]

**Comment 1:  Non-Prime Plate Adjustment**

*Dillinger Comments*

- Commerce erred in the Draft Remand Results in shifting the reported COP from non-prime to prime plate.  This methodology of shifting costs to reflect the sales value of the non-prime plate was rejected by the CAFC.[124]

- Commerce incorrectly claims that Dillinger values non-prime plate at its sales value in its normal books and records.  Rather, all costs related to the production of heavy plate, regardless of whether the plate is prime or non-prime merchandise, is booked to the same cost object.  Moreover, even if Dillinger's normal books and records valued non-prime plate at its sales value, under *Dillinger France I*, it would still be improper for Commerce to rely on this information in reporting COP.[125]

---

[119] *See AG Der Dillinger Hüttenwerke, v. United States* Court No. 17-00158, Slip. Op. 21-101 (CIT August 18, 2021), Draft Results of Redetermination Pursuant to Court Remand Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany, issued on December 3, 2021 (Draft Remand Results).

[120] *See* Nucor's Letter, "Comments on Draft Results of Redetermination," dated December 21, 2021 (Nucor Comments).

[121] *See* SSAB's Letter, "Comments on Draft Remand Redetermination," dated December 21, 2021 (SSAB Comments).

[122] *See* Dillinger's Letter, "Comments on Draft Results of Redetermination," dated December 21, 2021 (Dillinger Comments).

[123] *See* Salzgitter's Letter, "Comments on Draft Results of Redetermination Pursuant to Second Court Remand," dated December 21, 2021 (Salzgitter Comments).

[124] *See* Dillinger Comments at 1-2 (citing *Dillinger France II*; *see also Dillinger Germany II*, Slip Op. 21-101).

[125] *Id*. at 2 (citing Remand Supplemental Response at 8-9; and *Dillinger France I* at 1324).

- Commerce also incorrectly stated that Dillinger did not report the actual costs of producing non-prime plate.  The COM for the non-prime CONNUMs Dillinger reported corresponds to the average actual total COM for all plate sold during the POR.[126]

- Throughout the underlying LTFV investigation, Dillinger fully disclosed its difficulties in reporting all of the physical characteristics for non-prime plate and proposed alternatives to report the physical characteristics it could not identify.  Commerce made no objections to Dillinger's non-prime physical characteristic reporting methodology.[127]

- Moreover, the reporting of physical characteristics for non-prime merchandise is not necessary because no non-prime merchandise was sold to the United States; therefore, none of the home market sales of non-prime merchandise would be used in the margin calculations to be matched to U.S. sales.[128]

- No necessary information is missing from the record.  Dillinger properly reported COP for both prime and non-prime merchandise and Commerce fully verified this information.  The calculation of COP for prime material is entirely independent from the calculation of COP for non-prime material and no party has challenged the costs of prime material.[129]

- Although Commerce states that it must have actual product-specific cost information for non-prime plate, the average net sales value it uses as "facts available" is neither product-specific nor related to actual costs.  Commerce failed to demonstrate that the net sales value used for non-prime merchandise bears any relation to the actual costs of producing that plate.  Therefore, in no case can the net sales value of non-prime plate be properly

---

[126] *Id.* at 2-3 (citing Remand Supplemental Response at 6-7, 12-13, and Appendix R-5).
[127] *Id.* at 3-4.
[128] *Id.* at 4.
[129] *Id.* at 3.

used as "facts available" for the actual cost of non-prime plate under section 776(a) of the Act.[130]

- The average actual costs Dillinger reported for the cost of non-prime plate represent the best information available on the record for the actual COP of non-prime plate. This information corresponds to the average actual total COM for all plate sold during the POI and fulfills the requirements of section 782(e) of the Act.[131]

- Commerce's use of the likely selling price of non-prime plate, rather than the actual average COP reported by Dillinger, is effectively an impermissible adverse inference. Under section 776(b) of the Act, Commerce may only impose an adverse inference when a party has failed to cooperate. Dillinger fully cooperated to the best of its ability during the LTFV investigation; therefore, Commerce's implicit adverse inference in its non-prime plate adjustment methodology is unwarranted and unreasonable.[132]

*Nucor Comments*

- Commerce properly relied on the costs for prime and non-prime merchandise, as recorded in Dillinger's normal books and records, as the best available information for the non-prime plate adjustment in the Draft Remand Results. Commerce's approach is fully supported by the record and is consistent with the statute, the Court's order, and the CAFC's opinion in *Dillinger France II.*[133]

---

[130] *Id*. at 4.
[131] *Id.* at 5.
[132] *Id*. at 5-6.
[133] *See* Nucor Comments at 13-16 (citing sections 776(a) and 782(d) of the Act; and *Dillinger France II*, 981 F.3d at 1321 and 1324).

*Commerce's Position:*

We continue to find that, because Dillinger failed to submit either the actual product-specific costs of producing the non-prime products or the physical characteristics of the non-prime products, as requested, Commerce does not have the information that is necessary to calculate the actual costs of prime and non-prime products.  As explained above, Commerce has an obligation to ensure that the reported COP reasonably reflect the cost of producing the merchandise under consideration and necessarily analyzes information pertaining to the cost of producing the merchandise under consideration on both an aggregate and product-specific basis.[134]  Moreover, the Court ordered a remand requiring Commerce to "reconcile its COP determination with the CAFC decision in *Dillinger France II*."[135]  In *Dillinger France II*, the CAFC specifically ordered a remand requiring Commerce to "determine the actual costs of prime and non-prime products."[136]  Indeed, given the combination of the CAFC's directive that Commerce "determine the actual costs of prime and nonprime products" and Commerce's long-standing, judicially-approved practice of analyzing costs on a CONNUM-specific basis,[137] it is perplexing that Dillinger continues to claim that its failure to submit the actual product-specific costs of producing non-prime products or, at a minimum, the physical characteristics of non-prime products, as Commerce requested, has not resulted in a record lacking necessary information.

Dillinger's argument, that section 782(c) of the Act requires that Commerce depart from its long-standing, judicially-approved practice of analyzing costs on a CONNUM-specific basis

---

[134] *See* Remand Supplemental Questionnaire at 3; *see also Thai Plastic Bags*, 746 F. 3d at 1368.
[135] *See Dillinger Germany II*, Slip Op. 21-101 at 6.
[136] *See Dillinger France II*, 981 F. 3d at 1321.
[137] *See Thai Plastic Bags*, 746 F.3d at 1368.

because Dillinger cannot provide the necessary information, is misplaced.[138]  Section 776(a)(1) of the Act requires that Commerce apply facts otherwise available if "necessary information is not available on the record."  Unlike section 776(a)(2)(B) of the Act, which requires that Commerce consider section 782(c) of the Act before applying facts available when an interested party fails to provide requested information by the deadlines or in the form and manner requested, section 776(a)(1) of the Act simply requires that necessary information is not available on the record.  Here, as discussed above, information pertaining to the actual cost of producing the non-prime products and their physical characteristics is necessary information and Dillinger's claim that it is unable to provide the necessary information does not create an obligation for Commerce to depart from its long-standing, judicially-approved practice of analyzing costs on a CONNUM-specific basis.

Further, Dillinger's argument that Commerce must accept the overall average cost of prime products as a surrogate for the actual costs of producing non-prime products because no party challenged Dillinger's reporting of physical characteristics for non-prime plate is meritless.  First, Commerce explained above why the overall average cost of producing prime products is not an appropriate substitute for the actual product-specific COP.  Second, Dillinger's argument that Commerce never challenged Dillinger's reporting of the physical characteristics of non-prime products fails to acknowledge key facts.  The combination of Dillinger's assertion that it could not report the physical characteristics of non-prime products, Commerce's decision to

---

[138] Section 782(c) of the Act provides that "{i}f an interested party, promptly after receiving a request from the administering authority or the Commission for information, notifies the administering authority or the Commission (as the case may be) that such party is unable to submit the information requested in the requested form and manner, together with a full explanation and suggested alternative forms in which such party is able to submit the information, the administering authority or Commission (as the case may be) shall consider the ability of the interested party to submit the information in the requested form and manner and *may* modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party" (emphasis added). Section 782(c) of the Act does not require that Commerce alter its judicially approved practice of analyzing costs on a CONNUM-specific basis.

Barcode:4203167-01 A-428-844 REM - Remand  -  CIT 17-00158, Slip Op. 21-101

accept the allocation of total costs assigned to non-prime products as recorded in Dillinger's normal books and records (*i.e.*, the actual sales value), and the fact that no non-prime products were sold to customers in the United States (*i.e.*, the non-prime products sold in the home market would never serve as a potential match to products sold in the United States), rendered a discussion of Dillinger's claimed inability to report the physical characteristics of non-prime products unnecessary for the *Final Determination*.  While Dillinger's reporting of the physical characteristics was not relevant for the *Final Determination*, the accurate reporting of the physical characteristics of non-prime products became necessary once the Court held that Commerce must determine the actual costs of prime and non-prime products.  Accordingly, Commerce reopened the record and issued a supplemental questionnaire to obtain the information deemed necessary by the Court (*i.e.*, the actual CONNUM-specific costs and the physical characteristics of non-prime products).[139]  As discussed above, Dillinger did not submit the requested information.[140]

Dillinger's argument that the costs of non-prime products have no impact on the margin calculation, since no non-prime merchandise was sold to the United States, is flawed.  It is a *non sequitur* to state that "the draft results of redetermination err in shifting reported costs of production from non-prime plate to prime plate"[141] and then argue that the issue has no impact on the margin calculation.[142]  Because the shifting of costs from prime to non-prime products has a direct effect on the costs of both product groups, it directly affects the results of the sales-below-cost test and calculation of constructed value profit, regardless of whether non-prime products were sold in the United States.  Indeed, the fact that the weighted-average dumping

---

[139] *See* Remand Supplemental Questionnaire.
[140] *See* Remand Supplemental Response at 1-8.
[141] *See* Dillinger Comments at 1-2.
[142] *Id* at 4.

margin changes as a result of the allocation of costs between prime and non-prime products demonstrates that there is an impact on the calculated weighted-average dumping margin, and it also illustrates why ensuring the accurate reporting of product-specific production costs is an essential step in Commerce's obligation to ensure that the reported costs reasonably reflect the cost of producing the merchandise under consideration.[143]

As mentioned above, we continue to find that Dillinger failed to submit either the actual product-specific costs of producing the non-prime products or the physical characteristics of the non-prime products and have applied facts otherwise available, pursuant to section 776(a)(1) of the Act, because necessary information (*i.e.*, the actual CONNUM-specific costs of producing non-prime products) is not available on the record.  Section 776(a)(1) of the Act simply requires that necessary information is missing from the record and does not, unlike section 776(a)(2) of the Act consider whether a party has impeded a proceeding or withheld information.  Section 776(a) of the Act states that *either* necessary information is missing from the record *or* an interested party has impeded the proceed or withheld information.  There is no *and* statement; section 776(a) does not require both conditions to be met to apply facts otherwise available.  Indeed, in a recent case this Court held that section 776(a) of the Act has several layers and multiple uses, stating "{n}otably, paragraphs (1) and (2) are in the alternative, joined by the word 'or,' meaning that Commerce must use facts otherwise available if *either* necessary

---

[143] *See* section 773(f)(1)(A) of the Act (stating that "{c}osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and *reasonably* reflect the costs associated with the production and sale of the merchandise." (emphasis added.))  Additionally, the Court has recognized that Commerce "must ensure that {a respondent's} reported costs capture all of the costs incurred by the respondent in producing the subject merchandise' before it can appropriately use that respondent's cost allocation methodology." *See Sidenor Indus. SL v. United States*, 664 F. Supp. 2d 1349 (CIT 2009) (quoting *Myland Indus., Ltd. v. United States*, 31 CIT 1696, 1703 (CIT 2007)).

information is not available *or* the circumstances in paragraph (2) apply."[144]  Accordingly,

Dillinger's argument that it cooperated to the best of its ability in this proceeding and, thus, that

Commerce has imposed an impermissible adverse inference under section 776(b) of the Act is

misplaced.  What is required is merely that one of the conditions provided by the statute is met –

here, the record is missing necessary information and, thus, one of the conditions under section

776(a) of the Act is met.

　　　We disagree with Dillinger's assertions that the overall average cost of producing non-

prime plate satisfies the requirements of section 782(e) of the Act and represents the best

available information on the record such that the use of facts otherwise available is not

necessary.  Section 782(e) of the Act provides that:

> Commerce shall not decline to consider submitted information if all of the following
> requirements are met:  (1) the information is submitted by the established deadline;
> (2) the information can be verified; (3) the information is not so incomplete that it
> cannot serve as a reliable basis for reaching the applicable determination; (4) the
> interested party demonstrated that it acted to the best of its ability; and (5) the
> information can be used without undue difficulties.

As explained previously, the use of the overall average cost of producing prime products cannot

serve as a reliable basis for calculating an accurate weighted-average dumping margin because it

assigns the same costs to products with varying physical characteristics even though there is, in

fact, a wide disparity in the reported actual total COM amounts for prime products.[145]

Dillinger's contention that the use of the overall average actual cost of producing prime plate

satisfies the Court's and the CAFC's directive because it necessarily results in the calculation of

the actual aggregate costs of producing non-prime products is false.  As discussed above, while

---

[144] *See Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1336 (CIT 2020) (further explaining that the first
pathway for applying the facts otherwise available analysis focuses solely on the absence of necessary information,
not the reason why it is missing).
[145] *See* Dillinger SQRD2 at Exhibit SD-50 (containing a printout of Dillinger's COP database labeled "dhcop03").

Dillinger knows its total costs of producing all products (*i.e.*, both prime and non-prime),[146] Dillinger does not record the actual product-specific costs of producing non-prime products.[147] Dillinger's argument that the overall actual average cost of producing all of its prime plate sold equals the product-specific cost of the non-prime plate produced assumes, without evidence, that the product mixes of prime and non-prime products produced during the period are identical.  If Dillinger had wanted to present evidence of the specific non-prime products produced, it could have relied on production reports or finished goods inventory excerpts to show which production runs resulted in the production of non-prime plate.  Dillinger chose not to do so.  Further, we disagree with Dillinger's claim that we incorrectly stated that it values non-prime plate at its sales value in its normal books and records.  In fact, in its supplemental questionnaire response, Dillinger stated that "in Dillinger's internal factory results, non-prime merchandise is reported at its sales value (*i.e.*, manufacturing costs = net sales value)."[148]  Likewise, we disagree with Dillinger's argument that the net sales value of non-prime plate cannot be properly used as "facts available" for the actual cost of non-prime plate.  As mentioned above, since Dillinger was not able to provide the actual specific costs of producing the non-prime products or the physical characteristics of the non-prime products, Commerce has to resort to use the best available information on the record.  Accordingly, because Dillinger has not reported the actual product-specific costs of producing non-prime products and, because Commerce has verified the total costs of producing all products during the POI,[149] we are relying on the allocation of costs between prime and non-prime products recorded in Dillinger's normal books and records as the best available information.  While we recognize that the use of the non-prime cost information

---

[146] *See* Dillinger Cost Verification Report at 9.
[147] *See* SDQR1 at 22.
[148] *See* SDQR1 at 22.
[149] *See* Dillinger Cost Verification Report at 9.

recorded in Dillinger's normal books and records (*i.e.*, the actual sales prices) does not vary by CONNUM and does not reflect cost differences attributable to the physical characteristics, this information is preferable because it is based on the actual costs Dillinger assigns to the non-prime products produced in its normal books and records.

