NON-CONFIDENTIAL VERSION

2024-1219

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

AG DER DILLINGER HUTTENWERKE, FRIEDR. LOHMANN GMBH, THYSSENKRUPP STEEL EUROPE AG,

*Plaintiffs*

ILSENBURGER GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER MANNESMANN INTERNATIONAL GMBH,

*Plaintiffs – Appellants*

v.

UNITED STATES, SSAB ENTERPRISES LLC, NUCOR CORPORATION,

*Defendants – Appellees*

Appeal from the United States Court of International Trade in Case No. 1:17-cv-00158, Judge Leo M. Gordon

# RESPONSE BRIEF OF DEFENDANT-APPELLEE NUCOR CORPORATION

Alan H. Price, Esq.
Christopher B. Weld, Esq.
Stephanie M. Bell, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Nucor Corporation*

Dated: April 25, 2024

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2024-1219

**Short Case Caption** AG der Dillinger Huttenwerke v. US

**Filing Party/Entity** Nucor Corporation

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/18/2023

Signature: /s/ Alan H. Price

Name: Alan H. Price

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Nucor Corporation | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Douglas C. Dreier | | |
| Timothy Brightbill | | |
| Laura El-Sabaawi | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........ 1

II. STATEMENT OF RELATED CASES ........ 1

III. STATEMENT OF THE ISSUE ........ 1

IV. STATEMENT OF THE CASE ........ 2

V. SUMMARY OF THE ARGUMENT ........ 6

VI. ARGUMENT ........ 8

A. Commerce's Reliance on AFA Is Supported by the Record ........ 8

1. Commerce Properly Resorted to Facts Available Under 19 U.S.C. § 1677e(a) ........ 11

2. Commerce Acted Consistently with the Requirements of 19 U.S.C. § 1677m(e) ........ 14

3. Commerce Properly Found that Salzgitter Failed to Act to the Best of Its Ability ........ 20

B. Commerce's Selection of AFA Was Supported by the Record ........ 30

1. Commerce Properly Filled the Gap in the Record Regarding SMSD's Sales Information ........ 31

2. The Data Relied on By Commerce As Partial AFA Was Not Aberrational ........ 34

VII. CONCLUSION ........ 36

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted on lines 10-12 of page 21 describe certain aspects of a company's operations; the material omitted on line 15 of page 21 provides a percentage of sales that fit a particular description; the material omitted in line 2 of page 22 provides the number of sales that fit a particular description; the material omitted in line 3 of page 22 provides the total number of sales made; the material omitted in line 4 of page 22 provides the percentage of those sales that fit a particular description; and the material omitted on line 5 of page 22 describes the relative amount of sales that meet a particular description.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*China Steel Corp. v. United States*,
264 F. Supp. 2d 1339 (Ct. Int'l Trade 2003) ....................25, 26

*China Steel Corp. v. United States*,
306 F. Supp. 2d 1291 (Ct. Int'l Trade 2004) ....................23, 26

*Diamond Sawblades Mfrs.' Coal. v. United States*,
547 F. Supp. 3d 1323 (Ct. Int'l Trade 2021) ....................32, 33

*Diamond Sawblades Mfrs.' Coal. v. United States*,
986 F.3d 1351 (Fed. Cir. 2021) ....................8, 11, 12, 13

*Deacero S.A.P.I. de C.V. v. United States*,
996 F.3d 1283 (Fed. Cir. 2021) ....................34

*Hyundai Steel Co. v. United States*,
319 F. Supp. 3d 1327 (Ct. Int'l Trade 2018) ....................35

*JTEKT Corp. v. United States*,
642 F.3d 1378 (Fed. Cir. 2011) ....................27, 28

*Maverick Tube Corp. v. United States*,
857 F.3d 1353 (Fed. Cir. 2017) ....................*passim*

*Nan Ya Plastics Corp. v. United States*,
810 F.3d 1333 (Fed. Cir. 2016) ....................7, 10, 35, 36

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003) ....................*passim*

*Papierfabrik August Koehler SE v. United States*,
843 F.3d 1373 (Fed. Cir. 2016) ....................15

*Tung Fong Indus. Co. v. United States*,
318 F. Supp. 2d 1321 (Ct. Int'l Trade 2004) ....................25, 26

*Zhejiang DunAn Hetian Metal Co. v. United States*,
652 F.3d 1333 (Fed. Cir. 2011) ....................33, 34

**Statutes**

19 U.S.C. § 1677e(a) .......... 6, 8, 11

19 U.S.C. § 1677e(a)(1) .......... 12

19 U.S.C. § 1677e(b) .......... 9, 20, 34, 35

19 U.S.C. § 1677m(e)(1) .......... 15, 16

19 U.S.C. § 1677m(e)(2) .......... 16

19 U.S.C. § 1677m(e)(3) .......... 17

19 U.S.C. § 1677m(e)(4) .......... 18, 19

19 U.S.C. § 1677m(e)(5) .......... 19

**Administrative Materials**

*Certain Cut-to-Length Carbon-Quality Steel Plate Products from Japan*, 64 Fed. Reg. 73,215 (Dep't Commerce Dec. 29, 1999) .......... 27

**Other Authorities**

Fed. Cir. R. 28(b) .......... 1, 8

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 .......... 9

## I. INTRODUCTION

On behalf of Defendant-Appellee Nucor Corporation ("Nucor"), we respectfully submit this response to the February 2, 2024 opening brief filed by Plaintiffs-Appellants Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH (collectively, "Salzgitter"). *See* Br. of Pls.-Appellants Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH (Feb. 2, 2024), ECF No. 16 ("Salzgitter Br.").

## II. STATEMENT OF RELATED CASES

As noted in Salzgitter's opening brief, there is no appeal in or from the same civil action or proceeding in the lower court of body that was previously before this or any other appellate court. Like Salzgitter, Nucor is unaware of any currently pending cases before this or any other court that stand to directly affect or be affected by this appeal.

## III. STATEMENT OF THE ISSUE[1]

Whether the U.S. Department of Commerce's ("Commerce") decision to apply and the application of partial adverse facts available ("AFA") to Salzgitter was

[1] Nucor agrees with the jurisdictional statement provided by Salzgitter and therefore does not provide a separate statement of jurisdiction, pursuant to Fed. Cir. R. 28(b).

supported by substantial evidence and otherwise in accordance with law in light of the company's failure to provide complete information for all merchandise sold by its affiliated reseller.

