No. 2024-1219

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

AG DER DILLINGER HÜTTENWERKE, FRIEDR. LOHMANN GMBH,
THYSSENKRUPP STEEL EUROPE AG,
*Plaintiffs*,

ILSENBURGER GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH,
SALZGITTER MANNESMAN GROBBLECH GMBH, SALZGITTER
MANNESMANN INTERNATIONAL GMBH,
*Plaintiffs-Appellants*,

v.

UNITED STATES, SSAB ENTERPRISES LLC, NUCOR CORPORATION,
*Defendants-Appellees*.

Appeal from the United States Court of International Trade
in Case No. 1:17-CV-00158, Senior Judge Leo M. Gordon

**NON-CONFIDENTIAL RESPONSE BRIEF FOR DEFENDANT-
APPELLEE, UNITED STATES**

<div style="margin-left:40%;">

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

</div>

Of Counsel:

AYAT MUJAI
Senior Attorney
U.S. Department of Commerce
Office of the Chief Counsel for
   Trade Enforcement and Compliance

KARA M. WESTERCAMP
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-7571
Fax: (202) 514-8640
Email: kara.m.westercamp@usdoj.gov

April 25, 2024

*Attorneys for the United States*

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ................................................................. v

STATEMENT OF THE ISSUE ...................................................................... 1

STATEMENT OF THE CASE ........................................................................ 1

STATEMENT OF THE FACTS ...................................................................... 3

    I.      Legal Framework ................................................................ 3

    II.     The Underlying Investigation ................................................. 3

          A.     Questionnaires And Preliminary Determination ........................ 3

          B.     Commerce's Determination To Apply Partial AFA to Salzgitter
               In The Final Determination .................................................. 6

    III.    Trial Court Proceedings ...................................................... 8

          A.     In *Dillinger I*, The Trial Court Sustained Commerce's
               Application Of AFA, But Remanded To Commerce The
               Selected AFA Methodology In Light Of *Dillinger France* ....... 8

          B.     Following Commerce's First Remand Redetermination, In
               *Dillinger II*, The Trial Court Again Remanded The Partial AFA
               Methodology ........................................................................ 11

          C.     In The Second Remand Redetermination, Commerce Explained
               Why Its Original Partial AFA Methodology Was
               Reasonable ........................................................................ 12

          D.     In *Dillinger III*, The Trial Court Sustained Commerce's Partial
               AFA Methodology .............................................................. 16

SUMMARY OF THE ARGUMENT .................................................................. 18

ARGUMENT ............................................................................................. 19

i

I.     Standard Of Review ........................................................... 19

II.    Legal Framework For Application Of Facts Otherwise Available, Use Of An Adverse Inference, And Selection Of An AFA Rate .............. 20

III.   Substantial Evidence Supports Commerce's Application Of Partial AFA To Salzgitter ............................................................. 22

       A.    Commerce Appropriately Applied Facts Available Because 28,000 Downstream Sales Of SMSD Were Missing The Manufacturer's Information Although Salzgitter Had Access To The Critical Missing Information ........................................... 23

       B.    Commerce's Application Of An Adverse Inference Is Supported By Substantial Evidence And In Accordance With Law ...................................................................... 27

       C.    Commerce's Selection Of The Non-Aberrational Sale As The Partial AFA Rate Is Supported By Substantial Evidence ........ 32

CONCLUSION ....................................................................... 35

**CONFIDENTIAL MATERIAL DELETED**

The confidential material deleted on pages 13 and 14 consists of business proprietary information submitted to, or released by, the U.S. Department of Commerce under administrative protective order, the disclosure of which is protected by statute, 19 U.S.C. § 1677f.

# TABLE OF AUTHORITIES

## CASES

*Dillinger France S.A. v. United States*,
 350 F. Supp. 3d 1349 (Ct. Int'l Trade 2018) ..................................... 2, 11, 13-15

*Dillinger Hüttenwerke v. United States*,
 399 F. Supp. 3d 1247 (Ct. Int'l Trade 2019) ....................................................... 2

*Dillinger Hüttenwerke v. United States*,
 534 F. Supp. 3d 1403 (Ct. Int'l Trade 2021) ....................................................... 2

*Dillinger Hüttenwerke v. United States*,
 648 F. Supp. 3d 1321 (Ct. Int'l Trade 2023) ...............................................passim

*Essar Steel Ltd. v. United States*,
 678 F.3d 1268 (Fed. Cir. 2012) .................................................................... 21, 22

*Goodluck India Ltd. v. United States*,
 11 F.4th 1335 (Fed. Cir. 2021) ...........................................................................25

*Gov't of Argentina v. United States*,
 542 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) ......................................................34

*Maverick Tube Corp. v. United States*,
 857 F.3d 1353 (Fed. Cir. 2018) ..........................................................................31

*Mukand v. United States*,
 767 F.3d 1300 (Fed. Cir. 2014) ..........................................................................29

*Nan Ya Plastics Corp. Ltd. v. United States*,
 810 F.3d 1333 (Fed. Cir. 2016) ..............................................................27, 28, 34

*Nippon Steel Corp. v. United States*,
 337 F.3d 1373 (Fed. Cir. 2003) ..............................................................21, 27, 29

*Norsk Hydro Canada, Inc. v. United States*,
 472 F.3d 1347 (Fed. Cir. 2006) ..........................................................................19

*Qingdao Sea-Line Trading Co., Ltd. v. United States*,
   766 F.3d 1378 (Fed. Cir. 2014) ........................................................ 20

*Sage Prods. Inc. v. Devon Indus., Inc.*,
   126 F.3d 1420 (Fed. Cir. 1997) ...................................................... 33

*Shanxi Hairui Trade Co., Ltd. v. United States*,
   39 F.4th 1357 (Fed. Cir. 2022) ....................................................22

*Union Steel v. United States*,
   713 F.3d 1101 (Fed. Cir. 2013) ...........................................19, 30, 31

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951) ..................................................................19, 20

## STATUTES

19 U.S.C. § 1673 1675 ......................................................................... 3
19 U.S.C. § 1673 1675 ......................................................................... 3
19 U.S.C. § 1677b ...............................................................................3
19 U.S.C. § 1677 ................................................................................. 5
19 U.S.C. § 1677e ......................................................................passim
19 U.S.C. § 1677m ...............................................9, 16, 20, 24, 26

## REGULATIONS

19 C.F.R. § 351.308 ..........................................................................22
19 C.F.R. § 351.403 ........................................................................... 5

iv

**STATEMENT OF RELATED CASES**

Pursuant to Federal Circuit Rule 47.5, defendant-appellee's counsel states that she is unaware of any other appeal in or from this action that was previously before this Court, or any other appellate court, under the same or similar title.  The Court has designated the following case as a companion case:  *AG der Dillinger Huttenwerke v. United States*, Court No. 24-1498.

