2024-1219

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

AG DER DILLINGER HÜTTENWERKE, FRIEDR. LOHMANN GMBH,
THYSSENKRUPP STEEL EUROPE AG,
*Plaintiffs*

ILSENBURGER GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH,
SALZGITTER MANNESMAN GROBBLECH GMBH, SALZGITTER MANNESMANN
INTERNATIONAL GMBH,
*Plaintiffs-Appellants*

v.

UNITED STATES, SSAB ENTERPRISES LLC, NUCOR CORPORATION
*Defendants-Appellees*

Appeal from the U.S. Court of International Trade
Case Nos. 1:17-cv-00158-LMG, 1:17-cv-00159-LMG, 1:17-cv-00160-LMG

Senior Judge Leo M. Gordon

# CORRECTED NONCONFIDENTIAL RESPONSE BRIEF OF DEFENDANT-APPELLEE SSAB ENTERPRISES LLC

*Submitted on April 25, 2024 by*

Roger B. Schagrin
Jeffrey D. Gerrish
Saad Y. Chalchal*
SCHAGRIN ASSOCIATES
900 Seventh Street, NW, Suite 500
Washington, DC 20001
(202) 223-1700
jgerrish@schagrinassociates.com
*Counsel for SSAB Enterprises LLC*

*Admitted only in New York and New Jersey. Practice limited to matters before Federal courts and agencies.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2024-1219

**Short Case Caption** AG der Dillinger Huttenwerke v. United States

**Filing Party/Entity** SSAB Enterprises LLC

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/08/2024

Signature: /s/ Roger B. Schagrin

Name: Roger B. Schagrin

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☐ None/Not Applicable |
| SSAB Enterprises LLC | | SSAB Enterprises LLC is a subsidiary of SSAB AB which is a publicly traded company on the NASDAQ OMX Stockholm with a secondary listing on the NASDAQ OMX Helsinki |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| John W. Bohn, formerly of Schagrin Associates | | |
| Paul W. Jameson, formerly of Schagrin Associates | | |
| Alessandra A. Palazzolo | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ i

STATEMENT OF RELATED CASES ........ 1

STATEMENT OF THE ISSUES ........ 1

STATEMENT OF THE CASE ........ 3

I. Legal Framework for Determining Dumping Margins and the Importance of Manufacturer Information ........ 4

II. Commerce's Unsuccessful Attempts to Obtain Necessary Manufacturer Information from Salzgitter in the Underlying Investigation ........ 7

A. Commerce's Initial Antidumping Questionnaire and Salzgitter's Response ........ 7

B. Commerce's First Supplemental Questionnaire and Salzgitter's Response ........ 9

C. Commerce's Second Supplemental Questionnaire and Salzgitter's Response ........ 11

D. The Preliminary Determination ........ 13

E. Commerce's Post-Preliminary Determination Information Request and Salzgitter's Response ........ 14

F. Commerce's Verification of SMSD ........ 15

G. The Final Determination and Order ........ 16

III. Proceedings Before the CIT ........ 16

A. The CIT's Decision in *Dillinger I* ........ 16

B. The CIT's Decision in *Dillinger II* ........ 18

C. The CIT's Decision in *Dillinger III* and Entry of Partial Judgment ........ 19

SUMMARY OF ARGUMENT ........ 21

ARGUMENT ........ 25

I. Standard of Review ........ 25

II. Commerce's Decision to Resort to the Use of Partial Facts Otherwise Available Should Be Affirmed ........ 27

A. Legal Framework for Commerce's Authority to Use Facts Otherwise Available .......... 27

B. Commerce Lawfully Resorted to Facts Otherwise Available Because Salzgitter Withheld and Failed to Submit Manufacturer Information .......... 29

C. Salzgitter Erroneously Argues that the Statute Precluded the Use of Facts Otherwise Available .......... 37

III. Commerce's Decision to Apply Partial AFA Should Be Affirmed .......... 45

A. Legal Framework for Commerce's Discretionary Authority to Draw Adverse Inferences .......... 45

B. Commerce Lawfully Applied Partial AFA Because Salzgitter Failed to Cooperate to the Best of its Ability in Responding to Requests for Manufacturer Information .......... 46

C. Salzgitter Fails to Demonstrate that Commerce's Decision to Apply Partial AFA Is Unlawful .......... 50

IV. Commerce's Partial AFA Methodology to Determine Salzgitter's Final Dumping Margin Should Be Affirmed .......... 55

A. The Legislative Purpose of the AFA Statute .......... 55

B. Commerce's Partial AFA Methodology Is a Reasonable Means of Achieving the Legislative Purpose of the AFA Statute .......... 56

C. Salzgitter Fails to Demonstrate that Commerce's Partial AFA Methodology Is Unlawful .......... 60

CONCLUSION .......... 67

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF CONFIDENTIAL MATERIAL

PROOF OF SERVICE

Pursuant to Federal Circuit Rule 25.1(e)(1)(B), the confidential information in this brief is removed from single brackets on pages 10,

12, 19, 24, 50, 57–58, 62–63, and 65. The material removed from these pages is confidential sales information that was submitted to the administrative record in the less-than-fair-value investigation on carbon and alloy steel cut-to-length plate from Germany. Plaintiffs-Appellants requested business proprietary treatment for this information in the underlying proceeding, which is subject to limited disclosure only to authorized persons under an administrative protective order in accordance with 19 U.S.C. § 1677f(c)(1).

# TABLE OF AUTHORITIES

## Cases

*ABB Inc. v. United States*,
355 F. Supp. 3d 1206 (Ct. Int'l Trade 2018) .......... 27

*AG der Dillinger Hüttenwerke v. United States*,
666 F. Supp. 3d 1331 (Ct. Int'l Trade 2023) .......... 20

*AG der Dillinger Hüttenwerke v. United States*,
648 F. Supp. 3d 1321 (Ct. Int'l Trade 2023) .......... 19–20, 59–61, 64

*AG der Dillinger Hüttenwerke v. United States*,
534 F. Supp. 3d 1403 (Ct. Int'l Trade 2021) .......... 18–19, 57

*AG der Dillinger Hüttenwerke v. United States*,
399 F. Supp. 3d 1247 (Ct. Int'l Trade 2019) .......... *passim*

*Allegheny Ludlum Corp. v. United States*,
215 F. Supp. 2d 1322 (Ct. Int'l Trade 2000) .......... 27

*Altx, Inc. v. United States*,
370 F.3d 1108 (Fed. Cir. 2004) .......... 26

*BMW of N. Am. LLC v. United States*,
926 F.3d 1291 (Fed. Cir. 2019) .......... 55–56

*Boomerang Tube LLC v. United States*,
856 F.3d 908 (Fed. Cir. 2017) .......... 25

*Chevron U.S.A., Inc. v. Natural Resources Defense Council*,
467 U.S. 837 (1984) .......... 26

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) .......... 25–26

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1996)........................................................................26

*Deacero S.A.P.I. de C.V. v. United States*,
996 F.3d 1283 (Fed. Cir. 2021)........................................................55

*Dillinger France S.A. v. United States*,
350 F. Supp. 3d 1349 (Ct. Int'l Trade 2019)..............................*passim*

*Gallant Ocean (Thailand) Co. v. United States*,
602 F.3d 1319 (Fed. Cir. 2010)........................................................66

*Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi, A.Ş. v. United States*,
415 F. Supp. 3d 1195 (Ct. Int'l Trade 2019)......................................61

*Hung Vuong Corp. v. United States*,
483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020)......................................39

*JTEKT Corp. v. United States*,
642 F.3d 1378 (Fed. Cir. 2011)..........................................................5

*Koyo Seiko Co. v. United States*,
551 F.3d 1286 (Fed. Cir. 2008)..........................................................6

*Maverick Tube Corp. v. United States*,
857 F.3d 1353 (Fed. Cir. 2017)..................................28–29, 34, 54–55

*Mukand, Ltd. v. United States*,
767 F.3d 1300 (Fed. Cir. 2014)........................................................39

*Nan Ya Plastics Corp. v. United States*,
810 F.3d 1333 (Fed. Cir. 2016)........................................25, 27, 64, 66

*New Mexico Garlic Growers Coalition v. United States*,
352 F. Supp. 3d 1281 (Ct. Int'l Trade 2018)......................................34

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003)..................................22, 39, 45–46, 49

*NSK Ltd. v. United States*,
481 F.3d 1355 (Fed. Cir. 2007) ........ 28–29

*Olympic Adhesives, Inc. v. United States*,
899 F.2d 1565 (Fed. Cir. 1990) ........ 27

*Papierfabrik August Koehler SE v. United States*,
843 F.3d 1373 (Fed. Cir. 2016) ........ 31

*QVD Food Corp. v. United States*,
658 F.3d 1318 (Fed. Cir. 2011) ........ 27

*Smith-Corona Grp. v. United States*,
713 F.2d 1568 (Fed. Cir. 1983) ........ 6

*Stupp Corp. v. United States*,
5 F.4th 1341 (Fed. Cir. 2021) ........ 40

*Timken Co. v. United States*,
354 F.3d 1334 (Fed. Cir. 2004) ........ 26

*United States v. Eurodif S.A.*,
555 U.S. 305 (2009) ........ 27

*Union Steel v. United States*,
713 F.3d 1101 (Fed. Cir. 2013) ........ 25

*USEC, Inc. v. United States*,
498 F. Supp. 2d 1337 (Ct. Int'l Trade 2007) ........ 6

*Venus Wire Indus. Pvt. Ltd. v. United States*,
494 F. Supp. 3d 1342 (Ct. Int'l Trade 2021) ........ 5–6

