2024-1219

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

AG DER DILLINGER HÜTTENWERKE, FRIEDR. LOHMANN GMBH, THYSSENKRUPP STEEL EUROPE AG,

Plaintiffs,

ILSENBURGER GROBBLECH GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, AND SALZGITTER MANNESMANN INTERNATIONAL GMBH,

Plaintiffs-Appellants,

v.

UNITED STATES, SSAB ENTERPRISES LLC, NUCOR CORPORATION

Defendants-Appellees,

Appeal from the United States Court of International Trade
in Case No. 1:17-CV-00158
Judge Leo Gordon

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS
ILSENBURGER GROBBLECH GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, AND SALZGITTER MANNESMANN INTERNATIONAL GMBH

### NON-CONFIDENTIAL VERSION

David E. Bond
Ron Kendler
Allison Kepkay
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

May 30, 2024

Counsel to Plaintiff-Appellants Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2024-1219 |
| **Short Case Caption** | AG der Dillinger Huttenwerke v. US |
| **Filing Party/Entity** | Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Signature: /s/ David E. Bond

Date: May 30 2024

Name: David E. Bond

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Ilsenburger Grobblech GmbH | | Wholly-owned (directly or indirectly) by Salzgitter AG, a publicly traded entity. |
| Salzgitter Flachstahl GmbH | | Wholly-owned (directly or indirectly) by Salzgitter AG, a publicly traded entity. |
| Salzgitter Mannesmann Grobblech GmbH | | Wholly-owned (directly or indirectly) by Salzgitter AG, a publicly traded entity. |
| Salzgitter Mannesmann International GmbH | | Wholly-owned (directly or indirectly) by Salzgitter AG, a publicly traded entity. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable              ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐    Yes (file separate notice; see below)    ☑    No    ☐    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable              ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

Pursuant to Federal Circuit Rules 25.1(d) and 25.1(e)(1)(B), this brief contains confidential material that has been omitted. The material omitted on pages 3, 19, 21, and 22 identifies Salzgitter's sales information. The material omitted on page 27 identifies dumping margin information.

INTRODUCTION ...............................................................................................1

SUMMARY OF REPLY ....................................................................................2

ARGUMENT .....................................................................................................4

I.     THE DEPARTMENT'S USE OF AN ADVERSE INFERENCE
       WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE..................4

       A.     Defendants-Appellees' Claims of Inadequate Recordkeeping
              Are Not Supported by Substantial Evidence ...................................5

       B.     Substantial Evidence Establishes that Salzgitter Made Every
              Reasonable Effort to Comply with the Department's Request......12

II.    THE DEPARTMENT ERRED IN NOT USING AN OPTION
       PROPOSED BY SALZGITTER TO INTEGRATE THE SALES IN
       THE    SEPARATE    DATABASE    INTO    THE    DUMPING
       CALCULATION..................................................................................19

III.   DEFENDANTS-APPELLEES FAIL TO SHOW THAT THE
       DEPARTMENT'S CHOICE OF AFA WAS CONSISTENT WITH
       THE    STATUTE    OR    SUPPORTED    BY    SUBSTANTIAL
       EVIDENCE ..........................................................................................24

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ...............................30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. United States Sec'y of Agric.*,
 462 F. Supp. 2d 1333 (Ct. Int'l Trade 2006)...............................................11, 17

*Diamond Sawblades Manufacturers' Coalition v. United States*,
 2018 Ct. Intl. Trade LEXIS 155 (Oct. 23, 2018)...................................................8

*Diamond Sawblades Manufacturers' Coalition v. United States*,
 547 F. Supp. 3d 1323 (Ct. Int'l Trade 2021)...................................................25, 26

*Dillinger France S.A. v. United States*,
 350 F. Supp. 3d 1349 (Ct. Int'l Trade 2018) ...........................................6, 26, 27

*Dillinger France S.A. v. United States*,
 393 F. Supp. 3d 1225 (Ct. Int'l Trade 2019),
 *aff'd in part and vacated in part on other grounds*,
 981 F.3d 1318 (Fed. Cir. 2020) .........................................................................26

*F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*,
 216 F.3d 1027 (Fed. Cir. 2000) .........................................................................24

*Ghigi 1870 S.P.A. v. United States*,
 577 F. Supp. 3d 1338 (Ct. Int'l Trade 2022) ...................................................8, 13

*Huong Vong Corp. v. United States*,
 482 F. Supp. 3d 1321 (Ct. Int'l Trade 2021) .......................................................8

*Hyundai Heavy Indus. Co., Ltd. v. United States*,
 393 F. Supp. 3d 1293 (Ct. Int'l Trade 2019),
 *aff'd Hyundai Elec. & Energy Sys. V. United States*,
 2022 U.S. App. LEXIS 22235 (Fed. Cir. Aug. 11, 2022)
 (nonprecedential) ...............................................................................................4

*JTEKT Corp. v. United States*,
 642 F.3d 1378 (Fed. Cir. 2011) .........................................................................28

*KYD Inc. v. United States*,
 607 F.3d 760 (Fed. Cir. 2010) ...........................................................................29

*Maverick Tube Corp. v. United States*,
    857 F.3d 1353 (Fed. Cir. 2018) ......................................................17, 18

*Nat'l Muffler Dealers Ass'n v. United States*,
    440 U.S. 472 (1979)........................................................................12

*Nat'l Nail Corp. v. United States*,
    390 F. Supp. 3d 1356 (Ct. Int'l Trade 2019) .....................................13

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003) ..................................................passim

*S. Shore Hosp., Inc. v. Thompson*,
    308 F.3d 91 (1st Cir. 2002)...............................................................12

*Sage Prods. v. Devon Indus, Inc.*
    126 F.3d 1420 (Fed. Cir. 1997) ....................................................27, 28

*Shandong Huarong Mach. Co. v. United States*,
    435 F. Supp. 2d 1261 (Ct. Int'l Trade 2006) .....................................24

*Stupp Corp. v. United States*,
    5 F.4th 1341, 1350-51 (Fed. Cir. 2021).......................................16, 17

