# United States Court of Appeals for the Federal Circuit

---

**AG DER DILLINGER HUTTENWERKE, FRIEDR. LOHMANN GMBH, THYSSENKRUPP STEEL EUROPE AG,**
*Plaintiffs*

**ILSENBURGER GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER MANNESMANN INTERNATIONAL GMBH,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, SSAB ENTERPRISES LLC, NUCOR CORPORATION,**
*Defendants-Appellees*

---

2024-1219

---

Appeal from the United States Court of International Trade in Nos. 1:17-cv-00158-LMG, 1:17-cv-00160-LMG, 1:17-cv-00162-LMG, Senior Judge Leo M. Gordon.

---

Decided: June 17, 2025

---

RON KENDLER, White & Case LLP, Washington, DC, argued for plaintiffs-appellants. Also represented by

DAVID EDWARD BOND, ALLISON KEPKAY.

KARA WESTERCAMP, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by BRIAN M. BOYNTON, TARA K. HOGAN, PATRICIA M. MCCARTHY; AYAT MUJAIS, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

JEFFREY DAVID GERRISH, Schagrin Associates, Washington, DC, argued for defendant-appellee SSAB Enterprises LLC. Also represented by NICHOLAS J. BIRCH, SAAD YOUNUS CHALCHAL, CHRISTOPHER TODD CLOUTIER, ELIZABETH DRAKE, WILLIAM ALFRED FENNELL, LUKE A. MEISNER, ROGER BRIAN SCHAGRIN.

ALAN H. PRICE, Wiley Rein, LLP, Washington, DC, for defendant-appellee Nucor Corporation. Also represented by STEPHANIE MANAKER BELL, TESSA V. CAPELOTO, STEPHEN JOSEPH OBERMEIER, ADAM MILAN TESLIK, MAUREEN E. THORSON, ENBAR TOLEDANO, CHRISTOPHER B. WELD.

---

Before LOURIE, DYK, and REYNA, *Circuit Judges*.

DYK, *Circuit Judge*.

In this antidumping case, appellants Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, and Salzgitter Mannesmann International GmbH (collectively, “Salzgitter”) appeal from a decision of the U.S. Court of International Trade (“Trade Court”) sustaining the Department of Commerce’s application of partial adverse facts available to impose a final dumping margin of 22.9 percent on Salzgitter’s steel plate products.

Commerce applied an adverse inference based on its determination that Salzgitter failed to cooperate to the best of its ability with one of Commerce's requests for information. We hold that, although Commerce's information request imposed an unreasonable burden on Salzgitter, Commerce's application of an adverse inference was permissible because Salzgitter failed to propose reasonable alternative forms of the missing information as required by statute. We reject Salzgitter's other contentions and accordingly affirm.

## BACKGROUND

### I

In an antidumping duty proceeding, Commerce must determine whether a foreign exporter's merchandise is being, or is likely to be, sold "in the United States at less than its fair value." *Risen Energy Co. v. United States*, 122 F.4th 1348, 1351 (Fed. Cir. 2024) (quoting *Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1321 (Fed. Cir. 2020)). When merchandise is sold at less than fair value, Commerce calculates a "dumping margin" for each entry of merchandise subject to Commerce's review. 19 U.S.C. § 1675(a)(2). The dumping margin is "the amount by which the normal value" (typically the price at which a particular piece of merchandise is sold in an exporter's home country) "exceeds the export price or constructed export price of the subject merchandise." *Id.* § 1677(35)(A); *accord id.* § 1677b(a). If an exporter's affiliated companies sell both the exporter's products and other manufacturers' products (as is the case here), Commerce must decide which home market sales are attributable to the exporter under review in order to calculate the dumping margin.

