2024-1219

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

AG DER DILLINGER HÜTTENWERKE, FRIEDR. LOHMANN GMBH, THYSSENKRUPP STEEL EUROPE AG,

Plaintiffs,

ILSENBURGER GROBBLECH GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, AND SALZGITTER MANNESMANN INTERNATIONAL GMBH,

Plaintiffs-Appellants,

v.

UNITED STATES, SSAB ENTERPRISES LLC, NUCOR CORPORATION

Defendants-Appellees,

Appeal from the United States Court of International Trade
in Case No. 1:17-CV-00158
Judge Leo Gordon

## PETITION FOR REHEARING BY PLAINTIFFS-APPELLANTS ILSENBURGER GROBBLECH GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, AND SALZGITTER MANNESMANN INTERNATIONAL GMBH

David E. Bond
Ron Kendler
Allison Kepkay

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

August 1, 2025

Counsel to Plaintiffs-Appellants Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2024-1219 |
| **Short Case Caption** | AG der Dillinger Huttenwerke v. US |
| **Filing Party/Entity** | Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Mannesmann International GmbH |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Signature: /s/ David E. Bond

Date: August 1, 2025

Name: David E. Bond

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. <br><br> ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. <br><br> ☐ None/Not Applicable |
| Ilsenburger Grobblech GmbH | | Wholly-owned (directly or indirectly) by Salzgitter AG, a publicly traded entity. |
| Salzgitter Flachstahl GmbH | | Wholly-owned (directly or indirectly) by Salzgitter AG, a publicly traded entity. |
| Salzgitter Mannesmann Grobblech GmbH | | Wholly-owned (directly or indirectly) by Salzgitter AG, a publicly traded entity. |
| Salzgitter Mannesmann International GmbH | | Wholly-owned (directly or indirectly) by Salzgitter AG, a publicly traded entity. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable          ☐ Additional pages attached

|  |  |  |
|--|--|--|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below)     ☑ No     ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable          ☐ Additional pages attached

|  |  |  |
|--|--|--|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

POINTS OF LAW AND FACT OVERLOOKED AND
MISAPPREHENDED ................................................................................. 1

ARGUMENT ............................................................................................ 3

I.   THE PANEL'S DECISION THAT OPTION 3 WAS
     "INSUFFICIENT" SHOULD BE RECONSIDERED ............................ 3

     A.   The Panel's Decision ...................................................... 4

     B.   The Panel Misapprehended the Data Used Under Option 3 ........... 5

     C.   The Panel's Conclusion That Option 3 Was Insufficient Was
          Inconsistent with Accepted Statistical Principles ......................... 6

          1.   Option 3 Was at Least as Representative as a Random
               Sample ................................................................ 6

          2.   The Panel Should Take Judicial Notice of Academic
               Literature on Sampling Error ....................................... 7

II.  THE PANEL CITED COMMERCE'S PRACTICE WITH
     RESPECT TO FINDING "UNREASONABLE BURDEN," BUT
     THE CITED CASES DO NOT SUPPORT APPLICATION OF
     AFA ........................................................................................... 9

     A.   The Panel Relied Upon Commerce Precedent With Respect
          to Findings of "Unreasonable Burden" .................................... 9

     B.   The Panel's Determination with Respect to the Application of
          AFA Was Inconsistent with Commerce's Practice ....................... 11

CONCLUSION AND REQUEST FOR REHEARING ......................................... 13

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AG der Dillinger Hüttenwerke v. United States,*
    140 F.4th 1364 (Fed. Cir. 2025) ............................................................passim

*AG der Dillinger Hüttenwerke v. United States,*
    399 F. Supp. 3d 1247 (Ct. Int'l Trade 2019) ....................................................7

*Marmen Inc. v. United States,*
    134 F.4th 1334 (Fed. Cir. 2025) .....................................................................8

*Stupp Corp. v. United States,*
    5 F.4th 1341 (Fed. Cir. 2021) .........................................................................9

## STATUTES AND REGULATIONS

19 U.S.C. § 1677m(c)(1)..............................................................................9

## ADMINISTRATIVE DETERMINATIONS

*Notice of Final Determination of Sales at Less Than Fair Value: Certain Cut-To-Length Carbon-Quality Steel Plate Products from Japan,*
    64 Fed. Reg. 73,215 (Dep't Commerce Dec. 29, 1999).................................10

*Notice of Final Determination of Sales at Less Than Fair Value: Structural Steel Beams From Germany,*
    67 Fed. Reg. 35,497 (Dep't Commerce May 20, 2002)..........................10, 11

## POINTS OF LAW AND FACT OVERLOOKED AND MISAPPREHENDED

Plaintiffs-Appellants Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH (collectively, "Salzgitter") respectfully request panel rehearing of the decision by a panel of this Court in *AG der Dillinger Hüttenwerke v. United States*, 140 F.4th 1364 (Fed. Cir. 2025). The panel affirmed a decision of the U.S. Department of Commerce ("Commerce") that applied partial adverse facts available ("AFA").

This petition should be granted on two grounds. First, the panel rejected Salzgitter's principal proposed methodology for addressing missing manufacturer data in its dumping margin calculation – "Option 3" – on the grounds that it was "insufficient." *AG der Dillinger Hüttenwerke*, 140 F.4th at 1374. The panel should reconsider and correct this conclusion because (1) the panel apparently misunderstood the data used under Option 3; and, more importantly, (2) the panel's conclusion is contradicted by accepted statistical principles. The panel referred to the Court of International Trade's ("CIT") statement that a "randomized sampling" would have been a reasonable approach. If *sampling* would have been sufficient (which necessarily introduces sampling error), then using the *entire population*, as in Option 3, leading to zero sampling error, would also be reasonable.