**Comment 2:  Major Input Rule Applied to Blast Furnace Coke**

*Dillinger Comments*

- Commerce's failed to explain in the Draft Remand Results how it determined the "Affiliated Consumption (Transfer Price)" of [     ] EUR/MT.  The source for this value is either incorrect or missing from the Draft Remand Calculation Memorandum. Specifically, Commerce cites "Attachment 1.2." as the source of this figure; however, no such attachment exists.[150]

- Commerce fails to explain in the Draft Remand Results how the calculated transfer price comports with the Court's instruction that the adjustment be contemporaneous and on the same basis (*i.e.*, wet- vs. dry-weight basis, freight, G&A, and interest expenses).  Rather, Commerce's Draft Remand Results adjustment distorts the actual difference between the contemporaneous POI prices for large coke purchased from ZKS and unaffiliated parties.[151]

- Commerce's average freight calculation for unaffiliated coke purchases is distortive because it calculated an average freight rate for the POI for all unaffiliated coke purchases, rather than apply the county-specific POI freight rate that Dillinger reported.[152]

---

[150] *See* Dillinger Comments at 6 (citing Draft Remand Calculation Memorandum at Attachment 3.).
[151] *Id.* at 6-7 (citing Remand Supplemental Response at Appendix R-13).
[152] *Id.* at 7.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED
Barcode:4203167-01 A-428-844 REM - Remand  -  CIT 17-00158, Slip Op. 21-101

- Commerce further erred by applying facts available to the small blast furnace coke consumed, for which there were no contemporaneous purchases of small blast furnace coke from unaffiliated parties.  In such circumstances, Commerce's normal practice would be to compare the transfer price with the affiliate's COP of the input.  Instead, Commerce used the adjustment calculated for large blast furnace coke to increase Dillinger's reported costs for small blast furnace coke.  In doing so, Commerce essentially applied an adverse inference in applying the major input rule to Dillinger's small coke purchases, even though none of the statutory requirements of section 776(a) or (b) of the Act are present.[153]

- If Commerce continues to adjust ZKS' total cost of producing coke to add G&A and other expenses to the transfer price of the inputs and services Dillinger provided, Commerce must also include the additional cost of over [          ] Euros to the market price in its major input analysis of the coke inputs supplied by ZKS.  Otherwise, Commerce overstates the difference between the cost and the market value.[154]

*Nucor Comments*

- Commerce's calculation of the major input adjustment for coke in the *Final Determination* was appropriate and supported by the record.  However, in consideration of the Court's remand instructions and the additional information collected by Commerce as part of this proceeding, Nucor considers that Commerce's adjustment in the Draft Remand Results complies with the Court's instructions.[155]

---

[153] *Id.*
[154] *Id.* at 7-8.
[155] *See* Nucor Comments at 16.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

*Commerce's Position:*

We disagree with Dillinger that the Draft Remand Results fail to explain how Commerce determined its proposed market value and how the proposed value comports with the Court's ruling of being contemporaneous and on the same basis.[156] First, we acknowledge that the reference to Attachment 1.2 in the Draft Remand Calculation Memorandum was an error; the correct reference is to Attachment 3 at page 2. Nevertheless, the calculation of the [    ] EUR/MT figure is shown on the second page of Attachment 3 to the Draft Remand Calculation Memorandum, as Dillinger acknowledges.[157] While Dillinger also claims there is no explanation as to how Commerce derived the figures on this page, Dillinger notes the source Commerce cited in this calculation. Specifically, Dillinger states that the "source for the calculation is '11/7/16 Supp D, Appendix SD-34' so it is not clear as to whether any of the information in Dillinger's October 5, 2021 questionnaire response was used in arriving at the [    ] Eur/MT figure."[158] Thus, while Dillinger acknowledges that Commerce explained how the market value was calculated, Dillinger suggests that Commerce is limited to using only the Remand Supplemental Response in the remand redetermination. We disagree. Commerce referenced the source for each value used in the calculation of the [    ] EUR/MT figure in the Draft Remand Results.[159] The fact that a source document listed on the worksheet was from the record of the LTFV investigation does not mean the calculation is unsupported or unexplained.

We also disagree that our calculation in the Draft Remand Results distorts the actual difference between the contemporaneous POI price of large coke purchased from ZKS, and the

---

[156] While Dillinger identifies the "'Affiliated Consumption (Transfer Price)'" of [    ] EUR/MT" (*see* Dillinger Comments at 6), this value and the associated source document (Attachment 1.2) subsequently referenced by Dillinger actually reflect the unaffiliated consumption value (market price), rather than the transfer price.
[157] *See* Dillinger Comments at 6.
[158] *Id*.
[159] *See* Draft Remand Calculation Memorandum at Attachment 3.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

price of purchases from unaffiliated third parties.  Dillinger in its comments referred to POI average purchase values,[160] and therefore disregards the Court's decision to uphold Commerce's use of consumption values in this proceeding.[161]  The per-unit cost of [     ] EUR/MT Commerce calculated reflects an average consumption value, while the [     ] EUR/MT Dillinger proffered pertains to an average purchase value.  The Court states that "the court is not persuaded by Dillinger's argument that Commerce contravened {19 CFR} 351.407(b) by selecting consumption values over purchase prices for determining coke value under the major input rule."[162]  Therefore, there is no distortion in Commerce's use of consumption values in comparing affiliated and unaffiliated supplier pricing behavior in the major input calculation.

We also disagree with Dillinger that Commerce's average freight calculation in the Draft Remand Results is distortive.  In its brief to the Court, Dillinger argued that Commerce made an unreasonable assumption that coke transport costs from [                    ] are the same as those from [                              ].[163]  Our revisions in the Draft Remand Results remedy this issue.  While our calculation of the average freight cost during the POI still reflects transport from [                ], we deducted this POI average freight cost from a revised per-unit average coke consumption value that no longer includes the non-POI purchases from [                ].[164]  Further, we only deducted these freight costs from the consumption values of coke that were transported from [                ].  Thus, our overall revised major input analysis addresses Dillinger's original concern that the average

---

[160] *See* Dillinger Comments at 6-7.
[161] *See Dillinger Germany II*, Slip Op. 21-101 at 7.
[162] *Id.*
[163] *See* Dillinger Brief at 41.
[164] *See* Dillinger Final Cost Calc Memo at Attachment 2.2.

freight cost Commerce calculated was too low to be used to adjust purchases from [

].[165]

However, Dillinger now argues that Commerce must calculate a country-specific freight

rate. We disagree. First, Dillinger failed to proffer this argument prior to this remand

proceeding even though our use of an average freight rate is consistent with our freight

calculation in the *Final Determination*.[166] Rather, Dillinger challenged the use of pre-POI

unaffiliated blast furnace coke purchases that were "influenced by higher freight costs"[167] and

were not properly adjusted with a freight rate that reflects purchases from "[

]."[168] Because the pre-POI purchases that Dillinger challenged have been

removed from our calculations, we now properly match the average POI freight costs from

[                                                          ], with purchases from those same

countries.[169] Second, Commerce routinely relies on averages in calculating major and minor

input adjustments.[170] In fact, the courts have approved Commerce's use of overall averages in its

calculations.[171] Thus, after the changes applied in our Draft Remand Results, we do not find that

using an average freight rate for [                                    ] to adjust purchases from

those same countries is unreasonable.

---

[165] *See* Dillinger Brief at 41.

[166] *See* Dillinger Final Cost Calc Memo at Attachment 2.2.

[167] *See* Dillinger Brief at 40.

[168] *See* Dillinger Brief at 41.

[169] *See* Draft Remand Recalculation Memorandum at Attachment 3.

[170] *See, e.g., Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 16646 (April 22, 2019), and accompanying IDM at Comment 5, where Commerce used an average of two market prices in the major input analysis; and, *Fine Denier Polyester Staple Fiber from the Republic of Korea: Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 24743 (May 30, 2018), and accompanying IDM at Comment 11, where Commerce explains that "{t}he reported costs are a weighted-average of the costs TCK incurred during the POI. Accordingly, the transactions disregarded analysis also needs to be based on the weighted-average of all the affiliated and unaffiliated purchases TCK made during the POI."

[171] *See Non-Oriented Electrical Steel from the Republic of Korea: Final Determination of Sales at less Than Fair Value and Negative Determination of Critical Circumstances*, 79 FR 61612 (October 14, 2014), and accompanying IDM at Comment 2.

We also disagree with Dillinger that Commerce essentially applied an adverse inference in its calculation of the major input adjustment to small blast furnace coke consumption. Dillinger states that under the major input rule, Commerce practice is to simply compare the transfer price with the affiliate's cost of producing the input when there are no contemporaneous market prices on the record.[172]  Dillinger adds that, contrary to Commerce's claims, it is not necessary to have contemporaneous purchases of small blast furnace coke information on the record to use in the application of the major input rule.[173]  Dillinger's interpretation of the major input rule is incorrect.  In the absence of a market price, Commerce's practice is to obtain surrogate information, where available, that would allow it to fulfill the requirements of sections 773(f)(2) and (3) of the Act to test the affiliated party transactions for major inputs against both market prices and the affiliate's COP.[174]  In this case, we determined that the most reasonably available information was the pricing behavior between the same parties for a similar input. Thus, we relied on the difference between the market value and transfer price of large coke, as this data is readily available and the inputs are similar.[175]  Therefore, Commerce did not apply an adverse inference in its calculation of the margin input adjustment.  Rather, we relied on the information available on the record in order to satisfy the statutory analysis described in sections 773(f)(2) and (3) of the Act, that is, a comparison of the transfer price for a major input to both a market price and to the affiliate's COP for the input.  Because no contemporaneous market price for small blast furnace coke was available on the record, we relied on the difference between the market and transfer prices for large blast furnace coke as indicative of the affiliate's pricing

---

[172] *See* Dillinger Comments at 7.
[173] *Id*.
[174] *See Mattresses from Cambodia:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 86 FR 15894 (March 25, 2021) (*Mattresses from Cambodia*), and accompanying IDM at Comment 1.
[175] *See* Draft Remand Calculation Memorandum at Attachment 3.

behavior for small coke.  Therefore, we did not err in using the facts available on the record to determine whether the small coke transfer prices reflect market prices, but rather relied on the best information available to comply with the analysis outlined in the statute.

Finally, Dillinger contends that, if Commerce adjusts ZKS' cost of producing the blast furnace coke, this adjustment should also be factored into Commerce's major input analysis of the affiliated coke inputs.  While we performed a transactions disregarded analysis of the inputs and services ZKS obtained from Dillinger in accordance with section 773(f)(2) of the Act, ultimately, we did not rely on ZKS' total cost of producing coke in our calculation of the major input adjustment to coke inputs.[176]  As noted above, in our major input analysis of the affiliated coke inputs, we determined that the market value was higher than both the transfer price and the affiliate's actual cost of producing the coke.  Because Dillinger's reported costs include coke inputs at their transfer price, our major input adjustment is therefore calculated as the difference between the market price and the transfer price for the coke.  Therefore, ZKS' actual cost of producing the coke was not a component in the calculation of our major input adjustment, and any potential adjustment to ZKS' total blast furnace coke costs (large and small) need not be incorporated into the major input adjustment applied to the reported costs.

**Comment 3:  Adjustment to Expenses for Inputs and Services Provided to Affiliates**

*Dillinger Comments*

- There is no basis for Commerce's adjustment.  It is not in dispute that the transfer prices Dillinger charged ZKS and Rogesa were higher than Dillinger's total cost of the inputs and services provided.  However, increasing the transfer price to include a portion of Dillinger's G&A expenses only increases Dillinger's other income which, under

---

[176] *See* Dillinger Final Cost Calc Memo at Attachment 3; and Draft Remand Calculation Memorandum at Attachment 3.

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

Commerce's long-standing practice, is treated as an offset to G&A expenses. Thus, Commerce's adjustment that increases G&A expenses at one level and offsets them by income at another level makes no sense.[177]

- Commerce failed to adequately explain the calculation of this adjustment in the Draft Remand Results because the market value figure used in the calculation cannot be found in Attachment 4 of the Dillinger Final Cost Calc Memo, the source referenced in the Draft Remand Results.[178]

- In the Draft Remand Results, Commerce miscalculated the denominator used in the calculation of the adjustment. Instead of [          ] Euros, Commerce should use Dillinger's full POI COP of [          ] Euros. Alternatively, Commerce should revise the portion of the denominator related to CTL plate to reflect the total COM of CTL plate of [          ] Euros, rather than the [          ] Euros used in the Draft Remand Results.[179]

*Nucor Comments*

- In its Draft Remand Results, Commerce properly continued to adjust the reported costs so that the inputs and services Dillinger provided to ZKS and Rogesa, and the inputs ZKS and Rogesa in turn provided to Dillinger, reflect arm's length values.[180]

- Commerce addressed each specific argument raised by Dillinger regarding the calculation and implemented several revisions as a result.[181]

---

[177] *See* Dillinger Comments at 8.
[178] *Id.* at 8-9.
[179] *Id.* at 9 (citing SQRD2 at Appendix SD-44; and Draft Remand Calculation Memorandum at Attachment 4).
[180] *See* Nucor Comments at 18.
[181] *Id.*

- Therefore, pursuant to the Court's order, Commerce's Draft Remand Results fully address Dillinger's comments and explain Commerce's adjustments related to the inputs and services Dillinger provided to ZKS and Rogesa.[182]

*Commerce's Position:*

In accordance with the Court's order, Commerce addressed each argument proffered by Dillinger with regard to the inputs and services that Dillinger provided to its affiliates ZKS and Rogesa during the POI. While our evaluation of Dillinger's original arguments resulted in revisions to our analysis and calculation of this adjustment, our revised analysis nonetheless demonstrates that there is a basis for an adjustment.

As noted above, Commerce compared the transfer prices Dillinger charged ZKS and Rogesa for the inputs and services to Dillinger's total cost of the inputs and services. We calculated the total cost of these affiliated transactions as the cost of the inputs and services provided plus an allocated portion of Dillinger's G&A expenses (calculated by applying Dillinger's G&A expense ratio to the cost of the inputs and services). While Dillinger claims the transfer price covers the cost of the inputs and services, Dillinger's reported cost for the inputs and services did not include G&A expenses.[183] We explained above that it was appropriate to include a portion of Dillinger's G&A expenses because the denominator to Dillinger's G&A expense ratio included the cost of the inputs and services provided to Dillinger's affiliates. Although Dillinger continues to argue that the other income collected from ZKS and Rogesa for the inputs and services (the transfer price) offsets the associated costs and makes an allocation of G&A expenses to the cost of the inputs and services unnecessary, we disagree. As noted above, we confirmed with Dillinger that the other income collected from ZKS and Rogesa (the transfer

---

[182] *Id.* at 18-19.
[183] *See* SQRD1 at Appendix SD-26.

price) was not included in the calculation of Dillinger's G&A expense ratio.  Had Dillinger excluded the cost of the inputs and services from the G&A expense ratio denominator or included the other income in the denominator to "offset" the associated costs, then Dillinger would be correct that it is unnecessary to add G&A expenses to the cost of these affiliated inputs and services.  However, this is not the case.  Dillinger's calculation of its G&A expense ratio, which includes the cost of the inputs and services provided to ZKS and Rogesa in its denominator, effectively acknowledges that a portion of its G&A expenses are related to these affiliated activities.  Thus, our addition of a portion of Dillinger's G&A expenses in calculating the total cost of the affiliated inputs and services merely follows Dillinger's reported methodology for calculating its G&A expense ratio.