## IV. <u>STATEMENT OF THE CASE</u>

This appeal arises from Commerce's final determination in its antidumping duty investigation of certain carbon and alloy steel cut-to-length plate from the Federal Republic of Germany. *See* Appx1-8, Apppx13-112. The U.S. Court of International Trade's ("CIT") opinion sustaining Commerce's determination to apply partial AFA to Salzgitter was published in *AG der Dillinger Hüttenwerke v. United States*, 399 F. Supp. 3d 1247 (Ct. Int'l Trade 2019), Appx113-123. The CIT's opinion sustaining the manner in which partial AFA was applied to Salzgitter was published in *AG der Dillinger Hüttenwerke v. United States*, 648 F. Supp. 3d 1321 (Ct. Int'l Trade 2023), Appx199-214.

In the subject antidumping duty investigation, Commerce selected Salzgitter as one of the mandatory respondents, meaning that the company was subject to individual investigation and required to respond to questionnaires. *See* Appx13. In its initial questionnaire, consistent with its standard questionnaire, Commerce directed Salzgitter to "prepare a separate computer data file containing *each* sale made during the period of investigation" and to "{r}eport *all* sales of the foreign like product . . . ." Appx5743-5744 (emphasis added). The questionnaire further

explained that Salzgitter should report its affiliated parties' resales to unaffiliated customers unless sales to affiliates constituted less than five percent of its sales in the comparison market or were made at arm's length. Appx5746-5747. Salzgitter responded that it reported both its sales to its affiliates and its affiliates' sales to unaffiliated customers. Appx5747. However, Salzgitter also explained that, because identifying the manufacturer for some of the sales made by one of its affiliated resellers, Salzgitter Mannesmann Stahlhandel GmbH ("SMSD"), would require it to manually check invoices, it did not report these sales. Appx5742-5743, Appx5747.

Identifying certain deficiencies regarding Salzgitter's reporting of its home market sales, Commerce issued a supplemental questionnaire noting that "Salzgitter states that it did not report the downstream sales made by SMSD because it could not identify the manufacturer of the CTL plates sold unless it performed a burdensome manual check." Appx6788. Commerce then instructed Salzgitter to

> revise your home market sales reporting to comply with the Department's specific instructions. If Salzgitter is unable to link all of its sales of subject merchandise to SMSD to SMSD's resales, explain in detail how each entity tracks the merchandise through all of its sale and record-keeping process, and why certain sales cannot be traced to the manufacturer.

Appx6788-6789. Salzgitter responded that it "reported all sales by SMSD of CTL plate that were identified as produced by Salzgitter mills{,}" but that it did not include sales where the manufacturer "could not be identified." Appx6789.

Salzgitter then explained how it determined whether to include sales in its reporting. Specifically, Salzgitter stated that, for some sales, manufacturer information could be identified electronically through its SAP and mill certificate record systems; to respond to the questionnaire, Salzgitter queried these systems. Appx6789-6790. However, if it was not able to identify the manufacturer through its electronic query, Salzgitter did not report the sale, as identifying the manufacturer would require a manual review of its records. *Id.*

As Salzgitter's response continued to contain deficiencies, Commerce issued another supplemental questionnaire, stating: "We request that you revise the home market sales database to include all SMSD resales of Salzgitter CTL Plate made during the POI." Appx8044. Salzgitter responded that it "has reported all resales by SMSD of CTL plate that are identified as produced by Salzgitter mills using the electronic records kept in the ordinary course of business" and reiterated its explanation regarding the steps it took to identify the manufacturer of SMSD's sales. Appx8044-8045.

Thus, prior to the preliminary determination, Commerce requested on three occasions that Salzgitter report all of its home market sales, two of which included specific directions that Salzgitter report all sales made by SMSD of CTL plate manufactured by Salzgitter. Salzgitter, however, did not provide this information. *See* Appx8213. Accordingly, Commerce preliminarily found that, "by failing to

comply with our requests for information, Salzgitter withheld information that has been requested and failed to provide such information by the deadline for submission . . . ." *Id.* Moreover, Commerce determined that AFA was appropriate because, "although Salzgitter contends that identifying all SMSD sales of Salzgitter produced merchandise would be unreasonably burdensome, Salzgitter stated it could report SMSD's sales where the manufacturer could not be identified. However, it failed to do so." *Id.* (footnote omitted). Thus, Commerce applied partial AFA "to account for SMSD's unreported downstream sales." *Id.*

After the preliminary determination, Commerce issued another supplemental questionnaire, requesting that Salzgitter submit a separate database that included all resales by SMSD that had not been previously reported. *See* Appx8237. While Salzgitter submitted a database in response, it failed to provide information on the manufacturer for these sales. Appx8237, Appx8240-8241.

In the final determination, Commerce continued to apply AFA for Salzgitter's home market sales for which it failed to identify the manufacturer. Appx43. While Commerce acknowledged Salzgitter's argument that it would have been "unreasonably burdensome" for it to report the sales, the agency disagreed. Appx43-44. Commerce noted that information on the manufacturer of the CTL plate resold by SMSD "is vital to the Department's margin calculations" and "is the type of information that a respondent should have reasonably anticipated being required to

provide to its customers" and highlighted that, during verification, "we found that Salzgitter was able to identify the manufacturer of a sale in the additional SMSD sales database when it attempted to obtain that information." Appx44-45. Thus, Commerce found that "Salzgitter would have been able to provide this information if it had made the appropriate effort when it first received the Department's antidumping duty questionnaire and was notified that it was required to report SMSD's downstream sales, as well as when Salzgitter received the Department's subsequent requests." Appx45. Consequently, Commerce concluded that the application of AFA was appropriate. Appx45-46.

## V. SUMMARY OF THE ARGUMENT

Commerce properly applied partial AFA to Salzgitter. *First*, Salzgitter does not dispute that information is missing from the record and that this information was necessary for Commerce's determination. The record is also clear that Commerce requested this information and that Salzgitter did not provide it. Further, the information submitted by Salzgitter was incomplete and could not be used to reliably calculate Salzgitter's dumping margin and the company failed to cooperate to the best of its ability in the course of the proceeding. Accordingly, Commerce correctly relied on facts available. *See* 19 U.S.C. § 1677e(a).