## STATEMENT OF THE ISSUE[1]

Whether the Department of Commerce's application of partial facts available with an adverse inference to calculate the dumping margin of Ilsenburger Grobblech GmbH (ILG), Salzgitter Mannesmann Grobblech GmbH (MGB), Salzgitter Flachstahl GmbH (SZFG), and Salzgitter Mannesmann International GmbH (SMID) (collectively, Salzgitter) is based on substantial evidence and otherwise in accordance with law.

## STATEMENT OF THE CASE

This appeal concerns the final affirmative determination in the antidumping duty investigation covering certain carbon and alloy steel cut-to-length (CTL) plate from the Federal Republic of Germany produced and exported by Saltzgitter, during the period between April 1, 2015, through March 31, 2016. *See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany*, 82 Fed. Reg. 16,360 (Dep't Commerce Apr. 4, 2017) (final determination), Appx9-12, and the accompanying Issues and Decision Memorandum, Appx14-112. Salzgitter and another mandatory respondent, AG der Dillinger Hüttenwerke (Dillinger), both appealed to the Court of International Trade, and the cases were consolidated.

---

[1] Pursuant to Fed. Cir. R. 28(b), we provide counter-statements of the issue, the case, and the facts because we disagree with those of plaintiffs-appellants.

The trial court sustained Commerce's application of partial facts available with an adverse inference (AFA) to both Salzgitter and Dillinger. *AG der Dillinger Hüttenwerke v. United States*, 399 F. Supp. 3d 1247 (Ct. Int'l Trade 2019) (*Dillinger I*). Appx113-123. However, the court remanded to Commerce with instructions to recalculate the antidumping margin for Dillinger and Salzgitter using the AFA methodology applied to certain downstream sales used in a parallel proceeding in *Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349, 1364 (Ct. Int'l Trade 2018). Appx122-123. Under respectful protest, Commerce applied the partial AFA methodology used in *Dillinger France*, which had no impact on Dillinger's recalculated estimated weighted-average dumping margin but did materially affect Saltzgitter's margins. Appx124-128 (First Remand Redetermination).

The court again remanded and ordered Commerce to provide an explanation why it was reasonable to take different AFA approaches in the Germany and France investigations. *AG der Dillinger Hüttenwerke v. United States*, 534 F. Supp. 3d 1403 (Ct. Int'l Trade 2021) (*Dillinger II*). Appx129-140. Following the second remand redetermination, the court sustained Commerce's partial AFA methodology it had originally applied to Salzgitter in the final determination. *AG der Dillinger Hüttenwerke v. United States*, 648 F. Supp. 3d 1321 (Ct. Int'l Trade

2023) (*Dillinger III*), Appx199-214; Appx141-198 (Second Remand

Redetermination).

## STATEMENT OF THE FACTS

### I.    Legal Framework

In an antidumping duty proceeding, Commerce determines whether subject

merchandise is being, or is likely to be, sold at less than fair value in the United

States by comparing the price of the merchandise sold in the United States and the

"normal value" of the merchandise.  *See* 19 U.S.C. §§ 1673, 1675(a)(2)(A), (C),

1677b(a).  Commerce can determine the "normal value" in certain cases by

considering sales of the merchandise in the home market.  *See* 19 U.S.C.

§1677b(a)(1).  Generally, Commerce compares the cost of production to home

market sales prices to determine whether those home market prices can be used as

a basis for normal value.  *See* 19 U.S.C. §§ 1677b(b)(1), (b)(2)(A)(ii) (outlining

"sales at less than cost of production" determinations).  Accordingly, submission of

accurate cost of production data from the beginning is essential to the proceeding

because it dictates the trajectory of the review.

### II.    The Underlying Investigation

#### A.    Questionnaires And Preliminary Determination

On May 25, 2016, Commerce issued the antidumping duty questionnaire to

the mandatory respondents, which required Salzgitter to report sales of subject

merchandise to the United States and in Germany, including resales of the products by affiliated resellers.[2]  Appx298-300.  The initial questionnaire further required that respondents identify the manufacturer of the CTL plate sales reported in their respective United States' and German sales databases.  Appx338, Appx371.

On June 29, 2016, Salzgitter submitted its Section A response to Commerce's antidumping duty questionnaire (*i.e.*, the section relating to general information).  Appx8204.  On July 15, Salzgitter responded to sections B, C, and D of the questionnaire (*i.e.*, the sections relating to home market sales, U.S. sales, cost of production, constructed value, respectively).  *Id.*

Commerce issued numerous supplemental questionnaires to Salzgitter.  *See e.g.*, Appx6755-6772, Appx8204. Commerce also issued five supplemental section B&C questionnaires and two supplemental section D and section E questionnaires to Salzgitter.  Appx8031-33, Appx8200-8201. On October 20, Commerce issued final supplemental questionnaires to Salzgitter regarding sales in both markets, and further manufacture in the United States, respectively.  Appx8205.

In calculating normal value, Commerce first determined that the aggregate volume of home market sales of the foreign like product for each respondent was greater than five percent of the aggregate volume of its U.S. sales of the subject

---

[2]  Unless relevant, we omit references in the factual background to the other mandatory respondent, Dillinger.

merchandise.  Appx8211-8212.  Therefore, Commerce used home market sales as the basis for normal value for Salzgitter.  Appx8212.  During the period of investigation, Salzgitter made sales of the foreign like product in the home market to affiliated parties, as defined in 19 U.S.C. § 1677(33).  Consequently, Commerce tested those sales to ensure that they were made at arm's-length prices, in accordance with 19 C.F.R. § 351.403(c).