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ........ 25

19 U.S.C. § 1673d(a)(1) ........ 4

19 U.S.C. § 1677(16) ........ 5

19 U.S.C. § 1677(16)(A) ........ 5

19 U.S.C. § 1677(16)(B) ........ 5

19 U.S.C. § 1677(16)(C) ........ 5

19 U.S.C. § 1677(35)(A). ........ 4

19 U.S.C. § 1677(35)(B). ........ 4

19 U.S.C. § 1677a(a) ........ 4

19 U.S.C. § 1677b(a)(1) ........ 4

19 U.S.C. § 1677e(a) ........ 1–2, 16

19 U.S.C. § 1677e(a)(1) ........ 22, 27–28, 34–36 , 39, 44

19 U.S.C. § 1677e(a)(2)(A) ........ 27–28, 36, 39

19 U.S.C. § 1677e(a)(2)(B) ........ 27–28, 36, 39

19 U.S.C. § 1677e(a)(2)(C) ........ 27–28, 39

19 U.S.C. § 1677e(a)(2)(D) ........ 27–28, 39

19 U.S.C. § 1677e(b) ........ 2, 55

19 U.S.C. § 1677e(b)(1) ........ 45

19 U.S.C. § 1677e(b)(1)(B) ........ 56, 64

19 U.S.C. § 1677e(d)(2)–(3) ........ 56, 64

19 U.S.C. § 1677e(d)(2)–(3) ........ 56, 64

19 U.S.C. § 1677m ........................................................................ 28

19 U.S.C. § 1677m(c) ..................................................................... 54

19 U.S.C. § 1677m(c)(1) ........................................................ 28, 52–53

19 U.S.C. § 1677m(d) ................................... 28–29, 31, 34, 37–39, 60–61

19 U.S.C. § 1677m(e) ...................................................... 29, 41–42, 61

19 U.S.C. § 3512(d) ....................................................................... 24

**Federal Register Notices**

*Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom*,
62 Fed. Reg. 2,081 (Dep't Commerce Jan. 15, 1997) .......................... 5–6

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany*,
82 Fed. Reg. 24,096 (Dep't Commerce May 25, 2017) ............................ 3

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany*,
82 Fed. Reg. 16,360 (Dep't Commerce Apr. 4, 2017) .................... *passim*

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany*,
81 Fed. Reg. 79,446 (Dep't Commerce Nov. 14, 2016) ......................... 13

*Certain Cold Rolled Carbon Steel Flat Products from Germany*,
67 Fed. Reg. 62,116 (Dep't Commerce Oct. 3, 2002) ............................ 41

*Certain Cut-to-Length Carbon-Quality Steel Plate Products from Japan*,
64 Fed. Reg. 73,215 (Dep't Commerce Dec. 29, 1999) ............. 40–41, 53

*Stainless Steel Sheet and Strip in Coils from Germany*,
64 Fed. Reg., 30,710 (Dep't Commerce June 8, 1999).................... 47–48

*Structural Steel Beams from Germany*,
67 Fed. Reg. 35,497 (Dep't Commerce May 20, 2002).......................... 46

**Other Authorities**

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act,
H.R. Rep. No. 103-316, vol. 1 (1994) ............................................ *passim*

Trade Preferences Extension Act,
Pub. L. No. 114-27, 129 Stat. 362 (2015) ....................................... 56, 64

Defendant-Appellee SSAB Enterprises LLC ("SSAB") respectfully submits this brief in response to the opening brief of Plaintiffs-Appellants Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, and Salzgitter Mannesmann International GmbH (collectively, "Salzgitter") in their appeal of the Rule 54(b) partial final judgment entered by the U.S. Court of International Trade (the "CIT") in *AG der Dillinger Huttenwerke v. United States*, CIT Consol. Court No. 17-00158 ("Salzgitter Br.").

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for SSAB makes the following statement:

1. An appeal in or from the same civil action or proceeding in the CIT is a pending companion case in this Court. *See AG der Dillinger Hüttenwerke v. United States* (Appeal No. 2024-1498).
2. Counsel is not aware of any other case pending in this or any other court that will directly affect or be directly affected by the Court's decision in this appeal.

## STATEMENT OF THE ISSUES

1. Whether the U.S. Department of Commerce ("Commerce") lawfully resorted to the use of partial facts otherwise available

pursuant to 19 U.S.C. § 1677e(a) in determining Salzgitter's dumping margin, where the record demonstrates that Salzgitter withheld and failed to submit in a timely manner information that was necessary for Commerce's analysis.

2. Whether Commerce lawfully exercised its discretionary authority to apply adverse facts available ("AFA") in determining Salzgitter's dumping margin pursuant to 19 U.S.C. § 1677e(b), where the record demonstrates that Salzgitter failed to cooperate by not acting to the best of its ability to comply with Commerce's requests to identify and report the manufacturers for approximately 28,000 downstream home market sales.

3. Whether Commerce's partial AFA methodology as applied to Salzgitter's downstream home market sales with missing manufacturer information is a reasonable exercise of Commerce's discretion under 19 U.S.C. § 1677e(b) and achieves the legislative purpose of applying AFA in a manner that will induce future cooperation.

## STATEMENT OF THE CASE

This appeal concerns Commerce's affirmative final determination in the less-than-fair-value investigation of carbon and alloy steel cut-to-length plate ("CTL plate") from Germany. *See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany*, 82 Fed. Reg. 16,360 (Dep't Commerce Apr. 4, 2017) ("Final Determination") (Appx9–12), and accompanying Issues and Decision Memorandum ("Final Determination Memorandum") (Appx13–112), as amended by 82 Fed. Reg. 24,096 (Dep't Commerce May 25, 2017) ("Amended Final and Order") (Appx1–8). At issue is Salzgitter's 22.90 percent dumping margin that Commerce determined based on the application of partial AFA, after concluding that Salzgitter failed to cooperate by not acting to the best of its ability to comply with requests to provide manufacturer information for approximately 28,000 downstream sales in the home market (*i.e.*, Germany) that were made by one of Salzgitter's affiliated resellers, Salzgitter Mannesmann Stahlhandel GmbH ("SMSD"). An overview of the legal framework as well as the relevant facts and procedural history of the case are set forth below.

## I. Legal Framework for Determining Dumping Margins and the Importance of Manufacturer Information

In less-than-fair-value investigations, Commerce is tasked with determining whether imports of subject merchandise are being, or are likely to be, sold in the United States at less than fair value, *i.e.*, dumped. *See* 19 U.S.C. § 1673d(a)(1). Commerce makes this determination by comparing the export price (the price at which the subject merchandise is sold in the United States) with the normal value (the price at which the foreign like product is sold in the home market). *See* 19 U.S.C. §§ 1677a(a), 1677b(a)(1). A product is sold at less than fair value when the product's export price is lower than its normal value, and the dumping margin is "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." *Id.* § 1677(35)(A). After determining a dumping margin for each sale of subject merchandise, Commerce calculates a weighted-average dumping margin "by dividing the aggregate dumping margins … by the aggregate export prices and constructed export prices …." *Id.* § 1677(35)(B).

In the dumping analysis, Commerce is guided by the statutory definition of "foreign like product" when choosing which home market

sales in the exporting country should be matched to sales of the subject merchandise in the United States. The statute at 19 U.S.C. § 1677(16) provides three hierarchical definitions of "foreign like product" that are based on criteria that include the country where the product is produced, the manufacturer of the product, and the physical characteristics of the product. The statute expresses a preference for a foreign like product that is an identical match. *Id.* § 1677(16)(A); *see also JTEKT Corp. v. United States*, 642 F.3d 1378, 1379 (Fed. Cir. 2011). When an identical match is not possible, the statute instructs Commerce to use home market sales of merchandise that is most similar to subject merchandise. *See id.* § 1677(16)(B) and (C).

Identification of the foreign like product is a critically important step in the analysis, because the foreign like product forms the basis of the comparison to the allegedly dumped subject merchandise sold in the United States. Each of the definitions of "foreign like product" references a product that is produced "by the same person" as the subject merchandise. 19 U.S.C. § 1677(16)(A)–(C). This statutory language is the source of Commerce's longstanding practice of matching sales by manufacturer. *See Venus Wire Indus. Pvt. Ltd. v. United States*,

494 F. Supp. 3d 1342, 1346 (Ct. Int'l Trade 2021); *see also Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom*, 62 Fed. Reg. 2,081, 2,127 (Dep't Commerce Jan. 15, 1997).

The statute does not specify a methodology that Commerce should employ to identify which products sold in the home market are identical or most similar to the subject merchandise sold in the United States. *See USEC, Inc. v. United States*, 498 F. Supp. 2d 1337, 1345 (Ct. Int'l Trade 2007) (citing *Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1578 (Fed. Cir. 1983)). The "process by which Commerce identifies the 'foreign like product' in determining dumping margins … is called 'model-matching.'" *Koyo Seiko Co. v. United States*, 551 F.3d 1286, 1289 (Fed. Cir. 2008). As part of its model-matching process, Commerce instructs respondents selected for individual examination to use a manufacturer code to identify the manufacturer for each sale of merchandise in the home market and U.S. market. *See Venus Wire*, 494 F. Supp. 3d at 1346. Commerce then uses the manufacturer codes to identify appropriate matches of sales of subject merchandise in the United States with sales of the foreign like product in the home market.

The manufacturer codes are vital to the dumping analysis and to achieve a fair comparison between the export price and the normal value. It is impossible for Commerce to match sales with missing manufacturer information, even if the respondent provides all other information pertaining to the sales.

## II. Commerce's Unsuccessful Attempts to Obtain Necessary Manufacturer Information from Salzgitter in the Underlying Investigation

### A. Commerce's Initial Antidumping Questionnaire and Salzgitter's Response

Following the initiation of the less-than-fair-value investigation in May 2016, Commerce selected Salzgitter as a mandatory respondent and issued its initial antidumping questionnaire requesting information on Salzgitter's sales and production costs. *See* Initial Antidumping Questionnaire (Appx281–435). The standard questionnaire is divided into five sections—Section A (Organization, Accounting Practices, Markets and Merchandise), Section B (Home Market or Third Country Sales), Section C (U.S. Sales), Section D (Cost of Production), and Section E (Further U.S. Manufacturing Costs). *Id.* (Appx286).

Among other things, Section B of the questionnaire required Salzgitter to submit an electronic database reporting complete

information on its sales of CTL plate in the German home market that were made during the 2015–2016 period of investigation ("POI"). *Id.* at B-1 (Appx314).[1] Salzgitter was instructed to include the requested information for *all* home market sales, including any downstream resales of CTL plate by affiliated resellers to unaffiliated customers. *Id.* at G-10 and B-4–B-5 (Appx296, Appx317–318). Salzgitter was required to include a data field identifying the manufacturer for each sale reported in its home market sales database (*i.e.*, the MFRH field). *Id.* at B-25 (Appx338).