*SunEdison, Inc. v. United States*,
    179 F. Supp. 3d 1309 (Ct. Int'l Trade 2016)...............................passim

*Zhejiang Dunan Hetian Metal Co. v. United States*,
    652 F.3d 1333 (Fed. Cir. 2011) ...................................................25, 27

## STATUTES AND REGULATIONS

19 U.S.C. § 3512....................................................................................15

## LEGISLATIVE MATERIALS

Statement of Administrative Action accompanying the Uruguay
    Round Agreements Act,
     H.R. Rep. No. 103-826(I), at 865,
      reprinted in 1994 U.S.C.C.A.N. 4040, 4194 .....................................15

## ADMINISTRATIVE DETERMINATIONS

*Canned Pineapple Fruit from Thailand*,
  69 Fed. Reg. 56,014 (Dep't Commerce Aug. 13, 2004),
  and accompanying Issues & Decision Memorandum ......................................23

*Certain Carbon and Alloy Steel Cut-To-Length Plate from Austria*,
  82 Fed. Reg. 16,366 (Dep't Commerce Apr. 4, 2017),
  and accompanying Issues & Decision Memorandum ......................................11

*Certain Cut-To-Length Carbon-Quality Steel Plate Products from Japan*,
  64 Fed. Reg. 73,215 (Dep't Commerce Dec. 29, 1999) ................................9, 16

*Certain Steel Concrete Reinforcing Bars from Latvia*,
  68 Fed. Reg. 71,067 (Dep't Commerce Dec. 22, 2003),
  and accompanying Issues & Decision Memorandum ......................................8

*Certain Steel Grating from the People's Republic of China*,
  75 Fed. Reg. 32,362 (June 8, 2010),
  and accompanying Issues & Decision Memorandum ......................................8

*Mattresses from Indonesia*,
  86 Fed. Reg. 15,899 (Dep't Commerce Mar. 25, 2021),
  and accompanying Issues & Decision Memorandum ......................................23

*Structural Steel Beams from Germany*,
  67 Fed. Reg. 35497,
  and accompanying Issues & Decision Memorandum ..........................10, 15, 16

## <u>INTRODUCTION</u>

Plaintiffs-Appellants Ilsenburger Grobblech GmbH ("ILG"), Salzgitter Mannesmann Grobblech GmbH ("MGB"), Salzgitter Flachstahl GmbH ("SZFG"), and Salzgitter Mannesmann International GmbH ("SMID") (collectively, "Salzgitter") reply to the *Response Brief for Defendant-Appellee, United States* (ECF 33, 34) ("U.S. Br."); the *Response Brief of Defendant-Appellee Nucor Corporation* (ECF 31, 32) ("Nucor Br."); and the *Response Brief of Defendant-Appellee SSAB Enterprises LLC* (ECF 40, 41) ("SSAB Br.") in this appeal. For consistency, we refer to underlying documents from the administrative record using the abbreviated document names set forth in the *Brief of Plaintiffs-Appellants Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH* ("Salzgitter Br.") (ECF 16, 17).

## SUMMARY OF REPLY

**Issue 1:  The Department's Use of an Adverse Inference**

The Department's use of an adverse inference in applying facts available ("AFA") was not supported by substantial evidence.  Defendants-Appellees argue that Salzgitter failed to cooperate by not reporting the manufacturer for 28,000 sales of cut-to-length ("CTL") plate made by Salzgitter's affiliated reseller, Salzgitter Mannesmann Stahlhandel GmbH ("SMSD").  They argue that: (1) Salzgitter's recordkeeping was "poor" and "sloppy," and that Salzgitter "should" have known the Department would require such information; and (2) Salzgitter did not expend "maximum" effort to locate the manufacturer information.  The record refutes both claims, clearly showing that Salzgitter maintained adequate records for its commercial needs in the ordinary course of business and made every reasonable effort to meet the Department's request for information.  This Court's precedent and the Department's practice further establish that the use of an adverse inference under these circumstances was unreasonable.  At most, the Department was justified in using neutral facts available ("FA").

**Issue 2:  Salzgitter's Three Options for Using the Separate Database**

Salzgitter made detailed proposals for using the verified sales data in the Separate Database as neutral FA to calculate the dumping margin.  The Department could have: (1) treated all sales in the Separate Database as if Salzgitter was ***not*** the

2

manufacturer; (2) treated all sales in the Separate Database as if Salzgitter *was* the manufacturer; or (3) treated [Sales Info] percent of the quantity of each sale as if Salzgitter was the manufacturer, consistent with the fact that [Sales Info] percent of purchases by SMSD during the period of investigation ("POI") were of Salzgitter-produced CTL plate. The Department ignored Salzgitter's proposal and the CIT erroneously dismissed it as "speculative" and statistically unsound. Defendants-Appellees make the same flawed arguments on appeal. The record establishes that Salzgitter's proposed options were accurate, reasonable, and should have been used as neutral FA.

## Issue 3:  The Department's Choice of Partial AFA

If the Court affirms the Department's use of an adverse inference, it should nevertheless find that its choice of partial AFA was improper. The Department's decision to replace the sales prices for all 28,000 sales in the Separate Database with the so-called "highest non-aberrational net price" was contrary to law because it disregarded verified price data that was unrelated to the manufacturer's identity. Further, the Department's choice of partial AFA was not supported by substantial evidence because the price used was, in fact, aberrational.

**ARGUMENT**

I.  **THE DEPARTMENT'S USE OF AN ADVERSE INFERENCE WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE**

The record does not support either of the claims underlying the Department's finding that Salzgitter did not cooperate to the best of its ability and, therefore, that an adverse inference was justified.  First, the record wholly contradicts Defendants-Appellees' claim that the system used by SMSD in the ordinary course of business was inadequate for commercial purposes.  Second, the record disproves Defendants-Appellees' claim that Salzgitter "chose" not to identify the manufacturer for each of the 28,000 sales.  Without substantial evidence supporting these claims, the Department's application of AFA cannot stand.  *See*, *e.g.*, *Hyundai Heavy Indus. Co., Ltd. v. United States*, 393 F. Supp. 3d 1293, 1316-17 (Ct. Int'l Trade 2019) (concluding that the Department's finding that a respondent "failed to provide requested information . . . and failed to act to the best of its ability is unsupported by substantial evidence.  Accordingly, Commerce's decision to apply an adverse inference was not in accordance with law."), *aff'd Hyundai Elec. & Energy Sys. V. United States*, 2022 U.S. App. LEXIS 22235 (Fed. Cir. Aug. 11, 2022) (nonprecedential).