Exporters whose merchandise is subject to an antidumping investigation are obligated to provide information necessary for Commerce to reach its final antidumping determinations. *See Oman Fasteners, LLC v. United States*,

125 F.4th 1068, 1075 (Fed. Cir. 2025). Commerce gathers this information by issuing "questionnaires requesting factual information" about an exporter's business. 19 C.F.R. § 351.221(b)(2); 19 U.S.C. § 1677b(b)(2)(A)(ii). If Commerce lacks information necessary to its determination after an exporter has responded to its questionnaires, it "must 'fill in the gaps' using information otherwise available to it." *Oman Fasteners*, 125 F.4th at 1075 (quoting *BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1295 (Fed. Cir. 2019)). Where Commerce determines that an exporter "failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce may apply an adverse inference to the information otherwise available in calculating the exporter's antidumping duty margin. 19 U.S.C. § 1677e(b).

II

Commerce initiated this antidumping investigation in 2016 to determine if antidumping duties should be imposed on cut-to-length steel plate manufacturers from twelve countries, including Germany. *See Certain Carbon and Alloy Steel Cut-To-Length Plate from Austria, Belgium, Brazil, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, the People's Republic of China, South Africa, Taiwan, and the Republic of Turkey: Initiation of Less-Than-Fair Value Investigations*, 81 Fed. Reg. 27,089, 27,089–90 (May 5, 2016). Salzgitter was chosen as a mandatory respondent, and in May 2016, received an initial questionnaire from Commerce. The initial questionnaire asked Salzgitter to report the sales of its merchandise in the United States and in its home market Germany, including the resales of its products by affiliated resellers. As part of this request, Commerce asked Salzgitter to identify the manufacturer of every plate sold by its resellers because the plates sold by those resellers included those produced by manufacturers other than Salzgitter, and Commerce needed to know which home market sales were attributable to Salzgitter.

In its initial response, Salzgitter submitted a database with the home-market sales of all its affiliated companies showing the manufacturers of the plate sold, except that it excluded some sales of one of its resellers because it was "unable to identify the manufacturer" of those plates, and identifying the manufacturer of those plates "could only be done manually." J.A. 5742.

This set in motion a lengthy back-and-forth between Salzgitter and Commerce regarding the missing manufacturer information for the sales of Salzgitter's reseller, which included five supplemental questionnaires from Commerce and corresponding responses from Salzgitter. In the end, Salzgitter was able to produce complete information for approximately 80 percent of the sales by its affiliated reseller. Salzgitter explained that it was unable to provide the manufacturer information for the remaining 20 percent of sales (28,000 sales) by its reseller because doing so would impose an unreasonable burden. Salzgitter estimated that production of the missing information, which would need to be done manually, "would take <u>at least</u> 4,667 hours, or more than two years for two people working full-time" to complete. Appellants' Br. 12 (citing J.A. 8238–40).

At the verification stage, Commerce agreed with Salzgitter that the information could be gathered only through a manual process of reconciling information from two distinct sources and agreed with Salzgitter's estimate that it would take about 5,000 hours to collect this information.

Following verification, Salzgitter acknowledged that the missing manufacturer information constituted an information gap in the record upon which Commerce was obligated to base its final determination and that Commerce would need to use information otherwise available. Salzgitter proposed three alternatives to make up for this gap. According to Salzgitter, Commerce could have: (1) attributed to Salzgitter all of the 28,000 sales missing

manufacturer information; (2) attributed none of those sales to Salzgitter; or (3) attributed the percentage of those sales to Salzgitter that reflected "the actual and verified ratio of plate purchased from Salzgitter affiliates versus other mills during" the period of investigation, i.e., the percent calculated based on the sales where the manufacturer information was identified. Appellants' Br. 14. All three approaches would have resulted in a zero percent dumping margin for Salzgitter.

On April 4, 2017, Commerce assigned Salzgitter a 22.9 percent margin. *See Certain Carbon Steel and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany: Final Determination of Sales at Less Than Fair Value*, 82 Fed. Reg. 16,360, 16,361 (Apr. 4, 2017). In its calculations, Commerce relied in part on its determination that the application of partial adverse facts available was warranted because Salzgitter failed to cooperate to the best of its ability by not supplying complete manufacturer information for its reseller's sales. Commerce explained that this information "is the type of information that a respondent should have reasonably anticipated being required to provide to its customers for quality assurance and warranty claims," and concluded that its verification demonstrated that "Salzgitter had relevant information available to it[] but determined not to invest the time in comprehensively examining its documentation in order to provide the requested information." J.A. 44–45.