Second, while the panel correctly determined that Commerce's demands placed an "unreasonable burden" on Salzgitter, it nevertheless upheld Commerce's application of partial AFA. The panel's determination is in direct conflict with Commerce's practice in comparable cases.

After reconsidering these issues, the Court should remand to Commerce with instructions to reconsider its application of partial AFA to Salzgitter.

## ARGUMENT

As set out in Federal Rule of Appellate Procedure 40, a party petitioning for panel rehearing must state "each point of law or fact that the petitioner believes the court has overlooked or misapprehended." It follows that a petition should be granted in cases where the panel overlooked or misapprehended a material fact or legal issue. As demonstrated below, the panel's decision in this case merits rehearing.

## I. THE PANEL'S DECISION THAT OPTION 3 WAS "INSUFFICIENT" SHOULD BE RECONSIDERED

In the underlying investigation before Commerce, Salzgitter proposed three options for integrating the 28,000 sales for which the manufacturer could not be identified into the overall calculation of Salzgitter's dumping margin. *See* Appx44; *see also* Appx11405-11406, Appx14428-11430; Appx11570-11571. The panel characterized Salzgitter's proposals as "insufficient" and, therefore, determined that "Commerce did not err in finding that Salzgitter did not provide reasonable 'alternative forms' of information as required" by statute. *AG der Dillinger Hüttenwerke*, 140 F.4th at 1374. The panel's decision should be reconsidered because its misapprehension of the statistical basis for Salzgitter's Option 3 constitutes a material error of fact.

## A.    The Panel's Decision

Under Option 3, Salzgitter proposed that Commerce could integrate a portion of the 28,000 sales for which the manufacturer could not be identified into the home-market sales database.  Salzgitter had provided a separate sales database containing full information for *each and every one* of the 28,000 sales, except the manufacturer, including product information, sales prices, and sales quantities.  Appx8237. Commerce verified this sales database.  Further, at Commerce's request, Salzgitter reported the *actual* ratio of plate purchased from Salzgitter affiliates and from unaffiliated mills during the period of investigation.  Appx8274-8279.  Commerce verified this ratio.  Thus, Option 3 entailed using the entire verified data set for the 28,000 sales and integrating a portion of that data set into the dumping margin calculation using the verified purchases ratio.

The panel concluded that this approach was not reasonable:

> The third {Option} simply assumed that the proportion of Salzgitter's sales among the 28,000 sales by its affiliated reseller was the same as the proportion of sales that were identified as Salzgitter's in the dataset, without any evidence that these other sales were representative of the 28,000 sales missing manufacturer data.

*AG der Dillinger Hüttenwerke*, 140 F.4th at 1373-74.  As a result, the panel concluded that "Salzgitter's proposals were insufficient because they failed to address Commerce's concerns about selective reporting."  *AG der Dillinger Hüttenwerke*, 140 F.4th at 1374.

4

The panel's conclusion was apparently based, in part, on a comment by the Court of International Trade ("CIT") that "randomized sampling would have been a reasonable 'alternative form{}' of the missing information." *AG der Dillinger Hüttenwerke*, 140 F.4th at 1374 (citations omitted).[1]

## B.    The Panel Misapprehended the Data Used Under Option 3

The record demonstrates that Option 3 was accurate and reasonable, because it was based on the complete universe of relevant sales data, adjusted proportionately to reflect Salzgitter-produced CTL plate, and both elements were verified by Commerce for accuracy.

First, the data were complete.  As explained, "Option 3 'was based on the *full universe* of {Salzgitter Mannesmann Stahlhandel GmbH's ("SMSD")} actual purchases during the period' and adjusted 'proportionately … to take account of the relative quantities of (a) possible Salzgitter-produced plate to (b) the total plate in the database.'"  Salzgitter Reply Br. at 22 (emphasis added) (citing Appx11406; Appx13137-13138; Salzgitter Opening Br. at 38-39).

Second, the data were accurate and verified.  Commerce verified the sales data reported in the Separate Database, in particular, the product control number, sales

---

[1] Commerce itself never sought to justify its decision to reject Option 3 on the grounds that it was not "a statistical analysis of the {missing plate sales} … using a sufficient and randomized sample size."  This comment was made for the first time by the CIT in its decision.  *See* Appx121.  Commerce simply ignored Salzgitter's proposal.  *See* Salzgitter Reply Br. at 3.

prices, and quantities, which are at the core of the dumping margin calculation. See Appx11322-11323; Appx9463-9513 (Verification Exhibit SMSD-11); Appx9574-9603 (Verification Exhibit SMSD-15). With respect to Option 3, the purchase ratio was derived from an exhibit prepared by Salzgitter at Commerce's request regarding the volume of purchases from affiliated versus unaffiliated suppliers, the contents of which Commerce likewise verified. *See* Appx11316 (noting Commerce's verification of "the quantity and value of SMSD's POI purchases"); Appx11406, Appx11430 (Salzgitter's administrative case brief and appended exhibit discussing and demonstrating calculation of the ratio). Thus, 100 percent of the data used under Option 3 were verified.

## C.   The Panel's Conclusion That Option 3 Was Insufficient Was Inconsistent with Accepted Statistical Principles

### 1.   Option 3 Was at Least as Representative as a Random Sample

Option 3 more than satisfied accepted statistical principles regarding representativity and overcomes the panel's concerns about "speculative" methodologies and "selective reporting." *AG der Dillinger Hüttenwerke*, 140 F.4th at 1374 (citing Appx170-71).