Regarding Dillinger's comments on our calculation worksheet, we first note that the worksheet includes fields for values, for any formulas used to calculate values, and for references to source documents used in the calculation.  For the market value shown on the worksheet, our reference to Attachment 4 of the Dillinger Final Cost Calc Memo provides the source for Dillinger's G&A expense ratio, which is a component of the formula that calculates the market value.  However, we note that we also calculated the same market value in the Dillinger Final Cost Calc Memo; therefore, the market value itself can be found at Attachment 3 of that document.

Finally, Dillinger objects to the denominator used in the calculation of the adjustment but provides no argument to support the use of the proffered alternatives.  We examined the alternative denominators submitted by Dillinger and find that they are not on the same basis as the per-unit TOTCOMs to which the adjustment will be applied.  Specifically, Dillinger's

alternative denominators include G&A and other expenses that are not included in TOTCOM.[184]
As a result, we do not find it appropriate to rely on the alternative denominators Dillinger
submitted for the calculation of the affiliated transactions adjustment.

**Comment 4:  Remand Results on Partial AFA**

*Salzgitter Comments*

- Commerce's draft remand results do not meet the Court's remand requirements because
  Commerce failed to adequately explain the alleged differences between the AFA
  determinations in the underlying LTFV investigations of CTL plate from Germany and
  France that would support different AFA treatment.  In particular, Commerce's reliance
  on highlighting the difference in the number of reported sales for which manufacturer
  data was missing is overly simplistic.  Commerce should instead consider the quantity of
  such sales that would have been compared to U.S. sales; under that metric there is no
  significant difference between Salzgitter and the Dillinger companies.[185]

- Commerce incorrectly stated that applying the *Dillinger France I* AFA methodology to
  Salzgitter frustrates the goal of inducing cooperation by ensuring a non-cooperative
  respondent does not receive a more favorable rate than if it had cooperated fully.  Based
  on Salzgitter's analysis, Salzgitter would not have received a more favorable AFA rate if
  it had reported the manufacturer for all home market sales.[186]

- Commerce's application of the AFA methodology from the *Final Determination* is
  unreasonable and contrary to the conclusions in *Dillinger France I*, in which the Court
  noted that the reliability of the reported sales prices had not been questioned.  There is no

---

[184] *See* SQRD2 at Appendix SD-44.
[185] *See* Dillinger Comments at 3-5.
[186] *Id*. at 5-8.

information gap for Commerce to fill with AFA because Salzgitter reported the requisite

information for the vast majority of sales at issue.  Further, the missing manufacturer

information would not affect the margin, according to Salzgitter's methodologies of

incorporating none, some, or all of the unknown manufacturer sales in the calculation of

NV.[187]

*SSAB Comments*

- Commerce's draft remand results explain in detail the material differences in applying the
  *Dillinger I* AFA methodology between Salzgitter, Dillinger, and Dillinger France,
  pursuant to the Court's remand instructions.  Commerce's application of the *Final
  Determination* AFA methodology to Salzitter is appropriate given these meaningful
  differences.[188]

- The application of AFA is an essential tool to provide respondents with an incentive to
  cooperate that ensures they do not receive a more favorable result by failing to cooperate.
  As Commerce explained in the draft remand results, the application of the *Dillinger
  France I* methodology to Salzgitter may well have provided Salzgitter with a more
  favorable dumping margin than if Salzgitter had fully cooperated.  Thus, Commerce's
  application of the *Final Determination* AFA rate fulfills the purpose of establishing an
  adequate deterrent to future noncooperation.[189]

- Commerce's selection of Salzgitter's AFA rate is also appropriate in this instance
  because it relied on Salzgitter's own price information and applied it to those sales where
  Salzgitter did not cooperate by supplying all of the requested information.  As a result,

---

[187] *Id*. at 8-11.
[188] *See* SSAB Comments at 1-5.
[189] *Id.* at 5-9.

Commerce's selection was reasonable and consistent with the statutory intent of applying AFA.[190]

*Nucor Comments*

- Commerce fully explained in the draft remand results the factual differences between Salzgitter, Dillinger, and Dillinger France, and why these differences justify applying partial AFA differently. Commerce's explanation fully complies with the Court's remand and should be maintained in the final results of redetermination.[191]

- Specifically, Salzgitter failed to identify the manufacturer for 28,000 SMSD sales, which accounted for a significant portion of Salzgitter's home market sales; thus, the application of the AFA rate also had a significant margin impact. In contrast, the number of downstream sales for which Dillinger failed to report the manufacturer was small; thus, the application of the AFA rate had no impact on the margin. Accordingly, the number of affected sales represents the extent of each respondent's failure to cooperate and the corresponding extent to which each record was incomplete, facts which support different approaches to the application of AFA.[192]

- Commerce further satisfied the Court's remand by pointing out that application of the *Dillinger I* methodology to Salzgitter would likely result in a more favorable result (*i.e.*, exclusion from the antidumping duty order) than if Salzgitter had cooperated fully. This result would undermine the purpose of AFA to encourage full cooperation by all respondents.[193]

---

[190] *Id.* at 9-10.
[191] *See* Nucor Comments at 8-10.
[192] *Id.* at 10-11.
[193] *Id.* at 11-13.

*Commerce's Position:*

The Court remanded the *Final Determination* to Commerce to explain why:  (1) Commerce did not address the material factual differences between Salzgitter, Dillinger, and Dillinger France on the AFA issue in the *Final Determination* and the CTL plate from France LTFV investigation;[194] (2) these material factual differences warrant differing AFA treatment among these companies;[195] and (3) applying a different AFA methodology to Salzgitter than to Dillinger and Dillinger France is reasonable.[196]

As discussed above, Commerce complied fully with the Court's instructions.  We explained that the material factual differences between the companies were not apparent or relevant in the CTL plate from France and Germany LTFV final determinations in applying the original partial AFA methodology, but are now apparent and relevant based on the application of the *Dillinger France I* partial AFA methodology.  We demonstrated above that these material differences had a significant impact on Salzgitter's margin, but no impact on the margins calculated for either Dillinger or Dillinger France.  In turn, these differences affected Commerce's goals in using partial AFA as a means to induce cooperation because the margin result for Salzgitter under the *Dillinger France I* methodology provides no incentive for Salzgitter to cooperate by providing requested information to Commerce.  Accordingly, applying the *Final Determination* partial AFA methodology to Salzgitter is reasonable.

Contrary to Salzgitter's claims, the Court did not instruct Commerce to rely on record information not in dispute (*i.e.*, Salzgitter's reported home market price data) in responding to the Court's remand.[197]  The Court previously affirmed that Commerce's application of partial

---

[194] *See Dillinger Germany II* at 18.
[195] *Id.*
[196] *Id.*
[197] *See* Salzgitter Comments at 7-9 (citing *Dillinger France I*, 350 F. Supp. 3d at 1364).

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

AFA to Salzgitter in the *Final Determination* was warranted.[198]  In its opinion, the Court acknowledged Commerce's statutory authority under section 782(d) of the Act to "disregard all or part of the original and subsequent responses" when relying on AFA.[199]  Accordingly, applying the *Final Determination* partial AFA methodology to Salzgitter does not conflict with the Court's instructions.

Salzgitter contends that Commerce failed to adequately explain the material differences between Salzgitter and the Dillinger companies.  To make this claim, Salzgitter asserts that comparing the number of home market sales with missing manufacturer data (*i.e.*, 28,000 for Salzgitter compared to [  ] for Dillinger) is irrelevant; the relevant metric is the number and quantity (in metric tons) of home market sales that Commerce may have compared to the products sold to the United States.[200]  Salzgitter would have Commerce establish a new test of materiality to determine whether AFA is warranted – a test that would allow a respondent, not Commerce, to determine what information is relevant for Commerce's analysis.  However, Salzgitter's proposal is not one advocated by the Court in either *Dillinger France I* or *Dillinger Germany I*, nor is it supported by the statute.

As described in detail above, the application of the *Dillinger France I* partial AFA methodology to Salzgitter deprives Commerce of the ability to apply section 776 of the Act meaningfully in this proceeding because it frustrates Commerce's goals of inducing cooperation by ensuring that a non-cooperating respondent does not receive a more favorable AFA rate than it would have received if the company had cooperated fully.  Under the *Dillinger France I* partial AFA methodology, Salzgitter would receive a zero rate and, consequently, would be excluded

---

[198] *See Dillinger Germany I*, 399 F. Supp. 3d at 1256.
[199] *Id.*
[200] *See* Salzgitter Comments at 4-5.

from the AD order.  Because of Salzgitter's failure to provide requested information, Commerce cannot determine what the resulting margin would have been if Salzgitter had complied fully with Commerce's requests to report the manufacturer information for all of its home market sales.  Thus, it is reasonable to assume that Salzgitter would receive a more favorable result under the *Dillinger France I* methodology as a result of withholding information than by providing the requested information and allowing Commerce to properly analyze the sales in question.

Salzgitter argues that the three alternatives it proposed in the *Final Determination* to account for the missing manufacturer data all resulted in a zero or *de minimis* margin;[201] therefore, Salzgitter did not receive a more favorable result than if it had provided the requested information.  However, the Court already rejected this approach in *Dillinger Germany I*, noting that Salzgitter's conclusions regarding these alternative constituted "mere speculation" and "self-serving statements or interpretations of the record," highlighting Salzgitter's failure to identify where the record actually identified the effect on Salzgitter's margin if it had supplied the manufacturer data for all its home market sales.[202]

Commerce applied the *Dillinger France I* methodology to Salzgitter in response to the Court's directions in *Dillinger Germany I*.  The differences between Dillinger France and Salzgitter were not relevant to the Court in *Dillinger France I* because only the application of partial AFA to Dillinger France was at issue.  While the Court in *Dillinger Germany I* had directed Commerce to follow the *Dillinger France I* partial AFA methodology in the interest of

---

[201] These alternatives are to treat:  1) none of the home market sales with missing manufacturer data as Salzgitter-manufactured plate; 2) all of these sales as Salzgitter-manufactured plate; or 3) a percentage of each sale as Salzgitter-manufactured plate based on SMSD's annual plate purchases from each supplier.  *See* Salzgitter Comments at 6 (citing Salzgitter's Letter, "Salzgitter Case Brief," dated February 13, 2017, at 14-15).
[202] *See Dillinger Germany I*, 399 F. Supp. 3d at 1256.

consistency, the Court in *Dillinger Germany II* has now provided Commerce with an opportunity to explain why the *Dillinger France I* partial AFA methodology should not be applied to Salzgitter.  Commerce's explanation above details the differences between Salzgitter and the Dillinger companies in:  (1) the number of sales lacking the requested manufacturer information; (2) the net prices among the sales with the missing data; and (3) the impact on the margin caused by the respondents' failure to provide the requested information.  These differences are significant and warrant the application of a different partial AFA methodology than that prescribed by *Dillinger France I* to achieve the purpose of the statute to incentivize a respondent's full cooperation in an antidumping proceeding.

## V.    FINAL RESULTS OF REDETERMINATION

As a result of our redetermination, Dillinger's and Salzgitter's estimated weighted-average dumping margins are 4.98 percent and 22.90 percent, respectively.[203]  Moreover, in accordance with section 735(c)(5)(A) of the Act, which provides that the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted-average dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins, we revised the all-others rate based on the margins noted above for Dillinger and Salzgitter, in accordance with the *Amended Final Determination*.  Accordingly, as a result of our redetermination, the all-others rate is 20.99 percent.[204]

Because Dillinger's margin and the all-others rate are different from the rates in the *Amended Final Determination*, we intend to issue a *Timken* notice with the amended final determination, should the Court sustain these final results of redetermination.  Should the Court

---

[203] *See* Draft Remand Calculation Memorandum; and *Amended Final Determination*, 82 FR at 24098, respectively.
[204] *See* Memorandum, "Calculation of the All-Others Rate for the Draft Results of Redetermination," dated December 3, 2021.

Barcode:4203167-01 A-428-844 REM - Remand - CIT 17-00158, Slip Op. 21-101

sustain these final results of redetermination with respect to Salzgitter, the published *Timken*

notice/amended final determination on the above determinations would not need to include a

discussion of Salzgitter because Salzgitter's original weighted-average dumping margin of 22.90

percent calculated in the *Final Determination* would be reinstated.

1/19/2022

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

*AG der Dillinger Hüttenwerke v. United States*,
648 F. Supp. 3d 1321 (Ct. Int'l Trade 2023)

Appx199-Appx214

that Jones gave Tsur low performance ratings and SSL awards based in part on that discriminatory animus, and that those low performance ratings and SSL awards influenced the decionmaking process. Tsur has provided sufficient evidence to survive summary judgment that Jones had discriminatory animus based on national origin. For the same reasons that the Court denied summary judgment on Intel's discrimination claim based on age discrimination, the Court denies Intel's motion for summary judgment against Tsur's national origin discrimination claim under Title VII and Oregon law, based on the "cat's paw" theory.

## CONCLUSION

The Court GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment (ECF 61). Plaintiff may proceed to trial on his federal and state claims of disparate *treatment* age discrimination (Claim One), retaliation for reporting and/or opposing age discrimination (Claim Three), and disparate treatment national origin discrimination (Claim Four). The Court grants summary judgment in favor of Defendant on Plaintiff's federal and state claim of disparate *impact* age discrimination (Claim Two).

**IT IS SO ORDERED**.



**AG DER DILLINGER HÜTTENWERKE, Plaintiff,**

and

**Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann International GmbH, and Friedr. Lohmann GmbH, Consolidated Plaintiffs,**

and

**Thyssenkrupp Steel Europe AG, Plaintiff-Intervenor,**

v.

**UNITED STATES, Defendant,**

and

**Nucor Corporation and SSAB Enterprises LLC, Defendant-Intervenors.**

**Slip Op. 23 - 94**

**Consol. Court No. 17-00158**

United States Court of International Trade.

June 23, 2023

**Background:** German producers and exporters of steel brought action challenging Department of Commerce's final affirmative determination in antidumping-duty investigation of carbon and alloy steel cut-to-length plate from the Federal Republic of Germany. The Court of International Trade, 399 F. Supp. 3d 1247, sustained in part and remanded to Commerce as to certain issues and, 532 F. Supp. 3d 1338, sustained as to certain remaining issues. After Commerce's first remand redetermination, the Court of International Trade, 534 F.Supp.3d 1403, again remanded. After Commerce's second remand redetermination, the Court of International Trade, 592 F. Supp. 3d 1344, again remanded. Commerce's third remand redetermination came up for review.

**Holdings:** The Court of International Trade, Leo M. Gordon, J., held that:

(1) Commerce's reliance on facts otherwise available to assign the likely selling price as the cost of production for certain non-prime steel plate made by one producer was not unreasonable;

(2) Commerce's selected methodology for applying partial adverse facts available (AFA) to determine dumping margin for one producer was reasonable; but

(3) further explanation or reconsideration was warranted of whether it was proper for Commerce to apply a model-match methodology to use a single quality code for all types of producer's petroleum-transport plate, rather than adopting a separate quality code for sour transport plate.

Sustained in part and remanded in part with instructions.

**1. Customs Duties ⚖84(6)**

When reviewing agency determinations, findings, or conclusions for substantial evidence in an antidumping-duty investigation, the Court of International Trade assesses whether the agency action is reasonable given the record as a whole. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

**2. Customs Duties ⚖84(6)**

When addressing a substantial-evidence issue raised by a party in a challenge to an agency determination in an antidumping-duty investigation, a reviewing court analyzes whether the challenged agency action was reasonable given the circumstances presented by the whole record. Tariff Act of 1930 § 516A, 19 U.S.C.A. § 1516a(b)(1)(B)(i).