*Second*, Commerce's reliance on an adverse inference in selecting among facts available is supported by the record and consistent with Court precedent. As

the Court of Appeals for the Federal Circuit ("Federal Circuit") has recognized, to avoid the application of AFA, respondents must do the maximum they are able to do, including maintaining full and complete records. *See Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381-83 (Fed. Cir. 2003). Salzgitter failed to do so, as it did not provide information that was requested by Commerce despite the fact that the information was in its possession and was information that it could reasonably expect would be needed. Salzgitter's claim that it would be too burdensome to provide the information does not serve as a shield against its obligation to cooperate to the best of its ability. *See Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017).

*Third*, the manner in which Commerce applied partial AFA was appropriate. The record does not contain information that allows Commerce to identify which transactions with missing manufacturer data should be included in the dumping calculation. Without this data, the record lacks information on what pricing data should be included in the dumping calculation. Accordingly, Commerce's use of pricing data as AFA properly addressed the gap in the record. Moreover, Commerce was not required to select a transaction that met any specific criteria or created any specific result. *See Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1348 (Fed. Cir. 2016). Instead, Commerce properly relied on its broad discretion and the

AFA statute's deterrence goal in selecting the highest non-aberrational net price as partial AFA.

## VI. ARGUMENT[2]

### A. Commerce's Reliance on AFA Is Supported by the Record

The statute outlines a two-step process to determine whether AFA may be applied. First, pursuant to 19 U.S.C. § 1677e(a), if necessary information is not on the record or if an interested party withholds information that has been requested, fails to provide information by the deadline or in the form or manner requested, significantly impedes a proceeding, or provides information that cannot be verified, Commerce shall use facts otherwise available. 19 U.S.C. § 1677e(a). This portion of the statute focuses on the absence of information and not the reason why such information may be missing. *See Nippon Steel Corp.*, 337 F.3d at 1381 ("The focus of subsection (a) is respondent's failure to provide information. The reason for the failure is of no moment."). If any of the five preconditions identified in 19 U.S.C. § 1677e(a) are satisfied, then facts available shall be applied. *See Diamond Sawblades Mfrs.' Coal. v. United States*, 986 F.3d 1351, 1362 (Fed. Cir. 2021).

Second, if Commerce determines that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for

[2] Nucor does not disagree with Salzgitter's description of the standard of review and thus does not provide a separate description of that standard here, pursuant to Fed. Cir. R. 28(b).

information{,}" Commerce may rely on an adverse inference in selecting among facts available. 19 U.S.C. § 1677e(b). The Federal Circuit has explained that the statute does not require perfection, but does demand that a respondent "do the maximum it is able to do." *Nippon Steel Corp.*, 337 F.3d at 1382. To meet this standard, respondents are expected to keep "full and complete records documenting the information that a reasonable {respondent} should anticipate being called upon to produce{,}" be familiar with all such records, and "conduct prompt, careful, and comprehensive investigations of all relevant records . . . to the full extent of the {respondent's} ability to do so." *Id.* Moreover, it is not necessary for a party to have acted willfully, as the statute does not require a finding of motivation or intent. *Id.* at 1383. Instead,

> the statute requires a factual assessment of the extent to which a respondent keeps and maintains reasonable records and the degree to which the respondent cooperates in investigating those records and in providing Commerce with the requested information. . . . It is not an excuse that the employee assigned to prepare a response does not know what files exist, or where they are kept, or did not think—through inadvertence, neglect, or otherwise to look beyond the files immediately available.

*Id.*

Legislative history explains that Commerce's ability to apply adverse inferences allows it "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 870

(1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4199. Put differently, "{t}he purpose of the adverse facts statute is 'to provide respondents with an incentive to cooperate' with Commerce's investigation." *Maverick Tube*, 857 F.3d at 1360 (quoting *F.lli De Cecco Di Filippo Fara S. Martin S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)). Accordingly, the courts have recognized the role of deterrence in the application of AFA. For example, in affirming Commerce's application of AFA, the Federal Circuit has recognized that "consideration of the deterrent effect of {Commerce's} determination reflects the law's expectation." *Nan Ya Plastics Corp.*, 810 F.3d at 1348 (rejecting the argument that Commerce cannot lawfully take deterrence into account and explaining that "{t}he legislative history belies {respondent's} argument").

As discussed below, here, Commerce followed the statutory directive in its application of partial AFA to Salzgitter. First, Commerce determined that information was missing from the record, necessitating reliance on facts available. Next, Commerce considered Salzgitter's actions during the course of the proceeding and concluded that the company did not act to the best of its abilities. Accordingly, Commerce concluded that the application of AFA with respect to the sales for which Salzgitter failed to provide complete information was appropriate. This determination is supported by the record and in accordance with law and should be upheld.

### 1. Commerce Properly Resorted to Facts Available Under 19 U.S.C. § 1677e(a)

Salzgitter first claims that Commerce incorrectly applied facts available, asserting that it was "fully responsive" to the agency's requests for information. Salzgitter Br. at 24-27. This argument does not persuade. Consistent with the statute, Commerce explained that it was necessary to rely on facts available based on three subsections of 19 U.S.C. § 1677e(a): section (a)(1), section (a)(2)(A), and section (a)(2)(B). Appx44. That is, Commerce deemed the application of facts available appropriate because information was missing from the record, because Salzgitter withheld information requested by the agency, and because Salzgitter did not provide requested information in a timely manner. *Id.*; *see* 19 U.S.C. § 1677e(a). Consequently, there are three independent basis that supported Commerce's use of facts available. For Commerce's reliance on facts available to be appropriate, however, only one of these bases need to be supported. *Diamond Sawblades Mfrs.' Coal.*, 986 F.3d at 1362 (explaining that Commerce "shall" resort to facts available under 19 U.S.C. § 1677e(a) "when *any* of the five preconditions are met" (emphasis added)). As the record supports Commerce's conclusion with respect to each of the three bases provided, the agency's reliance on facts available is supported by the record and in accordance with law.

To start, it is undisputed that information is missing from the record, as Salzgitter did not identify the manufacturer for 28,000 sales made by its affiliated

reseller SMSD. *See* Salzgitter Br. at 25. It likewise cannot be disputed that this information is necessary, as it dictates whether the sales at issue should or should not be included in the dumping calculation. *See* Appx44, Appx227-228. Indeed, Salzgitter recognizes as "generally true" Commerce's statement that "manufacturer information is critical for the {agency's} margin analysis because the {agency} matches sales by . . . manufacturer." *See* Salzgitter Br. at 29 (quoting Appx44). Accordingly, necessary information is not on the record, meaning that 19 U.S.C. § 1677e(a)(1) is satisfied. This alone fully supports Commerce's determination to rely on facts available. *See Diamond Sawblades Mfrs.' Coal.*, 986 F.3d at 1362 ("Commerce 'shall' resort to 'the facts otherwise available' (subject to § 1677m(d)) when *any* of the five preconditions are met.").