In its questionnaire responses, Salzgitter stated that it did not report certain downstream sales by its affiliated reseller Salzgitter Mannesmann Stahlhandel GmbH (SMSD), because it could not identify the original manufacturer of the CTL plate sold without performing a burdensome manual check.  Appx5742-5743.  Commerce twice requested that Salzgitter provide these unreported sales if the sales to SMSD failed the arm's-length test.  *See* Appx6756-6766, Appx8056.  Salzgitter reported the sales in a new, separate database, but failed to provide the identity of the CTL plate manufacturer for 28,000 sales.  Appx8237-8242 (stating that "SMSD remains unable to identify the manufacturer for the sales listed in the Separate Database."); Appx8329-8346 (Separate Database excerpts).  Despite stating that it could not provide the CTL manufacturer identities without conducting a manual query, Salzgitter nonetheless conceded that SMSD retains PDF documents listing manufacturer information in SMSD's certification system, but the PDFs were allegedly not in electronically searchable form.  Appx8238.

5

As Commerce explained in the preliminary determination, "Salzgitter did not provide these sales, contending that, while it is able to do so for customers upon request, its accounting system does not track merchandise by manufacturer once placed into inventory and, thus, it would be 'unreasonably burdensome' to obtain the requested information." Appx8213. Although Salzgitter contended that identifying all SMSD sales of Salzgitter-produced merchandise would be unreasonably burdensome, Salzgitter stated it could report SMSD's sales where the manufacturer could not be identified, upon request. *Id*. Because Salzgitter could report these sales if requested and nevertheless chose *not* to identify all SMSD sales of Salzgitter-produced merchandise, Commerce preliminarily found that application of facts available, in part, with an adverse inference was warranted to account for SMSD's unreported downstream sales. *Id*. As adverse facts available, Commerce "applied the highest net price among the reported sales made by SMSD to all of the sales made by SMSD." *Id*. Commerce also explained that it intended to examine the issue further at verification and for the final determination. *Id*.

## B.    Commerce Determined To Apply Partial AFA To Salzgitter In The Final Determination

In its final determination, Commerce continued to apply partial AFA to Salzgitter for 28,000 home market downstream sales where SMSD did not identify the original manufacturer of the CTL plate. Appx43. Commerce explained that it disagreed that it was "unreasonably burdensome" for SMSD to report the

6

manufacturer for the missing sales because Commerce had "asked Salzgitter on multiple occasions to submit complete home market sales data, inclusive of manufacturer information." Appx44. And even though Salzgitter "ultimately submitted all of SMSD's sales," after the preliminary determination, Salzgitter still did not provide the "missing critical information, *i.e.*, the manufacturer of the CTL plate." *Id.*

Indeed, in the final determination, Commerce explained that, at the verification, Salzgitter "was able to identify the manufacturer of a sale in the additional SMSD sales database when it attempted to obtain that information," and Commerce accordingly determined that "Salzgitter had relevant information available to it, but determined not to invest the time in comprehensively examining its documentation in order to provide the requested information." *Id.*

Commerce also explained why a party would be expected to have the missing information. To wit, the identity of the manufacturers of the CTL plate resold by Salzgitter's affiliate, SMSD, "is the type of information that a respondent should have reasonably anticipated being required to provide to its customers for quality assurance and warranty claims." Appx45. And Commerce had given Salzgitter more than sufficient notice that it "was required to report SMSD's downstream sales" because that information was requested in the initial questionnaire and three supplemental questionnaires. *Id.* Thus, Commerce found

7

that "Salzgitter's failure to report the requested manufacturer information accurately, and in the manner requested, using the records over which it maintained control, indicates that Salzgitter did not act to the best of its ability to comply with {Commerce's} requests for information," and determined to apply partial AFA to "those downstream SMSD sales where Salzgitter did not identify the manufacturer of the CTL plate." *Id.*

As partial AFA, Commerce determined to use the "highest non-aberrational net price among all of the downstream sales in the additional SMSD sales database," and assigned that price to the 28,000 sales that were missing the manufacturer's identity.  Appx46.  Commerce calculated Salzgitter's margin, using partial AFA, at 22.90 percent.  Appx3.

## III.    Trial Court Proceedings

### A.    In *Dillinger I*, The Trial Court Sustained Commerce's Application Of AFA, But Remanded To Commerce The Selected AFA Methodology In Light Of *Dillinger France*

The trial court sustained Commerce's reliance on facts available and application of an adverse inference, but remanded Commerce's selected AFA methodology, in light of Commerce's different treatment of the issue in  the parallel investigation into CTL plate from France, *Dillinger France*.  Appx118-

8

123.

First, although Salzgitter argued that it had provided all the information that Commerce requested, the court disagreed.  The court found that the "'information' to which {19 U.S.C.} § 1677m(e) refers, in the context of this proceeding, is the *missing* manufacturer information, not the remainder of the 'information'" that Salzgitter submitted.  Appx119 (emphasis added).  That is, 19 U.S.C. § 1677m states that if a party does not provide all of the requested information, then Commerce may consider that shortfall in information in making its determination.  Here, Commerce requested Salzgitter and SMSD to provide all of the information in its various questionnaires, and even Salzgitter "acknowledge{d} that the identity of the CTL plate manufacturers is relevant to whether home market transactions should or should not be included in margin calculations, and that they did not identity all of them."  Appx119.  Thus, the trial court found that Salzgitter's reliance on 19 U.S.C. § 1677m(e) was "misplaced" and Commerce "reasonably determined that it must resort to 'facts available' pursuant to 19 U.S.C. § 1677e(a)."  *Id.*

Second, the court held that it was reasonable for Commerce to apply an adverse inference because the identity of the manufacturers was something that Salzgitter could reasonably anticipate that it would need to provide, and Commerce gave Salzgitter multiple opportunities to provide the information.  Appx120-122.

Although Salzgitter claimed that it "would have taken 4,667 hours for Salzgitter to provide the missing manufacturer information by manually correlating its two disparate financial accounting and mill certificate management systems," based on the fact that a "single incident" at verification took 10 minutes to locate and match one CTL plate manufacturer, the trial court held that that "neither excuses nor resolves the problem that Commerce still faced as to whether to include or exclude those transactions in Salzgitter's margin calculation." Appx121.