Salzgitter submitted its responses to the initial antidumping questionnaire in June and July 2016. Salzgitter explained in its response to Section A of the questionnaire that Salzgitter's affiliated resellers in Germany, including the wholly-owned subsidiary SMSD, sold CTL plate that was produced by Salzgitter as well as other unaffiliated mills located in Germany and in third countries.[2] Salzgitter

---

[1] Likewise, Section C of the questionnaire asked Salzgitter to provide information on its CTL plate sales in the U.S. market. *See* Initial Antidumping Questionnaire at C-1 (Appx341).

[2] Salzgitter reported that its mills in Germany manufactured all of the CTL plate it sold in the U.S. market during the POI. Salzgitter Sections

(*footnoted continued on next page*)

Section A Response at A-5 (Appx501). Although Salzgitter indicated that its "home-market sales database contain{ed} all sales of the foreign like product during the POI," including sales made through its five affiliated resellers, it stated that it did not include an unspecified quantity of resales made by SMSD because SMSD did not identify the manufacturer of the CTL plate for these sales. Salzgitter Sections B, C, and E Response at B-2–B-3 (Appx5742–5743).

### B. Commerce's First Supplemental Questionnaire and Salzgitter's Response

In August 2016, Commerce issued a supplemental questionnaire to notify Salzgitter of deficiencies in its initial response and to provide Salzgitter an opportunity to remedy the deficiencies. *See* First Sections B&C Supplemental Questionnaire (Appx6755–6772). In relevant part, the supplemental questionnaire asked Salzgitter: (1) to confirm that it reported all POI home market sales of CTL plate manufactured in Salzgitter mills and, if not, to revise the sales database to include all

(*footnote continued from previous page*)

B, C, and E Response at C-66 (Appx6497). Thus, the matching foreign like product would also be CTL plate manufactured by Salzgitter mills in Germany.

sales; (2) to provide the percentage of sales made to SMSD relative to total sales made by Salzgitter mills; and (3) to revise the sales database so that all of SMSD's downstream sales to unaffiliated customers were included, as originally instructed. *Id.* at Section B Questions 1 and 3 (Appx6756–6757).

One month later, in September 2016, Salzgitter submitted its responses to the supplemental questions. *See* Salzgitter First Sections B&C Supplemental Response (Appx6773–8030). Salzgitter submitted a revised home market sales database to report additional sales that were not included in the originally submitted database. *Id.* at 2 (Appx6787). According to Salzgitter, its sales to SMSD accounted for [ SALES DATA ] of all Salzgitter-manufactured CTL plate sold in the home market during the POI. *Id.* at 3–4 (Appx6788–6789). Salzgitter limited its reporting of SMSD's downstream home market sales to CTL plate for which the manufacturer previously had been identified in response to specific requests from customers. *Id.* at 4–5 (Appx6789–6790). However, the revised home market sales database did not include a significant portion of SMSD's sales for which SMSD did not identify the manufacturer (and country of origin). *Id.* It did not include *any*

information on these downstream home market sales whatsoever. Moreover, Salzgitter did not mention any additional efforts to search SMSD's records to locate the missing manufacturer information for the SMSD downstream sales in response to Commerce's information requests.

### C. Commerce's Second Supplemental Questionnaire and Salzgitter's Response

In October 2016, after analyzing Salzgitter's previous responses, Commerce issued another supplemental questionnaire that requested, for a *third* time, information on SMSD's resales of CTL plate in the home market during the POI. *See* Third Sections B&C Supplemental Questionnaire (Appx8031–8033). Specifically, Commerce asked Salzgitter: (1) to delineate the quantity and value of SMSD's resales both for CTL plate produced by Salzgitter mills and for CTL plate without distinguishing between manufacturers; and (2) to revise the home market sales database to include all SMSD resales of CTL plate manufactured by Salzgitter mills. *Id.* at Questions 1 and 2 (Appx8032). Commerce noted in its information request that "sales to SMSD

constitute a substantial portion of Salzgitter's POI home market sales." *Id.*

In response, Salzgitter stated that SMSD sold [SALES DATA] metric tons of CTL plate that were valued at [ SALES DATA ] Euros to unaffiliated customers, and [ SALES DATA ] of the CTL plate sold by SMSD was manufactured by Salzgitter mills. *See* Salzgitter Third Sections B&C Supplemental Response at 2 (Appx8043). Again, Salzgitter did not report all downstream home market sales made by SMSD—the home market sales database continued to include only those sales for which SMSD maintained an electronic record that identified a Salzgitter mill as the manufacturer and omitted sales where SMSD's recordkeeping was lacking and required further review of the company's records to identify the manufacturer. *Id.* at 3 (Appx8044). In other words, Salzgitter limited its search to some but not all of SMSD's records, and Salzgitter did not make any additional

effort to comply with Commerce's information request. *Id.* at 4–5 (Appx8045–8046).

### D. The Preliminary Determination

Commerce issued its affirmative preliminary determination on November 4, 2016. *See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany*, 81 Fed. Reg. 79,446 (Dep't Commerce Nov. 14, 2016) (Appx8224–8228), and accompanying Preliminary Decision Memorandum (Appx8202–8223). In the "Normal Value" section of the Preliminary Decision Memorandum, Commerce stated that Salzgitter did not report certain downstream home market sales by its affiliated reseller SMSD in response to the initial questionnaire and two supplemental questionnaires. *See* Preliminary Decision Memorandum (Appx8213). As Commerce explained, Salzgitter's submissions indicated that SMSD possessed the missing manufacturer information and provided such information to its customers upon request, but Salzgitter did not provide the information

to Commerce because Salzgitter deemed that doing so would be too burdensome for SMSD. *Id.*

Commerce found that Salzgitter withheld and failed to timely submit information regarding downstream home market sales that Commerce needed for its analysis. *Id.* Commerce additionally found that Salzgitter failed to cooperate to the best of its ability because it did not put forth its maximum effort to comply with Commerce's information requests. *Id.* As a result, Commerce applied partial AFA to account for SMSD's unreported sales and applied the highest net price among SMSD's reported sales. *Id.*

### E. Commerce's Post-Preliminary Determination Information Request and Salzgitter's Response

Following the preliminary determination, Commerce issued a one-question supplemental questionnaire with the sole purpose of obtaining information on Salzgitter's downstream home market sales made through SMSD. *See* Fifth Sections B&C Supplemental Questionnaire (Appx8229–8230). Commerce instructed Salzgitter to report SMSD's resales with missing manufacturer information in a separate database. *Id.* Commerce also requested additional quantity and value information regarding SMSD's CTL plate purchases and resales during the POI. *Id.*

In its response, Salzgitter provided the requested separate database with information on SMSD's resales, reported "UNKNOWN" for the manufacturer in the MFRH field for all of SMSD's resales that were included in the separate database, and provided exhibits with the requested quantity and value data. *See* Salzgitter Fifth Sections B&C Supplemental Response (Appx8231–8328). Without the manufacturer information in the SMSD separate database, Commerce could not distinguish between CTL plate manufactured by Salzgitter mills and CTL plate manufactured by other unaffiliated mills located in Germany and in third countries.

### F. Commerce's Verification of SMSD

Commerce conducted verification of SMSD's reported sales data in December 2016 and issued a report that memorialized observations by Commerce officials while on-site at SMSD's offices in Germany. *See* SMSD Sales Verification Report (Appx11309–11327). Section IX of the report contains a summary of Commerce's examination of two sales that were reported in the separate database containing SMSD's resales with no manufacturer information. *Id.* (Appx11322–11323). When prompted by the Commerce officials, SMSD's officials demonstrated their ability

to locate the applicable mill test certificate and successfully identified an unaffiliated third-country mill and a Salzgitter mill as the manufacturers for the two sales. *Id.*

### G. The Final Determination and Order

After analyzing arguments raised by parties in administrative briefs and holding a public hearing, Commerce issued its affirmative Final Determination on March 29, 2017. *See* Final Determination Memorandum (Appx13–112). In the Final Determination, Commerce continued to determine Salzgitter's dumping margin based on the application of partial AFA to account for Salzgitter's failure to report the manufacturer for 28,000 of SMSD's resales of CTL plate in the home market. *Id.* at 27–34 (Appx39–46). Commerce calculated a 22.90 percent final dumping margin for Salzgitter. *See* Final Determination, 82 Fed. Reg. at 16,361 (Appx10). Thereafter, Commerce published the antidumping duty order on CTL plate imports from Germany. *See* Amended Final and Order (Appx1–8).

## III. Proceedings Before the CIT

### A. The CIT's Decision in *Dillinger I*

In its initial decision, the CIT held that Commerce reasonably resorted to facts otherwise available pursuant to 19 U.S.C. § 1677e(a)

because Salzgitter failed to provide Commerce with manufacturer information for SMSD's resales, without which Commerce could not match home market and U.S. sales by manufacturer and had no way to determine whether to include or exclude SMSD's resales from Salzgitter's margin calculations. *See AG der Dillinger Hüttenwerke v. United States*, 399 F. Supp. 3d 1247, 1252–53 (Ct. Int'l Trade 2019) ("*Dillinger I*") (Appx118–119). The CIT also held that Commerce reasonably found that the circumstances warranted the application of partial AFA because Salzgitter did not satisfy the level of cooperation required under the "best of its ability" standard. *Id.* at 1253–1256 (Appx119–122). However, the CIT remanded Commerce's partial AFA methodology of applying SMSD's highest non-aberrational net price to all of its resales for which manufacturer information had not been reported. *Id.* at 1256–57 (Appx122–123). The CIT explained that parallel litigation concerning the investigation on CTL plate imports from France involved a nearly identical situation and, pursuant to a remand order, Commerce relied on the downstream home market sales prices as reported. *Id.* at 1256–1257 (citing *Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349 (Ct. Int'l Trade 2019) ("*Dillinger*

*France*")) (Appx122–123). In light of the outcome in the France case and to promote consistency in Commerce's decisions, the CIT remanded to Commerce with instructions to follow the *Dillinger France* partial AFA methodology for Salzgitter. *Id.* at 1257 (Appx123).