4

### A. Defendants-Appellees' Claims of Inadequate Recordkeeping Are Not Supported by Substantial Evidence

Defendants-Appellees characterize Salzgitter's records as inadequate and claim that such inadequacy supported the use of an adverse inference. *See*, *e.g.*, U.S. Br. at 28; Nucor Br. at 22; SSAB Br. at 23. For example, the Government repeats the Department's assertion that SMSD "should have reasonably anticipated being required to provide" manufacturer identities "to its customers for quality assurance and warranty claims." U.S. Br. at 7, 28. Nucor and SSAB, for their part, characterize Salzgitter's recordkeeping as "poor" and "sloppy." *See* Nucor Br. at 22; SSAB Br. at 23.

These characterizations are merely opinions, which are not supported by evidence. The Government simply quotes the *Final Determination*, which likewise did not cite to record evidence regarding what a global steel distributor "should" do. *See* U.S. Br. at 7, 28; Appx45; Salzgitter Br. at 33. Similarly, Nucor and SSAB fail to cite to record evidence establishing their claim that SMSD's recordkeeping was "sloppy."

Moreover, record evidence uniformly contradicts Defendants-Appellees' characterizations. The record establishes that SMSD did, in fact, have a system that was perfectly adequate for providing customers with manufacturer information in response to "quality assurance and warranty claims." *See* Appx45. In its responses, Salzgitter explained that "steel trading businesses {such as SMSD} traditionally do

not systemically track the producer/supplier of the product they are selling," because customers typically do not "require the knowledge of the original supplier" and only occasionally request such information in the context of specific, individual quality and warranty claims. *See* Appx6789; Appx7107. At verification, the Department confirmed that SMSD could connect individual sales to records from the manufacturer, which is precisely what was needed by a German steel distributor to meet its customers' demands in the ordinary course of business. *See* Appx11313, Appx11322-11323 (recognizing that Salzgitter maintained sales and manufacturer information in two separate electronic systems and could link them through a manual exercise for specific sales). The fact that the affiliated reseller of the other respondent in this case, Dillinger (as well as the affiliated reseller of the respondent in *Dillinger France S.A. v. United States*) kept similar records is further evidence that Salzgitter's records were adequate for the needs of a European steel distributor in the ordinary course of business. *See* Appx76; Appx122.

Defendants-Appellees repeatedly (although unintentionally) acknowledge the adequacy of SMSD's system for commercial purposes. *See* U.S. Br. at 10, 25, 30 (noting that "at verification, Salzgitter was able to retrieve the identity of a manufacturer within minutes.") (citation omitted); Nucor Br. at 6, 16, 23-26; SSAB Br. at 22, 33-34, 43-44; *see also* Appx11313, Appx11322-11323; Appx8237-8239

(verification report and questionnaire response confirming that manual identification of the manufacturer for a single sale took approximately 10 minutes).

As discussed further below, the record establishes that SMSD's system was not set up to electronically link all sales during a year to the manufacturer. *See infra* Section I.B; *see also*, *e.g.*, Salzgitter Br. at 9-10, 35. As a result, despite having maximized its systems to make this linkage, SMSD still was unable to electronically link 28,000 sales. The Department verified that this was the case. *See id.* at 12-13; Appx 11313, Appx11322-11323; *see also* Appx8237-8239. The capacity to make this connection on such a massive scale was not relevant to SMSD's ability to meet customers' demands in the ordinary course of business for "quality assurance and warranty claims." It was relevant ***only*** to participating in an antidumping investigation.

There was no reason that Salzgitter "should" have known it would be subject to an antidumping investigation. It had no notice of a pending antidumping investigation, *see* Appx8046, and Defendants-Appellees do not claim otherwise. As this Court has made clear, the Department may use an adverse inference "only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made{.}" *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1383 (Fed. Cir. 2003). This requires an "objective showing that a reasonable and responsible" respondent "would have known that the requested

information was required to be kept and maintained under the applicable statutes, rules, and regulations" for antidumping proceedings. *See id.* at 1382. Consistent with this, the Department has stated that it is "not the Department's policy to penalize respondent companies for a failure to maintain and produce documents that they are not required to maintain in the ordinary course of their business." *Certain Steel Grating from the People's Republic of China*, 75 Fed. Reg. 32,362 (June 8, 2010) (final CVD determ.), accompanying Issues and Decision Memorandum at 69. Yet, that is exactly what the Department did with Salzgitter.

Indeed, both the courts and the Department have distinguished between experienced respondents and first-time respondents in assessing their degree of cooperation. *Compare*, *e.g.*, *Ghigi 1870 S.P.A. v. United States*, 577 F. Supp. 3d 1338, 1342 (Ct. Int'l Trade 2022); *Huong Vong Corp. v. United States*, 482 F. Supp. 3d 1321, 1352 (Ct. Int'l Trade 2021); *and Diamond Sawblades Manufacturers' Coalition v. United States*, 2018 Ct. Intl. Trade LEXIS 155 at *15 (Oct. 23, 2018) (explaining that an "experienced respondent would reasonably foresee the need to maintain" information required by the Department in an antidumping proceeding), *with Certain Steel Concrete Reinforcing Bars from Latvia*, 68 Fed. Reg. 71,067 (Dep't Commerce Dec. 22, 2003) (final AD results), accompanying Issues and Decision Memorandum at 4-5 (explaining that the application of AFA was not warranted because "as a new company, ASC did not have the proper record-keeping

8

system in place to meet the Department's reporting requirements . . . . We expect that in future reviews ASC will have had sufficient time to establish its record keeping procedures in full awareness of the Department's reporting requirements."). The Department nevertheless failed to consider Salzgitter's lack of experience in assessing its level of cooperation.