Commerce declined to use any of the three alternatives proposed by Salzgitter. Instead, Commerce attributed to Salzgitter all 28,000 sales, using "the highest non-aberrational net price among" those sales. J.A. 46. Commerce maintained the 22.9 percent antidumping duty for Salzgitter when it published the final results of its larger investigation. *See Certain Carbon and Alloy Steel Cut-To-Length Plate from Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan: Amended Final Affirmative Antidumping*

*Determinations for France, the Federal Republic of Germany, the Republic of Korea and Taiwan, and Antidumping Duty Orders*, 82 Fed. Reg. 24,096, 24,098 (May 25, 2017).

III

Salzgitter challenged Commerce's final determination in the Trade Court. On the parties' motions for judgment on the agency record, the Trade Court concluded that Commerce reasonably resorted to facts otherwise available because Commerce "could not determine whether to include or exclude the [disputed] plate transactions from . . . Salzgitter's margin calculation[]" due to the missing information. *AG der Dillinger Hüttenwerke v. United States*, 399 F. Supp. 3d 1247, 1253 (Ct. Int'l Trade 2019) (*Salzgitter I*). The Trade Court then considered whether it was reasonable for Commerce to apply adverse facts available based on Salzgitter's failure to cooperate.

The court sustained Commerce's decision to apply adverse facts available, finding that the record reasonably supported Commerce's determination that Salzgitter failed to cooperate to the best of its ability. *See id.* at 1254–56. Unconvinced that any of Salzgitter's three proposals for allocating the 28,000 missing sales was a reasonable alternative, the Trade Court stated that it could not "understand why Salzgitter did not just simply conduct a statistical analysis of the [missing plate sales] . . . using a sufficient and randomized sample size that was then manually matched to the missing manufacturer information." *Id.* at 1255. Such an approach, according to the Trade Court, would have better supported Salzgitter's position under the statute. *Id.* at 1256.

After two additional remands,[1] the court sustained Commerce's use of the highest non-aberrational net price among Salzgitter's downstream market sales for which there was no manufacturer information. The court found reasonable Commerce's explanation that its approach was warranted given the size of the information gap and the need to deter noncooperation. *See AG der Dillinger Hüttenwerke v. United States*, 648 F. Supp. 3d 1321, 1332–33 (Ct. Int'l Trade 2023) (*Salzgitter II*). Salzgitter appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

"We review Commerce's determinations using the same standard as the Trade Court—that is, whether those determinations are 'unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]'"

---

[1] These remands were necessary because a nearly identical issue was raised in a separate case before the Trade Court, *Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349 (Ct. Int'l Trade 2018), where the Trade Court rejected Commerce's use of the highest non-aberrational net price of an exporter's sales to fill a gap caused by missing manufacturer information. *See id.* at 1364. In *Dillinger France*, Commerce eventually attributed to the exporter all the sales with missing manufacturer information at their reported sales prices (which was, in essence, the first of Salzgitter's alternative proposals here). *See Dillinger Fr. S.A. v. United States*, 393 F. Supp. 3d 1225, 1228–29 (Ct. Int'l Trade 2019). During the remands here, Commerce explained that it did not adopt the *Dillinger France* approach for Salzgitter because the gap of missing information in Salzgitter's case (28,000 sales), greatly exceeded the number of sales in *Dillinger France*, and thus had a material impact on Salzgitter's margin, in contrast to *Dillinger France*, where it did not.

*Risen Energy*, 122 F.4th at 1353 (alteration in original) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).