If, as suggested by the CIT and reiterated by this Court, "randomized sampling would have been a reasonable 'alternative form{}' of the missing information," *see AG der Dillinger Hüttenwerke*, 140 F.4th at 1374 (citing *AG der Dillinger*

*Hüttenwerke v. United States*, 399 F. Supp. 3d 1247, 1255 (Ct. Int'l Trade 2019)), *then using the entire population as Option 3 did, leading to zero sampling error, should certainly be deemed reasonable.* Option 3 "was at least as accurate as, and likely more accurate than, a random sample." Appx11406; Appx13137-13138; Salzgitter Opening Br. at 38-39. The panel apparently overlooked Salzgitter's explanations with respect to the completeness and accuracy of the data – representing the entire verified population of the sales with missing manufacturing information adjusted using verified purchases information – and, thus, incorrectly concluded Option 3 was insufficient.

### 2. The Panel Should Take Judicial Notice of Academic Literature on Sampling Error

Rule 201 of Federal Rules of Evidence allows the Court to "judicially notice a fact that is not subject to reasonable dispute" at "any stage of the proceeding," so long as the fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned" and "a party requests it and the court is supplied with the necessary information." Federal Rules of Evidence, Rule 201(b)(2), (c)(2), (d). In this case, meaningful consideration of the reasonableness of Option 3 requires reference to basic principles of statistics, specifically related to the difference between a census and a sample. For this reason, the panel should take judicial notice of scholarship elucidating the concept of sampling error, both in reviewing this motion and during a rehearing, if granted.

A review of the literature confirms that Salzgitter's Option 3 was statistically sound and was, *at least*, "reasonable." It is a well-established statistical principle that any parameter based on a complete census (*i.e.*, 100%) of the population has *zero* sampling error, whereas an estimator based on a subset (*i.e.*, a statistical sample, however derived, comprised of less than 100% of the population) will exhibit *non-zero* sampling error. For example, the 1960 text "Sample Design in Business Research" states plainly that "sampling error will disappear as the size of the sample increases . . . ." W. EDWARDS DEMING, SAMPLE DESIGN IN BUSINESS RESEARCH 64 (1960). Similarly, the World Health Organization-published reference volume "Teaching Health Statistics" lists as a "disadvantage" of sampling that "*there is always a sampling error.*" CHO-YOOK TYE, O. AYENI, S. KAGGWA LWANGA, TEACHING HEALTH STATISTICS LESSON AND SEMINAR OUTLINES 73 (1999) (emphasis added).

In other cases, the Court has relied upon academic literature to understand and apply statistical principles to the issue on appeal. For example, the Court recently engaged in-depth with statistical theory and application when, as here, the reasonableness of a methodology was a key legal and factual consideration. *See, e.g., Marmen Inc. v. United States*, 134 F.4th 1334, 1346-48 (Fed. Cir. 2025) (including detailed analysis of relevant academic literature, and the application of

8

accepted statistical principles to Commerce's differential pricing analysis); *Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021) (same).

The consensus among the academic literature is clear: *an analysis of an entire population – such as in Salzgitter's Option 3* – will definitionally be more accurate than any random sample. The panel should take judicial notice of this literature in considering this motion and on any rehearing. Based on this literature, it is clear that Option 3 provided a sufficient basis for Commerce to calculate an accurate dumping margin for Salzgitter.

## II. THE PANEL CITED COMMERCE'S PRACTICE WITH RESPECT TO FINDING "UNREASONABLE BURDEN," BUT THE CITED CASES DO NOT SUPPORT APPLICATION OF AFA

The statute allows for instances where it may be impractical for a respondent to supply certain information, and to do so would impose an "unreasonable burden." *AG der Dillinger Hüttenwerke*, 140 F.4th at 1371 (citing 19 U.S.C. § 1677m(c)(1)). In this case, the panel correctly determined that "Commerce's apparent finding of a lack of an unreasonable burden was not supported by substantial evidence." *AG der Dillinger Hüttenwerke*, 140 F.4th at 1373. However, the panel then went on to make an inconsistent finding that Commerce was justified in using an adverse inference.

### A. The Panel Relied Upon Commerce Precedent With Respect to Findings of "Unreasonable Burden"

As noted by the panel, Commerce "acknowledged" at oral argument that "Commerce cannot demand information if the request would place an unreasonable

burden on the respondent." *AG der Dillinger Hüttenwerke*, 140 F.4th at 1372 (citing Oral Arg. at 13:03–10). As further support for this principle, the panel cited to prior Commerce determinations:

> Commerce has declined to impose adverse inferences in prior cases because of the administrative burdens those requests would impose on respondents. *See Notice of Final Determination of Sales at Less Than Fair Value: Certain Cut-to-Length Carbon-Quality Steel Plate Products from Japan*, 64 Fed. Reg. 73,215, 73,218 (Dec. 29, 1999) (*CTL Japan*); *Notice of Final Determination of Sales at Less Than Fair Value: Structural Steel Beams from Germany*, 67 Fed. Reg. 35,497, 35,498–99 (May 20, 2002).

*AG der Dillinger Hüttenwerke*, 140 F.4th at 1372. In these cases where Commerce found the burden on the respondent to be unreasonable, Commerce then decided it was *inappropriate* to conclude the respondent had not cooperated to the best of its ability and apply AFA.