**3. Customs Duties ⚖21.5(5)**

Department of Commerce's reliance on facts otherwise available to assign the likely selling price as the cost of produc-

tion for certain non-prime steel plate made by German producer was not unreasonable in antidumping-duty investigation of carbon and alloy steel cut-to-length plate from the Federal Republic of Germany, where producer failed to provide either the actual cost of producing non-prime products and their physical characteristics, or other information from its production records, Commerce had previously reopened the record to allow producer to provide actual-cost information, producer's proposal to use overall average cost for all prime products would distort disparities across products, and producer had placed likely-selling-price information on the record. Tariff Act of 1930 §§ 773, 776, 19 U.S.C.A. §§ 1677b, 1677b(f), 1677e(a).

**4. Customs Duties ⚖21.5(5)**

Department of Commerce's selected methodology for applying partial adverse facts available (AFA) to determine dumping margin for German producer of steel plate was reasonable in antidumping-duty investigation of carbon and alloy steel cut-to-length plate from the Federal Republic of Germany, even though methodology differed from one applied in a related case, where producer failed to report manufacturer information for a significant percentage of home-market sales used in Commerce's analysis, Commerce's chosen methodology gave producer an incentive to cooperate by providing requested information, and producer failed to show that its proposed alternative methodologies were the only reasonable path forward on the record. Tariff Act of 1930 § 776, 19 U.S.C.A. § 1677e.

**5. Customs Duties ⚖84(8.1)**

Court would remand to Department of Commerce for further explanation or reconsideration of whether it was proper to apply a model-match methodology to use a single quality code for all types of steel producer's petroleum-transport plate, rather than adopting a separate quality code

for sour transport plate, a type of steel plate used with petroleum products containing high amounts of hydrogen sulfide, in antidumping-duty investigation of carbon and alloy steel cut-to-length plate from the Federal Republic of Germany, where it was possible, in light of a case decided during the litigation, that treating all plate types under the same quality code did not sufficiently account for variations in the alloy content of sour transport plate versus other types of transport plate. Tariff Act of 1930 § 771, 19 U.S.C.A. § 1677(16)(A).

———————

Marc E. Montalbine, deKieffer & Horgan, PLLC, of Washington, D.C., argued for Plaintiff AG der Dillinger Hüttenwerke. With him on the brief were Gregory S. Menegaz, Alexandra H. Salzman, and Merisa A. Horgan.

Ron Kendler and Allison Kepkay, White & Case LLP, of Washington, D.C., argued for Consolidated Plaintiffs Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH. With them on the brief was David E. Bond.

Kara M. Westercamp, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, D.C., argued for Defendant United States. On the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Tara K. Hogan, Assistant Director. Of counsel was Ayat Mujais, Attorney, U.S. Department of Commerce, Office of Chief Counsel for Trade Enforcement and Compliance of Washington, D.C.

Jeffrey Gerrish, Schagrin Associates, of Washington, D.C., argued for Defendant-Intervenor SSAB Enterprises LLC. With

him on the brief were Roger B. Schagrin, Luke A. Meisner, and Nicholas J. Birch.

Stephanie M. Bell, Wiley Rein LLP, of Washington, D.C., argued for Defendant-Intervenor Nucor Corporation. With her on the brief were Alan H. Price and Christopher B. Weld.

### OPINION and ORDER

Gordon, Judge:

This consolidated action involves challenges to the final determination in the antidumping ("AD") investigation conducted by the U.S. Department of Commerce ("Commerce") of certain carbon and alloy steel cut-to-length plate ("CTL plate") from the Federal Republic of Germany. See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany, 82 Fed. Reg. 16,360 (Dep't of Commerce Apr. 4, 2017) ("Final Determination"), and accompanying Issues and Decision Memorandum, A-428-844 (Mar. 29, 2017), http://enforcement.trade.gov/frn/summary/germany/2017-06628-1.pdf (last visited this date) ("Decision Memorandum").

Before the court are Commerce's Final Results of Redetermination Pursuant to Court Remand, ECF No. 153 ("Third Remand Results") filed pursuant to the court's remand order in AG der Dillinger Huttenwerke v. United States, 46 CIT ——, 592 F. Supp. 3d 1344 (2022) ("Dillinger II"). Plaintiff AG der Dillinger Hüttenwerke ("Dillinger") challenges Commerce's determination to use "likely selling price" for the cost of production for non-prime plate as facts otherwise available when it was missing necessary actual cost information, as well as Commerce's rejection of Dillinger's proposed change to the agency's model-match methodology to include a proposed additional quality code for "sour transport plate."[1] See Pl. Dillinger's Com-

———————

1. The parties refer to the products covered by proposed quality code 771 with different

ments in Opp'n to Final Results of Redetermination, ECF No. 162 ("Dillinger Comments"); see also Def.'s Resp. to Comments on Remand Redetermination, ECF No. 168 ("Def.'s Resp."); Pl. Dillinger Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R., ECF No. 40 ("Dillinger MSJ"); Def.'s Mem. Opp. Pls.' Rule 56.2 Mots. for J. on the Admin. R., ECF No. 55 ("Def.'s MSJ Resp."); Reply Br. of Pl. Dillinger, ECF No. 62 ("Dillinger MSJ Reply").

Separately, Consolidated Plaintiffs Ilsenburger Grobblech GMBH, Salzgitter Mannesmann Grobblech GMBH ("SMSD"), Salzgitter Flachstahl GMBH, and Salzgitter Mannesmann International GMBH (collectively, "Salzgitter") challenge Commerce's determination from the results of the previous remand to use partial AFA for certain home market CTL plate sales made by their respective affiliates when Salzgitter failed to submit manufacturing information. See Salzgitter Consol. Pls.' Comments on Remand Redetermination, ECF No. 135 ("Salzgitter Comments"); Commerce's Final Results of Redetermination Pursuant to Court Remand, ECF No. 129 ("Second Remand Results"); see also Def.'s Resp. to Comments on Remand Redetermination, ECF No. 141 ("Def.'s 2RR Resp."); Def.-Int. SSAB's Comments on Remand Redetermination, ECF No. 139; Def.-Int. Nucor Corporation's Comments on Remand Redetermination, ECF No. 146. The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii),[2] and 28 U.S.C. § 1581(c) (2018).

For the reasons set forth below, the court sustains: (1) Commerce's determination to assign the "likely selling price" as the cost of production for non-prime plate recorded in Dillinger's books and records as "the best available information on the record" for evaluating and adjusting the cost of production under 19 U.S.C. § 1677b(f); and (2) Commerce's application of partial AFA to Salzgitter. The court remands the issue of Commerce's application of its model-match methodology to Dillinger for further explanation, or if appropriate, reconsideration.

**I. Standard of Review**

**[1, 2]** The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83

---

terms including "Sour Service Petroleum Transport Plate" and "Sour Service Line Pipe Steel." See Decision Memorandum at 77 ("Dillinger first proposed a distinct quality reporting code for sour service petroleum transport plate in its Dillinger Model Match Comments."); Dillinger Br. at 11 (describing "sour service petroleum transport or line pipe

steel (code 771)". The court will continue to use the shorthand term "sour transport plate" for consistency.

**2.** Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

L.Ed. 126 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr. & Richard Murphy, Administrative Law and Practice § 9.24[1] (3d ed. 2023). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2023).

## II. Discussion

### A. Use of "Likely Selling Price" to Calculate Cost of Production under § 1677b

[3] The court presumes familiarity with its prior decisions regarding Commerce's calculation of the cost of production of Dillinger's non-prime products under 19 U.S.C. § 1677b. In its most recent opinion, the court held that "[b]ecause Dillinger has failed to place information on the record demonstrating the actual cost of production of its non-prime products, Commerce may reasonably rely on facts otherwise available pursuant to § 1677e(a)(1)." Dillinger II, 46 CIT at ——, 592 F. Supp. 3d at 1349. However, the court remanded the determination of facts otherwise available for Commerce to "explain how its reliance on information indicating the 'likely selling price' of non-prime products accords with its obligation to ensure that the reported costs of production reasonably reflect the cost of producing the merchan-

dise under consideration." Id. On remand, Commerce explained "how the information recorded for non-prime products in Dillinger's normal books and records is not only the best available information on the record, but also ensures that the reported costs reasonably reflect the cost of producing both prime and non-prime products." Third Remand Results at 5; see also id. at 4 (noting that Commerce continues "to rely on ['the likely selling price' information from] Dillinger's normal books and records," which Commerce maintains is "the only reasonable approach for determining the allocation of total costs between prime and non-prime products, and the per-unit costs of non-prime products.").

Dillinger continues to challenge the reasonableness of Commerce's finding that Dillinger values the cost of producing non-prime merchandise at the "likely selling price" in its normal books and records. Dillinger contends that the application of facts otherwise available, i.e., Commerce's reliance on the "likely selling price" of the non-prime merchandise recorded in Dillinger's books and records, was unreasonable given the totality of the record as well as the guidance from the U.S. Court of Appeals for the Federal Circuit ("Court of Appeals") in Dillinger France S.A. v. United States, 981 F.3d 1318, 1321 (Fed. Cir. 2020). See Dillinger Comments at 1. Dillinger further maintains that Commerce misread the record by finding that Dillinger uses the likely selling price of non-prime products to value costs in its audited financial statements. Id. at 4. Dillinger also argues that "[b]y using the likely selling price of non-prime plate rather than the actual cost of production allocated to non-prime plate in Dillinger's verified cost calculation, Commerce has imposed an impermissible adverse inference." Id. at 14. As explained below, because Dillinger has failed to demonstrate that Commerce's application of facts otherwise available was

unreasonable given the limited information in the record, the court is unpersuaded by Dillinger's arguments and sustains Commerce's determination on this issue.

The parties' dispute centers on Commerce's finding that "[t]he information recorded in Dillinger's normal books and records, including the likely selling price of non-prime products, to allocate costs for the [period of investigation ("POI")] is the most reasonable information on the record to fill in the informational gap caused by Dillinger's failure to provide either the actual cost of producing non-prime products and their physical characteristics, or other information from its production records." Third Remand Results at 9. Commerce emphasizes that Dillinger "could have provided Commerce with the information needed to ascertain the non-prime product's actual costs and to comply with the Federal Circuit's directive [in Dillinger France] to determine the actual costs of prime and non-prime products." Id. Commerce highlights the fact that it had previously re-opened the record to allow Dillinger to provide such critical actual cost information for Commerce's calculations, but Dillinger's failure to provide such information resulted in Commerce resorting to using facts otherwise available under 19 U.S.C. § 1677e(a). Id. at 3, 9–10.

Dillinger maintains that Commerce should have used Dillinger's proffered information regarding the average actual total cost of manufacture for all of its plate sold during the POI. See Dillinger Comments at 7. While Dillinger acknowledges that its proposal would require Commerce to accept data from an "average," Dillinger maintains that its preferred calculation nonetheless represents the "most reasonable calculation of the actual production costs" because Dillinger's proffered information "is based upon **actual** costs." Id. In rejecting Dillinger's proposed alternative, Commerce explained that:

Dillinger's normal books and records are more reasonable to use as facts otherwise available because they recognize that the lost value of the non-prime products, which is an inevitable result of Dillinger's production of prime products, is appropriately considered to be a cost of producing the prime products. Consequently, Dillinger's proposal to assign the overall average cost of all prime products is unreasonable because it would distort the disparity in cost across prime CTL plate products, as well as the disparity in "size, specification, and grade" among non-prime products. Thus, although both Dillinger's proposal and Dillinger's normal books and records are flawed because Dillinger chooses not to track the actual costs of producing non-prime products, we find that the use of the amounts recorded in Dillinger's normal books and records is reasonable for use as facts otherwise available.

Third Remand Results at 5–6.

Dillinger responds by emphasizing Commerce's obligation under 19 U.S.C. § 1677b(b)(3) to calculate Dillinger's actual cost of production of non-prime products. Dillinger contends that Commerce may resort to facts otherwise available under § 1677e(a) only to fill an "informational gap" in the record, and that Commerce's reliance on the likely sales price for non-prime merchandise as a substitute for the actual cost of production is an unreasonable application of facts otherwise available as the estimated sales values of non-prime merchandise "has absolutely nothing to do with the costs of production." Dillinger Comments at 2–4. Dillinger maintains that Commerce unreasonably relied on this selling price information because this information was not how Dillinger actually valued the cost of production for non-prime products in its audited financial statements. See id. at 1–2 (arguing that

Commerce unreasonably conflated record here with record in Dillinger France, which was subject to different generally accepted accounting principles and practices).

Dillinger's argument is unpersuasive. Dillinger placed this likely selling price information on the record as part of its response in the Supplemental Section D Questionnaire regarding "the 'quantity and value of non-prime, defective, and low quality plates sold during the POI.'" See id. at 3 (citing Dillinger's Supplemental Section D Questionnaire Response). Commerce has previously explained the importance of reviewing information as to the "physical characteristics of the non-prime products produced and the actual cost of producing the non-prime products," and even re-opened the record to allow Dillinger to place actual cost information on the record. See Third Remand Results at 3. When Dillinger failed to provide this actual cost information, Commerce determined it was necessary to resort to facts otherwise available under § 1677e(a) and to use the best available information on the record to fill this gap, a determination already sustained in Dillinger II. See id. at 9–10. Commerce found that this likely selling price information submitted by Dillinger is the "best available information" on the record to value the cost of producing non-prime products in the absence of accurate, actual cost of production data. See id. at 4, 5.

Despite maintaining that Commerce's reliance on Dillinger's likely selling price information was unreasonable as that information was unrelated to the cost of production, Dillinger fails to demonstrate that Commerce acted unreasonably in finding that "Dillinger values non-prime products at their likely selling price, rather than full cost." See id. at 10. In light of this finding based on Dillinger's questionnaire response, coupled with Dillinger's failure

to put data corresponding to the actual cost of production of non-prime products on the record, the court sustains Commerce's use of the likely selling price information to value the cost of production of non-prime products as a reasonable application of facts otherwise available under § 1677e(a).

Dillinger lastly contends that "[b]y using the likely selling price of non-prime plate rather than the actual cost of production allocated to non-prime plate in Dillinger's verified cost calculation, Commerce has imposed an impermissible adverse inference." Dillinger Comments at 14. Dillinger maintains that "[u]nder the statute, Commerce may only impose an adverse inference when it 'finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with the request for information.'" Id. (quoting 19 U.S.C. § 1677e(b)). Dillinger argues that "[b]y rejecting all of these other cost of production figures and applying an unreasonably low cost of production to non-prime plate based upon resale value, Commerce is applying an adverse inference that impermissibly shifts costs from non-prime plate to prime plate and thereby increases the dumping margin." Id. at 20.

Dillinger's argument is unsupported by the record. Dillinger's naked assertion that Commerce is applying an adverse inference lacks any basis beyond the fact that Commerce's selection of facts otherwise available ultimately resulted in an increase in Dillinger's calculated dumping margin. As Commerce explained:

> Dillinger is quite simply mistaken that Commerce's reliance on its books and records to fill an informational gap created by Dillinger's decision is an impermissible adverse inference because Commerce's reliance on the information recorded in Dillinger's normal books and records accords with its own recognition that the information recorded in its nor-

mal books and records results in the total direct and indirect costs reasonably attributable to the production of prime products being allocated to prime products.