Notably, Salzgitter does not directly address this statutory provision or this aspect of Commerce's determination. Salzgitter Br. at 24-26. Instead, Salzgitter's arguments are centered on its conduct and claims regarding its ability to provide the missing information. *Id.* But this argument is misplaced. The statute states that facts available "shall" be applied if "necessary information is not available on the record . . ." without any requirement for or consideration of why such information is not available. 19 U.S.C. § 1677e(a)(1). As is evident from the plain language of the statue, and as explained by the Federal Circuit, the precondition identified in subsection (a)(1) "is not tied to the conduct of any interested party or other person:

it is simply that 'necessary information is not available on the record.'" *Diamond Sawblades Mfrs.' Coal.*, 986 F.3d at 1362. Thus, Commerce properly resorted to facts available pursuant to 19 U.S.C. § 1677e(a)(1) based on its finding—a finding that Salzgitter does not challenge—that necessary information was missing from the record. Salzgitter has not presented any reason as to why reliance on facts available was unsupported or not appropriate under this provision.

While Commerce's reliance on facts available is supported by its finding under subsection (a)(1) alone, the agency's determination is also supported by its additional findings. As Commerce explained, its determination to rely on facts available was also based on 19 U.S.C. § 1677e(a)(2)(A) and (B), given that the agency requested the missing information—multiple times—and Salzgitter did not provide this information and did not submit it by the relevant deadline. Appx44. Here, too, it cannot be disputed that this information was requested and was not provided. While Salzgitter asserts that it provided "all requested information," it also acknowledges that there was information that was requested and not provided. *See* Salzgitter Br. at 25.

Salzgitter, however, asserts that reliance on facts available under these provisions was inappropriate because it was "fully responsive" to Commerce's requests given that it explained why it did not provide the missing data. *Id.* at 24-26. Salzgitter's focus on its proffered justification for not providing the requested

information does not undermine Commerce's reliance on facts available. By seeking to excuse its failure and focus on its efforts, Salzgitter improperly conflates the requirements of subsection (a)—the facts available provision—with subsection (b)—the application of adverse facts. But, as the Federal Circuit has made clear, these are two distinct provisions. *Nippon Steel Corp.*, 337 F.3d at 1381. In *Nippon Steel Corp.*, for example, the Federal Circuit explained that subsection (a) focuses on the "respondent's failure to provide information. The *reason for the failure is of no moment*. The mere failure of a respondent to furnish requested information—*for any reason*—requires Commerce to resort to other sources of information to complete the factual record." *Id.* (emphasis added). Whether a respondent acted to the best of its abilities is "a separate matter" with "a separate determination." *Id.* As such, while Salzgitter's protests that it "provided comprehensive explanations" as to why complete information was not submitted, Salzgitter Br. at 24, this is "of no moment" for Commerce's determination under 19 U.S.C. § 1677e(a). *Nippon Steel Corp.*, 337 F.3d at 1381. Consequently, Commerce's resort to facts available was further supported by and consistent with 19 U.S.C. § 1677e(a)(2)(A) and (B).

### 2. **<u>Commerce Acted Consistently with the Requirements of 19 U.S.C. § 1677m(e)</u>**

Salzgitter next claims that reliance on facts available was inconsistent with 19 U.S.C. § 1677m. Salzgitter Br. at 27-32. According to Salzgitter, because the information it submitted regarding SMSD's sales met the criteria identified in

19 U.S.C. § 1677m(e), Commerce was required to rely on it. *Id.* at 27-29. This argument is misplaced and ignores the record.

Pursuant to 19 U.S.C. § 1677m(e), Commerce may not decline to consider information that is necessary but may not meet all applicable requirements so long as: (1) the information was submitted by the established deadline, (2) the information can be verified, (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination, (4) the interested party has acted to the best of its ability in providing the information, and (5) the information can be used without undue difficulty. 19 U.S.C. § 1677m(e); *see Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1382 (Fed. Cir. 2016). If the information at issue fails with respect to any of these requirements, then Commerce is not constrained by 19 U.S.C. § 1677m(e). *See Papierfabrik August Koehler SE*, 843 F.3d at 1382-83. Contrary to Salzgitter's claims otherwise, the information it provided on SMSD's resales did not meet all of the criteria outlined in 19 U.S.C. § 1677m(e). Consequently, Commerce's application of facts available was consistent with 19 U.S.C. § 1677m(e).

First, complete information regarding SMSD's sales was not provided by the established deadline. *See* 19 U.S.C. § 1677m(e)(1). As discussed above, it cannot be disputed that Salzgitter failed to provide full information—namely, the manufacturer information for all of SMSD's resales that would have allowed Commerce to

determine which data was relevant for the dumping margins calculation—notwithstanding Commerce's request for such information. Thus, this information was not timely submitted. *See id.* While Salzgitter asserts the information it did provide was timely, this misses the point. Salzgitter Br. at 28. Providing only some of the information requested by Commerce does not equate to timely submitting all requested information. Salzgitter's claim that Commerce's verification findings undermine its determination likewise fails. *See id.* As Commerce explained, at verification "Salzgitter was able to identify the manufacturer of a sale in the additional SMSD sales database when it attempted to obtain that information." Appx44. This is wholly consistent with Commerce's conclusion that Salzgitter failed to timely provide manufacturer information.

Second, the sales data for which no manufacturer was identified could not be fully verified. *See* 19 U.S.C. § 1677m(e)(2). To start, as manufacturer information was not provided, there was no manufacturer information to be verified. Moreover, because no manufacturer information was provided, Commerce could not verify which sales data should be included in the dumping margin calculation, as manufacturer information was necessary to make that determination. Contrary to Salzgitter's assertions otherwise, Commerce's verification of other data does not render these critical pieces of information verified or verifiable. *See* Salzgitter Br. at 29.