The court also held that it was reasonable for Commerce to reject Salzgitter's three proposed options for using the separate database that Salzgitter had submitted as a proxy for the missing manufacturers' information for the 28,000 sales. *Id.* Indeed, the court struggled to "understand why Salzgitter did not just simply conduct a statistical analysis of the 28,000 CTL plate sales with missing manufacturer information" that "might have established a statistically valid extrapolation, rather than Salzgitter's mere speculation, of the missing manufacturer information based on the sample's actual ratio of Salzgitter-manufactured to non-Salzgitter-manufactured CTL plate sales." *Id.* The court theorized that a robust statistical analysis "would also have presented Commerce with an evidentiary proffer that Commerce would have been hard pressed to reasonably reject, and it would have better carried Salzgitter's burden to create an adequate record." *Id.* In summary, the court held that Salzgitter "mainly"

10

presented "only self-serving statements or interpretations of the record" and held

that Commerce's determination to apply an adverse inference in selecting among

the facts available was reasonable.  Appx122.

Finally, when considering Commerce's use of the highest non-aberrational

net price to fill the gap in the record for the 28,000 downstream Salzgitter sales, the

court remanded to Commerce to consider whether it should change its application

of partial AFA to downstream sales, consistent with *Dillinger France*.  Appx122-

123.  In *Dillinger France*, a parallel proceeding, Commerce treated all the missing

downstream home market sales transactions as Dillinger France-produced plate

and then relied on those sales as reported.  350 F. Supp. 3d at 1361.  The court held

that "{r}easoned decision-making requires a certain measure of consistency, which

is not present across the France and Germany investigations," and ordered

Commerce to review whether the "same correction" done in *Dillinger France*

would "have any material effect on the margins in this case, or if it would be

immaterial."  Appx123.

**B.     Following Commerce's First Remand Redetermination, In
         *Dillinger II*, The Trial Court Again Remanded The Partial AFA
         Methodology**

In July 2019, under respectful protest, Commerce applied the "same partial

AFA methodology" used in *Dillinger France* and determined that the margin for

Salzgitter "was materially affected."  Appx125.  Commerce explained that the facts

11

in this investigation "differ significantly" from *Dillinger France* because Salzgitter's missing reported downstream sales was 28,000 and "the result of accepting the data as reported for these sales is that Salzgitter's margin becomes zero, meaning that Salzgitter will be excluded from the order."  Appx127.[3]

The trial court again remanded the "AFA issue so that Commerce may explain why, if there were material factual differences between the French and German investigations on the AFA issue, those differences were not reflected in the decision memoranda or Commerce's handling of AFA between the cases." Appx139.  That is, the court ordered Commerce to "explain why an alternative AFA methodology might be appropriate," and that Commerce was required to "provide a reasoned explanation" for why Commerce had argued in the first remand redetermination that "there were material differences not previously identified or explained that warrant differing AFA treatment across the two investigations."  Appx140.

### C.    In The Second Remand Redetermination, Commerce Explained Why Its Original Partial AFA Methodology Was Reasonable

In the second remand redetermination, Commerce explained why its original partial AFA methodology it had used to fill the gap left by the missing

---

[3]  As explained below, the trial court ultimately affirmed Commerce's partial AFA approach from the final determination, which Commerce explained in more detail in the second remand redetermination.  Appx43-44, Appx166-171, Appx194-197.

CONFIDENTIAL INFORMATION DELETED

manufacturer information for Salzgitter's 28,000 sales was reasonable and merited

a different approach than that taken in *Dillinger France*.  Appx166-171, Appx194-

197.  Although Commerce "acknowledge{d} that the circumstances that led to

Commerce's determination to resort to partial AFA in each investigation are

essentially the same," Commerce explained why the "scope of Salzgitter's failure

to cooperate is substantially different" than that of Dillinger France's failure to

cooperate.  Appx166-167.

Specifically, the 28,000 downstream sales missing manufacturer information

out of a total of [ **#**     ] Salzgitter-produced home market sales used in

Commerce's analysis represented more than [ **#** ] percent of the home market

sales.  Appx167.  In contrast, the missing manufacturer information for the other

mandatory respondent, Dillinger, represented "a small number."  *Id.*  And if

Commerce attributed the missing manufacturer information to Salzgitter-produced

CTL plate, as it did in *Dillinger France*, then "this methodology had a material

effect on the margin, resulting in a change from the 22.90 percent" to a "rate of

zero percent" and Salzgitter's potential exclusion from the antidumping duty order.

Appx168.  Commerce also explained that the court had already sustained

Commerce's "authority to apply partial AFA" for the 28,000 sales missing

manufacturer information, and that using the *Dillinger France* methodology

"frustrates Commerce's goals of inducing cooperation by ensuring that a non-

CONFIDENTIAL INFORMATION DELETED

cooperating respondent does not receive a more favorable AFA rate than it would

have received if the company had cooperated fully." Appx169.

Relatedly, Commerce considered that its selection of a "partial AFA

methodology" seeks to "induce future cooperation and ensure that necessary

information is placed on the record." *Id.* In the case of Salzgitter, for example, if

it finds that "there is no benefit" to cooperating, then it "may conclude that

withholding information or providing only certain information, rather than

providing a fulsome response, is more advantageous." Appx169-170.

Turning to the effect of the non-cooperation, Commerce observed that

Salzgitter's reporting failures were "significant" at "more than [ # ] percent of

Salzgitter's home market sales," and that Commerce was "unable to determine

what Salzgitter's margins would have been if Salzgitter had fully cooperated with

{its} requests for information and properly reported the manufacturer of the

downstream sales at issue." Appx170. In other words, without knowing the

"critical" manufacturer information, "Commerce cannot properly identify which

home market sales to compare to U.S. sales," or know how many of the 28,000

downstream sales were produced by Salzgitter or a different manufacturer. *Id.*

The missing manufacturer information was also relevant to Commerce's

pricing of the sales. Commerce "sorted all of SMSD's net prices" and then

determined the highest non-aberrational net price for the 28,000 sales missing

manufacturer information in "descending order and selected the transaction at the beginning of a smooth continuum of net prices." *Id.* Commerce explained that even with this approach, it could not "rule out the possibility that the sales with the highest prices were entirely or primarily of CTL plate manufactured by Salzgitter, and Salzgitter's failure to report the manufacturer information was an attempt to obscure this fact, thereby distorting the margin." Appx170-171.