### B. The CIT's Decision in *Dillinger II*

Commerce complied with the CIT's remand order and, after applying the *Dillinger France* partial AFA methodology, recalculated a zero percent dumping margin for Salzgitter. *See* First Remand Redetermination (Appx124–128). If sustained, Salzgitter would have been excluded from the imposition of antidumping duties under the order. In its remand redetermination, Commerce explained that while it followed the CIT's instructions, it did so under respectful protest because the *Dillinger France* partial AFA methodology is not appropriate in this case given the significant factual differences that existed between the France and Germany investigations. *See id.* (Appx127). However, the CIT's remand order did not afford Commerce flexibility to consider alternative approaches. *Id.* The CIT remanded the matter for a second time to give Commerce an opportunity to reconsider the issue and explain why it might be appropriate to apply an

alternative partial AFA methodology to Salzgitter. *See AG der Dillinger Hüttenwerke v. United States*, 534 F. Supp. 3d 1403, 1413–1414 (Ct. Int'l Trade 2021) ("*Dillinger II*") (Appx139–140).

### C. The CIT's Decision in *Dillinger III* and Entry of Partial Judgment

On remand, Commerce explained that applying the *Dillinger France* partial AFA methodology to Salzgitter would result in a zero percent dumping margin to the company and its exclusion from the order in contravention of the meaning and purpose of the AFA statute. Second Remand Redetermination (Appx166–171, Appx191–197). Commerce also explained that such a result was not appropriate because, unlike the respondents with partial AFA margins based on the *Dillinger France* methodology, Salzgitter's failure to cooperate impacted approximately 28,000 downstream home market sales, which represented more than [SALES DATA] percent of the [ SALES DATA] home market sales manufactured by Salzgitter mills that were used in the dumping analysis. *Id.* (Appx167). To achieve the Congressional intent of inducing future cooperation and ensuring that the noncooperative respondent does not receive a more favorable dumping margin than it would have received had it fully cooperated, Commerce once again utilized the

partial AFA methodology it applied to Salzgitter in the Final Determination and reinstated Salzgitter's 22.90 percent dumping margin. *Id.* (Appx169–171).

The CIT accepted Commerce's explanation, stating that "{s}ince a zero percent margin cannot, by definition, be higher than what Salzgitter's margin would otherwise have been if it had disclosed all its manufacturer information, Commerce reasonably found that applying AFA to Salzgitter using the *Dillinger France I* methodology would be inconsistent with the intent of § 1677e." *AG der Dillinger Hüttenwerke v. United States*, 648 F. Supp. 3d 1321, 1330 (Ct. Int'l Trade 2023) ("*Dillinger III*") (Appx208). The CIT also sustained Commerce's alternative partial AFA methodology as reasonable based on the totality of the circumstances. *Id.* at 1331–1333 (Appx209–Appx211). Thereafter, on November 15, 2023, the CIT entered a Rule 54(b) partial judgment as to Salzgitter's claims. *See AG der Dillinger Hüttenwerke v. United States*, 666 F. Supp. 3d 1331, 1333–1334 (Ct. Int'l Trade 2023) (Appx218–219); Partial Judgment (Appx220–221).

## **SUMMARY OF ARGUMENT**

For the reasons stated below, Commerce lawfully applied partial AFA in determining Salzgitter's 22.90 percent dumping margin. The Court should therefore affirm the CIT's judgment in this case in its entirety.

*First*, the statute required Commerce to resort to the use of facts otherwise available under the factual circumstances of this case. Commerce requires manufacturer information from the investigated respondents to determine which home market sales of the foreign like product should be matched with U.S. sales of subject merchandise. Commerce made at least *four* attempts in the span of six months to obtain necessary information on the manufacturer of Salzgitter's downstream home market resales made through SMSD. Despite Commerce's repeated requests, Salzgitter failed to provide the manufacturer information for SMSD's resales. In addition, the investigatory record demonstrates that the manufacturer information was in SMSD's possession. However, because the manufacturer information was not electronically recorded and readily available in SMSD's accounting system and mill certificate recording system,

Salzgitter opted not to undertake a more comprehensive search of SMSD's records to provide Commerce with the information. Commerce was authorized to resort to facts otherwise available pursuant to 19 U.S.C. § 1677e(a)(1), (a)(2)(A), and (a)(2)(B) because Salzgitter withheld and failed to timely submit the necessary manufacturer information. Contrary to Salzgitter's contentions, the statutory conditions that preclude the use of facts otherwise available in certain factual scenarios were either satisfied or did not apply here.

*Second*, Commerce correctly exercised its discretion and applied partial AFA in selecting from among the facts otherwise available. As explained in *Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003), the plain meaning of "best of its ability" imposes a standard of cooperation that requires a respondent to do the maximum it is able to do. Salzgitter did not meet this standard because it failed to comply with Commerce's requests for the manufacturer of SMSD's resales, despite the fact that SMSD possessed the information and at verification demonstrated its ability to identify the manufacturer. There is no merit to Salzgitter's assertions that providing the manufacturer information would have been unreasonably burdensome. The alleged

burden was self-imposed because SMSD chose not to maintain manufacturer information in the ordinary course of business in its electronic accounting system and mill certificate recording system. The "best of its ability" standard does not condone inadequate recordkeeping. Additionally, Commerce routinely examines large steel companies in its proceedings and explained that the manufacturer is the type of basic information that any respondent should reasonably anticipate it would need to provide to its customers at any given time. Rather than conduct a full search of its records, Salzgitter limited its reporting to manufacturer information that was readily accessible in SMSD's electronic recordkeeping systems. Salzgitter failed to do the maximum it could do to comply with Commerce's information requests and provide the essential manufacturer information for approximately 28,000 of its home market sales. Salzgitter cannot rely on SMSD's sloppy recordkeeping as a valid excuse to justify its failure to provide Commerce with the requested manufacturer information.

*Third*, and finally, Commerce's partial AFA methodology—*i.e.*, drawing the inference that Salzgitter is the manufacturer and assigning the highest non-aberrational net price—is reasonable and consistent

with the AFA statute's purpose according to the Statement of Administrative Action Accompanying the Uruguay Round Agreements Act ("SAA"). H.R. Doc. No. 103-316 (1994).[3] Commerce explained that application of the *Dillinger France* partial AFA methodology would have resulted in a zero percent dumping margin and Salzgitter's exclusion from the order. While this methodology may have been acceptable in *Dillinger France* and for the other respondent in the Germany investigation that did not provide manufacturer information for an insignificant number of downstream home market sales, Salzgitter failed to provide manufacturer information for approximately 28,000 downstream home market sales, which represented over [SALES DATA] percent of total home market sales in the dumping analysis. Applying the *Dillinger France* methodology to Salzgitter would frustrate the AFA statute's goal of inducing cooperation by ensuring that the non-cooperative respondent does not receive a more favorable AFA rate than

[3] By statute, the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

it would have received had it fully cooperated. Commerce's approach achieves the AFA statute's goal and should be upheld.

## ARGUMENT

### I. Standard of Review

This Court reviews final decisions of the CIT *de novo* and applies anew the same standard of review applied by the CIT. *See Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (citing *Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013)). Accordingly, the Court will uphold any determination, finding, or conclusion by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Although this Court's review is *de novo*, the Court gives "great weight" to the CIT's informed view, and the CIT's opinion is "nearly always the starting point of {the Court's} analysis" as the CIT has unique and specialized expertise in addressing antidumping law issues on a daily basis. *See Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1341 (Fed. Cir. 2016) (quotations and citation omitted).

The substantial evidence standard requires "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence is "more than a mere scintilla" but "less than the weight of the evidence." *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004). "{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1996).

When determining whether Commerce's interpretation and application of the statute are in accordance with law, the Court applies the two-step analysis established in *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). The Court first examines "whether Commerce has directly spoken to the precise question at issue," and, if it has, the agency must comply with Congress's clear intent. *Id.* at 842-843. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. "Any reasonable construction of the statute is a permissible construction." *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004). Commerce's "interpretation

governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009).

## II. Commerce's Decision to Resort to the Use of Partial Facts Otherwise Available Should Be Affirmed

### A. Legal Framework for Commerce's Authority to Use Facts Otherwise Available

In antidumping proceedings, Commerce issues questionnaires to elicit sales and cost information that it needs to examine a respondent's pricing behavior, and the respondent bears the burden to respond with all of the requested information and create an adequate record. *See ABB Inc. v. United States*, 355 F. Supp. 3d 1206, 1222 (Ct. Int'l Trade 2018) (citing *Nan Ya*, 810 F.3d at 1337; *QVD Food Corp. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)). Respondents selected for individual examination have "a statutory obligation to prepare an accurate and complete record in response to questions plainly asked by Commerce." *Allegheny Ludlum Corp. v. United States*, 215 F. Supp. 2d 1322, 1339-40 (Ct. Int'l Trade 2000) (citing *Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565, 1571-72 (Fed. Cir. 1990)).

The statute directs Commerce to use facts otherwise available if "necessary information is not available on the record," 19 U.S.C.

§ 1677e(a)(1), or when a respondent "withholds information that has been requested," "fails to provide such information by the deadlines … or in the form and manner requested," "significantly impedes a proceeding," or "provides such information but the information cannot be verified." 19 U.S.C. § 1677e(a)(2)(A)–(D). However, before Commerce may proceed to use facts otherwise available, Commerce's authority to resort to facts otherwise available is subject to certain provisions under 19 U.S.C. § 1677m.

For example, if a respondent timely notifies Commerce of difficulties in complying with an information request *and* suggests alternative forms in which the information could be provided, Commerce must take into account the difficulties and may modify the information request to avoid an unreasonable burden on the respondent. 19 U.S.C. § 1677m(c)(1). Additionally, if Commerce finds that a respondent's response to an information request is deficient, Commerce must inform the respondent and, to the extent practicable, provide the respondent with an opportunity to rectify the deficiency. *See* 19 U.S.C. § 1677m(d). This obligation is generally satisfied when Commerce issues a supplemental questionnaire requesting the

respondent to address the deficiency. *See Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017) (citing *NSK Ltd. v. United States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007)). If the respondent does not satisfactorily address the deficiency, Commerce "may … disregard all or part of the original and subsequent responses," unless the deficient information was timely submitted, can be verified, is not so incomplete that it cannot be reliably used, can be used without undue difficulties, *and* the respondent acted to the best of its ability to comply with the information request. *See* 19 U.S.C. § 1677m(d) and (e).