Defendants-Appellees' claims are also at odds with the Department's treatment of steel resellers in other similar cases. The Department has repeatedly confronted the issue of a steel reseller not being able to link its sales to its purchases from the manufacturer – with the notable difference that, in those cases, it did not apply AFA. For example, in the antidumping investigation of CTL Plate from Japan ("*CTL Plate from Japan*"), the Department found that, while the "downstream sales from {the respondent KSC's} resellers/processors constitute a substantial portion of home market sales . . . . these affiliates cannot report their downstream sales" in part because "the affiliates are unable to 'systematically distinguish' CTL plate produced by KSC from that produced by other manufacturers{.}" *Certain Cut-To-Length Carbon-Quality Steel Plate Products from Japan*, 64 Fed. Reg. 73,215, 73,225 (Dep't Commerce Dec. 29, 1999) (final AD determ.). Moreover, as in the instant case, the Department confirmed the respondent's reporting limitations at verification. *See id.* Yet, in *CTL Plate from Japan*, the Department refused to apply AFA. *See id.* at 73,223-73,225 (rejecting Petitioners' argument that, "since KSC

incorrectly claimed that the affiliated resellers/processors could not identify KSC as the manufacturer of its purchased plate and did not report downstream sales to the best of its ability, the Department should apply adverse facts available").

Similarly, in the antidumping investigation of structural steel beams from Germany ("*Structural Steel Beams from Germany*"), the Department accepted the fact that, like Salzgitter and SMSD in the instant case, neither the respondent "nor its resellers maintain any sales record-keeping system that would allow for a systematic and timely identification" that could "link historical sales records to their purchases from the producing mills." *Structural Steel Beams from Germany*, 67 Fed. Reg. 35497 (Dep't Commerce) (May 20, 2002) (final AD determ.), accompanying Issues and Decision Memorandum at Comment 3.  And like in the instant case, the Department found:

> Our verification confirmed that SWT does not have the ability to provide the sales information for its affiliated resellers' sales within the time constraints of this investigation, except for the relatively small number of such sales shipped directly from the mill to the unaffiliated customers.

*See id.*  Unlike in the instant case, however, the Department concluded that there was "no basis to apply adverse facts available." *Id.*

And, in an investigation of CTL plate from Austria concurrent with the investigation at issue in this case, the Department found that an affiliated reseller of the respondent had "record-keeping deficiencies" related to its "ability to track

inventory and sales . . . based on their country of origin . . . ." *See Certain Carbon and Alloy Steel Cut-To-Length Plate from Austria*, 82 Fed. Reg. 16,366 (Dep't Commerce Apr. 4, 2017) (final AD determ.), accompanying Issues and Decision Memorandum at 52-53. Rather than conclude that the respondent failed to cooperate because it should have known better, the Department instructed the affiliated reseller to "improve its ability to track inventory and sales" for any future segments of the proceeding. *See id.*

Taken together, these examples demonstrate the Department's consistent recognition that steel resellers often do not maintain electronic systems enabling them to link their sales to purchases from the manufacturer. In each case, the Department recognized such limitations and declined to draw an adverse inference. The Department reached the opposite conclusion for Salzgitter. Such inconsistent treatment is inherently unreasonable. An "agency determination . . . is *ipso facto* unreasonable, and . . . arbitrary when it . . . treats similar situations in dissimilar ways." *SunEdison, Inc. v. United States*, 179 F. Supp. 3d 1309, 1316 (Ct. Int'l Trade 2016) (citations, internal quotations, and brackets omitted); *see also*, *e.g.*, *Anderson v. United States Sec'y of Agric.*, 462 F. Supp. 2d 1333, 1339 (Ct. Int'l Trade 2006) (explaining that a "principal justification for the administrative state is that 'in areas of limitless factual variations, like cases will be treated alike.'") (quoting *Nat'l*

11

*Muffler Dealers Ass'n v. United States*, 440 U.S. 472 (1979); *S. Shore Hosp., Inc. v. Thompson*, 308 F.3d 91, 101 (1st Cir. 2002)).

In sum, the record establishes that, contrary to Defendants-Appellees' unsupported claims, Salzgitter had a system in place that was adequate for its commercial needs. While it lacked an electronic system to link the tens of thousands of sales made during a year, that capability was not needed in the ordinary course of business, but only to participate in an antidumping investigation of which it had no notice. This, combined with the Department's recognition in numerous other cases that steel resellers do not typically possess such a capability, means that it was not reasonable to expect more "forthcoming" responses from Salzgitter. *See Nippon Steel*, 337 F.3d at 1382-83. Therefore, the Court should hold that the Department's application of AFA to Salzgitter was incorrect.

### B.    Substantial Evidence Establishes that Salzgitter Made Every Reasonable Effort to Comply with the Department's Request

Defendants-Appellees claim that that Salzgitter did not expend "maximum" effort to locate the manufacturer information in its records. *See* U.S. Br. at 21, 29, Nucor Br. at 7, 9, 20, 24; SSAB Br. at 22-23, 45, 50. Here too, substantial evidence disproves their arguments. And, if Defendants-Appellees are arguing that the Court's ruling in *Nippon Steel* required SMSD to spend thousands of hours manually attempting to link documents, they are mistaken.

The question of what constitutes "maximum" effort is fact-intensive and context-specific. In *Nippon Steel*, the Court explained that, to apply an adverse inference, in addition to the "objective" showing that the Department must make regarding the records that a reasonable respondent would know to maintain, the Department must make a "subjective showing" that the respondent failed "to put forth its maximum efforts to investigate and obtain the requested information from its records." 337 F.3d at 1382-83. This "subjective component of the 'best of its ability' standard judges what constitutes the maximum effort that a particular respondent is capable of doing{.}" *Ghigi 1870 S.P.A.*, 577 F. Supp. 3d at 1341 (emphasis added) (quoting *Nat'l Nail Corp. v. United States*, 390 F. Supp. 3d 1356, 1373 (Ct. Int'l Trade 2019)).