I

Commerce may apply adverse facts available to fill in an information gap if it concludes that a respondent has "failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1). One purpose of applying adverse facts available is to incentivize cooperation because "Commerce lacks subpoena power" to ensure compliance. *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012). The central question presented in this case is whether Commerce may apply adverse facts available to a respondent based on its failure to cooperate after the respondent has demonstrated that full compliance with a request would pose an unreasonable burden.[2]

We have previously explained that "the 'best of its ability' standard is determined by assessing whether [a] respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). This standard neither "require[s] perfection" nor "condone[s] inattentiveness, carelessness, or inadequate record keeping." *Id.* Commerce may apply adverse facts "only under

---

[2] We see no merit to Salzgitter's argument that Commerce should not have applied facts available in the first instance. Appellants' Br. 24–30. Salzgitter effectively concedes that the manufacturer information is "critical" for a margin analysis. Appellants' Br. 29. Without this critical information, Commerce could not have fulfilled its duty to accurately calculate Salzgitter's dumping margin, so Commerce's resort to facts available was warranted under 19 U.S.C. § 1677e.

circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made." *See id.* at 1383. This obligates Commerce to "examine [a] respondent's actions and assess the extent of [a] respondent's abilities, efforts, and cooperation" throughout the proceeding. *Id.* at 1382.

The statute itself recognizes that there are times where it may be impractical for a respondent to supply information. It provides:

> If an interested party, promptly after receiving a request from [Commerce] for information, notifies [Commerce] that such party is unable to submit the information requested in the requested form and manner, together with a full explanation and suggested alternative forms in which such party is able to submit the information, [Commerce] shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party.

19 U.S.C. § 1677m(c)(1) (emphases added). Pertinent to this assessment is a respondent's "computer capabilities"—that is, the respondent's "ability to provide requested information in an automated format without incurring an unreasonable extra burden or expense." Statement of Administrative Action, Uruguay Round Agreements Act, H.R. Rep. No. 103-316, *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4195.

Although Commerce previously asserted that there is an absolute obligation for a respondent to supply all the information Commerce requests unless it is impossible to do so, Commerce acknowledged at oral argument that § 1677m(c)(1) makes clear that Commerce cannot demand information if the request would place an unreasonable burden on the respondent. Oral Arg. at 13:03–10.

Consistent with the statute, Commerce has declined to impose adverse inferences in prior cases because of the administrative burdens those requests would impose on respondents. *See Notice of Final Determination of Sales at Less Than Fair Value: Certain Cut-to-Length Carbon-Quality Steel Plate Products from Japan*, 64 Fed. Reg. 73,215, 73,218 (Dec. 29, 1999) (*CTL Japan*); *Notice of Final Determination of Sales at Less Than Fair Value: Structural Steel Beams from Germany*, 67 Fed. Reg. 35,497, 35,498–99 (May 20, 2002).

Even if a request does constitute an unreasonable burden, the respondent must still provide "suggested alternative forms" for submitting the information requested. 19 U.S.C. § 1677m(c)(1).

The issues presented are therefore: (1) whether Commerce's request for the manufacturer information of the 28,000 sales made by Salzgitter's reseller constituted an unreasonable burden; and (2) whether Salzgitter proposed reasonable alternative forms of the missing data to satisfy § 1677m(c)(1).

A

We first consider whether the collection of the missing manufacturer information would have imposed an unreasonable burden on Salzgitter. Under the statute, a respondent is the party responsible for establishing that a request constitutes an unreasonable burden. *See* 19 U.S.C. § 1677m(c)(1) (providing that a respondent must "promptly" notify Commerce of an inability to respond in order to avoid an unreasonable burden).

Commerce appears to contend that requiring Salzgitter to supply the manufacturer information for each of the 28,000 disputed sales was not an unreasonable burden because during verification, Salzgitter manually identified a manufacturer for a particular sale "within minutes." Gov't's Br. 25. The ability to retrieve relevant information

manually in a single instance says nothing about the overall burden of the request, as Salzgitter has consistently argued. Commerce has not disputed Salzgitter's calculation of the required burden, nor does Commerce seriously contest that the burden was substantial.

Commerce next defends its course of action on the ground that its treatment of Salzgitter was not inconsistent with prior determinations like *CTL Japan*, where Commerce acknowledged that a manual retrieval would have posed an unreasonable burden for the respondent. *See* J.A. 45. Commerce distinguishes from *CTL Japan* because "technological advances in electronic records management" since 1999 have "significantly reduce[d] the burden in obtaining the missing information." J.A. 45; *see also* Gov't's Br. 29.