For example, in *CTL Japan*, Commerce determined that the time-consuming manual process required for the respondent to report downstream sales by affiliated resellers/processors was "unreasonably burdensome given the time constraints of an antidumping investigation." *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cut-To-Length Carbon-Quality Steel Plate Products from Japan*, 64 Fed. Reg. 73,215 (Dep't Commerce Dec. 29, 1999), accompanying Issues and Decision Memorandum at Comment 5. Petitioners in that case advocated for the application of AFA, but Commerce declined to do so. *Id.*

Likewise, in *Structural Steel Beams from Germany*, Commerce "confirmed that {the respondent} does not have the ability to provide the sales information for its affiliated resellers' sales within the time constraints of this investigation," and so found "no basis to apply adverse facts available." *Notice of Final Determination of Sales at Less Than Fair Value: Structural Steel Beams From Germany*, 67 Fed. Reg. 35,497 (Dep't Commerce May 20, 2002), accompanying Issues and Decision Memorandum at Comment 3 ("*Structural Steel Beams from Germany*"). Instead, Commerce "simply removed the sales to affiliates when they did not pass the arm's-length test and have not attempted to use non-adverse facts available for such sales." *Id*. Even though parties proposed alternative approaches, Commerce appears to have devised its *own* methodology to fill in any gaps. *Id.* (stating that "we found identical product matches. . .").

These cases, relied upon by the panel to underscore Commerce's practice, establish that, in cases where submitting complete information in response to Commerce's request would impose an "unreasonable burden" on the respondent, Commerce has not (and logically could not) found that the respondent failed to cooperate to the best of its ability and, therefore, did not impose AFA.

B.  **The Panel's Determination with Respect to the Application of AFA Was Inconsistent with Commerce's Practice**

As noted above, the only agency precedent to which the panel referred on this point did *not* support the application of AFA; in fact, the panel acknowledged that

11

in the cited cases Commerce "declined to impose adverse inferences in prior cases because of the administrative burdens." *AG der Dillinger Hüttenwerke*, 140 F.4th at 1372. Yet, the panel proceeded to sustain Commerce's application of partial AFA.

According to the panel, Commerce erred in not finding an unreasonable burden. But had Commerce found an unreasonable burden as the panel concluded it should have, Commerce *should not have applied AFA* under its normal practice. Therefore, the panel's split approach here – finding an unreasonable burden, but sustaining the application of AFA – is inconsistent both internally and with Commerce's practice, and should be reconsidered.

# CONCLUSION AND REQUEST FOR REHEARING

For the foregoing reasons, Plaintiffs-Appellants respectfully request that the Court grant this petition for panel rehearing to reconsider its conclusions with respect to Commerce's application of partial AFA to Salzgitter.

Respectfully submitted,


 /s/ David E. Bond
David E. Bond
Ron Kendler
Allison Kepkay

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Plaintiff-Appellants Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH

August 1, 2025

ADDENDUM

*AG der Dillinger Hüttenwerke v. United States*
140 F.4th 1364 (Fed. Cir. 2025)

140 F.4th 1364

United States Court of Appeals, Federal Circuit.

AG DER DILLINGER HUTTENWERKE,
Friedr. Lohmann GmbH, Thyssenkrupp
Steel Europe AG, Plaintiffs
Ilsenburger Grobblech GmbH, Salzgitter
Flachstahl GmbH, Salzgitter Mannesmann
Grobblech GmbH, Salzgitter Mannesmann
International GmbH, Plaintiffs-Appellants
v.
UNITED STATES, SSAB Enterprises LLC,
Nucor Corporation, Defendants-Appellees

2024-1219
|
Decided: June 17, 2025

## Synopsis

**Background:** Foreign exporters filed suit challenging Department of Commerce's final affirmative determination in antidumping duty investigation of carbon and alloy steel cut-to-length plate from Federal Republic of Germany. The Court of International Trade, Leo M. Gordon, J., 399 F. Supp. 3d 1247, sustained in part and remanded in part, 534 F.Supp.3d 1403, remanded first remand redetermination, 592 F. Supp. 3d 1344, remanded second remand redetermination, 648 F.Supp.3d 1321, sustained in part and remanded in part third remand redetermination, and 666 F.Supp.3d 1331, granted motion by consolidated subset of exporters for entry of partial judgment. Exporters appealed.

**Holdings:** The Court of Appeals, Dyk, Circuit Judge, held that:

substantial evidence did not support determination that request for information was not unreasonable burden;

substantial evidence supported application of adverse facts available (AFA); and

substantial evidence supported choice of adverse inference in applying AFA.

Affirmed.

**Procedural Posture(s):** On Appeal; Judgment; Review of Administrative Decision.

Appeal from the United States Court of International Trade in Nos. 1:17-cv-00158-LMG, 1:17-cv-00160-LMG, 1:17-cv-00162-LMG, Senior Judge Leo M. Gordon.

## Attorneys and Law Firms

Ron Kendler, White & Case LLP, Washington, DC, argued for plaintiffs-appellants. Also represented by David Edward Bond, Allison Kepkay.

Kara Westercamp, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by Brian M. Boynton, Tara K. Hogan, Patricia M. McCarthy; Ayat Mujais, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

Jeffrey David Gerrish, Schagrin Associates, Washington, DC, argued for defendant-appellee SSAB Enterprises LLC. Also represented by Nicholas J. Birch, Saad Younus Chalchal, Christopher Todd Cloutier, Elizabeth Drake, William Alfred Fennell, Luke A. Meisner, Roger Brian Schagrin.

Alan H. Price, Wiley Rein, LLP, Washington, DC, for defendant-appellee Nucor Corporation. Also represented by Stephanie Manaker Bell, Tessa V. Capeloto, Stephen Joseph Obermeier, Adam Milan Teslik, Maureen E. Thorson, Enbar Toledano, Christopher B. Weld.

Before Lourie, Dyk, and Reyna, Circuit Judges.

## Opinion

Dyk, Circuit Judge.

**\*1367** In this antidumping case, appellants Ilsenburger Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech GmbH, and Salzgitter Mannesmann International GmbH (collectively, "Salzgitter") appeal from a decision of the U.S. Court of International Trade ("Trade Court") sustaining the Department of Commerce's application of partial adverse facts available to impose a final dumping **\*1368** margin of 22.9 percent on Salzgitter's steel plate products.