Third Remand Results at 16. Defendant further highlights that Commerce did not make a finding that an adverse inference was warranted pursuant to 19 U.S.C. § 1677e(b)—a prerequisite for applying an adverse inference when selecting from among the facts otherwise available on the record. See Def.'s Resp. at 9 (citing Third Remand Results). Dillinger's dissatisfaction with its resulting dumping margin, without more, does not demonstrate that Commerce's selection of facts otherwise available was made with an impermissible adverse inference. Dillinger's remaining arguments and cited case law are without merit as they are predicated on the unfounded assumption that Commerce applied an adverse inference here. Accordingly, the court sustains Commerce's reliance on Dillinger's normal books and records as a reasonable application of facts otherwise available.

## B. Application of Partial AFA to Salzgitter

[4]   In a previous remand redetermination, Commerce explained that it used different AFA methodologies to calculate Dillinger and Salzgitter's margins, resulting in totals of 4.98% and 22.9% respectively, because the scope of Salzgitter's non-disclosures was significantly larger than Dillinger's non-disclosures. See Second Remand Results at 27, ECF No. 129. Salzgitter challenged the reasonableness of this determination, and the court reserved decision on this issue in Dillinger II. See Dillinger II, 46 CIT at ——, 592 F. Supp. 3d at 1347; see also Salzgitter Comments; Def.'s 2RR Resp. In calculating Salzgitter's margin, Commerce applied AFA to incentivize Salzgitter's future cooperation. Second Remand Results at 27. Specifically, Commerce explained that:

[T]he application of the Dillinger France I[3] partial AFA methodology to Salzgitter deprives Commerce of the ability to apply [19 U.S.C. § 1677c] meaningfully in this proceeding. It is well established that Congress intended Commerce to use AFA as a means to induce cooperation in its proceedings and address evasion concerns. The purpose of AFA is to provide respondents with an incentive to cooperate in Commerce's investigations and reviews and ensure that necessary information is placed on the record to enable Commerce to reach a reasonable

---

**3.**   In Dillinger France S.A. v. United States, 42 CIT ——, 350 F. Supp. 3d 1349 (2018) ("Dillinger France I"), the court remanded Commerce's application of partial AFA to Dillinger France, concluding that the decision "to utilize the highest non-aberrational net price among Dillinger's downstream home market sales" was unreasonable because "the reliability of the reported sales prices has not been called into question and there is no informational gap in the sale prices for Commerce to fill." See id. at ——, 350 F. Supp. 3d at 1364. On remand, Commerce followed the court's guidance and determined that it would "treat[ ] these downstream home market sales transactions as Dillinger France-produced plate, rather than treating these transactions as sales of plate produced by an unrelated

manufacturer; and 2) rel[y] on the sale prices as reported." See Dillinger France S.A. v. United States, 43 CIT ——, ——, 393 F. Supp. 3d 1225, 1228 (2019) (quoting Commerce's remand results adopting Dillinger France I methodology), rev'd in part on other grounds, 981 F.3d 1318 (Fed. Cir. 2020); see also AG der Dillinger Huttenwerke v. United States, 43 CIT ——, ——, 399 F. Supp. 3d 1247, 1256–57 (2019) ("Dillinger I") (explaining that in Dillinger France, Commerce initially applied highest net-aberrational price to all sales without manufacturer information, but ultimately accepting the sales prices as reported, classifying all sales without manufacturer information as Dillinger produced sales—Dillinger France I methodology).

determination. However, the change in the AFA methodology prescribed by the Court in Dillinger France I and applied to Salzgitter in the Dillinger I Remand Redetermination frustrates Commerce's goal of inducing cooperation by ensuring that a non-cooperating respondent does not receive a more favorable AFA rate than it would have received it would have fully cooperated.

Id. at 29.

Dillinger reported manufacturer information for more than 99 percent of its downstream sales in this matter and, while the "number of sales with missing manufacturer information was not on the record" in Dillinger France, Commerce reported that "it was only a small number of Dillinger France's downstream sales." Id. at 27. Commerce could therefore approximate what Dillinger and Dillinger-France's margins would have been had they disclosed manufacturer information for all their downstream sales and could be sure that the Dillinger France I methodology would not materially impact either margin calculation. Id. at 27–28.

In contrast, Salzgitter did not report manufacturer information for approximately 28,000 downstream sales of CTL plate, representing a not-insignificant percentage of home market sales used in Commerce's analysis. Id. at 27. Thus, Commerce maintains that it "could not determine what Salzgitter's margin would have been if Salzgitter had fully cooperated with [its] requests for information and properly reported the manufacturer of the downstream sales at issue," so Salzgitter "may well receive a more favorable margin [using the Dillinger France I methodology] than it would have received if [it] had fully cooperated." Id. at 29–31. As a result, Commerce applied the highest non-aberrational net price for all of Salzgitter's sales without manufacturer information to in-

sure it did not receive a lower margin than it otherwise would have. Id. at 30.

Salzgitter maintains that this approach is unreasonable because Commerce compared the scope of each exporter's non-disclosures inconsistently. First, Salzgitter argues that "substantial evidence does not support Commerce's conclusion that the sales at issue for Dillinger France were smaller than the sales at issue for Salzgitter." Salzgitter Comments at 6. Further, Salzgitter notes that even if the scope of its non-disclosure was larger, very few of those sales would be necessary to calculate its antidumping margin. Id. at 4. Specifically, Salzgitter notes that:

Commerce claimed that the universe of sales considered with respect to Salzgitter was larger than the universe of sales considered with respect to Dillinger France, Commerce did not similarly consider the linkage between the number of Salzgitter sales affected and Salzgitter's dumping margin. Indeed, were Commerce to apply the analysis used for Dillinger France to Salzgitter, it is clear that only a very small fraction of SMSD's sales for which manufacturer information was unknown were use "as a basis for normal value" and were "actually compared to U.S sales prices."

Id. (quoting Dillinger France S.A. v. United States, 43 CIT ——, ——, 393 F. Supp. 3d 1225, 1228 (2019)). Salzgitter maintains that, if Commerce only considered sales that were necessary for its home market comparison, there would be little difference between the scope of Salzgitter and Dillinger's non-disclosures. Id.

Salzgitter further contends that Commerce's application of § 1677e is unreasonable because there is no indication that Salzgitter benefitted from not fully disclosing all requested information, and there is no evidence that Salzgitter intentionally obscured any information for this purpose.

First, Salzgitter notes that it did not maliciously or dishonestly omit information, but rather its information systems were not equipped to record all of the information Commerce requested. Id. at 6. Second, Salzgitter maintains that it does not benefit from these omissions because its antidumping margin would likely have been zero percent even if it had disclosed all requested information. Id. at 8.

Commerce disagrees. First, Commerce notes that there is a factual difference between the overall number of sales that Dillinger and Dillinger-France reported without manufacturer information and the number of sales that Salzgitter reported without manufacturer information, and not just a difference in how many sales are relevant to each exporter's margin calculation. Second Remand Results at 28. Specifically, Commerce notes that the AFA methodology applied to Dillinger's sales without manufacturer information in this matter, as well as Dillinger-France's sales without manufacturer information, did not impact the margin calculation for Dillinger in either proceeding. Id. at 27; see also First Remand Results at 2, ECF No. 85 (finding that applying partial AFA methodology of Dillinger France I to Dillinger did not impact Dillinger's margin calculation). Salzgitter's margin, however, would have been reduced from 22.90 percent, when Commerce applied the highest net-aberrational price, to zero percent under the Dillinger France I methodology. Second Remand Results at 28, 54.

Commerce further explained that "these differences affected Commerce's goals in using partial AFA as a means to induce cooperation because the margin result for Salzgitter under the Dillinger France I methodology provides no incentive for Salzgitter to cooperate by providing requested information to Commerce." Id. at 54. Commerce rejected Salzgitter's suggested view of the record, stating that "Salzgitter

would have Commerce establish a new test of materiality to determine whether AFA is warranted – a test that would allow a respondent, not Commerce, to determine what information is relevant for Commerce's analysis." Id. at 55. Commerce maintains that Salzgitter's margin must reflect the full extent of its non-disclosure, and determined that using the Dillinger France I methodology to assign Salzgitter a zero percent margin would not incentivize future cooperation. Id. at 54–57.

Since a zero percent margin cannot, by definition, be higher than what Salzgitter's margin would otherwise have been if it had disclosed all its manufacturer information, Commerce reasonably found that applying AFA to Salzgitter using the Dillinger France I methodology would be inconsistent with the intent of § 1677e. For the same reason, Commerce's refusal to adopt one of Salzgitter's three proposed alternative methods for calculating normal value is also reasonable, as all three of Salzgitter's proposed alternatives would have left Salzgitter with a de minimis dumping margin. See Salzgitter Comments at 8–9 (explaining Salzgitter's proposed alternatives that Commerce calculate its margin by (1) treating none of the sales as Salzgitter-manufactured plate; (2) treating all sales as Salzgitter-manufactured plate; or (3) treating a percentage of each sale as Salzgitter-manufactured plate based on SMSD's purchases from each supplier"); see also Second Remand Results at 55–56 (noting that "[u]nder the Dillinger France I partial AFA methodology, Salzgitter would receive a zero rate and, consequently, would be excluded from the AD order. Because of Salzgitter's failure to provide requested information, Commerce cannot determine what the resulting margin would have been if Salzgitter had complied fully with Commerce's requests to report the manufacturer information for all of its home market sales. Thus, it is reasonable

to assume that Salzgitter would receive a more favorable result under the Dillinger France I methodology as a result of withholding information than by providing the requested information and allowing Commerce to properly analyze the sales in question").

19 U.S.C. § 1677e provides Commerce with discretion in applying AFA methodologies. See, e.g., Nippon Steel Corp. v. United States, 337 F.3d 1373,1383 (Fed. Cir. 2003) (noting that 19 U.S.C. § 1677e does not require Commerce to find "evidence of nefarious intentions" to apply AFA against the importer); F.lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000) (stating that 19 U.S.C. § 1677e gives Commerce "broad discretion" in calculating antidumping margins for "uncooperative respondents"). As the court observed in Dillinger I, Salzgitter has failed to demonstrate that its proposed alternative methods provide a reliable measure or approximation of what its margin would be if it fully disclosed all relevant information. See Dillinger I, 43 CIT at ——, 399 F. Supp. 3d at 1255–56. Since Salzgitter did not provide any additional information to show that one of these alternative methodologies constituted the only reasonable path forward on this record, the court again concludes that Commerce acted reasonably in rejecting those proposed alternatives.

Salzgitter contends that, even if Commerce acted reasonably in applying a different AFA methodology than was applied to Dillinger, Commerce still unreasonably ignored information that Salzgitter had already placed on the record in calculating its margin. Salzgitter Comments at 10–11. Specifically, Salzgitter maintains that under 19 U.S.C. § 1677m(e) "Commerce was not permitted on remand to disregard [its] verified sales prices for the sales at issue as a result of the missing manufacturer

[information]." Id. at 10. Salzgitter maintains that it has demonstrated that "it would not receive a more favorable AFA rate using the methodology applied to Dillinger France than it would have received if it reported the manufacturer for all sales." Id. at 8. Nevertheless, Salzgitter admits that this conclusion requires Commerce to "not unjustifiably 'ignore record information that is not in dispute,' namely the prices and other information for the SMSD sales, which Commerce verified." Id. Although the court in Dillinger France raised concerns about Commerce's refusal to consider the submitted sales price data in applying AFA, this Court refused to reach the same conclusion in Dillinger I, observing that "Commerce has clear statutory authority pursuant to 19 U.S.C. § 1677m(d) to 'disregard all or part' of the original and subsequent responses' in an adverse inference scenario." Dillinger I, 43 CIT at ——, 399 F. Supp. 3d at 1256; see also Second Remand Results at 55 (highlighting that "the Court acknowledged Commerce's statutory authority under section 782(d) of the Act to 'disregard all or part of the original and subsequent responses' when relying on AFA").

Salzgitter responds that Commerce may only exercise this authority subject to § 1677m(e) and contends that Salzgitter's pricing information could not be disregarded by Commerce because Salzgitter's submission of information met all of the criteria under this provision. Salzgitter Comments at 10–11. The court previously addressed and rejected this same argument. See Dillinger I, 43 CIT at ——, 399 F. Supp. 3d at 1253 (explaining that the 'information' to which § 1677m(e) refers, in the context of this proceeding, is the missing manufacturer information, not the remainder of 'the information' that Plaintiffs submitted. Plaintiffs acknowledge that the identity of the CTL plate manufacturers is relevant to whether home market transac-

tions should or should not be included in margin calculations, and that they did not identify all of them. Plaintiffs thus cannot escape the conclusion that they failed to satisfy § 1677m(e) with respect to that information."). Because Salzgitter has failed to demonstrate any error in the court's prior analysis of this issue, the court again concludes that "Plaintiffs' reliance upon § 1677(m)(e) is misplaced." Id. As a result, the court cannot agree that Commerce's selected methodology for applying partial AFA to Salzgitter was unreasonable.

Lastly, Salzgitter contends that "Commerce's selection of the highest non-aberrational net price as AFA is inappropriate." Salzgitter Comments at 12. Salzgitter maintains that "that the sale from which this price was derived would not even be used as a basis for normal value in Salzgitter's margin calculation" because the product at issue in that sale "was <u>so dissimilar to the products sold to the United States that it was not compared to a single U.S. sale</u>." Id. Consequently, Salzgitter argues that "[i]t is unreasonable and punitive for Commerce to extrapolate the price of a wholly dissimilar product, and use that price as the basis for normal value for all of Salzgitter's home-market sales for which it could not identify the manufacturer." Id. at 13. Commerce stated that "[t]o determine the highest non-aberrational net price [ ] to be assigned to the downstream sales with missing manufacturer information, Commerce sorted all of SMSD's net prices for these sales in descending order and selected the transaction at the beginning of a smooth continuum of net prices." <u>Second Remand Results</u> at 30 (confidential information omitted). Commerce further explained that "[b]ecause Salzgitter failed to report the manufacturer of these sales, we cannot determine if the net prices correlated to the manufacturer of the CTL plate. Commerce cannot rule out the possibility that the sales with the highest prices

were entirely or primarily of CTL plate manufactured by Salzgitter, and Salzgitter's failure to report the manufacturer information was an attempt to obscure this fact, thereby distorting the margin." Id. at 30–31.

Beyond generally decrying the unreasonableness of Commerce's selected AFA sale price, Salzgitter fails to suggest an alternative basis for an AFA sale price that would instead be the one and only reasonable option on the record. While Salzgitter emphasizes the fact that Commerce does not have "unlimited authority" in applying AFA, Salzgitter does not identify how Commerce exceeded the bounds of reasonableness here, or what alternative AFA price Commerce should have selected in order to meet the purpose of § 1677e(b). <u>See</u> Salzgitter Comments at 13 (noting that "[t]he purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins." (quoting <u>F.lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States</u>, 216 F.3d 1027, 1032 (Fed. Cir. 2000)). There is no dispute that Commerce has the discretion, where appropriate, to select the highest non-aberrational net price in applying AFA. <u>See</u> <u>BMW of N. Am. v. United States</u>, 926 F.3d 1291, 1300 (Fed. Cir. 2019) (noting that court has "previously held that Commerce has wide discretion to assign the 'highest calculated rate' to uncooperative parties," but warning that "use of the highest rate is not automatic, however, and 'will depend upon the facts of a particular case.'") (internal citations omitted)). Here, Commerce has considered the totality of the record and explained the factors that led to its differing application of AFA to Salzgitter as compared to Dillinger. <u>See</u> <u>Second Remand Results</u> at 57 (highlighting differences in "(1) the number of sales lacking the requested manufacturer information; (2) the net prices among the sales

with the missing data; and (3) the impact on the margin caused by the respondents' failure to provide the requested information."). While Salzgitter contends that Commerce's selected AFA price (and resulting margin of 22.9%) is "punitive," Salzgitter fails to explain how Commerce's selection was unreasonable given the totality of the circumstances on the record. Salzgitter also fails to suggest any alternative price from the record that Commerce could have selected as a reasonable application of AFA. Based on the record as a whole, the court cannot agree with Salzgitter's contention that Commerce's selection of the highest non-aberrational net price on the record was "unreasonable and punitive." <u>See</u> Salzgitter Comments at 13. Accordingly, the court sustains Commerce's application of partial AFA to Salzgitter.