Third, the information concerning SMSD's sale cannot be considered "not so incomplete" that it cannot "serve as a reliable basis" for calculating the dumping margins. *See* 19 U.S.C. § 1677m(e)(3). As Commerce found: "While Salzgitter ultimately submitted all of SMSD's sales, it did not provide us with critical information, *i.e.*, the manufacturer of the CTL plate for certain of the sales . . . . The manufacturer information is critical for {Commerce}'s margin analysis because {Commerce} matches sales by, among other criteria, manufacturer." Appx44. In other words, without the manufacturer information, Commerce does not know which sales data to utilize in its dumping margin calculation. Consequently, this missing information renders the entirety of SMSD's additional sales data unusable because Commerce had no reliable way of determining which sales should be included or excluded.

Salzgitter's reliance on its proposed options for using these data does not undermine this conclusion.[3] According to Salzgitter, the fact that Commerce could

---

[3] Nucor notes that, while Salzgitter identifies three options, they effectively represent only two options: include all sales in the dumping calculation or exclude all sales from the dumping calculation. *See* Salzgitter Br. at 14. While Option 3 is described as using "a portion of the 28,000 sales{,}" it results in all sales being included in the dumping calculation, but the quantity associated with each sale being reduced. *Id.* As Salzgitter explained in its administrative case brief, this option would be implemented the same as Option 1 (*i.e.*, treating all sales as goods produced by Salzgitter), but with a proportional reduction to the sales quantity for each transaction based on the ratio of SMSD's purchases from Salzgitter to its purchases from all sources. Appx11428-11429.

have calculated a dumping margin using its proposals demonstrates that its data were complete enough to be used to calculate a reliable dumping margin. Salzgitter Br. at 29-30. This is incorrect. Salzgitter failed to provide Commerce with "information which is vital" to its calculations. Appx44. Because manufacturer information was missing from the record for these sales, Commerce could not determine which sales should be included in the dumping calculation. This is essential to calculating a reliable dumping margin. *See id.* That Commerce could have calculated a dumping margin by arbitrarily choosing to include or exclude these data does not mean that the resulting margin would have been reliable. To the contrary, because manufacturer information is missing, Commerce has no means for knowing which data should be included in order to calculate a reliable margin. Thus, the data is so incomplete that it cannot be used as a reliable basis to calculate the dumping margin.

Fourth, Salzgitter did not act to the best of its ability during the course of this proceeding. *See* 19 U.S.C. § 1677m(e)(4). As discussed in more detail below, despite being requested to submit all of SMSD's relevant sales data at the outset of this investigation and repeatedly after that, and notwithstanding the fact that this information was in its possession, Salzgitter waited until after receiving AFA in the preliminary determination to provide Commerce with certain information. When these data were provided, they were incomplete, lacking vital information that would allow Commerce to determine which sales and data were relevant to its calculation.

*See* Appx44. Moreover, as Commerce found, the missing data were information that Salzgitter should have had access to and could have provided if it had put in the effort when originally requested. *Id.* Accordingly, Salzgitter did not act to the best of its abilities to provide this information.

Finally, Commerce could not have used Salzgitter's incomplete information without undue difficulty. *See* 19 U.S.C. § 1677m(e)(5). Salzgitter focuses on Commerce's ability to calculate a dumping margin. Salzgitter Br. at 32. But, as discussed above, this would have required Commerce to arbitrarily make a determination about whether these sales should be included or excluded from the dumping calculation. However, Commerce did not have the ability to calculate an accurate or reliable dumping margin because it did not have the information available to it to do so. Thus, Commerce could not use this information without undue burden as it would have been impossible based on the record to make a determination of which sales data to include or exclude.

In short, Salzgitter's information did not meet the requirements of 19 U.S.C. § 1677m(e). Salzgitter's arguments to the contrary focus on information that was provided, but this ignores both the information that was missing and the implication of that missing information. As such, Salzgitter has not demonstrated that Commerce's determination was inconsistent with 19 U.S.C. § 1677m(e).

### 3. Commerce Properly Found that Salzgitter Failed to Act to the Best of Its Ability

As discussed above, when Commerce applies facts available, the agency may rely on adverse inferences in selecting among such facts if the respondent failed to cooperate to the best of its abilities in the course of the proceeding. 19 U.S.C. § 1677e(b); *Nippon Steel Corp.*, 337 F.3d at 1381. The Federal Circuit has identified what is required for a respondent to be considered to have cooperated to the best of its ability, namely that it do the "maximum it is able to do" and "put forth its maximum effort." *Nippon Steel Corp.*, 337 F.3d at 1382. The Federal Circuit has further explained that this standard "does not condone inattentiveness, carelessness, or inadequate record keeping" and assumes that respondents will:

> (a) take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable {respondent} should anticipate being called upon to produce; (b) have familiarity with all of the records it maintains in its possession, custody, or control; and (c) conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the {respondent's} ability to do so.

*Id.* Further, this consideration is made regardless of the respondent's "motivation or intent." *Id.* at 1383.

Based on this standard, Commerce's determination here is supported by the record and in accordance with law. As Commerce explained, the information at issue is the type of information Salzgitter should have anticipated needing access to and Salzgitter could have provided this information "if it had made the appropriate effort

when it first received {Commerce's} antidumping duty questionnaire and was notified that it was required to report SMSD's downstream sales, as well as when Salzgitter received {Commerce's} subsequent requests." Appx45. Thus, by not providing this information despite its access and ability, Salzgitter failed to cooperate to the best of its ability. *Id.*

While Salzgitter attempts to undermine this conclusion, these arguments do not persuade. Salzgitter first claims that there is no support for Commerce's finding that Salzgitter should have anticipated needing access to manufacturer information. Salzgitter Br. at 33-34. But the support for Commerce's conclusion is evident from Salzgitter's own reporting. For example, Salzgitter reported that it is an [ *type* ] company, meaning the company is subject to [ *descrption* ]. Appx6638-6642. Indeed, manufacturer information is often required for traceability, quality control, and liability purposes. *See* Appx11501; *see* Salzgitter Br. at 34. Moreover, Salzgitter was able to provide this information for more than [ #] percent of SMSD's sales. *See* Appx227. Salzgitter was also able to provide this information for its other affiliated resellers. *See* Appx501; Appx5742-5743. And Salzgitter explained that customers do request mill test certificates. *See* Appx6789. Thus, the record shows that manufacturer identity is information that Salzgitter understands it generally needs access to and may be called upon to provide.