Commerce then rejected Salzgitter's argument that Commerce could have compared the "number and quantity (in metric tons) of home market sales" rather than the number of home market sales with missing manufacturer data. Appx195. This approach "would have Commerce establish a new test of materiality to determine whether AFA is warranted – a test that would allow a respondent, not Commerce, to determine what information is relevant for Commerce's analysis." *Id.* Commerce observed that Salzgitter's three alternatives for accounting for the missing manufacturer data also resulted in a zero or *de minimis* margin, a speculative and self-serving result that the trial court had "already rejected." Appx121, Appx196. Commerce concluded that its original partial AFA methodology, resulting in a 22.90 percent margin, ensures that Salzgitter, a non-cooperating respondent, does not receive a more favorable AFA rate than if it had cooperated fully. Appx195.

**D.    In *Dillinger III*, The Trial Court Sustained Commerce's Partial AFA Methodology**

In June 2023, the trial court sustained Commerce's second remand redetermination with respect to this issue.  Appx206-211; *see also* Appx43-46.

First, the court held that Commerce "reasonably found that applying AFA to Salzgitter using the *Dillinger France I* methodology would be inconsistent with the intent of § 1677e," because it would result in a zero percent margin which, "cannot, by definition, be higher than what Salzgitter's margin would otherwise have been if it had disclosed all its manufacturer information."  Appx208.  The court also held that Commerce reasonably rejected Salzgitter's three proposed alternatives because Salzgitter had not demonstrated that its proposed alternatives "provide a reliable measure or approximation of what its margins would be if it fully disclosed all relevant information."  Appx208-209.  That is, Salzgitter did not provide evidence "to show that one of these alternative methodologies constituted the only reasonable path forward on this record."  Appx209.

Second, the court continued to reject Salzgitter's argument that Commerce could not disregard some of Salzgitter's pricing information pursuant to 19 U.S.C. § 1677m(e), because the court had previously held in *Dillinger I* that the missing information was the "missing manufacturer information, not the remainder of 'the information'" that Salzgitter submitted.  Appx209-210; *see also* Appx119.  "As a

16

result, the court cannot agree that Commerce's selected methodology for applying partial AFA to Salzgitter was unreasonable." Appx210.

Finally, the court sustained Commerce's selection of the highest non-aberrational net price as AFA. Appx210-211. Indeed, the Court held that "{b}eyond generally decrying the unreasonableness of Commerce's selected AFA sale price, Salzgitter had identified no alternative basis that would be "the one and only reasonable option on the record." Appx210. Nor did Salzgitter "identify how Commerce exceeded the bounds of reasonableness here, or what alternative AFA price Commerce should have selected in order to meet the purpose of § 1677e(b)." *Id.* Because Commerce explained why it applied different methodologies to Dillinger and Salzgitter, the court held that "Salzgitter fails to explain how Commerce's selection was unreasonable given the totality of the circumstances on the record" and "fails to suggest any alternative price from the record that Commerce could have selected as a reasonable application of AFA." Appx210-211. The court finally rejected Salzgitter's contention that Commerce's selection of the highest non-aberrational net price on the record was 'unreasonable and punitive.'" Appx211.

## <u>SUMMARY OF THE ARGUMENT</u>

This Court should affirm the trial court's judgment because Commerce's application of partial AFA to determine Salzgitter's dumping margin is supported by substantial evidence and in accordance with law.

First, the trial court correctly found that substantial evidence supported Commerce's determination that there was a gap in the record. Salzgitter failed to report the manufacturer information for 28,000 of SMSD's downstream sales and that information was "critical" because without it, Commerce could not identify which home market sales to compare to U.S. sales, or know how many of the 28,000 downstream sales were produced by Salzgitter or a different manufacturer. Thus, it was reasonable for Commerce to apply facts otherwise available to fill that gap. *See* 19 U.S.C. § 1677e(a).

Second, substantial evidence supports Commerce's determination that Salzgitter failed to act to the best of its ability in responding to Commerce's repeated requests for the manufacturer information. Salzgitter could reasonably anticipate that the CLT manufacturer information was something it would need to provide to Commerce. Salzgitter's failure to cooperate was also "significant" when compared to the other mandatory respondent. And because Salzgitter had access to the information but nevertheless chose *not* to identify all SMSD sales of Salzgitter-produced merchandise, it was appropriate for Commerce to apply an

adverse inference when selecting among the facts available. Relatedly, in its selection of a partial AFA rate, Commerce determined to use the highest non-aberrational net price for all 28,000 sales missing manufacturer information. Although Salzgitter objects to use of that price, it never proposed an alternative price for Commerce to select as facts available. Thus, Commerce's selection of the partial AFA rate is supported by substantial evidence and in accordance with law.

## ARGUMENT

### I.    Standard Of Review

Although this Court recognizes that the Court of International Trade has unique and specialized expertise in trade law, this Court nevertheless reviews the trial court's decision *de novo*. *See Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013). Specifically, the Court applies anew "the same standard of review the Court of International Trade used in reviewing the Commerce administrative record{.}" *Norsk Hydro Canada, Inc. v. United States*, 472 F.3d 1347, 1358 (Fed. Cir. 2006). Thus, the Court will uphold Commerce's determination unless it is "'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Union Steel*, 713 F.3d at 1106 (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*,

340 U.S. 474, 477 (1951).  "An agency finding may still be supported by

substantial evidence even if two inconsistent conclusions can be drawn from the

evidence."  *Qingdao Sea-Line Trading Co., Ltd. v. United States*, 766 F.3d 1378,

1385 (Fed. Cir. 2014).

## II.    Legal Framework For Application Of Facts Otherwise Available, Use Of AFA, And Selection Of An AFA Rate

If Commerce determines that a response does not comply with the request

for information in an antidumping duty proceeding, it shall "promptly inform the

person submitting the response of the nature of the deficiency{.}"  19 U.S.C.

§ 1677m(d).  Commerce "shall not decline to consider" necessary "information" if:

(1) the submission is timely, (2) the information is verifiable, (3) it is "not so

incomplete that it cannot serve as a reliable basis for reaching the applicable

determination," (4) the interested party "acted to the best of its ability" to provide

it, and (5) the information can be used without undue difficulties.  *Id.* § 1677m(e).