### B. Commerce Lawfully Resorted to Facts Otherwise Available Because Salzgitter Withheld and Failed to Submit Manufacturer Information

As detailed above in Section II within the Statement of the Case, Commerce made at least *four* attempts in the span of six months to obtain information on the manufacturer of Salzgitter's downstream home market resales made through SMSD. The initial antidumping questionnaire was Commerce's first attempt at obtaining all the information it needed on Salzgitter's sales of CTL plate in Germany during the POI. Section B of the questionnaire requested Salzgitter to submit a database with complete information for each of its home

market sales, including downstream resales of CTL plate by affiliated resellers to unaffiliated customers. *See* Initial Antidumping Questionnaire at G-10 and B-4–B-5 (Appx296, Appx317–318). As part of its reporting, Salzgitter was required to identify the manufacturer of each sale. *Id.* at G-10 and B-25 (Appx296, Appx338). Commerce noted at the very beginning that the failure to provide the requested information on downstream home market sales by affiliated resellers may result in the application of facts available or AFA. *Id.* at B-5 (Appx318).

In response, Salzgitter reported information on resales made by five of its affiliates that resold CTL plate in Germany during the POI. Salzgitter Sections B, C, and E Response at B-2–B-3 (Appx5742–5743). The affiliated resellers were able to rely on records kept in the normal course of business to distinguish between CTL plate manufactured by Salzgitter mills and others. *Id.* at B-8 (Appx5748). However, Salzgitter failed to report *any* information on a significant proportion of resales made by SMSD because identifying the manufacturer would have involved the additional step of checking SMSD's invoice records.

Salzgitter's home market sales database therefore did not include any of SMSD's resales for which the manufacturer was unknown.

In accordance with 19 U.S.C. § 1677m(d) and the requirement to provide an opportunity to address a deficient response,[4] Commerce issued a supplemental questionnaire that notified Salzgitter of its deficient response and requested, *inter alia*, that Salzgitter revise its database to include all of SMSD's downstream home market sales. *See* First Sections B&C Supplemental Questionnaire (Appx6755–6772). Commerce again reminded Salzgitter that the failure to provide the requested information may result in the application of facts available or AFA. *See id.* (Appx6755).

Salzgitter's response to the supplemental questionnaire did not improve the state of the record regarding the missing manufacturer

---

[4] Arguably, as a matter of law, Commerce's obligations under 19 U.S.C. § 1677m(d) were not triggered in this case because Salzgitter intentionally submitted incomplete data, which this Court has said does not qualify as a "deficiency." *See Papierfabrik August Koehler SE v. United States*, 843 F.3d 1373, 1384 (Fed. Cir. 2016) ("But nothing in {the first sentence of § 1677m(d)} compels Commerce to treat intentionally incomplete data as a 'deficiency' and then give a party that has intentionally submitted incomplete data an opportunity to 'remedy' as well as to 'explain.'").

information for SMSD's home market resales. Once again, Salzgitter failed to identify the manufacturer for "a significant proportion" of SMSD's resales because of the same alleged difficulties with searching through SMSD's records that Salzgitter described in its initial response. *See* Salzgitter First Sections B&C Supplemental Response at 4–5 (Appx6789–6790). Salzgitter also entirely failed to include the sales in question in its revised database and confusingly stated that "these sales can be provided upon request," even though Commerce plainly asked Salzgitter to report the sales in the revised database submitted as part of its supplemental response. *Id.* at 4 (Appx6789).

At this point, Commerce was under no legal obligation to take any further action to obtain information on Salzgitter's unreported downstream home market resales made through SMSD. Nonetheless, Commerce issued *two* more supplemental questionnaires (including one issued after the preliminary determination when the factual record is typically closed) that gave Salzgitter several opportunities and an extraordinary amount of time to report complete home market sales information. *See* Third Sections B&C Supplemental Questionnaire (Appx8031–8033); Fifth Sections B&C Supplemental Questionnaire

(Appx8229–8230). Prior to the preliminary determination, Salzgitter did not submit *any* information on SMSD's resales with missing manufacturer information. It was not until after Commerce applied partial AFA in the preliminary determination that Salzgitter reported information on SMSD's resales, in a separate database, but even then it lacked the crucial manufacturer information. *See* Salzgitter Fifth Sections B&C Supplemental Response (Appx8231–8328). No further steps were taken to search SMSD's records and identify the manufacturer. Accordingly, in the separate database, Salzgitter reported "UNKNOWN" for the manufacturer in the MFRH field. *Id.* (Appx8241).

At verification, Commerce confirmed that SMSD could have identified and reported the missing manufacturer information if it conducted a more thorough review of its records. *See* SMSD Sales Verification Report (Appx11322–11323). In fact, SMSD was asked to identify the manufacturer for two resales and company officials were able to locate the mill test certificate with the manufacturer information. *See* SMSD Sales Verification Report (Appx11322–11323). Verification left no doubt that the manufacturer information was in

SMSD's possession and could have been provided if SMSD conducted a comprehensive review of its records.

Against this backdrop, Commerce concluded in the Final Determination that it must resort to the use of facts otherwise available pursuant to 19 U.S.C. § 1677e(a)(1), (a)(2)(A), and (a)(2)(B) because Salzgitter withheld and failed to submit in a timely manner the necessary manufacturer information relating to SMSD's home market resales. *See* Final Determination Memorandum at 27–34 (Appx39–46). Commerce stated that "{a}lthough Salzgitter reported these sales after the *Preliminary Determination* in response to our request for them (in the additional SMSD sales database), it nonetheless failed to identify the manufacturer of the CTL plate for these sales." *Id.* (Appx43). One supplemental questionnaire was enough to satisfy Commerce's obligation under 19 U.S.C. § 1677m(d). *See New Mexico Garlic Growers Coalition v. United States*, 352 F. Supp. 3d 1281, 1295 (Ct. Int'l Trade 2018) (citing *Maverick*, 857 F.3d at 1361). In this case, Commerce went above and beyond what was required by the statute and issued *three* supplemental questionnaires. Salzgitter failed to submit the missing manufacturer information in each of its responses. *See* Final

Determination Memorandum at 32 ("We asked Salzgitter on multiple occasions to submit complete home market sales data, inclusive of manufacturer information.") (Appx44).

To ensure an accurate margin calculation, it was critical that Salzgitter provide Commerce with information on the entire universe of its sales, both in the home market and the U.S. market, and identify the manufacturer for each sale. This is because Commerce calculates individual dumping margins by matching home market sales of the foreign like product produced by one manufacturer with U.S. sales of the subject merchandise produced by that same manufacturer. *See supra* Section I, Statement of the Case; *see also* Final Determination Memorandum at 32 (Appx44); Second Remand Redetermination (Appx170). Because Salzgitter failed to submit manufacturer information for a significant proportion of SMSD's home market resales, Commerce reasonably found that information it needed for its analysis, *i.e.*, the identities of the manufacturers, was not available on the record. The statute instructs Commerce that it "shall" use facts otherwise available in this precise situation so that Commerce may fulfill its

statutory mandate and reach a final determination. *See* 19 U.S.C. § 1677e(a)(1).

In addition, Commerce explained that it relied on facts otherwise available because the manufacturer of the CTL plate sold by SMSD was information that Salzgitter withheld and failed to submit in a timely manner. *See* Final Determination Memorandum at 32 (Appx44). Salzgitter never submitted the manufacturer information in response to Commerce's requests. Salzgitter has not claimed that SMSD does not possess the manufacturer information. Salzgitter simply made the decision not to expend any additional time and effort to conduct a thorough search of SMSD's records to provide the requested information. As Commerce found at verification, "Salzgitter was able to identify the manufacturer of a sale in the additional SMSD sales database when it attempted to obtain that information." *Id.* The statute authorizes Commerce to use facts otherwise available when a respondent withholds or does not timely submit requested information. *See* 19 U.S.C. § 1677e(a)(2)(A) and (a)(2)(B).

### C. Salzgitter Erroneously Argues that the Statute Precluded the Use of Facts Otherwise Available

As an initial matter, Salzgitter's assertion that it "fully responded to {Commerce's} requests for data and information" should be summarily rejected. Salzgitter Br. at 24. Salzgitter concedes that "the data were not perfect" and that it "timely submitted 100% of the home-market sales *for which the manufacturer could be identified as a Salzgitter mill using the electronic systems maintained in the ordinary course of business* …." *Id.* at 25 (emphasis added). This qualified statement shows that Salzgitter's reporting was incomplete, because it did not include home market sales which required additional time and effort to conduct a complete search of SMSD's records to identify whether the manufacturer was a Salzgitter mill or an unaffiliated mill located in Germany or in a third country. Salzgitter's submissions cannot be considered to be fully responsive because, as Salzgitter itself acknowledges, it reported information on the SMSD home market resales at issue "except {for} the identity of the manufacturer." *Id.*

Next, Salzgitter argues that 19 U.S.C. § 1677m(d) precluded the use of facts otherwise available because it explained SMSD's recordkeeping practices and the burden associated with providing the

manufacturer information within the available time. *Id.* at 24–26. Salzgitter complains that Commerce "never responded to SMSD's explanations" and "simply ignored them." *Id.* at 26. That is not the case. Although the statute says that a respondent may "explain the deficiency," Commerce must find the explanation to be "satisfactory." 19 U.S.C. § 1677m(d). Commerce did not "ignore" Salzgitter's explanations. Rather, Commerce found that Salzgitter's explanations were not satisfactory because there remained an unavoidable gap in the record that had to be filled with facts otherwise available to make a determination. In its discussion of the issue, Commerce repeatedly stated that the manufacturer information is "vital" and "critical" to the analysis because the margin calculation matches products by manufacturer. Final Determination Memorandum at 32 (Appx44). Commerce additionally found that Salzgitter's explanations were not satisfactory because, at verification, SMSD officials were able to use information in their possession to identify the manufacturer. *Id.* Salzgitter thus had the ability to provide Commerce with the requested manufacturer information.

As the CIT stated, "{w}ithout the identity on the record of the manufacturers of all CTL plate transactions sold in the home market, Commerce faced the dilemma of how to treat those sales in the margin calculation." *Dillinger I*, 399 F. Supp. 3d at 1252 (Appx118). The CIT has aptly explained that the reason why a respondent might not submit information in response to a request is not a relevant consideration under the statute:

> If necessary information is missing, *whatever the reason*, regardless of whether it is due to the respondent's failure to provide it, then Commerce applies "facts otherwise available." 19 U.S.C. § 1677e(a)(1). *Alternatively*, if the respondent acts or omits to act in specified ways in connection with the administrative record—*regardless* of the reason for the act and whether the information in question is necessary—then Commerce also applies "facts otherwise available." *See id.* § 1677e(a)(2)(A)–(D).

*Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, n.13 (Ct. Int'l Trade 2020) (emphasis in original); *see also Mukand, Ltd. v. United States*, 767 F.3d 1300, 1304 (Fed. Cir. 2014) (citing *Nippon*, 337 F.3d at 1381). Because Salzgitter's explanations failed to remedy the deficient reporting of SMSD's sales in the separate database, Commerce had the discretion under the statute to "disregard all or part of the original and subsequent responses." 19 U.S.C. § 1677m(d).

Salzgitter relies on a decision issued by Commerce over two decades ago to argue that Commerce has excused a respondent from conducting a burdensome manual search to report information on downstream home market resales. *See* Salzgitter Br. at 26 (citing *Certain Cut-to-Length Carbon-Quality Steel Plate Products from Japan*, 64 Fed. Reg. 73,215, 73,225 (Dep't Commerce Dec. 29, 1999) ("*CTL Plate from Japan 1999*")). However, the burden experienced by the respondent in that investigation was far greater because the unreported downstream resales were made by 25 indirect affiliates. In contrast, Salzgitter failed to report information on downstream resales made by one direct affiliate. Additionally, even assuming, *arguendo*, that *CTL Plate from Japan 1999* is analogous to this investigation, Commerce may relax or modify its rules in a given case and "Commerce's failure to apply those rules with Procrustean consistency in every case does not deprive it of the authority to enforce those rules in any case." *Stupp Corp. v. United States*, 5 F.4th 1341, 1350–51 (Fed. Cir. 2021). Commerce is not bound by a single decision made on different facts nearly 25 years ago. It had the discretion to enforce its reporting requirements in this case. If anything, decisions issued after *CTL Plate*

*from Japan 1999* show that Commerce relies on facts otherwise available when the respondent has failed to report complete information on downstream home market sales. *See, e.g.*, *Certain Cold Rolled Carbon Steel Flat Products from Germany*, 67 Fed. Reg. 62,116 (Dep't Commerce Oct. 3, 2002), and accompanying Issues and Decision Memorandum at Comment 1.

Furthermore, Salzgitter devotes several pages of its brief to argue that Commerce's reliance on facts otherwise available violated 19 U.S.C. § 1677m(e), which provides that Commerce shall not decline to consider necessary information submitted by a respondent that does not meet all of Commerce's requirements if certain conditions of reliability are met. *See* Salzgitter Br. at 27–31. Commerce committed no such violation. The CIT rejected Salzgitter's misplaced reliance on this statutory provision, explaining the following:

> {T}he "information" to which § 1677m(e) refers, in the context of this proceeding, is the missing manufacturer information, not the remainder of "the information" that Plaintiffs submitted. Plaintiffs acknowledge that the identity of the CTL plate manufacturers is relevant to whether home market transactions should or should not be included in margin calculations, and that they did not identify all of them. Plaintiffs thus cannot escape the conclusion that they failed to satisfy § 1677m(e) with respect to that information. In short, Plaintiffs' reliance upon § 1677m(e) is misplaced.

*Dillinger I*, 399 F. Supp. 3d at 1253 (Appx119). This case does not involve a situation where the reliability of the manufacturer information submitted by Salzgitter has been called into question—rather, Salzgitter never submitted the manufacturer information and § 1677m(e) is inapplicable.[5]

To the extent 19 U.S.C. § 1677m(e) applies to the information submitted by Salzgitter in the SMSD separate database, the conditions under subparagraphs (3) through (5) of § 1677m(e) were not met as Salzgitter argues. Specifically, Commerce found that the SMSD separate database with missing manufacturer information was so incomplete that the information was unusable and, as further discussed below in Section III, Salzgitter failed to cooperate by not acting to the best of its ability in providing complete information on SMSD's downstream home market resales. *See* Final Determination Memorandum at 31–34 (Appx43–46). All five of the conditions in § 1677m(e) were not met as required. Even so, Salzgitter claims that

---

[5] Because 19 U.S.C. § 1677m(e) does not apply to the factual circumstances of this case, the SAA language that Salzgitter references also does not apply. *See* Salzgitter Br. at 27 n.3 (quoting SAA at 865).

the information it submitted could have been used and presents three options on how Commerce could have accounted for the missing manufacturer information, *see* Salzgitter Br. at 29–30, but none of the options were viable because they each relied on an unsupported assumption regarding the manufacturer that produced the CTL plate for each sale. *See Dillinger I*, 399 F. Supp. 3d at 1255 (Appx121).

Finally, Salzgitter disputes Commerce's finding that Salzgitter withheld and failed to timely provide the manufacturer information. *See* Salzgitter Br. at 28. It asserts that Commerce's finding is not supported by the record because Commerce "verified the accuracy of SMSD's statement that it was impossible to identify the manufacturer for the sales in the Separate Database with the electronic systems used in the ordinary course of business." *Id.* (citing SMSD Sales Verification Report (Appx11313)). Nothing on that page of the verification report suggests that Commerce verified it was impossible for SMSD to identify the manufacturer using its electronic systems.

In fact, that same page of the verification report explains that SMSD had the ability to merge and link the manufacturer information in its mill certificate recording system (referred to as the "CMS system")

to specific sales in its accounting system (referred to as the "SAP system") by using the melt and sample number recorded in both systems. *See* SMSD Sales Verification Report (Appx11313). SMSD had the means to obtain the information, even though SMSD did not routinely maintain a record of the mill in its accounting system. Elsewhere in the report, Commerce explains that SMSD was able to identify the manufacturer for two sales when asked to do so. *See id.* (Appx11322–11323). For these reasons, Commerce found that "Salzgitter had relevant information available to it, but determined not to invest the time in comprehensively examining its documentation in order to provide the requested information." Final Determination Memorandum at 32 (Appx44).

In sum, Commerce lawfully resorted to partial facts otherwise available pursuant to 19 U.S.C. § 1677e(a)(1), (a)(2)(B), and (a)(2)(C) because the manufacturer information for SMSD's resales was necessary information that Salzgitter withheld and failed to submit in a timely manner.

## III. Commerce's Decision to Apply Partial AFA Should Be Affirmed

### A. Legal Framework for Commerce's Discretionary Authority to Draw Adverse Inferences

Commerce has the discretion to draw adverse inferences when selecting from among the facts otherwise available to fill the informational gap in the record when it finds that the respondent "has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1). A respondent fails to act to the best of its ability when it does not exert "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon*, 337 F.3d at 1382. The "best of its ability" standard requires that the respondent maintain full and complete records, is familiar with all of its records, and has conducted a careful review of its records. *Id.* The standard "does not condone inattentiveness, carelessness, or inadequate record keeping." *Id.* The respondent's motivation or intent is not a relevant consideration. *Id.* at 1383 ("While intentional conduct, such as deliberate concealment or

inaccurate reporting, surely evinces a failure to cooperate, the statute does not contain an intent element.”).

### B. Commerce Lawfully Applied Partial AFA Because Salzgitter Failed to Cooperate to the Best of its Ability in Responding to Requests for Manufacturer Information

Salzgitter was required to report all of its home market sales, inclusive of downstream sales made by affiliated resellers, and all information related to these sales at the start of the investigation. There was nothing extraordinary about Commerce’s request. The initial antidumping questionnaire is issued to every respondent selected for examination in antidumping proceedings and specifically requests manufacturer codes identifying the manufacturer for each sale (including downstream sales made by affiliates). Salzgitter has been involved in steel production for decades and has familiarity with Commerce’s antidumping proceedings. *See, e.g.*, *Structural Steel Beams from Germany*, 67 Fed. Reg. 35,497 (Dep’t Commerce May 20, 2002). Commerce provided Salzgitter with ample time (nearly six months) and multiple opportunities (the initial questionnaire and three supplemental questionnaires) to submit the manufacturer information for SMSD’s resales. *See* Final Determination Memorandum at 32 n.89

(Appx44). At the outset, Salzgitter was warned that failing to provide the requested information may result in the application of AFA. *See* Initial Antidumping Questionnaire at B-5 (Appx318). Commerce did its part. However, Commerce concluded that Salzgitter did not uphold its duty as a mandatory respondent because it failed to cooperate by not acting to the best of its ability to comply with Commerce's requests to report the manufacturer for the downstream home market sales made by SMSD. *See* Final Determination Memorandum at 33 (Appx45).

Commerce has issued and administered hundreds of orders on steel products and has vast experience examining foreign steel companies. The identity of the manufacturer is basic information that foreign steel companies maintain in the normal course of business for a multitude of reasons, *e.g.*, traceability for quality control and liability purposes. Commerce has referred to such information as "elementary and critical," both for the respondent's business operations and for Commerce's dumping analysis. *See Stainless Steel Sheet and Strip in*

*Coils from Germany*, 64 Fed. Reg. 30,710, 30,742 (Dep't Commerce June 8, 1999).

Here, Commerce explained that "{t}he information in question (*i.e.*, the identity of the manufacturers of the CTL plate resold by Salzgitter's affiliate, SMSD) is the type of information that a respondent should have reasonably anticipated being required to provide to its customers for quality assurance and warranty claims." Final Determination Memorandum at 33 (Appx45). Salzgitter should have reasonably expected that SMSD would need to produce the manufacturer information upon request. In fact, Salzgitter stated in its questionnaire responses that SMSD provides such information to its customers upon request. *See* Salzgitter First Sections B&C Supplemental Response at 4–5 (Appx6789–6790); Salzgitter Third Sections B&C Supplemental Response at 3–4 (Appx8044–8045).

Salzgitter failed to submit the requested information because the identities of the manufacturers were not readily accessible in SMSD's electronic accounting system or mill certificate recording system and Salzgitter opted not to conduct a comprehensive search of SMSD's other records. Salzgitter never claimed that the information was not in

SMSD's possession. Instead, Salzgitter chose not to comply because of the alleged burden associated with conducting the necessary search to obtain the information.

As Commerce explained, "Salzgitter was familiar with all of the records that SMSD maintained," and SMSD officials at verification were "able to identify the manufacturer of a sale in the additional SMSD sales database when {they} attempted to obtain that information." Final Determination Memorandum at 33 (Appx45). The alleged burden was self-imposed because SMSD chose not to maintain manufacturer information in the ordinary course of business in its electronic accounting system and mill certificate recording system.