Here, the record clearly shows that Salzgitter put forth its maximum effort to obtain the information at issue, based on the capabilities and limitations of the systems kept in the ordinary course of business. As explained in Salzgitter's opening brief, *see* Salzgitter Br. at 25, Salzgitter timely submitted 100 percent of the home-market sales for which the manufacturer could be identified using the electronic systems maintained in the ordinary course of business. Appx11351-11378. Then, to maximize the data that could be submitted, SMSD created new programs to link data kept in its systems in the ordinary course of business. Appx7107-7111. Contrary to Defendants-Appellees' portrayals, SMSD did not simply give up and

13

report whatever was easily available. *See*, *e.g.*, U.S. Br. at 6, 18; SSAB Br. at 49 (all alleging that Salzgitter "chose" not to report relevant information). And, Salzgitter described in detail and documented the steps it took to identify the manufacturer for SMSD's resales of CTL plate. Appx7107-7111. Defendants-Appellees are notably silent regarding these extensive efforts.

Salzgitter went further than simply explaining what it had done. It discussed in detail and documented why it was not reasonably possible to conduct a manual review of the remaining 28,000 sales for which it had not identified the manufacturer. Salzgitter calculated that reporting the manufacturer for the additional sales would have required a manual process that it calculated would have taken at least 4,667 hours – more than two years for two people working full-time at the task. Appx8238-8240. The Department verified this calculation. *See* Appx11313, Appx11322-11323; Appx8237-8239.

In its determination, the Department did not specify what more Salzgitter should have done. In particular, the Department did not expressly conclude that Salzgitter should have manually attempted to link the documents for the 28,000 sales without the manufacturer. *See generally* Appx43-46. Yet, this would have been the only course of action available to Salzgitter, and ultimately serves as the basis for Defendants-Appellees' claims that Salzgitter did not make its maximum effort. Such claims cannot be squared with the statute and its legislative history. The Statement

of Administrative Action ("SAA")[1] emphasizes that a respondent's "accounting systems" and "computer capabilities" are a relevant consideration when assessing its ability to respond to a request for information, and that the term "{c}omputer capabilities relates to ***the ability to provide requested information in an automated format without incurring an unreasonable extra burden or expense***." *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-826(I), at 865, reprinted in 1994 U.S.C.C.A.N. 4040, 4194 (emphasis added, internal quotation marks omitted).

Indeed, the Department has elsewhere rejected unreasonable assertions like those made now by Defendants-Appellants. For example, in *Structural Steel Beams from Germany*, the respondent "SWT stated that, for some of its resellers, it may take as long as two years to report the necessary data and, for others, it would be impossible." *Structural Steel Beams from Germany*, 67 Fed. Reg. 35497 (Dep't Commerce) (May 20, 2002) (final AD determ.), accompanying Issues and Decision Memorandum at Comment 3. The Department verified these facts, finding that it was not possible for SWT to provide the information "within the time constraints of

---

[1] The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act" (*i.e.*, including the antidumping statute) "in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512.

this investigation" and concluded that there was "no basis to apply adverse facts available." *Id.* Likewise, in *CTL Plate from Japan*, the Department concluded that the need to go beyond computerized information to conduct a manual search process "is unreasonably burdensome given the time constraints of an antidumping investigation" and, therefore, refused to apply an adverse inference. *Certain Cut-To-Length Carbon-Quality Steel Plate Products from Japan*, 64 Fed. Reg. 73,215, 73,225 (Dep't Commerce Dec. 29, 1999) (final AD determ.). There is no difference between these cases and the instant one.

Defendants-Appellees claim that *CTL Plate from Japan* does not apply to Salzgitter's circumstances due to "technological advancement." U.S. Br. at 29; Nucor Br. at 26-27. However, as Salzgitter has already explained, technology is not the issue. the issue is the burden of conducting a massive manual search once all technological means have been exhausted. Salzgitter Br. at 36. A manual search of documents for 28,000 sales was just as unreasonably burdensome in 2016 (when the investigation subject to this appeal was conducted) as it was in 1999 (when the *CTL Plate from Japan* investigation was conducted). *Id.*

SSAB quotes this Court in *Stupp Corp. v. United States*, claiming that the Department is not required to apply "rules with Procrustean consistency in every case" and, therefore, is not bound by *CTL Plate from Japan*. SSAB Br. at 40 (quoting 5 F.4th 1341, 1350-51 (Fed. Cir. 2021)). This Court's proclamation in

*Stupp*, however, addressed consistency in the Department's application of procedural rules – unlike this case, which concerns the Department's compliance with a statutory obligation. *See Stupp*, 5 F.4th at 1350-51. SSAB's reliance on *Stupp* is therefore misplaced. In any event, the claim that the Department should not be "bound" by *CTL Plate from Japan* is refuted by the well-established maxim that agencies must treat similar situations in similar ways. *See SunEdison, Inc.* 179 F. Supp. 3d at 1306; *Anderson* 462 F. Supp. 2d at 1339.

Finally, and like the CIT, Defendants-Appellees cite to the Court's decision in *Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir. 2018), claiming that it and this case are comparable in terms of assessing the respondent's "maximum" efforts to cooperate. *See Dillinger I*, 399 F. Supp. 3d at 1255; U.S. Br. at 31; Nucor Br. at 24-25; SSAB Br. at 54. Nucor in particular claims that Salzgitter, like the respondent in *Maverick Tube* (Borusan), did not "put forth its maximum effort" because it had information, but did not provide it. Nucor Br. at 24. Nucor ignores the extensive evidence of Salzgitter's efforts to provide as much information as possible using its electronic systems, and the verified calculations showing that providing manufacturer information for the remaining sales would have involved thousands of hours of manual work. *See* Appx7107-7111; Appx8238-8240; Appx8329-8346; Appx11313, Appx11322-11323; Appx11351-11378. In contrast to the detailed explanations and calculations provided by Salzgitter, Borusan in

*Maverick Tube* simply stated that there was a burden associated with submitting the requested information and stopped there. *See* 857 F.3d at 1361. As a result, the Court found that Borusan's "explanation of its difficulties does not constitute a statement that it was unable to provide the information." *Id.* The "explanation" in *Maverick Tube* bore no resemblance to the detailed, verified evidence provided by Salzgitter.