Commerce's conclusion ignores the fact that here the missing information required manual assembly, and that technological enhancements in electronic records management could not be utilized to replace a manual effort. *See, e.g.*, J.A. 8239–40 (explaining burden); J.A. 7107–11 (demonstrating technological obstacles). As Commerce itself found at verification, the problem was that Salzgitter's reseller did not systematically track manufacturer information for each product sold, and collecting the missing information for the 28,000 disputed sales would require manual effort. *See* J.A. 11322–23. Commerce admitted that completing this manual process "would have required two people to work full-time for more than two years," Appellants' Br. 35 (citing J.A. 8239–40), noting that its "review was consistent with Salzgitter's descriptions" of the estimated time needed to complete the task. J.A. 11313.

Finally, we are unpersuaded by Commerce's argument that Salzgitter is responsible for any burden it may have experienced because manufacturer information "is the type of information that a respondent should have reasonably anticipated being required to provide to its customers for

quality assurance and warranty claims." Gov't's Br. 28 (quoting J.A. 45). There is no evidence to support this finding, and Commerce's argument ignores the difference between responding to individual customer claims using a manual approach (which Salzgitter could indisputably satisfy) and retrieving the same information in the aggregate (which may be unreasonably burdensome).

While Commerce appropriately assumes "that importers are familiar with the rules and regulations that apply to the[ir] import activities," *Nippon Steel*, 337 F.3d at 1382, Commerce notably does not argue that Salzgitter should have collected the information in anticipation of a need to produce this information in an antidumping investigation. It appears that there was little reason for Salzgitter to anticipate this need because this was an original investigation, and Salzgitter had no prior notice that it would be named as a respondent.

We conclude that Commerce's apparent finding of a lack of an unreasonable burden was not supported by substantial evidence.[3]

B

Although we conclude that Commerce's request imposed an unreasonable burden on Salzgitter, we must also consider whether Salzgitter provided reasonable

---

[3] This is not a situation like that in *Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir. 2017), where the respondent did not properly raise the issue of an unreasonable burden by asserting that it was unable to provide the requested information. In fact, in *Maverick Tube*, the respondent offered to supply the missing information. *See id.* at 1360–61. Here, Salzgitter did state that it was unable to provide the missing manufacturer information because of the unreasonable burden it would impose.

"alternative forms" for reporting the missing information as required by § 1677m(c)(1).[4] In *Maverick Tube*, we recognized the obligation of an importer to provide alternative forms of missing information under the statute. 857 F.3d at 1361.

Salzgitter contends that its proposed alternatives would have allowed Commerce to fill the gap in the record for the missing manufacturer information and, therefore, Commerce should have accepted any of its three options to apply neutral, not adverse, facts available. *See* Appellants' Br. 37–39. Those three proposals would have attributed (1) all, (2) none, or (3) a percent of the disputed sales at their reported and verified prices to Salzgitter based on the manufacturer data reported by Salzgitter's resellers, resulting in a dumping margin of zero percent.

Commerce did not err in rejecting Salzgitter's proposals. The first two did nothing to allocate the 28,000 sales between Salzgitter and other manufacturers. The third simply assumed that the proportion of Salzgitter's sales among the 28,000 sales by its affiliated reseller was the same as the proportion of sales that were identified as Salzgitter's in the dataset, without any evidence that these other sales were representative of the 28,000 sales missing manufacturer data.

Salzgitter's proposals were insufficient because they failed to address Commerce's concerns about selective

---

[4] The parties further dispute whether Salzgitter "promptly" provided notice of its difficulties in collecting the information and its alternative proposals. *Compare* Gov't's Br. 28–30, *with* Appellants' Br. 39. Because we conclude that the alternatives proposed by Salzgitter did not reasonably fill the information gap caused by failure to supply the missing manufacturer information, we do not reach the timeliness issue.

reporting, which could have potentially rewarded Salzgitter by artificially distorting the margin by failing to reflect high-priced sales by Salzgitter. *See* J.A. 170–71 ("Commerce cannot rule out the possibility that the sales with the highest prices were entirely or primarily of CTL plate manufactured by Salzgitter, and Salzgitter's failure to report the manufacturer information was an attempt to obscure this fact, thereby distorting the margin."). As the Trade Court recognized, randomized sampling would have been a reasonable "alternative form[]" of the missing information, *see* 399 F. Supp. 3d at 1255, but Salzgitter never proposed such an approach, and it was Salzgitter's obligation (not Commerce's) to do so under the statute. 19 U.S.C. § 1677m(c)(1).