Commerce applied an adverse inference based on its determination that Salzgitter failed to cooperate to the best of its ability with one of Commerce's requests for information.

We hold that, although Commerce's information request imposed an unreasonable burden on Salzgitter, Commerce's application of an adverse inference was permissible because Salzgitter failed to propose reasonable alternative forms of the missing information as required by statute. We reject Salzgitter's other contentions and accordingly affirm.

BACKGROUND

I

In an antidumping duty proceeding, Commerce must determine whether a foreign exporter's merchandise is being, or is likely to be, sold "in the United States at less than its fair value." *Risen Energy Co. v. United States*, 122 F.4th 1348, 1351 (Fed. Cir. 2024) (quoting *Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1321 (Fed. Cir. 2020)). When merchandise is sold at less than fair value, Commerce calculates a "dumping margin" for each entry of merchandise subject to Commerce's review. 19 U.S.C. § 1675(a)(2). The dumping margin is "the amount by which the normal value" (typically the price at which a particular piece of merchandise is sold in an exporter's home country) "exceeds the export price or constructed export price of the subject merchandise." *Id.* § 1677(35)(A); *accord id.* § 1677b(a). If an exporter's affiliated companies sell both the exporter's products and other manufacturers' products (as is the case here), Commerce must decide which home market sales are attributable to the exporter under review in order to calculate the dumping margin.

Exporters whose merchandise is subject to an antidumping investigation are obligated to provide information necessary for Commerce to reach its final antidumping determinations. *See Oman Fasteners, LLC v. United States*, 125 F.4th 1068, 1075 (Fed. Cir. 2025). Commerce gathers this information by issuing "questionnaires requesting factual information" about an exporter's business. 19 C.F.R. § 351.221(b)(2); 19 U.S.C. § 1677b(b)(2)(A)(ii). If Commerce lacks information necessary to its determination after an exporter has responded to its questionnaires, it "must 'fill in the gaps' using information otherwise available to it." *Oman Fasteners*, 125 F.4th at 1075 (quoting *BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1295 (Fed. Cir. 2019)). Where Commerce determines that an exporter "failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce may apply an adverse inference to the information

otherwise available in calculating the exporter's antidumping duty margin. 19 U.S.C. § 1677e(b).

II

Commerce initiated this antidumping investigation in 2016 to determine if antidumping duties should be imposed on cut-to-length steel plate manufacturers from twelve countries, including Germany. *See Certain Carbon and Alloy Steel Cut-To-Length Plate from Austria, Belgium, Brazil, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, the People's Republic of China, South Africa, Taiwan, and the Republic of Turkey: Initiation of Less-Than-Fair Value Investigations*, 81 Fed. Reg. 27,089, 27,089–90 (May 5, 2016). Salzgitter was chosen as a mandatory respondent, and in May 2016, received an initial questionnaire from Commerce. The initial questionnaire asked Salzgitter to report the sales of its merchandise in the United States and in its home market Germany, including the **\*1369** resales of its products by affiliated resellers. As part of this request, Commerce asked Salzgitter to identify the manufacturer of every plate sold by its resellers because the plates sold by those resellers included those produced by manufacturers other than Salzgitter, and Commerce needed to know which home market sales were attributable to Salzgitter.

In its initial response, Salzgitter submitted a database with the home-market sales of all its affiliated companies showing the manufacturers of the plate sold, except that it excluded some sales of one of its resellers because it was "unable to identify the manufacturer" of those plates, and identifying the manufacturer of those plates "could only be done manually." J.A. 5742.

This set in motion a lengthy back-and-forth between Salzgitter and Commerce regarding the missing manufacturer information for the sales of Salzgitter's reseller, which included five supplemental questionnaires from Commerce and corresponding responses from Salzgitter. In the end, Salzgitter was able to produce complete information for approximately 80 percent of the sales by its affiliated reseller. Salzgitter explained that it was unable to provide the manufacturer information for the remaining 20 percent of sales (28,000 sales) by its reseller because doing so would impose an unreasonable burden. Salzgitter estimated that production of the missing information, which would need to be done manually, "would take <u>at least</u> 4,667 hours, or more

than two years for two people working full-time" to complete. Appellants' Br. 12 (citing J.A. 8238–40).

At the verification stage, Commerce agreed with Salzgitter that the information could be gathered only through a manual process of reconciling information from two distinct sources and agreed with Salzgitter's estimate that it would take about 5,000 hours to collect this information.

Following verification, Salzgitter acknowledged that the missing manufacturer information constituted an information gap in the record upon which Commerce was obligated to base its final determination and that Commerce would need to use information otherwise available. Salzgitter proposed three alternatives to make up for this gap. According to Salzgitter, Commerce could have: (1) attributed to Salzgitter all of the 28,000 sales missing manufacturer information; (2) attributed none of those sales to Salzgitter; or (3) attributed the percentage of those sales to Salzgitter that reflected "the actual and verified ratio of plate purchased from Salzgitter affiliates versus other mills during" the period of investigation, i.e., the percent calculated based on the sales where the manufacturer information was identified. Appellants' Br. 14. All three approaches would have resulted in a zero percent dumping margin for Salzgitter.

On April 4, 2017, Commerce assigned Salzgitter a 22.9 percent margin. *See Certain Carbon Steel and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany: Final Determination of Sales at Less Than Fair Value*, 82 Fed. Reg. 16,360, 16,361 (Apr. 4, 2017). In its calculations, Commerce relied in part on its determination that the application of partial adverse facts available was warranted because Salzgitter failed to cooperate to the best of its ability by not supplying complete manufacturer information for its reseller's sales. Commerce explained that this information "is the type of information that a respondent should have reasonably anticipated being required to provide to its customers for quality assurance and warranty claims," and concluded that its verification demonstrated that "Salzgitter had relevant information available to it[ ] but determined not to invest the time in comprehensively examining its documentation **\*1370** in order to provide the requested information." J.A. 44–45.