### C. Rejection of Dillinger's Proposed Quality Code for Sour Transport Plate

**[5]** In a previous memorandum and order addressing Dillinger's challenge to Commerce's model-match methodology, the court sustained Commerce's rejection of Dillinger's proposed quality code for sour vessel plate but stayed consideration of "Dillinger's challenge to Commerce's rejection of Dillinger's other proposed quality code (sour transport plate), pending the outcome of the remanded issues." <u>See</u> Memorandum and Order, ECF No. 121 (Aug. 18, 2021); <u>see also</u> Dillinger MSJ; Def.'s MSJ Resp.; Def.-Intervenor Nucor Corporation Resp. Br., ECF No. 58; Dillinger MSJ Reply. The court assumes familiarity with that decision, which outlined the basic details as to how Commerce applies its model-match methodology and how that methodology was applied in this matter. The court remands this issue again to Commerce for further consideration, and if appropriate, reconsideration.

Commerce rejected Dillinger's proposed quality code 771 (for sour transport plate), explaining:

> In its Dillinger Model Match Comments, Dillinger identified two examples of products contained in its proposed sour service petroleum transport plate quality subcategory: NACE TM0284/ISO 15156-2 and NACE MR0175/ISO 15156. We did not adopt this suggested quality subcategory in the final model match methodology issued to interested parties, and instead we identified a single quality code for petroleum transport plate.

> Nonetheless, Dillinger reported sales in its questionnaire responses using its proposed quality code subcategory for this product, and also changed the examples it provided for the subcategory to be "steel grades L450MS-PSL2, 5L-X65MS-PSL2, etc." without explanation. Dillinger did not identify what standards it had provided, if any, to identify the products to which it refers. The absence of any actual standards, identifying the full range of properties for such products, limits our ability to evaluate how such products compare to other petroleum transport plate products.

> Dillinger provided a "Presentation on Requirements for Steel Plates in Sour Service" (Sour Service Presentation), which appears to be a slide presentation containing information about sour service. However, the Sour Service Presentation does not provide a systematic or clear reference to the range of properties of the products in question. Of the four example products Dillinger listed in the Dillinger Model Match Comments and its section B response, only one of them (<u>i.e.</u>, NACE FR0175/ISO 15156) appears to be clearly identified in the Sour Service Presentation for use in the corrosive hydrogen sulfide environments Dillinger indicates require such plate,

while the example products listed in Dillinger's section B response are not referenced at all.

Dillinger indicates that the sulfur content must be strictly limited for sour service petroleum transport plate, and we note that the Sour Service Presentation does appear to refer to a maximum allowable percentage level, which it refers to as "low." However, it is not evident that such a requirement applies to the two example "grades" (L450MS-PSL2, 5L-X65MS-PSL2) identified in Dillinger's section B response. Even assuming, arguendo, that those grades are within the API 5L line pipe specification, as the petitioner states, that would support the petitioner's argument that Dillinger's petroleum transport plate products are covered under the same specification as other petroleum plate products identified by the quality code established by the Department. The Sour Service Presentation also does not refer to the content requirements of carbon or the "expensive alloys" (i.e., copper and nickel) discussed in the Dillinger Model Match Comments.

Furthermore, assuming these elements are pertinent to the analysis, the Department's model match methodology contains product characteristic fields that segregate products based on minimum specified content of two of those three elements (i.e., carbon and nickel). If the levels of these chemical elements are important distinguishing factors for sour service petroleum transport plate, as Dillinger indicates, the separate product characteristic fields for those elements would distinguish sour service petroleum transport plate products from other plate products.

Similarly, the heat treatment product characteristic may also distinguish these products from other petroleum transport plate products. The Sour Service Presentation refers to the use of "Q&T" (i.e., quenching and tempering) to effect the desired end properties of the sour service petroleum transport plate. Products that have been quenched and tempered will be assigned a different heat treatment code than those which have not undergone that treatment.

Therefore, we do not agree that a new quality reporting code is required to distinguish sour service petroleum transport plate from other products. We find that Dillinger did not subsequently provide information that would justify either allowing it to report revised quality codes for different petroleum transport plate products or revisiting this issue once parties had submitted their questionnaire responses. Instead, we find that Dillinger has failed to both: 1) justify creating a quality code subcategory for this product; and 2) clearly identify the products that would be classified in its proposed subcategory. Consequently, consistent with the Preliminary Determination, we continued to reassign all products which Dillinger reported with a quality code of 771 to have a quality code 772, thereby assigning all petroleum transport plate products the same quality code.

Decision Memorandum at 77–79 (footnotes omitted).

The model-match methodology, based on 19 U.S.C. § 1677(16)(A), determines matches based on physical differences. Courts have noted that this is a consideration apart from whether physical characteristics result in price and cost differences between products. See Maverick Tube Corp. v. United States, 39 CIT ——, ——, 107 F. Supp. 3d 1318, 1330 (2015) ("differences in costs do not constitute differences in products in and of themselves").

As noted above, Dillinger explains that its sour transport plate is used with "sour" petroleum products containing high

amounts of hydrogen sulfide, thus the sour transport plate is made with "extremely low levels of phosphorus and sulfur" to withstand the corrosion effects of the hydrogen sulfide. See Dillinger MSJ at 11. Dillinger thus maintains that there are non-minor, commercially significant differences in physical characteristics between sour transport plate and other petroleum transport products. See id. at 11–15; Dillinger MSJ Reply at 4–7 (citing Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1384 (Fed. Cir. 2001) for proposition that merchandise can only be treated as identical under 19 U.S.C. § 1677(16)(A) if it has either (1) no differences in physical characteristics or (2) the differences are only minor and 'not commercially significant' ").

Dillinger highlights Bohler Bleche GMBH & Co. KG v. United States, 42 CIT ——, 324 F. Supp. 3d 1344 (2018) ("Bohler"), in which the court "struck down the model-match methodology used in this investigation." Dillinger MSJ Reply at 1. Relying on this decision, Dillinger maintains that it should receive similar relief as the respondent in that case. Id. at 2. In Bohler, the plaintiff-respondents challenged a final determination by Commerce, which relied on the same model-match methodology that was used in the underlying proceeding here, arguing that Commerce had failed to adequately account for "the alloy content of Plaintiffs' specialized high alloy steel products, thereby failing to account for significant differences in physical characteristics, costs, and price." See Bohler, 42 CIT at ——, 324 F. Supp. 3d at

1348. While Commerce there disagreed "that the newly proposed methodologies would have the effect of creating closer matches between exported merchandise and home market merchandise," the court ultimately agreed with the plaintiffs that the "methodology insufficiently accounts for alloy content in Plaintiffs' products" and remanded the issue to Commerce for reconsideration. Id., 42 CIT at ——, ——, 324 F. Supp. 3d at 1348, 1354. On remand, Commerce changed course and revised its methodology to better account for these alloy content differences.[4]

Here, in a similar fashion, Commerce rejected Dillinger's contention that the record reflected that lower levels of phosphorus and sulfur in these steels distinguished them from other petroleum transport plate. See Decision Memorandum at 77–79 (reviewing record evidence cited by Dillinger in support of its position, and explaining findings that "Dillinger has failed to both: 1) justify creating a quality code subcategory for this product; and 2) clearly identify the products that would be classified in its proposed subcategory."). Thus, although Commerce acknowledged the record evidence supporting a finding that Dillinger's sour transport plate had different physical characteristics than other comparable products (i.e., lower maximum sulfur content), Commerce ultimately did not agree "that a new quality reporting code is required to distinguish sour service petroleum transport plate from other products." Decision Memorandum at 79. Given Commerce's apparent recognition in

---

**4.** While Commerce noted that it was changing its model-match methodology to meet the respondent's concerns in that matter "under protest," the Government did not appeal the court's subsequent decision sustaining those remand results. See Bohler Bleche Remand Results at 2, Court No. 17-00163, ECF No. 55 (explaining that Commerce would adopt respondent's proposed alternative model-match

methodology under protest); Bohler Bleche GMBH & Co. KG v. United States, 43 CIT ——, 362 F. Supp. 3d 1377 (2019) (sustaining as reasonable Commerce's adoption on remand of plaintiffs' alternative model-match methodology "as it fairly compares commercially significant differences in physical characteristics").

Bohler that its model-match methodology insufficiently accounted for variations in the alloy content of the products at issue in that proceeding, the court concludes that Commerce should have the opportunity to explain why a similar outcome is not warranted here.

Because Bohler and Commerce's subsequent remand results in that action were not published until after the submission of the Government's response brief in this litigation, Commerce has had no opportunity to address whether the circumstances in Bohler are comparable to those here. At oral argument, the court noted its concern for the parties that any response by the Government or Defendant-Intervenor to the circumstances of Bohler might constitute post hoc rationalization that the court could not use to sustain the decision-making of Commerce without potentially violating fundamental principles of administrative law. See, e.g., Burlington Truck Lines Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) ("courts may not accept appellate counsel's post hoc rationalizations for agency action"); SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947) (warning that courts "must judge the propriety of [agency] action solely by the grounds invoked by the agency"). As the circumstances in Bohler appear analogous, the court reiterates its observation that "[r]easoned decision-making requires a certain measure of consistency." See Dillinger I, 43 CIT at ——, 399 F. Supp. 3d at 1257. Accordingly, the court remands this issue for Commerce to further explain why its determination is reasonable in light of its approach in Bohler, or if appropriate, reconsider its rejection of Dillinger's proposed quality code for sour transport plate.

### III. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Commerce's determinations as to the cost adjustments for Dillinger's non-prime plate, as well as the application of partial AFA to Salzgitter, are sustained; it is further

**ORDERED** that Commerce's determination to reject Dillinger's proposed quality code for sour transport plate is remanded for further explanation, and if appropriate, reconsideration; it is further

**ORDERED** that Commerce shall file its remand results on or before September 7, 2023; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.



**PROSPERITY TIEH ENTERPRISE CO., LTD. and Yieh Phui Enterprise Co., Ltd., Plaintiffs,**

**v.**

**UNITED STATES, Defendant,**

**and**

**California Steel Industries, Inc., Cleveland-Cliffs Steel Corp., Cleveland-Cliffs Steel LLC, Nucor Corp., Steel Dynamics, Inc., and United States Steel Corp., Defendant-Intervenors.**

**Slip Op. 23-95**
**Consolidated Court No. 16-00138**

United States Court of International Trade.

Signed June 23, 2023

**Background:** Taiwanese producers and exporters of corrosion-resistant steel prod-

*AG der Dillinger Hüttenwerke v. United States,*
No. 17-00158, Slip. Op. 23-160 (Ct. Int'l Trade Nov. 15, 2024)

Appx215-Appx219

Slip Op. 23-160

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AG DER DILLINGER HÜTTENWERKE,<br><br>        Plaintiff,<br><br>   and<br><br>ILSENBURGER GROBBLECH GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, SALZGITTER MANNESMANN INTERNATIONAL GMBH, and FRIEDR. LOHMANN GMBH,<br><br>        Consolidated Plaintiffs,<br>   and<br><br>THYSSENKRUPP STEEL EUROPE AG,<br><br>        Plaintiff-Intervenor,<br><br>   v.<br><br>UNITED STATES,<br><br>        Defendant,<br><br>   and<br><br>NUCOR CORPORATION and SSAB ENTERPRISES LLC,<br><br>        Defendant-Intervenors. | Before: Leo M. Gordon, Judge<br><br>Consol. Court No. 17-00158 |

**MEMORANDUM and ORDER**

    <u>Marc E. Montalbine</u>, deKieffer & Horgan, PLLC, of Washington, D.C., for Plaintiff AG der Dillinger Hüttenwerke.

    <u>Ron Kendler</u>, White & Case LLP, of Washington, D.C., for Consolidated Plaintiffs Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Saltzgitter Mannesmann International GmbH.

Robert L. LaFrankie, Crowell & Moring LLP, of Washington D.C., for Plaintiff-Intervenor thyssenkrupp Steel Europe AG.

Kara M. Westercamp, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, D.C., argued for Defendant United States. Of counsel was Ayat Mujais, Attorney, U.S. Department of Commerce, Office of Chief Counsel for Trade Enforcement and Compliance of Washington, D.C.

Jeffrey Gerrish, Schagrin Associates, of Washington, D.C., for Defendant-Intervenor SSAB Enterprises LLC.

Stephanie M. Bell, Wiley Rein LLP, of Washington, D.C., for Defendant-Intervenor Nucor Corporation.

Gordon, Judge: Recently, the court issued an opinion denying a challenge to the final determination made by the U.S. Department of Commerce ("Commerce") in the antidumping investigation of certain carbon and alloy steel cut-to-length plate ("CTL plate") from the Federal Republic of Germany. See AG der Dillinger Hüttenwerke v. United States, 47 CIT ___, 648 F. Supp. 3d 1321 (2023) ("AG Dillinger 2023"); see also Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany, 82 Fed. Reg. 16,360 (Dep't of Commerce Apr. 4, 2017) ("Final Determination"), and accompanying Issues and Decision Memorandum, A-428-844 (Mar. 29, 2017), http://enforcement.trade.gov/frn/summary/germany/2017-06628-1.pdf (last visited this date) ("Decision Memorandum"). The court's opinion focused on Commerce's determination under 19 U.S.C. § 1677e(b) to apply partial adverse facts available ("AFA") to certain sales for which Consolidated Plaintiffs, Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH (collectively, "Salzgitter"), could not identify and report the manufacturer. See also AG der Dillinger Hüttenwerke v. United States, 43 CIT ___,

399 F. Supp. 3d 1247 (2019) (sustaining Commerce's decision to apply "facts available" under 19 U.S.C. § 1677e(a), as well as an adverse inference under 19 U.S.C. § 1677e(b), but remanding the selection of AFA as applied in this matter); AG der Dillinger Hüttenwerke v. United States, 45 CIT ___, 534 F. Supp. 3d 1403 (2021) (remanding Commerce's application of AFA again after Commerce erred in following court's instructions to explain its decision-making in light of Dillinger France S.A. v. United States, 43 CIT ___, 350 F. Supp. 3d 1349 (2018)).  The court rejected Salzgitter's argument that Commerce's determination was unreasonable or unlawful, and also rejected Salzgitter's challenge to Commerce's selection and application of partial AFA to Salzgitter.  See Salzgitter Consol. Pls.' Rule 56.2 Mot. for J. on the Agency R., ECF No. 43 ("Salzgitter Br."); see also Def.'s Mem. Opp. Pls.' Rule 56.2 Mots. for J. on the Admin. R., ECF No. 55 ("Def.'s Resp."); Reply in Supp. of Consol. Pls.' Rule 56.2 Mot. for J. on the Agency R., ECF No. 64 ("Salzgitter Reply"); Final Results of Redetermination Pursuant to Court Remand, ECF No. 129 ("Second Remand Results"); Consol. Pls.' Comments in Opp'n to Second Remand Redetermination, ECF No. 135; Def.'s Resp. to Comments on Second Remand Redetermination, ECF No. 141.