This is also consistent with other reporting in the underlying proceeding. Notably, as Commerce recognized, "Dillinger reported only [ # ] downstream sales for which it did not identify the manufacturer, out of a total of [ # ] home market sales examined (*i.e.*, less than [ # ] percent)." Appx224. In other words, Dillinger maintained manufacturer information for the [ *amount* ] of its sales. Thus, contrary to Salzgitter's claims, record evidence regarding how other resellers conduct their businesses further supports Commerce's conclusion. *See* Salzgitter Br. at 34.

Salzgitter also fails to acknowledge its own admission that this information was missing for some data as a result of poor record keeping. In particular, Salzgitter explained that it was unable to identify the manufacturer for some transactions because of "manual input errors." Appx8238. In other words, Salzgitter acknowledges that, for at least some sales, it would have been able to identify the manufacturer but for inadequate record keeping practices. This does not serve as a shield to the application of AFA. *See Nippon Steel Corp.*, 337 F.3d at 1381.

Accordingly, as Commerce found, the record demonstrates that manufacturer information constitutes information Salzgitter should have anticipated being called upon to produce. *See* Appx45. That Salzgitter may have nonetheless failed to maintain full and complete records in this regard does not excuse it from the application of AFA. Indeed, as discussed above, the Federal Circuit recognized that

the "best of one's ability" includes the expectation that companies "keep and maintain complete records" and does not excuse "inadequate record keeping." *Nippon Steel Corp.*, 337 F.3d at 1381-83.

Salzgitter also asks that its actions be excused because it "did not have notice" that Commerce was going to undertake an antidumping duty investigation. Salzgitter Br. at 34. That is of no consequence here, as Commerce did not fault Salzgitter for failing to anticipate that the agency might request the information in the course of an antidumping duty proceeding. *See* Appx45. Instead, Commerce highlighted that this information is of the type that Salzgitter should have reasonably anticipated being required to provide its customers. *Id.* Nor is Commerce prohibited from finding that a reasonable company would have known that information may be requested in the context of an original investigation. *See China Steel Corp. v. United States*, 306 F. Supp. 2d 1291, 1305 (Ct. Int'l Trade 2004) (affirming application of AFA in an investigation where Commerce found that "a responsible and reasonable respondent would have known that the product characteristics and downstream sales data were required to be kept and maintained in accordance with the statute, rules and regulations").

Salzgitter next argues that Commerce incorrectly found that it could have obtained the manufacturer information if it had put forth the appropriate effort. Salzgitter Br. at 35. While Salzgitter acknowledges that it was able to identify the

missing manufacturer information for a sale during verification, its asserts that this does not mean it could have obtained the same information for all the sales at issue. *Id.* Salzgitter's argument is grounded in the alleged burden associated with obtaining the information. But the Federal Circuit has already rejected such claims.

Notably, in *Maverick Tube*, the Court affirmed Commerce's application of AFA based on a respondent's claim that it would have been too burdensome to provide the requested information. In doing so, the Court explained: "Borusan effectively concedes that it possessed information necessary to Commerce's investigation, that Commerce requested that information, and that Borusan did not provide that information. Such behavior cannot be considered 'maximum effort to provide Commerce with full and complete answers." *Maverick Tube*, 857 F.3d at 1361 (quoting *Nippon Steel Corp.*, 337 F.3d at 1382). The same conclusion applies here. Salzgitter acknowledges that it possesses the manufacturer information, that Commerce requested this information, and that it did not report the manufacturer information. Consequently, Salzgitter has not put forth its maximum effort.

While Salzgitter seeks to distinguish *Maverick Tube*, its claims are unavailing. Salzgitter Br. at 39. First, Salzgitter asserts that it, unlike the respondent in *Maverick Tube*, was unable to provide the information at issue. *Id.* This is incorrect. In *Maverick Tube*, the respondent claimed that it could not provide the information at issue because doing so would be "extremely time consuming and burdensome{.}"

*Maverick Tube*, 857 F.3d at 1356. Similarly, here, Salzgitter stated that it did not provide the missing manufacturer information because of the time and effort that would have been required to do so. *See* Salzgitter Br. at 31. Thus, both the respondent in *Maverick Tube* and Salzgitter *could* have provided the information, but did not because of the claimed burden associated with doing so. Second, Salzgitter claims that, unlike in *Maverick Tube*, it suggested an alternative for providing the missing information. *Id.* at 39. Here, too, Salzgitter is incorrect. Contrary to its assertions otherwise, Salzgitter did not suggest alternative means for providing the data; instead, Salzgitter proposed methodologies for Commerce to calculate a dumping margin without the missing information. Thus, as with the respondent in *Maverick Tube*, Salzgitter's "'alternative' was not providing the information at all." *Maverick Tube*, 857 F.3d at 1361.

Salzgitter's reliance on *China Steel Corp. v. United States*, 264 F. Supp. 2d 1339 (Ct. Int'l Trade 2003), and *Tung Fong Indus. Co. v. United States*, 318 F. Supp. 2d 1321 (Ct. Int'l Trade 2004), is likewise misplaced. Salzgitter Br. at 31. In *China Steel Corp.*, the lower court faulted Commerce because it entirely failed to address the respondent's claims regarding its alleged difficulties. *China Steel Corp.*, 264 F. Supp. 2d at 1360 ("In its Case Brief before Commerce, Plaintiff described the difficulties it experiences in gathering and submitting the requested information. . . . {Commerce}, however, fails to address this claim in reaching its 'best of its ability'

determination.”). In other words, the CIT did not find that Commerce could not apply AFA when a party identifies a difficulty in its ability to respond; instead, the CIT recognized only that Commerce must address such claims in explaining its determination. *Id.* Indeed, following a remand in which Commerce did address these arguments, the CIT affirmed the application of AFA. *China Steel Corp.*, 306 F. Supp. 2d at 1301-09. Here, Commerce did address Salzgitter’s claims regarding its ability to provide the requested information, explaining that Salzgitter was able to obtain this information during verification and finding that Salzgitter “would have been able to provide this information if it had made the appropriate effort when it first received {Commerce’s} antidumping duty questionnaire . . . .” Appx45.

And in *Tung Fond Indus. Co.*, the CIT found that Commerce had not sufficiently supported its determination in light of the fact that the respondent did not have the requested information at all and provided the agency with an alternative means of reporting the relevant data. *Tung Fong Indus. Co.*, 318 F. Supp. 2d at 1335-36. In contrast, here, Salzgitter had the missing information but did not submit it, nor did Salzgitter not provide an alternative means for reporting the data at issue.