However, if that party submits further information that continues to be

unsatisfactory, Commerce may, subject to 19 U.S.C. § 1677m(e), disregard all or

part of the original and subsequent responses, as appropriate.

Commerce will use facts otherwise available to fill gaps in the record if:

(1) necessary information is not available or (2) an interested party withholds

information requested by Commerce, fails to provide the information by the

deadline or in the manner requested, significantly impedes the proceedings, or provides information that cannot be verified. 19 U.S.C. § 1677e(a).

If Commerce finds that a respondent has failed to cooperate by not acting "to the best of its ability to comply with a request for information," it may apply an adverse inference in its selection of facts otherwise available. *Id.* § 1677e(b). Indeed, Commerce may apply an adverse inference for a respondent's "failure to cooperate to the best of respondent's ability, *regardless of motivation or intent*." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003) (emphasis added).

A respondent fails to act to the best of its ability when it does not exert "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Id*. Further, the standard requires that importers "conduct prompt, careful and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so." *Id*.

Not having access to cost of production data, Commerce relies on information it obtains from parties, including petitioners and respondent companies. "Because Commerce lacks subpoena power, Commerce's ability to apply adverse facts is an important one." *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012). Thus, "{t}he purpose of the adverse facts statute

21

is 'to provide respondents with an incentive to cooperate' with Commerce's investigation." *Id.* (quoting *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)).

In selecting among the facts available, Commerce may rely on information from:  (1) the petition, (2) the final determination in the investigation, (3) any previous administrative review, or (4) any other information placed on the record. *See* 19 U.S.C. § 1677e(b); 19 C.F.R. § 351.308(c).  When selecting an adverse fact from among the possible sources, Commerce seeks to use facts that are sufficiently adverse to effectuate the statutory purpose of inducing respondents to provide Commerce with complete and accurate information in a timely manner.  *See Shanxi Hairui Trade Co., Ltd. v. United States*, 39 F.4th 1357, 1364 (Fed. Cir. 2022) (affirming Commerce's use of partial AFA in calculating dumping margin). This ensures "that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."  Statement of Administrative Action (SAA), H.R. Doc. No. 103-316, vol. 1, at 870, *reprinted* in 1994 U.S.C.C.A.N. 4040, 4199.

## III.    Substantial Evidence Supports Commerce's Application Of Partial AFA To Salzgitter

Commerce's decision to apply partial AFA to calculate Salzgitter's home market sales missing the 28,000 downstream sales by SMSD is supported by substantial evidence and in accordance with law.  Salzgitter raises numerous

challenges to Commerce's determination to apply facts available, application of an adverse inference, and selection of the AFA rate, none of which have merit. *See* Salzgitter Br. at 23-44.

### A. Commerce Appropriately Applied Facts Available Because 28,000 Downstream Sales Of SMSD Were Missing The Manufacturer's Information Although Salzgitter Had Access To The Critical Missing Information

The trial court correctly sustained Commerce's decision to use facts otherwise available in accordance with 19 U.S.C. § 1677e(a), because the missing manufacturer information is "critical" to its analysis of home market sales. Appx44. Indeed, regarding the missing information, in the second remand redetermination, Commerce explained that Commerce "relies on the manufacturer information to match U.S. sales to comparison market sales produced by the same manufacturer for comparison purposes in calculating the dumping margin" and without this "critical information," Commerce "cannot determine which of the 28,000 downstream sales without a reported manufacturer were produced by Salzgitter (and are thus potentially comparable to Salzgitter's U.S. sales), and which were produced by other manufacturers (and are thus excluded from the comparison poll)." Appx170. The identity of the manufacturer is "critical" for calculating Salzgitter's margin because Commerce "matches sales by, among other criteria, manufacturer." Appx44; *see also* Appx166-167. Without that information, Commerce had no ability to "properly identify which home market

23

sales to compare to U.S. sales" or know how many of the 28,000 downstream sales were produced by Salzgitter or a different manufacturer, such that the sale should even be considered.  Appx170.

Commerce also gave Salzgitter ample notice of the need to report this information, starting with the initial questionnaire, which requested information relating to all "sales to {its} affiliate, whether the merchandise was consumed or resold by the affiliate."  Appx44.  Commerce then provided Salzgitter with opportunities to remedy the deficiencies in reporting the manufacturer for all of SMSD's sales in its questionnaire response.  Salzgitter failed to provide Commerce with the necessary information, despite Commerce's multiple supplemental questionnaires to get the information.  Appx44-45; *see also* 19 U.S.C. § 1677m(d).  The trial court correctly held that Commerce "properly alerted" Salzgitter of this deficiency pursuant to 19 U.S.C. § 1677m(d).  Appx118.

The trial court also correctly held that Salzgitter's failure to provide the manufacturer information for the 28,000 downstream sales was a gap in the record, and that Commerce reasonably applied facts otherwise available to fill that gap.  Appx119.  Salzgitter even conceded that the missing manufacturer information was relevant, as it again does before this Court, Salzgitter Br. at 29 (acknowledging as "generally true" that Commerce matches sales by manufacturer), and, thus, the trial court correctly held that it "cannot escape that conclusion" that Salzgitter "failed to

satisfy § 1677m(e) with respect to that information." Appx119. In fact, for these reasons, the "record belies {Salzgitter's} argument that it should be excused because it acted to the best of its ability." *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343 (Fed. Cir. 2021).

Indeed, while Salzgitter primarily asserts that it "fully responded" to Commerce's information requests and provided a "comprehensive explanation" that it was too burdensome to conduct the "manual review required" to tie the 28,000 sales entries to the manufacturer, Salzgitter Br. at 24-26, the record demonstrates otherwise. Even Salzgitter's argument that Commerce ignored the burden of a manual search falls flat. *Id.* at 31. For example, Commerce explained in the final determination that "Salzgitter would have been able to provide this information if it had made the appropriate effort" after receiving the initial questionnaire and three supplemental questionnaires. Appx45. Salzgitter also conceded that SMSD had PDF documents that could identify the CTL manufacturer identities, and, at verification, Salzgitter was able to retrieve the identity of a manufacturer within minutes. Appx44. The fact that Salzgitter repeatedly refused to provide Commerce with the requested information demonstrates that it did not act to the best of its ability. *Id.*

Second, Salzgitter's argument that Commerce should have accepted the *other* information about the 28,000 entries in the Separate Database, which were

25

missing manufacturer information, because the data were otherwise compliant with

19 U.S.C. § 1677m(e), Salzgitter Br. at 27-32, was correctly rejected twice by the

trial court.  Appx119, Appx209-210.  The issue was never the remaining

information of the 28,000 entries in the Separate Database:  the issue remains and

has always been the *missing* manufacturer information, which prohibits Commerce

from using the data.  Appx44.