Critically, this Court in *Nippon* clarified that the "best of its ability" standard "does not condone inattentiveness, carelessness, or inadequate recordkeeping." 337 F.3d at 1382. Under these circumstances, Commerce found that Salzgitter had the ability to provide the manufacturer information "if it had made the appropriate effort" when it received the initial request for information and the three subsequent requests. *See* Final Determination Memorandum at 33 (Appx45). Manufacturer information was missing for approximately

28,000 downstream home market sales, which represented more than [SALES DATA] percent of the [SALES DATA] home market sales that Commerce used in the dumping analysis. *See* Second Remand Redetermination (Appx167). Salzgitter failed to submit the manufacturer information for *any* of these sales, despite the fact that the information was in SMSD's possession. Salzgitter's conduct falls far short of the maximum it could have done.

### C. Salzgitter Fails to Demonstrate that Commerce's Decision to Apply Partial AFA Is Unlawful

Each of Salzgitter's challenges to Commerce's decision to apply partial AFA is meritless and should be rejected. Salzgitter first incorrectly argues that the evidence does not support Commerce's finding that a respondent should have reasonably expected that it would need the manufacturer information to respond to customers' inquiries relating to quality and warranty claims. *See* Salzgitter Br. at 33. As explained above, Commerce has the benefit of several decades of experience investigating foreign steel companies and drew from this vast experience and knowledge regarding the steel industry. Additionally, because the record showed that SMSD dealt with customers involved in, *inter alia*, structural steelwork and pipeline

construction, the record supports Commerce's understanding that quality assurance and warranty claims are of high importance. *See* Salzgitter Section A Response at Exhibit A-3.b (Appx698). Commerce's finding was not based on "mere speculation," as Salzgitter argues.

Salzgitter contends that evidence on the record detracts from Commerce's finding and points to its own self-serving explanations to argue that steel trading businesses do not systematically track the manufacturer. *See* Salzgitter Br. at 33–34. But this contention is belied by the fact that, of Salzgitter's five affiliated resellers, only SMSD did not provide Commerce with manufacturer information. Four of the five affiliated resellers were able to rely on records kept in the normal course of business to distinguish between CTL plate manufactured by Salzgitter mills and others. *See* Salzgitter Sections B, C, and E Response at B-8 (Appx5748). If it were true that steel trading businesses did not track the manufacturer, then all five of Salzgitter's affiliated resellers would not have submitted manufacturer information.

Next, Salzgitter argues that while SMSD had the ability to identify the manufacturer for particular transactions to address quality assurance and warranty claims that arose in the ordinary course of

business, SMSD's electronic recordkeeping systems "did not gather such data on a scale that would have permitted it to report the manufacturer for all sales" and within the timeframe of the investigation. *See* Salzgitter Br. at 33–34. It goes on to explain the difference between "doing something once and doing it 28,000 times." *Id.* at 35. As explained in detail above, Salzgitter was given nearly *six months* to provide information that is ordinarily submitted in response to the initial questionnaire. Despite the significant time it had, Salzgitter took an all or nothing approach and did not provide manufacturer information for any of the sales at issue.

Further, the statute contemplates that in certain situations a respondent may have difficulty responding to Commerce's requests for information. *See* 19 U.S.C. § 1677m(c)(1). However, as explained by the CIT, Salzgitter "did not more completely avail itself of the full operation of {that statute} and promptly disclose its difficulties to Commerce <u>and</u> request assistance to figure out a path to ascertain the necessary information." *Dillinger I*, 399 F. Supp. 3d at 1255–1256 (Appx121–122). Because Salzgitter did not take the necessary steps to trigger 19 U.S.C.

§ 1677m(c)(1), Commerce was under no obligation to take into account and accommodate Salzgitter's alleged difficulties.

Salzgitter again cites to *CTL Plate from Japan 1999*, explaining that Commerce excused the respondent in that case from the burden of manually reviewing records and that "{t}he exact same reasoning applied to Salzgitter and the Separate Database." Salzgitter Br. at 36. As discussed above, *CTL Plate from Japan 1999* involved dissimilar facts and is not binding. *See supra* Section II.C. In addition, as Commerce explained, *CTL Plate from Japan 1999* has minimal precedential value because of "technological advancements in electronic records management since that time, which significantly reduces the burden in obtaining the missing information." Final Determination Memorandum at 33 (Appx45). Salzgitter disputes this rationale because it contends that the burden of a manual review of 28,000 sales was the same during this investigation as it was in 1999. *See* Salzgitter Br. at 36. Nonetheless, SMSD demonstrated its ability to locate the mill test certificate and identified the manufacturer for two sales without any mention of undue hardship in the verification report. *See* SMSD Sales Verification Report (Appx11322–11323).

Lastly, Salzgitter's challenges to three aspects of the CIT's decision should be rejected. *See* Salzgitter Br. at 37–39 (discussing *Dillinger I*, 399 F. Supp. 3d at 1255 (Appx121)). The CIT's response to Salzgitter's three proposed options to account for the sales in SMSD's separate database was ostensibly a further explication of Commerce's finding that the separate database "is not usable because it is missing critical information, *i.e.*, the manufacturer of the CTL plate." Final Determination Memorandum at 32 (Appx44). The CIT understood Commerce's rationale and recognized that each of Salzgitter's proposals required making unsupported assumptions and haphazardly attributing specific sales to a specific manufacturer. This was the case even under Salzgitter's proposed option three because although this option relied on each producer's percentage of merchandise based on the full universe of SMSD's sales, there still remained the conundrum of deciding how to pick which specific sales should be assigned to each manufacturer without speculating. Salzgitter suggests that the CIT erred by citing to this Court's decision in *Maverick*. The CIT referenced that decision within its discussion of 19 U.S.C. § 1677m(c), which the respondent in *Maverick* and Salzgitter did not trigger, and emphasized

that Salzgitter's alleged difficulties were not the same as having zero ability to provide the requested information. Salzgitter has not shown that the CIT erred in its analysis.

For all of these reasons, Commerce reasonably concluded that Salzgitter failed to cooperate to the best of its ability and lawfully exercised its discretionary authority to apply partial AFA pursuant to 19 U.S.C. § 1677e(b) in determining Salzgitter's dumping margin.

## IV. Commerce's Partial AFA Methodology to Determine Salzgitter's Final Dumping Margin Should Be Affirmed

### A. The Legislative Purpose of the AFA Statute

Commerce's authority to apply AFA is "an essential investigative tool" to incentivize cooperation because the agency does not have subpoena power. *See Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1295 (Fed. Cir. 2021) (citing SAA at 868). To encourage cooperation, Congress instructed Commerce to consider "the extent to which a party may benefit from its own lack of cooperation" and apply AFA in a way that will "ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." SAA at 870. Commerce's application of AFA is tailored to the factual circumstances of a particular case, and while the partial or total AFA

dumping margin should not be unduly punitive, it should include some built-in increase to deter future noncompliance. *See BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1301–1302 (Fed. Cir. 2019).

Congress further enhanced Commerce's authority to apply AFA with the passage of the Trade Preferences Extension Act of 2015 ("TPEA"), which clarified that Commerce has the "discretion to apply {the} highest rate," is not required to consider what the "dumping margin would have been if the interested party … had cooperated," and has no obligation to demonstrate that a particular dumping margin "reflects an alleged commercial reality of the interested party." 19 U.S.C. § 1677e(b)(1)(B) and (d)(2)–(3); *see also* Section 502 of the TPEA, Pub. L. No. 114-27, 129 Stat. 362 (2015).

### B. Commerce's Partial AFA Methodology Is a Reasonable Means of Achieving the Legislative Purpose of the AFA Statute

In the Final Determination, Commerce adopted a partial AFA methodology which involved, first, drawing the inference that Salzgitter is the manufacturer of the roughly 28,000 downstream home market sales made by SMSD with missing manufacturer information and, second, assigning the highest non-aberrational net price among all of

SMSD's downstream sales to the sales with missing manufacturer information. *See* Final Determination Memorandum at 10, 34 (Appx22, Appx46). Commerce explained that it identified €[SALES DATA] per metric ton as the highest non-aberrational net price, because it was the price "at the beginning of a smooth continuum of net prices after sorting all of SMSD's net prices in descending order." Salzgitter Final Calculation Memorandum at 2 (Appx11649).

The CIT initially instructed Commerce to revise its methodology on remand so as to be consistent with the *Dillinger France* methodology, which relied on the prices as reported for the respondent's sales with missing manufacturer information. *See Dillinger I*, 399 F. Supp. 3d at 1256–1257 (Appx122–123). However, Commerce was afforded an opportunity to consider whether an alternative method would be more appropriate in the case of Salzgitter. *See Dillinger II*, 534 F. Supp. 3d at 1413–1414 (Appx139–140). On remand, Commerce explained that adopting the approach taken in *Dillinger France* would not be consistent with the meaning and purpose of the AFA statute because it would result in a zero percent margin and Salzgitter's exclusion from the order. *See* Second Remand Redetermination (Appx166–171,

Appx191–197). Commerce found that such a result would frustrate the AFA statute's goal of inducing cooperation by ensuring that the non-cooperative respondent does not receive a more favorable AFA rate than it would have received had it fully cooperated. *Id.* (Appx169).

Commerce considered it appropriate to adopt an alternative approach because it identified key differences between Salzgitter and other respondents that were subject to the *Dillinger France* partial AFA methodology. Commerce explained that "the scope of Salzgitter's failure to cooperate is substantially different than the scope of Dillinger's (or Dillinger France's) failure to cooperate." *Id.* (Appx167). Salzgitter failed to report the manufacturer for approximately 28,000 downstream home market sales (*i.e.*, more than [SALES DATA] percent of the home market sales used in the margin calculations). *Id.* In stark contrast, the other respondents failed to report the manufacturer for a small number of sales, and the application of partial AFA, regardless of any methodology, would have had "no measurable impact" on their dumping margins. *Id.* Further, Commerce could not "rule out the possibility that the sales with the highest prices were entirely or primarily of CTL plate manufactured by Salzgitter, and Salzgitter's failure to report the manufacturer

information was an attempt to obscure this fact, thereby distorting the margin." *Id.* (Appx170–171).