Furthermore, unlike Borusan, Salzgitter provided the Department with three reasonable means to fill the gap in the manufacturer data. *See* Salzgitter Br. at 39; *Maverick Tube Corp.*, 857 F.3d at 1361. Nucor claims that these options are illegitimate because they were not "alternative means for providing the data{.}" Nucor Br. at 25. Nucor's comment makes little sense. If there were no gap in the record, there would not have been a need to fill it. The fact that there was a gap does not negate the reasonableness of the alternatives proposed to fill it. Ultimately, the fact remains that Salzgitter provided three reasonable alternatives to fill the gap in the manufacturer data, demonstrating its efforts to cooperate, which is a second way in which Salzgitter's actions were substantially different from Borusan's. *Compare* Salzgitter Br. at 14, 39, 42 *with Maverick Tube Corp.*, 857 F.3d at 1361.

In light of the above and consistent with this Court's precedent in *Nippon Steel* and the Department's practice in cases such as *Structural Steel Beams from Germany*

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

and *CTL Plate from Japan*, the Department's determination that Salzgitter did not act to the best of its ability is not supported by substantial evidence.

## II. THE DEPARTMENT ERRED IN NOT USING AN OPTION PROPOSED BY SALZGITTER TO INTEGRATE THE SALES IN THE SEPARATE DATABASE INTO THE DUMPING CALCULATION

The Department should have used one of the three options proposed by Salzgitter[2] to integrate the verified data in the Separate Database into the dumping calculation.[3] *See* Salzgitter Br. at 14.  As an initial matter, the presence of those options on the record negated the statutory basis for the Department to use any form of FA, because the data were "not so incomplete" that they "could not serve as a reliable basis" for calculating the dumping margin.   Salzgitter Br. at 29-30. Alternatively, because the Department was not justified in drawing an adverse inference, the Department should have used one of the options as neutral FA. Neither the Department nor Defendants-Appellees have provided a reasonable

---

[2]  The options proposed by Salzgitter were: (1) treat all sales in the Separate Database as if Salzgitter was ***not*** the manufacturer; (2) treat all sales in the Separate Database as if Salzgitter ***was*** the manufacturer; or (3) treat [ Sales Info] percent of the quantity of each sale as if Salzgitter was the manufacturer, consistent with the fact that [ Sales Info] percent of purchases made by SMSD during the period of investigation ("POI") were purchases of Salzgitter-produced CTL plate. *See* Salzgitter Br. at 14; Appx11405-11406, Appx14428-11430; Appx11570-11571.

[3]   *See* Salzgitter Br. at 13-14 ("When calculating a dumping margin, the Department's programs normally compare U.S. and home-market sales of the product under investigation produced by the same manufacturer or 'collapsed' group of manufacturers.") (citing Appx11659; Appx11866; Appx11869).

explanation supported by substantial evidence as to why none of the options could be so used, in particular Option 3.

The CIT characterized the three options as "speculative," without describing how; and suggested that they were not statistically valid, without referencing any statistical principle that was violated.  *See Dillinger I*, 399 F. Supp. 3d at 1255; Salzgitter Br. at 38-39 (describing and explaining flaws inherent to the CIT's citation to a hypothetical methodology involving a "sufficient and randomized sample size" and "statistically valid extrapolation").  Defendants-Appellees largely repeat the CIT's conclusions.  The Government argues that the options proposed by Salzgitter were "self-serving" and that Salzgitter should have provided some sort of "robust statistical analysis."  *See* U.S. Br. at 10-11, 26, 30-31, 33.  Nucor claims that Salzgitter did not demonstrate that the options "were accurate or representative." Nucor Br. at 28-29.  And, SSAB concludes that the options were speculative.  *See* SSAB Br. at 43, 54-55.

An examination of the options presented by Salzgitter belies the CIT's and Defendants-Appellees' conclusions.  First, the diversity of the options proposed by Salzgitter, coupled with the fact that they all yielded the same result, clearly contradicts the characterization of the options as "self-serving."  The options suggested by Salzgitter were for the Department to use all of the sales, none of the sales, or something in the middle.  Yet, under any of these options, the Department

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

would have calculated a zero percent or *de minimis* dumping margin for Salzgitter. *See, e.g.*, U.S. Br. at 15 (noting that, on remand, "Commerce observed that Salzgitter's three alternatives for accounting for the missing manufacturer data also resulted in a zero or *de minimis* margin, a speculative and self-serving result that the trial court had 'already rejected.'") (citing Appx121, Appx196). It is unclear how such diverse options could have been "self-serving" in their totality. The fact that the inclusion or exclusion of these sales in their entirety or in part did not affect the outcome speaks to the fact that the proposed options were ***not*** "self-serving." As Salzgitter explained to the Department on remand, "regardless of how these sales could be used in Salzgitter's margin, Salzgitter does not receive a more favorable result than it would have if it were able to determine the manufacturer for these sales." Appx13138.

Second, Salzgitter's proposed options were not "speculative." *See, e.g.*, *Dillinger I*, 399 F. Supp. 3d at 1255; U.S. Br. at 10, 15; Nucor Br. at 29; SSAB Br. at 54. The Department verified the sales data reported in the Separate Database, in particular, the sales prices. *See* Salzgitter Br. at 13; Appx11322-11323; Appx9463-9513 (Verification Exhibit SMSD-11); Appx9574-9603 (Verification Exhibit SMSD-15). Furthermore, with respect to Option 3, Salzgitter calculated the [Sales Info] percent ratio on the basis of the quantity information contained in the Separate Database, the contents of which the Department likewise verified. *See* Appx11316

21

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

(noting the Department's verification of "the quantity and value of SMSD's POI purchases"); Appx11406, Appx11430 (Salzgitter's administrative case brief and appended exhibit discussing and demonstrating calculation of the [Sales Info] percent ratio). The only element of the Separate Database that the Department did not verify was the identity of the manufacturer, because this element was missing. Thus, 100 percent of the data used under each of the options proposed by Salzgitter was verified. There is no evidentiary support for the assertion that any of the options were "speculative." This conclusion is reinforced by the fact that the dumping margin calculated using each of the three highly diverse options – all, none, or some – was the same.