We conclude that Commerce did not err in finding that Salzgitter did not provide reasonable "alternative forms" of information as required by § 1677m(c)(1), and that Commerce could properly apply adverse facts available.

## II

We also reject Salzgitter's challenge to Commerce's application of the highest non-aberrational net price among the 28,000 sales to each of the 28,000 sales, while attributing all those sales to Salzgitter, as partial adverse facts available. Salzgitter contends that this selection was aberrational and not supported by substantial evidence.

In selecting an adverse inference, Commerce enjoys discretion to choose information on the record from which to draw an adverse inference to fill an information gap, *see* 19 U.S.C. § 1677e(b)(2), but may not draw inferences unsupported by the record or those that are merely punitive in nature, *see Oman Fasteners*, 125 F.4th at 1086–87. Commerce is not required "to select facts that reflect a certain amount of sales, yield a particular margin, fall within a continuum according to the application of particular statistical methods, or align with standards articulated in other statutes and regulations." *Nan Ya Plastics Corp.*

*v. United States*, 810 F.3d 1333, 1347 (Fed. Cir. 2016). Commerce is not precluded from using the highest non-aberrational sales price under appropriate circumstances. *See BMW of N. Am.*, 926 F.3d at 1301–02.

Commerce's application of adverse facts available here was reasonable, if barely so, given the absence of evidence of misconduct.[5] We have recognized that "the 'inference' that Commerce 'may use' in 'selecting from among the facts otherwise available' must 'be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance.'" *Diamond Sawblades Mfrs.' Coal. v. United States*, 986 F.3d 1351, 1367 (Fed. Cir. 2021) (quoting *F.lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)). Here, the size of the information gap—20 percent of the reseller's sales during the period of investigation—left Commerce unable to reasonably estimate Salzgitter's actual rate.

Under these circumstances, Commerce's substitution of the actual sales prices for the 28,000 sales missing manufacturer information with the highest non-aberrational net price among those 28,000 sales was a reasonable application of adverse facts available based on Salzgitter's failure to cooperate to the best of its ability because it did not supply reasonable alternatives under 19 U.S.C.

---

[5] We note that the sale selected by Commerce did not identify Salzgitter as the manufacturer of the plate sold, raising questions as to the propriety of Commerce's use of that sale to fill the gap of missing manufacturer information. Salzgitter, however, did not object to Commerce's use of the sale on the ground that it should not be attributed to it as the manufacturer, so we do not decide the issue. Nor does Salzgitter object to attributing to it the 28,000 sales missing manufacturer information, an approach that Salzgitter itself suggested.

§ 1677m(c)(1). Such a selection furthers the purposes of the antidumping statutes by ensuring that intransigent respondents are not rewarded for refusing to cooperate, *see Essar Steel*, 678 F.3d at 1276, while ensuring that the "rate chosen ha[d] a relationship to the actual sales information available." *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1340 (Fed. Cir. 2002).

Salzgitter additionally argues that the margin Commerce calculated was aberrational because the transaction Commerce selected concerned a product "that was . . . dissimilar in physical characteristics to the products sold in the United States." Appellants' Br. 42. We see no error in the Trade Court's conclusion that, given the circumstances, Commerce's approach was reasonable, especially because Salzgitter failed "to suggest any alternative price from the record that Commerce could have selected as a reasonable application" of adverse facts available. 648 F. Supp. 3d at 1333.

We conclude that Commerce's choice of adverse inference in its application of adverse facts available was supported by substantial evidence and otherwise in accordance with law.

## Conclusion

We have considered the remainder of Salzgitter's arguments and do not find them persuasive.

## **AFFIRMED**

## Costs

No costs.