Commerce declined to use any of the three alternatives proposed by Salzgitter. Instead, Commerce attributed to Salzgitter all 28,000 sales, using "the highest non-aberrational net price among" those sales. J.A. 46. Commerce maintained the 22.9 percent antidumping duty for Salzgitter when it published the final results of its larger investigation. *See Certain Carbon and Alloy Steel Cut-To-Length Plate from Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan: Amended Final Affirmative Antidumping Determinations for France, the Federal Republic of Germany, the Republic of Korea and Taiwan, and Antidumping Duty Orders*, 82 Fed. Reg. 24,096, 24,098 (May 25, 2017).

### III

Salzgitter challenged Commerce's final determination in the Trade Court. On the parties' motions for judgment on the agency record, the Trade Court concluded that Commerce reasonably resorted to facts otherwise available because Commerce "could not determine whether to include or exclude the [disputed] plate transactions from ... Salzgitter's margin calculation[ ]" due to the missing information. *AG der Dillinger Hüttenwerke v. United States*, 399 F. Supp. 3d 1247, 1253 (Ct. Int'l Trade 2019) (*Salzgitter I*). The Trade Court then considered whether it was reasonable for Commerce to apply adverse facts available based on Salzgitter's failure to cooperate.

The court sustained Commerce's decision to apply adverse facts available, finding that the record reasonably supported Commerce's determination that Salzgitter failed to cooperate to the best of its ability. *See id.* at 1254–56. Unconvinced that any of Salzgitter's three proposals for allocating the 28,000 missing sales was a reasonable alternative, the Trade Court stated that it could not "understand why Salzgitter did not just simply conduct a statistical analysis of the [missing plate sales] ... using a sufficient and randomized sample size that was then manually matched to the missing manufacturer information." *Id.* at 1255. Such an approach, according to the Trade Court, would have better supported Salzgitter's position under the statute. *Id.* at 1256.

After two additional remands, [1] the court sustained Commerce's use of the highest non-aberrational net price among Salzgitter's downstream market sales for which there was no manufacturer information. The court found reasonable Commerce's explanation that its approach was warranted given the size of the information gap and the need to deter noncooperation. *See AG der Dillinger Hüttenwerke v. United States*, 648 F. Supp. 3d 1321, 1332–33 (Ct. Int'l Trade

2023) (*Salzgitter II*). Salzgitter appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

**\*1371** DISCUSSION

"We review Commerce's determinations using the same standard as the Trade Court—that is, whether those determinations are 'unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]' " *Risen Energy,* 122 F.4th at 1353 (alteration in original) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).

I

Commerce may apply adverse facts available to fill in an information gap if it concludes that a respondent has "failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1). One purpose of applying adverse facts available is to incentivize cooperation because "Commerce lacks subpoena power" to ensure compliance. *Essar Steel Ltd. v. United States,* 678 F.3d 1268, 1276 (Fed. Cir. 2012). The central question presented in this case is whether Commerce may apply adverse facts available to a respondent based on its failure to cooperate after the respondent has demonstrated that full compliance with a request would pose an unreasonable burden.[2]

We have previously explained that "the 'best of its ability' standard is determined by assessing whether [a] respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel Corp. v. United States,* 337 F.3d 1373, 1382 (Fed. Cir. 2003). This standard neither "require[s] perfection" nor "condone[s] inattentiveness, carelessness, or inadequate record keeping." *Id.* Commerce may apply adverse facts "only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made." *See id.* at 1383. This obligates Commerce to "examine [a] respondent's actions and assess the extent of [a] respondent's abilities, efforts, and cooperation" throughout the proceeding. *Id.* at 1382.

The statute itself recognizes that there are times where it may be impractical for a respondent to supply information. It provides:

> If an interested party, promptly after receiving a request from [Commerce] for information, notifies [Commerce] that such party is <u>unable to submit the information requested in the requested form and manner</u>, together with a full explanation and <u>suggested alternative forms</u> in which such party is able to submit the information, [Commerce] shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to <u>avoid imposing an unreasonable burden on that party</u>.

19 U.S.C. § 1677m(c)(1) (emphases added). Pertinent to this assessment is a respondent's "computer capabilities"—that is, the respondent's "ability to provide requested information in an automated format without incurring an unreasonable extra burden or expense." Statement of Administrative Action, Uruguay Round Agreements Act, H.R. Rep. No. 103-316, *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4195.

Although Commerce previously asserted that there is an absolute obligation for a **\*1372** respondent to supply all the information Commerce requests unless it is impossible to do so, Commerce acknowledged at oral argument that § 1677m(c)(1) makes clear that Commerce cannot demand information if the request would place an unreasonable burden on the respondent. Oral Arg. at 13:03–10. Consistent with the statute, Commerce has declined to impose adverse inferences in prior cases because of the administrative burdens those requests would impose on respondents. *See Notice of Final Determination of Sales at Less Than Fair Value: Certain Cut-to-Length Carbon-Quality Steel Plate Products from Japan,* 64 Fed. Reg. 73,215, 73,218 (Dec. 29, 1999) (*CTL Japan*); *Notice of Final Determination of Sales at Less Than Fair Value: Structural Steel Beams from Germany,* 67 Fed. Reg. 35,497, 35,498–99 (May 20, 2002).

Even if a request does constitute an unreasonable burden, the respondent must still provide "suggested alternative forms" for submitting the information requested. 19 U.S.C. § 1677m(c)(1).