Pending before the court is a motion by Salzgitter pursuant to USCIT Rule 54(b) for the entry of partial judgment sustaining Commerce's determination as to the challenges raised by Salzgitter.[1]  See Consol. Pls.' Mot. for Partial Final J., ECF No. 194.

---

[1] Specifically, the court is sustaining Commerce's determination as presented in its Second Remand Results, in which Commerce explained why it differed in its application of partial AFA to Salzgitter as compared to Dillinger and adjusted its calculation of Salzgitter's final weighted-average dumping margin to 22.90 percent.

For the reasons set forth below, the court will grant Salzgitter's motion and enter a Rule 54(b) partial judgment.

Rule 54(b) provides in part that:

> [w]hen an action presents more than one claim for relief—whether as a claim, counterclaim, cross-claim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.

USCIT R. 54(b). Rule 54(b) requires finality—"an ultimate disposition of an individual claim entered in the course of a multiple claims action." Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 436 (1956). Additionally, in evaluating whether there is no just reason for delay, the court examines whether the concern for avoiding piecemeal litigation is outweighed by considerations favoring immediate entry of judgment. See Timken v. Regan, 5 CIT 4, 6 (1983).

Here, Salzgitter solely challenged Commerce's determination under 19 U.S.C. § 1677e(b) to apply partial AFA to certain sales for which Salzgitter could not identify and report the manufacturer. See generally Salzgitter Br. What remains for adjudication is a challenge by AG der Dillinger Hüttenwerke ("Dillinger") and other interested parties to the Fourth Remand Results in this matter which addresses issues not relevant to Salzgitter. See, e.g., Final Results of Redetermination Pursuant to Court Remand, ECF No. 184; Pl. AG der Dillinger Hüttenwerke's Comments in Partial Opp'n to Final Results of Redetermination, ECF No. 192; Def.-Intervenor Nucor Corp.'s Comments on Final Results of Redetermination, ECF No. 193. As Salzgitter has no interest in the issues

remaining to be litigated before the court in this action, AG Dillinger 2023 provides "an ultimate disposition" as to Salzgitter's challenge to the Final Determination. See Sears, Roebuck & Co., 351 U.S. at 436; see also AG Dillinger 2023.

The entry of a Rule 54(b) partial judgment would serve the interests of the parties and the administration of justice by bringing this issue, and Salzgitter's role in this litigation, to a conclusion. Partial judgment would also give Salzgitter the opportunity to immediately appeal if it so chooses. In consulting with the parties, the Government confirmed that there is no threat of piecemeal judicial review as the resolution of the remaining issue presented by Dillinger does not implicate the final disposition of the challenges raised by Salzgitter. See Conference Call, ECF No. 196 (Oct. 31, 2023). Therefore, the court has no just reason for delay, and will enter partial judgment pursuant to USCIT Rule 54(b). Accordingly, it is hereby

**ORDERED** that Salzgitter's motion for partial judgment pursuant to USCIT Rule 54(b) is granted.

/s/ Leo M. Gordon
Judge Leo M. Gordon

Dated: November 15, 2023
     New York, New York

*AG der Dillinger Hüttenwerke v. United States*, Judgment

Appx220-Appx221

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| AG DER DILLINGER HÜTTENWERKE, | |
| Plaintiff, | |
| and | |
| ILSENBURGER GROBBLECH GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, SALZGITTER MANNESMANN INTERNATIONAL GMBH, and FRIEDR. LOHMANN GMBH, | |
| Consolidated Plaintiffs, | Before: Leo M. Gordon, Judge |
| and | |
| THYSSENKRUPP STEEL EUROPE AG, | |
| Plaintiff-Intervenor, | Consol. Court No. 17-00158 |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| NUCOR CORPORATION and SSAB ENTERPRISES LLC, | |
| Defendant-Intervenors. | |

## JUDGMENT

This action having been submitted for decision, and the court after due deliberation having rendered opinions (1) sustaining the U.S. Department of Commerce's ("Commerce") application of partial adverse facts available to Consolidated Plaintiffs Ilsenburger Grobblech GMBH, Salzgitter Mannesmann Grobblech GMBH, Salzgitter

Consol. Court No. 17-00158                                          Page 2

Flachstahl GMBH, and Salzgitter Mannesmann International GMBH (collectively, "Salzgitter") in Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany, 82 Fed. Reg. 16,360 (Dep't of Commerce Apr. 4, 2017) ("Final Determination"), see AG der Dillinger Hüttenwerke, 47 CIT ___, 648 F. Supp. 3d 1321 (2023), ECF No. 183, and (2) finding, after consultation with the parties confirming that there is no threat of piecemeal litigation, that there is no just reason to delay the entry of partial judgment as to Salzgitter pursuant to USCIT Rule 54(b), see AG der Dillinger Hüttenwerke v. United States, 47 CIT ___, Slip Op. 23-160 (Nov. 15, 2023), ECF No. 197; now in conformity with those opinions, it is hereby

ORDERED that the Final Determination is sustained, except for the matter covered by the Final Results of Redetermination ("Second Remand Results"), ECF No. 129, filed pursuant to AG der Dillinger Hüttenwerke v. United States, 45 CIT ___, 534 F. Supp. 3d 1403 (2021); and it is further

ORDERED that the Second Remand Results are sustained.

_____/s/ Leo M. Gordon_____
Judge Leo M. Gordon

Dated: November 15, 2023
        New York, New York

19 U.S.C. § 1677e



treated as compliance with paragraph (1) for both investigations, unless the Commission considers that special circumstances require that a hearing be held in the course of each of the investigations. During any investigation regarding which the holding of a hearing is waived under this paragraph, the Commission shall allow any party to submit such additional written comment as it considers relevant.

**(b) Procedures**

Any hearing required or permitted under this subtitle shall be conducted after notice published in the Federal Register, and a transcript of the hearing shall be prepared and made available to the public. The hearing shall not be subject to the provisions of subchapter II of chapter 5 of title 5, or to section 702 of such title.

(June 17, 1930, ch. 497, title VII, § 774, as added Pub. L. 96–39, title I, § 101, July 26, 1979, 93 Stat. 186; amended Pub. L. 98–573, title VI, § 616, Oct. 30, 1984, 98 Stat. 3037.)

EDITORIAL NOTES

AMENDMENTS

1984—Subsec. (a). Pub. L. 98–573 designated existing provisions as par. (1), inserted "Except as provided in paragraph (2),", and added par. (2).

STATUTORY NOTES AND RELATED SUBSIDIARIES

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–573 effective Oct. 30, 1984, see section 626(a) of Pub. L. 98–573, set out as a note under section 1671 of this title.

**§ 1677d. Countervailable subsidy practices discovered during a proceeding**

If, in the course of a proceeding under this subtitle, the administering authority discovers a practice which appears to be a countervailable subsidy, but was not included in the matters alleged in a countervailing duty petition, or if the administering authority receives notice from the Trade Representative that a subsidy or subsidy program is in violation of Article 8 of the Subsidies Agreement, then the administering authority—

(1) shall include the practice, subsidy, or subsidy program in the proceeding if the practice, subsidy, or subsidy program appears to be a countervailable subsidy with respect to the merchandise which is the subject of the proceeding, or

(2) shall transfer the information (other than confidential information) concerning the practice, subsidy, or subsidy program to the library maintained under section 1677f(a)(1) of this title, if the practice, subsidy, or subsidy program appears to be a countervailable subsidy with respect to any other merchandise.

(June 17, 1930, ch. 497, title VII, § 775, as added Pub. L. 96–39, title I, § 101, July 26, 1979, 93 Stat. 186; amended Pub. L. 98–573, title VI, § 617, Oct. 30, 1984, 98 Stat. 3037; Pub. L. 99–514, title XVIII, § 1886(a)(12), Oct. 22, 1986, 100 Stat. 2922; Pub. L. 103–465, title II, § 283(b), Dec. 8, 1994, 108 Stat. 4930.)

EDITORIAL NOTES

AMENDMENTS

1994—Pub. L. 103–465 substituted "Countervailable subsidy" for "Subsidy" in section catchline and amended text generally. Prior to amendment, text read as follows: "If, in the course of a proceeding under this subtitle, the administering authority discovers a practice which appears to be a subsidy, but was not included in the matters alleged in a countervailing duty petition, then the administering authority—

"(1) shall include the practice in the proceeding if it appears to be a subsidy with respect to the merchandise which is the subject of the proceeding, or

"(2) shall transfer the information concerning the practice (other than confidential information) to the library maintained under section 1677f(a)(1) of this title, if the practice appears to be a subsidy with respect to any other merchandise."

1986—Pub. L. 99–514 substituted "a proceeding" for "an proceeding" in introductory provisions.

1984—Pub. L. 98–573 substituted "proceeding" for "investigation" wherever appearing.

STATUTORY NOTES AND RELATED SUBSIDIARIES

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–573 effective Oct. 30, 1984, see section 626(a) of Pub. L. 98–573, set out as a note under section 1671 of this title.

PLAN AMENDMENTS NOT REQUIRED UNTIL
JANUARY 1, 1989

For provisions directing that if any amendments made by subtitle A or subtitle C of title XI [§§ 1101–1147 and 1171–1177] or title XVIII [§§ 1801–1899A] of Pub. L. 99–514 require an amendment to any plan, such plan amendment shall not be required to be made before the first plan year beginning on or after Jan. 1, 1989, see section 1140 of Pub. L. 99–514, as amended, set out as a note under section 401 of Title 26, Internal Revenue Code.

**§ 1677e. Determinations on basis of facts available**

**(a) In general**

If—

(1) necessary information is not available on the record, or

(2) an interested party or any other person—

(A) withholds information that has been requested by the administering authority or the Commission under this subtitle,

(B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,

(C) significantly impedes a proceeding under this subtitle, or

(D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title,

the administering authority and the Commission shall, subject to section 1677m(d) of this

title, use the facts otherwise available in reaching the applicable determination under this subtitle.

**(b) Adverse inferences**

**(1) In general**

If the administering authority or the Commission (as the case may be) finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission, the administering authority or the Commission (as the case may be), in reaching the applicable determination under this subtitle—

(A) may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available; and

(B) is not required to determine, or make any adjustments to, a countervailable subsidy rate or weighted average dumping margin based on any assumptions about information the interested party would have provided if the interested party had complied with the request for information.

**(2) Potential sources of information for adverse inferences**

An adverse inference under paragraph (1)(A) may include reliance on information derived from—

(A) the petition,

(B) a final determination in the investigation under this subtitle,

(C) any previous review under section 1675 of this title or determination under section 1675b of this title, or

(D) any other information placed on the record.

**(c) Corroboration of secondary information**

**(1) In general**

Except as provided in paragraph (2), when the administering authority or the Commission relies on secondary information rather than on information obtained in the course of an investigation or review, the administering authority or the Commission, as the case may be, shall, to the extent practicable, corroborate that information from independent sources that are reasonably at their disposal.

**(2) Exception**

The administrative authority and the Commission shall not be required to corroborate any dumping margin or countervailing duty applied in a separate segment of the same proceeding.

**(d) Subsidy rates and dumping margins in adverse inference determinations**

**(1) In general**

If the administering authority uses an inference that is adverse to the interests of a party under subsection (b)(1)(A) in selecting among the facts otherwise available, the administering authority may—

(A) in the case of a countervailing duty proceeding—

(i) use a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country; or

(ii) if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that the administering authority considers reasonable to use; and

(B) in the case of an antidumping duty proceeding, use any dumping margin from any segment of the proceeding under the applicable antidumping order.

**(2) Discretion to apply highest rate**

In carrying out paragraph (1), the administering authority may apply any of the countervailable subsidy rates or dumping margins specified under that paragraph, including the highest such rate or margin, based on the evaluation by the administering authority of the situation that resulted in the administering authority using an adverse inference in selecting among the facts otherwise available.

**(3) No obligation to make certain estimates or address certain claims**

If the administering authority uses an adverse inference under subsection (b)(1)(A) in selecting among the facts otherwise available, the administering authority is not required, for purposes of subsection (c) or for any other purpose—

(A) to estimate what the countervailable subsidy rate or dumping margin would have been if the interested party found to have failed to cooperate under subsection (b)(1) had cooperated; or

(B) to demonstrate that the countervailable subsidy rate or dumping margin used by the administering authority reflects an alleged commercial reality of the interested party.

(June 17, 1930, ch. 497, title VII, § 776, as added Pub. L. 96–39, title I, § 101, July 26, 1979, 93 Stat. 186; amended Pub. L. 98–573, title VI, § 618, Oct. 30, 1984, 98 Stat. 3037; Pub. L. 100–418, title I, §§ 1326(d)(1), 1331, Aug. 23, 1988, 102 Stat. 1204, 1207; Pub. L. 103–465, title II, § 231(c), Dec. 8, 1994, 108 Stat. 4896; Pub. L. 114–27, title V, § 502, June 29, 2015, 129 Stat. 383.)

**Editorial Notes**

AMENDMENTS

2015—Subsec. (b). Pub. L. 114–27, § 502(1), inserted par. (1) designation and heading before "If the administering", substituted "under this subtitle—" for "under this subtitle, may use", inserted "(A) may use" before "an inference that is adverse", substituted "facts otherwise available; and" for "facts otherwise available. Such adverse inference may include", added subpar. (B), inserted par. (2) designation, heading, and "An adverse inference under paragraph (1)(A) may include" before "reliance on information", and redesignated former pars. (1) to (4) as subpars. (A) to (D), respectively, of par. (2) and realigned margins.

Subsec. (c). Pub. L. 114–27, § 502(2), designated existing provisions as par. (1) and inserted heading, substituted "Except as provided in paragraph (2), when the" for "When the", and added par. (2).

Subsec. (d). Pub. L. 114–27, § 502(3), added subsec. (d).

1994—Pub. L. 103–465 amended section generally, substituting present provisions for provisions relating to verification of information, certification of submissions, and determinations required to be made on best information available.

1988—Subsec. (a). Pub. L. 100–418, §1331(1), (3), added subsec. (a). Former subsec. (a) redesignated (b).

Subsec. (b). Pub. L. 100–418, §1331(1), (2), redesignated former subsec. (a) as (b) and in heading substituted "Verification" for "General rule".

Subsec. (b)(3)(A). Pub. L. 100–418, §1326(d)(1), which directed the amendment of this subtitle by substituting "subparagraph (C), (D), (E), (F), or (G) of section 1677(9) of this title" for "subparagraph (C), (D), (E), or (F), of section 1677(9) of this title" was executed to subsec. (b)(3)(A) of this section by substituting "section 1677(9)(C), (D), (E), (F), or (G) of this title" for "section 1677(9)(C), (D), (E), or (F) of this title" to reflect the probable intent of Congress.

Subsec. (c). Pub. L. 100–418, §1331(1), redesignated former subsec. (b) as (c).

1984—Subsec. (a). Pub. L. 98–573 amended subsec. (a) generally, which prior to amendment read as follows: "Except with respect to information the verification of which is waived under section 1673b(b)(2) of this title, the administering authority shall verify all information relied upon in making a final determination in an investigation. In publishing such a determination, the administering authority shall report the methods and procedures used to verify such information. If the administering authority is unable to verify the accuracy of the information submitted, it shall use the best information available to it as the basis for its determination, which may include the information submitted in support of the petition."

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–465 effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as a note under section 1671 of this title.

#### EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100–418 applicable with respect to investigations initiated after Aug. 23, 1988, and to reviews initiated under section 1675(c) or 1675 of this title after Aug. 23, 1988, see section 1337(b) of Pub. L. 100–418, set out as a note under section 1671 of this title.

#### EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–573 effective Oct. 30, 1984, see section 626(a) of Pub. L. 98–573, set out as a note under section 1671 of this title.

### § 1677f. Access to information

#### (a) Information generally made available

##### (1) Public information function

There shall be established a library of information relating to foreign subsidy practices and countervailing measures. Copies of material in the library shall be made available to the public upon payment of the costs of preparing such copies.

##### (2) Progress of investigation reports

The administering authority and the Commission shall, from time to time upon request, inform the parties to an investigation of the progress of that investigation.

##### (3) Ex parte meetings

The administering authority and the Commission shall maintain a record of any ex parte meeting between—

(A) interested parties or other persons providing factual information in connection with a proceeding, and

(B) the person charged with making the determination, or any person charged with making a final recommendation to that person, in connection with that proceeding,

if information relating to that proceeding was presented or discussed at such meeting. The record of such an ex parte meeting shall include the identity of the persons present at the meeting, the date, time, and place of the meeting, and a summary of the matters discussed or submitted. The record of the ex parte meeting shall be included in the record of the proceeding.

##### (4) Summaries; non-proprietary submissions

The administering authority and the Commission shall disclose—

(A) any proprietary information received in the course of a proceeding if it is disclosed in a form which cannot be associated with, or otherwise be used to identify, operations of a particular person, and

(B) any information submitted in connection with a proceeding which is not designated as proprietary by the person submitting it.

#### (b) Proprietary information

##### (1) Proprietary status maintained

###### (A) In general

Except as provided in subsection (a)(4)(A) and subsection (c), information submitted to the administering authority or the Commission which is designated as proprietary by the person submitting the information shall not be disclosed to any person without the consent of the person submitting the information, other than—

(i) to an officer or employee of the administering authority or the Commission who is directly concerned with carrying out the investigation in connection with which the information is submitted or any review under this subtitle covering the same subject merchandise, or

(ii) to an officer or employee of the United States Customs Service who is directly involved in conducting an investigation regarding negligence, gross negligence, or fraud under this subtitle.

###### (B) Additional requirements

The administering authority and the Commission shall require that information for which proprietary treatment is requested be accompanied by—

(i) either—

(I) a non-proprietary summary in sufficient detail to permit a reasonable understanding of the substance of the information submitted in confidence, or

(II) a statement that the information is not susceptible to summary accompanied by a statement of the reasons in support of the contention, and

(ii) either—

(I) a statement which permits the administering authority or the Commis-

19 U.S.C. § 1677m



merchandise produced by a foreign country (whether or not an Agreement country) may, if it has reason to believe that—

    (A) such merchandise is being dumped in an Agreement country; and

    (B) such domestic industry is being materially injured, or threatened with material injury, by reason of such dumping;

submit a petition to the Trade Representative that alleges the elements referred to in subparagraphs (A) and (B) and requests the Trade Representative to take action under subsection (c) on behalf of the domestic industry.

    (2) A petition submitted under paragraph (1) shall contain such detailed information as the Trade Representative may require in support of the allegations in the petition.

**(c) Application for antidumping action on behalf of domestic industry**

    (1) If the Trade Representative, on the basis of the information contained in a petition submitted under paragraph (1), determines that there is a reasonable basis for the allegations in the petition, the Trade Representative shall submit to the appropriate authority of the Agreement country where the alleged dumping is occurring an application pursuant to Article 12 of the Agreement which requests that appropriate antidumping action under the law of that country be taken, on behalf of the United States, with respect to imports into that country of the merchandise concerned.

    (2) At the request of the Trade Representative, the appropriate officers of the Department of Commerce and the United States International Trade Commission shall assist the Trade Representative in preparing the application under paragraph (1).

**(d) Consultation after submission of application**

After submitting an application under subsection (c)(1), the Trade Representative shall seek consultations with the appropriate authority of the Agreement country regarding the request for antidumping action.

**(e) Action upon refusal of Agreement country to act**

If the appropriate authority of an Agreement country refuses to undertake antidumping measures in response to a request made therefor by the Trade Representative under subsection (c), the Trade Representative shall promptly consult with the domestic industry on whether action under any other law of the United States is appropriate.

(Pub. L. 100–418, title I, §1317, Aug. 23, 1988, 102 Stat. 1188; Pub. L. 103–465, title VI, §621(a)(1), Dec. 8, 1994, 108 Stat. 4992.)

### Editorial Notes

#### CODIFICATION

Section was enacted as part of the Omnibus Trade and Competitiveness Act of 1988, and not as part of the Tariff Act of 1930 which comprises this chapter.

#### AMENDMENTS

1994—Subsec. (a)(1). Pub. L. 103–465 designated existing provisions as subpar. (A), substituted "GATT 1994" for "General Agreement on Tariffs and Trade", and added subpar. (B).

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 1994 AMENDMENT

Pub. L. 103–465, title VI, §621(b), Dec. 8, 1994, 108 Stat. 4993, provided that: "The amendments made by this section [amending this section and sections 2171, 2411, 2702, 2905, 2906, 3107, 3111, and 3202 of this title] shall take effect on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995)."

## §1677l. Repealed. Pub. L. 116–113, title VI, §601, Jan. 29, 2020, 134 Stat. 78

Section, Pub. L. 103–182, title VI, §691(a), Dec. 8, 1993, 107 Stat. 2223; Pub. L. 114–125, title VIII, §802(d)(2), Feb. 24, 2016, 130 Stat. 210, related to annual reports on antidumping and countervailing duty collections.

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF REPEAL

Repeal effective on the date the USMCA entered into force (July 1, 2020), see section 601 of Pub. L. 116–113, set out as a note under former section 3301 of this title.

## §1677m. Conduct of investigations and administrative reviews

**(a) Treatment of voluntary responses in countervailing or antidumping duty investigations and reviews**

**(1) In general**

In any investigation under part I or II of this subtitle or a review under section 1675(a) of this title in which the administering authority has, under section 1677f–1(c)(2) of this title or section 1677f–1(e)(2)(A) of this title (whichever is applicable), limited the number of exporters or producers examined, or determined a single country-wide rate, the administering authority shall establish an individual countervailable subsidy rate or an individual weighted average dumping margin for any exporter or producer not initially selected for individual examination under such sections who submits to the administering authority the information requested from exporters or producers selected for examination, if—

    (A) such information is so submitted by the date specified—

        (i) for exporters and producers that were initially selected for examination, or

        (ii) for the foreign government, in a countervailing duty case where the administering authority has determined a single country-wide rate; and

    (B) the number of exporters or producers subject to the investigation or review is not so large that any additional individual examination of such exporters or producers would be unduly burdensome to the administering authority and inhibit the timely completion of the investigation or review.

**(2) Determination of unduly burdensome**

In determining if an individual examination under paragraph (1)(B) would be unduly burdensome, the administering authority may consider the following:

    (A) The complexity of the issues or information presented in the proceeding, including questionnaires and any responses thereto.

(B) Any prior experience of the administering authority in the same or similar proceeding.

(C) The total number of investigations under part I or II and reviews under section 1675 of this title being conducted by the administering authority as of the date of the determination.

(D) Such other factors relating to the timely completion of each such investigation and review as the administering authority considers appropriate.

**(b) Certification of submissions**

Any person providing factual information to the administering authority or the Commission in connection with a proceeding under this subtitle on behalf of the petitioner or any other interested party shall certify that such information is accurate and complete to the best of that person's knowledge.

**(c) Difficulties in meeting requirements**

**(1) Notification by interested party**

If an interested party, promptly after receiving a request from the administering authority or the Commission for information, notifies the administering authority or the Commission (as the case may be) that such party is unable to submit the information requested in the requested form and manner, together with a full explanation and suggested alternative forms in which such party is able to submit the information, the administering authority or the Commission (as the case may be) shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party.

**(2) Assistance to interested parties**

The administering authority and the Commission shall take into account any difficulties experienced by interested parties, particularly small companies, in supplying information requested by the administering authority or the Commission in connection with investigations and reviews under this subtitle, and shall provide to such interested parties any assistance that is practicable in supplying such information.

**(d) Deficient submissions**

If the administering authority or the Commission determines that a response to a request for information under this subtitle does not comply with the request, the administering authority or the Commission (as the case may be) shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle. If that person submits further information in response to such deficiency and either—

(1) the administering authority or the Commission (as the case may be) finds that such response is not satisfactory, or

(2) such response is not submitted within the applicable time limits,

then the administering authority or the Commission (as the case may be) may, subject to subsection (e), disregard all or part of the original and subsequent responses.

**(e) Use of certain information**

In reaching a determination under section 1671b, 1671d, 1673b, 1673d, 1675, or 1675b of this title the administering authority and the Commission shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by the administering authority or the Commission, if—

(1) the information is submitted by the deadline established for its submission,

(2) the information can be verified,

(3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,

(4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and

(5) the information can be used without undue difficulties.

**(f) Nonacceptance of submissions**

If the administering authority or the Commission declines to accept into the record any information submitted in an investigation or review under this subtitle, it shall, to the extent practicable, provide to the person submitting the information a written explanation of the reasons for not accepting the information.

**(g) Public comment on information**

Information that is submitted on a timely basis to the administering authority or the Commission during the course of a proceeding under this subtitle shall be subject to comment by other parties to the proceeding within such reasonable time as the administering authority or the Commission shall provide. The administering authority and the Commission, before making a final determination under section 1671d, 1673d, 1675, or 1675b of this title shall cease collecting information and shall provide the parties with a final opportunity to comment on the information obtained by the administering authority or the Commission (as the case may be) upon which the parties have not previously had an opportunity to comment. Comments containing new factual information shall be disregarded.

**(h) Termination of investigation or revocation of order for lack of interest**

The administering authority may—

(1) terminate an investigation under part I or II of this subtitle with respect to a domestic like product if, prior to publication of an order under section 1671e or 1673e of this title, the administering authority determines that producers accounting for substantially all of the production of that domestic like product have expressed a lack of interest in issuance of an order; and

(2) revoke an order issued under section 1671e or 1673e of this title with respect to a domestic like product, or terminate an investigation suspended under section 1671c or 1673c of this title with respect to a domestic like product, if the administering authority determines that producers accounting for substantially all of the production of that domestic like product, have expressed a lack of interest in the order or suspended investigation.

**(i) Verification**

The administering authority shall verify all information relied upon in making—

    (1) a final determination in an investigation,

    (2) a revocation under section 1675(d) of this title, and

    (3) a final determination in a review under section 1675(a) of this title, if—

        (A) verification is timely requested by an interested party as defined in section 1677(9)(C), (D), (E), (F), or (G) of this title, and

        (B) no verification was made under this subparagraph during the 2 immediately preceding reviews and determinations under section 1675(a) of this title of the same order, finding, or notice, except that this clause shall not apply if good cause for verification is shown.

(June 17, 1930, ch. 497, title VII, § 782, as added Pub. L. 103–465, title II, § 231(a), Dec. 8, 1994, 108 Stat. 4893; amended Pub. L. 114–27, title V, § 506, June 29, 2015, 129 Stat. 386.)

**Editorial Notes**

AMENDMENTS

2015—Subsec. (a). Pub. L. 114–27 designated existing provisions as par. (1) and inserted heading, redesignated former par. (1) and subpars. (A) and (B) as subpar. (A) and cls. (i) and (ii), respectively, added par. (2), and redesignated former par. (2) as subpar. (B) of par. (1) and amended it generally. Prior to amendment, subpar. (B) of par. (1) read as follows: "the number of exporters or producers who have submitted such information is not so large that individual examination of such exporters or producers would be unduly burdensome and inhibit the timely completion of the investigation."

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE

Section effective, except as otherwise provided, on the date on which the WTO Agreement enters into force with respect to the United States (Jan. 1, 1995), and applicable with respect to investigations, reviews, and inquiries initiated and petitions filed under specified provisions of this chapter after such date, see section 291 of Pub. L. 103–465, set out as an Effective Date of 1994 Amendment note under section 1671 of this title.

**§ 1677n. Antidumping petitions by third countries**

**(a) Filing of petition**

The government of a WTO member may file with the Trade Representative a petition requesting that an investigation be conducted to determine if—

    (1) imports from another country are being sold in the United States at less than fair value, and

    (2) an industry in the petitioning country is materially injured by reason of those imports.

**(b) Initiation**

The Trade Representative, after consultation with the administering authority and the Commission and obtaining the approval of the WTO Council for Trade in Goods, shall determine whether to initiate an investigation described in subsection (a).

**(c) Determinations**

Upon initiation of an investigation under this section, the Trade Representative shall request the following determinations be made according to substantive and procedural requirements specified by the Trade Representative, notwithstanding any other provision of this subtitle:

    (1) The administering authority shall determine whether imports into the United States of the subject merchandise are being sold at less than fair value.

    (2) The Commission shall determine whether an industry in the petitioning country is materially injured by reason of imports of the subject merchandise into the United States.

**(d) Public comment**

An opportunity for public comment shall be provided, as appropriate—

    (1) by the Trade Representative, in making the determination required by subsection (b), and

    (2) by the administering authority and the Commission, in making the determination required by subsection (c).

**(e) Issuance of order**

If the administering authority makes an affirmative determination under paragraph (1) of subsection (c), and the Commission makes an affirmative determination under paragraph (2) of subsection (c), the administering authority shall issue an antidumping duty order in accordance with section 1673e of this title and take such other actions as are required by section 1673e of this title.

**(f) Reviews of determinations**

For purposes of review under section 1516a of this title or review under section 1675 of this title, if an order is issued under subsection (e), the final determinations of the administering authority and the Commission under this section shall be treated as final determinations made under section 1673d of this title.

**(g) Access to information**

Section 1677f of this title shall apply to investigations under this section, to the extent specified by the Trade Representative, after consultation with the administering authority and the Commission.

(June 17, 1930, ch. 497, title VII, § 783, as added Pub. L. 103–465, title II, § 232(a), Dec. 8, 1994, 108 Stat. 4897; amended Pub. L. 104–295, § 20(b)(17), Oct. 11, 1996, 110 Stat. 3528.)

**Editorial Notes**

AMENDMENTS

1996—Subsec. (f). Pub. L. 104–295 substituted "subsection (e)" for "subsection (d)".

(Form 19)

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

## CAFC Court No. 2024-1219

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 8,929 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: February 2, 2024

Signature: ___/s/ David E. Bond___

Name: ___David E. Bond___

(Form 31)

# CERTIFICATE OF CONFIDENTIAL MATERIAL

## CAFC Court No. 2024-1219

The foregoing document contains 16 unique words (including numbers) marked confidential.

☐ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: February 2, 2024          Signature:      /s/ David E. Bond

                               Name:          David E. Bond

# CERTIFICATE OF SERVICE

## CAFC Court No. 2024-1219

I certify that I served a copy of the foregoing filing on February 2, 2023 by the Court's electron filing system on the below individuals at the following locations.

| Person Served | Service Location (E-mail) |
|---|---|
| Kara Westercamp, U.S. Department of Justice | kara.m.westercamp@usdoj.gov |
| Roger Brian Schagrin, Schagrin Associates | rschagrin@schagrinassociates.com |
| Alan H. Price, Wiley Rein LLP | aprice@wiley.law |

Date: February 2, 2024

/s/ David E. Bond
David E. Bond
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600