Salzgitter likewise argues that Commerce improperly distinguished its determination in *CTL Plate from Japan from 1999*. Salzgitter Br. at 35-36. However, the fact that Salzgitter can identify a single case from over fifteen years ago by no means demonstrates that Commerce had a practice that it was bound to follow here.

Moreover, Salzgitter ignores the distinctions between the present case and *CTL Plate from Japan from 1999*. Notably, as Commerce highlighted, expectations regarding what a respondent can and should be able to do are appropriately affected by technological capabilities and advancements. *See* Appx45. Additionally, in *CTL Plate from Japan from 1999*, the respondent was tasked with reporting the downstream sales of 26 affiliated resellers/processors. *Certain Cut-to-Length Carbon-Quality Steel Plate Products from Japan*, 64 Fed. Reg. 73,215, 73,224-25 (Dep't Commerce Dec. 29, 1999) (notice of final deter. of sales at less than fair value). Here, in contrast, Salzgitter's missing information relates to sales by one affiliate. In short, what Commerce might have reasonably expected from a different respondent in different circumstances in 1999 is not the same as what Commerce may reasonably expect from Salzgitter in 2016. Thus, Commerce's determination in *CTL Plate from Japan from 1999* does not undermine or otherwise detract from its determination here.

Finally, Salzgitter argues that the lower court erred in affirming Commerce's application of AFA. Salzgitter Br. at 37-39. As an initial matter, as Salzgitter recognizes, this Court reviews determinations by Commerce *de novo* and will uphold the agency determination unless it is unsupported by substantial evidence or otherwise not in accordance with law. *See id.* at 23; *JTEKT Corp. v. United States*, 642 F.3d 1378, 1381 (Fed. Cir. 2011). As discussed above, Commerce's

determination is supported by substantial record evidence and otherwise in accordance with law and Salzgitter's arguments to the contrary are unavailing. Accordingly, this Court should uphold Commerce's determination. *See JTEKT Corp.*, 642 F.3d at 1381.

Furthermore, Salzgitter's criticisms of the lower court's opinion fail to establish any error in Commerce's determination. Salzgitter first faults the CIT for its discussion of Salzgitter's proposed alternatives for calculating its dumping margin, asserting the Commerce's failed to consider this and that the CIT improperly affirmed the agency's determination on a basis not articulated by the agency. Salzgitter Br. at 37-38. Salzgitter is incorrect on both counts. In its case brief, Salzgitter proposed options for Commerce to apply as neutral facts available in light of the missing information. Appx11405-11406. As Commerce rejected the argument that neutral facts available should be applied—because an adverse inference was warranted—there was no need for the agency to further discuss or consider Salzgitter's proposed options for the application of neutral facts. *See* Appx43-46. Thus, there was no important aspect of the problem that Commerce failed to consider. *See* Salzgitter Br. at 37-38. Likewise, the lower court did not affirm Commerce's determination based on the agency's rejection of Salzgitter's proposed calculations. Appx122-123. Consequently, Salzgitter's complaint regarding the CIT's discussion is inapposite. *See* Salzgitter Br. at 37-38.

Salzgitter also challenges the CIT's characterization of its proposed alternatives for the dumping calculation as "mere speculation." *Id.* at 38-39. This claim has no merit. As discussed above, Salzgitter's proposed alternatives were to either include or exclude all sales. These proposals were made without any demonstration that they were accurate or representative. Indeed, the alternatives required accepting the opposite assumptions (*i.e.*, that either all of the sales at issue were manufactured by Salzgitter or none of them were).[4] The fact that these proposals utilized the reported sales data and that Salzgitter provided programming language does not render them more accurate or reliable with respect to whether the sales should be included or excluded in the first place.

Finally, Salzgitter asserts that the lower court incorrectly relied on *Maverick Tube* in affirming Commerce's determination. *Id.* at 39. However, as discussed above, Salzgitter's attempts to distinguish *Maverick Tube* are unavailing. Like the respondent in *Maverick Tube*, Salzgitter claimed that it could not provide the information at issue because doing so would be "extremely time consuming and burdensome{.}" *Maverick Tube*, 857 F.3d at 1356. And like the respondent in *Maverick Tube*, Salzgitter did not provide Commerce with an alternative means for obtaining the information at issue and instead proposed that the agency move

[4] As noted above, the third option proposed by Salzgitter, which Salzgitter highlights as being based on its "actual purchase data," Salzgitter Br. at 38, was effectively identical to treating all sales as manufactured by Salzgitter. *Supra* note 3.

forward without it. According, as with the respondent in the proceeding underlying *Maverick Tube*, Commerce properly found that Salzgitter had failed to cooperate to the best of its ability and, therefore, properly applied AFA. As such, the CIT properly relied on *Maverick Tube* in finding that Commerce's determination was supported.

### B. Commerce's Selection of AFA Was Supported by the Record

In light of Salzgitter's failure to provide complete information regarding SMSD's sales, Commerce properly resorted to AFA to fill the gap in the record. *See* Appx45. As Commerce explained, without manufacturer information, it was unable to determine which sales should be used for comparison purposes, and, consequently, which net prices were appropriately included in its dumping calculation. *See* Appx226-227. Accordingly, to account for this missing information, Commerce identified the highest non-aberrational net price among the SMSD sales with missing information and assigned that price to all of the sales for which there was no manufacturer information. Appx46. Salzgitter challenges Commerce's selection of partial AFA, asserting that the agency improperly replaced information that was not missing and relied on aberrational data to do so. Salzgitter Br. at 40-44. As discussed below, these arguments do not persuade and fail to demonstrate any error in Commerce's determination.

### 1. Commerce Properly Filled the Gap in the Record Regarding SMSD's Sales Information

Salzgitter first argues that the manner in which Commerce applied AFA was improper because the agency was limited to replacing the missing manufacturer information. *Id.* at 40-41. This argument ignores the effects of the missing manufacturer information on Salzgitter's sales data and is not supported by law. Consequently, this claim should be rejected.