Similarly, Salzgitter posits that Commerce should have used its "three

option" approach for "calculating its dumping margin in a way that would integrate

the verified data in the Separate Database."  Salzgitter Br. at 30.  But this, again,

requires Commerce to ignore (or perhaps accept) the missing manufacturer

information, which it time and again explained was critical to its analysis in

matching home market sales.  Appx44, Appx166-167.  The trial court was

similarly critical of Salzgitter's proposed "self-serving" alternatives which *all*

would have resulted in a zero percent margin.  Appx121, Appx208-209.  Indeed, in

*Dillinger III*, the court noted that Salzgitter's preferred three options did not

demonstrate that the approaches were a "reliable measure or approximation of

what its margins would be if it fully disclosed all relevant information" *or* that any

of the approaches were the "only reasonable path forward on this record."

Appx208-209.

Thus, substantial evidence supports Commerce's determination to resort to
facts available pursuant to 19 U.S.C. § 1677e(a)(2).  Appx44-45, Appx8212-8213.

**B.    Commerce's Application Of An Adverse Inference Is Supported
By Substantial Evidence And In Accordance With Law**

In the final determination, Commerce applied an adverse inference because
it determined that Salzgitter did not act to the best of its ability to provide the
manufacturer information for SMSD's 28,000 home market downstream sales.
Appx43-46.  The trial court correctly sustained Commerce's decision to apply an
adverse inference in its selection from among facts otherwise available in
accordance with 19 U.S.C. § 1677e(b)(1).  Appx120-122, Appx206-211.
Commerce addressed the relevant standard for applying an adverse inference,
made the necessary factual findings, and analyzed how Salzgitter's conduct
affected the review.  *See* Appx43-46; *Nippon Steel Corp.*, 337 F.3d at 1382
("Before making an adverse inference, Commerce must examine respondent's
actions and assess the extent of respondent's abilities, efforts, and cooperation in
responding to Commerce's requests for information."); *see Nan Ya Plastics Corp.
Ltd. v. United States*, 810 F.3d 1333, 1347 (Fed. Cir. 2016) ("Congress decided
what requirements Commerce must fulfill in reaching its determinations,
§ 1677e(b), and we do not impose conditions not present in or suggested by the

statute's text."). Salzgitter's arguments to the contrary do not show that

Commerce's determination lacks substantial evidence. *See* Salzgitter Br. at 33-39.

First, Salzgitter argues that the identity of the manufacturer is not the type of

information that a reseller like SMSD would normally record and that "SMSD

reasonably designed and operated its systems for commercial purposes," and that

SMSD/Salzgitter should not be expected to provide such information in this

investigation. Salzgitter Br. at 33. But in the very next sentence, Salzgitter

acknowledges that it "could identify the manufacturer for particular transactions" *if*

that is requested as a business need. *Id.* at 34. This statement *supports*

Commerce's determination that the identity of the manufacturer "is the type of

information that a respondent should have reasonably anticipated being required to

provide to its customers for quality assurance and warranty claims." Appx45.

Second, Salzgitter again stresses that it would be "manifestly unreasonable"

to require it to trace the manufacturer's identity of 28,000 downstream sales,

Salzgitter Br. at 34. This argument ignores the *months* that Salzgitter had to

request that SMSD access the information for these sales or propose an alternative

approach to Commerce, beginning with the initial questionnaire. Appx298-300.

Indeed, Salzgitter has not disputed that it possessed or had access to, but failed to

provide, the relevant manufacturer information because SMSD has PDFs of that

information. *See* Appx44-45, Appx8238. As this Court has recognized,

Commerce's ability to apply an adverse inference is a "useful tool" to discourage gamesmanship and ensure compliance with its questionnaires. *Mukand v. United States*, 767 F.3d 1300, 1307 (Fed. Cir. 2014). Regardless of intent or what Salzgitter believed to be a "reasonable burden," Salzgitter did not do the maximum it was able to do to educate Commerce regarding its ability to access the 28,000 missing manufacturers' information in the Separate Database and it "was thus reasonable for Commerce to expect from {Salzgitter} more accurate and responsive answers to the questionnaire." *Id.*; *see Nippon Steel*, 337 F.3d at 1382 (holding that respondent did not "put forth its maximum effort to provide Commerce with full and complete answers to all inquiries" as required by this Court).

Third, Salztitter's argument fails that Commerce should have treated it differently than an earlier investigation about CTL plate from Japan because Commerce had accepted that respondent's technical difficulties and should do the same here. Salzgitter Br. at 35-36 (citing *Certain Cut-To-Length Carbon Quality Steel Plate Products from Japan*, 64 Fed. Reg. 73,215, 73,225 (Dep't of Commerce Dec. 29, 1999)). Commerce distinguished *CTL Japan* on the basis of "technological advances in electronic records management" since 1999. Appx45. Salzgitter offers no authority that forecloses Commerce from revising its determination for what would be too burdensome as technology evolves, especially

29

when Salzgitter was able to access missing manufacturer information at verification. *Id.*; *see* Appx8238. Even Salzgitter argues that it successfully extracted manufacturer information for 77,000 sales, and Commerce should, perhaps, accept that that is the limit of its technological capabilities. Salzgitter Br. at 36. But Salzgitter put no information on the record to demonstrate that, if it had assiduously requested the manufacturer information from SMSD when it received the initial questionnaire, then it would have still been unable to get the manufacturer information for the 28,000 downstream sales. There is simply no evidence to support such an assertion.

Finally, Salzgitter argues that certain aspects of the trial court's opinions are "reversible error" because the trial court either read something into the record that was not there, or misinterpreted precedent as applied to this investigation. Salzgitter Br. at 37-39. These arguments are meritless.