In choosing an appropriate partial AFA methodology, Commerce followed the SAA's guidance and "considered the extent to which Salzgitter may benefit from its own lack of cooperation." *Id.* (Appx169). Commerce also was mindful of the AFA statute's purpose of encouraging future cooperation, explaining that under the *Dillinger France* approach "Salzgitter may well receive a more favorable dumping margin than it would have received if the company had fully cooperated with Commerce, and, as a result, Salzgitter would ultimately be excluded from the {antidumping} order." *Id.* (Appx170). "{A} zero percent margin cannot, by definition, be higher than what Salzgitter's margin would otherwise have been if it had disclosed all its manufacturer information." *Dillinger III*, 648 F. Supp. 3d at 1330 (Appx208). In fact, under the *Dillinger France* partial AFA methodology, Salzgitter would have benefitted from its own lack of cooperation because it would have been rewarded with the *most favorable* possible outcome — a zero percent dumping margin and exclusion from the order.

Commerce thus found it appropriate to rely on an alternative method and, as partial AFA, treated SMSD's sales with missing manufacturer information as though they were all manufactured by Salzgitter, which made the sales potential matches with Salzgitter's U.S. sales, and assigned them the highest non-aberrational net price. This resulted in a 22.90 percent dumping margin for Salzgitter. Commerce's approach reasonably achieves the AFA statute's goals.

### C. Salzgitter Fails to Demonstrate that Commerce's Partial AFA Methodology Is Unlawful

Salzgitter argues that Commerce's use of the highest non-aberrational price as partial AFA was unjustified because prices for the SMSD sales were included in the separate database and the gap in the record was limited to the missing manufacturer information. *See* Salzgitter Br. at 40–42. The law and facts do not support Salzgitter's argument. The CIT acknowledged that, in *Dillinger France*, concerns were raised about Commerce's refusal to consider price data on the record in applying AFA. *See Dillinger III*, 648 F. Supp. 3d at 1331 (Appx209). However, the CIT correctly pointed out that "Commerce has clear statutory authority pursuant to 19 U.S.C. § 1677m(d) to 'disregard all or part of the original and subsequent responses' in an adverse

inference scenario." *Id.* (quoting *Dillinger I*, 399 F. Supp. 3d at 1256 (Appx122), and Second Remand Redetermination at 55 (Appx195)). Salzgitter again relies on 19 U.S.C. § 1677m(e) to argue that Commerce could not ignore the prices as reported, but Salzgitter's reliance on that statute is misplaced for the reasons already explained above. *See supra* Section II.C. Moreover, the CIT previously has upheld this same partial AFA methodology (including use of the highest non-aberrational price) in another case involving sales with missing manufacturer information. *See Habaş Sinai ve Tibbi Gazlar Istihsal Endüstrisi, A.Ş. v. United States*, 415 F. Supp. 3d 1195, 1213–1215 (Ct. Int'l Trade 2019).

In addition, Salzgitter makes much of the fact that the reported prices were verified and their reliability was never questioned. *See* Salzgitter Br. at 40–41. However, Salzgitter misunderstands the full extent of the informational gap in the record and the critical issue caused by the missing manufacturer information—namely, the information on the record did not identify for Commerce which specific sales should be assigned to each manufacturer. Commerce could not "determine if the net prices correlated to the manufacturer of the CTL plate," and it could not "rule out the possibility that the sales with the

highest prices were entirely or primarily of CTL plate manufactured by Salzgitter." Second Remand Redetermination (Appx170–171).

Treating Salzgitter as the manufacturer *and* using the prices as reported (*i.e.*, the *Dillinger France* method) may have inappropriately assigned lower prices to CTL plate manufactured by Salzgitter and run the risk of Salzgitter receiving a more favorable margin than it would have received had it fully cooperated. This is evidenced by the fact that the *Dillinger France* partial AFA methodology used in the First Remand Redetermination resulted in a zero percent margin while the alternative approach used in the Second Remand Redetermination resulted in a 22.90 percent margin. Thus, the gap in the record included the identity of the manufacturer *and* the specific sales attributable to each manufacturer.

Salzgitter contends that the price used by Commerce was aberrational or otherwise impermissibly punitive. *See* Salzgitter Br. at 42–44. Salzgitter first questions where the smooth continuum of SMSD's net prices begins. *See id.* at 42. When looking at SMSD's net prices sorted in descending order, as Commerce did in the Final Determination, it is clear that [ SALES DATA ] are outliers

and that [ SALES DATA ] is where the price disparity becomes smaller and is properly characterized as the beginning of the continuum of non-aberrational prices. *See* Salzgitter Final Calculation Memorandum, Attachment 1 at 81 (Appx11805).[6]

Salzgitter argues that Commerce unreasonably used the price for a dissimilar product that was not matched to any of its U.S. sales in the margin calculations. *See* Salzgitter Br. at 42–43. The statute defines "foreign like product" according to a hierarchy, expressing a preference for merchandise that is identical to the subject merchandise that is sold in the United States or, in the absence of an identical match, the most similar merchandise. The fact that Commerce selected a product in the home market that was not, in fact, matched to a U.S. sale simply means that there was an identical or *more* similar match. Commerce used the price for a comparable product that met the description of the CTL plate that was subject to investigation, which is why Salzgitter was required to report the sale in the SMSD separate database.

---

[6] The highest net price among all of SMSD's sales in the separate database (€[ SALES DATA ] per metric ton) is roughly [ SALES DATA ] than the one that Commerce used as partial AFA.

More importantly, Salzgitter's argument suggests that Commerce is required to apply AFA so as to perform the margin calculations in the same way that it would if Salzgitter had fully cooperated. The statute imposes no such requirement. In fact, when Congress amended the AFA statute in the TPEA, it clarified that Commerce has no obligation to calculate the margin as if the interested party had cooperated or to reflect an alleged commercial reality. *See* 19 U.S.C. § 1677e(b)(1)(B) and (d)(2)–(3).

Salzgitter's complaints about the adverse nature of the price also have no merit. *See* Salzgitter Br. at 43. The CIT was correct to reject these arguments because Commerce considered the totality of the record and acted within the discretion afforded to it under the statute when it selected the highest non-aberrational net price. *See Dillinger III*, 648 F. Supp. 3d at 1332–1333 (Appx210–211). Salzgitter has not offered any alternative that it considers to be the one and only reasonable choice. This Court also has explained that Commerce has wide latitude in determining dumping margins when dealing with AFA determinations to induce a non-cooperative respondent's future cooperation. *See Nan Ya*, 810 F.3d at 1348.

**CONFIDENTIAL INFORMATION DELETED**

Salzgitter claims that a comparison of the range of transaction-specific margins calculated using Commerce's partial AFA method and the *Dillinger France* method shows that Commerce's decision is punitive. *Id.* This type of comparison serves no purpose because, as explained in the SAA, "proving that the facts selected are the best alternative facts would require that the facts available be compared with the missing information, which obviously cannot be done." SAA at 870. Further, Salzgitter's comparative analysis is faulty because it presupposes that the *Dillinger France* method is an accurate or reliable baseline. Even assuming that the *Dillinger France* method is an appropriate comparator, this comparison actually *supports* Commerce's decision because, according to Salzgitter, the highest transaction-specific margin under each method was [SALES DATA] percent and [SALES DATA] percent. Commerce calculated a 22.90 percent weighted-average dumping margin for Salzgitter, which it deemed sufficient to accomplish the goals of the AFA statute and is [ SALES DATA ] Salzgitter's highest transaction-specific margin, even under the *Dillinger France* method.

The discretion under the statute unconditionally authorizes Commerce to use "any other information placed on the record" as AFA. 19 U.S.C. § 1677e(b)(4). As previously explained by the Court, this statutory authority permits Commerce to use even the highest transaction-specific margin as AFA to induce cooperation. *See Nan Ya*, 810 F.3d at 1346–1348. Likewise, it is within Commerce's discretion under the statute to use the highest non-aberrational net price as partial AFA for SMSD's downstream home market sales.

Salzgitter also cites to *Gallant Ocean (Thailand) Co. v. United States*, which is inapposite because in that case the Court ruled that Commerce failed to corroborate its use of the petition rate as AFA in the context of an administrative review. *See* 602 F.3d 1319, 1323–1325 (Fed. Cir. 2010). The corroboration requirement did not apply here because the price Commerce used as partial AFA was information that Salzgitter reported regarding its own sales during the course of the investigation. *See* 19 U.S.C. § 1677e(c)(1); SAA at 870 (listing types of secondary information subject to corroboration requirement).

In sum, Commerce's partial AFA methodology is a reasonable means of effectuating the statutory purpose and should be affirmed.

## CONCLUSION

For the foregoing reasons, Commerce's application of partial AFA in calculating Salzgitter's 22.90 percent dumping margin in the less-than-fair-value investigation of CTL plate from Germany was supported by substantial evidence and in accordance with law. Accordingly, the Court should affirm the CIT's judgment and uphold Commerce's Final Determination.

Respectfully submitted,

Roger B. Schagrin
Jeffrey D. Gerrish
Saad Y. Chalchal*
SCHAGRIN ASSOCIATES
900 7th St. NW Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for SSAB Enterprises LLC*

Date: April 25, 2024

* Admitted only in New York and New Jersey. Practice limited to matters before Federal courts and agencies.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2024-1219

**Short Case Caption:** AG der Dillinger Huttenwerke v. United States

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 12,139 words.

- [ ] the filing has been prepared using a monospaced typeface and includes __________ lines of text.

- [ ] the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 04/25/2024

Signature: /s/ Roger B. Schagrin

Name: Roger B. Schagrin

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2024-1219

**Short Case Caption:** AG der Dillinger Huttenwerke v. United States

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).
- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains 26 number of unique words (including numbers) marked confidential.

☐ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 04/25/2024

Signature: /s/ Roger B. Schagrin

Name: Roger B. Schagrin

FORM 30. Certificate of Service

Form 30
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number** 2024-1219

**Short Case Caption** AG der Dillinger Huttenwerke v. United States

**NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e). Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on 05/08/2024

by ☐ U.S. Mail ☐ Hand Delivery ☐ Email ☐ Facsimile
☑ Other: Secure File Transfer Protocol

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Kara M. Westercamp | kara.m.westercamp@usdoj.gov |
| David E. Bond | dbond@whitecase.com |
| Alan H. Price | aprice@wiley.law |
| | |
| | |

☐ Additional pages attached.

Date: 05/08/2024

Signature: /s/ Roger B. Schagrin

Name: Roger B. Schagrin