Third, the CIT's and Defendants-Appellees' claim that Salzgitter's Option 3 was not statistically valid is clearly incorrect. Option 3 "was based on the full universe of SMSD's actual purchases during the period" and adjusted "proportionately . . . to take account of the relative quantities of (a) possible Salzgitter-produced plate to (b) the total plate in the database" (*i.e.*, by [Sales Info] percent). Therefore, Option 3 "was at least as accurate as, and likely more accurate than, a random sample." Appx11406; Appx13137-13138; Salzgitter Br. at 38-39.

The Department's determinations in other cases confirms that Option 3 was a reasonable, representative, and non-speculative approach to dealing with the sales for which a manufacturer could not be identified. Specifically, the Department has

dealt with other cases where downstream affiliated resellers commingled subject merchandise (*i.e.*, produced in the country subject to the investigation) with non-subject merchandise (*i.e.*, produced in other countries). In such cases, parties have proposed including sales in the respondent's sales database based on the proportion of subject merchandise in its commingled inventory, and the Department has accepted that approach. *See*, *e.g.*, *Mattresses from Indonesia*, 86 Fed. Reg. 15,899 (Dep't Commerce Mar. 25, 2021) (final AD determ.), accompanying Issues and Decision Memorandum at 8-9 (treating sales as being of subject merchandise based on "quarterly ratios, calculated based on the proportion of mattresses purchased from Indonesia during the POI, to the universe of Zinus U.S.'s warehouse sales"); *Canned Pineapple Fruit from Thailand*, 69 Fed. Reg. 56,014 (Dep't Commerce Aug. 13, 2004) (final AD results), accompanying Issues and Decision Memorandum at 5-9 (using a "shipment ratio" based on "the ratio of Thai-origin merchandise to Philippine-origin merchandise entering each warehouse by product" to include or exclude, as appropriate, certain sales from the respondent's U.S. sales reporting).

The circumstances in these cases, which were highly similar to those here, establish that Salzgitter's Option 3 was reasonable. Further, the Department's acceptance of similar approaches in other cases demonstrates that the CIT and Defendants-Appellees are incorrect in claiming that the only acceptable approach was some hypothetical, random sample. *See Dillinger I*, 399 F. Supp. 3d at 1255;

23

U.S. Br. at 10, 31; SSAB Br. at 54. A random sample could have been a reasonable approach as well, but it was not the only reasonable approach available. In sum, the Department erred in not using Option 3 to integrate the sales information in the Separate Database into the dumping margin calculation.

**III.  DEFENDANTS-APPELLEES FAIL TO SHOW THAT THE DEPARTMENT'S CHOICE OF AFA WAS CONSISTENT WITH THE STATUTE OR SUPPORTED BY SUBSTANTIAL EVIDENCE**

If the Court affirms the Department's application of an adverse inference, then it should reject the form of partial AFA chosen by the Department as unsupported by substantial evidence and contrary to law. *See* Salzgitter Br. at 40-44. Importantly, the Department may only apply partial AFA "with respect to the specific information that a respondent failed to provide." *Shandong Huarong Mach. Co. v. United States*, 435 F. Supp. 2d 1261, 1273 (Ct. Int'l Trade 2006). Here, the missing information was the identity of the manufacturer. This Court has also made clear that the Department may not use AFA as a means to arrive at "punitive" or "aberrational" dumping margins. *F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000).

In its opening brief, Salzgitter demonstrated that the form of partial AFA used by the Department was both too broad (*i.e.*, by replacing all sales prices with an allegedly "highest non-aberrational net price," despite the fact that the Department had no basis to question the reliability of the reported, verified sales prices) and that

the price selected as partial AFA was aberrational.  *See* Salzgitter Br. at 40-44.

Defendants-Appellees offer various responses, *see* U.S. Br. at 32-35; Nucor Br. at

30-36; SSAB Br. at 57-67, all of which are incorrect as a matter of fact, law, or both.

First, as Salzgitter explained, the Department was not authorized under the

statute to disregard verified prices for the sales in the Separate Database and replace

them with the so-called "highest non-aberrational net price" because manufacturer

information, not price information, was missing.  *See* Salzgitter Br. at 40-42.

Nucor attempts to counter this argument by citing to a CIT case, *Diamond

Sawblades Manufacturers' Coalition v. United States*, in which the Department

found that the failure to "reliably identify the country of origin . . . means that the

corresponding price data in the U.S. sales database is also unreliable{,}" and

otherwise seeks to distinguish this Court's decision in *Zhejiang Dunan Hetian Metal

Co. v. United States*, 652 F.3d 1333 (Fed. Cir. 2011), cited by Salzgitter its opening

brief.  *See* Nucor Br. at 32-33 (quoting *Diamond Sawblades*, 547 F. Supp. 3d 1323,

1330-31 (Ct. Int'l Trade 2021)); Salzgitter Br. at 41.

However, *Diamond Sawblades* is readily distinguishable from this case.  In

that case, the country of origin was at issue, rather than manufacturer.  As the CIT

recognized, there is an inherent problem when prices for subject merchandise

originating in a non-market economy such as China are mixed with prices for non-

subject merchandise originating in a market economy such as Thailand.  *See*

*Diamond Sawblades*, 547 F. Supp. 3d at 1330-31 ("Commerce explained that . . . there was a possibility that the margin calculation could involve sales of Thai sawblades . . . . Thus, Commerce reasonably concludes that the inability to reliably identify the country of origin . . . means that the corresponding price data in the U.S. sales database is also unreliable because Commerce cannot accurately pair price data with the correct country of origin."); Appx11322-11323. Such concerns do not exist with respect to Salzgitter, where the issue related to distinguishing among CTL plate made by other German manufactures.