The issues presented are therefore: (1) whether Commerce's request for the manufacturer information of the 28,000 sales made by Salzgitter's reseller constituted an unreasonable burden; and (2) whether Salzgitter proposed reasonable alternative forms of the missing data to satisfy § 1677m(c)(1).

A

We first consider whether the collection of the missing manufacturer information would have imposed an unreasonable burden on Salzgitter. Under the statute, a respondent is the party responsible for establishing that a request constitutes an unreasonable burden. *See* 19 U.S.C. § 1677m(c)(1) (providing that a respondent must "promptly" notify Commerce of an inability to respond in order to avoid an unreasonable burden).

Commerce appears to contend that requiring Salzgitter to supply the manufacturer information for each of the 28,000 disputed sales was not an unreasonable burden because during verification, Salzgitter manually identified a manufacturer for a particular sale "within minutes." Gov't's Br. 25. The ability to retrieve relevant information manually in a single instance says nothing about the overall burden of the request, as Salzgitter has consistently argued. Commerce has not disputed Salzgitter's calculation of the required burden, nor does Commerce seriously contest that the burden was substantial.

Commerce next defends its course of action on the ground that its treatment of Salzgitter was not inconsistent with prior determinations like *CTL Japan*, where Commerce acknowledged that a manual retrieval would have posed an unreasonable burden for the respondent. *See* J.A. 45. Commerce distinguishes from *CTL Japan* because "technological advances in electronic records management" since 1999 have "significantly reduce[d] the burden in obtaining the missing information." J.A. 45; *see also* Gov't's Br. 29.

Commerce's conclusion ignores the fact that here the missing information required manual assembly, and that technological enhancements in electronic records management could not be utilized to replace a manual effort. *See, e.g.*, J.A. 8239–40 (explaining burden); J.A. 7107–11 (demonstrating technological obstacles). As Commerce itself found at verification, the problem was that Salzgitter's reseller did not systematically track manufacturer information for each product sold, and collecting the missing information for the 28,000 disputed sales would require manual effort. *See* J.A. 11322–23. Commerce admitted that completing this manual process "would have required two people to **\*1373** work full-time for more than two years," Appellants' Br. 35 (citing J.A. 8239–40), noting that its "review was consistent with Salzgitter's descriptions" of the estimated time needed to complete the task. J.A. 11313.

Finally, we are unpersuaded by Commerce's argument that Salzgitter is responsible for any burden it may have experienced because manufacturer information "is the type of information that a respondent should have reasonably anticipated being required to provide to its customers for quality assurance and warranty claims." Gov't's Br. 28 (quoting J.A. 45). There is no evidence to support this finding, and Commerce's argument ignores the difference between responding to individual customer claims using a manual approach (which Salzgitter could indisputably satisfy) and retrieving the same information in the aggregate (which may be unreasonably burdensome).

While Commerce appropriately assumes "that importers are familiar with the rules and regulations that apply to the[ir] import activities," *Nippon Steel*, 337 F.3d at 1382, Commerce notably does not argue that Salzgitter should have collected the information in anticipation of a need to produce this information in an antidumping investigation. It appears that there was little reason for Salzgitter to anticipate this need because this was an original investigation, and Salzgitter had no prior notice that it would be named as a respondent.

We conclude that Commerce's apparent finding of a lack of an unreasonable burden was not supported by substantial evidence. [3]

B

Although we conclude that Commerce's request imposed an unreasonable burden on Salzgitter, we must also consider whether Salzgitter provided reasonable "alternative forms" for reporting the missing information as required by § 1677m(c)(1). [4] In *Maverick Tube*, we recognized the obligation of an importer to provide alternative forms of missing information under the statute. 857 F.3d at 1361.

Salzgitter contends that its proposed alternatives would have allowed Commerce to fill the gap in the record for the missing manufacturer information and, therefore, Commerce should have accepted any of its three options to apply neutral, not adverse, facts available. *See* Appellants' Br. 37–39. Those three proposals would have attributed (1) all, (2) none, or (3) a percent of the disputed sales at their reported and verified prices to Salzgitter based on the manufacturer data reported by Salzgitter's resellers, resulting in a dumping margin of zero percent.

Commerce did not err in rejecting Salzgitter's proposals. The first two did nothing to allocate the 28,000 sales between Salzgitter and other manufacturers. The third simply assumed that the proportion of Salzgitter's sales among the 28,000 sales **\*1374** by its affiliated reseller was the same as the proportion of sales that were identified as Salzgitter's in the dataset, without any evidence that these other sales were representative of the 28,000 sales missing manufacturer data.

Salzgitter's proposals were insufficient because they failed to address Commerce's concerns about selective reporting, which could have potentially rewarded Salzgitter by artificially distorting the margin by failing to reflect high-priced sales by Salzgitter. *See* J.A. 170–71 ("Commerce cannot rule out the possibility that the sales with the highest prices were entirely or primarily of CTL plate manufactured by Salzgitter, and Salzgitter's failure to report the manufacturer information was an attempt to obscure this fact, thereby distorting the margin."). As the Trade Court recognized, randomized sampling would have been a reasonable "alternative form[ ]" of the missing information, *see* 399 F. Supp. 3d at 1255, but Salzgitter never proposed such an approach, and it was Salzgitter's obligation (not Commerce's) to do so under the statute. 19 U.S.C. § 1677m(c)(1).

We conclude that Commerce did not err in finding that Salzgitter did not provide reasonable "alternative forms" of information as required by § 1677m(c)(1), and that Commerce could properly apply adverse facts available.

## II

We also reject Salzgitter's challenge to Commerce's application of the highest non-aberrational net price among the 28,000 sales to each of the 28,000 sales, while attributing all those sales to Salzgitter, as partial adverse facts available.