As Commerce explained, what is missing from the record is the information that dictates whether the sales should be included or excluded from the home market sales database. *See* Appx44 ("The manufacturer information is critical for the Department's margin analysis because the Department matches sales by, among other criteria, manufacturer."); Appx227 ("Commerce cannot determine which of the nearly 28,000 downstream sales without a reported manufacturer were produced by Salzgitter (and are thus potentially comparable to Salzgitter's U.S. sales), and which were produced by other manufacturers (and are thus excluded from the comparison pool)."), Appx227. Because the manufacturer information is missing, Commerce cannot rely on the corresponding price data because it cannot pair price data with manufacturer information; in other words, Commerce cannot determine which sales prices are for goods manufactured by Salzgitter, and therefore should be included, and which are for goods manufactured by other companies, and therefore should be excluded. Appx227. Consequently, the record does not contain information that

allows Commerce to determine which transactions—including which sales prices—are appropriately included in the dumping calculation. Thus, contrary to Salzgitter's claims, the gap in the record is not simply the manufacturer information; the gap is which data should be included in margin calculation at all. As a result, *none* of the sales data is usable because Commerce does not have the information that would allow it to determine which information should be used.

This is consistent with the lower court's findings in other proceedings. In *Diamond Sawblades Mfrs.' Coalition v. United States*, the CIT considered an argument that Commerce improperly applied an AFA rate to certain sales for which the country of origin could not be identified. *Diamond Sawblades Mfrs.' Coal. v. United States*, 547 F. Supp. 3d 1323, 1330 (Ct. Int'l Trade 2021). The respondent argued that, while Commerce could use adverse inferences to determine the country of origin of the sales at issue, it could not disregard the sales price data that had been placed on the record. *Id.* In rejecting this argument, the CIT stated:

> Commerce explains that although Bosun correctly states that the information missing from the record is the country-of-origin for the {first-in-first-out ("FIFO")} Sales, that information is critical to the determination of whether a sale is properly included or excluded in the U.S. sales database. Thus, Commerce reasonably concludes that the inability to reliably identify the country of origin for the FIFO Sales means that the corresponding price data in the U.S. sales database is also unreliable because Commerce cannot accurately pair price data with the correct country of origin. Consequently, the U.S. sales database information is missing. Since the information is missing from the record, Commerce filled the gap with facts otherwise available.

*Id.* at 1330-31. The same reasoning is applicable here.

Moreover, Salzgitter's reliance on *Zhejiang DunAn Hetian Metal Co. v. United States* is misplaced. In *Zhejiang DunAn*, the Federal Circuit rejected Commerce's application of a transaction specific dumping margin as AFA for certain transactions for which the respondent had failed to correctly report quantity information. *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1345-48 (Fed. Cir. 2011). In making this determination, the Court explained that the question before it was "whether it is possible to calculate a transaction specific dumping margin without sales quantity." *Id.* at 1347. Because, in that case, the dumping margin could still be calculated, the Court found that Commerce's application of AFA was improper. *Id.* The Court also contrasted the facts in *Zhejiang DunAn* with those in *Nippon Steel*, noting that, in the latter case, a transaction specific margin could not be calculated without the missing conversion rate data. *Id.*

As explained above, Commerce cannot calculate transaction specific dumping margins without knowing which transactions and sales prices to use. And, without manufacturer information, Commerce cannot identify which transactions and sales prices to use. Accordingly, the missing information includes the relevant sales data to be included in the dumping calculation and, consequently, Commerce relied on AFA to determine which sales price to use. This is consistent with the Federal Circuit's findings in *Zhejiang DunAn* and *Nippon Steel Corp.*

#### 2. **The Data Relied on By Commerce As Partial AFA Was Not Aberrational**

Finally, Salzgitter asserts that Commerce erred in its application of AFA because the transaction selected for the AFA rate was aberrational. Salzgitter Br. at 42-44. Yet, Salzgitter fails to point to any record evidence demonstrating that the sale is aberrational and instead relies on its claim that the sale is simply "dissimilar" from the sales sold in the United States. However, Salzgitter provides no support for its claim that a "dissimilar" transaction cannot be relied on or that Commerce's selected data was otherwise inappropriate.

The statute provides broad discretion to Commerce in selecting among facts available when applying AFA, permitting the use of, *inter alia*, information derived from a final determination or any other information placed on the record. 19 U.S.C. § 1677e(b); *see Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1300-01 (Fed. Cir. 2021). In this regard, the Federal Circuit has explained that the statute

permits the use of the highest-transaction specific margin as AFA. *Nan Ya Plastics Corp.*, 810 F.3d at 1348. Notably, in doing so, the Court rejected the argument that doing so could result in using unrepresentative or aberrational margins, explaining that 19 U.S.C. § 1677e(b) "simply does not require Commerce to select facts that reflect a certain amount of sales, yield a particular margin, fall within a continuum according to the application of particular statistical methods, or align with standards articulated in other statutes and regulations. Congress decided what requirements Commerce must fulfill in reaching its determinations, § 1677e(b), and we do not impose conditions not present in or suggested by the statute's text." *Id.*[5]

Salzgitter has provided no grounds for Commerce's selected AFA rate to be rejected. That the sales price selected may have been high does not render it aberrational. Nor was Commerce required to demonstrate that the information relied on fell within a continuum, aligned with any particular standards, or create any particular result. For these same reasons, Salzgitter's claim that the resulting margin is evidence that the transaction is aberrational or unusable is unpersuasive. Salzgitter Br. at 43-44. In short, Salzgitter has put forth no grounds for rejecting the transaction

[5] Nucor notes that *Nan Ya Plastics Corp.* addressed 19 U.S.C. § 1677e(b) prior to its revision by the passage of the Trade Preferences Extension Act ("TPEA"). *Compare* 19 U.S.C. § 1677e(b) (2012), *with* 19 U.S.C. § 1677e(b) (2018). However, the language relied upon by the Court in *Nan Ya Plastics Corp.* remains in the statute, and the TPEA broadened Commerce's discretion in selecting AFA rates. *See Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1355 (Ct. Int'l Trade 2018).

selected by Commerce for its AFA determination. Indeed, Commerce's selection of the highest non-aberrational transaction-specific price is consistent with deterrence feature of the AFA statute. *See Nan Ya Plastics Corp.*, 810 F.3d at 1348.

## VII. CONCLUSION

For the foregoing reasons, Nucor respectfully requests that the Court affirm Commerce's determination and the CIT opinions upholding it.

*/s/ Alan H. Price*
Alan H. Price, Esq.
Christopher B. Weld, Esq.
Stephanie M. Bell, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Nucor Corporation*

Dated: April 25, 2024

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-1219

**Short Case Caption:** AG der Dillinger Huttenwerke v. US

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 8,300 words.

☐ the filing has been prepared using a monospaced typeface and includes ________ lines of text.

☐ the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 04/25/2024

Signature: /s/ Alan H. Price

Name: Alan H. Price

Save for Filing