To begin with, this Court's standard of review is *de novo* so even if Salzgitter disagrees with cherry-picked excerpts of the trial court's various opinions, that does not undermine whether Commerce's determination is supported by substantial evidence and in accordance with law. *See Union Steel*, 713 F.3d at 1106. Also, like the trial court, the Court should reject the "three options" that Salzgitter argues that Commerce otherwise should have used. *See* Salzgitter Br. at 14 (citing Appx11405-11406, Appx14428-11430, Appx11570-11571). Indeed,

Salzgitter argues that the trial court inappropriately used the word "interconnected" when it referred to Salzgitter's three options to utilize the Separate Database, in that it is "reversible error" when the word "connectivity" appeared nowhere in Commerce's final determination. *See id.* at 37-38 (citing Appx43-44, Appx121). But Salzgitter offers no authority for the proposition that a trial court cannot explain something in its own words when it reviews Commerce's final determination. *See* Appx196-197; *Dillinger III*, Appx209. In other words, Salzgitter offers no support that, merely because the word "connectivity" does not appear in Commerce's determinations, the trial court cannot use that as shorthand for analyzing the deficiencies of Salzgitter's proposed alternative options.

Relatedly, Salzgitter argues that the trial court incorrectly held that a statistical approach to the missing manufacturer information data in the Separate Database could have been more convincing to Commerce. Salzgitter Br. at 38. But, again, the court's dicta for what Commerce *could have* considered to be better evidence is certainly no opinion as to *whether* Commerce would have ultimately accepted the evidence, had Salzgitter taken that approach. *See* Appx121. It simply does not matter. And Salzgitter's complaint about the trial court's apparently mistaken citation to *Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir. 2018) is also irrelevant. Because although Salzgitter argues that it did explain and verify information but the respondent did not in Maverick, Salzgitter Br. at 39,

Commerce's determination that Salzgitter failed to act to the best of its ability is not undermined.  *See* Appx44-46, Appx194-196.

Accordingly, this Court should affirm Commerce's use of an adverse inference from among facts available as supported by substantial evidence and in accordance with law.

### C.    Commerce's Selection Of The Non-Aberrational Sale As the Adverse Inference Fact Available Is Supported By Substantial Evidence And In Accordance With Law

Commerce selected the highest non-aberrational net price among all the downstream sales in the Separate Database and then assigned that price to all 28,000 sales missing the manufacturer's information.  Appx46.  Commerce selected the highest non-aberrational price after it had analyzed the data and this net transaction was "at the beginning of a smooth continuum of net prices." Appx170.  The trial court correctly held that Commerce's selection of this transaction was reasonable as partial AFA because Salzgitter failed to offer any alternative price from the record.  Appx210-211.

Salzgitter again argues that no data was missing from the record and that Commerce "filled a gap that did not exist."  Salzgitter Br. at 40-42.  As we explained above, critical data *was* missing from the record, the manufacturer information, and Commerce appropriately used facts otherwise available to plug that gap.  Appx43-44.  Salzgitter also asserts that the selected transaction is an

aberrational price and is dissimilar to other CTL products, such that it was inappropriate for Commerce to have selected it. Salzgitter Br. at 42-43. But Salzgitter offered no record evidence to support this assertion, as the trial court correctly found, and it does not excuse Salzgitter's failure to provide an alternative to Commerce if it believed the selected transaction to not be representative and also aberrational. Appx210-211.

And although Salzgitter argues that Commerce should have used the Separate Database and its "three options" alternative, Salzgitter Br. at 41-42, the trial court explained that "Salzgitter has failed to demonstrate that its proposed alternative methods provide a reliable measure or approximation of what its margin would be if it fully disclosed all relevant information." Appx209; *see also* Appx196.

Finally, Salzgitter argues that the dumping margin is "hugely inflated" as demonstrated by the comparison between the minimum and maximum dumping margins present in the final determination/second remand redetermination and the first remand redetermination. Salzgitter Br. at 43. As an initial matter, Salzgitter entirely failed to raise this argument before the trial court and the Court should therefore deem it waived. *See Sage Prods. Inc. v. Devon Indus., Inc*., 126 F.3d 1420, 1426 (Fed. Cir. 1997) (an argument is waived if not raised before the trial court).

In any event, substantial evidence supports Commerce's determination that the partial AFA methodology used in the first remand redetermination would not adequately induce cooperation from Salzgitter because it resulted in a zero margin for Salzgitter. Appx125-127. The statute specifically provides that Commerce is not required to "estimate what the . . . dumping margin would have been if the interested party" had cooperated "or to demonstrate that the . . . dumping margin used by {Commerce} reflects an alleged commercial reality of the interested party." 19 U.S.C. § 1677e(d)(3). Salzgitter's mere disagreement with the selection of the transaction price used for the adverse inference, which could potentially lower Commerce's dumping margin, is insufficient to overcome Commerce's exercise of discretion. *See Gov't of Argentina v. United States*, 542 F. Supp. 3d 1380, 1395 (Ct. Int'l Trade 2021). And "{t}he statute simply does not require Commerce to select facts that reflect a certain amount of sales, yield a particular margin, fall within a continuum according to the application of particular statistical methods, or align with standards articulated in other statutes and regulations." *Nan Ya*, 810 F.3d at 1347.

Moreover, the trial court ultimately held that Commerce's determination was reasonable to *not* use the *Dillinger France* partial AFA methodology and it accepted Commerce's original analysis from the final determination and second remand redetermination. Appx206-211. Thus, Salzgitter's comparison of

34

minimum and maximum margins does not undermine the reasonableness of

Commerce's methodological approach, as the trial court held. Appx208-211. At

bottom, Salzgitter presented no other transaction to Commerce to use for partial

AFA and the trial court correctly sustained Commerce's determination. *See id.*

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court affirm the trial

court's judgment.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

/s/ Kara M. Westercamp
KARA M. WESTERCAMP
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C., 20044
Tel: (202) 305-7571
Fax:  (202) 514-8624

OF COUNSEL:

AYAT MUJAIS
Senior Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade
Enforcement and Compliance

April 25, 2024          Attorneys for Defendant-Appellee

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 24-1219

**Short Case Caption:** AG der Dillinger Huttenwerke v. United States

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 7,336 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 04/25/2024

Signature: /s/ Kara M. Westercamp

Name: Kara M. Westercamp

Save for Filing