Moreover, Nucor ignores far more relevant CIT precedent in *Dillinger France*, which concerned a parallel investigation to the one at issue in this appeal and the exact same reporting issue. There, the CIT recognized that "the reliability of the reported sales prices" was not called into question where the respondent could not identify the manufacturer for certain sales and there was "no informational gap in the sale prices for Commerce to fill." *Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349, 1364 (Ct. Int'l Trade 2018). Following a remand by the CIT, the Department "treated the relevant transactions as Dillinger-produced plate" and "relied on the sales prices as reported" (*i.e.*, identical to Salzgitter's proposed Option 2 here) – which the CIT affirmed. *See Dillinger France S.A. v. United States*, 393 F. Supp. 3d 1225, 1228-29 (Ct. Int'l Trade 2019), *aff'd in part and vacated in part on other grounds*, 981 F.3d 1318 (Fed. Cir. 2020). Indeed, although Nucor claims

26

CONFIDENTIAL INFORMATION CONTAINED IN BRACKETS HAS BEEN DELETED

that *Zhejiang Dunan* is distinguishable because this Court found in that case that "the dumping margin could still be calculated" and argues that the Department cannot do so in this case, Nucor fails to account for the fact that the Department was able to calculate a margin using the form of AFA selected in *Dillinger France*. *See* Nucor Br. at 33-34.

Second, Salzgitter challenges the Department's claim that the price selected as AFA was "non-aberrational" when the resulting overall dumping margin (with margins for individual sales ranging from negative [ Margin Info ] percent to positive [ Margin Info ] percent) was 12 times higher than the overall dumping margin using the information contained in the Separate Database (with margins for individual sales ranging from negative [ Margin Info ] percent to positive [ Margin Info ] percent). *See* Salzgitter Br. at 43; Appx12121; Appx13028. The Government claims that (1) Salzgitter "entirely failed to raise this argument before the trial court" and consequently, (2) Salzgitter "waived" this argument. U.S. Br. at 33 (citing *Sage Prods. v. Devon Indus, Inc.*126 F.3d 1420, 1426 (Fed. Cir. 1997)).

Both of the Government's conclusions are wrong. Salzgitter explicitly raised this issue before the CIT in its comments regarding the Department's remand. *See* Consolidated Pls.' Resp. Comments Supp. Remand Determination, CIT Consol. No. 17-00158, ECF Nos. 106, 107, at 12 (Dec. 18, 2019). Furthermore, the Government's cited authority, *Sage Prods.*, is not applicable here because the Court

27

reviews the Department's decisions *de novo*, U.S. Br. at 19, 30; *see also*, *e.g. JTEKT Corp. v. United States*, 642 F.3d 1378, 1381 (Fed. Cir. 2011), whereas *Sage Prods.* related to judicial review of "claim interpretations and grants of summary judgment" in a patent appeal. 126 F.3d at 1426.

Third, Salzgitter explained that the so-called "non-aberrational net price" was, in fact, aberrational, given that the product at issue was so dissimilar in physical characteristics from any product sold to the United States that it was not compared to a single U.S. sale in the dumping margin calculation. *See* Salzgitter Br. at 42-43; Appx5756; Appx8329-8330, Appx8240; Appx12127-12130; Appx12171-12174. Nucor simplistically reduces and mischaracterizes such record evidence to the argument that, although "the sales price selected may have been high{, this} does not render it aberrational." *See* Nucor Br. at 35. This Court should reject Nucor's attempts to downplay the record evidence establishing the aberrational nature of the sales price at issue.

Finally, SSAB claims that the Department's choice of AFA was necessary to ensure that Salzgitter did not receive a more favorable outcome than it would have, had it cooperated. *See*, *e.g.*, SSAB Br. at 55, 58-59, 62. This argument is as unpersuasive here as it is in other contexts, discussed above in Section II, and does not justify applying a form of AFA that replaces verified record data with a punitive, aberrational price that is wholly unrelated to the gap in the record. Furthermore, the

record in this case clearly demonstrates that Salzgitter would not have benefited by using the verified sales prices for the sales in the Separate Database, despite the fact that the manufacturer was missing. That is, applying any of the three options provided by Salzgitter, covering the full spectrum from including all of the sales for which manufacturer information was missing, to including some, or including none, yielded the same result. Under no circumstance was Salzgitter better off by not cooperating than if it had been able to identify the manufacturer for all of the sales; the data establish this key fact.

Consequently, given that the use of this aberrational price as AFA was neither remedial nor otherwise induced Salzgitter to "cooperate," it was clearly punitive. This Court has unequivocally stated that such outcomes are impermissible. *See*, *e.g.*, *KYD Inc. v. United States*, 607 F.3d 760, 767 (Fed. Cir. 2010) ("The antidumping laws are remedial not punitive . . . and an antidumping rate based on AFA is designed to provide respondents with an incentive to cooperate, not to impose punitive . . . margins.") (citations and internal quotation marks omitted).

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the foregoing reasons, the Department's conclusions in the *Final Determination* regarding the application of partial AFA to Salzgitter, as well as the choice of partial AFA, are unsupported by substantial evidence on the record and otherwise not in accordance with law. Salzgitter respectfully requests that the Court reverse the CIT's decision on these issues, and remand to the Department with instructions to issue a revised determination, consistent with the opinion of the Court.

Respectfully submitted,

 /s/ David E. Bond
David E. Bond
Ron Kendler
Allison Kepkay

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiff-Appellants Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH

May 30, 2024

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS**

**CAFC Court No. 2024-1219**

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

    ☑    the filing has been prepared using a proportionally-spaced typeface and includes 6,526 words.

    ☐    the filing has been prepared using a monospaced typeface and includes _____ lines of text.

    ☐    the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: May 30, 2024          Signature:      /s/ David E. Bond

                                 Name:        David E. Bond

(Form 31)

## CERTIFICATE OF CONFIDENTIAL MATERIAL

### CAFC Court No. 2024-1219

The foregoing document contains 4 unique words (including numbers) marked confidential.

☐ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: May 30, 2024          Signature:      /s/ David E. Bond

                            Name:          David E. Bond