Salzgitter contends that this selection was aberrational and not supported by substantial evidence.

In selecting an adverse inference, Commerce enjoys discretion to choose information on the record from which to draw an adverse inference to fill an information gap, *see* 19 U.S.C. § 1677e(b)(2), but may not draw inferences unsupported by the record or those that are merely punitive in nature, *see Oman Fasteners*, 125 F.4th at 1086–87. Commerce is not required "to select facts that reflect a certain amount of sales, yield a particular margin, fall within a continuum according to the application of particular statistical methods, or align with standards articulated in other statutes and regulations." *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1347 (Fed. Cir. 2016). Commerce is not precluded from using the highest non-aberrational sales price under appropriate circumstances. *See BMW of N. Am.*, 926 F.3d at 1301–02.

Commerce's application of adverse facts available here was reasonable, if barely so, given the absence of evidence of misconduct. [5] We have recognized that "the 'inference' that Commerce 'may use' in 'selecting from among the facts otherwise available' must 'be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance.' " *Diamond Sawblades Mfrs.' Coal. v. United States*, 986 F.3d 1351, 1367 (Fed. Cir. 2021) (quoting *F.lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)). Here, the size of the information gap—20 percent of the reseller's sales during the **\*1375** period of investigation—left Commerce unable to reasonably estimate Salzgitter's actual rate.

Under these circumstances, Commerce's substitution of the actual sales prices for the 28,000 sales missing manufacturer information with the highest non-aberrational net price among those 28,000 sales was a reasonable application of adverse facts available based on Salzgitter's failure to cooperate to the best of its ability because it did not supply reasonable alternatives under 19 U.S.C. § 1677m(c)(1). Such a selection furthers the purposes of the antidumping statutes by ensuring that intransigent respondents are not rewarded for refusing to cooperate, *see Essar Steel*, 678 F.3d at 1276, while ensuring that the "rate chosen ha[d] a relationship to the actual sales information available." *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1340 (Fed. Cir. 2002).

Salzgitter additionally argues that the margin Commerce calculated was aberrational because the transaction Commerce selected concerned a product "that was ... dissimilar in physical characteristics to the products sold in the United States." Appellants' Br. 42. We see no error in the Trade Court's conclusion that, given the circumstances, Commerce's approach was reasonable, especially because Salzgitter failed "to suggest any alternative price from the record that Commerce could have selected as a reasonable application" of adverse facts available. 648 F. Supp. 3d at 1333.

We conclude that Commerce's choice of adverse inference in its application of adverse facts available was supported by substantial evidence and otherwise in accordance with law.

CONCLUSION

We have considered the remainder of Salzgitter's arguments and do not find them persuasive.

**AFFIRMED**

COSTS

No costs.

**All Citations**

140 F.4th 1364

---

## Footnotes

1    These remands were necessary because a nearly identical issue was raised in a separate case before the Trade Court, *Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349 (Ct. Int'l Trade 2018), where the Trade Court rejected Commerce's use of the highest non-aberrational net price of an exporter's sales to fill a gap caused by missing manufacturer information. *See id.* at 1364. In *Dillinger France*, Commerce eventually attributed to the exporter all the sales with missing manufacturer information at their reported sales prices (which was, in essence, the first of Salzgitter's alternative proposals here). *See Dillinger Fr. S.A. v. United States*, 393 F. Supp. 3d 1225, 1228–29 (Ct. Int'l Trade 2019). During the remands here, Commerce explained that it did not adopt the *Dillinger France* approach for Salzgitter because the gap of missing information in Salzgitter's case (28,000 sales), greatly exceeded the number of sales in *Dillinger France*, and thus had a material impact on Salzgitter's margin, in contrast to *Dillinger France*, where it did not.

2    We see no merit to Salzgitter's argument that Commerce should not have applied facts available in the first instance. Appellants' Br. 24–30. Salzgitter effectively concedes that the manufacturer information is "critical" for a margin analysis. Appellants' Br. 29. Without this critical information, Commerce could not have fulfilled its duty to accurately calculate Salzgitter's dumping margin, so Commerce's resort to facts available was warranted under 19 U.S.C. § 1677e.

3    This is not a situation like that in *Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir. 2017), where the respondent did not properly raise the issue of an unreasonable burden by asserting that it was unable to provide the requested information. In fact, in *Maverick Tube*, the respondent offered to supply the missing information. *See id.* at 1360–61. Here, Salzgitter did state that it was unable to provide the missing manufacturer information because of the unreasonable burden it would impose.

4    The parties further dispute whether Salzgitter "promptly" provided notice of its difficulties in collecting the information and its alternative proposals. *Compare* Gov't's Br. 28–30, *with* Appellants' Br. 39. Because we conclude that the alternatives proposed by Salzgitter did not reasonably fill the information gap caused by failure to supply the missing manufacturer information, we do not reach the timeliness issue.

5    We note that the sale selected by Commerce did not identify Salzgitter as the manufacturer of the plate sold, raising questions as to the propriety of Commerce's use of that sale to fill the gap of missing manufacturer information. Salzgitter, however, did not object to Commerce's use of the sale on the ground that it should not be attributed to it as the manufacturer, so we do not decide the issue. Nor does Salzgitter object to attributing to it the 28,000 sales missing manufacturer information, an approach that Salzgitter itself suggested.

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

## CAFC Court No. 2024-1219

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 2,347 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: August 1, 2025

Signature: _____/s/ David E. Bond_____

Name: _____David E. Bond_____

I hereby certify that on August 1, 2025 the foregoing document filed on behalf of Plaintiffs-Appellants Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH (collectively, "Salzgitter") was served upon all parties by operation of the Court's electronic filing system.

Date: August 1, 2025

/s/ David E. Bond
David E. Bond
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600